**No. 24-1910**

# In the United States Court of Appeals for the Third Circuit

IN RE NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION

BYRON CUTHBERT & ASSOCIATES LLC,

Appellants.

v.

NATIONAL FOOTBALL LEAGUE AND NFL PROPERTIES LLC,

Appellees.

On Appeal from the United States District Court for the Eastern District of Pennsylvania (E.D. Pa. No. 2:12-md-02323) (The Honorable Anita B. Brody, J.)

# SUPPLEMENTAL APPENDIX NATIONAL FOOTBALL LEAGUE AND NFL PROPERTIES LLC

Brad S. Karp
Bruce Birenboim
Lynn B. Bayard

PAUL, WEISS, RIFKIND,
   WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
Phone: 212-373-3000
Fax: 212-757-3990

*Attorneys for Appellees*
*National Football League and NFL Properties LLC*

# TABLE OF CONTENTS

June 25, 2014 Class Action Settlement Agreement (Dkt. 6481-1) .......... SA 1

February 15, 2023 Claims Administrator's Rule 15 Audit Report: Byron Cuthbert & Associates, LLC .......... SA 111

May 3, 2023 Attorney Byron Cuthbert – Response to Audit Report .......... SA 339

Special Masters' Rule 27 Decision on the Report of Adverse Finding Regarding Byron Cuthbert and Associates, LLC .......... SA 349

Objection Statement to Rule 27 Decision .......... SA 356

Response of the National Football League and NFL Properties LLC in Opposition to Byron Cuthbert & Associates, LLC's Objection to the Special Masters' Rule 27 Decision .......... SA 367

Supplemental Objection Statement to Audit Rule 27 Decision .......... SA 379

Response of the National Football League and NFL Properties LLC in Opposition to Byron Cuthbert & Associates, LLC's Supplemental Objection to the Special Masters' Rule 27 Decision .......... SA 390

March 4, 2024 Cuthbert Motion for Reconsideration (Dkt. 12379) .......... SA 399

July 17, 2024 Claims Administrator Status Report No. 23 (Dkt. 12419) .......... SA 413

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323 |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated,*<br>Plaintiffs,<br><br>v.<br><br>National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.,<br>Defendants. | CIVIL ACTION NO: 14-cv-0029 |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**<u>CLASS ACTION SETTLEMENT AGREEMENT</u>**

**(AS AMENDED)**

Dated: June 25, 2014

Amended: February 13, 2015

# TABLE OF CONTENTS

| | | Page |
|---|---|---|
| ARTICLE I | Definitions of Settlement Class and Subclasses | 4 |
| ARTICLE II | Definitions | 4 |
| ARTICLE III | Settlement Benefits for Class Members | 17 |
| ARTICLE IV | Information and Registration Process | 17 |
| ARTICLE V | Baseline Assessment Program | 20 |
| ARTICLE VI | Monetary Awards for Qualifying Diagnoses | 31 |
| ARTICLE VII | Derivative Claimant Awards | 38 |
| ARTICLE VIII | Submission and Review of Claim Packages and Derivative Claim Packages | 39 |
| ARTICLE IX | Notice of Claim Determinations, Payments, and Appeals | 43 |
| ARTICLE X | Class Action Settlement Administration | 50 |
| ARTICLE XI | Identification and Satisfaction of Liens | 59 |
| ARTICLE XII | Education Fund | 64 |
| ARTICLE XIII | Preliminary Approval and Class Certification | 64 |
| ARTICLE XIV | Notice, Opt Out, and Objections | 66 |
| ARTICLE XV | Communications to the Public | 69 |
| ARTICLE XVI | Termination | 69 |
| ARTICLE XVII | Treatment of Confidential Information | 71 |
| ARTICLE XVIII | Releases and Covenant Not to Sue | 72 |
| ARTICLE XIX | Bar Order | 76 |
| ARTICLE XX | Final Order and Judgment and Dismissal With Prejudice | 76 |
| ARTICLE XXI | Attorneys' Fees | 77 |
| ARTICLE XXII | Enforceability of Settlement Agreement and Dismissal of Claims | 78 |

ARTICLE XXIII NFL Payment Obligations ........ 79

ARTICLE XXIV Denial of Wrongdoing, No Admission of Liability ........ 86

ARTICLE XXV Representations and Warranties ........ 87

ARTICLE XXVI Cooperation ........ 90

ARTICLE XXVII Continuing Jurisdiction ........ 91

ARTICLE XXVIII Role of Co-Lead Class Counsel, Class Counsel and Subclass Counsel ........ 91

ARTICLE XXIX Bargained-For Benefits ........ 92

ARTICLE XXX Miscellaneous Provisions ........ 92

**IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION, MDL 2323, CLASS ACTION SETTLEMENT AGREEMENT AS OF JUNE 25, 2014**
**(as amended as of February 13, 2015)**
**(subject to Court approval)**

## PREAMBLE

This SETTLEMENT AGREEMENT, dated as of June 25, 2014 (the "Settlement Date"), as amended as of February 13, 2015, is made and entered into by and among defendants the National Football League ("NFL") and NFL Properties LLC ("NFL Properties") (collectively, "NFL Parties"), by and through their attorneys, and the Class Representatives and Subclass Representatives, individually and on behalf of the Settlement Class and Subclasses, by and through Class Counsel. This Settlement Agreement is intended by the Parties fully, finally, and forever to resolve, discharge, and settle all Released Claims against the Released Parties, as set forth below, subject to review and approval by the Court.[1]

## RECITALS

A. On January 31, 2012, a federal multidistrict litigation was established in the United States District Court for the Eastern District of Pennsylvania, In re: National Football League Players' Concussion Injury Litigation, MDL No. 2323. Plaintiffs in MDL No. 2323 filed a Master Administrative Long-Form Complaint and a Master Administrative Class Action Complaint for Medical Monitoring on June 7, 2012. Plaintiffs filed an Amended Master Administrative Long-Form Complaint on July 17, 2012. Additional similar lawsuits are pending in various state and federal courts.

B. The lawsuits arise from the alleged effects of mild traumatic brain injury allegedly caused by the concussive and sub-concussive impacts experienced by former NFL Football players. Plaintiffs seek to hold the NFL Parties responsible for their alleged injuries under various theories of liability, including that the NFL Parties allegedly breached a duty to NFL Football players to warn and protect them from the long-term health problems associated with concussions and that the NFL Parties allegedly concealed and misrepresented the connection between concussions and long-term chronic brain injury.

C. On August 30, 2012, the NFL Parties filed motions to dismiss the Master Administrative Class Action Complaint for Medical Monitoring and the Amended Master Administrative Long-Form Complaint on preemption grounds. Plaintiffs filed their oppositions to the motions on October 31, 2012, the NFL Parties filed reply memoranda of law on December 17, 2012, and plaintiffs filed sur-reply memoranda of law on January 28, 2013. Oral argument on the NFL Parties' motions to dismiss on preemption grounds was held on April 9, 2013.

---

[1] Capitalized terms have the meanings provided in ARTICLE II, unless a section or subsection of this Settlement Agreement provides otherwise.

D.      On July 8, 2013, prior to ruling on the motions to dismiss, the Court ordered the plaintiffs and NFL Parties to engage in mediation to determine if consensual resolution was possible and appointed retired United States District Court Judge Layn Phillips of Irell & Manella LLP as mediator.

E.      Over the course of the following two months, the Parties, by and through their respective counsel, engaged in settlement negotiations under the direction of Judge Phillips.  On August 29, 2013, the Parties signed a settlement term sheet setting forth the material terms of a settlement agreement.  On the same day, the Court issued an order deferring a ruling on the NFL Parties' motions to dismiss and ordering the Parties to submit, as soon as possible, the full documentation relating to the settlement, along with a motion seeking preliminary approval of the settlement and notice plan.  On December 16, 2013, the Court appointed a special master, Perry Golkin ("Special Master Golkin"), to assist the Court in evaluating the financial aspects of the proposed settlement.

F.      On January 6, 2014, Class Counsel moved the Court for an order, among other things, granting preliminary approval of the proposed settlement and conditionally certifying a settlement class and subclasses.  On January 14, 2014, the Court denied that motion without prejudice.

G.      In conjunction with the January 2014 filing of the proposed settlement agreement, and this Settlement Agreement, the Class and Subclass Representatives filed Plaintiffs' Class Action Complaint ("Class Action Complaint") on January 6, 2014.  In the Class Action Complaint, the Class and Subclass Representatives allege claims for equitable, injunctive and declaratory relief pursuant to Federal Rules of Civil Procedure 23(a)(1-4) & (b)(2), or, alternatively, for compensatory damages pursuant to Federal Rule of Civil Procedure 23(b)(3), for negligence, negligent hiring, negligent retention, negligent misrepresentation, fraud, fraudulent concealment, medical monitoring, wrongful death and survival, and loss of consortium, all under state law.

H.      The NFL Parties deny the Class and Subclass Representatives' allegations, and the allegations in Related Lawsuits, and deny any liability to the Class and Subclass Representatives, the Settlement Class, or any Settlement Class Member for any claims, causes of action, costs, expenses, attorneys' fees, or damages of any kind, and would assert a number of substantial legal and factual defenses against plaintiffs' claims if they were litigated to conclusion.

I.      The Class and Subclass Representatives, through their counsel, have engaged in substantial fact gathering to evaluate the merits of their claims and the NFL Parties' defenses.  In addition, the Class and Subclass Representatives have analyzed the legal issues raised by their claims and the NFL Parties' defenses, including, without limitation, the NFL Parties' motions to dismiss the Amended Master Administrative Long-Form Complaint and Master Administrative Class Action Complaint on preemption grounds.

J.  After careful consideration, the Class and Subclass Representatives, and their respective Counsel, have concluded that it is in the best interests of the Class and Subclass Representatives and the Settlement Class and Subclasses to compromise and settle all Released Claims against the Released Parties for consideration reflected in the terms and benefits of this Settlement Agreement.  After arm's length negotiations with Counsel for the NFL Parties, including through the efforts of the court-appointed mediator and Special Master Golkin, the Class and Subclass Representatives have considered, among other things:  (1) the complexity, expense, and likely duration of the litigation; (2) the stage of the litigation and amount of fact gathering completed; (3) the potential for the NFL Parties to prevail on threshold issues and on the merits; and (4) the range of possible recovery, and have determined that this Settlement Agreement is fair, reasonable, adequate, and in the best interests of the Class and Subclass Representatives and the Settlement Class and Subclasses.

K.  The NFL Parties have concluded, in light of the costs, risks, and burden of litigation, that this Settlement Agreement in this complex putative class action litigation is appropriate.  The NFL Parties and Counsel for the NFL Parties agree with the Class and Subclass Representatives and their respective counsel that this Settlement Agreement is a fair, reasonable, and adequate resolution of the Released Claims.  The NFL Parties reached this conclusion after considering the factual and legal issues relating to the litigation, the substantial benefits of this Settlement Agreement, the expense that would be necessary to defend claims by Settlement Class Members through trial and any appeals that might be taken, the benefits of disposing of protracted and complex litigation, and the desire of the NFL Parties to conduct their business unhampered by the costs, distraction and risks of continued litigation over Released Claims.

L.  The Parties desire to settle, compromise, and resolve fully all Released Claims.

M.  The Parties desire and intend to seek Court review and approval of the Settlement Agreement, and, upon preliminary approval by the Court, the Parties intend to seek a Final Order and Judgment from the Court dismissing with prejudice the Class Action Complaint and ordering the dismissal with prejudice of Related Lawsuits.

N.  This Settlement Agreement will not be construed as evidence of, or as an admission by, the NFL Parties of any liability or wrongdoing whatsoever or as an admission by the Class or Subclass Representatives, or Settlement Class Members, of any lack of merit in their claims.

NOW, THEREFORE, it is agreed that the foregoing recitals are hereby expressly incorporated into this Settlement Agreement and made a part hereof and further, that in consideration of the agreements, promises, and covenants set forth in this Settlement Agreement, including the Releases and Covenant Not to Sue in ARTICLE XVIII, the entry by the Court of the Final Order and Judgment dismissing the Class Action Complaint with prejudice and approving the terms and conditions of the Settlement Agreement, and for other good and valuable consideration, the receipt and

sufficiency of which are hereby acknowledged, this action shall be settled and compromised under the following terms and conditions:

**ARTICLE I**
**Definitions of Settlement Class and Subclasses**

Section 1.1 Definition of Settlement Class

(a) "Settlement Class" means all Retired NFL Football Players, Representative Claimants and Derivative Claimants.

(b) Excluded from the Settlement Class are any Retired NFL Football Players, Representative Claimants or Derivative Claimants who timely and properly exercise the right to be excluded from the Settlement Class ("Opt Outs").

Section 1.2 Definition of Subclasses

(a) "Subclass 1" means Retired NFL Football Players who were not diagnosed with a Qualifying Diagnosis prior to the date of the Preliminary Approval and Class Certification Order and their Representative Claimants and Derivative Claimants.

(b) "Subclass 2" means Retired NFL Football Players who were diagnosed with a Qualifying Diagnosis prior to the date of the Preliminary Approval and Class Certification Order and their Representative Claimants and Derivative Claimants, and the Representative Claimants of deceased Retired NFL Football Players who were diagnosed with a Qualifying Diagnosis prior to death or who died prior to the date of the Preliminary Approval and Class Certification Order and who received a post-mortem diagnosis of CTE.

**ARTICLE II**
**Definitions**

Section 2.1 Definitions

For the purposes of this Settlement Agreement, the following terms (designated by initial capitalization throughout this Agreement) will have the meanings set forth in this Section.

Unless the context requires otherwise, (i) words expressed in the masculine will include the feminine and neuter gender and vice versa; (ii) the word "will" shall be construed to have the same meaning and effect as the word "shall"; (iii) the word "or" will not be exclusive; (iv) the word "extent" in the phrase "to the extent" will mean the degree to which a subject or other thing extends, and such phrase will not simply mean "if"; (v) references to "day" or "days" in the lower case are to calendar days, but if the last day is a Saturday, Sunday, or legal holiday (as defined in Fed. R. Civ. P. 6(a)(6)), the period will continue to run until the end of the next day that is not a Saturday, Sunday, or legal holiday; (vi) references to this Settlement Agreement will include all

exhibits, schedules, and annexes hereto; (vii) references to any law will include all rules and regulations promulgated thereunder; (viii) the terms "include," "includes," and "including" will be deemed to be followed by "without limitation," whether or not they are in fact followed by such words or words of similar import; and (ix) references to dollars or "$" are to United States dollars.

(a)    "Active List" means the list of all players physically present, eligible and under contract to play for a Member Club on a particular game day within any applicable roster or squad limits set forth in the applicable NFL or American Football League Constitution and Bylaws.

(b)    "Affiliate" means, with respect to any person or entity, any other person or entity that, directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, such person or entity, where "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies, whether through the ownership of voting shares, by contract, or otherwise.

(c)    "ALS" means amyotrophic lateral sclerosis, also known as Lou Gehrig's Disease, as defined in Exhibit 1.

(d)    "Alzheimer's Disease" is defined in Exhibit 1.

(e)    "American Football League" means the former professional football league that merged with the NFL.

(f)    "Appeals Form" means that document that Settlement Class Members, the NFL Parties or Co-Lead Class Counsel, as the case may be, will submit when appealing Monetary Award or Derivative Claimant Award determinations by the Claims Administrator, as set forth in Section 9.7.

(g)    "Appeals Advisory Panel" means a panel of physicians, composed of, in any combination, five (5) board-certified neurologists, board-certified neurosurgeons, and/or other board-certified neuro-specialist physicians agreed to and jointly recommended by Co-Lead Class Counsel and Counsel for the NFL Parties, and appointed by the Court, any one of whom is eligible to advise the Court or the Special Master with respect to medical aspects of the Class Action Settlement and to perform the other duties of the Appeals Advisory Panel set forth in this Settlement Agreement.

(h)    "Appeals Advisory Panel Consultants" means three (3) neuropsychologists certified by the American Board of Professional Psychology (ABPP) or the American Board of Clinical Neuropsychology (ABCN), a member board of the American Board of Professional Psychology, in the specialty of Clinical Neuropsychology, agreed to and jointly recommended by Co-Lead Class Counsel and Counsel for the NFL Parties, and appointed by the Court, any one of whom is eligible to advise a member of the Appeals Advisory Panel, the Court, or the Special Master on the neuropsychological testing referenced in Exhibits 1 and 2 to the Settlement Agreement, as pertaining to the Qualifying Diagnoses of Level 1.5 Neurocognitive Impairment and

Case 2:12-md-02323-AB Document 6481-1 Filed 02/13/15 Page 10 of 162

Level 2 Neurocognitive Impairment, and Level 1 Neurocognitive Impairment if subject to review as set forth in Section 5.13. Appeals Advisory Panel Consultants do not meet the definition of Appeals Advisory Panel members and shall not serve as members of the Appeals Advisory Panel.

(i) "Baseline Assessment Program" ("BAP") means the program described in ARTICLE V.

(j) "Baseline Assessment Program Supplemental Benefits" or "BAP Supplemental Benefits" means medical treatment, including, as needed, counseling and pharmaceutical coverage, for Level 1 Neurocognitive Impairment (as set forth in Exhibit 1) within a network of Qualified BAP Providers and Qualified BAP Pharmacy Vendor(s), respectively, established by the BAP Administrator, as set forth in Section 5.11.

(k) "Baseline Assessment Program Fund Administrator" or "BAP Administrator" means that person(s) or entity, agreed to and jointly recommended by Co-Lead Class Counsel and Counsel for the NFL Parties, and appointed by the Court, to perform the responsibilities assigned to the BAP Administrator under this Settlement Agreement, including, without limitation, as set forth in ARTICLE V.

(l) "Baseline Assessment Program Fund" or "BAP Fund" means the fund to pay BAP costs and expenses, as set forth in ARTICLE V.

(m) "Claim Form" means that document to be submitted to the Claims Administrator by a Settlement Class Member who is a Retired NFL Football Player or Representative Claimant claiming a Monetary Award, as set forth in ARTICLE VIII.

(n) "Claim Package" means the Claim Form and other documentation, as set forth in Section 8.2(a).

(o) "Claims Administrator" means that person(s) or entity, agreed to and jointly recommended by Co-Lead Class Counsel and Counsel for the NFL Parties, and appointed by the Court, to perform the responsibilities assigned to the Claims Administrator under this Settlement Agreement, including, without limitation, as set forth in Section 10.2.

(p) "Class Action Complaint" means the complaint captioned Plaintiffs' Class Action Complaint filed on consent in the Court on January 6, 2014.

(q) "Class Action Settlement" means that settlement set forth in this Settlement Agreement.

(r) "Class Counsel" means, pending Court appointment, the counsel who are so designated and who are signatories to this Settlement Agreement, namely, Co-Lead Class Counsel, Christopher A. Seeger and Sol Weiss, Subclass Counsel, Arnold Levin and Dianne M. Nast, and Steven C. Marks of Podhurst Orseck,

Case 2:12-md-02323-AB Document 6481-1 Filed 02/13/15 Page 11 of 162

P.A. and Gene Locks of Locks Law Firm, and, upon appointment, such other counsel as the Court may appoint to represent the Settlement Class.

(s) "Class Representatives" means Shawn Wooden and Kevin Turner, or such other or different persons as may be appointed by the Court as the representatives of the Settlement Class.

(t) "CMS" means the Centers for Medicare & Medicaid Services, the agency within the United States Department of Health and Human Services responsible for administration of the Medicare Program and the Medicaid Program.

(u) "Co-Lead Class Counsel" means, pending Court appointment, the counsel who are so designated and who are signatories to this Settlement Agreement, namely, Christopher A. Seeger of Seeger Weiss LLP and Sol Weiss of Anapol Schwartz, and, upon appointment, such other counsel as the Court may appoint to represent the Settlement Class in a lead role.

(v) "Collective Bargaining Agreement" means the August 4, 2011 Collective Bargaining Agreement between the NFL Management Council and the NFL Players Association, individually and together with all previous and future NFL Football collective bargaining agreements governing NFL Football players.

(w) "Counsel for the NFL Parties" means Paul, Weiss, Rifkind, Wharton & Garrison LLP, or any law firm or attorney so designated in writing by the NFL Parties.

(x) "Court" means the United States District Court for the Eastern District of Pennsylvania, Judge Anita Brody (or any successor judge designated by the United States District Court for the Eastern District of Pennsylvania, or a magistrate judge designated by Judge Brody or such designated successor judge, as set forth in and pursuant to Federal Rule of Civil Procedure 72), presiding in In re: National Football League Players' Concussion Injury Litigation, MDL No. 2323. For the period of time from the Effective Date up to and including the fifth year of the Class Action Settlement, the Parties agree, in accordance with the provisions of 28 U.S.C. § 636(c), to waive their right to proceed before a judge of the United States District Court in connection with issues relating to the administration of this Settlement Agreement where the Court is required or requested to act, and consent to have a United States Magistrate Judge conduct such proceedings.

(y) "Covenant Not to Sue" means the covenant not to sue set forth in Section 18.4.

(z) "CTE" means Chronic Traumatic Encephalopathy.

(aa) "Death with CTE" is defined in Exhibit 1.

Case 2:12-md-02323-AB Document 6481-1 Filed 02/13/15 Page 12 of 162

(bb) "Deficiency" means any failure of a Settlement Class Member to provide required information or documentation to the Claims Administrator, as set forth in Section 8.5.

(cc) "Derivative Claim Form" means that document to be submitted to the Claims Administrator by a Settlement Class Member who is a Derivative Claimant claiming a Derivative Claimant Award, as set forth in ARTICLE VIII.

(dd) "Derivative Claim Package" means the Derivative Claim Form and other documentation, as set forth in Section 8.2(b).

(ee) "Derivative Claimants" means spouses, parents, children who are dependents, or any other persons who properly under applicable state law assert the right to sue independently or derivatively by reason of their relationship with a Retired NFL Football Player or deceased Retired NFL Football Player.

(ff) "Derivative Claimant Award" means the payment of money from the Monetary Award of the subject Retired NFL Football Player to a Settlement Class Member who is a Derivative Claimant, as set forth in ARTICLE VII.

(gg) "Diagnosing Physician Certification" means that document which a Settlement Class Member who is a Retired NFL Football Player or Representative Claimant must submit either as part of a Claim Package in order to receive a Monetary Award, as set forth in Section 8.2(a), or to receive BAP Supplemental Benefits, as set forth in Section 5.11, the contents of which shall be agreed to by Co-Lead Class Counsel and Counsel for the NFL Parties and that shall include, without limitation: (i) a certification under penalty of perjury by the diagnosing physician that the information provided is true and correct, (ii) the Qualifying Diagnosis being made consistent with the criteria in Exhibit 1 (Injury Definitions) and the date of diagnosis, and (iii) the qualifications of the diagnosing physician, including, without limitation, whether the diagnosing physician is a Qualified MAF Physician.

(hh) "Education Fund" means a fund to support education programs promoting safety and injury prevention with respect to football players, including safety-related initiatives in youth football, the education of Retired NFL Football Players regarding the NFL CBA Medical and Disability Benefits programs, and other educational initiatives benefitting Retired NFL Football Players, as set forth in ARTICLE XII.

(ii) "Education Fund Amount" means the amount of Ten Million United States dollars (U.S. $10,000,000), as set forth in Section 23.1(c).

(jj) "Effective Date" means (i) the day following the expiration of the deadline for appealing the entry by the Court of the Final Order and Judgment approving the Settlement Agreement and certifying the Settlement Class (or for appealing any ruling on a timely motion for reconsideration of such Final Order, whichever is later), if no such appeal is filed; or (ii) if an appeal of the Final Order and Judgment is filed, the date upon which all appellate courts with jurisdiction (including the United States

Supreme Court by petition for certiorari) affirm such Final Order and Judgment, or deny any such appeal or petition for certiorari, such that no future appeal is possible.

(kk) "Eligible Season" means a season in which a Retired NFL Football Player or deceased Retired NFL Football Player was: (i) on a Member Club's Active List on the date of three (3) or more regular season or postseason games; or (ii) on a Member Club's Active List on the date of one (1) or more regular or postseason games, and then spent at least two (2) regular or postseason games on a Member Club's injured reserve list or inactive list due to a concussion or head injury. A "half of an Eligible Season" means a season in which a Retired NFL Football Player or deceased Retired NFL Football Player was: (i) on a Member Club's practice, developmental, or taxi squad roster for at least eight (8) regular or postseason games; or (ii) on a World League of American Football, NFL Europe League, or NFL Europa League team's active roster on the date of three (3) or more regular season or postseason games or on the active roster on the date of one (1) or more regular or postseason games, and then spent at least two (2) regular or postseason games on the World League of American Football, NFL Europe League, or NFL Europa League injured reserve list or team inactive list due to a concussion or head injury.

(ll) "Fairness Hearing" means the hearing scheduled by the Court to consider the fairness, reasonableness, and adequacy of this Settlement Agreement under Rule 23(e)(2) of the Federal Rules of Civil Procedure, and to determine whether a Final Order and Judgment should be entered.

(mm) "Final Approval Date" means the date on which the Court enters the Final Order and Judgment.

(nn) "Final Order and Judgment" means the final judgment and order entered by the Court, substantially in the form of Exhibit 4, and as set forth in ARTICLE XX.

(oo) "Funds" means the Settlement Trust Account, the BAP Fund, the Monetary Award Fund, and the Education Fund.

(pp) "Governmental Payor" means any federal, state, or other governmental body, agency, department, plan, program, or entity that administers, funds, pays, contracts for, or provides medical items, services, and/or prescription drugs, including, but not limited to, the Medicare Program, the Medicaid Program, Tricare, the Department of Veterans Affairs, and the Department of Indian Health Services.

(qq) "HIPAA" means the administrative simplification provisions of the Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, 110 Stat. 1936 (1996) (codified as amended in scattered sections of 42 U.S.C.) and the implementing regulations issued by the United States Department of Health and Human Services thereunder, and incorporates by reference the provisions of the Health Information Technology for Economic and Clinical Health Act (Title XIII of

Case 2:12-md-02323-AB Document 6481-1 Filed 02/13/15 Page 14 of 162

Division A and Title IV of Division B of the American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5 (2009)) pertaining to Protected Health Information.

(rr) "Level 1 Neurocognitive Impairment" is defined in Exhibit 1.

(ss) "Level 1.5 Neurocognitive Impairment" is defined in Exhibit 1.

(tt) "Level 2 Neurocognitive Impairment" is defined in Exhibit 1.

(uu) "Lien" means any statutory lien of a Government Payor or Medicare Part C or Part D Program sponsor; or any mortgage, lien, pledge, charge, security interest, or legal encumbrance, of any nature whatsoever, held by any person or entity, where there is a legal obligation to withhold payment of a Monetary Award, Supplemental Monetary Award, Derivative Claimant Award, or some portion thereof, to a Settlement Class Member under applicable federal or state law.

(vv) "Lien Resolution Administrator" means that person(s) or entity, agreed to and jointly recommended by Co-Lead Class Counsel and Counsel for the NFL Parties, and appointed by the Court, to perform the responsibilities assigned to the Lien Resolution Administrator under this Settlement Agreement, including, without limitation, as set forth in ARTICLE XI.

(ww) "Medicaid Program" means the federal program administered by the states under which certain medical items, services, and/or prescription drugs are furnished to Medicaid beneficiaries under Title XIX of the Social Security Act, 42 U.S.C. § 1396–1, *et seq*.

(xx) "Medicare Part C or Part D Program" means the program(s) under which Medicare Advantage, Medicare cost, and Medicare health care prepayment plan benefits and Medicare Part D prescription drug plan benefits are administered by private entities that contract with CMS.

(yy) "Medicare Program" means the Medicare Parts A and B federal program administered by CMS under which certain medical items, services, and/or prescription drugs are furnished to Medicare beneficiaries under Title XVIII of the Social Security Act, 42 U.S.C. § 1395, *et seq*.

(zz) "Member Club" means any past or present member club of the NFL or any past member club of the American Football League.

(aaa) "Monetary Award" means the payment of money from the Monetary Award Fund to a Settlement Class Member, other than a Derivative Claimant, as set forth in ARTICLE VI. The term "Monetary Award" shall also include "Supplemental Monetary Award" with respect to the claims process set forth in this

Case 2:12-md-02323-AB Document 6481-1 Filed 02/13/15 Page 15 of 162

Settlement Agreement, including, without limitation, relating to submission and approval of claims, calculation and distribution of awards, and appeals.

(bbb) "Monetary Award Fund" or "MAF" means the sixty-five (65) year fund, as set forth in Section 6.10.

(ccc) "Monetary Award Grid" means that document attached as Exhibit 3.

(ddd) "MSP Laws" means the Medicare Secondary Payer Act set forth at 42 U.S.C. § 1395y(b), as amended from time to time, and implementing regulations, and other applicable written CMS guidance.

(eee) "NFL CBA Medical and Disability Benefits" means any disability or medical benefits available under the Collective Bargaining Agreement, including the benefits available under the Bert Bell/Pete Rozelle NFL Player Retirement Plan; NFL Player Supplemental Disability Plan, including the Neuro-Cognitive Disability Benefit provided for under Article 65 of the Collective Bargaining Agreement; the 88 Plan; Gene Upshaw NFL Player Health Reimbursement Account Plan; Former Player Life Improvement Plan; NFL Player Insurance Plan; and/or the Long Term Care Insurance Plan.

(fff) "NFL Football" means the sport of professional football as played in the NFL, the American Football League, the World League of American Football, the NFL Europe League, and the NFL Europa League. NFL Football excludes football played by all other past, present or future professional football leagues, including, without limitation, the All-American Football Conference.

(ggg) "NFL Medical Committees" means the various past and present medical committees, subcommittees and panels that operated or operate at the request and/or direction of the NFL, whether independent or not, including, without limitation, the Injury and Safety Panel, Mild Traumatic Brain Injury Committee, Head Neck and Spine Medical Committee, Foot and Ankle Subcommittee, Cardiovascular Health Subcommittee, and Medical Grants Subcommittee, and all persons, whether employees, agents or independent of the NFL, who at any time were members of or participated on each such panel, committee, or subcommittee.

(hhh) "Notice of Challenge Determination" means the written notice set forth in Section 4.3(a)(ii)-(iv).

(iii) "Notice of Deficiency" means that document that the Claims Administrator sends to any Settlement Class Member whose Claim Package or Derivative Claim Package contains a Deficiency, as set forth in Section 8.5.

(jjj) "Notice of Derivative Claimant Award Determination" means the written notice set forth in Section 9.2(a)-(b).

Case 2:12-md-02323-AB Document 6481-1 Filed 02/13/15 Page 16 of 162

(kkk) "Notice of Monetary Award Claim Determination" means the written notice set forth in Section 9.1(b)-(c).

(lll) "Notice of Registration Determination" means the written notice set forth in Section 4.3.

(mmm)"Offsets" means downward adjustments to Monetary Awards, as set forth in Section 6.7(b).

(nnn) "Opt Out," when used as a verb, means the process by which any Retired NFL Football Player, Representative Claimant or Derivative Claimant otherwise included in the Settlement Class exercises the right to exclude himself or herself from the Settlement Class in accordance with Fed. R. Civ. P. 23(c)(2).

(ooo) "Opt Outs," when used as a noun, means those Retired NFL Football Players, Representative Claimants and Derivative Claimants who would otherwise have been included in the Settlement Class and who have timely and properly exercised their rights to Opt Out and therefore, after the Final Approval Date, are not Settlement Class Members.

(ppp) "Other Party" means every person, entity, or party other than the Released Parties.

(qqq) "Parkinson's Disease" is defined in Exhibit 1.

(rrr) "Parties" means the Class Representatives and Subclass Representatives, individually and on behalf of the Settlement Class and Subclasses, and the NFL Parties.

(sss) "Personal Signature" means the actual signature by the person whose signature is required on the document. Unless otherwise specified in this Settlement Agreement, a document requiring a Personal Signature may be submitted by an actual original "wet ink" signature on hard copy, or a PDF or other electronic image of an actual signature, but cannot be submitted by an electronic signature within the meaning of the Electronic Records and Signatures in Commerce Act, 15 U.S.C. §§7001, *et seq.*, the Uniform Electronic Transactions Act, or their successor acts.

(ttt) "Preliminary Approval and Class Certification Order" means the order, upon entry by the Court, preliminarily approving the Class Action Settlement and conditionally certifying the Settlement Class and Subclasses.

(uuu) "Protected Health Information" means individually identifiable health information, as defined in 45 C.F.R. § 160.103.

(vvv) "Qualified BAP Providers" means neuropsychologists certified by the American Board of Professional Psychology (ABPP) or the American Board of Clinical Neuropsychology (ABCN), a member board of the American Board of Professional Psychology, in the specialty of Clinical Neuropsychology, and board-

certified neurologists, eligible to conduct baseline assessments of Retired NFL Football Players under the BAP, as set forth in Section 5.7(a).

(www) "Qualified MAF Physician" means a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician, who is part of an approved list of physicians authorized to make Qualifying Diagnoses, as set forth in Section 6.5.

(xxx) "Qualified Pharmacy Vendor(s)" means one or more nationwide mail order pharmacies contracted to provide approved pharmaceutical prescriptions as part of the BAP Supplemental Benefits, as set forth in Section 5.7(b).

(yyy) "Qualifying Diagnosis" or "Qualifying Diagnoses" means Level 1.5 Neurocognitive Impairment, Level 2 Neurocognitive Impairment, Alzheimer's Disease, Parkinson's Disease, ALS, and/or Death with CTE, as set forth in Exhibit 1 (Injury Definitions).

(zzz) "Related Lawsuits" means all past, present and future actions brought by one or more Releasors against one or more Released Parties pending in the Court, other than the Class Action Complaint, or in any other federal court, state court, arbitration, regulatory agency, or other tribunal or forum that arise out of, are based upon or are related to the allegations, transactions, facts, matters, occurrences, representations or omissions involved, set forth, alleged, or referred to in the Class Action Complaint, except that Settlement Class Members' claims for workers' compensation and claims alleging entitlement to NFL CBA Medical and Disability Benefits are not Related Lawsuits.

(aaaa) "Released Claims" means those claims released as set forth in Section 18.1 and Section 18.2.

(bbbb) "Released Parties" for purposes of the Released Claims means (i) the NFL Parties (including all persons, entities, subsidiaries, divisions, and business units composed thereby), together with (ii) each of the Member Clubs, (iii) each of the NFL Parties' and Member Clubs' respective past, present, and future agents, directors, officers, employees, independent contractors, general or limited partners, members, joint venturers, shareholders, attorneys, trustees, insurers (solely in their capacities as liability insurers of those persons or entities referred to in subparagraphs (i) and (ii) above and/or arising out of their relationship as liability insurers to such persons or entities), predecessors, successors, indemnitees, and assigns, and their past, present, and future spouses, heirs, beneficiaries, estates, executors, administrators, and personal representatives, including, without limitation, all past and present physicians who have been employed or retained by any Member Club and members of all past and present NFL Medical Committees; and (iv) any natural, legal, or juridical person or entity acting on behalf of or having liability in respect of the NFL Parties or the Member Clubs, in their respective capacities as such; and, as to (i)-(ii) above, each of their respective Affiliates, including their Affiliates' officers, directors, shareholders, employees, and agents. For the avoidance of any doubt, Riddell is not a Released Party.

(cccc) "Releases" means the releases set forth in ARTICLE XVIII.

(dddd) "Releasors" means the releasors set forth in Section 18.1.

(eeee) "Representative Claimants" means authorized representatives, ordered by a court or other official of competent jurisdiction under applicable state law, of deceased or legally incapacitated or incompetent Retired NFL Football Players.

(ffff) "Retired NFL Football Players" means all living NFL Football players who, prior to the date of the Preliminary Approval and Class Certification Order, retired, formally or informally, from playing professional football with the NFL or any Member Club, including American Football League, World League of American Football, NFL Europe League and NFL Europa League players, or were formerly on any roster, including preseason, regular season, or postseason, of any such Member Club or league and who no longer are under contract to a Member Club and are not seeking active employment as players with any Member Club, whether signed to a roster or signed to any practice squad, developmental squad, or taxi squad of a Member Club.

(gggg) "Riddell" means Riddell, Inc.; All American Sports Corporation; Riddell Sports Group, Inc.; Easton-Bell Sports, Inc.; Easton-Bell Sports, LLC; EB Sports Corp.; and RBG Holdings Corp., and each of their respective past, present, and future Affiliates, directors, officers, employees, general or limited partners, members, joint venturers, shareholders, agents, trustees, insurers (solely in their capacities as such), reinsurers (solely in their capacities as such), predecessors, successors, indemnitees, and assigns.

(hhhh) "Settlement Agreement" means this Settlement Agreement and all accompanying exhibits, including any subsequent amendments thereto and any exhibits to such amendments.

(iiii) "Settlement Class and Subclasses" is defined in Section 1.1 and Section 1.2.

(jjjj) "Settlement Class Member" means each Retired NFL Football Player, Representative Claimant and/or Derivative Claimant in the Settlement Class; provided, however, that the term Settlement Class Member as used herein with respect to any right or obligation after the Final Approval Date does not include any Opt Outs.

(kkkk) "Settlement Class Notice" means that notice, in the form of Exhibit 5, and as set forth in Section 14.1, as agreed to by Co-Lead Class Counsel and Counsel for the NFL Parties, and approved by the Court.

Case 2:12-md-02323-AB Document 6481-1 Filed 02/13/15 Page 19 of 162

(llll) "Settlement Class Notice Agent" means that person or entity who will implement the Settlement Class Notice Plan and who will be responsible for the publication and provision of the Settlement Class Notice and Settlement Class Supplemental Notice.

(mmmm) "Settlement Class Notice Payment" means Four Million United States dollars (U.S. $4,000,000), as set forth in Sections 23.1(d) and 23.3(e), for the costs of Settlement Class Notice, any supplemental notice required, including, without limitation, the Settlement Class Supplemental Notice, and compensation of the Settlement Class Notice Agent and the Claims Administrator to the extent the Claims Administrator performs notice-related duties that have been agreed to by the NFL Parties.

(nnnn) "Settlement Class Notice Plan" means that document which sets forth the methods, timetable, and responsibilities for providing Settlement Class Notice to Settlement Class Members, as set forth in Section 14.1.

(oooo) "Settlement Class Supplemental Notice" means that notice, as set forth in Section 14.1(d), as agreed to by Co-Lead Class Counsel and Counsel for the NFL Parties, and approved by the Court.

(pppp) "Settlement Date" means the date by which Class Counsel and Counsel for the NFL Parties have all signed the Settlement Agreement dated June 25, 2014 on behalf of the Class and Subclass Representatives, Settlement Class and Subclasses, and the NFL Parties, respectively.

(qqqq) "Settlement Trust" means the trust enacted pursuant to the Settlement Trust Agreement, as set forth in Section 23.5.

(rrrr) "Settlement Trust Account" means that account created under the Settlement Trust Agreement and held by the Trustee into which the NFL Parties will make payments pursuant to ARTICLE XXIII of this Settlement Agreement.

(ssss) "Settlement Trust Agreement" means the agreement that will establish the Settlement Trust and will be entered into by Co-Lead Class Counsel, the NFL Parties, and the Trustee, as set forth in Section 23.5(c).

(tttt) "Signature" means the actual signature by the person whose signature is required on the document, or on behalf of such person by a person authorized by a power of attorney or equivalent document to sign such documents on behalf of such person. Unless otherwise specified in this Settlement Agreement, a document requiring a Signature may be submitted by: (i) an actual original "wet ink" signature on hard copy; (ii) a PDF or other electronic image of an actual signature; or (iii) an electronic signature within the meaning of the Electronic Records and Signatures in Commerce Act, 15 U.S.C. §§7001, *et seq.*, the Uniform Electronic Transactions Act, or their successor acts.

Case 2:12-md-02323-AB Document 6481-1 Filed 02/13/15 Page 20 of 162

(uuuu) "Special Master" means that person appointed by the Court pursuant to Federal Rule of Civil Procedure 53 to oversee the administration of the Settlement Agreement, as set forth in Section 10.1.

(vvvv) "Stadium Program Bonds" means the NFL's G3 and G4 bonds.

(wwww) "Stroke" means stroke, as defined by the World Health Organization's International Classification of Diseases, 9th Edition (ICD-9) or the World Health Organization's International Classification of Diseases, 10th Edition (ICD-10), which occurs prior to or after the time the Retired NFL Football Player played NFL Football. A medically diagnosed Stroke does not include a transient cerebral ischaemic attack and related syndromes, as defined by ICD-10.

(xxxx) "Subclass Counsel" means, pending Court appointment, the counsel who are so designated and who are signatories to this Settlement Agreement, namely Arnold Levin of Levin, Fishbein, Sedran & Berman for Subclass 1, and Dianne M. Nast of NastLaw LLC for Subclass 2, and, upon appointment, such other counsel as the Court may appoint to represent the Settlement Subclasses 1 and 2.

(yyyy) "Subclass Representatives" means Shawn Wooden and Kevin Turner, or such other or different persons as may be designated by the Court as the representatives of the Settlement Subclasses 1 and 2.

(zzzz) "Supplemental Monetary Award" means the supplemental payment of monies from the Monetary Award Fund to a Settlement Class Member, as set forth in Section 6.8.

(aaaaa) "Traumatic Brain Injury" means severe traumatic brain injury unrelated to NFL Football play, that occurs during or after the time the Retired NFL Football Player played NFL Football, consistent with the definitions in the World Health Organization's International Classification of Diseases, 9th Edition (ICD-9), Codes 854.04, 854.05, 854.14 and 854.15, and the World Health Organization's International Classification of Diseases, 10th Edition (ICD-10), Codes S06.9x5 and S06.9x6.

(bbbbb) "Tricare" means the federal program managed and administered by the United States Department of Defense through the Tricare Management Activity under which certain medical items, services, and/or prescription drugs are furnished to eligible members of the military services, military retirees, and military dependents under 10 U.S.C. § 1071, *et seq*.

(ccccc) "Trustee" means that person or entity approved by the Court as trustee of the Settlement Trust Account and as administrator of the qualified settlement fund for purposes of Treasury Regulation §1.468B-2(k)(3), as set forth in ARTICLE XXIII.

Case 2:12-md-02323-AB Document 6481-1 Filed 02/13/15 Page 21 of 162

**ARTICLE III**
**Settlement Benefits for Class Members**

Section 3.1 The Class and Subclass Representatives, by and through Class Counsel and Subclass Counsel, and the NFL Parties, by and through Counsel for the NFL Parties, agree that, in consideration of the Releases and Covenant Not to Sue set forth in ARTICLE XVIII, and the dismissal with prejudice of the Class Action Complaint and the Related Lawsuits, and subject to the terms and conditions of this Settlement Agreement, the NFL Parties will, in addition to other obligations set forth in this Settlement Agreement:

(a) Pay all final Monetary Awards and Derivative Claimant Awards to those Settlement Class Members who qualify for such awards pursuant to the requirements and criteria set forth in this Settlement Agreement;

(b) Provide qualified Settlement Class Members who are Retired NFL Football Players with the option to participate in the BAP and receive a BAP baseline assessment examination and BAP Supplemental Benefits, if eligible, pursuant to the requirements and criteria set forth in this Settlement Agreement; and

(c) Establish the Education Fund to support education programs promoting safety and injury prevention with respect to football players, including safety-related initiatives in youth football, the education of Retired NFL Football Players regarding the NFL CBA Medical and Disability Benefits programs, and other educational initiatives benefitting Retired NFL Football Players, as set forth in ARTICLE XII.

**ARTICLE IV**
**Information and Registration Process**

Section 4.1 Information

(a) Within ten (10) days after the Preliminary Approval and Class Certification Order, Co-Lead Class Counsel will cause to be established and maintained a public website containing information about the Class Action Settlement (the “Settlement Website”), including the Settlement Class Notice and “Frequently Asked Questions.” Within ninety (90) days after the Effective Date, Co-Lead Class Counsel will cause the Settlement Website to be transitioned for claims administration purposes. The Settlement Website will be the launching site for secure web-based portals established and maintained by the Claims Administrator, BAP Administrator, and/or Lien Resolution Administrator for use by Settlement Class Members and their designated attorneys throughout the term of the Class Action Settlement. The Claims Administrator will post all necessary information about the Class Action Settlement on the Settlement Website, including, as they become available, information about registration deadlines and methods to participate in the BAP, the Claim Package requirements and Monetary Awards, and the Derivative Claim Package requirements and Derivative Claimant

Case 2:12-md-02323-AB Document 6481-1 Filed 02/13/15 Page 22 of 162

Awards. All content posted on the Settlement Website will be subject to advance approval by Co-Lead Class Counsel and Counsel for the NFL Parties.

(b) Within ten (10) days after the Preliminary Approval and Class Certification Order, Co-Lead Class Counsel also will cause to be established and maintained an automated telephone system that uses a toll-free number or numbers to provide information about the Class Action Settlement. Within ninety (90) days after the Effective Date, Co-Lead Class Counsel will cause the automated telephone system to be transitioned for claims administration purposes. Through this system, Settlement Class Members may request and obtain copies of the Settlement Class Notice, Settlement Agreement, Claim Form, Derivative Claim Form, and Appeals Form, and they may speak with operators for further information.

Section 4.2 Registration Methods and Requirements

(a) The Claims Administrator will establish and administer both online and hard copy registration methods for participation in the Class Action Settlement.

(b) The registration requirements will include information sufficient to determine if a registrant is a Settlement Class Member, including: (i) name; (ii) address; (iii) date of birth; (iv) Social Security Number (if any); (v) email address (if any), and whether email, the web-based portal on the Settlement Website, or U.S. mail is the preferred method of communication; (vi) identification as a Retired NFL Football Player, Representative Claimant or Derivative Claimant; (vii) dates and nature of NFL Football employment (*e.g.*, Active List, practice squad, developmental squad), and corresponding identification of the employer Member Club(s) or assigned team(s) (for Retired NFL Football Players, or, for the subject Retired NFL Football Player or deceased Retired NFL Football Player in the case of Representative Claimants and Derivative Claimants); and (viii) Signature of the registering purported Settlement Class Member.

(i) In addition to the registration requirements in this Section 4.2(b), Representative Claimants also will identify the subject deceased or legally incapacitated or incompetent Retired NFL Football Player, including name, last known address, date of birth, and Social Security Number (if any), and will provide a copy of the court order, or other document issued by an official of competent jurisdiction, providing the authority to act on behalf of that deceased or legally incapacitated or incompetent Retired NFL Football Player.

(ii) In addition to the registration requirements in this Section 4.2(b), Derivative Claimants also will identify the subject Retired NFL Football Player or deceased Retired NFL Football Player and the relationship by which they assert the right under applicable state law to sue independently or derivatively.

(c) Unless good cause, as set forth in subsection (i), is shown, Settlement Class Members must register on or before 180 days from the date that the

Settlement Class Supplemental Notice is posted on the Settlement Website. If a Settlement Class Member does not register by that deadline, that Settlement Class Member will be deemed ineligible for the BAP and BAP Supplemental Benefits, Monetary Awards and Derivative Claimant Awards.

(i) Good cause will include, without limitation, (a) that a Settlement Class Member who is a Representative Claimant had not been ordered by a court or other official of competent jurisdiction to be the authorized representative of the subject deceased or legally incapacitated or incompetent Retired NFL Football Player prior to the registration deadline (and the Representative Claimant seeks to register within 180 days of authorization by the court or other official of competent jurisdiction), or (b) that the subject Retired NFL Football Player timely registered prior to his death or becoming legally incapacitated or incompetent and his Representative Claimant seeks to register for that Retired NFL Football Player; or (c) that the subject Retired NFL Football Player timely registered and the Derivative Claimant seeks to register within thirty (30) days of that Retired NFL Football Player's submission of a Claim Package.

Section 4.3    Registration Review

(a) Upon receipt of a purported Settlement Class Member's registration, the Claims Administrator will review the information to determine whether the purported Settlement Class Member is a Settlement Class Member under the Settlement Agreement, and whether he or she has timely registered. In order to determine qualification for the BAP, as set forth in Section 5.1, the Claims Administrator will also determine if a registering Retired NFL Football Player has identified his participation in NFL Football that earns him at least one half of an Eligible Season. The Claims Administrator will then issue a favorable or adverse Notice of Registration Determination, within forty-five (45) days of receipt of the purported Settlement Class Member's registration, informing the purported Settlement Class Member whether he or she is a Settlement Class Member who has properly registered. To the extent the volume of registrations warrants, this deadline may be extended by agreement between Co-Lead Class Counsel and Counsel for the NFL Parties.

(i) Favorable Notices of Registration Determination will include information regarding the sections of the Settlement Website and/or secure web-based portals that provide detailed information regarding the Claim Package and Monetary Awards, the Derivative Claim Package and Derivative Claimant Awards and, for Settlement Class Members who are Retired NFL Football Players, information regarding the BAP. The Notice of Registration Determination will inform the Settlement Class Member of his or her unique identifying number for future use, including on a Claim Form or Derivative Claimant Form.

(ii) Adverse Notices of Registration Determination will include information regarding how the purported Settlement Class Member can challenge the determination. The purported Settlement Class Member may submit a written challenge to the Claims Administrator within sixty (60) days after the date of the Notice of Registration Determination. The purported Settlement Class Member must present a

sworn statement or other evidence in support of any written challenge. The Claims Administrator will make a determination on the written challenge and issue a Notice of Challenge Determination to the purported Settlement Class Member and the NFL Parties informing them of the decision.

(iii) The NFL Parties can challenge, for good cause, a favorable Notice of Registration Determination by submitting a written challenge to the Claims Administrator within sixty (60) days after the date of the Notice of Registration Determination. The NFL Parties must present evidence in support of the written challenge. The Claims Administrator will make a determination on the written challenge and issue a Notice of Challenge Determination to the purported Settlement Class Member and the NFL Parties informing them of the decision.

(iv) Any Notice of Challenge Determination may be appealed by the purported Settlement Class Member or the NFL Parties, provided that the NFL Parties' appeal is limited to challenging the purported Retired NFL Football Player's or subject Retired NFL Football Player's status as a Retired NFL Football Player, in writing to the Court within sixty (60) days after the date of the Notice of Challenge Determination. The parties may present evidence in support of, or in opposition to, the appeal. The Court will be provided access to all documents and information available to the Claims Administrator to aid in determining the appeal. The Court may, in its discretion, refer the appeal to the Special Master. The decision of the Court or the Special Master shall be final and binding.

(v) If either Co-Lead Class Counsel or Counsel for the NFL Parties believe that the Claims Administrator has issued a Notice of Registration Determination that reflects an improper interpretation of the Settlement Class definition set forth in Section 1.1, such counsel may petition the Court to resolve the issue. The Court may, in its discretion, refer the matter to the Special Master. If the Court or the Special Master determines that the Claims Administrator misinterpreted the Settlement Class definition, the decision of the Court or the Special Master will supersede the prior determination by the Claims Administrator.

**ARTICLE V**
**Baseline Assessment Program**

Section 5.1 Qualification. All Retired NFL Football Players with at least one half of an Eligible Season, as defined in Section 2.1(kk), who timely registered to participate in the Class Action Settlement, as set forth in ARTICLE IV, will qualify for the BAP and will be entitled to one (1) baseline assessment examination as provided in Section 5.2. For the avoidance of any doubt, an eligible Retired NFL Football Player who submits a claim for a Monetary Award, whether successful or not, may participate in the BAP, except a Retired NFL Football Player who submits a successful claim for a Monetary Award is not eligible to later receive BAP Supplemental Benefits.

Section 5.2 Scope of Program. The BAP will provide the opportunity for each qualified Retired NFL Football Player, as set forth in Section 5.1, to receive a

Case 2:12-md-02323-AB Document 6481-1 Filed 02/13/15 Page 25 of 162

maximum of one (1) baseline assessment examination, which includes: (a) a standardized neuropsychological examination in accordance with the testing protocol set forth in Exhibit 2 performed by a neuropsychologist certified by the American Board of Professional Psychology (ABPP) or the American Board of Clinical Neuropsychology (ABCN), a member board of the American Board of Professional Psychology, in the specialty of Clinical Neuropsychology, who is a Qualified BAP Provider; and (b) a basic neurological examination performed by a board-certified neurologist who is a Qualified BAP Provider. The diagnosis of Level 1 Neurocognitive Impairment, Level 1.5 Neurocognitive Impairment and Level 2 Neurocognitive Impairment made pursuant to the BAP must be agreed to by both the neuropsychologist and board-certified neurologist serving as Qualified BAP Providers. BAP baseline assessment examinations are intended to establish a physician/patient relationship between the Retired NFL Football Player and his Qualified BAP Providers. Retired NFL Football Players diagnosed during their BAP baseline assessment examinations by Qualified BAP Providers with Level 1 Neurocognitive Impairment will be eligible to receive BAP Supplemental Benefits, as set forth in Section 5.11. For the avoidance of any doubt, a Qualifying Diagnosis of Alzheimer's Disease, Parkinson's Disease, ALS or Death with CTE shall not be made through the BAP baseline assessment examination.

Section 5.3 Deadline for BAP Baseline Assessment Examination. A Retired NFL Football Player electing to receive a BAP baseline assessment examination must take it: (i) within two (2) years of the commencement of the BAP if he is age 43 or older on the Effective Date; or (ii) if he is younger than age 43 on the Effective Date, before his 45th birthday or within ten (10) years of the commencement of the BAP, whichever occurs earlier. For the avoidance of any doubt, there shall be no baseline assessment examinations after the tenth anniversary of the commencement of the BAP.

Section 5.4 Monetary Award Offset. If a Retired NFL Football Player in Subclass 1 chooses not to participate in the BAP and receives a Qualifying Diagnosis on or after the Effective Date, that Retired NFL Football Player will be subject to a Monetary Award Offset (as set forth in Section 6.7(b)(iv)) based on his non-participation in the BAP unless the Qualifying Diagnosis is of ALS or if he receives any Qualifying Diagnosis other than ALS prior to his deadline to receive a BAP baseline assessment examination as set forth in Section 5.3. This Offset does not apply to a Retired NFL Football Player who is in Subclass 2.

Section 5.5 BAP Term. The BAP will commence one hundred and twenty (120) days after the Settlement Class Supplemental Notice is posted on the Settlement Website and will end ten (10) years after it commences, except that the provision of BAP Supplemental Benefits to Retired NFL Football Players diagnosed with Level 1 Neurocognitive Impairment, as set forth in Exhibit 1, may extend beyond the term of the BAP for up to five (5) years as set forth in Section 5.11. Retired NFL Football Players who are qualified, as set forth in Section 5.1, will be entitled to one (1) baseline assessment examination within the applicable time limitations set forth in Section 5.3.

Case 2:12-md-02323-AB Document 6481-1 Filed 02/13/15 Page 26 of 162

Section 5.6 BAP Administrator

(a) Appointment and Oversight

(i) The Motion for Preliminary Approval of the Class Action Settlement filed by Class Counsel will request that the Court appoint The Garretson Resolution Group, Inc. ("Garretson Group") as BAP Administrator. Within ten (10) days after the Effective Date, Co-Lead Class Counsel will retain the BAP Administrator appointed by the Court.

(ii) Co-Lead Class Counsel's retention agreement with the BAP Administrator will provide that the BAP Administrator will perform its responsibilities and take all steps necessary to faithfully implement and administer the BAP-related provisions of the Settlement Agreement, and will require that the BAP Administrator maintain at all times appropriate and sufficient bonding insurance in connection with its performance of its responsibilities under the Settlement Agreement.

(iii) The Court may, at its sole discretion, request reports or information from the BAP Administrator. The BAP Administrator will be responsible for reporting and providing information to the Court at such frequency and in such a manner as the Court directs.

(iv) The Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof) will oversee the BAP Administrator, and may, at his or her sole discretion, request reports or information from the BAP Administrator.

(v) Beyond the reporting requirements set forth in Section 5.6(a)(iii)-(iv), beginning one month after the Effective Date, the BAP Administrator will issue a regular monthly report to the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), Co-Lead Class Counsel, and Counsel for the NFL Parties during the first three years of the BAP, and thereafter on a quarterly basis, or as reasonably agreed upon by the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), Co-Lead Class Counsel and Counsel for the NFL Parties, regarding the status and progress of the BAP. The monthly (or quarterly) report will include, without limitation, information regarding activity in the BAP, including: (a) the number and identity of Retired NFL Football Players with pending BAP appointments, (b) the monthly and total number of Retired NFL Football Players who took part in the BAP, and the identity of each Settlement Class Member who took part in the preceding month; (c) the monthly and total monetary amounts paid to Qualified BAP Providers; (d) the monthly and total number of Retired NFL Football Players eligible for BAP Supplemental Benefits, as set forth in Section 5.11, and the identity of each such Retired NFL Football Player; (e) any Retired NFL Football Player complaints regarding specific Qualified BAP Providers; (f) expenses/administrative costs, including a summary accounting of the administrative expenses incurred by the BAP Administrator in the preceding month; and (g) any other information reasonably requested by the Special Master (or the Court after expiration of

Case 2:12-md-02323-AB Document 6481-1 Filed 01/13/15 Page 27 of 162

the term of the Special Master and any extension(s) thereof), Co-Lead Class Counsel, or Counsel for the NFL Parties.

(vi) Beginning on the first January after the Effective Date, the BAP Administrator will provide annual financial reports to the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), Co-Lead Class Counsel and Counsel for the NFL Parties, based on information from the preceding year, regarding: (a) the number of Retired NFL Football Players who took part in the BAP; (b) the monetary amount paid to Qualified BAP Providers; (c) the number of Retired NFL Football Players eligible for BAP Supplemental Benefits; (d) the expenses/administrative costs incurred by the BAP Administrator; (e) the projected expenses/administrative costs for the remainder of the BAP, including the five-year period for the provision of BAP Supplemental Benefits as set forth in Sections 5.5 and 5.11; (f) the monies remaining in the BAP Fund; and (g) any other information reasonably requested by the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), Co-Lead Class Counsel, or Counsel for the NFL Parties.

(b) Compensation and Expenses. Reasonable compensation of the BAP Administrator, as agreed to by Co-Lead Class Counsel and Counsel for the NFL Parties, and reasonable out-of-pocket costs and expenses directly incurred as a result of the BAP Administrator's responsibilities will be paid out of the BAP Fund. The BAP Administrator shall submit an annual budget to the Court for review and approval. Either Co-Lead Class Counsel or Counsel for the NFL Parties may challenge the reasonableness of the BAP Administrator's out-of-pocket costs and expenses, in which case the Court will determine (or may, in its discretion, refer the challenge to the Special Master to determine) the reasonableness of such costs and expenses. If the Court or Special Master, as applicable, determines that any costs and expenses are unreasonable, the BAP Administrator will not be paid for such costs and expenses or, if such costs and expenses have already been paid, the BAP Administrator will refund that amount to the BAP Fund.

(c) Liability. The Parties, Class Counsel, Counsel for the NFL Parties, and the Special Master, and their respective Affiliates, will not be liable for any act, or failure to act, of the BAP Administrator.

(d) Replacement. The BAP Administrator may be replaced by joint motion made by Co-Lead Class Counsel and Counsel for the NFL Parties, or for cause by motion of either Co-Lead Class Counsel or Counsel for the NFL Parties, upon order of the Court. If the BAP Administrator resigns, dies, is replaced, or is otherwise unable to continue employment in this position, Co-Lead Class Counsel and Counsel for the NFL Parties will agree to and jointly recommend a new proposed BAP Administrator for appointment by the Court.

(e) Conflicts of Interest. Within ninety (90) days after the Effective Date, Co-Lead Class Counsel, Counsel for the NFL Parties, the Special Master and the BAP Administrator will establish and implement procedures to promptly detect and resolve possible conflicts of interest between the BAP Administrator, including,

Case 2:12-md-02323-AB Document 6481-1 Filed 02/13/15 Page 28 of 162

without limitation, its executive leadership team and all employees conducting BAP-related work, on the one hand, and Settlement Class Members (and counsel individually representing them, if any), the NFL Parties, Counsel for the NFL Parties, or the Special Master, on the other hand. Co-Lead Class Counsel, Counsel for the NFL Parties, and the BAP Administrator, subject to approval of the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof) may modify such procedures in the future, if appropriate. Notwithstanding anything herein to the contrary, Co-Lead Class Counsel, Counsel for the NFL Parties, and the Special Master understand that the BAP Administrator regularly provides settlement administration, lien resolution, and other related services to settling parties and their attorneys, and Co-Lead Class Counsel, Counsel for the NFL Parties, and the Special Master acknowledge and agree that it shall not be a conflict of interest for the BAP Administrator to provide such services to such individuals or to receive compensation for such work.

Section 5.7 Retention and Oversight of Qualified BAP Providers and Qualified BAP Pharmacy Vendor(s)

(a) Qualified BAP Providers

(i) Within ninety (90) days after the Effective Date, the BAP Administrator will establish and maintain a network of Qualified BAP Providers to provide baseline assessment examinations to Retired NFL Football Players, and to provide medical treatment to Retired NFL Football Players who receive BAP Supplemental Benefits, as set forth in Section 5.11. The BAP Administrator's selection of all Qualified BAP Providers will be subject to written approval of Co-Lead Class Counsel and Counsel for the NFL Parties, each of which will have the unconditional right to veto the selection of twenty (20) Qualified BAP Providers, in addition to the unconditional right to veto the selection of any Qualified BAP Provider who has served or is serving as a litigation expert consultant or expert witness for a party or his, her or its counsel in connection with litigation relating to the subject matter of the Class Action Complaint since July 1, 2011. Thereafter, the BAP Administrator may select additional Qualified BAP Providers during the term of the BAP to the extent necessary to effectuate network coverage, subject to written approval of Co-Lead Class Counsel and Counsel for the NFL Parties. Co-Lead Class Counsel and Counsel for the NFL Parties each shall accrue five (5) additional unconditional veto rights for every fifty (50) new Qualified BAP Providers selected and approved during the term of the BAP, and shall retain the unconditional right to veto the selection of any Qualified BAP Provider who has served or is serving as a litigation expert consultant or expert witness for a party or his, her or its counsel in connection with litigation relating to the subject matter of the Class Action Complaint since July 1, 2011.

(ii) The BAP Administrator will select Qualified BAP Providers based on the following criteria: (a) education, training, licensing, credentialing, board certification, and insurance coverage; (b) ability to provide the specified baseline assessment examinations under the BAP; (c) ability to provide medical services under the BAP Supplemental Benefits; (d) ability to provide all required examinations and services in a timely manner; (e) geographic proximity to Retired NFL

Case 2:12-md-02323-AB Document 6481-1 Filed 02/13/15 Page 29 of 162

Football Players; and (f) rate structure and payment terms. Under no circumstances will a Qualified BAP Provider be selected or approved who has been convicted of a crime of dishonesty, or who is serving on or after the Final Approval Date as a litigation expert consultant or expert witness for an Opt Out, or his, her or its counsel in connection with litigation relating to the subject matter of the Class Action Complaint. If selected and approved, under no circumstances shall a Qualified BAP Provider continue to serve in that role if convicted of a crime of dishonesty and/or thereafter retained as a litigation expert consultant or expert witness for an Opt Out, or his, her or its counsel in connection with litigation relating to the subject matter of the Class Action Complaint.

(iii) In order to be eligible for selection, each Qualified BAP Provider must provide the following information to the BAP Administrator: (a) state professional license number; (b) National Provider Identifier; (c) board-certification information, if any; (d) evidence of proper licensing and insurance coverage under applicable state laws; (e) experience, including number of years as a healthcare provider; (f) primary and additional service locations; (g) mailing and billing addresses; (h) tax identification information; (i) ability to provide the specified baseline assessment examinations; (j) capacity for new patients; (k) appointment accessibility; (l) languages spoken; (m) criminal record; (n) the percentage of his/her practice related to litigation expert/consulting engagements, including the relative percentage of such expert/consulting performed for plaintiffs, defendants and court/administrative bodies, and a general description of such engagements, since July 1, 2011; (o) list of all litigation-related engagements as a litigation expert consultant or expert witness arising out of, or relating to, head, brain and/or cognitive injury of athletes; (p) a general description of any past or present salaried, or other professional or consulting relationships with the NFL Parties or Member Clubs; and (q) such other information as the BAP Administrator may reasonably request.

(iv) The BAP Administrator will enter into a written contract with each Qualified BAP Provider (the "Provider Contract") to provide the specified baseline assessment examinations under the BAP and authorized medical services under the BAP Supplemental Benefits. The Provider Contract will include, among other things, a description of the baseline assessment examinations that will be provided under the BAP; rates, billing, and payment terms; terms relating to licensing, credentials, board certification, and other qualifications; the amount and type of insurance to be maintained by the Qualified BAP Provider; procedures for scheduling, rescheduling, and cancelling BAP appointments; document retention policies and procedures; and fraud policies. The Provider Contract will further provide: (a) that the Qualified BAP Provider will release and hold harmless the Parties, Class Counsel, Counsel for the NFL Parties, Special Master, BAP Administrator, and Claims Administrator from any and all claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, arising from or related to the services provided by that Qualified BAP Provider as part of the BAP; (b) that the Qualified BAP Provider will not seek payment from the Parties, Class Counsel, Counsel for the NFL Parties, Special Master, BAP Administrator, or Claims Administrator for any medical service(s), examination(s), and/or test(s) or any medical

Case 2:12-md-02323-AB Document 6481-1 Filed 02/13/15 Page 30 of 162

treatment or care that are not part of the specified baseline assessment examinations or authorized for payment under the terms of the BAP Supplemental Benefits, except that the Qualified BAP Provider may seek payment from a Retired NFL Football Player or, where applicable, his or her insurer for any medical service(s), examination(s), and/or test(s) or any medical treatment or care that are not part of the specified baseline assessment examinations or BAP Supplemental Benefits, where the Retired NFL Football Player, or, where applicable, his or her insurer, has agreed in writing to authorize and pay for such medical service(s), examination(s), and/or test(s) or any medical treatment or care; and (c) that the Qualified BAP Provider will retain medical records for Retired NFL Football Players in accordance with Section 5.10.

(1) The Provider Contract will be drafted by the BAP Administrator, as overseen by the Special Master, and in consultation with and subject to the approval of, Co-Lead Class Counsel and Counsel for the NFL Parties.

(2) The Provider Contract's fraud policies will contain the following warning against fraudulent conduct: "As a Qualified BAP Provider you have agreed to provide your services and make your diagnosis in good faith in accordance with best medical practices. Your diagnoses and billings will be audited on a periodic and random basis subject to the discretion of the BAP Administrator and Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof). Any finding of fraudulent diagnoses or billings by you will be subject to, without limitation, referral to appropriate regulatory and disciplinary boards and agencies and/or federal authorities, the immediate termination of this contract, and your disqualification from serving as a diagnosing physician in any aspect of the Class Action Settlement."

(v) The BAP Administrator will audit the credentialing and performance of Qualified BAP Providers on an annual (or, as needed, more frequent) basis. The criteria and process for the audit will be overseen by the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof) and subject to the approval of Co-Lead Class Counsel and Counsel for the NFL Parties, except Co-Lead Class Counsel or Counsel for the NFL Parties shall maintain the right to order audits of specific Qualified BAP Providers under this subparagraph, on the basis of good cause, at any time during the BAP, including the five-year period for the provision of BAP Supplemental Benefits as set forth in Sections 5.5 and 5.11. The BAP Administrator may conduct onsite visits at the locations of Qualified BAP Providers on a random or adverse selection basis to confirm their compliance with the Provider Contract described in Section 5.7(a)(iv).

(vi) All Qualified BAP Providers will bill the BAP Administrator directly for any services rendered pursuant to the terms and conditions of the BAP. The BAP Administrator will establish procedures to ensure that the BAP Fund is the primary payer for BAP baseline assessment examinations and treatments under the BAP Supplemental Benefits, subject to the coverage limits of the BAP Supplemental Benefits, consistent with the Provider Contract, which will be executed by the BAP Administrator and each participating Qualified BAP Provider. The BAP Administrator

Case 2:12-md-02323-AB Document 6481-1 Filed 02/13/15 Page 31 of 162

will establish and administer a system to audit Qualified BAP Providers' procedures for billing and providing BAP baseline assessment examinations and BAP Supplemental Benefits treatments. This audit system will be designed to detect billing errors that could result in overpayment or the payment of unauthorized medical services. The BAP Administrator will bring abusive and fraudulent Qualified BAP Provider billings to the attention of the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), Co-Lead Class Counsel and Counsel for the NFL Parties.

(vii) The BAP Administrator may terminate the Provider Contract of any Qualified BAP Providers that are not in compliance with its terms, or for other cause.

(b) Qualified Pharmacy Vendor(s)

(i) Within ninety (90) days after the Effective Date, the BAP Administrator will contract with one or more Qualified BAP Pharmacy Vendor(s) to provide pharmaceuticals covered by the BAP Supplemental Benefits, as set forth in Section 5.11. The BAP Administrator's selection of the Qualified BAP Pharmacy Vendor(s) will be subject to written approval of the Special Master, in consultation with Co-Lead Class Counsel and Counsel for the NFL Parties.

(ii) The BAP Administrator will select Qualified BAP Pharmacy Vendor(s) based on the following criteria: (a) proper licensing for operation as a mail order pharmacy in all U.S. states and territories; (b) nationwide coverage and ease of administration; and (c) rate structure and payment terms.

(iii) In order to be eligible for selection, each Qualified BAP Pharmacy Vendor must provide the following information to the BAP Administrator: (a) federal DEA and/or state license numbers, as applicable; (b) evidence of proper licensing under applicable state laws; (c) experience, including number of years as a mail order pharmacy; (d) information about processes required to submit and fulfill mail order prescriptions; (e) average processing and delivery time from submission of a valid prescription; (f) policies related to generic substitution of name-brand pharmaceutical products; (g) mailing and billing addresses; (h) tax identification information; (i) languages spoken; and (j) such other information as the BAP Administrator may reasonably request.

(iv) The BAP Administrator will enter into a written contract with each Qualified BAP Pharmacy Vendor (the "Pharmacy Contract") to provide the pharmaceuticals covered under the BAP Supplemental Benefits. The Pharmacy Contract will include, among other things, a description of the pharmaceutical therapies that will be covered under the BAP Supplemental Benefits; rates, billing, and payment terms; terms relating to qualifications; procedures for submitting, filling, and shipping prescriptions; document retention policies and procedures; and fraud policies. The Pharmacy Contract will further provide: (a) that the Qualified BAP Pharmacy Vendor will release and hold harmless the Parties, Class Counsel, Counsel for the NFL

Case 2:12-md-02323-AB Document 6481-1 Filed 02/13/15 Page 32 of 162

Parties, Special Master, BAP Administrator, and Claims Administrator from any and all claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, arising from or related to the services provided by that Qualified BAP Pharmacy Vendor as part of the BAP; and (b) that the Qualified BAP Pharmacy Vendor will not seek payment from the Parties, Class Counsel, Counsel for the NFL Parties, Special Master, BAP Administrator, or Claims Administrator for any prescriptions that are authorized for payment under the terms of the BAP Supplemental Benefits.

(v) The BAP Administrator will audit the performance of Qualified BAP Pharmacy Vendor(s) on an annual (or, as needed, more frequent) basis. The criteria and process for the audit will be overseen by the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof) and subject to the approval of Co-Lead Class Counsel and Counsel for the NFL.

(vi) All Qualified BAP Pharmacy Vendors will be reimbursed by the BAP Administrator directly for any services rendered pursuant to the terms and conditions of the BAP, subject to the coverage limits of the BAP Supplemental Benefits. The BAP Administrator will establish procedures to ensure that the BAP Fund is the primary payer for covered prescriptions consistent with the Pharmacy Contract, which will be executed by the BAP Administrator and each participating Qualified BAP Provider. The BAP Administrator will establish and administer a system to audit Qualified BAP Pharmacy Vendor(s)' procedures for billing and providing approved BAP Supplemental Benefits prescriptions. This audit system will be designed to detect billing errors that could result in overpayment or the payment of unauthorized prescriptions. The BAP Administrator will bring abusive and fraudulent Qualified BAP Pharmacy Vendor billings to the attention of the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), Co-Lead Class Counsel and Counsel for the NFL Parties.

(vii) The BAP Administrator may terminate the Pharmacy Contract of any Qualified BAP Pharmacy Vendor that is not in compliance with its terms, or for other cause.

Section 5.8 Scheduling and Providing Baseline Assessment Examinations. The Parties will establish, subject to Court approval, processes and procedures governing the scheduling and provision of BAP examinations.

Section 5.9 Other Communications with Retired NFL Football Players

(a) The BAP Administrator will send an Explanation of Benefits ("EOB") statement to each Retired NFL Football Player following a BAP appointment. The statement will describe the services and medical examinations that were performed during the appointment.

Case 2:12-md-02323-AB Document 6481-1 Filed 02/13/15 Page 33 of 162

(b) Beginning one (1) year after the Effective Date of the Settlement Agreement, the BAP Administrator will send Retired NFL Football Players who have not received baseline assessments and remain eligible to do so, an annual statement describing the BAP and requesting that they update any contact information that has changed in the preceding year.

(c) If a Retired NFL Football Player is represented by counsel and has provided such notice to the BAP Administrator, the BAP Administrator will copy his counsel of record on any written communications with the Retired NFL Football Player.

Section 5.10 Use and Retention of Medical Records

(a) All Retired NFL Football Players who participate in the BAP will be encouraged to provide their confidential medical records for use in medical research into cognitive impairment and safety and injury prevention with respect to football players. The provision of such medical records shall be subject to the reasonable informed consent of the Retired NFL Football Players, and in compliance with applicable law, including a HIPAA-compliant authorization form. Medical records and information used in medical research will be kept confidential.

(b) The BAP Administrator will retain the medical records of Retired NFL Football Players and other program-defined forms that must be completed by the Qualified BAP Providers.

(c) Qualified BAP Providers who provide BAP baseline assessment examinations will be required to retain all medical records from such visits in compliance with applicable state and federal laws; provided, however, that each Qualified BAP Provider will be required to retain all medical records in the format(s) prescribed by applicable state and federal laws and, notwithstanding any shorter time period permitted under applicable laws, will be required to retain such medical records for not less than ten (10) years after the conclusion of the BAP term.

(d) All Retired NFL Football Player medical records will be treated as confidential, as set forth in Section 17.2.

Section 5.11 BAP Supplemental Benefits. Each Retired NFL Football Player diagnosed by Qualified BAP Providers with a Level 1 Neurocognitive Impairment, as defined in Exhibit 1, shall be eligible for BAP Supplemental Benefits related to the Retired NFL Football Player's impairment in the form of medical treatment, counseling and/or examination by Qualified BAP Providers, including, if medically needed and prescribed by a Qualified BAP Provider, pharmaceuticals by Qualified BAP Pharmacy Vendor(s). BAP Supplemental Benefits shall comprise medical treatments and/or examinations generally accepted by the medical community. The BAP Supplemental Benefits must be used within the term of the BAP or within five (5) years of diagnosis of Level 1 Neurocognitive Impairment by Qualified BAP Providers, even if the five (5) year period extends beyond the term of the BAP, whichever is later. The

Case 2:12-md-02323-AB Document 6481-1 Filed 02/13/15 Page 34 of 162

BAP Administrator, as overseen by the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), and in consultation with, and subject to the approval of, Co-Lead Class Counsel and Counsel for the NFL Parties, will establish the procedures governing BAP Supplemental Benefits.

Section 5.12 Diagnosing Physician Certifications. Qualified BAP Providers who diagnose a Level 1 Neurocognitive Impairment, Level 1.5 Neurocognitive Impairment or Level 2 Neurocognitive Impairment, as set forth in Exhibit 1, must support that diagnosis with a Diagnosing Physician Certification and supporting medical records. The Qualified BAP Provider must provide the Diagnosing Physician Certification and copies of the supporting medical records to the Retired NFL Football Player, his counsel (if any), and the BAP Administrator.

Section 5.13 Conflicting Opinions of Qualified BAP Providers. If there is a lack of agreement, as required by Section 5.2 and Exhibit 1, between the two Qualified BAP Providers regarding whether a Retired NFL Football Player has Level 1 Neurocognitive Impairment, Level 1.5 Neurocognitive Impairment, Level 2 Neurocognitive Impairment, or none, the BAP Administrator may in its discretion: (a) request that the Qualified BAP Providers confer with each other in an attempt to resolve the conflict; (b) request that a second BAP baseline assessment examination be conducted by different Qualified BAP Providers; or (c) refer the results of the BAP baseline assessment examination and all relevant medical records to a member of the Appeals Advisory Panel for review and decision. The decision of the member of the Appeals Advisory Panel will determine whether the Retired NFL Football Player has Level 1 Neurocognitive Impairment, Level 1.5 Neurocognitive Impairment, Level 2 Neurocognitive Impairment, or none. If the member of the Appeals Advisory Panel determines that additional review, analysis and/or testing needs to be conducted prior to a decision, such review, analysis and/or testing will be completed by Qualified BAP Providers as selected by the BAP Administrator. The decision of the Appeals Advisory Panel member as to whether the Retired NFL Football Player has Level 1 Neurocognitive Impairment, Level 1.5 Neurocognitive Impairment, Level 2 Neurocognitive Impairment, or none, will be final and binding, except a claim for a Monetary Award or Derivative Claimant Award relying on such diagnosis may still be appealed, as set forth in Section 9.5. The member of the Appeals Advisory Panel must support the decision with a Diagnosing Physician Certification.

Section 5.14 Funding.

(a) All aspects of the BAP, including, without limitation, its costs and expenses, payment of Qualified BAP Providers, compensation of the BAP Administrator, and BAP Supplemental Benefits, will be paid from the BAP Fund. Any funds remaining in the BAP Fund at the conclusion of the five-year period for the provision of BAP Supplemental Benefits, as set forth in Sections 5.5 and 5.11, shall be transferred to the Settlement Trust for transfer by the Trustee into the Monetary Award Fund.

Case 2:12-md-02323-AB Document 6481-1 Filed 02/13/15 Page 35 of 162

(b) In order to ensure sufficient funds to pay for a baseline assessment examination for each eligible Retired NFL Football Player, as set forth in Section 5.2 and subject to Sections 5.14(a), 23.1(b) and 23.3(d) of this Agreement, the maximum per player BAP Supplemental Benefit payable under this Section, taking into account such factors as the number of Retired NFL Football Players using the BAP and diagnosed with Level 1 Neurocognitive Impairment, shall be determined on the one-year anniversary of the commencement of the BAP by Co-Lead Class Counsel and Counsel for the NFL Parties, in consultation with the BAP Administrator, and with the approval of the Court. The maximum per player benefit will be set at a sufficient level to ensure that there will be sufficient funds, without exceeding the Seventy-Five Million United States Dollars (U.S. $75,000,000) cap on the BAP Fund, to pay for every eligible Retired NFL Football Player to receive one baseline assessment examination. At the conclusion of the term of the BAP, and at such other times as the Court may direct or as may be requested by Co-Lead Class Counsel or Counsel for the NFL Parties, Co-Lead Class Counsel and Counsel for the NFL Parties will review and adjust, if necessary, this maximum benefit, in consultation with the BAP Administrator and with the approval of the Court, to ensure that there are sufficient funds to pay for all baseline assessment examinations without exceeding the Seventy-Five Million United States Dollar (U.S. $75,000,000) cap on the BAP Fund.

## ARTICLE VI
## Monetary Awards for Qualifying Diagnoses

Section 6.1 Eligible Retired NFL Football Players and Representative Claimants will be entitled to Monetary Awards as set forth in this Article.

Section 6.2 <u>Eligibility</u>

(a) A Settlement Class Member who is a Retired NFL Football Player or Representative Claimant is eligible for a Monetary Award if, and only if: (i) the Settlement Class Member timely registered to participate in the Class Action Settlement, as set forth in Section 4.2; (ii) the subject Retired NFL Football Player or deceased Retired NFL Football Player was diagnosed with a Qualifying Diagnosis; and (iii) the Settlement Class Member timely submits a Claim Package, subject to the terms and conditions set forth in ARTICLE VIII.

(b) A Representative Claimant of a deceased Retired NFL Football Player will be eligible for a Monetary Award only if the deceased Retired NFL Football Player died on or after January 1, 2006, or if the Court determines that a wrongful death or survival claim filed by the Representative Claimant would not be barred by the statute of limitations under applicable state law as of: (i) the date the Representative Claimant filed litigation against the NFL (and, where applicable, NFL Properties) relating to the subject matter of these lawsuits, if such a wrongful death or survival claim was filed prior to the Settlement Date; or (ii) the Settlement Date, where no such suit has previously been filed.

Section 6.3 Qualifying Diagnoses

(a) The following, as defined in Exhibit 1, are Qualifying Diagnoses eligible for a Monetary Award: (a) Level 1.5 Neurocognitive Impairment; (b) Level 2 Neurocognitive Impairment; (c) Alzheimer's Disease; (d) Parkinson's Disease; (e) Death with CTE; and (f) ALS. All Qualifying Diagnoses must be made by properly credentialed physicians as set forth below for the particular Qualifying Diagnosis, consistent with Exhibit 1 (Injury Definitions).

(b) Following the Effective Date, a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment, Level 2 Neurocognitive Impairment, Alzheimer's Disease, Parkinson's Disease, or ALS shall be made only by Qualified MAF Physicians, except that a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment or Level 2 Neurocognitive Impairment may also be made by Qualified BAP Providers as set forth in Section 5.2 and consistent with the terms of Exhibit 1 (Injury Definitions).

(i) Any licensed neuropsychologist who assists a Qualified MAF Physician in making a Qualifying Diagnosis must be certified by the American Board of Professional Psychology (ABPP) or the American Board of Clinical Neuropsychology (ABCN), a member board of the American Board of Professional Psychology, in the specialty of Clinical Neuropsychology.

(c) From the date of the Preliminary Approval and Class Certification Order through the Effective Date, a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment, Level 2 Neurocognitive Impairment, Alzheimer's Disease, Parkinson's Disease, or ALS shall be made only by board-certified neurologists, board-certified neurosurgeons, or other board-certified neuro-specialist physicians, except as set forth in Section 6.3(e).

(d) Prior to the date of the Preliminary Approval and Class Certification Order, a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment, Level 2 Neurocognitive Impairment, Alzheimer's Disease, Parkinson's Disease, or ALS shall be made only by board-certified neurologists, board-certified neurosurgeons, or other board-certified neuro-specialist physicians, or otherwise qualified neurologists, neurosurgeons, or other neuro-specialist physicians, except as set forth in Section 6.3(e).

(e) For a Retired NFL Football Player deceased prior to the Effective Date, a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment, Level 2 Neurocognitive Impairment, Alzheimer's Disease, Parkinson's Disease, or ALS, which was rendered while the Retired NFL Football Player was living by a physician not otherwise identified in Sections 6.3 (b)-(d) but who has sufficient qualifications (i) in the field of neurology to make a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment, Level 2 Neurocognitive Impairment, Alzheimer's Disease, Parkinson's Disease, or ALS, or (ii) in the field of neurocognitive disorders to make a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment or Level 2 Neurocognitive Impairment, is permitted.

(f) A Qualifying Diagnosis of Death with CTE shall be made only for Retired NFL Football Players who died prior to the Final Approval Date, through a post-mortem diagnosis made by a board-certified neuropathologist prior to the Final Approval Date, provided that a Retired NFL Football Player who died between July 7, 2014 and the Final Approval Date shall have until 270 days from his date of death to obtain such a post-mortem diagnosis.

Section 6.4 Qualifying Diagnosis Review by Appeals Advisory Panel.

(a) A member of the Appeals Advisory Panel must review, as set forth in Section 6.4(b), Qualifying Diagnoses made prior to the Effective Date by:

(i) A board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician, who is not a Qualified MAF Physician, between July 1, 2011 and the Effective Date;

(ii) A neurologist, neurosurgeon, or other neuro-specialist physician, who is not board-certified but is otherwise qualified; and

(iii) A physician who is not a Qualified MAF Physician and who is not otherwise identified in Section 6.4(a)(i)-(ii) but who has sufficient qualifications (i) in the field of neurology to make a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment, Level 2 Neurocognitive Impairment, Alzheimer's Disease, Parkinson's Disease, or ALS, or (ii) in the field of neurocognitive disorders to make a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment or Level 2 Neurocognitive Impairment.

(b) If a review of a Qualifying Diagnosis by a member of the Appeals Advisory Panel is required by Section 6.4(a), the contents of the Claim Package relevant to the Qualifying Diagnosis, including the Claim Form, the Diagnosing Physician Certification, medical records supporting and reflecting the Qualifying Diagnosis, and any other related materials concerning the Qualifying Diagnosis, shall be submitted to a member of the Appeals Advisory Panel for review. The Appeals Advisory Panel member will determine whether the Retired NFL Football Player or deceased Retired NFL Football Player has the Qualifying Diagnosis reported in the Diagnosing Physician Certification, or, where there is no Diagnosing Physician Certification as set forth in Section 8.2(a), reported in the Claim Package submitted by the Representative Claimant. The Appeals Advisory Panel member shall review the Qualifying Diagnosis based on principles generally consistent with the diagnostic criteria set forth in Exhibit 1 (Injury Definitions), including consideration of, without limitation, the qualifications of the diagnosing physician, the supporting medical records and the year and state of medicine in which the Qualifying Diagnosis was made. The Appeals Advisory Panel member also shall confirm that the Qualifying Diagnosis was made by an appropriate physician as set forth in Section 6.3. For the avoidance of any doubt, the review of whether a Qualifying Diagnosis is based on principles generally consistent with the diagnostic criteria set forth in Exhibit 1 (Injury Definitions) does not require identical

Case 2:12-md-02323-AB Document 6481-1 Filed 02/13/15 Page 38 of 162

diagnostic criteria, including without limitation, the same testing protocols or documentation requirements.

(i) The review by a member of the Appeals Advisory Panel under this subsection, absent extraordinary circumstances impacting the schedule of such member, shall be completed within forty-five (45) days of the date on which he or she receives a Settlement Class Member's file, except such time limit may be altered to the extent the volume of files warrants, either by agreement between Co-Lead Class Counsel and Counsel for the NFL Parties, subject to approval by the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), or by application by Co-Lead Class Counsel or Counsel for the NFL Parties to the Court. The Qualifying Diagnoses shall generally be reviewed in the order in which they are received.

Section 6.5 <u>Qualified MAF Physicians</u>

(a) Within ninety (90) days after the Effective Date, the Claims Administrator will establish and maintain a list of Qualified MAF Physicians eligible to provide Qualifying Diagnoses. Each Qualified MAF Physician shall be approved by Co-Lead Class Counsel and Counsel for the NFL Parties, which approval shall not be unreasonably withheld. To the extent a Retired NFL Football Player is examined by a Qualified MAF Physician, such visit and examination shall be at the Retired NFL Football Player's own expense.

(b) The Claims Administrator will select Qualified MAF Physicians based on the following criteria: (a) education, training, licensing, credentialing, board certification, and insurance coverage; (b) ability to provide the specified examinations necessary to make Qualifying Diagnoses; (c) ability to provide all required examinations and services in a timely manner; (d) insurance accessibility; and (e) geographic proximity to Retired NFL Football Players. Under no circumstances will a Qualified MAF Physician be selected or approved who has been convicted of a crime of dishonesty, or who is serving on or after the Final Approval Date as a litigation expert consultant or expert witness for an Opt Out, or his, her or its counsel in connection with litigation relating to the subject matter of the Class Action Complaint. If selected and approved, under no circumstances shall a Qualified MAF Physician continue to serve in that role if convicted of a crime of dishonesty and/or thereafter retained as a litigation expert consultant or expert witness for an Opt Out, or his, her or its counsel in connection with litigation relating to the subject matter of the Class Action Complaint.

(c) In order to be eligible for selection, each Qualified MAF Physician must provide the following information to the Claims Administrator: (a) state professional license number; (b) National Provider Identifier; (c) board-certification information; (d) evidence of proper licensing and insurance coverage under applicable state laws; (e) experience, including number of years as a healthcare provider; (f) primary and additional service locations; (g) mailing and billing addresses; (h) tax identification information; (i) ability to provide all required examinations and services in a timely manner; (j) capacity for new patients; (k) appointment accessibility; (l) languages spoken;

Case 2:12-md-02323-AB Document 6481-1 Filed 02/13/15 Page 39 of 162

(m) criminal record; (n) the percentage of his/her practice related to litigation expert/consulting engagements, including the relative percentage of such expert/consulting performed for plaintiffs, defendants, and court/administrative bodies, and a general description of such engagements, since July 1, 2011; (o) list of all litigation-related engagements as a litigation expert consultant or expert witness arising out of, or relating to, head, brain and/or cognitive injury of athletes; (p) a general description of any past or present salaried, or other professional or consulting relationships with the NFL Parties or Member Clubs; and (q) such other information as the Claims Administrator may reasonably request.

Section 6.6 Modification of Qualifying Diagnoses

(a) Subject to the constraints of Section 6.6(b), following the Effective Date, on a periodic basis not to exceed once every ten (10) years, Co-Lead Class Counsel and Counsel for the NFL Parties agree to discuss in good faith possible prospective modifications to the definitions of Qualifying Diagnoses and/or the protocols for making Qualifying Diagnoses, in light of generally accepted advances in medical science. No such modifications can be made absent written agreement between Co-Lead Class Counsel and Counsel for the NFL Parties and approval by the Court, and neither Co-Lead Class Counsel nor Counsel for the NFL Parties shall seek modification to the definitions of Qualifying Diagnoses and/or the protocols for making Qualifying Diagnoses other than with the written agreement of the other regarding such modifications.

(b) Monetary Awards, consistent with the terms of this Settlement Agreement, shall compensate Settlement Class Members only in circumstances where a Retired NFL Football Player manifests actual cognitive impairment and/or actual neuromuscular impairment, or a deceased Retired NFL Football Player manifested actual cognitive impairment and/or actual neuromuscular impairment while living. For the avoidance of any doubt, the identification of a condition—for example, through a blood test, genetic test, imaging technique, or otherwise—that has not yet resulted in actual cognitive impairment and/or actual neuromuscular impairment experienced by the Retired NFL Football Player does not qualify as a Qualifying Diagnosis. As such, Co-Lead Class Counsel and Counsel for the NFL Parties have defined the Qualifying Diagnoses to require an actual manifestation of cognitive impairment and/or an actual manifestation of neuromuscular impairment. Consistent with Section 6.6(a), Co-Lead Class Counsel and Counsel for the NFL Parties will address possible advances in science to effectuate this mutual intent. For the avoidance of doubt, this subsection does not apply to the Qualifying Diagnosis of Death with CTE. This subsection also does not alter the Qualifying Diagnoses definitions, as set forth in Exhibit 1.

(c) In no event will modifications be made to the Monetary Award levels in the Monetary Award Grid, except for inflation adjustment(s) as set forth in Section 6.9.

Case 2:12-md-02323-AB Document 6481-1 Filed 02/13/15 Page 40 of 162

Section 6.7 Determination of Monetary Awards

(a) Settlement Class Members who the Claims Administrator determines are entitled to Monetary Awards will be compensated in accordance with the terms of the Monetary Award Grid and all applicable Offsets, as set forth in Exhibit 3 and below, except such compensation will be reduced by one percent (1%) to the extent that any Derivative Claimants submit for, and are entitled to, a Derivative Claimant Award based upon their relationships with the Retired NFL Football Player, as set forth in ARTICLE VII.

(b) Offsets. All Monetary Awards will be subject to downward adjustments, including based on a Settlement Class Member's age at the time of the Qualifying Diagnosis (as reflected in the Monetary Award Grid, as set forth in Exhibit 3), and as follows:

(i) Number of Eligible Seasons:

(1) 4.5 Eligible Seasons: - 10%

(2) 4 Eligible Seasons: - 20%

(3) 3.5 Eligible Seasons: - 30%

(4) 3 Eligible Seasons: - 40%

(5) 2.5 Eligible Seasons: - 50%

(6) 2 Eligible Seasons: - 60%

(7) 1.5 Eligible Seasons: - 70%

(8) 1 Eligible Season: - 80%

(9) 0.5 Eligible Seasons: - 90%

(10) 0 Eligible Seasons: - 97.5%

(ii) Medically diagnosed Stroke occurring prior to a Qualifying Diagnosis: - 75%

(iii) Medically diagnosed Traumatic Brain Injury occurring prior to a Qualifying Diagnosis: - 75%

(iv) Non-participation in the BAP by a Retired NFL Football Player in Subclass 1, except where the Qualifying Diagnosis is of ALS or if he receives any Qualifying Diagnosis prior to his deadline to receive a BAP baseline assessment examination as set forth in Section 5.3: - 10%

Case 2:12-md-02323-AB Document 6481-1 Filed 02/13/15 Page 41 of 162

(c) For purposes of calculating the total number of Eligible Seasons earned by a Retired NFL Football Player or deceased Retired NFL Football Player under this Settlement Agreement, each earned Eligible Season and each earned half of an Eligible Season will be summed together to reach a total number of Eligible Seasons (*e.g.*, 3.5 Eligible Seasons), except a Retired NFL Football Player may not receive credit for more than one (1) Eligible Season per year (with each year defined to include any spring World League of American Football, NFL Europe League or NFL Europa League season, and the following fall NFL season). By way of example only: (a) a Retired NFL Football Player who was on a NFL Europe League team's active roster on the date of three (3) or more regular season or postseason games during the 2002 spring NFL Europe League season and who was on a Member Club's Active List on the date of three (3) or more regular season or postseason games during the 2002-2003 fall NFL season would receive credit for one (1) Eligible Season for the year; and (b) a Retired NFL Football Player who was on a NFL Europe League team's active roster on the date of three (3) or more regular season or postseason games during the 2002 spring NFL Europe League season and who was on a Member Club's practice squad for at least eight (8) regular season or postseason games during the 2002-2003 fall NFL season would receive credit for one (1) Eligible Season for the year.

(d) If the Retired NFL Football Player receives a Qualifying Diagnosis prior to a medically diagnosed Stroke or a medically diagnosed Traumatic Brain Injury, then the 75% Offset for medically diagnosed Stroke or medically diagnosed Traumatic Brain Injury will not apply. If the Retired NFL Football Player receives a Qualifying Diagnosis subsequent to a medically diagnosed Stroke or a medically diagnosed Traumatic Brain Injury, and if the Settlement Class Member demonstrates, by clear and convincing evidence, that the Qualifying Diagnosis was not causally related to the Stroke or the Traumatic Brain Injury, then the 75% Offset will not apply.

(e) Multiple Offsets will be applied individually and in a serial manner to any Monetary Award. For example, if the Monetary Award before the application of Offsets is $1,000,000, and two 10% Offsets apply, there will be a 19% aggregate downward adjustment of the award (*i.e.*, application of the first Offset will reduce the award by 10%, or $100,000, to $900,000, and application of the second Offset will reduce the award by an additional 10%, or $90,000, to $810,000).

Section 6.8 Supplemental Monetary Awards. If, during the term of the Monetary Award Fund, a Retired NFL Football Player who has received a Monetary Award based on a certain Qualifying Diagnosis subsequently is diagnosed with a different Qualifying Diagnosis, the Retired NFL Football Player (or his Representative Claimant, if applicable) may be entitled to a Supplemental Monetary Award. If the Monetary Award level in the Monetary Award Grid ("Grid Level") for the subsequent Qualifying Diagnosis is greater than the Grid Level for the earlier Qualifying Diagnosis, the Retired NFL Football Player (or his Representative Claimant, if applicable) will be entitled to a payment that is equal to the Grid Level for the subsequent Qualifying Diagnosis, after application of all applicable Offsets, minus the Grid Level for the earlier Qualifying Diagnosis, after application of all applicable Offsets, but prior to any deductions for the satisfaction of Liens. In other words, any amounts deducted from the

earlier Monetary Award to satisfy Liens will not be considered in the calculation of the Supplemental Monetary Award, which may also require an amount deducted to satisfy any subsequent Liens. (By way of example only, a Retired NFL Football Player who receives a Monetary Award for Level 1.5 Neurocognitive Impairment that is $1,000,000 after application of all Offsets, which is then reduced by $20,000 to $980,000 to satisfy a Lien, and who later receives a Qualifying Diagnosis for Level 2 Neurocognitive Impairment that would pay $1,200,000 after application of all Offsets, where there are no additional Liens, shall be entitled to a Supplemental Monetary Award of $200,000.)

Section 6.9    Inflation Adjustment.  Monetary Award amounts set forth in Exhibit 3 will be subject to an annual inflation adjustment, beginning one year after the Effective Date, not to exceed two and a half percent (2.5%), the precise amount subject to the sound judgment of the Special Master (or the Court after expiration of the term of the Special Master) based on consideration of the Consumer Price Index for Urban Consumers (CPI-U).

Section 6.10    Monetary Award Fund Term.  The Monetary Award Fund will commence on the Effective Date and will end sixty-five (65) years after the Effective Date.

## ARTICLE VII
## Derivative Claimant Awards

Section 7.1    All Settlement Class Members who are Derivative Claimants seeking Derivative Claimant Awards must do so through the submission of Derivative Claim Packages containing all required proof, as set forth in Section 8.2(b).

Section 7.2    Eligibility.  A Settlement Class Member who is a Derivative Claimant is entitled to a Derivative Claimant Award if, and only if:  (a) the Derivative Claimant timely registered to participate in the Class Action Settlement, as set forth in Section 4.2; (b) the Retired NFL Football Player through whom the relationship is the basis of the claim (or the Representative Claimant of a deceased or legally incapacitated or incompetent Retired NFL Football Player through whom the relationship is the basis of the claim) has received a Monetary Award; (c) the Settlement Class Member timely submits a Derivative Claim Package, subject to the terms and conditions set forth in ARTICLE VIII; and (d) the Claims Administrator determines, based on a review of the records provided in the Derivative Claim Package and applicable state law, that the Derivative Claimant has a relationship with the subject Retired NFL Football Player that properly and legally provides the right under applicable state law to sue independently and derivatively.

Section 7.3    Determination of Derivative Claimant Awards.  Settlement Class Members who the Claims Administrator determines are entitled to Derivative Claimant Awards will be compensated from the Monetary Award of the Retired NFL Football Player through whom the relationship is the basis of the claim (or his Representative Claimant), and from any Supplemental Monetary Award, in the amount of one percent (1%) of that Monetary Award and any Supplemental Monetary Award.  If

there are multiple Derivative Claimants asserting valid claims based on the same subject Retired NFL Football Player, the Claims Administrator will divide and distribute the Derivative Claimant Award among those Derivative Claimants pursuant to the laws of the domicile of the Retired NFL Football Player (or his Representative Claimant, if any).

**ARTICLE VIII**
**Submission and Review of Claim Packages and Derivative Claim Packages**

Section 8.1 All Settlement Class Members applying for Monetary Awards or Derivative Claimant Awards must submit Claim Packages or Derivative Claim Packages to the Claims Administrator.

Section 8.2 Content

(a) The content of Claim Packages will be agreed to by Co-Lead Class Counsel and Counsel for the NFL Parties, and will include, without limitation: (i) a Claim Form with the Personal Signature of the Retired NFL Football Player (or Representative Claimant) either on the Claim Form or on an acknowledgement form verifying the contents of the Claim Form; (ii) a Diagnosing Physician Certification; (iii) medical records reflecting the Qualifying Diagnosis; (iv) a HIPAA-compliant authorization form; and (v) records in the possession, custody or control of the Settlement Class Member demonstrating employment and participation in NFL Football.

(i) Representative Claimants of Retired NFL Football Players who died prior to the Effective Date do not need to include a Diagnosing Physician Certification in the Claim Package if the physician who provided the Qualifying Diagnosis, as set forth in Exhibit 1, also died prior to the Effective Date or was deemed by a court of competent jurisdiction legally incapacitated or incompetent prior to the Effective Date. Instead, the Representative Claimant must provide evidence of that physician's death, incapacity or incompetence and of the qualifications of the diagnosing physician. For the avoidance of any doubt, all other content of Claim Packages must be submitted, including medical records reflecting the Qualifying Diagnosis.

(ii) In cases where a deceased Retired NFL Football Player received a Qualifying Diagnosis but the medical records reflecting the Qualifying Diagnosis are unavailable because of a force majeure type event (*e.g.*, flood, hurricane, fire), the Claims Administrator, upon petition by the Representative Claimant, may determine the Claim Package to be valid without the medical records if the Representative Claimant makes a showing of a reasonable effort to obtain the medical records from any available source and presents a certified death certificate referencing the Qualifying Diagnosis made while the Retired NFL Football Player was living. For the avoidance of any doubt, the Claims Administrator has the sole discretion to determine the sufficiency of this showing, subject to the appeal rights set forth in Section 9.5. If the unavailability of medical records also causes the diagnosing physician to be unable to provide a Diagnosing Physician Certification, the Claims Administrator, upon petition by

Case 2:12-md-02323-AB Document 6481-1 Filed 02/13/15 Page 44 of 162

the Representative Claimant, and in addition to the presentation of a certified death certificate referencing the Qualifying Diagnosis made while the Retired NFL Football Player was living, may instead allow an accompanying sworn affidavit from the diagnosing physician attesting to the reasons why the diagnosing physician is unable to provide a Diagnosing Physician Certification without the medical records. The Claims Administrator has the sole discretion to determine the sufficiency of this showing, subject to the appeal rights set forth in Section 9.5.

(iii) In cases where a Retired NFL Football Player has received a Qualifying Diagnosis and the diagnosing physician who provided the Qualifying Diagnosis, as set forth in Exhibit 1, has died or has been deemed by a court of competent jurisdiction legally incapacitated or incompetent prior to the Effective Date, or otherwise prior to completing a Diagnosing Physician Certification, the Retired NFL Football Player (or his Representative Claimant, if applicable) may obtain a Diagnosing Physician Certification from a separate qualified physician for the Qualifying Diagnosis as specified in Exhibit 1 based on an independent examination by the qualified physician and a review of the Retired NFL Football Player's medical records that formed the basis of the Qualifying Diagnosis by the deceased or legally incapacitated or incompetent physician. If the same Qualifying Diagnosis is found by both doctors, the date of Qualifying Diagnosis used to calculate Monetary Awards shall be the date of the earlier Qualifying Diagnosis.

(b) The content of Derivative Claim Packages will be agreed to by Co-Lead Class Counsel and Counsel for the NFL Parties, and will include, without limitation: (i) a Derivative Claim Form with the Personal Signature of the Derivative Claimant either on the Derivative Claim Form or on an acknowledgement form verifying the contents of the Derivative Claim Form; and (ii) records sufficient to verify the relationship with the subject Retired NFL Football Player or deceased Retired NFL Football Player that properly and legally provides the Derivative Claimant the right under applicable state law to sue independently and derivatively.

(c) All statements made in Claim Forms, Derivative Claim Forms, any acknowledgement forms, and Diagnosing Physician Certifications will be sworn statements under penalty of perjury.

(d) Each Settlement Class Member has the obligation to submit to the Claims Administrator all of the documents required in Section 8.2 to receive a Monetary Award or Derivative Claimant Award.

Section 8.3 Submission

(a) Settlement Class Members must submit Claim Packages and Derivative Claim Packages to the Claims Administrator in accordance with Section 30.15.

(i) Claim Packages must be submitted to the Claims Administrator no later than two (2) years after the date of the Qualifying Diagnosis or

Case 2:12-md-02323-AB Document 6481-1 Filed 02/13/15 Page 45 of 162

within two (2) years after the Settlement Class Supplemental Notice is posted on the Settlement Website, whichever is later. Failure to comply with this two (2) year time limitation will preclude a Monetary Award for that Qualifying Diagnosis, unless the Settlement Class Member can show substantial hardship that extends beyond the Retired NFL Football Player's Qualifying Diagnosis and that precluded the Settlement Class Member from complying with the two (2) year deadline, and submits the Claim Package within four (4) years after the date of the Qualifying Diagnosis or after the Settlement Class Supplemental Notice is posted on the Settlement Website, whichever is later.

(ii) Derivative Claim Packages must be submitted to the Claims Administrator no later than thirty (30) days after the Retired NFL Football Player through whom the relationship is the basis of the claim (or the Representative Claimant of a deceased or legally incapacitated or incompetent Retired NFL Football Player through whom the relationship is the basis of the claim) receives a Notice of Monetary Award Claim Determination that provides a determination that the Retired NFL Football Player (or his Representative Claimant) is entitled to a Monetary Award. Failure to comply with this time limitation will preclude a Derivative Claimant Award based on that Monetary Award.

(b) Each Settlement Class Member will promptly notify the Claims Administrator of any changes or updates to the information the Settlement Class Member has provided in the Claim Package or Derivative Claim Package, including any change in mailing address.

(c) All information submitted by Settlement Class Members to the Claims Administrator will be recorded in a computerized database that will be maintained and secured in accordance with all applicable federal, state and local laws, regulations and guidelines, including, without limitation, HIPAA. The Claims Administrator must ensure that information is recorded and used properly, that an orderly system of data management and maintenance is adopted, and that the information is retained under responsible custody. The Claims Administrator will keep the database in a form that grants access for claims administration use, but otherwise restricts access rights, including to employees of the Claims Administrator who are not working on claims administration for the Class Action Settlement.

(i) The Claims Administrator and Lien Resolution Administrator, and their respective agents, representatives, and professionals who are administering the Class Action Settlement, will have access to all information submitted by Settlement Class Members to the Claims Administrator and/or Lien Resolution Administrator necessary to perform their responsibilities under the Settlement Agreement.

(ii) All information submitted by Settlement Class Members to the Claims Administrator will be treated as confidential, as set forth in Section 17.2.

Case 2:12-md-02323-AB Document 6481-1 Filed 02/13/15 Page 46 of 162

Section 8.4 Preliminary Review

(a) Within forty-five (45) days of the date on which the Claims Administrator receives a Claim Package or Derivative Claim Package from a Settlement Class Member, the Claims Administrator will determine the sufficiency and completeness of the required contents, as set forth in Section 8.2. To the extent the volume of claims warrants, this deadline may be extended by agreement between Co-Lead Class Counsel and Counsel for the NFL Parties, subject to approval by the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof).

(b) The Claims Administrator will reject a claim submitted by a Settlement Class Member, subject to the cure provisions of Section 8.5, if the Claims Administrator has not received all required content.

Section 8.5 Deficiencies and Cure. For rejected Claim Packages or Derivative Claim Packages, the Claims Administrator will send a Notice of Deficiency to the Settlement Class Member, which Notice will contain a brief explanation of the Deficiency(ies) giving rise to rejection of the Claim Package or Derivative Claim Package, and will, where necessary, request additional information and/or documentation. The Claims Administrator will make available to the Settlement Class Member through a secure online web interface any document(s) with a Deficiency needing correction or, upon request from the Settlement Class Member, will mail the Settlement Class Member a copy of such document(s). The Notice of Deficiency will be sent no later than forty-five (45) days from the date of receipt of the Claim Package or Derivative Claim Package by the Claims Administrator. To the extent the volume of claims warrants, this deadline may be extended by agreement between Co-Lead Class Counsel and Counsel for the NFL Parties, subject to approval by the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof). The Notice of Deficiency will contain a recommendation for how, if possible, the Settlement Class Member can cure the Deficiency, and will provide a reasonable deadline not less than 120 days (from the date the Notice of Deficiency is sent to the Settlement Class Member) for the Settlement Class Member to submit Deficiency cure materials. Within that time period, the Settlement Class Member will have the opportunity to cure all Deficiencies and provide any requested additional information or documentation, except that the failure to submit timely a Claim Package or Derivative Claim Package in accordance with the terms of this Settlement Agreement cannot be cured other than upon a showing of substantial hardship as set forth in Section 8.3(a)(i). Any Claim Package or Derivative Claim Package that continues to suffer from a Deficiency identified on the Notice of Deficiency following the submission of documentation intended to cure the Deficiency will be denied by the Claims Administrator.

Section 8.6 Verification and Investigation

(a) Each Settlement Class Member claiming a Monetary Award or Derivative Claimant Award will authorize the Claims Administrator and/or Lien Resolution Administrator, as applicable, consistent with HIPAA and other

Case 2:12-md-02323-AB Document 6481-1 Filed 02/13/15 Page 47 of 162

applicable privacy laws, to verify facts and details of any aspect of the Claim Package or Derivative Claim Package and/or the existence and amounts, if any, of any Liens. The Claims Administrator or Lien Resolution Administrator, at its sole discretion, may request additional documentation, which each Settlement Class Member agrees to provide in order to claim a Monetary Award or Derivative Claimant Award.

(b) The Claims Administrator will have the discretion to undertake or cause to be undertaken further verification and investigation, including into the nature and sufficiency of any Claim Package or Derivative Claim Package documentation, including, without limitation, as set forth in Section 10.3.

**ARTICLE IX**
**Notice of Claim Determinations, Payments, and Appeals**

Section 9.1 Monetary Award Determination. Based upon its review of the Claim Package, and the results of any investigations of the Settlement Class Member's claim, the Claims Administrator will determine whether a Settlement Class Member qualifies for a Monetary Award and the amount of any such Award. In order to decide whether a Settlement Class Member is entitled to a Monetary Award, and at what level, the Claims Administrator will determine whether the Retired NFL Football Player or deceased Retired NFL Football Player has a Qualifying Diagnosis according to the Diagnosing Physician Certification, including consideration of, without limitation, the qualifications of the diagnosing physician, or in the case of a deceased Retired NFL Football Player diagnosed by a deceased physician, as set forth in Section 8.2(a)(i), according to the supporting medical records. If the Claims Administrator determines that there is a Qualifying Diagnosis, it will determine the level of Monetary Award based on the Monetary Award Grid (attached as Exhibit 3) and a review of the Diagnosing Physician Certification for the age at the time of the Qualifying Diagnosis, and will review the Claim Package, including the Claim Form and medical records reflecting the Qualifying Diagnosis, for information relating to all other Offsets, and must apply all applicable Offsets to the Monetary Award. For the avoidance of any doubt, the Claims Administrator has no discretion to make a Monetary Award determination other than as set forth above.

(a) Evidence of NFL Employment and Participation. To the extent that the Claims Administrator determines that the Settlement Class Member has provided in the Claim Package insufficient evidence of the Retired NFL Football Player's NFL employment and participation to substantiate the claimed Eligible Seasons, the Claims Administrator will request that the NFL Parties and Member Clubs provide any employment or participation records of the Retired NFL Football Player in their reasonable possession, custody or control, which the NFL Parties and Member Clubs will provide in good faith. The Claims Administrator will consider all of the evidence provided to it by the Retired NFL Football Player and the NFL Parties and Member Clubs in determining the appropriate number of Eligible Seasons to apply to the Retired NFL Football Player's claim. The Claims Administrator shall credit only the Eligible Seasons substantiated by the overall evidence. To the extent there is no objective evidence regarding an Eligible Season claimed by the Retired NFL Football Player

Case 2:12-md-02323-AB Document 6481-1 Filed 02/13/15 Page 48 of 162

beyond his sworn statement, the Claims Administrator will take into account the reasons offered by the Retired NFL Football Player for the lack of such objective evidence in arriving at its final decision.

(i) The assertion of NFL employment and participation in more than one (1) Eligible Season, however, must be substantiated by the Retired NFL Football Player with objective evidence beyond his sworn statement, the sufficiency of which shall be in the Claims Administrator's discretion. In the event there is no objective evidence of NFL employment and participation in more than one (1) Eligible Season, the Claims Administrator may credit the Retired NFL Football Player with one (1) or fewer Eligible Seasons consistent with Section 9.1(a).

(b) Timing of Monetary Award Determination. The Claims Administrator will make such determination and will send a corresponding Notice of Monetary Award Claim Determination to the Settlement Class Member and the NFL Parties no later than sixty (60) days from the later of: (i) the date when a completed Claim Package that is free from all Deficiencies is received by the Claims Administrator; (ii) the date, if any, when all Deficiencies with a Settlement Class Member's Claim Package have been deemed cured by the Claims Administrator; (iii) the date, if any, on which the additional information or documentation identified in the Notice of Deficiency, if applicable, has been timely provided to the Claims Administrator; (iv) the date of a decision by a member of the Appeals Advisory Panel under Section 8.6(b); or (v) the date on which the Settlement Class Member no longer has the right to cure such Deficiencies or provide additional information or documentation, in accordance with Section 8.5; provided, however, that to the extent the volume of claims warrants, these deadlines may be extended by agreement between Co-Lead Class Counsel and Counsel for the NFL Parties, subject to approval by the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof).

(c) Notice Content

(i) Notices of Monetary Award Claim Determination that provide an adverse determination will include a short statement regarding the reasons for the adverse determination and information regarding how the Settlement Class Member can appeal the determination, as set forth in Section 9.7. An adverse Notice of Monetary Award Claim Determination does not preclude a Settlement Class Member from submitting a Claim Package in the future for a Monetary Award should the Retired NFL Football Player's medical condition change. The Claims Administrator shall develop reasonable procedures and rules to ensure the right of Settlement Class Members to submit a Claim Package for the same or different Qualifying Diagnoses in the future, while preventing unwarranted repetitive claims that do not disclose materially changed circumstances from prior claims made by the Settlement Class Member.

(ii) Notices of Monetary Award Claim Determination that provide a determination that the Settlement Class Member is entitled to a Monetary Award will provide: (a) the net amount of that Monetary Award after application of Offsets; (b) a listing of the Offsets applied to that Monetary Award; (c) the Lien

Case 2:12-md-02323-AB Document 6481-1 Filed 02/13/15 Page 49 of 162

Resolution Administrator's determination of any amount deducted from the Monetary Award to satisfy identified Liens, as set forth in ARTICLE XI; or the Lien Resolution Administrator's determination of the "holdback" amount to be deducted from the Monetary Award under which identified Liens shall be resolved, as set forth in ARTICLE XI; (d) information regarding how the Settlement Class Member can appeal the Monetary Award determination, as set forth in Section 9.7; and (e) information regarding the timing of payment, as set forth in Section 9.3.

(d) NFL Parties' and Co-Lead Class Counsel's Review of Claim Packages. If a Notice of Monetary Award Determination provides a determination that the Settlement Class Member is entitled to a Monetary Award, the Claims Administrator will make the Settlement Class Member's Claim Package and the review determinations available to the NFL Parties and Co-Lead Class Counsel.

Section 9.2 Derivative Claimant Award Determination. Based upon its review of the Derivative Claim Package, and the results of any investigations of the Derivative Claimant's claim, the Claims Administrator will determine whether a Derivative Claimant qualifies for a Derivative Claimant Award, as set forth in Section 7.3.

(a) Timing of Derivative Claimant Award Determination. The Claims Administrator will make such determination and will send a corresponding Notice of Derivative Claimant Award Determination to the Settlement Class Member and the NFL Parties no later than thirty (30) days from the later of: (i) the date when a completed Derivative Claim Package that is free from all Deficiencies is received by the Claims Administrator; (ii) the date when all Deficiencies with a Settlement Class Member's Derivative Claim Package have been determined by the Claims Administrator to be satisfactorily cured; (iii) the date, if any, on which the additional information or documentation identified in the Notice of Deficiency, if applicable, has been timely provided to the Claims Administrator; or (iv) the date on which the Settlement Class Member no longer has the right to cure such Deficiencies or provide additional information or documentation, in accordance with Section 8.5; provided, however, that to the extent the volume of claims warrants, these deadlines may be extended by agreement between Co-Lead Class Counsel and Counsel for the NFL Parties, subject to approval by the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof).

(b) Notice Content

(i) Notices of Derivative Claimant Award Determination that provide an adverse determination will include a short statement regarding the reasons for the adverse determination and information regarding how the Settlement Class Member can appeal the determination, as set forth in Section 9.7. An adverse Notice of Derivative Claimant Award Determination does not preclude a Derivative Claimant from submitting a Derivative Claim Package in the future for a Derivative Claimant Award should the Retired NFL Football Player receive a

Case 2:12-md-02323-AB Document 6481-1 Filed 02/13/15 Page 50 of 162

Supplemental Monetary Award or succeed on an appeal of a previously denied claim for a Monetary Award.

(ii) Notices of Derivative Claimant Award Determination that provide a determination that the Settlement Class Member is entitled to a Derivative Claimant Award will provide: (a) the amount of that Derivative Claimant Award; (b) the Lien Resolution Administrator's determination of any amount deducted from the Derivative Claimant Award to satisfy identified Liens, as set forth in ARTICLE XI; or the Lien Resolution Administrator's determination of the "holdback" amount to be deducted from the Derivative Claimant Award under which identified Liens will be resolved, as set forth in ARTICLE XI; (c) information regarding how the Derivative Claimant can appeal the Derivative Claimant Award determination, as set forth in Section 9.7; and (d) information regarding the timing of payment, as set forth in Section 9.4.

(c) NFL Parties' and Co-Lead Class Counsel's Review of Derivative Claim Packages. If a Notice of Derivative Claimant Award Determination provides a determination that the Settlement Class Member is entitled to a Derivative Claimant Award, the Claims Administrator will make the Settlement Class Member's Claim Package and the review determinations available to the NFL Parties and Co-Lead Class Counsel.

Section 9.3 Remuneration and Payment of Monetary Awards.

(a) The Claims Administrator will promptly pay any Monetary Awards to Settlement Class Members who qualify under the terms of the Monetary Award Grid and all applicable Offsets after the Claims Administrator sends a Notice of Monetary Award Claim Determination; provided, however, any such payment will not occur until after the completion of the processes for (i) appealing Monetary Award determinations, as set forth in Section 9.7; (ii) auditing claims and investigating claims for fraud, as set forth in Section 10.3; (iii) identifying and satisfying Liens, as set forth in ARTICLE XI; and (iv) determining if any Derivative Claimants have filed timely, and are entitled to, Derivative Claimant Awards based on their relationship with the subject Retired NFL Football Player. Such payment shall be made consistent with Section 23.3(b)(iv) of this Settlement Agreement.

(b) In connection with a Monetary Award issued to a Representative Claimant, the Claims Administrator will abide by all substantive laws of the domicile of such Representative Claimant concerning distribution and will not issue payment until the Claims Administrator has received from the Settlement Class Member proof of such court approvals or other documents necessary to authorize payment. Where short form procedures exist concerning such distribution that do not require domiciliary court approval or supervision, the Claims Administrator is authorized to adopt those procedures as part of the claims administration process applicable to such Representative Claimant. The Claims Administrator also is authorized to adopt procedures as are approved by the Court to aid or facilitate in the payment of claims to minor, incapacitated or incompetent Settlement Class Members or their guardians.

(c)     Upon the completion of the Monetary Award Fund term, as set forth in Section 6.10, the Court shall determine the proper disposition of any funds remaining in the Monetary Award Fund consistent with the purpose of this Settlement, including to promote safety and injury prevention with respect to football players and/or the treatment or prevention of traumatic brain injuries.

Section 9.4     Remuneration and Payment of Derivative Claimant Awards

(a)     The Claims Administrator will promptly pay any Derivative Claimant Awards to Settlement Class Members who qualify; provided, however, any such payment will not occur until after expiration or completion of:  (i) the time period for Derivative Claimants to file Derivative Claim Packages, as set forth in Section 8.3(a)(ii), has expired; (ii) the process for appealing Derivative Claimant Awards, including appeals by any other Derivative Claimants asserting claims based on the same Retired NFL Football Player, as set forth in Section 9.7; (iii) the process for auditing claims and investigating claims for fraud, set forth in Section 10.3; and (iv) the process for identifying and satisfying Liens, as set forth in ARTICLE XI.  Such payment shall be made consistent with Section 23.3(b)(iv) of this Settlement Agreement.

(b)     In paying a Derivative Claimant Award to a minor, the Claims Administrator will abide by all substantive laws of the domicile of such Settlement Class Member concerning distribution and will not issue payment until the Claims Administrator has received from the Settlement Class Member proof of such court approvals or other documents necessary to authorize payment.  Where short form procedures exist concerning such distribution that do not require domiciliary court approval or supervision, the Claims Administrator is authorized to adopt those procedures as part of the claims administration process applicable to such Settlement Class Members.  The Claims Administrator also is authorized to adopt procedures as are approved by the Court to aid or facilitate in the payment of claims to minor, incapacitated or incompetent Settlement Class Members or their guardians.

Section 9.5     Scope of Appeals.     The Claims Administrator's determination as to whether a Settlement Class Member is entitled to a Monetary Award or Derivative Claimant Award under this Settlement Agreement, and/or the calculation of the Monetary Award or Derivative Claimant Award, is appealable by the Settlement Class Member, Co-Lead Class Counsel, or the NFL Parties based on their respective good faith belief that the determination by the Claims Administrator was incorrect.

Section 9.6     Appellant Fees and Limitations

(a)     Any Settlement Class Member taking an appeal will be charged a fee of One Thousand United States dollars (U.S. $1,000) by the Claims Administrator that must be paid before the appeal may proceed, which fee will be refunded if the Settlement Class Member's appeal is successful.  If the appeal is unsuccessful, the fee will be paid to the Settlement Trust for transfer by the Trustee into the Monetary Award Fund.

Case 2:12-md-02323-AB Document 6481-1 Filed 02/13/15 Page 52 of 162

(i) Settlement Class Members may make a hardship request to the Claims Administrator and ask that the fee of One Thousand United States dollars (U.S. $1,000) be waived for good cause. The Claims Administrator will require that the Settlement Class Member provide such financial information as may be necessary to decide the request to waive the fee, which request shall be approved or denied in the Claims Administrator's sole discretion.

(b) The NFL Parties may appeal Monetary Award or Derivative Claimant Award determinations in good faith. To the extent that Co-Lead Class Counsel believe that the NFL Parties are submitting vexatious, frivolous or bad faith appeals, Co-Lead Class Counsel may petition the Court for appropriate relief.

Section 9.7 Submissions on Appeals

(a) The appellant must submit to the Court his or her notice of appeal, using an Appeals Form to be agreed upon by Co-Lead Class Counsel and the NFL Parties and provided by the Claims Administrator, with written copy to the appellee(s) Settlement Class Member or the NFL Parties (as applicable), Co-Lead Class Counsel, and to the Claims Administrator, no later than thirty (30) days after receipt of a Notice of Monetary Award Claim Determination or Notice of Derivative Claimant Award Determination. Appellants must present evidence in support of their appeal, and any written statements may not exceed five (5) single-spaced pages in length.

(b) The appellee(s) may submit a written opposition to the appeal no later than thirty (30) days after receipt of the Appeals Form. This written opposition must not exceed five (5) single-spaced pages in length. The Court will not deem the lack of an opposition to be an admission regarding the merits of the appeal. The appellant may not submit a reply.

(c) Co-Lead Class Counsel may submit a written statement in support of or opposition to the appeal no later than fifteen (15) days after receipt of the Appeals Form or an appellee's written opposition. This written statement must not exceed five (5) single-spaced pages in length. The Court will not deem the lack of a statement to be an admission regarding the merits of the appeal. The appellant and appellee(s) may each submit a reply.

Section 9.8 Review and Decision. The Court will make a determination based upon a showing by the appellant of clear and convincing evidence. The Court may be assisted, in its discretion, by any member of the Appeals Advisory Panel and/or an Appeals Advisory Panel Consultant. The decision of the Court will be final and binding.

(a) Appeals Advisory Panel and Appeals Advisory Panel Consultants

(i) Within ninety (90) days after the Effective Date, Co-Lead Class Counsel and Counsel for the NFL Parties will agree to, and jointly recommend to the Court for appointment, the members of the Appeals Advisory Panel

and the Appeals Advisory Panel Consultants. Under no circumstances may a member of the Appeals Advisory Panel or an Appeals Advisory Panel Consultant have been convicted of a crime of dishonesty, or serve, on or after the Final Approval Date, as a litigation expert consultant or expert witness in connection with litigation relating to the subject matter of the Class Action Complaint for a party, a Member Club, or an Opt Out, or his, her or its counsel. If selected and approved, under no circumstances shall an Appeals Advisory Panel member or Appeals Advisory Panel Consultant continue to serve in that role if convicted of a crime of dishonesty and/or thereafter retained as an expert consultant or expert witness in connection with litigation relating to the subject matter of the Class Action Complaint by a party, a Member Club, or an Opt Out, or his, her or its counsel.

(ii) Co-Lead Class Counsel and Counsel for the NFL Parties will jointly retain the members of the Appeals Advisory Panel and the Appeals Advisory Panel Consultants appointed by the Court.

(iii) Upon request of the Court or the Special Master, the Appeals Advisory Panel will take all steps necessary to provide sound advice with respect to medical aspects of the Class Action Settlement.

(iv) The Court will oversee the Appeals Advisory Panel and the Appeals Advisory Panel Consultants, and may, in its discretion, request reports or information from the Appeals Advisory Panel or the Appeals Advisory Panel Consultants.

(v) Compensation of the Appeals Advisory Panel and Appeals Advisory Panel Consultants, at a reasonable rate for their time agreed to by Co-Lead Class Counsel and Counsel for the NFL Parties, will be paid out of the Monetary Award Fund, except that compensation of an Appeals Advisory Panel member or Appeals Advisory Panel Consultant will be paid out of the BAP fund for reviewing and advising the Court whether a Retired NFL Football player has Level 1 Neurocognitive Impairment, Level 1.5 Neurocognitive Impairment, Level 2 Neurocognitive Impairment, or none, in cases where there are conflicting diagnoses by Qualified BAP Providers.

(vi) Members of the Appeals Advisory Panel or the Appeals Advisory Panel Consultants may be replaced by joint motion made by Co-Lead Class Counsel and Counsel for the NFL Parties, or for cause by motion of either Co-Lead Class Counsel or Counsel for the NFL Parties, upon order of the Court. If any member of the Appeals Advisory Panel or an Appeals Advisory Panel Consultant resigns, dies, is replaced, or is otherwise unable to continue in his or her position, Co-Lead Class Counsel and Counsel for the NFL Parties will agree to and jointly recommend a new proposed member for appointment by the Court.

(b) Conflicts of Interest. Within ninety (90) days after the Effective Date, Co-Lead Class Counsel, Counsel for the NFL Parties, and the Special Master will establish and implement procedures to promptly detect and resolve possible conflicts of interest between members of the Appeals Advisory Panel or Appeals

Case 2:12-md-02323-AB Document 6481-1 Filed 02/13/15 Page 54 of 162

Advisory Panel Consultants, on the one hand, and an appellant or appellee(s), on the other hand. Co-Lead Class Counsel and Counsel for the NFL Parties, subject to approval of the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof) may modify such procedures in the future, if appropriate. For the avoidance of any doubt, employment of the Special Master by any Party as an expert in unrelated matters will not constitute a conflict of interest.

(c) Liability. The Parties, Class Counsel, Counsel for the NFL Parties, and the Special Master, and their respective Affiliates, will not be liable for any act, or failure to act, of a member of the Appeals Advisory Panel or an Appeals Advisory Panel Consultant.

**ARTICLE X**
**Class Action Settlement Administration**

Section 10.1 Special Master

(a) Appointment and Oversight

(i) The Motion for Preliminary Approval of the Class Action Settlement filed by Class Counsel will request that the Court appoint, in consultation with Co-Lead Class Counsel and Counsel for the NFL Parties, a Special Master pursuant to Federal Rule of Civil Procedure 53.

(ii) It is the intention of the Parties that the Special Master will perform his or her responsibilities and take all steps necessary to faithfully oversee the implementation and administration of the Settlement Agreement. The Special Master shall be appointed for a term of five (5) years commencing on the Effective Date. The term of the Special Master shall be extended, or a new Special Master shall be appointed, for additional five-year terms for the life of the Settlement Agreement, unless the Court determines, in consultation with Co-lead Class Counsel and Counsel for the NFL Parties, that the Special Master's role is no longer necessary.

(iii) The Special Master will maintain at all times appropriate and sufficient bonding insurance in connection with his or her performance of responsibilities under the Settlement Agreement. The cost for this insurance will be paid out of the Monetary Award Fund.

(iv) The Court may, at its sole discretion, request reports or information from the Special Master. The Special Master will be responsible for reporting and providing information to the Court at such frequency and in such a manner as the Court directs. The Claims Administrator may assist with such reports if requested by the Special Master.

(v) Following the five (5) year term of the Special Master, and any extension(s) thereof, oversight of the administration of the Class Action Settlement will revert to the Court.

(b) Roles and Responsibilities

(i) The Special Master will, among other responsibilities set forth in this Settlement Agreement:

(1) Provide reports or information that the Court may, at its sole discretion, request from the Special Master, who will be responsible for reporting and providing information to the Court at such frequency and in such a manner as the Court directs;

(2) Oversee complaints raised by Co-Lead Class Counsel, Counsel for the NFL Parties, the BAP Administrator, Claims Administrator and/or the Lien Resolution Administrator regarding aspects of the Class Action Settlement;

(3) Hear appeals of registration determinations, if requested by the Court, as set forth in Section 4.3(a)(iv);

(4) Oversee the BAP Administrator, Claims Administrator and Lien Resolution Administrator, as set forth in Section 5.6(a)(iv), Section 10.2(a)(iv), and Section 11.1(a)(iv), and receive monthly and annual reports from those Administrators; and

(5) Oversee fraud detection and prevention procedures, and review and decide the appropriate disposition of potentially fraudulent claims as further specified in Section 10.3(i).

(c) Compensation and Expenses. Annual compensation of the Special Master will not exceed Two Hundred Thousand United States dollars (U.S. $200,000). The annual compensation and reasonable out-of-pocket costs and expenses of the Special Master directly incurred as a result of the performance of his or her responsibilities will be paid out of the Monetary Award Fund. Either Co-Lead Class Counsel or Counsel for the NFL Parties may challenge the reasonableness of the Special Master's out-of-pocket costs and expenses, in which case the Court will determine the reasonableness of such costs and expenses. If the Court determines that any costs and expenses are unreasonable, the Special Master will not be paid for such costs and expenses or, if such costs and expenses have already been paid, the Special Master will refund that amount to the Monetary Award Fund.

(d) Replacement. The Court, in its discretion, can replace the Special Master for good cause. If the Special Master resigns, dies, or is otherwise unable to continue employment in this position, Co-Lead Class Counsel and Counsel for the NFL Parties may file a motion for the appointment by the Court of a new Special Master.

(e) Conflicts of Interest. Within ninety (90) days after the Effective Date, Co-Lead Class Counsel, Counsel for the NFL Parties, and the Special Master will establish and implement procedures to promptly detect and resolve possible conflicts of interest between the Special Master, on the one hand, and Settlement Class

Members (and counsel individually representing them, if any), Class Counsel, the NFL Parties, Counsel for the NFL Parties, the BAP Administrator, the Claims Administrator, or the Lien Resolution Administrator, on the other hand. Co-Lead Class Counsel and Counsel for the NFL Parties, subject to approval of the Court, may modify such procedures in the future, if appropriate. For the avoidance of any doubt, employment of the Special Master by any Party as an expert in unrelated matters will not constitute a conflict of interest.

Section 10.2 Claims Administrator

(a) Appointment and Oversight

(i) The Motion for Preliminary Approval of the Class Action Settlement filed by Class Counsel will request that the Court appoint BrownGreer PLC as Claims Administrator. Within ten (10) days after the Effective Date, Co-Lead Class Counsel will retain the Claims Administrator appointed by the Court.

(ii) Co-Lead Class Counsel's retention agreement with the Claims Administrator will provide that the Claims Administrator will perform its responsibilities and take all steps necessary to faithfully implement and administer the Settlement Agreement, and will require that the Claims Administrator maintain at all times appropriate and sufficient bonding insurance in connection with its performance of its responsibilities under the Settlement Agreement.

(iii) The Court may, at its sole discretion, request reports or information from the Claims Administrator. The Claims Administrator will be responsible for reporting and providing information to the Court at such frequency and in such a manner as the Court directs.

(iv) The Special Master, for the duration of his or her term, will oversee the Claims Administrator, and may, at his or her sole discretion, request reports or information from the Claims Administrator.

(v) Beyond the reporting requirements set forth in Section 10.2(a)(iii)-(iv), beginning one month after the Effective Date, the Claims Administrator will issue a regular monthly report to the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), Co-Lead Class Counsel, and Counsel for the NFL Parties during the first three years of the Monetary Award Fund, and thereafter on a quarterly basis or as reasonably agreed upon by the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), Co-Lead Class Counsel and the NFL Parties, regarding the status and progress of claims administration. The monthly (or quarterly) report will include, without limitation: (a) the monthly and total number of Settlement Class Members who registered timely, and the biographical information for each Settlement Class Member who registered timely in the preceding month, as set forth in Section 4.2(c); (b) the identity of each Settlement Class Member who submitted a Claim Package or Derivative Claim Package in the preceding month, the review status of such package (*e.g*, under

preliminary review, subject to a Notice of Deficiency, subject to verification and investigation, received a Notice of Claim Determination), and the monthly and total number of Settlement Class Member claims for Monetary Awards and Derivative Claimant Awards; (c) the monthly and total number of Monetary Awards and Derivative Claimant Awards paid; (d) the monthly and total number of each Qualifying Diagnosis for which a Monetary Award has been paid; (e) the monthly and total number of Settlement Class Members for whom appeals are pending regarding Monetary Awards and Derivative Claimant Awards; (f) the monthly identification/breakdown of physicians diagnosing Qualifying Diagnoses and/or law firms representing Settlement Class Members who submitted claims for Monetary Awards and Derivative Claimant Awards; (g) the monthly expenses/administrative costs, including a summary accounting of the administrative expenses incurred by the Claims Administrator; and (h) any other information requested by the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), Co-Lead Class Counsel, or Counsel for the NFL Parties.

(vi) Beginning on the first January after the Effective Date, the Claims Administrator will provide annual financial reports to the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), Co-Lead Class Counsel and Counsel for the NFL Parties, based on information from the preceding year, regarding: (a) the number of Settlement Class Members, broken down by Qualifying Diagnosis, who received Monetary Awards, and the corresponding number of Settlement Class Members who sought but were found by the Claims Administrator or the Court not to qualify for Monetary Awards; (b) the number of Settlement Class Members who received Derivative Claimant Awards, and the corresponding number of Settlement Class Members who sought but were found by the Claims Administrator or the Court not to qualify for Derivative Claimant Awards; (c) the monetary amounts paid through Monetary Awards and Derivative Claimant Awards, including the monetary amounts over the term of the Class Action Settlement; (d) the number of Settlement Class Members for whom appeals are pending regarding Monetary Awards and Derivative Claimant Awards; (e) the identification/breakdown of physicians diagnosing Qualifying Diagnoses and/or law firms representing Settlement Class Members who submitted claims for Monetary Awards and Derivative Claimant Awards; (f) expenses/administrative costs, including a summary accounting of the administrative expenses incurred by the Claims Administrator; (g) the projected expenses/administrative costs for the remainder of the Monetary Award Fund term; (h) the monies remaining in the Monetary Award Fund; and (i) any other information requested by the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), Co-Lead Class Counsel, or Counsel for the NFL Parties.

(vii) The NFL Parties may elect, at their own expense, to cause an audit to be performed by a certified public accountant of the financial records of the Claims Administrator, and the Claims Administrator shall cooperate in good faith with the audit. Audits may be conducted at any time during the term of the Monetary Award Fund. Complete copies of the audit findings report will be provided to the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), Co-Lead Class Counsel, and Counsel for the NFL Parties.

(b) Roles and Responsibilities

(i) The Claims Administrator will, among other responsibilities set forth in this Settlement Agreement:

(1) Maintain the Settlement Website, as set forth in Section 4.1(a);

(2) Maintain an automated telephone system to provide information about the Class Action Settlement, as set forth in Section 4.1(b);

(3) Establish and administer both online and hard copy registration methods, as set forth in Section 4.2(a);

(4) Review a purported Settlement Class Member's registration and determine its validity, as set forth in Section 4.3;

(5) Process and review Claim Packages and Derivative Claim Packages, as set forth in ARTICLE VIII;

(6) Determine whether Settlement Class Members who submit Claim Packages and Derivative Claim Packages are entitled to Monetary Awards or Derivative Claimant Awards, as set forth in ARTICLE VI and ARTICLE VII;

(7) Audit Claim Packages and Derivative Claim Packages, and establish and implement procedures to detect and prevent fraudulent submissions to, and payments of fraudulent claims from, the Monetary Award Fund, as set forth in Section 10.3; and

(8) Perform such other tasks reasonably necessary to accomplish the goals contemplated by this Settlement Agreement, as agreed to by Co-Lead Class Counsel and Counsel for the NFL Parties.

(c) Compensation and Expenses. Reasonable compensation of the Claims Administrator, as agreed to by Co-Lead Class Counsel and Counsel for the NFL Parties, and reasonable out-of-pocket costs and expenses directly incurred as a result of the Claims Administrator's responsibilities set forth in this Settlement Agreement will be paid out of the Monetary Award Fund. The Claims Administrator shall submit an annual budget to the Court for review and approval. Either Co-Lead Class Counsel or Counsel for the NFL Parties may challenge the reasonableness of the Claims Administrator's out-of-pocket costs and expenses, in which case the Court will determine (or may, in its discretion, refer the challenge to the Special Master to determine) the reasonableness of such costs and expenses. If the Court or Special Master, as applicable, determines that any costs and expenses are unreasonable, the Claims Administrator will not be paid for such costs and expenses or, if such costs and expenses have already been paid, the Claims Administrator will refund that amount to the Monetary Award Fund.

Case 2:12-md-02323-AB Document 6481-1 Filed 02/13/15 Page 59 of 162

(d) Liability. The Parties, Class Counsel, Counsel for the NFL Parties, and the Special Master, and their respective Affiliates, will not be liable for any act, or failure to act, of the Claims Administrator.

(e) Replacement. The Claims Administrator may be replaced by joint motion made by Co-Lead Class Counsel and Counsel for the NFL Parties, or for cause by motion of either Co-Lead Class Counsel or Counsel for the NFL Parties, upon order of the Court. If the Claims Administrator resigns, dies, is replaced, or is otherwise unable to continue employment in this position, Co-Lead Class Counsel and Counsel for the NFL Parties will jointly recommend a new proposed Claims Administrator for appointment by the Court.

(f) Conflicts of Interest. Within ninety (90) days after the Effective Date, Co-Lead Class Counsel, Counsel for the NFL Parties, the Special Master and the Claims Administrator will establish and implement procedures to promptly detect and resolve possible conflicts of interest between the Claims Administrator, including, without limitation, its executive leadership team and all employees working on the Class Action Settlement, on the one hand, and Settlement Class Members and their counsel (if any), the NFL Parties, Counsel for the NFL Parties, or the Special Master, on the other hand. Co-Lead Class Counsel, Counsel for the NFL Parties, and the Claims Administrator, subject to approval of the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), may modify such procedures in the future, if appropriate. Notwithstanding anything herein to the contrary, Co-Lead Class Counsel, Counsel for the NFL Parties, and the Special Master understand that the Claims Administrator regularly provides settlement claims administration and other related services to settling parties and their attorneys, and the Special Master, Co-Lead Class Counsel, and Counsel for the NFL Parties acknowledge and agree that it shall not be a conflict of interest for the Claims Administrator to provide such services to such individuals or to receive compensation for such work.

Section 10.3 Audit Rights and Detection and Prevention of Fraud

(a) Co-Lead Class Counsel and the NFL Parties each will have the absolute right and discretion, at any time, but at their sole expense, in good faith to conduct, or have conducted by an independent auditor, audits to verify Monetary Award and Derivative Claimant Award claims submitted by Settlement Class Members.

(b) In addition, Co-Lead Class Counsel, Counsel for the NFL Parties, and the Claims Administrator will establish and implement procedures to detect and prevent fraudulent submissions to, and payments of fraudulent claims from, the Monetary Award Fund. Among other fraud detection and prevention procedures, the Claims Administrator, with the approval of Co-Lead Class Counsel and Counsel for the NFL Parties, will institute the following procedures relating to claim audits:

(i) A Settlement Class Member whose claim has been selected for audit by the Claims Administrator, Co-Lead Class Counsel or Counsel for the

NFL Parties may be required to submit additional records, including medical records, and information as requested by the auditing party; and

(ii) A Settlement Class Member who refuses to cooperate with an audit, including by unreasonably failing or refusing to provide the auditing party with all records and information sought within the time frame specified, will have the claim denied by the Claims Administrator, without right to an appeal.

(c) On a monthly basis, the Claims Administrator will audit ten percent (10%) of the total Claim Packages and Derivative Claim Packages that the Claims Administrator has found to qualify for Monetary Awards or Derivative Claimant Awards during the preceding month. The Claims Administrator will select such Claim Packages and Derivative Claim Packages for auditing on a random basis or to address a specific concern raised by a Claim Package or Derivative Claim Package, but will audit at least one Claim Package, if any qualify, each month.

(d) In addition, the Claims Administrator will audit Claim Packages that: (i) seek a Monetary Award for a given Qualifying Diagnosis when the Retired NFL Football Player took part in the BAP within the prior 365 days and was not diagnosed with that Qualifying Diagnosis during the BAP baseline assessment examination; (ii) seek a Monetary Award for a given Qualifying Diagnosis when the Retired NFL Football Player submitted a different Claim Package within the prior 365 days based upon a diagnosis of that same Qualifying Diagnosis by a different physician, and that Claim Package was found not to qualify for a Monetary Award; and (iii) reflect a Qualifying Diagnosis made through a medical examination conducted at a location other than a standard treatment or diagnosis setting (*e.g.*, hotel rooms).

(e) Upon selection of a Settlement Class Member's Claim Package for audit, the Claims Administrator will notify Co-Lead Class Counsel, the Settlement Class Member (and his/her individual counsel, if applicable), and Counsel for the NFL Parties of the selection and will require that, within ninety (90) days, or such other time as is necessary and reasonable under the circumstances, the audited Settlement Class Member submit to the Claims Administrator, to the extent not already provided, such information as may be necessary and appropriate to audit the Claim Package, which may include the following records and information:

(i) All of the Retired NFL Football Player's medical records in the Settlement Class Member's possession, custody, or control that relate to the underlying medical condition that is the basis for the Qualifying Diagnosis claimed by the Settlement Class Member;

(ii) A list of all health care providers seen by the Retired NFL Football Player in the last five (5) years;

(iii) The Settlement Class Member's (or subject Retired NFL Football Player's) employment records from Member Clubs or other NFL Football employers, but only to the extent that the Settlement Class Member is authorized under

Case 2:12-md-02323-AB Document 6481-1 Filed 02/13/15 Page 61 of 162

applicable state law or Collective Bargaining Agreement to request and receive such records from the Member Club or other NFL Football employer;

(iv) Such other relevant documents or information within the Settlement Class Member's possession, custody, or control as may reasonably be requested by the Claims Administrator under the circumstances, including, if necessary, authorizations to obtain the medical records of the Settlement Class Member (or subject Retired NFL Football Player) created or obtained by any health care providers seen by the Settlement Class Member (or subject Retired NFL Football Player) in the last five (5) years; and

(v) Where the audit is conducted because of the circumstances set forth in Section 10.3(d), authorizations to obtain the medical records of the Settlement Class Member (or subject Retired NFL Football Player) held by the primary care physician of the Retired NFL Football Player and the medical records of all other physicians or neuropsychologists who have examined the Retired NFL Football Player relating to the Qualifying Diagnosis.

(f) Upon selection of a Settlement Class Member's Derivative Claim Package for audit, the Claims Administrator will notify Co-Lead Class Counsel, the Settlement Class Member (and his/her individual counsel, if applicable), and Counsel for the NFL Parties of the selection and will require that, within ninety (90) days, or such other time as is necessary and reasonable under the circumstances, the audited Settlement Class Member submit to the Claims Administrator, to the extent not already provided, such information as may be necessary and appropriate to audit the Claim Package, which may include relevant documents or information within the Settlement Class Member's possession, custody, or control as may reasonably be requested by the Claims Administrator under the circumstances.

(g) When auditing a Settlement Class Member's claim for a Monetary Award or Derivative Claimant Award, the Claims Administrator will review the records and information relating to that claim and determine whether the Claim Form or Derivative Claim Form misrepresents, omits, and/or conceals material facts that affect the claim.

(h) If, upon completion of an audit, the Claims Administrator determines that there has not been a misrepresentation, omission, or concealment of a material fact made in connection with the claim, the process of issuing a Monetary Award or Derivative Claimant Award, subject to appeal, will proceed.

(i) If, upon completion of an audit, the Claims Administrator determines that there has been a misrepresentation, omission, or concealment of a material fact made in connection with the claim, the Claims Administrator will notify the Settlement Class Member and will refer the claim to the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof) for review and findings. The Special Master's review and findings shall take into account whether the misrepresentation, omission or concealment was intentional, and may include the

following relief, without limitation:  (a) denial of the claim in the event of fraud; (b) additional audits of claims from the same law firm or physician (if applicable), including those already paid; (c) referral of the attorney or physician (if applicable) to the appropriate disciplinary boards; (d) referral to federal authorities; (e) disqualification of the attorney, physician and/or Settlement Class Member from further participation in the Class Action Settlement; and/or (f) if a law firm is found by the Claims Administrator to have submitted more than one fraudulent submission on behalf of Settlement Class Members, claim submissions by that law firm will no longer be accepted, and attorneys' fees paid to the firm by the Settlement Class Member will be forfeited and paid to the Settlement Trust for transfer by the Trustee into the Monetary Award Fund.

(j)    In addition, if the Claims Administrator at any time makes a finding (based on its own detection processes or from information received from Co-Lead Class Counsel or Counsel for the NFL Parties) of fraud by a Settlement Class Member submitting a claim for a Monetary Award or Derivative Claimant Award, and/or by the physician providing the Qualifying Diagnosis, including, without limitation, misrepresentations, omissions, or concealment of material facts relating to the claim, the Claims Administrator will notify the Settlement Class Member and will make a recommendation to Co-Lead Class Counsel and Counsel for the NFL Parties to refer the claim to the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof) for review and findings that may include, without limitation, those set forth in Section 10.3(i).

(i)    If both Co-Lead Class Counsel and Counsel for the NFL Parties do not agree with the Claims Administrator's recommendation to refer a claim to the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), they will notify the Claims Administrator, who will continue with the processing of the claim.

Section 10.4   The Claims Administrator, in consultation with Co-Lead Class Counsel and Counsel for the NFL Parties, will also establish system-wide processes to detect and prevent fraud, including, without limitation, claims processing quality training and review and data analytics to spot "red flags" of fraud, including, without limitation, alteration of documents, questionable signatures, duplicative documents submitted on claims, the number of claims from similar addresses or supported by the same physician or office of physicians, data metrics indicating patterns of fraudulent submissions, and such other attributes of claim submissions that create a reasonable suspicion of fraud.

Case 2:12-md-02323-AB Document 6481-1 Filed 02/13/15 Page 63 of 162

**ARTICLE XI**
**Identification and Satisfaction of Liens**

Section 11.1 Lien Resolution Administrator

(a) Appointment and Oversight

(i) The Motion for Preliminary Approval of the Class Action Settlement filed by Class Counsel, will request that the Court appoint Garretson Group as Lien Resolution Administrator. Within ten (10) days after the Effective Date, Co-Lead Class Counsel will retain the Lien Resolution Administrator appointed by the Court.

(ii) Co-Lead Class Counsel's retention agreement with the Lien Resolution Administrator will provide that the Lien Resolution Administrator will perform its responsibilities and take all steps necessary to faithfully implement and administer the Lien-related provisions of the Settlement Agreement, and will require that the Lien Resolution Administrator maintain at all times appropriate and sufficient bonding insurance in connection with its performance of its responsibilities under the Settlement Agreement.

(iii) The Court may, at its sole discretion, request reports or information from the Lien Resolution Administrator. The Lien Resolution Administrator will be responsible for reporting and providing information to the Court at such frequency and in such a manner as the Court directs.

(iv) The Special Master, for the duration of his or her term, will oversee the Lien Resolution Administrator, and may, at his or her sole discretion, request reports or information from the Lien Resolution Administrator.

(b) Roles and Responsibilities. The Lien Resolution Administrator will, among other responsibilities set forth in this Settlement Agreement, administer the process for the identification and satisfaction of all applicable Liens, as set forth in Section 11.3. Each Settlement Class Member (and his or her respective counsel, if applicable) claiming a Monetary Award or Derivative Claimant Award, however, will be solely responsible for the satisfaction and discharge of all Liens.

(c) Compensation and Expenses. Reasonable compensation of the Lien Resolution Administrator, as agreed to by Co-Lead Class Counsel and Counsel for the NFL Parties, and reasonable out-of-pocket costs and expenses directly incurred as a result of the Lien Resolution Administrator's responsibilities will be paid out of the Monetary Award Fund, unless otherwise specified herein. The Lien Resolution Administrator shall submit an annual budget to the Court for review and approval. Either Co-Lead Class Counsel or Counsel for the NFL Parties may challenge the reasonableness of the Lien Resolution Administrator's out-of-pocket costs and expenses, in which case the Court will determine (or may, in its discretion, refer the challenge to the Special Master to determine) the reasonableness of such costs and expenses. If the Court or Special Master, as applicable, determines that any costs and expenses are unreasonable,

Case 2:12-md-02323-AB Document 6481-1 Filed 02/13/15 Page 64 of 162

the Lien Resolution Administrator will not be paid for such costs and expenses or, if such costs and expenses have already been paid, the Lien Resolution Administrator will refund that amount to the Monetary Award Fund.

(d) Liability. The Parties, Class Counsel, Counsel for the NFL Parties, and the Special Master, and their respective Affiliates, will not be liable for any act, or failure to act, of the Lien Resolution Administrator.

(e) Replacement. The Lien Resolution Administrator may be replaced by joint motion made by Co-Lead Class Counsel and Counsel for the NFL Parties, or for cause by motion of either Co-Lead Class Counsel or Counsel for the NFL Parties, upon order of the Court. If the Lien Resolution Administrator resigns, dies, is replaced, or is otherwise unable to continue employment in this position, Co-Lead Class Counsel and Counsel for the NFL Parties will agree to and jointly recommend a new proposed Lien Resolution Administrator for appointment by the Court.

Section 11.2 Conflicts of Interest. Within ninety (90) days after the Effective Date, Co-Lead Class Counsel, Counsel for the NFL Parties, the Special Master and the Lien Resolution Administrator will establish and implement procedures to promptly detect and resolve possible conflicts of interest between the Lien Resolution Administrator, including, without limitation, its executive leadership team and all employees working on the Class Action Settlement, on the one hand, and Settlement Class Members (and counsel individually representing them, if any), the NFL Parties, Counsel for the NFL Parties, or the Special Master, on the other hand. Co-Lead Class Counsel, Counsel for the NFL Parties, and the Lien Resolution Administrator, subject to approval of the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), may modify such procedures in the future, if appropriate. Notwithstanding anything herein to the contrary, Co-Lead Class Counsel, Counsel for the NFL Parties, and the Special Master understand that the Lien Resolution Administrator regularly provides lien resolution and other related services to settling parties and their attorneys, and the Special Master, Co-Lead Class Counsel, and Counsel for the NFL Parties acknowledge and agree that it shall not be a conflict of interest for the Lien Resolution Administrator to provide such services to such individuals or to receive compensation for such work.

Section 11.3 Lien Identification, Satisfaction and Discharge

(a) Each Settlement Class Member claiming a Monetary Award or Derivative Claimant Award will identify all Liens held or asserted by Governmental Payors or Medicare Part C or Part D Program sponsors with respect to any Monetary Award or Derivative Claimant Award in his or her Claim Form or Derivative Claim Form.

(b) Each Settlement Class Member (and counsel individually representing him or her, if any) shall cooperate with the Lien Resolution Administrator to identify all Liens held or asserted by Governmental Payors or Medicare Part C or Part D Program sponsors with respect to any Monetary Award or Derivative Claimant Award as

Case 2:12-md-02323-AB Document 6481-1 Filed 02/13/15 Page 65 of 162

a prerequisite to receiving payment of any Monetary Award or Derivative Claimant Award, including by providing the requested information and authorizations to the Lien Resolution Administrator and/or Claims Administrator in the timeframe specified for so doing.

(c) Among other things, each Settlement Class Member will authorize the Lien Resolution Administrator to:

(i) Establish procedures and protocols to identify and resolve Liens held or asserted by Governmental Payors or Medicare Part C or Part D Program sponsors with respect to any Monetary Award or Derivative Claimant Award;

(ii) Undertake to obtain an agreement in writing and other supporting documentation with CMS promptly following the Effective Date that:

(1) Establishes a global repayment amount per Qualifying Diagnosis and/or for all or certain Qualifying Diagnoses for Settlement Class Members who are or were beneficiaries of the Medicare Program, or, alternatively, otherwise sets forth a conditional payment resolution process. Such amounts will be based on the routine costs associated with the medically accepted standard of care for the treatment and management of each Qualifying Diagnosis, as well as actual utilization of treatment by Settlement Class Members related to each Qualifying Diagnosis. The agreement, in writing, and supporting documentation with CMS will demonstrate reasonable proof of satisfaction of Medicare's Part A and/or Part B fee-for-service recovery claim in connection with Settlement Class Member's (who are or were beneficiaries of the Medicare Program) receipt of any Monetary Award or Derivative Claimant Award and any benefits provided pursuant to this Settlement Agreement.

(2) Establishes reporting processes recognized by CMS as satisfying the reporting obligations, if any, under the mandatory Medicare reporting requirements of Section 111 of the Medicare, Medicaid and SCHIP Extension Act of 2007, 110 Pub. L. No. 173, 121 Stat. 2492 ("MMSEA") in connection with this Settlement Agreement;

(iii) Fulfill all state and federal reporting obligations, including those to CMS that are agreed upon with CMS;

(iv) Satisfy Lien amounts owed to a Governmental Payor or, to the extent identified by the Class Member pursuant to Section 11.3(a), Medicare Part C or Part D Program sponsor for medical items, services, and/or prescription drugs paid on behalf of Settlement Class Members out of any Monetary Award or Derivative Claimant Award to the Settlement Class Member pursuant to this Settlement Agreement; and

(v) Transmit all information received from any Governmental Payor or Medicare Part C or Part D Program sponsor pursuant to such authorizations (i) to the NFL Parties, Claims Administrator, and/or Special Master solely for purposes of verifying compliance with the MSP Laws or other similar reporting

obligations and for verifying satisfaction and full discharge of all such Liens, or (ii) as otherwise directed by the Court.

(d)      If the Lien Resolution Administrator is able to negotiate a global repayment amount for some or all of the Qualifying Diagnoses for Settlement Class Members who are or were beneficiaries of the Medicare Program with CMS, as set forth in Section 11.3(c)(ii)(1), the Lien Resolution Administrator shall: (i) satisfy such global repayment amount out of any Monetary Award to such Settlement Class Member; and (ii) provide that reasonable compensation of the Lien Resolution Administrator for such efforts, will be paid out of any Monetary Award to such Settlement Class Member.

(e)      If the Lien Resolution Administrator is unable to negotiate a global repayment amount for some or all of the Qualifying Diagnoses for Settlement Class Members who are or were beneficiaries of the Medicare Program with CMS, as set forth in Section 11.3(c)(ii)(1), the Lien Resolution Administrator will put in place a mechanism for resolving these Liens on an individual basis, as agreed to by Co-Lead Class Counsel and Counsel for the NFL Parties. In addition, the Lien Resolution Administrator will put in place a mechanism for resolving Liens owed to other Governmental Payors or Medicare Part C or Part D Program sponsors on an individual basis, as agreed to by Co-Lead Class Counsel and Counsel for the NFL Parties. These mechanisms for resolving such Liens on an individual basis will allow the Lien Resolution Administrator to: (i) satisfy such Lien amounts owed for medical items, services, and/or prescription drugs paid on behalf of a Settlement Class Member out of any Monetary Award to the Settlement Class Member, subject to the Settlement Class Member's right to object to the fact and/or amount of such Lien amount; and (ii) provide that the Lien Resolution Administrator's reasonable costs and expenses incurred in resolving such Liens, including the reasonable compensation of the Lien Resolution Administrator for such efforts, will be paid out of any Monetary Award to the Settlement Class Member.

(f)      The Parties further understand and agree that the Lien Resolution Administrator's performance of functions described in this Article is not intended to modify the legal and financial rights and obligations of Settlement Class Members, including the duty to pay and/or arrange for reimbursement of each Settlement Class Member's past, current, or future bills or costs, if any, for medical items, services, and/and prescription drugs, and to satisfy and discharge any and all statutory recovery obligations for any Liens.

(g)      Notwithstanding any other provision of this Settlement Agreement relating to timely payment, the Claims Administrator will not pay any Monetary Award to a Settlement Class Member who is or was entitled to benefits under a Governmental Payor program or Medicare Part C or Part D Program prior to: (i) the Lien Resolution Administrator's determination of the final amount needed to satisfy the reimbursement obligation that any Governmental Payor or Medicare Part C or Part D Program sponsor states is due and owing (as reflected in a final demand letter or other formal written communication), and satisfaction and discharge of that reimbursement obligation as evidenced by the Lien Resolution Administrator's receipt of a written

satisfaction and discharge from the applicable Governmental Payor or Medicare Part C or Part D Program sponsor; or (ii) the Lien Resolution Administrator's determination of the "holdback" amount to be deducted from the Monetary Award or Derivative Claimant Award under which such reimbursement obligation will be resolved.

(h)     Notwithstanding any other provision of this Settlement Agreement relating to timely payment, if any person or entity claims any Liens, other than those set forth in Section 11.3(g), with respect to a Settlement Class Member's Monetary Award or Derivative Claimant Award, then the Claims Administrator will not pay any such Monetary Award or Derivative Claimant Award if the Claims Administrator or Lien Resolution Administrator has received notice of that Lien and there is a legal obligation to withhold payment to the Settlement Class Member under applicable federal or state law.  The Claims Administrator will hold such Monetary Award or Derivative Claimant Award in an escrow account until the Settlement Class Member (and counsel individually representing him or her, if any) presents documentary proof, such as a court order or release or notice of satisfaction by the party asserting the Lien, that such Lien has been satisfied and discharged; or until the Lien Resolution Administrator's determination of the "holdback" amount to be deducted from the Monetary Award, Supplemental Monetary Award or Derivative Claimant Award under which such reimbursement obligation will be resolved.

(i)     Settlement Class Members who are or were entitled to benefits under Medicare Part C or Part D Programs may be required by statute or otherwise, when making a claim for and/or receiving compensation pursuant to this Settlement Agreement, to notify the relevant Medicare Part C or Part D Program sponsor or others of the existence of, and that Settlement Class Member's participation in, this Class Action Settlement.  It is the sole responsibility of each Settlement Class Member to determine whether he or she has such a notice obligation, and to perform timely any such notice reporting.

Section 11.4   Indemnification.  Each Settlement Class Member, on his or her own behalf, and on behalf of his or her estate, predecessors, successors, assigns, representatives, heirs, beneficiaries, executors, and administrators, in return for the benefits and consideration provided in this Settlement Agreement, will indemnify and forever hold harmless, and pay all final judgments, damages, costs, expenses, fines, penalties, interest, multipliers, or liabilities, including the costs of defense and attorneys' fees of, the Released Parties against any and all claims by Other Parties arising from, relating to, or resulting from (a) any undisclosed Lien relating to, or resulting from, compensation or benefits received by a Settlement Class Member pursuant to this Class Action Settlement and/or (b) the failure of a Settlement Class Member timely and accurately to report or provide information that is necessary for compliance with the MSP Laws, or for the Lien Resolution Administrator to identify and/or satisfy all Governmental Payors or Medicare Part C or Part D Program sponsors who may hold or assert a reimbursement right.  The amount of indemnification will not exceed the total Monetary Award or Derivative Claimant Award for that Settlement Class Member's claim.  **CLASS AND SUBCLASS REPRESENTATIVES AND SETTLEMENT CLASS MEMBERS ACKNOWLEDGE THAT THIS SECTION COMPLIES**

Case 2:12-md-02323-AB Document 6481-1 Filed 02/13/15 Page 68 of 162

**WITH ANY REQUIREMENT TO EXPRESSLY STATE THAT LIABILITY FOR SUCH CLAIMS IS INDEMNIFIED AND THAT THIS SECTION IS CONSPICUOUS AND AFFORDS FAIR AND ADEQUATE NOTICE.**

Section 11.5 No Admission. Any reporting performed by the Lien Resolution Administrator and/or Claims Administrator for the purpose of resolving Liens, if any, related to compensation provided to Settlement Class Members pursuant to this Settlement Agreement does not constitute an admission by any Settlement Class Member or any Released Party of any liability or evidence of liability in any manner.

Section 11.6 The foregoing provisions of this Article are solely for the several benefit of the NFL Parties, the Lien Resolution Administrator, the Special Master, and the Claims Administrator. No Settlement Class Member (or counsel individually representing them, if any) will have any rights or defenses based upon or arising out of any act or omission of the NFL Parties or any Administrator with respect to this Article.

## ARTICLE XII
## Education Fund

Section 12.1 An Education Fund will be established to fund programs promoting safety and injury prevention with respect to football players, including safety-related initiatives in youth football, the education of Retired NFL Football Players regarding the NFL CBA Medical and Disability Benefits programs and other educational initiatives benefitting Retired NFL Football Players. The Court shall approve these education programs, with input from Co-Lead Class Counsel, Counsel for the NFL Parties and medical experts, as further set forth below. Co-Lead Class Counsel and Counsel for the NFL Parties will agree to a protocol through which Retired NFL Football Players will actively participate in such initiatives.

Section 12.2 Co-Lead Class Counsel, with input from Counsel for the NFL Parties, and with Court approval, will take all necessary steps to establish the Education Fund and establish procedures and controls to manage and account for the disbursement of funds to the education projects and all other costs associated with the Education Fund. The costs and expenses to administer the Education Fund will be paid out of the Education Fund Amount.

## ARTICLE XIII
## Preliminary Approval and Class Certification

Section 13.1 Promptly after execution, Class Counsel will file the Motion for Preliminary Approval of the Class Action Settlement and the Settlement Agreement as an exhibit thereto. Simultaneously, the Class and Subclass Representatives will file a Motion for Certification of Rule 23(b)(3) Class and Subclasses for Purposes of Settlement.

Section 13.2 The Parties agree to take all actions reasonably necessary to obtain the Preliminary Approval and Class Certification Order from the Court.

Section 13.3    The Parties agree to jointly request that the Court stay this action and all Related Lawsuits, and enjoin all Settlement Class Members, unless and until they have been excluded from the Settlement Class by action of the Court, or until the Court denies approval of the Class Action Settlement, or until the Settlement Agreement is otherwise terminated, from filing, commencing, prosecuting, intervening in, participating in and/or maintaining, as plaintiffs, claimants, or class members in, any other lawsuit, including, without limitation, a Related Lawsuit, or administrative, regulatory, arbitration, or other proceeding in any jurisdiction (whether state, federal or otherwise), against Released Parties based on, relating to, or arising out of the claims and causes of action, or the facts and circumstances at issue, in the Class Action Complaint, Related Lawsuits and/or the Released Claims, except that claims for workers' compensation and claims alleging entitlement to NFL CBA Medical and Disability Benefits will not be stayed or enjoined.    For the avoidance of any doubt, the Parties are not requesting that the Court stay any actions against Riddell.

(a)    The Parties recognize that there may be further pleadings, discovery responses, documents, testimony, or other matters or materials owed by the Parties to each other pursuant to existing pleading requirements, discovery requests, pretrial rules, procedures, orders, decisions, or otherwise.    As of the Settlement Date, each Party expressly waives any right to receive, inspect, or hear such pleadings, discovery, testimony, or other matters or materials during the pendency of the settlement proceedings contemplated by this Settlement Agreement and subject to further order of the Court.

Section 13.4    The Parties agree that any certification of the Settlement Class and Subclasses will be for settlement purposes only.    The Parties do not waive or concede any position or arguments they have for or against certification of any class for any other purpose in any action or proceeding.    Any class certification order entered in connection with this Settlement Agreement will not constitute an admission by the NFL Parties, or finding or evidence, that the Class and Subclass Representatives' claims, or the claims of any other Settlement Class Member, or the claims of the Settlement Class, are appropriate for class treatment if the claims were contested in this or any other federal, state, arbitral, or foreign forum.    If the Court enters the proposed form of Preliminary Approval and Class Certification Order, the Final Order and Judgment will provide for vacation of the Final Order and Judgment and the Preliminary Approval and Class Certification Order in the event that this Settlement Agreement does not become effective.

Section 13.5    Upon entry of the Preliminary Approval and Class Certification Order, the statutes of limitation applicable to any and all claims or causes of action that have been or could be asserted by or on behalf of any Settlement Class Members related to the subject matter of the Settlement Agreement will be tolled and stayed to the extent not already tolled by the initiation of an action in this litigation or a Related Lawsuit.    The limitations period will not begin to run again for any Settlement Class Member unless and until he or she is deemed to have Opted Out of the Settlement Class, this Settlement Agreement is terminated pursuant to ARTICLE XVI, or a Settlement Class Member's Release and Covenant Not to Sue has been rendered null and

Case 2:12-md-02323-AB Document 6481-1 Filed 02/13/15 Page 70 of 162

void by the Court as set forth in Section 25.6(g). In the event the Settlement Agreement is terminated pursuant to ARTICLE XVI, to the extent not otherwise tolled, the limitations period for each Settlement Class Member as to whom the limitations period had not expired as of the date of the Preliminary Approval and Class Certification Order will extend for the longer of thirty (30) days from the last required issuance of notice of termination or the period otherwise remaining before expiration. Notwithstanding the tolling agreement herein, the Parties recognize that any time already elapsed for any Class or Subclass Representatives or Settlement Class Members on any applicable statutes of limitations will not be reset, and no expired claims will be revived, by virtue of this tolling agreement. Class and Subclass Representatives and Settlement Class Members do not admit, by entering into this Settlement Agreement, that they have waived any applicable tolling protections available as a matter of law or equity. Nothing in this Settlement Agreement will constitute an admission in any manner that the statute of limitations has been tolled for anyone outside the Settlement Class, nor does it constitute a waiver of legal positions regarding tolling.

**ARTICLE XIV**
**Notice, Opt Out, and Objections**

Section 14.1 Notice

(a) As part of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement, Plaintiffs will submit to the Court a Settlement Class Notice Plan agreed upon by Class Counsel and Counsel for the NFL Parties.

(b) The Settlement Class Notice Plan, to be implemented by the Settlement Class Notice Agent following the Court's entry of the Preliminary Approval and Class Certification Order, and approval of the Settlement Class Notice (in the form of Exhibit 5), paid for by the NFL Parties' transfer of Four Million United States dollars (U.S. $4,000,000) to Co-Lead Class Counsel, as set forth in Sections 23.1 and 23.3, will be designed to meet the requirements of Fed. R. Civ. P. 23 (c)(2)(B), and will include: (i) direct notice by first-class mail; (ii) broad notice through the use of paid media including national radio spots, national consumer magazines, television and internet advertising; and (iii) electronic notice through the Settlement Website created under Section 4.1(a) and an automated telephone system created under Section 4.1(b).

(c) The Parties and the Claims Administrator will maintain a list of the names and addresses of each person to whom the Settlement Class Notice is transmitted in accordance with any order entered by the Court pursuant to ARTICLE XIII. These names and addresses will be kept strictly confidential and will be used only for purposes of administering this Class Action Settlement, except as otherwise ordered by the Court.

(d) Within thirty (30) days of the Effective Date, upon Court approval, Co-Lead Class Counsel shall cause the Settlement Class Supplemental Notice to be disseminated to Settlement Class Members by first-class mail and by posting on the Settlement Website created under Section 4.1(a) and through an automated telephone

system created under Section 4.1(b), to advise Settlement Class Members of the previously disclosed deadlines: (i) to register for participation in the Class Action Settlement, as set forth in Section 4.2; (ii) as to eligible Retired NFL Football Players, to participate in the BAP, as set forth in Section 5.3; and (iii) to submit Claim Packages or Derivative Claim Packages, as set forth in Section 8.3. The Settlement Class Supplemental Notice shall include the above information, and any other information, as agreed upon by Co-Lead Class Counsel and Counsel for the NFL Parties, and approved by the Court.

Section 14.2 Opt Outs

(a) The Settlement Class Notice will provide instructions regarding the procedures that must be followed to Opt Out of the Settlement Class pursuant to Fed. R. Civ. P. 23(c)(2)(B)(v). The Parties agree that, to Opt Out validly from the Settlement Class, a Settlement Class Member must submit a written request to Opt Out stating "I wish to exclude myself from the Settlement Class in *In re: National Football League Players' Concussion Injury Litigation*, No. 2:12-md-02323" (or substantially similar clear and unambiguous language) to the Claims Administrator on or before such date as is ordered by the Court. That written request also will contain the Settlement Class Member's printed name, address, telephone number, and date of birth and enclose a copy of his or her driver's license or other government issued identification. A written request to Opt Out may not be signed using any form of electronic signature, but must contain the dated Personal Signature of the Retired NFL Football Player, Representative Claimant, or Derivative Claimant seeking to exclude himself or herself from the Settlement Class. Attorneys for Settlement Class Members may submit a written request to Opt Out on behalf of a Settlement Class Member, but such request must contain the Personal Signature of the Settlement Class Member. The Claims Administrator will provide copies of all requests to Opt Out to Class Counsel and Counsel for the NFL Parties within seven (7) days of receipt of each such request. Valid requests to Opt Out from the Settlement Class will become effective on the Final Approval Date.

(b) All Settlement Class Members who do not timely and properly Opt Out from the Settlement Class will in all respects be bound by all terms of this Settlement Agreement and the Final Order and Judgment upon the Effective Date, will be entitled to all procedural opportunities and protections described in this Settlement Agreement and provided by the Court, and to all compensation and benefits for which they qualify under its terms, and will be barred permanently and forever from commencing, filing, initiating, prosecuting, asserting, and/or maintaining any and all Released Claims against any Released Parties in any court of law or equity, arbitration tribunal, or administrative or other forum.

(c) Prior to the Final Approval Date, any Retired NFL Football Player, Representative Claimant, or Derivative Claimant may seek to revoke his or her Opt Out from the Settlement Class and thereby receive the benefits of this Class Action Settlement by submitting a written request to Co-Lead Class Counsel and Counsel for the NFL Parties stating "I wish to revoke my request to be excluded from the Settlement

Class" (or substantially similar clear and unambiguous language), and also containing the Settlement Class Member's printed name, address, phone number, and date of birth. The written request to revoke an Opt Out must contain the Personal Signature of the Settlement Class Member seeking to revoke his or her Opt Out.

Section 14.3 Objections

(a) Provided a Settlement Class Member has not submitted a written request to Opt Out, as set forth in Section 14.2(a), the Settlement Class Member may present written objections, if any, explaining why he or she believes the Class Action Settlement should not be approved by the Court as fair, reasonable, and adequate. No later than such date as is ordered by the Court, a Settlement Class Member who wishes to object to any aspect of the Class Action Settlement must file with the Court , or as the Court otherwise may direct, a written statement of the objection(s). The written statement of objection(s) must include a detailed statement of the Settlement Class Member's objection(s), as well as the specific reasons, if any, for each such objection, including any evidence and legal authority the Settlement Class Member wishes to bring to the Court's attention. That written statement also will contain the Settlement Class Member's printed name, address, telephone number, and date of birth, written evidence establishing that the objector is a Settlement Class Member, and any other supporting papers, materials, or briefs the Settlement Class Member wishes the Court to consider when reviewing the objection. A written objection may not be signed using any form of electronic signature, but must contain the dated Personal Signature of the Retired NFL Football Player, Representative Claimant, or Derivative Claimant making the objection. The Court shall determine whether any Settlement Class Members who do not follow the procedures will have waived any objections they may have.

(b) A Settlement Class Member may object on his or her own behalf or through an attorney hired at that Settlement Class Member's own expense, provided the Settlement Class Member has not submitted a written request to Opt Out, as set forth in Section 14.2(a). Attorneys asserting objections on behalf of Settlement Class Members must: (i) file a notice of appearance with the Court by the date set forth in the Preliminary Approval and Class Certification Order, or as the Court otherwise may direct; (ii) file a sworn declaration attesting to his or her representation of each Settlement Class Member on whose behalf the objection is being filed or a copy of the contract (to be filed *in camera*) between that attorney and each such Settlement Class Member; and (iii) comply with the procedures described in this Section.

(c) A Settlement Class Member (or counsel individually representing him or her, if any) seeking to make an appearance at the Fairness Hearing must file with the Court, by the date set forth in the Preliminary Approval and Class Certification Order, or as the Court otherwise may direct, a written notice of his or her intention to appear at the Fairness Hearing, in accordance with the requirements set forth in the Preliminary Approval and Class Certification Order.

(d) Any Settlement Class Member who fails to comply with the provisions of this Section 14.3 will waive and forfeit any and all rights he or she may have to object to the Class Action Settlement.

**ARTICLE XV**
**Communications to the Public**

Section 15.1 The form, content, and timing of any public statement announcing the filing of this Settlement Agreement will be subject to mutual agreement by Class Counsel and Counsel for the NFL Parties. The Parties and their counsel agree not to make any public statements, including statements to the media, that are inconsistent with the Settlement Agreement. Any communications to the public or the media made by or on behalf of the Parties and their respective counsel regarding the Class Action Settlement will be made in good faith and will be consistent with the Parties' agreement to take all actions reasonably necessary for preliminary and final approval of this Class Action Settlement. Any information contained in such communications will be balanced, fair, accurate, and consistent with the content of the Settlement Class Notice.

(a) Nothing herein is intended or will be interpreted to inhibit or interfere with the ability of Class Counsel or Counsel for the NFL Parties to communicate with the Court, their clients, or Settlement Class Members and/or their counsel.

(b) Class Counsel acknowledge and agree, and the Preliminary Approval and Class Certification Order will provide, that the NFL Parties have the right to communicate orally and in writing with, and to respond to inquiries from, Settlement Class Members on matters unrelated to the Class Action Settlement in connection with the NFL Parties' normal business.

**ARTICLE XVI**
**Termination**

Section 16.1 Walk-Away Right of NFL Parties. Without limiting any other rights under this Settlement Agreement, the NFL Parties will have the absolute and unconditional right, in their sole good faith discretion, to unilaterally terminate and render null and void this Class Action Settlement and Settlement Agreement for any reason whatsoever following notice of Opt Outs and prior to the Fairness Hearing. The NFL Parties must provide written election to terminate this Settlement Agreement to Class Counsel and the Court prior to the Fairness Hearing.

Section 16.2 Party Termination Rights

(a) Class Counsel and Counsel for the NFL Parties each have the absolute and unconditional right, in their sole discretion, which discretion will be exercised in good faith, to terminate and render null and void this Class Action Settlement and Settlement Agreement if (i) the Court, or any appellate court(s), rejects, modifies, or denies approval of any portion of this Settlement Agreement that Class

Case 2:12-md-02323-AB Document 6481-1 Filed 02/13/15 Page 74 of 162

Counsel or Counsel for the NFL Parties reasonably and in good faith determines is material, including, without limitation, the Releases or the definition of the Settlement Class, or (ii) the Court, or any appellate court(s), does not enter or completely affirm, or alters or expands, any portion of the proposed Preliminary Approval and Class Certification Order or the proposed Final Order and Judgment (Exhibit 4) that Class Counsel or Counsel for the NFL Parties reasonably and in good faith believes is material. Such written election to terminate this Settlement Agreement must be made to the Court within thirty (30) days of such Court order.

(b) Class Counsel may not terminate and render null and void this Class Action Settlement and Settlement Agreement on the basis of the attorneys' fees award ordered, or modified, by the Court or any appellate court(s), as set forth in ARTICLE XXI.

Section 16.3 Post-Termination Actions

(a) In the event this Settlement Agreement is terminated or becomes null and void, this Settlement Agreement will not be offered into evidence or used in this or in any other action in the Court, or in any other federal court, state court, arbitration, regulatory agency, or other tribunal or forum for any purpose, including, but not limited to, the existence, certification, or maintenance of any purported class. In addition, in such event, this Settlement Agreement and all negotiations, proceedings, documents prepared and statements made in connection with this Settlement Agreement will be without prejudice to all Parties and will not be admissible into evidence and will not be deemed or construed to be an admission or concession by any of the Parties of any fact, matter, or proposition of law and will not be used in any manner for any purpose, and all Parties will stand in the same position as if this Settlement Agreement had not been negotiated, made, or filed with the Court.

(b) In the event this Settlement Agreement is terminated or becomes null and void, the Parties will jointly move the Court to vacate the Preliminary Approval and Certification Order and any other orders certifying a Settlement Class provided.

(c) If this Settlement Agreement is terminated or becomes null and void after notice has been given, the Parties will provide Court-approved notice of termination to the Settlement Class. If a Party terminates the Settlement Agreement in accordance with Section 16.1 or Section 16.2, that Party will pay the cost of notice of termination.

(d) In the event this Settlement Agreement is terminated or becomes null and void, any unspent and uncommitted monies in the Funds will revert to the NFL Parties within ten (10) days, and all data provided by the NFL Parties, Class Counsel and/or Settlement Class Members shall be returned or destroyed.

**ARTICLE XVII**
**Treatment of Confidential Information**

Section 17.1 Confidentiality of Information Relating to the Settlement Agreement. The Parties will treat all confidential or proprietary information shared hereunder, or in connection herewith, either prior to, on or after the Settlement Date, and any and all prior or subsequent drafts, representations, negotiations, conversations, correspondence, understandings, analyses, proposals, term sheets, and letters, whether oral or written, of any kind or nature, with respect to the subject matter hereof ("Confidential Information") in conformity with strict confidence and will not disclose Confidential Information to any non-Party without the prior written consent of the Party that shared the Confidential Information, except: (i) as required by applicable law, regulation, or by order or request of a court of competent jurisdiction, regulator, or self-regulatory organization (including subpoena or document request), provided that the Party that shared the Confidential Information is given prompt written notice thereof and, to the extent practicable, an opportunity to seek a protective order or other confidential treatment thereof, provided further that the Party subject to such requirement or request cooperates fully with the Party that shared the Confidential Information in connection therewith, and only such Confidential Information is disclosed as is legally required to be disclosed in the opinion of legal counsel for the disclosing Party; (ii) under legal (including contractual) or ethical obligations of confidentiality, on an as-needed and confidential basis to such Party's present and future accountants, counsel, insurers, or reinsurers; or (iii) with regard to any information that is already publicly known through no fault of such Party or its Affiliates. This Settlement Agreement, all exhibits hereto, any other documents filed in connection with the Class Action Settlement, and any information disclosed through a public court proceeding shall not be deemed Confidential Information.

Section 17.2 Confidentiality of Retired NFL Football Player Information

(a) All information relating to a Retired NFL Football Player that is disclosed to or obtained by the Special Master, BAP Administrator, Claims Administrator, Lien Resolution Administrator, designated Qualified BAP Providers, the NFL Parties, an Appeals Advisory Panel member, an Appeals Advisory Panel Consultant, or the Court, may be used only by the Special Master, BAP Administrator, Claims Administrator, Lien Resolution Administrator, designated Qualified BAP Providers, the NFL Parties, an Appeals Advisory Panel member, an Appeals Advisory Panel Consultant, or the Court for the administration of this Class Action Settlement according to the Settlement Agreement terms and conditions. All such information relating to a Retired NFL Football Player will be treated as Confidential Information hereunder, will be subject to the terms of Section 17.1 hereof, and, where applicable, will be treated as Protected Health Information subject to HIPAA and other applicable privacy laws.

Case 2:12-md-02323-AB Document 6481-1 Filed 02/13/15 Page 76 of 162

**ARTICLE XVIII**
**Releases and Covenant Not to Sue**

Section 18.1 Releases

(a) In consideration of the benefits described and the agreement and covenants contained in this Settlement Agreement, and by operation of the Final Order and Judgment, the Settlement Class, the Class and Subclass Representatives, and each Settlement Class Member, on his or her own behalf and on behalf of his or her respective predecessors, successors, assigns, assignors, representatives, attorneys, agents, trustees, insurers, heirs, next of kin, estates, beneficiaries, executors, administrators, and any natural, legal, or juridical person or entity to the extent he, she, or it is entitled to assert any claim on behalf of any Settlement Class Member (the "Releasors"), hereby waive and release, forever discharge and hold harmless the Released Parties, and each of them, of and from any and all past, present and future claims, counterclaims, actions, rights or causes of action, liabilities, suits, demands, damages, losses, payments, judgments, debts, dues, sums of money, costs and expenses (including, without limitation, attorneys' fees and costs), accounts, reckonings, bills, covenants, contracts, controversies, agreements, obligations, or promises, in law or in equity, contingent or non-contingent, known or unknown, suspected or unsuspected, foreseen or unforeseen, matured or unmatured, accrued or unaccrued, liquidated or unliquidated, whether direct, representative, class or individual in nature, in any forum that the Releasors, and each of them, had, has, or may have in the future arising out of, in any way relating to or in connection with the allegations, transactions, facts, matters, occurrences, representations or omissions involved, set forth, referred to or relating to the Class Action Complaint and/or Related Lawsuits ("Claims"), including, without limitation, Claims:

(i) that were, are or could have been asserted in the Class Action Complaint or any other Related Lawsuit; and/or

(ii) arising out of, or relating to, head, brain and/or cognitive injury, as well as any injuries arising out of, or relating to, concussions and/or subconcussive events (including, without limitation, prevention, diagnosis and treatment thereof) of whatever cause and its damages (whether short-term, long-term or death), whenever arising, including, without limitation, Claims for personal or bodily injury, including disease, mental or physical pain or suffering, emotional or mental harm, or anguish or loss of enjoyment of life (and exacerbation and/or progression of personal or bodily injury), or wrongful death and/or survival actions as a result of such injury and/or exacerbation and/or progression thereof; and/or

(iii) arising out of, or relating to, neurocognitive deficits or impairment, or cognitive disorders, of whatever kind or degree, including, without limitation, mild cognitive impairment, moderate cognitive impairment, dementia, Alzheimer's Disease, Parkinson's Disease, and ALS; and/or

(iv) arising out of, or relating to, CTE; and/or

Case 2:12-md-02323-AB Document 6481-1 Filed 02/13/15 Page 77 of 162

(v) arising out of, or relating to, loss of support, services, consortium, companionship, society, or affection, or damage to familial relations (including disease, mental or physical pain or suffering, emotional or mental harm, or anguish or loss of enjoyment of life); and/or

(vi) arising out of, or relating to, increased risk, possibility, or fear of suffering in the future from any head, brain and/or cognitive injury, as well as any injuries arising out of, or relating to, concussions and/or subconcussive events (including, without limitation, prevention, diagnosis and treatment thereof), and including disease, mental or physical pain or suffering, emotional or mental harm, or anguish or loss of enjoyment of life); and/or

(vii) arising out of, or relating to, medical screening and medical monitoring for undeveloped, unmanifested, and/or undiagnosed head, brain and/or cognitive injury, as well as any injuries arising out of, or relating to, concussions and/or subconcussive events (including, without limitation, prevention, diagnosis and treatment thereof); and/or

(viii) premised on any purported or alleged breach of any Collective Bargaining Agreement related to the issues in the Class Action Complaint and/or Related Lawsuits, except claims for workers' compensation and claims alleging entitlement to NFL CBA Medical and Disability Benefits.

(b) In consideration of the benefits described and the agreement and covenants contained in this Settlement Agreement, and by operation of the Final Order and Judgment, the Releasors do hereby release, forever discharge and hold harmless the Released Parties from any and all Claims, including unknown Claims, arising from, relating to, or resulting from the reporting, transmittal of information, or communications between or among the NFL Parties, Counsel for the NFL Parties, the Special Master, Claims Administrator, Lien Resolution Administrator, any Governmental Payor, and/or Medicare Part C or Part D Program sponsor regarding any claim for benefits under this Settlement Agreement, including any consequences in the event that this Settlement Agreement impacts, limits, or precludes any Settlement Class Member's right to benefits under Social Security or from any Governmental Payor or Medicare Part C or Part D Program sponsor.

(c) In consideration of the benefits described and the agreement and covenants contained in this Settlement Agreement, and by operation of the Final Order and Judgment, the Releasors do hereby release, forever discharge and hold harmless the Released Parties from any and all Claims, including unknown Claims, pursuant to the MSP Laws, or other similar causes of action, arising from, relating to, or resulting from the failure or alleged failure of any of the Released Parties to provide for a primary payment or appropriate reimbursement to a Governmental Payor or Medicare Part C or Part D Program sponsor with a Lien in connection with claims for medical items, services, and/or prescription drugs provided in connection with compensation or benefits claimed or received by a Settlement Class Member pursuant to this Settlement Agreement.

Case 2:12-md-02323-AB Document 6481-1 Filed 02/13/15 Page 78 of 162

(d) In consideration of the benefits described and the agreement and covenants contained in this Settlement Agreement, and by operation of the Final Order and Judgment, the Releasors do hereby release, forever discharge and hold harmless the Released Parties, the Special Master, BAP Administrator, Claims Administrator, and their respective officers, directors, and employees from any and all Claims, including unknown Claims, arising from, relating to, or resulting from their participation, if any, in the BAP, including, but not limited to, Claims for negligence, medical malpractice, wrongful or delayed diagnosis, personal injury, bodily injury (including disease, trauma, mental or physical pain or suffering, emotional or mental harm, or anguish or loss of enjoyment of life), or death arising from, relating to, or resulting from such participation.

Section 18.2 Release of Unknown Claims. In connection with the releases in Section 18.1, the Class and Subclass Representatives, all Settlement Class Members, and the Settlement Class acknowledge that they are aware that they may hereafter discover Claims now unknown or unsuspected, or facts in addition to or different from those which they now know or believe to be true, with respect to actions or matters released herein. Class and Subclass Representatives, all Settlement Class Members, and the Settlement Class explicitly took unknown or unsuspected claims into account in entering into the Settlement Agreement and it is the intention of the Parties fully, finally and forever to settle and release all Claims as provided in Section 18.1 with respect to all such matters.

Section 18.3 Scope of Releases

(a) Each Party acknowledges that it has been informed of Section 1542 of the Civil Code of the State of California (and similar statutes) by its counsel and that it does hereby expressly waive and relinquish all rights and benefits, if any, which it, he or she has or may have under said section (and similar sections) which reads as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

(b) The Parties acknowledge that the foregoing waiver of the provisions of Section 1542 of the California Civil Code and all similar provisions of the statutory or common law of any other state, territory, or other jurisdiction was separately bargained for and that the Parties would not have entered into this Settlement Agreement unless it included a broad release of unknown claims relating to the matters released herein.

(c) The Releasors intend to be legally bound by the Releases.

Case 2:12-md-02323-AB Document 6481-1 Filed 02/13/15 Page 79 of 162

(d) The Releases are not intended to prevent the NFL Parties from exercising their rights of contribution, subrogation, or indemnity under any law.

(e) Nothing in the Releases will preclude any action to enforce the terms of this Settlement Agreement in the Court.

(f) The Parties represent and warrant that no promise or inducement has been offered or made for the Releases contained in this Article except as set forth in this Settlement Agreement and that the Releases are executed without reliance on any statements or any representations not contained in this Settlement Agreement.

Section 18.4 Covenant Not to Sue. From and after the Effective Date, for the consideration provided for herein and by operation of the Final Order and Judgment, the Class and Subclass Representatives, each Settlement Class Member, and the Settlement Class, on behalf of the Releasors, and each of them, covenant, promise, and agree that they will not, at any time, continue to prosecute, commence, file, initiate, institute, cause to be instituted, assist in instituting, or permit to be instituted on their, his, her, or its behalf, or on behalf of any other individual or entity, any proceeding: (a) alleging or asserting any of his or her respective Released Claims against the Released Parties in any federal court, state court, arbitration, regulatory agency, or other tribunal or forum, including, without limitation, the Claims set forth in Section 18.1; or (b) challenging the validity of the Releases. To the extent any such proceeding exists in any court, tribunal or other forum as of the Effective Date, the Releasors covenant, promise and agree to withdraw, and seek a dismissal with prejudice of, such proceeding forthwith.

Section 18.5 No Release for Insurance Coverage.

(a) Notwithstanding anything herein to the contrary, this Settlement Agreement is not intended to and does not release any Governmental Payor or Medicare Part C or Part D Program sponsor from its or their obligation to provide any health insurance coverage, major medical insurance coverage, or disability insurance coverage to a Settlement Class Member, or from any claims, demands, rights, or causes of action of any kind that a Settlement Class Member has or hereafter may have with respect to such individuals or entities.

(b) Notwithstanding anything herein to the contrary, this Settlement Agreement is not intended to and does not effect a release of any rights or obligations that any insurer has under or in relation to any contract or policy of insurance to any named insured, insured, additional insured, or other insured person or entity thereunder, including those persons or entities referred to in Section 2.1(bbbb)(i)-(ii).

Section 18.6 No Release for Claims for Workers' Compensation and NFL CBA Medical and Disability Benefits. Nothing contained in this Settlement Agreement, including the Release and Covenant Not to Sue provisions in this ARTICLE XVIII, affects the rights of Settlement Class Members to pursue claims for workers' compensation and claims alleging entitlement to NFL CBA Medical and Disability Benefits. For the avoidance of any doubt, this Settlement Agreement does not alter the

showing that Settlement Class Members must demonstrate to pursue successful claims for workers' compensation and/or successful claims alleging entitlement to NFL CBA Medical and Disability Benefits, nor does it alter the defenses to such claims available to Released Parties except as set forth in ARTICLE XXIX.

**ARTICLE XIX**
**Bar Order**

Section 19.1 Bar Order. As a condition to the Settlement, the Parties agree to move the Court for a bar order, as part of the Final Order and Judgment (substantially in the form of Exhibit 4), as set forth in Section 20.1.

Section 19.2 Judgment Reduction. With respect to any litigation by the Releasors against Riddell, the Releasors further agree that if a verdict in their favor results in a verdict or judgment for contribution or indemnity against the Released Parties, the Releasors will not enforce their right to collect this verdict or judgment to the extent that such enforcement creates liability against the Released Parties. In such event, the Releasors agree that they will reduce their claim or agree to a judgment reduction or satisfy the verdict or judgment to the extent necessary to eliminate the claim of liability against the Released Parties or any Other Party claiming contribution or indemnity.

**ARTICLE XX**
**Final Order and Judgment and Dismissal With Prejudice**

Section 20.1 The Parties will jointly seek a Final Order and Judgment from the Court, substantially in the form of Exhibit 4, approval and entry of which shall be a condition of this Settlement Agreement, that:

(a) Approves the Class Action Settlement in its entirety pursuant to Fed. R. Civ. P. 23(e) as fair, reasonable, and adequate;

(b) Finds that this Settlement Agreement, with respect to each Subclass, is fair, reasonable, and adequate;

(c) Confirms the certification of the Settlement Class for settlement purposes only;

(d) Confirms the appointments of the Class and Subclass Representatives;

(e) Confirms the appointments of Co-Lead Class Counsel, Class Counsel and Subclass Counsel;

(f) Finds that the Settlement Class Notice satisfied the requirements set forth in Fed. R. Civ. P. 23(c)(2)(B);

Case 2:12-md-02323-AB Document 6481-1 Filed 02/13/15 Page 81 of 162

(g) Permanently bars, enjoins and restrains the Releasors (and each of them) from commencing, filing, initiating, prosecuting, asserting, and/or maintaining any and all Released Claims against any Released Party;

(h) Dismisses with prejudice the Class Action Complaint, without further costs, including claims for interest, penalties, costs and attorneys' fees, except that the motion for an award of attorneys' fees and reasonable costs, as set forth in in Section 21.1, will be made at an appropriate time to be determined by the Court;

(i) Orders the dismissal with prejudice, and without further costs, including claims for interest, penalties, costs, and attorneys' fees, of all Related Lawsuits pending in the Court as to the Released Parties, thereby effectuating in part the Releases;

(j) Orders all Releasors with Related Lawsuits pending in any federal court, state court, arbitration, regulatory agency, or other tribunal or forum, other than the Court, promptly to dismiss with prejudice, and without further costs, including claims for interest, penalties, costs, and attorneys' fees, all such Related Lawsuits as to the Released Parties, thereby effectuating in part the Releases;

(k) Permanently bars and enjoins the commencement, assertion, and/or prosecution of any claim for contribution and/or indemnity in the Court, in any other federal court, state court, arbitration, regulatory agency, or other tribunal or forum between the Released Parties and all alleged joint tortfeasors, other than Riddell, together with an appropriate judgment reduction provision;

(l) Confirms the appointment of the Special Master, Garretson Group as the BAP Administrator, BrownGreer as the Claims Administrator, Garretson Group as the Liens Resolution Administrator, and Citibank, N.A. as the Trustee, and confirms that the Court retains continuing jurisdiction over those appointed;

(m) Confirms that the Court retains continuing jurisdiction over the "qualified settlement funds," as defined under §1.468B-1 of the Treasury Regulations promulgated under Sections 461(h) and 468B of the Internal Revenue Code of 1986, as amended, created under the Settlement Agreement; and

(n) Expressly incorporates the terms of this Settlement Agreement and provides that the Court retains continuing and exclusive jurisdiction over the Parties, the Settlement Class Members and this Settlement Agreement, to interpret, implement, administer and enforce the Settlement Agreement in accordance with its terms.

**ARTICLE XXI**
**Attorneys' Fees**

Section 21.1 Award. Separately and in addition to the NFL Parties' payment of the monies set forth in ARTICLE XXIII and any consideration received by Settlement Class Members under this Settlement, the NFL Parties shall pay class

attorneys' fees and reasonable costs. Class Counsel shall be entitled, at an appropriate time to be determined by the Court, to petition the Court on behalf of all entitled attorneys for an award of class attorneys' fees and reasonable costs. Provided that said petition does not seek an award of class attorneys' fees and reasonable costs exceeding One Hundred and Twelve Million, Five Hundred Thousand United States dollars (U.S. $112,500,000), the NFL Parties agree not to oppose or object to the petition. Ultimately, the award of class attorneys' fees and reasonable costs to be paid by the NFL Parties is subject to the approval of the Court. For the avoidance of any doubt, the NFL Parties' obligation to pay class attorneys' fees and reasonable costs is limited to those attorneys' fees and reasonable costs ordered by the Court as a result of the initial petition by Class Counsel. The NFL Parties shall not be responsible for the payment of any further attorneys' fees and/or costs for the term of this Agreement. After the Effective Date, Co-Lead Class Counsel may petition the Court to set aside up to five percent (5%) of each Monetary Award and Derivative Claimant Award to facilitate the Settlement program and related efforts of Class Counsel. These set-aside monies shall be held in a separate fund overseen by the Court. Any future petition for a set-aside will describe: (i) the proposed amount; (ii) how the money will be used; and (iii) any other relevant information (for example, the assurance that any "set-aside" from a Monetary Award or Derivative Claimant Award for a Settlement Class Member represented by his/her individual counsel will reduce the attorney's fee payable to that counsel by the amount of the "set-aside"). No money will be held back or set aside from any Monetary Award or Derivative Claimant Award without Court approval. The NFL Parties believe that any such proposed set aside application is a matter strictly between and among Settlement Class Members, Class Counsel, and individual counsel for Settlement Class Members. The NFL Parties therefore take no position on the proposed set aside and will take no position on the proposed set aside in the event such an application is made.

Section 21.2 Payment. No later than sixty (60) days after the Effective Date, the NFL Parties will pay, or cause to be paid, a total of One Hundred and Twelve Million, Five Hundred Thousand United States dollars (U.S. $112,500,000) into the Attorneys' Fees Qualified Settlement Fund, as set forth in Section 23.7, to be held in escrow until such payment shall be made as directed by the Court.

## ARTICLE XXII
## Enforceability of Settlement Agreement and Dismissal of Claims

Section 22.1 It is a condition of this Settlement Agreement that the Court approve and enter the Preliminary Approval and Class Certification Order and Final Order and Judgment substantially in the form of Exhibit 4.

Section 22.2 The Parties agree that this Class Action Settlement is not final and enforceable until the Effective Date, except that upon entry of the Preliminary Approval and Class Certification Order, the NFL Parties will be obligated to make the Settlement Class Notice Payment as set forth in Sections 14.1, 23.1 and 23.3.

Section 22.3 From and after the Effective Date, for the consideration provided for herein and by operation of the Final Order and Judgment, the Court will

Case 2:12-md-02323-AB Document 6481-1 Filed 02/13/15 Page 83 of 162

dismiss with prejudice all Released Claims by any and all Releasors against any and all Released Parties pending in the Court, and any and all Releasors with Related Lawsuits pending in any federal court, state court, arbitration, regulatory agency, or other tribunal or forum, other than the Court, will dismiss with prejudice the Related Lawsuits as to the Released Parties, including any related appeals.

Section 22.4 From and after the Effective Date, for the consideration provided for herein and by operation of the Final Order and Judgment, the Parties agree that each and every Releasor will be permanently barred and enjoined from commencing, filing, initiating, instituting, prosecuting, and/or maintaining any judicial, arbitral, or regulatory action against any Released Party with respect to any and all Released Claims.

Section 22.5 From and after the Effective Date, for the consideration provided for herein and by operation of the Final Order and Judgment, this Settlement Agreement will be the exclusive remedy for any and all Released Claims by or on behalf of any and all Releasors against any and all Released Parties, and no Releasor will recover, directly or indirectly, any sums from any Released Parties for Released Claims other than those received for the Released Claims under the terms of this Settlement Agreement, if any.

Section 22.6 From and after the Effective Date, if any Releasor, in violation of Section 18.4, commences, files, initiates, or institutes any new action or other proceeding for any Released Claims against any Released Parties, or continues to prosecute any pending claims, or challenges the validity of the Releases, in any federal court, state court, arbitration, regulatory agency, or other tribunal or forum, such action or other proceeding will be dismissed with prejudice and at such Releasor's cost; provided, however, before any costs may be assessed, counsel for such Releasor or, if not represented, such Releasor, will be given reasonable notice and an opportunity voluntarily to dismiss such new action or proceeding with prejudice. Furthermore, if the NFL Parties or any other Released Party brings any legal action before the Court to enforce its rights under this Settlement Agreement against a Settlement Class Member and prevails in such action, that Released Party will be entitled to recover any and all related costs and expenses (including attorneys' fees) from any Releasor found to be in violation or breach of his or her obligations under this Article.

## ARTICLE XXIII
## NFL Payment Obligations

Section 23.1 Funding Amount. In consideration of the Releases and Covenant Not to Sue set forth in ARTICLE XVIII, and the dismissal with prejudice of the Class Action Complaint and the Related Lawsuits, and subject to the terms and conditions of this Settlement Agreement, the NFL Parties will pay in accordance with the funding terms set forth herein:

(a) Monetary Award Fund Amount. The amount of money sufficient to make all payments set forth in Section 23.3(b) for sixty-five (65) years from the Effective Date. For the avoidance of any doubt, the NFL Parties shall have no

Case 2:12-md-02323-AB Document 6481-1 Filed 02/13/15 Page 84 of 162

payment obligations under this Settlement Agreement after the end of the Monetary Award Fund sixty-five (65) year term;

(b) BAP Fund Amount. The amount of money, up to a maximum of Seventy-Five Million United States dollars (U.S. $75,000,000), sufficient to make all payments set forth in Section 23.3(d), except that every qualified Retired NFL Football Player, as set forth in Section 5.1, is entitled to one baseline assessment examination. For the avoidance of any doubt, if the Seventy-Five Million United States dollars (U.S. $75,000,000) is insufficient to cover the costs of one baseline assessment examination for every qualified Retired NFL Football Player electing to receive an examination by the deadline set forth in Section 5.3, the NFL Parties agree to pay the amount of money necessary to provide the examinations in accordance with this Settlement Agreement;

(c) Education Fund Amount. Ten Million United States dollars (U.S. $10,000,000), which monies will be used exclusively to fund the Education Fund;

(d) Settlement Class Notice Amount. Four Million United States dollars (U.S. $4,000,000), to pay for Settlement Class Notice and related expenses; and

(e) Annual Compensation of the Special Master. The annual compensation of the Special Master appointed by the Court, whose total annual compensation shall not exceed Two Hundred Thousand United States dollars (U.S. $200,000).

(f) Notwithstanding any provision of the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119, amended by the Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029, or any subsequent legislation mandating or subsidizing health insurance coverage, the NFL Parties will pay, or cause to be paid, in full the amounts set forth above in Section 23.1(a)-(e), and will not bill any Governmental Payor or Medicare Part C or Part D Program for any such costs.

Section 23.2 Exclusive Payments. For the avoidance of any doubt, other than as set forth in Section 21.2, the NFL Parties will have no additional payment obligations in connection with this Settlement Agreement.

Section 23.3 Funding Terms. The NFL Parties' payment obligations will be funded as follows:

(a) Education Fund. No later than thirty (30) days after the Effective Date, the NFL Parties will pay, or cause to be paid, a total of Ten Million United States dollars (U.S. $10,000,000) into the Settlement Trust Account, as set forth in Section 23.5, for transfer by the Trustee into the Education Fund.

Case 2:12-md-02323-AB Document 6481-1 Filed 02/13/15 Page 85 of 162

(b) Monetary Award Fund. The NFL Parties will pay, or cause to be paid six initial monthly installments of Twenty Million United States dollars (U.S. $20,000,000) each, into the Settlement Trust Account for transfer by the Trustee into the Monetary Award Fund, beginning no later than thirty (30) days after the Effective Date. If additional funds are necessary in any given month during this six month period, they shall be requested and paid in accordance with the procedures set forth in section 23.3(b)(i)-(iv). The Claims Administrator shall provide in writing to the NFL Parties and Co-Lead Class Counsel a monthly report for this initial six month period that includes an accounting of the items set forth in Section 23.3(b)(i)(1)-(5).

(i) Beginning no later than thirty (30) days after the Effective Date, on or before the 10th day of each month, the Claims Administrator shall provide in writing to the NFL Parties and Co-Lead Class Counsel a monthly funding request identifying the monetary amount necessary to pay all final and accrued Monetary Awards, Derivative Claimant Awards and the costs and expenses paid out of the Monetary Award Fund, as set forth in Section 23.5(d)(ii), and any additional amount necessary to maintain the Monetary Award Fund targeted reserve, as set forth in Section 23.3(b)(v), after all final and accrued Monetary Awards, Derivative Claimant Awards and costs and expenses are paid. This monthly funding request shall provide, in addition to the total monetary amount requested, an accounting of:

(1) The name of each Settlement Class Member with a final and accrued Monetary Awards or Derivative Claimant Award since the last monthly funding request, identification of his/her counsel, identification of the Award as a Monetary Award or Derivative Claimant Award, the Award amount, and identification of any "holdback" amount deducted from the Award as set forth in Sections 9.1(c)(ii) and 9.2(b)(ii), 11.3(g) and 11.3(h);

(2) The amount of costs and expenses related to the appeals process, as set forth in ARTICLE IX, since the last monthly funding request;

(3) The amount of costs and expenses of claims administration, as set forth in ARTICLE X, since the last monthly funding request;

(4) The amount of costs and expenses of the Lien identification and resolution process, as set forth in ARTICLE XI, since the last monthly funding request;

(5) The amount necessary to maintain the Monetary Award Fund targeted reserve, as set forth in Section 23.3(b)(v), after all final and accrued Monetary Awards, Derivative Claimant Awards, and costs and expenses are paid.

(ii) Subject to the objection process set forth in Section 23.3(b)(iii), the NFL Parties will pay, or cause to be paid, within thirty (30) days of receipt of the written monthly funding request, a payment of the total amount requested

Case 2:12-md-02323-AB Document 6481-1 Filed 02/13/15 Page 86 of 162

into the Settlement Trust Account for transfer by the Trustee into the Monetary Award Fund.

(iii) Within ten (10) days after receipt of the written monthly funding request, the NFL Parties and Co-Lead Class Counsel shall each notify the Claims Administrator in writing of any objection to any aspect of the funding request. If an objection is timely made, the NFL Parties, will pay, or cause to be paid, within thirty (30) days of such written monthly funding request, a payment of the undisputed portion of the total amount requested into the Settlement Trust Account for transfer by the Trustee into the Monetary Award Fund. The NFL Parties, Co-Lead Class Counsel and the Claims Administrator shall use their best efforts to resolve any objections within fifteen (15) days after receipt of the written monthly funding request. If the NFL Parties, Co-Lead Class Counsel and the Claims Administrator are unable to resolve the objection within twenty (20) days after receipt of the written monthly funding request, the objecting party shall present the matter in writing to the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof).

(1) After an agreement on the resolution of an objection, or a decision by the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof) resolving an objection by requiring the NFL Parties to pay, or cause to be paid, additional amounts beyond the undisputed portion of the monthly funding request, the NFL Parties will pay, or cause to be paid, the additional amounts beyond the undisputed portion of the monthly funding request within the longer of thirty (30) days of receiving the written monthly funding request or ten (10) days after resolution of the objection.

(iv) Within ten (10) days after transfer of funds into the Monetary Award Fund pursuant to a monthly funding request or decision of the Special Master or Court, as set forth in Section 23.3(b)(iii)(1), the Claims Administrator shall cause payment to be issued on all applicable final and accrued Monetary Awards, Derivative Claimant Awards and costs and expenses paid out of the Monetary Award Fund, as set forth in Section 23.5(d)(ii).

(v) The Monetary Award Fund shall maintain a targeted reserve, as set forth in Section 23.3(b)(v)(1), beyond the monetary amounts necessary to pay written monthly funding requests, which reserve may be used to pay any costs and expenses that must be satisfied pursuant to a contractual or other legal obligation before receipt of the monthly funding request amount and that are properly paid out of the Monetary Award Fund, as set forth in Section 23.5(d)(ii). The Claims Administrator shall report promptly any such payments from the Monetary Award Fund to the NFL Parties and Co-Lead Class Counsel. Either Co-Lead Class Counsel or Counsel for the NFL Parties may challenge the appropriateness of such payments, in which case the Court will determine (or may, in its discretion, refer the challenge to the Special Master to determine) the appropriateness of such payments. If the Court or Special Master, as applicable, determines that any such payment constituted willful misconduct, the Court or Special Master may, in its discretion, deduct that amount from the compensation of the Claims Administrator.

(1)     The Monetary Award Fund shall maintain a targeted reserve of:  (i) Ten Million United States dollars (U.S. $10,000,000) during the first through tenth years of the Monetary Award Fund; (ii) Five Million United States dollars (U.S. $5,000,000) during the eleventh through fiftieth years of the Monetary Award Fund; (iii) One Million United States dollars ($1,000,000) during the fifty-first through sixtieth years of the Monetary Award Fund; and (iv) Two Hundred and Fifty Thousand United States dollars (U.S. $250,000) during the sixty-first through sixty-fifth years of the Monetary Award Fund.

(c)     During the eleventh, fifty-first, and sixty-first years of the Monetary Award Fund, monthly funding requests shall first be satisfied by the money constituting the balance in the Monetary Award Fund until the revised targeted reserve, as set forth in Section 23.3(b)(v)(1), is achieved.  For example, in the eleventh year of the Monetary Award Fund, all monthly funding requests shall be paid from the Monetary Award Fund balance until the reserve is reduced to Five Million United States dollars ($5,000,000).  The process for the monthly funding request shall otherwise remain as set forth in Section 23.3(b).

(d)     BAP Fund.  No later than thirty (30) days after the Effective Date, the NFL Parties will pay, or cause to be paid, a total of Thirty-Five Million United States dollars (U.S. $35,000,000) into the Settlement Trust Account for transfer by the Trustee into the BAP Fund.  If at any point following the Effective Date until the expiration the five-year period for the provision of BAP Supplemental Benefits, as set forth in Sections 5.5 and 5.11, the balance of the BAP Fund falls below Ten Million United States dollars (U.S. $10,000,000), the NFL Parties, upon written notice from the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), who shall act upon application of the BAP Administrator, will pay, or cause to be paid, within thirty (30) days of such written notice, additional payments into the Settlement Trust Account for transfer by the Trustee into the BAP Fund in order to maintain a balance of no less than Ten Million United States dollars (U.S. $10,000,000), and no more than Eleven Million United States dollars (U.S. $11,000,000).  Under no circumstances will the aggregate transfers to the BAP Fund exceed Seventy-Five Million United States dollars (U.S. $75,000,000) in total, except if necessary to provide every qualified Retired NFL Football Player with one baseline assessment examination as provided for in Sections 5.1 and 23.1(b).  Any funds remaining in the BAP Fund at the conclusion of the five-year period for the provision of BAP Supplemental Benefits, as set forth in Sections 5.5 and 5.11, shall be transferred to the Settlement Trust for transfer by the Trustee into the Monetary Award Fund.

(e)     Class Notice Costs.  No later than five (5) days after the date of the Preliminary Approval and Class Certification Order, the NFL Parties will pay, or cause to be paid, a total of Four Million United States dollars (U.S. $4,000,000) to Co-Lead Class Counsel for the Settlement Class Notice and related expenses, as set forth in Section 14.1.

(f)     Prepayment Right.  The NFL Parties will have the right (but not the obligation) to prepay, or cause to be prepaid, any of their payment

Case 2:12-md-02323-AB Document 6481-1 Filed 02/13/15 Page 88 of 162

obligations to the Funds under the Settlement Agreement. In connection with any such prepayment, the NFL Parties will designate in writing the payment obligation that is being prepaid and how such prepayment should affect the NFL Parties' remaining payment obligations (*i.e.*, whether the amount prepaid should be credited against the next payment obligation or to one or more subsequent payment obligations or a combination thereof).

Section 23.4 No Interest or Inflation Adjustment. For the avoidance of any doubt, the payments set forth in Section 23.1 will not be subject to any interest obligation or inflation adjustment.

Section 23.5 Settlement Trust

(a) Promptly following the Effective Date, Co-Lead Class Counsel and Counsel for the NFL Parties will file a motion seeking the creation of a Settlement Trust under Delaware law and the appointment of the Trustee. Co-Lead Class Counsel and Counsel for the NFL Parties will file a proposed Settlement Trust Agreement with the Court.

(b) Co-Lead Class Counsel and Counsel for the NFL Parties will jointly recommend Citibank, N.A. as the Trustee, subject to the approval of the Court. The Trustee may be replaced by joint motion made by Co-Lead Class Counsel and Counsel for the NFL Parties, and granted by the Court. If the Trustee resigns, dies, is replaced, or is otherwise unable to continue employment in that position, Co-Lead Class Counsel and Counsel for the NFL Parties will agree to and jointly recommend a new proposed Trustee for appointment by the Court.

(c) Upon Court approval of the proposed Settlement Trust Agreement, Co-Lead Class Counsel, the NFL Parties, the Trustee and the Special Master, will execute the Settlement Trust Agreement approved by the Court, thereby creating the Settlement Trust. The Settlement Trust will be structured and operated in a manner so that it qualifies as a "qualified settlement fund" under §1.468B-1 of the Treasury Regulations promulgated under Sections 461(h) and 468B of the Internal Revenue Code of 1986, as amended.

(d) The Settlement Trust will be composed of the Funds. The Trustee will establish the Settlement Trust Account, into which the NFL Parties will make payments as required by this Settlement Agreement. The Trustee will also establish three separate funds (the "Funds"), into which the Trustee will transfer funds at the direction of the Special Master (or the Claims Administrator after expiration of the term of the Special Master and extension(s) thereof) and pursuant to the terms of this Settlement Agreement and on which the Special Master (or the Claims Administrator after expiration of the term of the Special Master and any extension(s) thereof) will have signatory authority. These Funds will constitute a single qualified settlement fund:

(i) The BAP Fund, which will be used to make payments for the BAP, as set forth in ARTICLE V.

(ii) The Monetary Award Fund, which will be used to make payments for: (a) all Monetary Awards and Derivative Claimant Awards, as set forth in ARTICLE VI and ARTICLE VII; (b) certain costs and expenses of the appeals process, as set forth in ARTICLE IX; (c) costs and expenses of claims administration, as set forth in ARTICLE X; and (d) certain costs and expenses of the Lien identification and resolution process, as set forth in ARTICLE XI;

(iii) The Education Fund, which will be used exclusively to make payments to support education programs and initiatives, as set forth in ARTICLE XII; and

(iv) The Settlement Trust Account, which will be used solely to transfer funds into the Funds described above in Section 23.5(d)(i)-(iii).

(e) The Settlement Trust will be managed by the Trustee as provided in the Settlement Trust Agreement, and both the Settlement Trust and Trustee will be subject to the continuing jurisdiction and supervision of the Court. Each of the Funds will be maintained in separate bank accounts at one or more federally insured depository institutions approved by Co-Lead Class Counsel and Counsel for the NFL Parties. The Trustee will have the authority to make payments from the Settlement Trust Account into the other Funds at the direction of the Special Master (or the Claims Administrator after expiration of the term of the Special Master and any extension(s) thereof) and to make disbursements from the Funds at the direction of the Special Master (or the Claims Administrator at the direction of Co-Lead Class Counsel and Counsel for the NFL Parties, after expiration of the term of the Special Master and any extension(s) thereof), and consistent with the terms of this Settlement Agreement and the Settlement Trust Agreement.

(f) The Trustee will be responsible for making any necessary tax filings and payments of taxes, estimated taxes, and associated interest and penalties, if any, by the Settlement Trust and responding to any questions from, or audits regarding such taxes by, the Internal Revenue Service or any state or local tax authority. The Trustee also will be responsible for complying with all tax information reporting and withholding requirements with respect to payments made by the Settlement Trust, as well as paying any associated interest and penalties. Any such taxes, interest, and penalty payments will be paid by the Trustee from the Monetary Award Fund.

Section 23.6 Funds Investment

(a) To the extent funds are available for investment, amounts deposited in each of the Funds will be invested conservatively in a manner designed to assure timely availability of funds, protection of principal and avoidance of concentration risk.

(b) Any earnings attributable to the BAP Fund, the Monetary Award Fund, and/or the Education Fund will be retained in the respective Fund.

Case 2:12-md-02323-AB Document 6481-1 Filed 02/13/15 Page 90 of 162

Section 23.7 Attorneys' Fees Qualified Settlement Fund. Unless the Court directs otherwise, a separate fund (intended to qualify as a "qualified settlement fund" under §1.468B-1 of the Treasury Regulations promulgated under Sections 461(h) and 468B of the Internal Revenue Code of 1986, as amended) will be established out of which attorneys' fees will be paid pursuant to order of the Court, as set forth in ARTICLE XXI. This separate qualified settlement fund will be established pursuant to order of the Court, and will operate under Court supervision and control. This separate qualified settlement fund will be separate from the qualified settlement fund described in Section 23.5(c) and any of the Funds described therein, and will not be administered by the Trustee. The Court will determine the form and manner of administering this fund, in which the NFL Parties will have no reversionary interest.

Section 23.8 Trustee Satisfaction of Monetary Obligations. Wherever in this Settlement Agreement the Special Master, BAP Administrator, Claims Administrator, or Lien Resolution Administrator is authorized or directed, as the context may reflect, to pay, disburse, reimburse, hold, waive, or satisfy any monetary obligation provided for or recognized under any of the terms of this Settlement Agreement, the Special Master, BAP Administrator, Claims Administrator, or Lien Resolution Administrator may comply with such authorization or direction by directing the Trustee to, as appropriate, pay, disburse, reimburse, hold, waive, or satisfy any such monetary obligation.

## ARTICLE XXIV
## Denial of Wrongdoing, No Admission of Liability

Section 24.1 This Settlement Agreement, whether or not the Class Action Settlement becomes effective, is for settlement purposes only and is to be construed solely as a reflection of the Parties' desire to facilitate a resolution of the Class Action Complaint and of the Released Claims and Related Lawsuits. The NFL Parties expressly deny that they, or the other Released Parties, have violated any duty to, breached any obligation to, committed any fraud on, or otherwise engaged in any wrongdoing with respect to, the Class and Subclass Representatives, the Settlement Class, any Settlement Class Member, or any Opt Out, and expressly deny the allegations asserted in the Class Action Complaint and Related Lawsuits, and deny any and all liability related thereto. Neither this Settlement Agreement nor any actions undertaken by the NFL Parties or the Released Parties in the negotiation, execution, or satisfaction of this Settlement Agreement will constitute, or be construed as, an admission of any liability or wrongdoing, or recognition of the validity of any claim made by the Class and Subclass Representatives, the Settlement Class, any Settlement Class Member, or any Opt Out, in this or any other action or proceeding.

Section 24.2 In no event will the Settlement Agreement, whether or not the Class Action Settlement becomes effective, or any of its provisions, or any negotiations, statements, or court proceedings relating to its provisions, or any actions undertaken in this Settlement Agreement, in any way be construed as, offered as, received as, used as, or deemed to be evidence, admissible or otherwise, of any kind, or used in any other fashion, by the Class and Subclass Representatives, the Settlement

Case 2:12-md-02323-AB Document 6481-1 Filed 02/13/15 Page 91 of 162

Class, any Settlement Class Member, Class Counsel, or any of the Released Parties in any litigation, action, hearing, or any judicial, arbitral, administrative, regulatory or other proceeding for any purpose, except a proceeding to resolve a dispute arising under, or to enforce, the Settlement Agreement. Without limiting the foregoing, neither the Settlement Agreement nor any of its provisions, negotiations, statements, or court proceedings relating to its provisions, nor any actions undertaken in this Settlement Agreement, will be construed as, offered as, received as, used as, or deemed to be evidence, admissible or otherwise, or an admission or concession of any liability or wrongdoing whatsoever on the part of any person or entity, including, but not limited to, the Released Parties, or as a waiver by the Released Parties of any applicable defense, or as a waiver by the Class and Subclass Representatives, the Settlement Class, any Settlement Class Member of any claims, causes of action, or remedies. This Section 24.2 shall not apply to disputes between the NFL Parties and their insurers, as to which the NFL Parties reserve all rights.

**ARTICLE XXV**
**Representations and Warranties**

Section 25.1 Authority. Class Counsel represent and warrant as of the date of the Settlement Agreement, as amended, that they have authority to enter into this Settlement Agreement on behalf of the Class and Subclass Representatives.

Section 25.2 Class and Subclass Representatives. Each of the Class and Subclass Representatives, through a duly authorized representative, represents and warrants that he: (i) has agreed to serve as a representative of the Settlement Class proposed to be certified herein; (ii) is willing, able, and ready to perform all of the duties and obligations as a representative of the Settlement Class; (iii) is familiar with the pleadings in In re: National Football League Players' Concussion Injury Litigation, MDL 2323, or has had the contents of such pleadings described to him; (iv) is familiar with the terms of this Settlement Agreement, including the exhibits attached to this Settlement Agreement, or has received a description of the Settlement Agreement, including the exhibits attached to this Settlement Agreement, from Class Counsel, and has agreed to its terms; (v) has consulted with, and received legal advice from, Class Counsel about the litigation, this Settlement Agreement (including the advisability of entering into this Settlement Agreement and its Releases and the legal effects of this Settlement Agreements and its Releases), and the obligations of a representative of the Settlement Class; (vi) has authorized Class Counsel to execute this Settlement Agreement on his behalf; and (vii) will remain in and not request exclusion from the Settlement Class and will serve as a representative of the Settlement Class until the terms of this Settlement Agreement are effectuated, this Settlement Agreement is terminated in accordance with its terms, or the Court at any time determines that such Class or Subclass Representative cannot represent the Settlement Class.

Section 25.3 NFL Parties. The NFL Parties represent and warrant as of the date of the Settlement Agreement, as amended, that: (i) they have all requisite corporate power and authority to execute, deliver, and perform this Settlement Agreement; (ii) the execution, delivery, and performance by the NFL Parties of this

Case 2:12-md-02323-AB Document 6481-1 Filed 02/13/15 Page 92 of 162

Settlement Agreement has been duly authorized by all necessary corporate action; (iii) this Settlement Agreement has been duly and validly executed and delivered by the NFL Parties; and (iv) this Settlement Agreement constitutes their legal, valid, and binding obligation.

Section 25.4 NFL Parties' Representation and Warranty Regarding Member Clubs. The NFL Parties represent and warrant as of the date of the Settlement Agreement, as amended, that the current Member Clubs have duly authorized the execution, delivery, and performance by the NFL Parties of this Settlement Agreement.

Section 25.5 Investigation and Future Events. The Parties and their counsel represent and warrant that they have each performed an independent investigation of the allegations of fact and law made in connection with the Class Action Complaint in In re: National Football League Players' Concussion Injury Litigation, MDL No. 2323, and may hereafter discover facts in addition to, or different from, those that they now know or believe to be true with respect to the subject matter of this Settlement Agreement. Nevertheless, the Parties intend to resolve their disputes pursuant to the terms of this Settlement Agreement and thus, in furtherance of their intentions, this Settlement Agreement will remain in full force and effect notwithstanding the discovery of any additional facts or law, or changes in law, and this Settlement Agreement will not be subject to rescission or modification by reason of any change or difference in facts or law.

Section 25.6 Security

(a) The NFL Parties represent and warrant that the NFL currently maintains, and will continue to maintain, an investment grade rating on its Stadium Program Bonds, as rated by Fitch Ratings. This investment grade rating shall serve as security that the NFL Parties will meet their payment obligations as set forth in Section 23.3 for the first ten years of the Settlement following the Effective Date.

(b) If the identity of the rating agency that rates the NFL's Stadium Program Bonds changes during the first ten years of the Settlement from the Effective Date, then an investment grade rating by the new rating agency on the NFL's Stadium Program Bonds will satisfy the NFL Parties' obligations under Section 25.6(a).

(c) The applicable definition of "investment grade" will be as provided by the rating agency rating the NFL's Stadium Program Bonds.

(d) No later than the tenth anniversary of the Effective Date (the "Tenth Anniversary Date"), the NFL Parties shall establish, or cause to be established, a special-purpose Delaware statutory trust (the "Statutory Trust"), with an independent trustee, that will be funded and managed as follows: the NFL Parties shall contribute cash to the Statutory Trust so that as of the Tenth Anniversary Date, it shall contain funds that, in the reasonable belief of the NFL Parties, and after taking into account reasonably expected investment returns over time, will be sufficient to satisfy the NFL Parties' remaining anticipated payment obligations, as set forth in Section

23.5(d)(ii), as they come due. In the event that the remaining anticipated payment obligations on the Tenth Anniversary Date materially exceed the NFL Parties' reasonable expectations as of the Effective Date due to participation rates and/or the claims experience during the first ten years of the Settlement, the NFL Parties may apply to the Court to fund the Statutory Trust as follows: seventy percent of the required funds to be contributed by the NFL Parties to the Statutory Trust by the Tenth Anniversary Date and the remaining thirty percent of the required funds to be contributed on a three-year schedule set by the Court so that all required funds are deposited in the Statutory Trust no later than the thirteenth anniversary of the Effective Date. The NFL Parties shall not have the right to pledge or assign the property of the Statutory Trust (including any investment returns earned thereon and remaining in the Statutory Trust, as provided herein) to any third-party, and, as contemplated by §3805(b) of Title 12 of the Delaware Code, no other creditor of any of the NFL Parties shall have any right to obtain possession of, or otherwise exercise legal or equitable remedies with respect to, the property of the Statutory Trust. The documents governing the Statutory Trust will provide that the NFL Parties may direct how the funds in the Statutory Trust are invested from time to time, but the Trustee will be instructed to permit withdrawals of funds from the Statutory Trust only for the limited purposes of: (i) satisfying the NFL Parties' payment obligations under this Settlement Agreement as set forth in Section 23.5(d)(ii); (ii) the NFL Parties' costs and expenses related to the Statutory Trust, including, without limitation, taxes, investment-related expenses and administrative costs; (iii) the return of excess monies in the Statutory Trust to the NFL Parties based on attaining investment returns exceeding the amount necessary to satisfy the NFL Parties' remaining anticipated payment obligations, but only upon Court approval; (iv) the return of excess monies in the Statutory Trust to the NFL Parties based on reductions to the NFL Parties' remaining anticipated payment obligations, but only upon Court approval; or (v) upon the completion of the NFL Parties' payment obligations, as set forth in this Settlement Agreement, but only upon Court approval. To the extent that Court approval is required for the withdrawal of funds from the Statutory Trust, such approval shall be granted unless there has been either a material default on the NFL Parties' payment obligations within the prior thirty (30) days, or upon a showing, by clear and convincing evidence, that the proposed withdrawal would materially impair the Settlement Agreement.

(e)    In the event of a material default by the NFL Parties in satisfying their payment obligations as set forth in this Settlement Agreement, and the NFL Parties' failure to cure any such material default within sixty (60) days of written notification of such default by the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), Co-Lead Class Counsel shall have the right to petition the Court to make a finding that there has been a material, uncured default in satisfying the NFL Parties' payment obligations and to enter an order directing the NFL Parties to meet their payment obligations. Beginning on the Tenth Anniversary Date, any such petition by Co-Lead Class Counsel may request that the Court direct the NFL Parties to meet their payment obligations with the funds available in the Statutory Trust established by the NFL Parties pursuant to Section 25.6(d).

(f)    The NFL Parties historically have maintained liability insurance policies under which they are seeking coverage and are pursuing their rights to

Case 2:12-md-02323-AB Document 6481-1 Filed 02/13/15 Page 94 of 162

recover under said policies. It is understood that if the NFL Parties secure funding commitments from one or more insurers under their historical policies, or a court order obligating one or more such insurers to fund in whole or in part certain of the NFL Parties' obligations under this Settlement Agreement, after such insurance funding is deposited into the Statutory Trust, the NFL Parties may seek Court approval to reduce, dollar-for-dollar, the equivalent amount of such funding for anticipated remaining liabilities that otherwise would be required to be deposited in the Statutory Trust by the NFL Parties pursuant to Section 25.6(d). In addition, if the NFL Parties obtain additional insurance policies from one or more third-party insurers with a rating of A or above, to insure in whole or in part certain of their obligations under the Settlement, the NFL Parties may seek Court approval to reduce, dollar-for-dollar, the equivalent amount of funding for anticipated remaining liabilities that otherwise would be required to be deposited in the Statutory Trust by the NFL Parties pursuant to Section 25.6(d). To do so, the NFL Parties must demonstrate to the Court that the Court or the Statutory Trust provided for in Section 25.6(d) will have sufficient control over such insurance policies and their proceeds to ensure that the proceeds are available to meet the NFL Parties' payment obligations, if necessary.

(g) In the event the Court enters an order pursuant to Section 25.6(e) directing the NFL Parties to meet their payment obligations pursuant to Section 23.3 and the NFL Parties fail materially to comply with such Order, as set forth in Section 25.6(e), Co-Lead Class Counsel may request that the Court provide the NFL Parties sixty (60) days to show cause why the Court shall not render null and void the Releases and Covenants Not to Sue provided to Released Parties, as set forth in Section 18.1, by Settlement Class Members who: (i) have received a final, favorable Notice of Registration Determination, as set forth in Section 4.3, and have not received a final and accrued Monetary Award or final and accrued Derivative Claimant Award as of the date of such application; or (ii) who have only received a final and accrued Monetary Award for a Level 1.5 Neurocognitive Impairment or a final and accrued Derivative Claimant Award for a Level 1.5 Neurocognitive Impairment as of the date of such application. For the avoidance of any doubt, all other Releases and Covenants Not to Sue shall remain effective. In the event that a Settlement Class Member's Release and Covenant Not to Sue is rendered null and void, such Settlement Class Member shall not challenge, if applicable, any Released Party's right to offset any final judgment received by the Settlement Class Member as a result of Section 25.6(g)(ii) in the amount of the Monetary Award or Derivative Claimant Award received by the Settlement Class Member. For the avoidance of any doubt, nothing in this subsection 25.6, shall affect any rights or obligations of Settlement Class Members and Released Parties as otherwise provided in, or with respect to, this Settlement Agreement or any breach thereof.

## ARTICLE XXVI
## Cooperation

Section 26.1 The Parties will cooperate, assist, and undertake all reasonable actions to accomplish the steps contemplated by this Settlement Agreement

Case 2:12-md-02323-AB Document 6481-1 Filed 02/13/15 Page 95 of 162

and to implement the Class Action Settlement on the terms and conditions provided herein.

Section 26.2 The Parties agree to take all actions necessary to obtain final approval of the Class Action Settlement and entry of a Final Order and Judgment, including the terms and provisions described in this Settlement Agreement, and, upon final approval and entry of such order, an order dismissing the Class Action Complaint and Related Lawsuits with prejudice as to the Class and Subclass Representatives, the Settlement Class, and each Settlement Class Member.

Section 26.3 The Parties and their counsel agree to support the final approval and implementation of this Settlement Agreement and defend it against objections, appeal, collateral attack or any efforts to hinder or delay its approval and implementation. Neither the Parties nor their counsel, directly or indirectly, will encourage any person to object to the Class Action Settlement or assist them in doing so.

**ARTICLE XXVII**
**Continuing Jurisdiction**

Section 27.1 Pursuant to the Final Order and Judgment, the Court will retain continuing and exclusive jurisdiction over the Parties and their counsel, all Settlement Class Members, the Special Master, BAP Administrator, Claims Administrator, Liens Resolution Administrator, Appeals Advisory Panel, Appeals Advisory Panel Consultants, and Trustee with respect to the terms of the Settlement Agreement. Any disputes or controversies arising out of, or related to, the interpretation, implementation, administration, and enforcement of this Settlement Agreement will be made by motion to the Court. In addition, the Parties, including each Settlement Class Member, are hereby deemed to have submitted to the exclusive jurisdiction of this Court for any suit, action, proceeding, or dispute arising out of, or relating to, this Settlement Agreement. The terms of the Settlement Agreement will be incorporated into the Final Order and Judgment of the Court, which will allow that Final Order and Judgment to serve as an enforceable injunction by the Court for purposes of the Court's continuing jurisdiction related to the Settlement Agreement.

(a) Notwithstanding any contrary law applicable to the underlying claims, this Settlement Agreement and the Releases hereunder will be interpreted and enforced in accordance with the laws of the State of New York, without regard to conflict of law principles.

**ARTICLE XXVIII**
**Role of Co-Lead Class Counsel, Class Counsel and Subclass Counsel**

Section 28.1 Co-Lead Class Counsel and Class Counsel acknowledge that, under applicable law, their respective duty is to the entire Settlement Class, to act in the best interest of the Settlement Class as a whole, with respect to promoting, supporting, and effectuating, as fair, adequate, and reasonable, the approval, implementation, and administration of the settlement embodied in the Settlement

Case 2:12-md-02323-AB Document 6481-1 Filed 02/13/15 Page 96 of 162

Agreement, and that their professional responsibilities as attorneys are to be viewed in this light, under the ongoing supervision and jurisdiction of the Court that appoints them to represent the interests of the Settlement Class.

Section 28.2 Subclass Counsel acknowledge that, under applicable law, their respective duty is to their respective Subclasses, to act in the best interest of the respective Subclass as a whole, with respect to promoting, supporting, and effectuating, as fair, adequate, and reasonable, the approval, implementation, and administration of the settlement embodied in the Settlement Agreement, and that their professional responsibilities as attorneys are to be viewed in this light, under the ongoing supervision and jurisdiction of the Court that appoints them to represent the interests of the respective Subclass.

## ARTICLE XXIX
## Bargained-For Benefits

Section 29.1 Nothing in the Collective Bargaining Agreement will preclude Settlement Class Members from receiving benefits under the Settlement Agreement. In addition, the fact that a Settlement Class Member has signed, or will sign, a release and covenant not to sue pursuant to Article 65 of the 2011 Collective Bargaining Agreement will not preclude the Settlement Class Member from receiving benefits under the Settlement Agreement, and the NFL Parties agree not to assert any defense or objection to the Settlement Class Member's receipt of benefits under the Settlement Agreement on the ground that he executed a release and covenant not to sue pursuant to Article 65 of the 2011 Collective Bargaining Agreement.

Section 29.2 A Retired NFL Football Player's participation in the Settlement Agreement will not in any way affect his eligibility for bargained-for benefits under the Collective Bargaining Agreement or the terms or conditions under which those benefits are provided, except as set forth in Section 18.1.

## ARTICLE XXX
## Miscellaneous Provisions

Section 30.1 No Assignment of Claims. Neither the Settlement Class nor any Class or Subclass Representative or Settlement Class Member has assigned, will assign, or will attempt to assign, to any person or entity other than the NFL Parties any rights or claims relating to the subject matter of the Class Action Complaint. Any such assignment, or attempt to assign, to any person or entity other than the NFL Parties any rights or claims relating to the subject matter of the Class Action Complaint will be void, invalid, and of no force and effect and the Claims Administrator shall not recognize any such action.

Section 30.2 Individual Counsel

(a) Counsel individually representing a Settlement Class Member shall provide notice of his or her representation to the Claims Administrator within thirty (30) days of the Effective Date or within thirty (30) days of the retention if

Case 2:12-md-02323-AB Document 6481-1 Filed 02/13/15 Page 97 of 162

Counsel is retained after the Effective Date. Counsel acting on his or her client's behalf may submit all claim forms, proof, correspondence, or other documents to the Special Master, BAP Administrator, Claims Administrator or Lien Resolution Administrator on behalf of that Settlement Class Member; provided, however, that counsel individually representing a Settlement Class Member may not sign on behalf of that Settlement Class Member: (i) an Opt Out request; (ii) a revocation of an Opt Out; (iii) an objection, as set forth in Section 14.3; (iv) a Claim Form, (v) a Derivative Claim Form, or (vi) an Appeals Form.

(b) Where a Settlement Class Member indicates in writing to the Special Master, BAP Administrator, Claims Administrator or Lien Resolution Administrator that he or she is individually represented by counsel, the Special Master, BAP Administrator, Claims Administrator or Lien Resolution Administrator will copy the counsel individually representing a Settlement Class Member on any written communications with the Settlement Class Member. Any communications, whether written or oral, by the Special Master, BAP Administrator, Claims Administrator or Lien Resolution Administrator with counsel individually representing a Settlement Class Member will be deemed to be a communication directly with such individually represented Settlement Class Member.

Section 30.3 Integration. This Settlement Agreement and its exhibits, attachments, and appendices will constitute the entire agreement and understanding among the Parties and supersedes all prior proposals, negotiations, letters, conversations, agreements, term sheets, and understandings, whether written or oral, relating to the subject matter of this Settlement Agreement, including the Settlement Term Sheet dated August 29, 2013. The Parties acknowledge, stipulate, and agree that no covenant, obligation, condition, representation, warranty, inducement, negotiation, agreement, arrangement, or understanding, whether written or oral, concerning any part or all of the subject matter of this Settlement Agreement has been made or relied on except as expressly set forth in this Settlement Agreement.

Section 30.4 Headings. The headings used in this Settlement Agreement are intended for the convenience of the reader only and will not affect the meaning or interpretation of this Settlement Agreement in any manner. Any inconsistency between the headings used in this Settlement Agreement and the text of the Articles and Sections of this Settlement Agreement will be resolved in favor of the text.

Section 30.5 Incorporation of Exhibits. All of the exhibits attached hereto are hereby incorporated by reference as though fully set forth herein. Notwithstanding the foregoing, any inconsistency between this Settlement Agreement and any attachments, exhibits, or appendices hereto will be resolved in favor of this Settlement Agreement.

Section 30.6 Amendment. This Settlement Agreement will not be subject to any change, modification, amendment, or addition without the express written consent of Class Counsel and Counsel for the NFL Parties, on behalf of all Parties to this Settlement Agreement, and upon Court approval.

Section 30.7    Mutual Preparation.  The Parties have negotiated all of the terms and conditions of this Settlement Agreement at arm's length.  Neither the Settlement Class Members nor the NFL Parties, nor any one of them, nor any of their counsel will be considered to be the sole drafter of this Settlement Agreement or any of its provisions for the purpose of any statute, case law, or rule of interpretation or construction that would or might cause any provision to be construed against the drafter of this Settlement Agreement.  This Settlement Agreement will be deemed to have been mutually prepared by the Parties and will not be construed against any of them by reason of authorship.

Section 30.8    Beneficiaries.  This Settlement Agreement will be binding upon the Parties and will inure to the benefit of the Settlement Class Members and the Released Parties.  All Released Parties who are not the NFL Parties are intended third-party beneficiaries who are entitled to enforce the terms of the Releases and Covenant Not to Sue set forth in ARTICLE XVIII.  No provision in this Settlement Agreement is intended to create any third-party beneficiary to this Settlement Agreement other than the Released Parties.  Nothing expressed or implied in this Settlement Agreement is intended to or will be construed to confer upon or give any person or entity other than Class and Subclass Representatives, the Settlement Class Members, Class Counsel, the NFL Parties, the Released Parties, and Counsel for the NFL Parties, any right or remedy under or by reason of this Settlement Agreement.

Section 30.9    Extensions of Time.  Co-Lead Class Counsel and Counsel for the NFL Parties may agree in writing, subject to approval of the Court where required, to reasonable extensions of time to implement the provisions of this Settlement Agreement.

Section 30.10  Execution in Counterparts.  This Settlement Agreement may be executed in counterparts, and a facsimile signature will be deemed an original signature for purposes of this Settlement Agreement.

Section 30.11  Good Faith Implementation.  Co-Lead Class Counsel and Counsel for the NFL Parties will undertake to implement the terms of this Settlement Agreement in good faith.  Before filing any motion or petition in the Court raising a dispute arising out of or related to this Settlement Agreement, Co-Lead Class Counsel and Counsel for the NFL Parties will consult with each other in good faith and certify to the Court that they have conferred in good faith.

Section 30.12  Force Majeure.  The Parties will be excused from any failure to perform timely any obligation hereunder to the extent such failure is caused by war, acts of public enemies or terrorists, strikes or other labor disturbances, fires, floods, acts of God, or any causes of the like or different kind beyond the reasonable control of the Parties.

Section 30.13  Waiver.  The waiver by any Party of any breach of this Settlement Agreement by another Party will not be deemed or construed as a waiver of

Case 2:12-md-02323-AB Document 6481-1 Filed 02/13/15 Page 99 of 162

any other breach, whether prior, subsequent, or contemporaneous, of this Settlement Agreement.

Section 30.14 Tax Consequences. No opinion regarding the tax consequences of this Settlement Agreement to any individual Settlement Class Member is being given or will be given by the NFL Parties, Counsel for the NFL Parties, Class and Subclass Representatives, Class Counsel, nor is any representation or warranty in this regard made by virtue of this Settlement Agreement. Settlement Class Members must consult their own tax advisors regarding the tax consequences of the Settlement Agreement, including any payments provided hereunder and any tax reporting obligations they may have with respect thereto. Each Settlement Class Member's tax obligations, and the determination thereof, are his or her sole responsibility, and it is understood that the tax consequences may vary depending on the particular circumstances of each individual Settlement Class Member. The NFL Parties, Counsel for the NFL Parties, Class Counsel will have no liability or responsibility whatsoever for any such tax consequences resulting from payments under this Settlement Agreement. To the extent required by law, the Claims Administrator will report payments made under the Settlement Agreement to the appropriate authorities.

Section 30.15 Issuance of Notices and Submission of Materials. In any instance in which this Settlement Agreement requires the issuance of any notice regarding registration, a claim or an award, unless specified otherwise in this Settlement Agreement, such notice must be issued by: (a) online submission through any secure web-based portal established by the Claims Administrator for this purpose to the Settlement Class Member or NFL Parties, which shall be accompanied by an email certifying receipt; or (b) U.S. mail (or its foreign equivalent). In any instance in which this Settlement Agreement requires submission of materials by or on behalf of a Settlement Class Member or the NFL Parties, unless specified otherwise in this Settlement Agreement, such submission must be made by: (a) online submission through any secure web-based portal established by the Claims Administrator for this purpose; or (b) U.S. mail (or its foreign equivalent); or (c) delivery. Written notice to the Class Representatives or Co-Lead Class Counsel must be given to: Christopher A. Seeger, Seeger Weiss LLP, 77 Water Street, New York, New York 10005; and Sol Weiss, Anapol Schwartz, 1710 Spruce Street, Philadelphia, PA 19103. Written notice to the NFL Parties or Counsel for the NFL Parties must be given to: Jeffrey Pash, Executive Vice President and General Counsel, National Football League, 345 Park Avenue, New York, New York 10154; Anastasia Danias, Senior Vice President and Chief Litigation Officer, National Football League, 345 Park Avenue, New York, New York 10154; and Brad S. Karp, Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019, or such other person or persons as shall be designated by the Parties.

Section 30.16 Party Burden. Unless explicitly provided otherwise, whenever a showing is required to be made in this Settlement Agreement, the party seeking the relief shall bear the burden of substantiation.

Agreed to as of this 13th day of February, 2015.

NATIONAL FOOTBALL LEAGUE, NFL PROPERTIES LLC

By: ____________________
Jeffrey Pash
NFL Executive Vice President

COUNSEL FOR THE NFL PARTIES

By: ____________________
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
Brad S. Karp
Theodore V. Wells, Jr.
Bruce Birenboim
Beth A. Wilkinson
Lynn B. Bayard

CO-LEAD CLASS COUNSEL

By: ____________________
SEEGER WEISS LLP
Christopher A. Seeger

By: ____________________
ANAPOL SCHWARTZ
Sol Weiss

CLASS COUNSEL

By: ____________________
PODHURST ORSECK, P.A.
Steven C. Marks

By: ____________________
LOCKS LAW FIRM
Gene Locks

SUBCLASS COUNSEL

By: ____________________
LEVIN, FISHBEIN, SEDRAN & BERMAN
Arnold Levin

By: ____________________
NASTLAW LLC
Dianne M. Nast

       Case 2:12-md-02323-AB Document 6481-1 Filed 02/13/15 Page 101 of 162

Section 30.16 Party Burden. Unless explicitly provided otherwise, whenever a showing is required to be made in this Settlement Agreement, the party seeking the relief shall bear the burden of substantiation.

Agreed to as of this 13th day of February, 2015.

NATIONAL FOOTBALL LEAGUE, NFL PROPERTIES LLC

By: ____________________
Jeffrey Pash
NFL Executive Vice President

COUNSEL FOR THE NFL PARTIES

By: ____________________
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
Brad S. Karp
Theodore V. Wells, Jr.
Bruce Birenboim
Beth A. Wilkinson
Lynn B. Bayard

CO-LEAD CLASS COUNSEL

By: ____________________
SEEGER WEISS LLP
Christopher A. Seeger

By: ____________________
ANAPOL SCHWARTZ
Sol Weiss

CLASS COUNSEL

By: ____________________
PODHURST ORSECK, P.A.
Steven C. Marks

By: ____________________
LOCKS LAW FIRM
Gene Locks

SUBCLASS COUNSEL

By: ____________________
LEVIN, FISHBEIN, SEDRAN & BERMAN
Arnold Levin

By: ____________________
NASTLAW LLC
Dianne M. Nast

Case 2:12-md-02323-AB Document 6481-1 Filed 02/13/15 Page 102 of 162

Section 30.16 Party Burden. Unless explicitly provided otherwise, whenever a showing is required to be made in this Settlement Agreement, the party seeking the relief shall bear the burden of substantiation.

Agreed to as of this 13th day of February, 2015.

NATIONAL FOOTBALL LEAGUE, NFL PROPERTIES LLC

By: ______________________
Jeffrey Pash
NFL Executive Vice President

COUNSEL FOR THE NFL PARTIES

By: ______________________
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
Brad S. Karp
Theodore V. Wells, Jr.
Bruce Birenboim
Beth A. Wilkinson
Lynn B. Bayard

CO-LEAD CLASS COUNSEL

By: ______________________
SEEGER WEISS LLP
Christopher A. Seeger

By: ______________________
ANAPOL SCHWARTZ
Sol Weiss

CLASS COUNSEL

By: ______________________
PODHURST ORSECK, P.A.
Steven C. Marks

By: ______________________
LOCKS LAW FIRM
Gene Locks

SUBCLASS COUNSEL

By: ______________________
LEVIN, FISHBEIN, SEDRAN & BERMAN
Arnold Levin

By: ______________________
NASTLAW LLC
Dianne M. Nast

Section 30.16 Party Burden. Unless explicitly provided otherwise, whenever a showing is required to be made in this Settlement Agreement, the party seeking the relief shall bear the burden of substantiation.

Agreed to as of this 13th day of February, 2015.

NATIONAL FOOTBALL LEAGUE, NFL PROPERTIES LLC

By: ____________________
Jeffrey Pash
NFL Executive Vice President

COUNSEL FOR THE NFL PARTIES

By: ____________________
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
Brad S. Karp
Theodore V. Wells, Jr.
Bruce Birenboim
Beth A. Wilkinson
Lynn B. Bayard

CO-LEAD CLASS COUNSEL

By: ____________________
SEEGER WEISS LLP
Christopher A. Seeger

By: ____________________
ANAPOL SCHWARTZ
Sol Weiss

CLASS COUNSEL

By: ____________________
PODHURST ORSECK, P.A.
Steven C. Marks

By: ____________________
LOCKS LAW FIRM
Gene Locks

SUBCLASS COUNSEL

By: ____________________
LEVIN, FISHBEIN, SEDRAN & BERMAN
Arnold Levin

By: ____________________
NASTLAW LLC
Dianne M. Nast

Case 2:12-md-02323-AB Document 6481-1 Filed 02/13/15 Page 104 of 162

Section 30.16 Party Burden. Unless explicitly provided otherwise, whenever a showing is required to be made in this Settlement Agreement, the party seeking the relief shall bear the burden of substantiation.

Agreed to as of this 13th day of February, 2015.

NATIONAL FOOTBALL LEAGUE, NFL PROPERTIES LLC

By: ____________________
Jeffrey Pash
NFL Executive Vice President

COUNSEL FOR THE NFL PARTIES

By: ____________________
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
Brad S. Karp
Theodore V. Wells, Jr.
Bruce Birenboim
Beth A. Wilkinson
Lynn B. Bayard

CO-LEAD CLASS COUNSEL

By: ____________________
SEEGER WEISS LLP
Christopher A. Seeger

By: ____________________
ANAPOL SCHWARTZ
Sol Weiss

CLASS COUNSEL

By: ____________________
PODHURST ORSECK, P.A.
Steven C. Marks

By: ____________________
LOCKS LAW FIRM
Gene Locks

SUBCLASS COUNSEL

By: ____________________
LEVIN, FISHBEIN, SEDRAN & BERMAN
Arnold Levin

By: [signature]
NASTLAW LLC
Dianne M. Nast

Case 2:12-md-02323-AB Document 6481-1 Filed 02/13/15 Page 105 of 162

# EXHIBIT A-1

# INJURY DEFINITIONS

## DIAGNOSIS FOR BAP SUPPLEMENTAL BENEFITS

### Level 1 Neurocognitive Impairment

(a) For Retired NFL Football Players diagnosed through the BAP, a diagnosis of Level 1 Neurocognitive Impairment must meet the criteria set forth in subsections (i)-(iv) below:

(i) Concern of the Retired NFL Football Player, a knowledgeable informant, or the Qualified BAP Provider that there has been a decline in cognitive function.

(ii) Evidence of moderate cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in Exhibit 2 to the Settlement Agreement, in two or more cognitive domains (complex attention, executive function, learning and memory, language, perceptual-spatial), provided one of the cognitive domains is (a) executive function, (b) learning and memory, or (c) complex attention.

(iii) The Retired NFL Football Player exhibits functional impairment generally consistent with the criteria set forth in the National Alzheimer's Coordinating Center's Clinical Dementia Rating scale Category 0.5 (Questionable) in the areas of Community Affairs, Home & Hobbies, and Personal Care.

(iv) The cognitive deficits do not occur exclusively in the context of a delirium, acute substance abuse, or as a result of medication side effects.

(b) Level 1 Neurocognitive Impairment, for the purposes of this Settlement Agreement, may only be diagnosed by Qualified BAP Providers during a BAP baseline assessment examination, with agreement on the diagnosis by the Qualified BAP Providers.

Case 2:12-md-02323-AB Document 6481-1 Filed 02/13/15 Page 107 of 162

# QUALIFYING DIAGNOSES FOR MONETARY AWARDS

1. **Level 1.5 Neurocognitive Impairment**

(a) For Retired NFL Football Players diagnosed through the BAP, a diagnosis of Level 1.5 Neurocognitive Impairment must meet the criteria set forth in subsections (i)-(iv) below:

(i) Concern of the Retired NFL Football Player, a knowledgeable informant, or the Qualified BAP Provider that there has been a severe decline in cognitive function.

(ii) Evidence of a moderate to severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in Exhibit 2 to the Settlement Agreement, in two or more cognitive domains (complex attention, executive function, learning and memory, language, perceptual-spatial), provided one of the cognitive domains is (a) executive function, (b) learning and memory, or (c) complex attention.

(iii) The Retired NFL Football Player exhibits functional impairment generally consistent with the criteria set forth in the National Alzheimer's Coordinating Center's Clinical Dementia Rating (CDR) scale Category 1.0 (Mild) in the areas of Community Affairs, Home & Hobbies, and Personal Care. Such functional impairment shall be corroborated by documentary evidence (*e.g.*, medical records, employment records), the sufficiency of which will be determined by the physician making the Qualifying Diagnosis. In the event that no documentary evidence of functional impairment exists or is available, then (a) there must be evidence of moderate to severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in Exhibit 2 to the Settlement Agreement, in the executive function cognitive domain or the learning and memory cognitive domain, and at least one other cognitive domain; and (b) the Retired NFL Football Player's functional impairment, as described above, must be corroborated by a third-party sworn affidavit from a person familiar with the Retired NFL Football Player's condition (other than the player or his family members), the sufficiency of which will be determined by the physician making the Qualifying Diagnosis.

(iv) The cognitive deficits do not occur exclusively in the context of a delirium, acute substance abuse, or as a result of medication side effects.

(b) For living Retired NFL Football Players diagnosed outside of the BAP, a diagnosis while living of Level 1.5 Neurocognitive Impairment, *i.e.*, early dementia, based on evaluation and evidence generally consistent with the diagnostic criteria set forth in subsection 1(a)(i)-(iv) above, made by a Qualified MAF Physician or a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, as set forth and provided in Sections 6.3(b)-(d) of the Settlement Agreement.

(c) For Retired NFL Football Players deceased prior to the Effective Date, a diagnosis of Level 1.5 Neurocognitive Impairment, *i.e.*, early dementia, based on evaluation and evidence generally consistent with the diagnostic criteria set forth in subsection 1(a)(i)-(iv)

above, made while the Retired NFL Football Player was living by a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology or neurocognitive disorders, as set forth and provided in Sections 6.3(c)-(e) of the Settlement Agreement.

2.      **Level 2 Neurocognitive Impairment**

(a)      For Retired NFL Football Players diagnosed through the BAP, a diagnosis of Level 2 Neurocognitive Impairment must meet the criteria set forth in subsections (i)-(iv) below:

(i)      Concern of the Retired NFL Football Player, a knowledgeable informant, or the Qualified BAP Provider that there has been a severe decline in cognitive function.

(ii)      Evidence of a severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in Exhibit 2 to the Settlement Agreement, in two or more cognitive domains (complex attention, executive function, learning and memory, language, perceptual-spatial), provided one of the cognitive domains is (a) executive function, (b) learning and memory, or (c) complex attention.

(iii)      The Retired NFL Football Player exhibits functional impairment generally consistent with the criteria set forth in the National Alzheimer's Coordinating Center's Clinical Dementia Rating (CDR) scale Category 2.0 (Moderate) in the areas of Community Affairs, Home & Hobbies, and Personal Care.  Such functional impairment shall be corroborated by documentary evidence (*e.g.*, medical records, employment records), the sufficiency of which will be determined by the physician making the Qualifying Diagnosis.  In the event that no documentary evidence of functional impairment exists or is available, then (a) there must be evidence of severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in Exhibit 2 to the Settlement Agreement, in the executive function cognitive domain or the learning and memory cognitive domain, and at least one other cognitive domain; and (b) the Retired NFL Football Player's functional impairment, as described above, must be corroborated by a third-party sworn affidavit from a person familiar with the Retired NFL Football Player's condition (other than the player or his family members), the sufficiency of which will be determined by the physician making the Qualifying Diagnosis.

(iv)      The cognitive deficits do not occur exclusively in the context of a delirium, acute substance abuse, or as a result of medication side effects.

(b)      For living Retired NFL Football Players diagnosed outside of the BAP, a diagnosis while living of Level 2 Neurocognitive Impairment, *i.e.*, moderate dementia, based on evaluation and evidence generally consistent with the diagnostic criteria set forth in subsection 2(a)(i)-(iv) above, unless the diagnosing physician can certify in the Diagnosing Physician Certification that certain testing in 2(a)(i)-(iv) is medically unnecessary because the Retired NFL Football Player's dementia is so severe, made by a Qualified MAF Physician or a board-certified

Case 2:12-md-02323-AB Document 6481-1 Filed 02/13/15 Page 109 of 162

or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, as set forth and provided in Sections 6.3(b)-(d) of the Settlement Agreement.

(c) For Retired NFL Football Players deceased prior to the Effective Date, a diagnosis of Level 2 Neurocognitive Impairment, *i.e.*, moderate dementia, based on evaluation and evidence generally consistent with the diagnostic criteria set forth in subsection 2(a)(i)-(iv) above, unless the diagnosing physician can certify in the Diagnosing Physician Certification that certain testing in 2(a)(i)-(iv) was medically unnecessary because the Retired NFL Football Player's dementia was so severe, made while the Retired NFL Football Player was living by a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology or neurocognitive disorders, as set forth and provided in Sections 6.3(c)-(e) of the Settlement Agreement.

3. **Alzheimer's Disease**

(a) For living Retired NFL Football Players, a diagnosis while living of the specific disease of Alzheimer's Disease as defined by the World Health Organization's International Classification of Diseases, 9th Edition (ICD-9), the World Health Organization's International Classification of Diseases, 10th Edition (ICD-10), or a diagnosis of Major Neurocognitive Disorder due to probable Alzheimer's Disease as defined in the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5), made by a Qualified MAF Physician or a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, as set forth and provided in Sections 6.3(b)-(d) of the Settlement Agreement.

(b) For Retired NFL Football Players deceased prior to the Effective Date, a diagnosis of Major Neurocognitive Disorder due to probable Alzheimer's Disease consistent with the definition in *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5), or a diagnosis of Alzheimer's Disease, made while the Retired NFL Football Player was living by a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology to make such a diagnosis, as set forth and provided in Sections 6.3(c)-(e) of the Settlement Agreement.

4. **Parkinson's Disease**

(a) For living Retired NFL Football Players, a diagnosis while living of the specific disease of Parkinson's Disease as defined by the World Health Organization's International Classification of Diseases, 9th Edition (ICD-9), the World Health Organization's International Classification of Diseases, 10th Edition (ICD-10), or a diagnosis of Major Neurocognitive Disorder probably due to Parkinson's Disease as defined in the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5), made by a Qualified MAF Physician or a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, as set forth and provided in Sections 6.3(b)-(d) of the Settlement Agreement.

(b) For Retired NFL Football Players deceased prior to the Effective Date, a diagnosis of Parkinson's Disease, made while the Retired NFL Football Player was living by a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist

Case 2:12-md-02323-AB Document 6481-1 Filed 02/13/15 Page 110 of 162

physician, or by a physician with sufficient qualifications in the field of neurology to make such a diagnosis, as set forth and provided in Sections 6.3(c)-(e) of the Settlement Agreement.

5. **Death with Chronic Traumatic Encephalopathy (CTE)**

For Retired NFL Football Players who died prior to the Final Approval Date, a post-mortem diagnosis of CTE made by a board-certified neuropathologist prior to the Final Approval Date, provided that a Retired NFL Football Player who died between July 7, 2014 and the Final Approval Date shall have until 270 days from his date of death to obtain such a post-mortem diagnosis.

6. **Amyotrophic Lateral Sclerosis (ALS)**

(a) For living Retired NFL Football Players, a diagnosis while living of the specific disease of Amyotrophic Lateral Sclerosis, also known as Lou Gehrig's Disease ("ALS"), as defined by the World Health Organization's International Classification of Diseases, 9th Edition (ICD-9) or the World Health Organization's International Classification of Diseases, 10th Edition (ICD-10), made by a Qualified MAF Physician or a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, as set forth and provided in Sections 6.3(b)-(d) of the Settlement Agreement.

(b) For Retired NFL Football Players deceased prior to the Effective Date, a diagnosis of ALS, made while the Retired NFL Football Player was living by a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology to make such a diagnosis, as set forth and provided in Sections 6.3(c)-(e) of the Settlement Agreement.

Case 2:12-md-02323-AB Document 6481-1 Filed 02/13/15 Page 111 of 162

# EXHIBIT A-2



# CLAIMS ADMINISTRATOR'S RULE 15 AUDIT REPORT:

# BYRON CUTHBERT AND ASSOCIATES, LLC

**February 15, 2023**



# TABLE OF CONTENTS

**PAGE**

I. Introduction ........ 1
II. Scope of Audit ........ 1
III. Background ........ 1
IV. Tips Implicating Mr. Cuthbert ........ 3
V. Unreliable Amyloid PET Scans ........ 6
A. Dr. Daryl Eber and 3T Radiology & Research ........ 8
B. AAPLC Review ........ 9
C. Expert Review and Audit Investigation ........ 10
D. 3T's Fees ........ 13
E. National Radiology Solutions and Dr. Timothy Dineen ........ 15
VI. Mr. Cuthbert's Communications with MAF Physicians ........ 16
A. Dr. Kevin Weber ........ 16
B. Dr. Alan Lerner ........ 20
C. Dr. Jack Scariano ........ 21
VII. Drafting of Medical Records ........ 22
VIII. Drafting of Third-Party Affidavits ........ 24
A. Overlapping Language ........ 25
B. SWS-3 Forms ........ 26
C. Calls to Affiants ........ 27
D. Mr. Cuthbert's Explanation ........ 30
E. Exclusion of Overlapping Affidavits from Claim Packages ........ 33
IX. Potential Coaching of Clients ........ 33
X. Other Concerns ........ 34
A. Terry Bolar and Recruitment of Clients ........ 35
B. Dr. Amandeep Dhillon's Network Provider Application ........ 37
C. Possible Misrepresentations in a Player's Appeal ........ 39
XI. Attempts to Resolve the Issues ........ 41
A. Opportunity to Resolve Issues ........ 41
B. Mr. Cuthbert's Apparent Rejection of Our Proposal ........ 42
XII. Dr. Dineen's Unreliable PET Scan Reports ........ 43
A. Conversations with NRAD and Dr. Dineen ........ 44
B. AAPLC Review of Dr. Dineen's Reports ........ 46
C. Nuclear Medicine Consultant Analysis ........ 47
XIII. Materiality ........ 48
XIV. Conclusion ........ 49
XV. Exhibit Index ........ 50

1. 3/11/20 Settlement Program Email to Dr. Eber ........ 52

2. 6/17/22 Questions to Mr. Cuthbert ....54
3. 6/27/22 Letter from Manny Arora ....56
4. 3/8/22 Byron Cuthbert Call Notes ....63
5. 1/7/22 Byron Cuthbert Response to Questions ....71
6. 8/28/20 Byron Cuthbert Response to Questions ....74
7. 5/17/22 Byron Cuthbert Response to Questions ....99
8. 3/2/21-3/3/21 Dr. Weber Emails to Settlement Program ....105
9. 12/10/20-3/12/21 Emails between Byron Cuthbert and Dr. Weber ....107
10. 3/15/21 Byron Cuthbert Email to Dr. Weber ....113
11. 3/15/21-4/27/21 Emails between Byron Cuthbert and Settlement Program ....115
12. 1/10/21 AAPLC Opinion ....127
13. 8/13/20 Questions to Byron Cuthbert ....128
14. 6/26/22 AAPLC Email to Settlement Program ....130
15. 3/11/21 Settlement Program Email to Dr. Scariano ....132
16. Feb.-Mar. 2021 Email Threads between Dr. Scariano and Mr. Cuthbert ....133
17. 4/6/21 Settlement Program Email to Dr. Scariano ....159
18. 4/23/21 Dr. Scariano Email to Settlement Program with Attached Emails & Draft Addendum ....160
19. Shawna Davis Call Notes ....173
20. Christopher Jeffries Call Notes ....177
21. Tiffany Bell Call Notes ....179
22. Brenda Vertison Call Notes ....180
23. Michael Hocter Call Notes ....182
24. Claude Roney Call Notes ....184
25. 4/7/21-6/2/21 Emails between Hope Neurological and Settlement Program ....185
26. Dr. Dhillon Network Provider Application with Curriculum Vitae ....190
27. Dr. Dhillon SEAK Expert Witness Directory Listing ....214
28. 1/31/23 Roderick Edmond Email to Settlement Program ....216
29. 12/27/22 AAPLC Review of Dr. Dineen Reports ....220
30. 1/29/23 Nuclear Medicine Consultant Analysis ....224

## I. INTRODUCTION.

Pursuant to Section 10.3 of the Settlement Agreement and Rule 7(b) of the Rules Governing the Audit of Claims ("Audit Rules"), we audited the law firm of Byron Cuthbert and Associates, LLC and placed in audit certain claims to determine how and if they are affected by the firm's representation. We prepared this Rule 15 Audit Report after completing the Audit and determining that Byron Cuthbert has engaged in a pattern of continuous questionable behavior that has had a material negative impact on the Settlement Program. We recommend referral to the Special Masters under Audit Rule 16.

## II. SCOPE OF AUDIT.

In an Audit, we determine whether there is a reasonable basis to support a finding that a Settlement Class Member or a third party misrepresented, omitted, or concealed a material fact in connection with a Monetary Award Claim Package. A material fact is a statement or an omission that did affect or has any potential to affect whether the Settlement Class Member qualifies for a Monetary Award and/or the amount of such award in favor of the Settlement Class Member under the provisions of the Settlement Agreement. A third party includes counsel for the Settlement Class Member, doctors providing Qualifying Diagnoses, and persons signing third-party sworn affidavits in support of a claim. We do not determine whether a misrepresentation, omission or concealment was made with knowledge or intent, which instead may be assessed by the Special Masters when they deem it appropriate or necessary to do so.

## III. BACKGROUND.

Byron Cuthbert and Associates, LLC is a law firm located in Marietta, GA. Byron Cuthbert is the Principal and Registered Agent of the firm, which he formed on 7/31/15.[1] Byron Cuthbert and Associates, LLC does not have a website, but we recently observed that Mr. Cuthbert is featured on The Cuthbert Firm, LLC website, which lists NFL Concussion Settlement as one of its practice areas.[2] The Cuthbert Firm, LLC was formed in Georgia on 8/31/21 and lists Vicki Cuthbert as its Registered Agent.[3] Mr. Cuthbert is an Active Member in Good Standing with the State Bar of Georgia.[4] Prior to representing Settlement Class Members in an individual capacity, Mr. Cuthbert had a co-counsel relationship with Locks Law Firm.

Mr. Cuthbert currently represents 223 registered Settlement Class Members in the Settlement Program, 83 of whom have filed 114 Monetary Award claims. Mr. Cuthbert did not submit all of these claims himself. Of the 83 Players who have filed a claim, 81 had filed at least one claim before Mr. Cuthbert took over representation.

---

1 https://ecorp.sos.ga.gov/BusinessSearch/BusinessInformation?businessId=2091821&businessType=Domestic%20Limited%20Liability%20Company&fromSearch=True

2 https://cuthbertfirm.com/

3 https://ecorp.sos.ga.gov/BusinessSearch/BusinessInformation?businessId=3428063&businessType=Domestic%20Limited%20Liability%20Company&fromSearch=True

4 https://gabar.reliaguide.com/lawyer/30062-GA-Byron-Cuthbert-277652

Settlement Program records show that Mr. Cuthbert started registering Settlement Class Members in February 2017. In late 2017, he assumed representation of two Players who had been *Pro Se*. Then, in August 2018, Mr. Cuthbert started acquiring clients from other law firms. Since then, most of Mr. Cuthbert's clients in the Program have come from other law firms. Some of the tactics Mr. Cuthbert employed in acquiring clients resulted in tips to us, discussed in Section IV of this Audit Report. We discuss the claims actually submitted by Mr. Cuthbert in Section V. Here is the general status of where all claims from Settlement Class Members represented by Mr. Cuthbert are in the review process:[5]

| **Table 1** | **Byron Cuthbert and Associates, LLC: Claim Status (as of 2/15/23)** | | | | | |
|---|---|---|---|---|---|---|
| **Claim Status** | | **Alzheimer's Disease** | **Level 1.5** | **Level 2** | **Parkinson's Disease** | **Total** |
| **1.** | Denied After Audit | 1 | 6 | 12 | 0 | 19 |
| **2.** | Final Denial | 7 | 15 | 6 | 0 | 28 |
| **3.** | In Review Process at Claims Administrator | 10 | 0 | 0 | 0 | 10 |
| **4.** | Last Notice Was Award Notice | 2 | 0 | 2 | 0 | 4 |
| **5.** | Last Notice was for Incomplete Claim Package | 1 | 0 | 0 | 0 | 1 |
| **6.** | Notice Ready to Issue | 12 | 1 | 0 | 1 | 14 |
| **7.** | On Appeal Now | 4 | 0 | 0 | 0 | 4 |
| **8.** | Paid | 7 | 13 | 4 | 0 | 24 |
| **9.** | Ready for Review by AAP | 2 | 2 | 0 | 0 | 4 |
| **10.** | Withdrawn | 0 | 3 | 3 | 0 | 6 |
| **11.** | **Total** | **46** | **40** | **27** | **1** | **114** |

This report addresses ongoing concerns we have with Mr. Cuthbert's actions related to the Settlement Program. As detailed in this report, we received and looked into various issues related to Mr. Cuthbert's actions over time. In September 2022, we shared our draft findings with Mr. Cuthbert in an effort to address these concerns. Our attempts to address the issues have not been successful, leading to the issuance of this report. We have observed that Mr. Cuthbert:

**1.** Submitted to the Program, and pressed Diagnosing Physicians to rely upon, Amyloid PET Scan findings from one specific doctor, Dr. Daryl Eber of 3T Radiology & Research ("3T"), despite having been alerted to unreliability of the findings documented by Dr. Eber by a Qualified MAF Physician and despite our finding that these reads are unreliable and misrepresent facts (*see* Section V of this Audit Report);

[5] On 12/16/22, we informed Mr. Cuthbert and his lawyer Mr. Arora that attempts to resolve the issues had failed (*see* Section XI), and we resumed the Audit investigation. Therefore, we were not issuing claim determinations while we were concluding this Audit investigation.



2. When presented with our findings regarding unreliability of Dr. Eber's findings, did not accept them. Instead, Mr. Cuthbert sought a secondary review of the PET scan images from another provider, Dr. Timothy Dineen. We determined these re-reads are also unreliable (*see* Section XII of this Audit Report);

3. Communicated inappropriately with several Qualified MAF Physicians and attempted to influence those providers' Qualifying Diagnoses (*see* Section VI of this Audit Report);

4. Submitted inaccurate costs in relation to lien disputes and corrected/retracted them only when questioned; at least two invoices were dated after we asked for proof (*see* Section V of this Audit Report);

5. Drafted medical records on behalf of at least one Diagnosing Physician to be used in support of an Appeal of a Monetary Award Determination (*see* Section VII of this Audit Report);

6. Drafted affidavits, purportedly from third parties, that asserted information not unique to each Settlement Class Member or his claim (*see* Section VIII of this Audit Report);

7. Possibly coached his Settlement Class Member clients on how to perform during examinations for the Settlement Program (*see* Section IX of this Audit Report);

8. May not have been truthful when asked about the aforementioned items (*see* Sections V-X of this Audit Report); and

9. When provided with an opportunity to resolve these concerns and rectify his relationship with the Program, he failed to do so, at the expense of both his clients' claims and the Settlement Program in general (*see* Section XI of this Audit Report).

## IV. **TIPS IMPLICATING MR. CUTHBERT**.

We first began looking into Mr. Cuthbert when we received multiple, unrelated tips alleging that he was engaging in improper conduct. These tips asserted that Mr. Cuthbert was promising Monetary Awards to potential clients, attempting to take clients from other law firms, and that he was using unreliable and even "fraudulent" PET scans to support Monetary Award claims for Qualifying Diagnoses of Alzheimer's Disease.

### 1. Tip #1.

On 1/18/19, less than six months after Mr. Cuthbert acquired his first client from another law firm, we received a phone call with a tip from a California-based lawyer who represents Players in the Settlement Program, alleging that Mr. Cuthbert was directly soliciting his clients through telephone contact. This attorney alleged that upon contacting a potential client, Mr. Cuthbert would entice representation by stating that he "has relationships with doctors," "knows the ins and outs of [the Program]," and can "get them through." The attorney also said that Mr. Cuthbert was representing that he can "guarantee results." The attorney first told us that Mr.



Cuthbert was using mass email communications to reach out to his clients, then later clarified on 2/4/19 that this was related to another law firm and that Mr. Cuthbert was approaching clients via telephone.

**2. Tip #2.**

Later that year, on 11/12/19, we received a call from a different lawyer who represents Players in the Program, who provided similar information. This lawyer told us that he lost clients to a firm enticing representation changes with promises of a Monetary Award. While he did not name the law firm at the time, the lawyer stated that the firm in question uses "positive PET scans" and amyloid exams to show a positive diagnosis for Alzheimer's Disease.

In February 2020, this same lawyer then reported more details on the situation to a Senior Counsel with the Special Investigator's office.[6] The lawyer reported that he believed attorneys, and in particular a Marietta, GA-based attorney named Byron Cuthbert, may be engaging in the "fraudulent" use of Amyloid PET scans to obtain Alzheimer's Disease diagnoses. The lawyer pointed out that one of his former clients who received a Level 0 diagnosis in the Baseline Assessment Program (BAP) changed representation to Mr. Cuthbert and then obtained an Alzheimer's Disease diagnosis. The lawyer opined that he did not think the PET scans in Mr. Cuthbert's claims were reliable.

**3. Tip #3.**

We also received another call, on 2/11/20, from a Texas-based lawyer, who echoed similar concerns. The lawyer reported that he was losing clients to Mr. Cuthbert and alleged that Mr. Cuthbert was telling Players that he will get them an Alzheimer's diagnosis by sending them for a brain scan with a doctor in Aventura, FL.

**4. Tip #4.**

In addition to these tips from lawyers representing Settlement Class Members in the Program, we also communicated with two individuals who provided us with information that may implicate Mr. Cuthbert in wrongdoing. While we have not been able to corroborate the information provided by these individuals, we feel the subject matter is very relevant to our Audit investigation and include it for consideration.

We received four separate tips alleging fraud in connection with a Player Mr. Cuthbert represents, Antwan Odom (SPID 100011429). All four tips appear to originate from the same tipster, and while the tipster has not named Mr. Cuthbert or his firm specifically, the language of the first tip leads us to believe that they may be relevant in this discussion. We received the first anonymous tip on 2/23/21 through the Program's website. The tipster stated that "Antwan odom is suppose to receive a concussion settlement but is capable of riding horses and roping calves for money in rodeos. How is this possible ?? You guys need to investigate and this needs to be

---

[6] On 12/10/18, Judge Anita Brody appointed Hon. Lawrence Stengel (Ret.), former Chief Judge for the United States District Court for the Eastern District of Pennsylvania, as Special Investigator in the Settlement Program.



reported." After seeing that Mr. Odom had not yet filed a claim, we questioned the tipster's assertion that he was supposed to receive money from the Program. While we have not confirmed it, we think it is reasonable that Mr. Odom may have bragged about receiving a payment in the future, even though he has not yet filed a claim. This may support the lawyers' allegations that Mr. Cuthbert has been promising Monetary Awards to clients or potential clients.

We received three other tips after the first, all alleging the same general information about Mr. Odom participating in rodeos or riding horses and how that is incompatible with his alleged impairments. We received the second tip from the same IP address through our website and the latest two tips from the tipster's email address in an email to the Claims Administrator inbox, which led us to confirm the probable identity of the tipster. We attempted to contact the tipster to gather more information but have not been successful.

**5. Tip #5.**

In addition to these tips, we have also been in contact with a woman who has wished to remain anonymous due to concerns for her safety. We spoke with this individual 13 times between April 2019 and March 2022. Her tip alleged that a Player, who we saw is represented by Mr. Cuthbert, had filed a claim but had faked his symptoms and had submitted an affidavit to support his claim which contained false information.[7] Despite the tipster's belief that the Player had filed a claim, no claim has been filed as of 2/15/23.

The tipster told us the Player is her ex-boyfriend and that she sat in on the Player's "practice" neuropsychological testing and observed inaccuracies in the information being reported. For example, the tipster told us that the Player told his doctors that he cannot be part of social groups or go outside, when in fact he was coaching at football camps. She further said that the Player "acts deadbeat to the world" but that he had a good memory and acted like he did not. The tipster also alleged that the Player took Valium prior to the practice exam and failed the exam as a result, further reporting that after the practice testing, the neuropsychologist and his examiner/assistant both confronted the Player and told him they knew he was faking it. The tipster said she had a "hunch" that "someone" was coaching the Player but said she did not know for sure.

The tipster also alleged that the Player submitted an inaccurate affidavit, which was signed by someone who stated that they lived with the Player and was his caretaker, but that this was false as the affiant was the Player's girlfriend and did not reside with him. The tipster also told us that the affidavit included inaccuracies about the Player's functional abilities, and that the Player told her that his attorney said she (the tipster) should sign a similar affidavit, but she refused to do so. The tipster told us that she had never met the Player's lawyer but thought his name was "Brian." Based on this, and the Player's representation, we believe she was talking about Byron Cuthbert.

The tipster informed us that she had pointed out some of the inaccuracies to the Player's attorney and that the attorney was aware of the Player being untruthful, but the attorney was

---

[7] To protect the tipster's anonymity, the Player is not named here.



confident they would be getting an award. While the Player has not filed a claim and we are unable to substantiate the tip, the allegations appear to possibly support the concerns we have observed with Mr. Cuthbert in the areas of both questionable affidavits and possible coaching, which we discuss in more detail in Sections VIII and IX.

After we received the initial tips in 2019, we first looked for any Players who changed their representation from Mr. Cuthbert and became *Pro Se.* We spoke with one Player who changed representation from Mr. Cuthbert and asked him about his experience with the firm, though we did not find anything concerning from the conversation that would substantiate the allegations in the tips. We also analyzed the documentation submitted in support of Mr. Cuthbert's claims and found that nearly all the PET scan reports submitted to us originated from the same provider: Dr. Daryl Eber of 3T. We discuss more about Dr. Eber and our findings on his PET scan reports in Section V, below. In March of 2020, we emailed questions to Dr. Eber and asked him for details on his involvement examining Players for the Program.[8] While Dr. Eber ultimately did not respond to our questions at that time, we started consulting with the Appeals Advisory Panel Leadership Council ("AAPLC") on the merits of PET scans and their relevance in the Program, all while monitoring claim submissions from Mr. Cuthbert. At that time, we could not confirm that PET scans connected to Mr. Cuthbert were "fraudulent" as the attorney in Tip #2 had alleged, but we continued to closely monitor PET scan submissions from Mr. Cuthbert, in consultation with the AAPLC, as further discussed in Section V.B.

## V. <u>UNRELIABLE AMYLOID PET SCANS</u>.

One of the concerns in the tips was that Mr. Cuthbert may have been suggesting to Players that a favorable diagnosis could be obtained simply by undergoing a PET scan. On 2/15/22, with permission of his current counsel, we spoke with a Player who was a former client of Mr. Cuthbert's. During this conversation, the Player and his wife reported that when they retained Mr. Cuthbert around December 2019, Mr. Cuthbert told them that the best way to receive a Qualifying Diagnosis in the Settlement Program was to undergo a PET scan, which the Player ended up receiving in Aventura, FL. We also spoke with another former client of Mr. Cuthbert's who is now *Pro Se* on 2/10/23. This Player provided a similar account and explained that Mr. Cuthbert suggested that there were "different ways" to obtain a Qualifying Diagnosis. The Player reported that other than the "regular way" of going through the MAF or BAP process, Mr. Cuthbert suggested undergoing a PET scan, which "looked at your brain." Before we discuss results of our findings, we will first give an overview of what PET scans are and how they are relevant to Qualifying Diagnoses in the Settlement Program.

Positron Emission Tomography (PET) is "a minimally-invasive diagnostic imaging procedure used to distinguish normal from diseased tissue in conditions such as cancer, ischemic heart disease, and some neurologic disorders."[9] PET scans use a radioactive drug (or "tracer") to show both normal and abnormal processes inside cells of the body. There are different types of

---

[8] Exhibit 1.
[9] https://www.cms.gov/Medicare/Coverage/Coverage-with-Evidence-Development/Amyloid-PET

PET scans. The most common type, called FDG-PET,[10] assesses energy use in cells throughout the body. However, the PET scans discussed in this Audit Report are commonly identified as "Amyloid PET" scans because they are used to detect accumulations of the protein "Amyloid." For ease of reference, we use the term "PET scan" in this report to refer to an Amyloid PET scan, as opposed to any other type.

As further explained in FAQs 117 and 118, the Settlement Program's position is that PET scans are not required for Alzheimer's Disease diagnoses in the Program but can be submitted to support a diagnosis.[11] Out of 131 claims based on an Alzheimer's Disease diagnosis that have been submitted to the Program within the last three years, 55 (42%) included a PET scan report with the claim file. Out of those 55 claims with PET scans, 32 (58%) were PET scans that were interpreted to be "positive," which means they suggested abnormalities existed in the brain. According to FAQs 117 and 118, those 32 claims with PET scans could support an Alzheimer's Disease diagnosis; 31 of these claims were from Mr. Cuthbert's clients. In other words, Monetary Award claims asserting Alzheimer's Qualifying Diagnoses, supported by a positive PET scan, are unique to Mr. Cuthbert's clients.

As shown in Table 1, 46 (40%) of the Monetary Award Claims represented by Mr. Cuthbert assert a Qualifying Diagnosis of Alzheimer's Disease. That includes all Settlement Class Members currently represented by Mr. Cuthbert, many of whom previously filed claims when they were represented by other counsel or when they were *Pro Se*. When we take a closer look to focus on claims submitted by Mr. Cuthbert himself during his representation, however, we see that over 76% of the claims he submitted assert a Qualifying Diagnosis of Alzheimer's Disease:[12]

| **Table 2** | **Claims Submitted by Byron Cuthbert and Associates, LLC While Player Was a Client of the Firm (as of 2/15/23)** | | | | |
|---|---|---|---|---|---|
| **Qualifying Diagnosis** | | **# of Claims** | **% of Claims** | **Claims Supported by any PET Scan** | **Claims Supported by Dr. Eber PET Scan** |
| **1.** | Alzheimer's Disease | 46 | 76.67% | 31 | 29 |
| **2.** | Level 1.5 Neurocognitive Impairment | 10 | 16.67% | 0 | 0 |
| **3.** | Level 2.0 Neurocognitive Impairment | 3 | 5.00% | 0 | 0 |

---

[10] Fluorodeoxyglucose (FDG)-positron emission tomography (PET). *See* https://www.cedars-sinai.org/programs/imaging-center/exams/nuclear-medicine/fdg-pet-scan.html.
[11] https://www.nflconcussionsettlement.com/FAQDetails.aspx?q=527#527.
[12] One claim, for Ezra Johnson (SPID 100007913), is listed in Table 2 under Alzheimer's Disease because Mr. Cuthbert submitted it as an Alzheimer's Disease claim supported by a PET scan report from Dr. Eber; however, the claim later received a Notice of Monetary Award Claim Determination for Level 2.0 Neurocognitive Impairment.



| 4. | Parkinson's Disease | 1 | 1.66% | 0 | 0 |
|---|---|---|---|---|---|
| **5.** | **Total** | **60** | **100%** | **31** | **29** |

This confirms what we were told by tipsters to be Mr. Cuthbert's approach to the Settlement Program: to attempt to obtain Qualifying Diagnoses of Alzheimer's Disease for his clients, supported in large part by Amyloid PET scan reports. In fact, Mr. Cuthbert told us that as of 5/17/22 he had sent 99 of his clients to Dr. Eber to undergo a PET scan. As of 5/17/22, Mr. Cuthbert represented a total of 250 Players. Using the figure of 99 that Mr. Cuthbert provided to us, we can see roughly 40% of the Settlement Class Members that Mr. Cuthbert represented at that time (including those who had not yet filed a claim) had undergone a PET scan.

**A. Dr. Daryl Eber and 3T Radiology & Research.**

As shown in Table 2 above, 46 (76%) of the Monetary Award Claims submitted by Mr. Cuthbert assert a Qualifying Diagnosis of Alzheimer's Disease. These 46 claims were submitted by 43 Players.[13] Mr. Cuthbert has submitted Amyloid PET scan reports to support 31 of the 46 Alzheimer's Disease claims. Among those 31 claims, 29 are supported by PET scan reports from the same doctor and facility: Dr. Daryl Eber of 3T. The Settlement Program retained an expert in the field of PET scans, who found that the Amyloid PET scan reports from Dr. Eber are overwhelmingly unreliable. We summarize this issue here but note that we are also preparing an Audit Rule 15 Report of Adverse Finding regarding Dr. Eber, which provides a more detailed analysis of our investigation in this area.

3T is a medical imaging diagnostic center with three locations in Coconut Creek, Miami Beach and Aventura, FL.[14] 3T's website describes the facility as "the vision of Dr. Eber, our in-house Board Certified, Fellowship Trained Radiologist and Practice Owner."[15] Dr. Eber is currently board certified in Nuclear Medicine by the American Board of Nuclear Medicine and in Diagnostic Radiology by the American Board of Radiology.[16]

During our 2/15/22 call with a Player who was a former client of Mr. Cuthbert's, when prompted with the name "3T," the Player and his wife confirmed that that was the facility that administered his PET scan. He stated that when he attended the exam at 3T, there were other former NFL Players in the waiting room, one of whom he knew to be another client of Mr. Cuthbert's. The Player stated that he never met with a doctor as a part of the exam and was only seen by a female technician. He noted that although he waited in the waiting room for several

[13] Each of these three Players submitted two Alzheimer's Disease claims while he was represented by Mr. Cuthbert: Stacey Bailey (SPID 100000597), Rory Graves (SPID 100005756), and Floyd Hodge (SPID 100006961). In each case, both claims were supported by a PET scan report from Dr. Daryl Eber of 3T.

[14] https://www.3tradiology.com/our-locations/

[15] https://www.3tradiology.com/about-us/

[16] https://www.certificationmatters.org/practitioner/?pid=945587&ped=QTdjcDVsSUdNSGhUcHI2M2RnLzFmeXJrbXVNMWpsakp3Q1hRTFYwQk0rUT0&qs=ZHNlYXJjaD0xJmZuYW1lPWRhcnlsJmxuYW1lPWViZXImc3RhdGU9JnNwZWNpYWx0eT0



hours, he thought the scan itself only took about 30 minutes. The Player and his wife then reported that they received a report directly from Mr. Cuthbert with the results of the scan, which was negative. Mr. Cuthbert informed them that the Player would need to undergo additional testing, but after that, they never heard back from Mr. Cuthbert and eventually retained new counsel.

**B. AAPLC Review.**

After we received the tips related to Mr. Cuthbert and his possible use of "fraudulent" PET scans, as discussed in Section IV, we sought input from the AAPLC. Pursuant to Sections 8.6 and 9.1 of the NFL Concussion Settlement Agreement, on 9/21/20, we began sending Alzheimer's Disease claims represented by Mr. Cuthbert that relied on PET scans to one specific member of the AAPLC for review. The AAPLC member reviewed each of the claims on an individual basis, considering all the available evidence to determine if the diagnosis of Alzheimer's Disease was supported. Ultimately, at this time, we found that while some the Diagnosing Physicians may have over-relied on the PET scans in making their diagnosis, we did not believe that the PET scan reports themselves were fabricated or unfounded.

With guidance and input from the AAPLC, we also prepared additional guidance regarding the use of PET scans and other biomarkers to address possible issues of overreliance. On 12/3/20, we published FAQ 118 on the public NFL Concussion Settlement website. This FAQ clarifies that a biomarker test alone, such as a PET scan, is not sufficient to establish a Qualifying Diagnosis of Alzheimer's Disease.[17] We also provided guidance regarding the new FAQ and the use of PET scans to both lawyers and Settlement Class Members in our December 2020 *Insights* newsletters.[18]

On 6/28/21, we spoke with the AAPLC member who had been reviewing the Alzheimer's Disease claims from Mr. Cuthbert that relied on PET scans as supporting evidence. The AAPLC member expressed concern with some of the recent PET scan reports he had seen and questioned the reliability of the reports as supporting evidence for an Alzheimer's Disease diagnosis, noting that in two cases the PET scan report was the "swinging factor" which caused him to approve the diagnosis. The AAPLC member noted that there is no "QC" process for the PET scan reports and that when he looked at the single image from the scan itself during his reviews, he was not convinced it was a positive scan and that he was concerned about possible misrepresentation. The AAPLC member also pointed out that Dr. Eber's reports used the same exact, generic language when explaining that the PET scan was a "positive" result and questioned whether Dr. Eber had the appropriate training to interpret the PET scan images. The AAPLC member acknowledged that while he is not an expert himself in interpreting PET scans, he was concerned that some of the PET scans he observed do not actually support Alzheimer's Disease diagnoses and recommended that a specialist review the images to confirm the findings.

---

[17] *See* FAQ 118 (https://www.nflconcussionsettlement.com/FAQDetails.aspx?q=527#527).
[18] https://www.nflconcussionsettlement.com/Docs/lawyer_dec_2020.pdf; https://www.nflconcussionsettlement.com/Docs/SCM_dec_2020.pdf



**C. Expert Review and Audit Investigation.**

Given the growing concerns with the PET scan reports from 3T, we worked closely with the AAPLC to identify an expert to review the PET scan reports and associated images. To find a highly qualified expert in this field, the AAPLC coordinated with a third party, Dr. Barry Siegel, Professor of Radiology at Washington University School of Medicine in St. Louis.[19] Dr. Siegel, who serves as co-chair of the Imaging Dementia—Evidence for Amyloid Scanning (IDEAS) Study, recommended a Nuclear Medicine Consultant ("NM Consultant") who is board certified in both Diagnostic Radiology by the American Board of Radiology and Nuclear Medicine by the American Board of Nuclear Medicine. We retained, with the approval of the Parties, this NM Consultant in August 2021.

We provided the NM Consultant with the PET scan reports and accompanying images from the PET scans (both in the form of single color images provided by Mr. Cuthbert or attached to the reports, and DICOM[20] images, either provided to us by Mr. Cuthbert or directly from 3T), for each of 23 Players.[21]

The NM Consultant reviewed the DICOM images and other materials and overwhelmingly disagreed with Dr. Eber's conclusions, finding that the DICOM images did not support the "positive" finding for 17 of the 23 Players. The NM Consultant agreed with Dr. Eber's "positive" findings for five Players[22] and found that the DICOM image quality was not high enough to make a determination for the one remaining Player. As the NM Consultant worked their way through reviewing Dr. Eber's reports, we participated in several phone calls with them. Here we summarize the main takeaways from our conversations:

1. The NM Consultant reviewed the DICOM images from each Player's PET scan before reviewing the report from the original reader, Dr. Eber, to avoid any possibility of bias.

2. After performing visual and semiquantitative analyses, the NM Consultant interpreted the studies and disagreed with Dr. Eber on the overall image assessment in most of the cases. Multiple variations and analyses of the DICOM images were tried in an attempt to recreate Dr. Eber's results. However, the NM Consultant was unable to do so even when using different software.

3. The NM Consultant felt that Dr. Eber used a template for his reports. Using a template is not unusual in clinical practice; however, the NM Consultant noted the

---

[19] https://www.mir.wustl.edu/employees/barry-siegel/

[20] DICOM stands for Digital Imaging and Communications in Medicine and is the "international standard to transmit, store, retrieve, print, process, and display medical imaging information" (https://www.dicomstandard.org/). There are various software applications that allow the user to view DICOM images.

[21] These 23 Players were all of the Settlement Class Members at that time who were represented by Mr. Cuthbert and who had submitted a claim supported by a PET scan report from Dr. Eber.

[22] For two of these five, the NM Consultant noted: "Accordingly, this positive amyloid-PET study indicating moderate to frequent beta-amyloid neuritic plaques. However, the suboptimal technical quality of the images can affect the accuracy of image interpretation."



similarity between findings on multiple reports such as including abnormal tracer deposition in all areas of the brain (bilateral frontal lobes, parietal lobes, lateral temporal lobes, and cingulate gyrus). In most of the cases, the NM Consultant's interpretation found no significant amyloid deposition (negative scan) or only subtle findings.

4. The NM Consultant opined that the single, color PET scan images attached to Dr. Eber's reports are insufficient to provide enough documentation of the interpretation of the study for several reasons:

   a. The entire brain is not included in this image, making it impossible to evaluate all the required brain regions for an accurate interpretation. Although this may be explained as the report only showing a "representative" picture, with the reader reviewing all images, the NM Consultant noted that the most common clinical practice is to include the whole brain in the report as documentation of the physician's interpretation.

   b. The representative images are displayed in a color scale. The NM Consultant noted that this is not recommended by the EANM and SNMMI standards/guidelines, which state: "For 18F-florbetaben and 18F-florbetapir, PET images should be displayed in the transaxial orientation."

   c. At least one image did not include identifying patient information, which the NM Consultant noted is a significant abnormality and a shortcoming in the standard of care.

5. To better understand the number of discrepancies in the overall PET assessment, the NM Consultant explored the possibility of a technical or processing issue to explain the variance. However, they could not arrive at a potential explanation. The NM Consultant evaluated several scenarios, such as the possibility that Dr. Eber analyzed different time points of the PET scan or changed the grayscale to a color scale to mimic the representative image included by Dr. Eber in the report. In multiple cases, the NM Consultant could not reproduce Dr. Eber's image interpretation.

Throughout our Audit investigation of Dr. Eber's reports, we explored the possibility that Mr. Cuthbert may have had an arrangement with Dr. Eber to provide "positive" PET scan reports, or that a third party may have fabricated or altered Dr. Eber's reports. We have not found evidence confirming either scenario. We also considered several factors that do not seem to support either situation. When questioned, Dr. Eber specifically denied any wrongdoing on his part or someone else's, citing that such actions would be unethical and illegal. We also identified at least one PET scan report from Dr. Eber for a Player who was represented by a different attorney and who was never represented by Mr. Cuthbert. Like those reports for Mr. Cuthbert's clients, Dr. Eber found the Player's PET scan to be positive for Amyloid deposition but the NM Consultant's finding was negative.[23] This indicates to us that Dr. Eber's medical

---

[23] Rick Razzano (SPID 100012566).

judgment is flawed and not that only Mr. Cuthbert's clients were receiving false positive results. While we have no way to absolutely confirm it, these factors have led us to believe that there was not a malicious collaboration or arrangement between Mr. Cuthbert and Dr. Eber related to the Program.

However, we have learned that Mr. Cuthbert was at least aware that Dr. Eber's reports may be unreliable as early as 4/19/21.  We spoke and emailed with one MAF Physician on several occasions from April 2020 to June 2022 to learn more about her examination of Mr. Cuthbert's clients and her use of Dr. Eber's PET scan reports as supporting medical records.  The MAF doctor initially told us that Mr. Cuthbert called her "all the time," but she said he did not come across as unethical.  She stopped answering his calls after a while and thinks that that may be a reason why he stopped referring Players to her for evaluation.  When we talked to the MAF doctor by phone on 1/12/22, she said that of the seven Players with 3T PET scans for whom she had rendered a diagnosis, she had one re-read for a second opinion and the second reader agreed with the PET scan results.  However, she said she did have two other Players with no diagnosis who had been re-read and came back negative.[24]  She said that Mr. Cuthbert had been told about the need for a second opinion, that he paid for those two re-reads, and that both re-reads came back negative.  Seeking more details, we emailed the MAF doctor on 6/10/22 and 6/17/22 and asked about the two Players whose 3T PET scans had been re-read and came back negative.  On 6/20/22, after locating her prior emails, the MAF doctor confirmed to us that her assistant communicated directly with Mr. Cuthbert on 4/19/21 to let him know that the MAF doctor recommended getting re-reads.  On 4/21/21, Mr. Cuthbert requested that the CDs be sent from 3T to the doctor who performed the second opinion reads.  The MAF doctor also located a 5/17/21 email from her assistant documenting that Mr. Cuthbert received the results of the re-reads.

In our 6/17/22 questions, we asked Mr. Cuthbert about his seeking a second opinion of Dr. Eber's interpretation of PET scan images.[25]  Mr. Cuthbert, through his attorney, responded on 6/27/22 that the MAF doctor had requested that he get a second opinion for six readings completed by Dr. Eber.  He explained that there were two positive results from the second opinions, only one of which has had a claim submitted to the Program, and that no claims have been submitted for the second opinions that had negative results.[26]  This does confirm that Mr. Cuthbert was on notice about possible unreliability of Dr. Eber's findings.

We have spoken with Dr. Eber several times throughout 2021 and 2022 and we summarize what he has told us in a separate Audit Report.  However, one piece of information from Dr. Eber stands out to us as particularly relevant in this discussion.  On 2/12/22, Dr. Eber informed us that someone associated with "the lawyer" told him not to submit to an interview with us because "[we] will change [his] words" but he decided to do it because he's a "nice guy" and because we had been persistent in our efforts to speak with him.  Dr. Eber reiterated this message to us on 2/23/22, when we requested that he review his reports that had been submitted to the Program.  At first, Dr. Eber seemed open to the idea, but said that he wanted to consult

---

[24] Mark Higgs (SPID 100006836) and Eugene Chung (SPID 100002745).
[25] Exhibit 2.
[26] Exhibit 3.



with his group, and possibly an attorney, because he felt like he is "stuck in middle." Dr. Eber continued on to say that he was getting mixed messages; he understood our position, but we were telling him one thing, and the "other guys" were telling him that we are distorting the truth. While we have not confirmed who these "other guys" are, because of Mr. Cuthbert's heavy reliance on Dr. Eber's reports and his awareness of this Audit investigation, we believe it may have been Mr. Cuthbert or someone with whom he works. Mr. Cuthbert, through his attorney, has denied having these conversations.

On 3/8/22, we interviewed Mr. Cuthbert by Zoom call about his use of PET scans, 3T, and Dr. Eber.[27] Mr. Cuthbert told us "I've never talked to Dr. Eber a day in my life" and said he only talked to 3T staff about scheduling.[28] We also asked him about Drs. Casey Leong and Sonny Dosanjh of Medici Spine & Pain, who were listed as referring physicians on most of the PET scan reports that he submitted from Dr. Eber. He denied having any relationship with Dr. Leong, identified him as a pain specialist doctor, and said Dr. Leong evaluated all 12 players prior to their PET scans. Mr. Cuthbert said that Dr. Dosanjh was previously Dr. Leong's partner, that they are no longer partners as of last year, and that Dr. Dosanjh evaluated the players prior to their PET scans.[29]

In response to our requests for medical records, Medici Spine & Pain provided records for 14 Players. All 14 records contain a report from a Medici provider listing "Med Legal: BYRON CUTHBERT" in the Insurance section, which confirms that it was in fact Mr. Cuthbert who sent all the Players to Medici. We asked Mr. Cuthbert about this on 6/17/22. His attorney explained on 6/27/22: "Mr. Cuthbert is listed in the Med Legal (insurance) because the doctors operate on liens for any personal injury or workers compensation matters. As the attorney, Mr. Cuthbert has to acknowledge the lien for the cost of medical treatment and pay off the lien of Medici."[30] 12 of the 14 reports list Dr. Leong as the provider, one lists Dr. Dosanjh, and one lists Oya Yildirim, Nurse Practitioner.[31]

Mr. Cuthbert's answers to our questions on the process and logistics behind his clients' PET scans left us confused and with the impression that he did not want to give us the full picture or a clear understanding of the process and all those involved in it. This is not surprising, however, given the general evasiveness of his responses throughout the 3/8/22 interview on nearly all the topics we discussed with him. We include more details about this interview throughout this report.

**D. <u>3T's Fees</u>.**

While the NM Consultant's review confirms that the PET scan reports from Dr. Eber are overwhelmingly unreliable, we also observed a strange pattern of events related to the fees 3T allegedly charged Mr. Cuthbert to perform the PET scans.

---

[27] Exhibit 4.
[28] *Id.*
[29] *Id.*
[30] Exhibit 3.
[31] The Medici report on Rory Graves (SPID 100005756) lists Oya Yildirim, N.P. Note, however, that the copy of Dr. Eber's PET scan in Mr. Graves' file lists Dr. Dosanjh as the Referring Physician (Doc ID 235624, pages 19-20).



Mr. Cuthbert has been involved in two attorney's lien disputes related to the Settlement Program involving Bobby Abrams (SPID 100000021) and Joe DeLamielleure (SPID 100003809), both of whom underwent PET scans with 3T. In support of his fees and costs related to the two Players' exams with 3T, Mr. Cuthbert asserted costs of $5,000 for Mr. DeLamielleure's PET scan, which occurred on 3/3/20, while Mr. Abrams' PET scan, which occurred on 2/9/21, was $10,000.

On 12/21/21, we asked Mr. Cuthbert for proof of his asserted costs for both Players. On 1/5/22 and 1/6/22, Mr. Cuthbert provided invoices from all the Program-related exams for Mr. Abrams and Mr. DeLamielleure, respectively. The 3T invoices list asserted costs of $5,000 and $10,000, matching Mr. Cuthbert's assertions. However, while the invoices Mr. Cuthbert provided from Dr. Dhillon and Dr. Schwartzbard were dated well before our request and around the time of the Players' exams with those providers, the 3T invoices were both dated 12/28/21, seven days after our request. While we have no direct evidence that the invoices were produced solely in response to our request. Neither provides any indication that they are reprinted versions of an original. At the very least, it appears Mr. Cuthbert did not have the invoices himself and requested them from 3T after we asked for them.

Confused by the enormous difference in the price of the two Players' 3T exams, we asked Mr. Cuthbert on 1/7/22 why they were different and for actual proof of payment for the 3T exams. To explain the price difference, Mr. Cuthbert simply replied that 3T's prices had changed.[32] Regarding proof of payment, Mr. Cuthbert provided copies of two receipts that showed credit card charges of $10,000 on the 27th day of an illegible month in 2020 and $16,995 on 4/29/21.[33] Mr. Cuthbert explained that the "numbers do not match because I pay the invoices in batches for multiple types of images and/or multiple clients."[34]

When we interviewed Mr. Cuthbert on 3/8/22, we discussed the varying prices that 3T charged for a PET scan. Mr. Cuthbert told us that 3T's fee for a PET scan was $5,000 at first and when asked if it increased, he acknowledged that it had "almost doubled" to "around $10,000."[35] When asked why the price for a PET scan increased, Mr. Cuthbert stated that he did not know and that he began looking for other providers because of the change. Mr. Cuthbert denied ever asking anyone at 3T why the price increased so drastically but pointed out that he stopped using 3T roughly one year ago.[36]

While we do not know the exact date that 3T doubled its fee for a PET scan from $5,000 to $10,000, and Mr. Cuthbert was unable to confirm that for us, he indicated that he thought it was around December 2020. We do know that 3T performed Mr. Abrams' scan on 2/9/21 and that Mr. Cuthbert paid $10,000 for that scan. Notably, Mr. Cuthbert submitted five 3T PET scans to us that were dated *after* Mr. Abrams' 2/9/21 $10,000 scan. Those PET scans were dated

---

[32] Exhibit 5.
[33] *Id.*
[34] *Id.*
[35] Exhibit 4.
[36] *Id.*

2/24/21, 2/25/21 (two scans), 3/11/21, and 5/25/21.[37] The most recent scan on 5/25/21 occurred about nine and a half months before Mr. Cuthbert told us on 3/8/22 that he stopped using 3T about a year before. Mr. Cuthbert later clarified that he stopped using 3T "later in 2021" when he learned of other facilities that provided the PET scans.[38] Assuming each was $10,000, those five scans cost Mr. Cuthbert a total of $25,000 more than he would have paid before the price increase.

As an aside, in his response to our questions about costs submitted in the lien dispute for Mr. DeLamielleure, Mr. Cuthbert submitted "revised" costs related to Dr. Schwartzbard's exams. Mr. Cuthbert stated that he thought he was charged and paid $2,200 for Dr. Schwartzbard's second re-evaluation, but after "verifying" with her office, they had waived the fee and the cost was "not incurred." Mr. Cuthbert also provided email exchanges with Dr. Schwartzbard's office discussing the matter. While this may have been a simple mistake, Mr. Cuthbert's initial cost assertion of $2,200 suggests errors in record keeping and a lack of due diligence on his part.

During our interview, however, Mr. Cuthbert made remarks about Dr. Schwartzbard's fees, which he told us in his 8/28/20 response to our questions had increased from $1,500 to $1,800.[39] On 3/8/22, Mr. Cuthbert stated that he stopped using Dr. Schwartzbard due to the increase in her fees (he did not specify the amounts during that conversation) and because he thought she had a poor attitude toward his clients.[40]

Mr. Cuthbert told us on 3/8/22 and again on 5/17/22 that he did not question 3T about the doubling of its fee.[41] [42] It seems illogical that Mr. Cuthbert would not even ask about such a steep price increase and that he would continue using 3T for at least three and a half months after the increase, apparently resulting in at least $25,000 in additional fees. In sharp contrast, Mr. Cuthbert claims he stopped using Dr. Schwartzbard, in part, over a $300 fee increase. All of this causes us to question Mr. Cuthbert's true motivations for using 3T and the details surrounding the massive increase in their fees.

**E. <u>National Radiology Solutions and Dr. Timothy Dineen</u>.**

As we discuss in greater detail in Section XI, we provided Mr. Cuthbert the opportunity to review the findings of our Audit Investigation, which included our determination that records from 3T and Dr. Eber are unreliable and misrepresent the true outcome of Players' PET scans. After Mr. Cuthbert had the opportunity to review these findings, we provided him with an option to remedy his relationship with the Program and move his claims forward by working with another lawyer with experience in the Program and based on credible records. As described in more detail in Sections XI and XII of this report, Mr. Cuthbert did not accept our proposal and,

[37] Raleigh McKenzie (SPID 100010229) on 2/24/21; Todd Kelly (SPID 100008484) and Ezra Johnson (SPID 100007913) on 2/25/21; Clarence Jones (SPID 950007603) on 3/11/21; and Derrick Burroughs (SPID 100002185) on 5/25/21.
[38] Exhibit 7.
[39] Exhibit 6.
[40] Exhibit 4.
[41] *Id.*
[42] Exhibit 7.



we later learned, instead sought his own second opinion of Dr. Eber's reports from another Radiologist: Dr. Timothy Dineen of National Radiology Solutions. In consultation with the NM Consultant retained by the Program, we have determined that Dr. Dineen incorrectly interpreted the PET scan images from 3T and his records, like Dr. Eber's, are also unreliable and cannot be used to support claims. We provide details on our findings on Dr. Dineen in Section XII. However, it is worth noting at this point of the Report that Mr. Cuthbert's refusal to accept our findings regarding Dr. Eber not only highlights his abrasive attitude in this Audit, but also his overreliance on PET scans.

## VI. MR. CUTHBERT'S COMMUNICATIONS WITH MAF PHYSICIANS.

In addition to Dr. Eber, Mr. Cuthbert utilized at least ten different health care providers to either examine his clients or provide Qualifying Diagnoses for the Program. The evidence suggests that Mr. Cuthbert used each of these providers for as long as he received favorable results, either in the form of receiving Qualifying Diagnoses or other support for his claims or appeals. While we were investigating the veracity of the PET scan reports from Dr. Eber that were submitted by Mr. Cuthbert, we also began to hear concerns from several Qualified MAF Physicians about their interactions with Mr. Cuthbert. Mr. Cuthbert's communications are not only concerning by themselves, but also provide substantial evidence of his over-reliance on the PET scans we (and he) knows to be questionable and his attempts to have doctors to rely on the records to give his clients an Alzheimer's Disease diagnosis.

When we spoke with Mr. Cuthbert on 3/8/22, we asked him directly if he had ever tried to persuade a Qualified MAF Physician to change his or her diagnosis. Mr. Cuthbert simply responded "no."[43] We then followed up and asked him: "Especially after you receive a PET scan?" Mr. Cuthbert again said "no."[44] As described in this section, we see that this is undeniably false and that several Qualified MAF Physicians came forward to us and expressed concerns about Mr. Cuthbert's communications and attempts at influencing their opinions.

### A. Dr. Kevin Weber.

On 3/2/21, Dr. Kevin Weber reached out to us concerned about a conversation he had with Mr. Cuthbert, in which Mr. Cuthbert attempted to influence Dr. Weber's diagnosis of Harlan Huckleby (SPID 100007249).[45] Dr. Weber told us, "I have had an attorney for a MAF player contact me a couple of times by email trying to get me to change my diagnosis," further stating on 3/3/21, "[r]eally pressuring me to give Alzheimer's diagnosis and I'm not sure what to say in reply."[46] Dr. Weber also forwarded his email conversation with Mr. Cuthbert to us.

From review of those emails, it appears that on 10/16/20, Dr. Weber examined Mr. Huckleby and noted in the summary of his report that the Player would need new neuropsychological testing. On 12/10/20, Mr. Cuthbert emailed Dr. Weber and attached new

---

[43] Exhibit 4.
[44] *Id.*
[45] Exhibit 8.
[46] *Id.*



neuropsychological testing from Dr. Laura Boxley and asked if Dr. Weber would "consider whether the combination of the DSM-5 factors, ICD-10/9, and the positive amyloid pet scan all combined together are generally consistent with Alzheimer's Disease."[47] On 12/21/20, Dr. Weber confirmed his review of the medical records associated with the claim and stated he would submit his diagnosis to the Program.[48] Mr. Cuthbert immediately inquired whether Dr. Weber provided an Alzheimer's Disease diagnosis, to which Dr. Weber responded that he provided a diagnosis of Level 2 Neurocognitive Impairment.[49] On 3/2/21, Mr. Cuthbert again emailed Dr. Weber and asked him to reconsider providing an Alzheimer's Disease diagnosis.[50] In this email, Mr. Cuthbert stated "[u]nder the Agreement, Harlan will recover larger compensation and his symptoms are supported by the Agreement DSM-5 diagnosis criteria for Alzheimer's Disease."[51]

Mr. Cuthbert then emailed Dr. Weber again on 3/11/21 and requested a phone conversation.[52] We informed Dr. Weber that he may direct Mr. Cuthbert to us for any further questions, but that, otherwise, Dr. Weber acted appropriately in responding summarily that the records have been submitted to the Program without addressing Mr. Cuthbert's questions. Dr. Weber replied to Mr. Cuthbert on 3/12/21, indicating that he was deferring to MAF program rules and could not discuss this matter with Mr. Cuthbert.[53] Mr. Cuthbert replied on 3/12/21: "You cannot discuss your medical Opinion about an patient condition by reviewing other medical records and medical Literature without guidance from the maf program? This is very concerning. I hope you have a good weekend as well."[54]

Mr. Cuthbert then emailed Dr. Weber again on 3/15/21.[55] Mr. Cuthbert cited and reproduced a section of Settlement Program FAQ 95, governing communications between attorneys and MAF physicians. FAQ 95 begins with a general description of what constitutes appropriate communications with an MAF physician. Alongside truthful description of Players' medical conditions, the rule allows discussion of "…scheduling appointments, paying for the exam, getting records from the exam, correcting factual things the records may have wrong, and the doctor's diagnosis and advice. If you have a lawyer representing you, then with your permission, that lawyer may also communicate with the physician and staff about those same things."[56]

However, FAQ 95 continues with a list of topics that are inappropriate for discussion with an MAF physician. FAQ 95 particularly forbids parties from questioning the methodology of MAF physicians and challenging conclusions or asking for changes in the physicians' opinions. Regarding physician methodologies, FAQ 95 states, "Do not attempt to instruct or

---

[47] Exhibit 9.
[48] *Id.*
[49] *Id.*
[50] *Id.*
[51] *Id.*
[52] *Id.*
[53] *Id.*
[54] *Id.*
[55] Exhibit 10.
[56] https://www.nflconcussionsettlement.com/FAQDetails.aspx?q=509#509



influence how the doctor performs the examination and makes a diagnosis."[57] Concerning challenging conclusions or asking for changes, FAQ 95 states, "Do not ask the doctor to change a diagnosis in any way."[58]

In his 3/15/21 email to Dr. Weber, Mr. Cuthbert only included the first section of FAQ 95 and did not include the latter half which covers the kinds of communications that are prohibited. Notably, Mr. Cuthbert did not include the prohibitions against challenging methodologies or against challenging conclusions or asking for changes, which Dr. Weber clearly felt Mr. Cuthbert was doing.[59]

In order to provide greater clarity about attorney-physician communications, we published an article in the Second Quarter 2021 Lawyer Newsletter highlighting the selective topics appropriate for communication between attorneys and physicians, citing FAQ 95.[60] We also published a list of prohibited communications with special emphasis on the various methods of influencing a physician's judgment regarding a Qualifying Diagnosis. Should an attorney or client have issues with a particular physician's diagnosis, we direct them to contact us or the BAP Administrator rather than contact the physician.[61]

We reached out to Mr. Cuthbert on 3/15/21 and informed him that we would look into the issues he raised to Dr. Weber regarding Mr. Huckleby's examination and to what extent Dr. Weber considered Alzheimer's Disease as a Qualifying Diagnosis.[62] While recognizing Mr. Cuthbert's prerogative to speak generally to MAF physicians, we reminded Mr. Cuthbert that "while [he] may ask the Qualified MAF Physician how he or she reached a diagnosis, [he] may not ask the doctor to change that diagnosis in any way."[63] Mr. Cuthbert responded on 3/17/21 and stated that he was not attempting to convince Dr. Weber to change his diagnosis, but that he was attempting to reconcile Dr. Weber's basis for not providing a diagnosis of Alzheimer's Disease.[64] Mr. Cuthbert detailed perceived issues with Dr. Weber's diagnosis, pointing to Dr. Weber's qualifications for diagnosing Alzheimer's Disease advertised through his practice's website and questioning why, despite these qualifications, Dr. Weber did not diagnose the Player with Alzheimer's Disease when Mr. Cuthbert believed the criteria were met.[65] Mr. Cuthbert further stated:

> It is disturbing that he would not answer basic questions and stated per the guidelines I can only talk to you Brown Greer the Administrator. My client and I want to know the basis of Dr. Weber rationale. Is it because my client went to the University of Michigan and the doctor is an Ohio State fan (see his biography)? Is it because my client is African American and the neurologist is a white man? As one of the few black attorneys around

---

[57] *Id*.
[58] *Id*.
[59] Exhibit 10.
[60] https://online.flipbuilder.com/bsxs/juyw/
[61] *Id.*
[62] Exhibit 11.
[63] *Id.*
[64] *Id.*
[65] *Id.*

> this litigation, this is a valid concern from my client due to the racial discrimination practices with the Heathen norms that are implemented in the BAP program algorithim when calculating impairment. Is it because the doctor has been instructed only to give Level 1.5 or Level 2.0 due to your AAP and Administrator training with doctors on how to write up reports? Is it because he wants to deny my client of benefits arbitrarily? The bottom line is this very concerning. When the doctors will not provide answers or explanations to their reasoning, how can the general public or the Players have confidence in the implementation of this suit?[66]

In attempting to answer Mr. Cuthbert's questions regarding Mr. Huckleby's exam, the basis for Mr. Huckleby's diagnosis with Dr. Weber, and the issue of overlapping diagnoses of Alzheimer's Disease and Level 2 Neurocognitive Impairment, we consulted the AAPLC and facilitated a call with Dr. Weber to discuss Mr. Cuthbert's concerns. Dr. Weber discussed challenges in classifying this case as either Neurocognitive Impairment or an Alzheimer's diagnosis. He did say that he would like to see the Player again to finalize his thoughts regarding the diagnosis and described the case as "grey area."

It is also notable that Mr. Cuthbert raised issues of overlapping diagnoses for Mr. Huckleby, pointing to evidence of Alzheimer's Disease after the Player had received a Qualifying Diagnosis of Level 2 Neurocognitive Impairment. A member of the AAPLC told us, "I do not think encouraging physicians to use AD more frequently will result in more medical accuracy or more genuinely supported claims. As the scenario for SPID 100007249 illustrates, the financial incentives for the attorneys would likely reduce the reliability of AD diagnoses if we provided guidance to lean toward AD when possible." The AAPLC member's guidance is particularly concerning in light of Mr. Cuthbert's prior statement to Dr. Weber that Mr. Huckleby will receive a larger payment should Dr. Weber diagnose him with Alzheimer's Disease.

We revisited this issue with Mr. Cuthbert in our 3/8/22 interview. We explained that Dr. Weber told us that he (Mr. Cuthbert) tried to get Dr. Weber to change his diagnosis for Mr. Huckleby.[67] Mr. Cuthbert flatly denied this, saying "that's incorrect" and that he did not ask Dr. Weber to change the diagnosis.[68]

When we notified Mr. Cuthbert that Dr. Weber would like to evaluate his client again and will attempt to schedule that appointment, he responded, "My clients do not trust Dr. Weber's opinion because he would not explain his rationale."[69] He also said, "Per my conversation with my client, Harlan and his wife Michelle stated they will be evaluated by Dr. Lerner because they do not trust Dr. Weber and his opinion."[70] On this communication, he copied Elaine.Callis@UHhospitals.org. Elaine manages appointments for Dr. Alan Lerner, another Qualified MAF Physician. We responded that while the Player is entitled to his opinion, we would prefer if Mr. Cuthbert did not besmirch Program doctors in emails made public to outside

---

66 *Id.*
67 Exhibit 4.
68 *Id.*
69 Exhibit 11.
70 *Id.*

parties, referring to his adding Elaine to the email that discussed Dr. Weber's diagnosis.[71] Mr. Cuthbert replied, "Opinion statements are protected by the first amendment in the United States of America. If you don't believe it was their opinion please call my clients. They will be more than happy to tell you, the judge, the media, or anyone else their feelings about their experience with this program."[72] It is worth noting that these communications – Mr. Cuthbert's push for the diagnoses based on positive PET scans and his responses to us – were happening around the same time when he learned from another MAF Physician's request for re-reads of the original scans that Dr. Eber's findings may be completely unreliable. Yet, this knowledge did not seem to affect Mr. Cuthbert's pursuit of diagnoses in support of these unreliable records.

At the same time, we started receiving calls from Dr. Lerner, which we discuss in the next section of this report.

**B. <u>Dr. Alan Lerner</u>.**

On 4/15/21, we received a phone call from Dr. Alan Lerner, who called us to discuss three Players referred to him by Mr. Cuthbert, including Mr. Huckleby. Dr. Lerner stated that, after reviewing the medical records of Mr. Huckleby, he noticed that the Player had already been diagnosed with Level 2 Neurocognitive Impairment by Dr. Weber in December 2020. Dr. Lerner stated this made him uneasy as he believed Mr. Cuthbert might be "diagnosis shopping." We informed Dr. Lerner that Mr. Huckleby was scheduled for a follow-up appointment with Dr. Weber and he would not need to schedule an appointment for that Player.

Then, on 4/26/21, we received a call from Dr. Lerner's office indicating that Mr. Huckleby's spouse called them and said that she and the Player refused to see Dr. Weber for a follow-up appointment, stating that they (the spouse and the Player) did not trust Dr. Weber and that Dr. Lerner was closer in distance to them. We then clarified to Mr. Cuthbert that the choice of doctor belonged to his client and that Dr. Weber's non-responsiveness to Mr. Cuthbert's follow-up was predicated on Program guidelines regarding communications with physicians which Dr. Weber felt Mr. Cuthbert violated.[73]

We asked Mr. Cuthbert about Dr. Lerner during our 3/8/22 interview. He confirmed that Mr. Huckleby went to Dr. Lerner after he went to Dr. Weber.[74] When we asked why he sent Mr. Huckleby to Dr. Lerner, Mr. Cuthbert said he thought "it was suspicious" and stated he wanted to get a "second opinion" but felt we tried to prevent him from doing so. However, Mr. Cuthbert did not explain what he meant by "it was suspicious" or why he thought he could not get a second opinion.[75]

---

[71] *Id.*
[72] *Id.*
[73] *Id.*
[74] Exhibit 4.
[75] *Id.*



**C. Dr. Jack Scariano.**

On 6/2/20, Dr. Jack Scariano called us before his first MAF appointment. During that call, Dr. Scariano brought up the use of PET scans and mentioned that he had talked to Mr. Cuthbert on the phone about the use of PET scans and that Mr. Cuthbert had a doctor in Florida providing PET scans for his clients. On 1/10/21, the AAPLC expressed strong concerns over Dr. Scariano's records and the reliability of the supporting PET scans, finding it likely that "Dr. Scariano was originally told that these Players were coming to him simply to confirm a biomarker-proved diagnosis of Alzheimer's disease."[76] After that feedback, we had a phone call with Dr. Scariano and the AAPLC on 2/9/21 and, among other items, discussed the limited role PET scans may play in a claim for Alzheimer's Disease under the Program. During that conversation, Dr. Scariano indicated that he relied on these PET scan records because they were presented to him by Mr. Cuthbert as all that was needed to make the Alzheimer's diagnosis.

On 4/13/21, Dr. Scariano called us and informed us that Mr. Cuthbert was emailing him daily to "twist [his] arm." Dr. Scariano commented that Mr. Cuthbert was "breaking the law" and that his emails feel like "mafia letters." Dr. Scariano stated that Mr. Cuthbert tells him what to do with a claim, including instructions to backdate a diagnosis to a particular date, and when Dr. Scariano expresses hesitancy, Mr. Cuthbert says he will "handle it through appeal." Dr. Scariano also stated that Mr. Cuthbert requested to meet with him in person, and that he felt unsure how to respond. We instructed Dr. Scariano to direct all future inquiries to us and to not meet with Mr. Cuthbert. Also, as a reminder, these communications that prompted Dr. Scariano to contact us were also happening around the time Mr. Cuthbert became aware that some of the re-reads of Dr. Eber's findings did not show positive findings, calling into question Dr. Eber's findings overall. Yet, he pushed Dr. Scariano with his "mafia letters" style of emails.

When we interviewed Mr. Cuthbert on 3/8/22, we inquired if he had ever asked Dr. Scariano to backdate a Qualifying Diagnosis.[77] Mr. Cuthbert denied ever doing this, saying he cannot dictate to doctors what to do. When we informed him that Dr. Scariano told us that Mr. Cuthbert had emailed him daily to try to get him to make changes to diagnoses, Mr. Cuthbert did not respond directly but told us to produce the documents and emails.[78]

On 8/13/20, we sent Audit Questions to Mr. Cuthbert while looking into the process behind his claims predicated on PET scans.[79] One of the questions we asked was whether Mr. Cuthbert has given any guidelines or instructions to Dr. Scariano in reference to medical exams.[80] Mr. Cuthbert replied on 8/28/20 and stated, "I have not provided Dr. Scariano any guidelines or instructions related to his examination of Players I represent."[81] While we acknowledge that Mr. Cuthbert's response to this question pre-dates his emails to Dr. Scariano, we are concerned that Mr. Cuthbert's practice of pressuring providers may have been longstanding and that his response was generally untruthful. At the very least, given our

---

[76] Exhibit 12.
[77] Exhibit 4.
[78] *Id.*
[79] Exhibit 13.
[80] *Id.*
[81] Exhibit 6.



question, Mr. Cuthbert would have known well before he provided his guidance to Dr. Scariano that this would have been a concern and topic of interest to us.

The AAPLC also recently expressed concerns about backdating, again in reference to claims represented by Mr. Cuthbert. On 6/26/22, an AAPLC member emailed us with the subject line "Continued concerns re attorney influence on diagnosis" after reviewing two Alzheimer's Disease claims submitted by Mr. Cuthbert that rely on diagnoses from Dr. Carl Billian.[82] The AAPLC member noted that both claims involved "significant backdating" and stated that he found no support in either claim for the diagnosis or the backdating.[83] He wrote: "This is the exact pattern I saw with Dr. Scariano's diagnoses of players represented by the same lawyer."[84] He then explained that, while he had questioned Dr. Scariano's documentation, Dr. Billian's medical notes contain "some tortured logic on coming to the qualifying diagnosis" but are "otherwise cogent and appropriately detailed."[85] Therefore, he told us: "My only conclusion is that the player's attorney is communicating an expectation about both the qualifying diagnosis and the date."[86]

## VII. DRAFTING OF MEDICAL RECORDS.

Mr. Cuthbert's communications with Qualified MAF Physicians were not limited to attempts at influencing a Qualifying Diagnosis or a date of the Qualifying Diagnosis. We obtained evidence that confirms Mr. Cuthbert actually drafted medical records for at least one Diagnosing Physician to be used in an appeal of a denied claim.

On 7/10/20, a Player submitted a Monetary Award Claim Form asserting a Qualifying Diagnosis of Alzheimer's Disease from Dr. Scariano, who arrived at a Qualifying Diagnosis date of 7/2/20.[87] We denied this claim on 1/27/21 after the Appeals Advisory Panel Leadership Council determined that the Player's Qualifying Diagnosis of Alzheimer's Disease was not made in a manner generally consistent with Settlement criteria.[88] The Player appealed the denial of this claim on 2/26/21 and the Special Masters remanded the claim back to us on 3/2/21.[89]

In support of the Appeal, Mr. Cuthbert submitted an addendum signed by Dr. Scariano, dated 2/23/21.[90] Given our concerns with mischaracterizations of employment information in other reports in the Appeal package (discussed in Section X.C below), we asked Dr. Scariano on 3/11/21 to produce all of his communications with Mr. Cuthbert regarding Player evaluations.[91] Dr. Scariano sent us copies of email exchanges he had with Mr. Cuthbert, including one

---

[82] Exhibit 14. The two claims are from Settlement Class Members Alphonso Carreker (SPID 100002465) and Corey Louchiey (SPID 100009416).
[83] *Id.*
[84] *Id.*
[85] *Id.*
[86] *Id.*
[87] Richard Shelton (SPID 100013792), Doc ID 226409.
[88] SPID 100013792, Doc ID 232355.
[89] SPID 100013792, Doc IDs 233363 and 233418.
[90] SPID 100013792, Doc ID 233362, pages 26-27.
[91] Exhibit 15.



exchange about their Appeal of the Player's claim.[92]  In that exchange, Mr. Cuthbert states that he obtained new testing for the Player from Drs. Randall Griffith and Amandeep Dhillon that confirms Dr. Scariano's diagnosis.[93]  Mr. Cuthbert also then provided a draft addendum report under Dr. Scariano's name, telling Dr. Scariano's office that "it's only educational and Dr. Jack needs to revise to his own opinion."[94]  Dr. Scariano's office replied to ask, "you want us to review the addendum or what would you like us to do specifically?"[95]  Mr. Cuthbert replied, "[r]eview, edit and sign off the addendum to his notes then send back to me so I can file fir [sic] his appeal."[96]  Dr. Scariano's office noted that the addendum "does not sound like [Dr. Scariano] at all," and that numerous edits would need to be made.[97]

On 4/6/21, we emailed Dr. Scariano to request a copy of that attachment as it existed when Mr. Cuthbert originally emailed it to Dr. Scariano.[98]  The original version in Microsoft Word that we received from Dr. Scariano on 4/23/21 shows Mr. Cuthbert as the last individual to modify the document:[99]



Mr. Cuthbert's initial draft of Dr. Scariano's addendum differs substantially in phrasing from the final version of the addendum submitted to the Program in support of the appeal.  For example, the original draft authored by Mr. Cuthbert includes a paragraph on the Player's supporting PET scans: "[i]n addition to the DSM-5 measures explained above, [the Player] demonstrated objective evidence of the Amyloid PET scan done on 6/29/20: the positive study for amyloid protein showed substantial increased cortical radiotracer accumulation in the bilateral frontal lobes, the parietal lobes, the lateral temporal lobes and in the cingulate gyrus."[100]  This sentence does not appear in the final version submitted on appeal, signed by Dr. Scariano, nor does any sentence commenting on the Player's PET scan or its reliability.[101]

---

[92] Exhibit 16.
[93] *Id.*
[94] *Id.*
[95] *Id.*
[96] *Id.*
[97] *Id.*
[98] Exhibit 17.
[99] Exhibit 18.
[100] *Id.*
[101] Richard Shelton (SPID 100013792), Doc ID 233362, pages 26-27.



On 4/27/21, we sent questions to Mr. Cuthbert and asked him who drafted the addendum submitted with the Player's appeal.[102] Rather than disclosing any of the true process behind the creation of the addendum, Mr. Cuthbert simply stated that Dr. Scariano drafted the addendum.[103] This response appears to be false and directly calls Mr. Cuthbert's credibility into question. Despite Dr. Scariano making substantial edits to the final version, the fact remains that Mr. Cuthbert drafted the addendum for Dr. Scariano to use. It is improper for an attorney to draft a medical record for a Settlement Program medical provider. It is also important to note that Mr. Cuthbert's draft emphasizes the Player's PET scan, while Dr. Scariano's final addendum omits any reference to the PET scan. This is consistent with our findings that Mr. Cuthbert over-relied on the use of 3T's PET scans despite their unreliability.

We also observed another addendum purportedly prepared by Dr. Scariano for a second Player, who is also represented by Mr. Cuthbert, that is similar in format to the first Player's addendum.[104] While we have not confirmed it, this addendum, also dated 2/23/21, the same date as the first Player's, appears to have possibly been drafted by Mr. Cuthbert. On 2/17/21, Dr. Scariano's office emailed Mr. Cuthbert to inform him that more edits were being made to the second Player's report.[105] Mr. Cuthbert responded that day to ask why they were making edits to the report.[106] Given that Dr. Scariano's office indicated that the first Player's addendum did not look like Dr. Scariano's work product and that edits would need to be made, we are concerned the same process occurred with the second Player, where Mr. Cuthbert drafted medical records and then had Dr. Scariano review and edit that draft before signing it.

During our 3/8/22 interview of Mr. Cuthbert, we asked him whether he had ever drafted an addendum to a report for a doctor.[107] To this question, Mr. Cuthbert simply replied, "No, never."[108] We responded by saying, "So if we provide a copy…" and Mr. Cuthbert cut us off, saying that we should and then he can respond properly.[109] Mr. Cuthbert's statement that he has never drafted an addendum for a doctor in this Program appears to be untrue.

## VIII. <u>DRAFTING OF THIRD-PARTY AFFIDAVITS</u>.

In addition to Mr. Cuthbert's drafting of medical records to support Monetary Award claims, our investigation has determined that Mr. Cuthbert also drafted affidavits, purportedly from third parties, several of whom have asserted under the penalty of perjury that they received no help preparing the documents. The evidence shows that Mr. Cuthbert prepared a "template" affidavit, which he provided to the affiants and that became the basis of their statement. While the use of a template is not by itself a concern, the language that Mr. Cuthbert supplied, and that was supposed to be unique to each Player's condition and situation, is identical and described very specific neurocognitive impairments and situations that are unreasonable to apply to each of

---

[102] SPID 100013792, Doc ID 235531, page 1.
[103] *Id.*
[104] Keith Henderson (SPID 100006694), Doc ID 233988, pages 5-7.
[105] Exhibit 18.
[106] *Id.*
[107] Exhibit 4.
[108] *Id.*
[109] *Id.*



his clients in a blind fashion. What concerned us as well is that instead of assisting the Program by providing full and complete answers about the affidavit process, Mr. Cuthbert provided vague and incomplete responses to frustrate and prolong the investigation.

**A. Overlapping Language.**

Twenty-one of Mr. Cuthbert's Monetary Award claims rely on a third-party affidavit or sworn statement in the same general format organized into the three Clinical Dementia Rating (CDR) domains of Community Affairs, Home and Hobbies, and Personal Care. Under each of these sections are numbered statements discussing the Player's neurocognitive difficulties, activities of daily living, etc. In 17 of these affidavits, the statements contain identical language that overlaps, despite purportedly having been authored by different individuals. Here are some examples of the overlapping language that we have observed:

**Example 1**

**Joseph "Brian" Johnston (SPID 100008049):**

longer participates in.

21. When Brian was younger, he was very active in community and in his neighborhood, along with hanging out with his friends. He was very social and just used to meet up with people and was never shy. He use to always like to do charity work helping others repair things, mowing yards, landscaping, etc. Now he has become a loner and very distant. He refuses to go anywhere. This is sad to me because Brian was always social, but his health prevents him from engaging with the community and he doesn't want anyone to see him the way he is and not be able to recall someone's name.

**Jeff Griffin (SPID 100005916):**

10. When Jeff was younger, he was very active in community and in his neighborhood, along with hanging out with his friends. Jeff was very social and just used to meet up with people and was never shy. Jeff used to always like to do charity work helping others repair things, mowing yards, landscaping, etc. Now he has become a loner and very distant. He refuses to go anywhere. This is sad to me because Jeff was always social, and that's what attracted me to him, but his health prevents him from engaging with the community and he doesn't want anyone to see him the way he is and not be able to recall someone's name.

**Example 2**

**Joseph "Brian" Johnston (SPID 100008049):**

25. Brian's memory decline over the past few years is very alarming. Without the help of my family, I would be very concerned about Brian 's ability to operate from day to day because if you add up all the factors together there could be risk to his health without someone around to act as a safeguard.



**Tommy Barnhardt (SPID 100000793):**

28. Tommy memory decline over the past few years is very alarming. Without the help of my family, I would be very concerned about Tommy 's ability to operate from day to day because if you add up all the factors together there could be risk to his health without someone around to act as a safeguard.

**Example 3**

**Corey Louchiey (SPID 100009416):**

6. Knowing Corey as long as I have and having an extremely close relationship with him, I was able to see changes in his behavior both physical and mental.

**Rory Graves (SPID 100005756):**

5. Knowing Rory as long as I have and having an extremely close relationship with him, I was able to see changes in his behavior both physical and mental.

**Example 4**

**Joseph Harris (SPID 100006402):**

6. The initial signs were memory loss in Joe started after his NFL career ended, which over the years elevated to severe memory loss.

**Joseph "Brian" Johnston (SPID 100008049):**

6. The initial signs were memory loss in Brian started after his NFL career ended, which over the years elevated to severe memory loss.

Clearly, these statements describe a history of specific cognitive impairments and activities that are not specific to each of these Players. The use of such overlapping statements leads to only one conclusion: that they were drafted by one individual and supplied to the affiants. Any other way for these affiants to create this language themselves is simply illogical.

**B. SWS-3 Forms.**

While the language overlaps themselves are a significant cause for concern, we observed an additional alarming trend with a subset of the Players: five of the third-party affidavits that contain the language overlaps were submitted on an official Settlement Program SWS-3 (Third-Party Sworn Statement: Functional Impairment) form. The first page of this form includes a section that asks if anyone helped the affiant fill out Section III (the affiant's statement regarding the Player) of the sworn statement. On all five SWS-3 forms, the affiant has answered "No" to this question. For example:





| Did anyone, including anyone working in a law office or in a claims preparation office, help you fill out Section III of this form? If you answer Yes, those who helped you must sign this form in Section V. | ☐ Yes ☑ No |
|---|---|

Because of the clear overlaps among the language on all SWS-3 forms, we find that attestation that the affiants did not receive any assistance in completing their statements to be a blatant misrepresentation of the facts. It is impossible that each of these five affiants, or the larger population of 17, each created their own language by themselves and without assistance. While we have not confirmed that Mr. Cuthbert instructed affiants to check the box on the SWS-3 Form "No," we have confirmed that Mr. Cuthbert did in fact provide a template and instructions to affiants when completing their affidavits. These overlapping statements originated with Mr. Cuthbert and we discuss these findings in greater detail in Sections VIII.C and VIII.D, below.

### C. <u>Calls to Affiants</u>.

After we discovered these issues with overlapping language and SWS-3 forms, we needed to learn more about the process Mr. Cuthbert used to create affidavits. In total, we spoke with seven affiants who purportedly authored the affidavits and summarize what we learned from six of these individuals here (we address our conversation with the seventh affiant, Terry Bolar, in Section X.A). Three of these six affiants signed SWS-3 forms and all six affidavits included language that overlapped substantially with other affidavits also submitted by Mr. Cuthbert. During the calls, we gave the affiants examples of overlapping language. While each of the affiants' explanations differed slightly, they were either unable to explain the overlaps or insisted that they wrote the affidavit themselves without assistance. Ultimately, we discontinued calling the affiants because we felt they were all not being truthful with us and the calls were not helpful. We note that we received the most information about the process, and the template used in the process, from Shawna Davis (*see* VIII.C.1). Other interviewees stood by their assertions that no one helped them and one of them (Michael Hocter; *see* VIII.C.5) even changed his story after speaking with him several times. Finally, Claude Roney (*see* VIII.C.6) suggested that he believed that being truthful with us would put the Player's claim into audit. All of these interactions suggest a possibility that the affiants were alerted about our calls as soon as we began making them and there is a strong possibility they were instructed what to tell us. The apparent person with knowledge of and contact information for all these affiants is Mr. Cuthbert.

We called three affiants who signed SWS-3 forms, all of whom had checked the box "No" to indicate they had received no help with the sworn statement:

1. **Shawna Davis, affiant for Joseph Harris (SPID 100006402)**, told us in our 11/29/21 phone interview that she had been contacted by a male attorney and she acknowledged that the name Byron Cuthbert was familiar to her. The attorney asked her a "slew" of questions about changes she had noticed in Mr. Harris and then



requested that she write a statement describing those things.[110] She then prepared a two-page letter addressed, "To whom it may concern," which outlined her observations. Ms. Davis then told us that she received a fill-in-the-blank template from the law firm which she completed by entering Mr. Harris' name and several observations of his condition, and returned by email to the law firm. She provided a copy of this document to us:

SWS-3

THIRD-PARTY SWORN STATEMENT: FUNCTIONAL IMPAIRMENT

1. I am a friend of JOE and I have known him for over 29 years. I met JOE at Marriott Hotel
2. I have no blood relationship with JOE of any kind.
3. Over these years, I have spent considerable time with JOE
4. I know his habits and his day-to-day activities. I have been able to observe and interact with him for extended periods of time.
5. Knowing JOE as long as I have and having an extremely close relationship with him, I was able to see changes in his behavior both physical and mental.
6. The initial signs were memory loss in JOE started after his NFL career ended, which over the years elevated to severe memory loss.
7. His memory has declined on things he should know.
8. For example, he is forgetful on simple tasks, can't recall purposes of actions, events which should be easily accessed are difficult for him to recall, consistently leaves things behind and leaves on and walks away from utilities such as faucets and ovens/ranges.
9. Other symptoms, I've noticed include the fact that JOE developed bad decision-making habits and processing issues.

HOME AND HOBBIES

10. JOE is demonstrating impairment in function at home.
11. JOE spouse or family handles chores at home due to his memory, processing and bad decision making.
12. For example, JOE leaves the stove on
13. He forgets turning on water to shower sometimes & just stands in the shower
14. He has really lost all interest in things he used to enjoy.
15. JOE used to enjoy good grooming. Now, he refuses to shave etc.
16. Family handle bills?

COMMUNITY AFFAIRS

1. In the past, JOE was an active member of his community and had many close relationships.
2. JOE no longer has those close relationships due to his memory, processing and bad decisions.
3. For example, he used to volunteer with youth football but no longer
4. JOE cannot stand for anyone to notice how bad his symptoms have become so he withdrawals
5. JOE has lost interest in activities outside of the home. Concerts, social events, fund raisers are all items he no longer participates in.
6. JOE'S driving status. If still drives any accidents? Flipped his Expedition
7. JOE working status: is he disabled? No longer works due to his progressing illness.

SWS-3 v.4
537565

www.NFLConcussionSettlement.com
Page 1 of 5

11/8/19

PERSONAL CARE

8. JOE requires assistance with his personal care due to his memory, processing and bad decisions issues.
9. For example, he sometimes forget to go to the Bathroom
10. Family helps with medicine? YES
11. Family handle financial decisions? YES
12. JOE HARRIS personal care is diminishing.
13. Over the years JOE became sloppier and more unkempt.
14. Because of his decline, his family and friends have taken steps keep an eye on him.
15. JOE HARRIS memory decline over the past few years is very alarming.
16. Without the help of my family, I would be very concerned about JOE ability to operate from day to day because if you add up all the factors together there could be risk to his health without someone around to act as a safeguard.
17. I have found a lot of this alarming, as I have seen this developed in JOE over the years.
18. If his family was not around for JOE then I would be very concerned for his well-being.

SWS-3 v.4
537565

www.NFLConcussionSettlement.com
Page 1 of 5

This document overlaps heavily with other affiants' statements and includes many of the language similarities that we had observed. Ms. Davis did not have a copy of the final version of her sworn statement which was submitted in connection with Mr. Harris' claim, so we provided it to her. After having a chance to review it, Ms. Davis acknowledged that the law firm prepared the SWS-3 with her input. Nonetheless, Ms. Davis told us she checked the attestation box "No" because she did not believe she had any help in the completion of the sworn statement and pointed to her two-page letter which she said formed the basis of the information contained in the sworn statement.[111]

2. **Christopher Jeffries, affiant for Reginald Singletary (SPID 100013989)**, explained to us on 2/3/22 that Mr. Cuthbert directed him to a "website" to complete the SWS-3, but Mr. Jeffries could not recall if the website belonged to the law firm or if it was the NFL Concussion Settlement website.[112] Mr. Jeffries stated that he had no

---

[110] Exhibit 19.
[111] *Id.*
[112] Exhibit 20.



help from anyone in completing the document, including receiving a template or "go-by." He did not specifically recall checking a box on the form affirming that he completed the document with no help, but said that if it was required then he must have done so. After being given some examples of overlapping language between his sworn statement and those of others, however, Mr. Jeffries was unable to explain how some of the language was identical.[113]

3. **Tiffany Bell, affiant for Corey Louchiey (SPID 100009416)**, reached by phone on 1/8/22, told us she downloaded the SWS-3 form and completed it by herself without any drafts, prompts or assistance from others.[114] She remembers checking the box indicating that no one assisted her with the affidavit and she remembers signing it. She denied ever receiving any "fill-in-the-blank" document from Mr. Cuthbert. When we provided examples of identical language from other affidavits and Mr. Cuthbert's template document, however, Ms. Bell was unable to give us an explanation.[115]

We also called three affiants who submitted affidavits that were not on the SWS-3 form:

4. **Brenda Vertison, affiant for Lester Holmes (SPID 100007068),** submitted two affidavits, one in 2017 and the other in 2020. When we called her on 1/4/22, Ms. Vertison said she was aware that Mr. Holmes had an attorney for the Settlement Program and believed his first name was Byron but did not recognize Cuthbert as his last name.[116] She was vague about the 2017 affidavit, saying she thought she "may" have had a conversation with Byron on the phone. Upon being given examples of overlapping statements in another Player's affidavit who was also represented by Mr. Cuthbert, Ms. Vertison acknowledged that they were the "type of things" that she and Mr. Holmes discussed and also maybe "a little with the attorney."[117] Ms. Vertison was not certain that she drafted the 2020 affidavit entirely by herself and cannot remember if she was given any prompts, drafts, or fill-in-the-blank forms to assist her. She said she "possibly" talked to the attorney and was fairly certain she emailed the draft of her statement to Byron in 2020 and he may have asked her to expand on some of the areas.[118] She believed that he wanted more discussion about the various events that caused her to think something was wrong with Mr. Holmes and asked her to detail it more fully in her statement. Ms. Vertison said she did not remember getting a document that told her what to write in the affidavit.[119]

5. **Michael Hocter, affiant for Tommy Barnhardt (SPID 100000793),** spoke to us by phone on 6/15/21, 12/13/21, and 12/16/21. When we first spoke with Mr. Hocter in June 2021, he told us that he had been asked by Mr. Barnhardt's attorney to produce

---

[113] *Id.*
[114] Exhibit 21.
[115] *Id.*
[116] Exhibit 22.
[117] *Id.*
[118] *Id.*
[119] *Id.*

an affidavit. However, in our December 2021 calls, Mr. Hocter changed his story and told us he had no contact with Mr. Barnhardt's attorney and denied being provided a fill-in-the-blank or template to use when creating his affidavit.[120] Instead, Mr. Hocter stated that Mr. Barnhardt requested the affidavit and directed him to the Settlement Program website for guidance. We asked him how, in several instances, the exact same verbiage he used in his statement appeared in other Players' affidavits who were also represented by Mr. Cuthbert. Mr. Hocter was unable to explain how that could have occurred. When we questioned him about the initial call with us in June 2021, when he had told us that he had been asked by Mr. Barnhardt's attorney to produce the affidavit, Mr. Hocter stated that he had answered the question in that manner because, despite Mr. Barnhardt asking him to draft the affidavit, he assumed the request came from Mr. Barnhardt's attorney.[121]

6. **Claude Roney, affiant for Ryan Stewart (SPID 100014629),** stated on our 1/4/22 phone call that he believed Mr. Stewart asked him to complete the affidavit.[122] He could not recall how he knew the various areas to address in the affidavit. He denied any contact with Mr. Stewart's attorney about the affidavit and denied receiving any assistance in crafting it or being given a template to follow. After we pointed out that certain aspects of his affidavit were similar to those submitted on behalf of other former Players represented by the same lawyer, Mr. Roney had no explanation except to say he thought the overlapping language was general in nature. He then pointed out other parts of the affidavit that did not overlap. Mr. Roney commented that not all affiants were from the same educational background or had the same intelligence level, so he suggested that perhaps some needed assistance in completing the affidavit. When we advised that any assistance provided to the affiant needed to be disclosed, Mr. Roney, oddly, stated that perhaps the "box wasn't checked" because the affiant feared their affidavit would be flagged or scrutinized and hold up the Player's claim.[123] We find this statement especially interesting because Mr. Roney's affidavit was not submitted on an SWS-3 form and there was no "box" to indicate whether he received help in completing it. We therefore think that Mr. Roney was familiar with the SWS-3 form and may have known more than what he told us.

### D. Mr. Cuthbert's Explanation.

In our 3/8/22 interview with Mr. Cuthbert, we discussed his use of third-party affidavits and our concerns with the overlapping language.[124] We first pointed out to Mr. Cuthbert that we found 17 affidavits with overlapping language and that five of those were on an SWS-3 form. We asked if Mr. Cuthbert ever provided any assistance, such as with examples or templates, to an affiant, to which he replied that he sent affiants to the Concussion Settlement website and that he worked with some affiants through interviews prior to completing the affidavit and typed their

---

[120] Exhibit 23.
[121] *Id.*
[122] Exhibit 24.
[123] *Id.*
[124] Exhibit 4.



responses, but that the affiants themselves made their own changes and signed the documents.[125] At this time, he did not directly answer whether he provided any sort of template to the affiants.

We pressed Mr. Cuthbert on this explanation and asked if there were any instances where he ever created a template or a fill-in-the-blank affidavit. Mr. Cuthbert then acknowledged that sometimes he gave a template to the affiants in a Word document and instructed them to edit it and "make it their own."[126] We then asked who created this template, to which Mr. Cuthbert replied, "we worked on it, my mother and I" and that it was based on previous affidavits, for example, from Locks Law Firm, questions from the CDR, and documents from the Settlement Program website.[127] Mr. Cuthbert added that "individuals made their edits and signed off saying their statements are true."[128]

We then pulled up and shared with all call participants the template provided to us by Shawna Davis, affiant for Joseph Harris (SPID 100006402), on our 11/29/21 call with her. As discussed earlier and shown in Section VIII.C, this document had numbered paragraphs, many of which contained language that overlapped with other affiants' statements, that were mostly typed but also included blanks that had the name "Joe" filled in.[129] The template also had several other handwritten statements added, but no information had been crossed out or removed. When we asked if he created the document, Mr. Cuthbert acknowledged that he did and explained that the template was a Word document that he sent out to the affiants, but that he considered it a draft that he did not turn in, and that it was a "part of the interview process."[130] He further stated that he sends these templates to the affiants, who have the ability to change it, and pointed out that Ms. Davis, who provided us the template, was an older lady and had "problems with computers."[131]

We then more directly asked Mr. Cuthbert whether, by typing up most of the information regarding the Player's abilities and difficulties, he considered that he was telling the affiant what to say. Mr. Cuthbert responded, "that's not true" and explained that the template was just the initial stage.[132] He said he sent the template to the affiant and told them to "make it your own words."[133] Mr. Cuthbert also explained that sometimes the affiant created the affidavit on his or her own and that other times he sent the affiant a template. Overall, Mr. Cuthbert's explanation was confusing and inconsistent.

When we pointed out to him that the template is a working document that he created, Mr. Cuthbert simply replied "it's a working document for an initial draft" and opined, "it's no different than your instructions."[134] We then asked Mr. Cuthbert to clarify how many affiants

---

[125] *Id.*
[126] *Id.*
[127] *Id.*
[128] *Id.*
[129] Joseph Harris (SPID 100006402).
[130] Exhibit 4.
[131] *Id.*
[132] *Id.*
[133] *Id.*
[134] *Id.*

are provided a template and how many affiants he interviews to gather the information. Mr. Cuthbert replied that it depends on the individual affiant's "skill level" and what he or she understands, but that all affidavits are edited by affiants, and all have examples he "would never know."[135]

We then cited one specific example from the template that we were sharing with Mr. Cuthbert on the screen, which included the very specific language that stated "the initial signs were memory loss in [BLANK for Player's NAME] started after his NFL career ended, which over the years elevated to severe memory loss:"[136]

... in his behavior both physical and mental.
6. The initial signs were memory loss in ____ started after his NFL career ended, which over the years elevated to severe memory loss.

We asked Mr. Cuthbert how he thought it could be reasonable to provide the affiant with this pre-typed information that is seemingly so specific to one individual. Mr. Cuthbert simply replied, "they can delete that… it's no different than what any major law firm does."[137]

When we asked Mr. Cuthbert what instructions he gave affiants who signed an SWS-3 form about the box they checked saying they received no assistance, he denied giving any instructions and said he left it up to the affiants.[138] As for the overall content of sworn statements, we pointed out that SWS-3 statements are supposed to be the affiants' work and Mr. Cuthbert replied, "it's up to them what they think" and "I can't control what they think."[139] We then asked Mr. Cuthbert if he could provide the instructions he gave to affiants, but he declined and said he may have emails where he told them to "make your own edits."[140]

We followed up with Mr. Cuthbert on 6/17/22 and asked him to produce copies of emails where he instructed affiants to "make your own edits."[141] Through his attorney, Mr. Cuthbert responded on 6/27/22: "It is common practice for attorneys to provide an outline of topics that need to be covered in a witness statement for a particular case. The witness then writes the actual statement as they deem appropriate. The emails in question are attached."[142] The response includes copies of four emails involving affiants for four Settlement Class Members.[143] Each email refers to several attachments with various file names such as "2nd Example of a Redacted Affidavit," though copies of the attachments were not provided.[144]

---

135 *Id.*
136 *Id.*
137 *Id.*
138 *Id.*
139 *Id.*
140 *Id.*
141 Exhibit 2.
142 Exhibit 3.
143 *Id.*
144 *Id.*

### E. Exclusion of Overlapping Affidavits from Claim Packages.

From all of this, we confirmed that Mr. Cuthbert did supply to the affiants a template that listed out very specific statements, purportedly about an individual person's history of cognitive impairment, difficulties with daily activities, and overall condition and well-being. While Mr. Cuthbert's defense of this practice seems to rest on his opinion that the affiants could simply remove anything they felt was inapplicable, we find this process highly troublesome, primarily given the very unique nature of the statements he supplied and the frequency that they appear across numerous Players' claims. By Mr. Cuthbert's own admission, the affiants all had different levels of understanding and based on Ms. Davis' template, it does not appear she removed any information that Mr. Cuthbert provided to her. Because of the blatant disregard for individuality in these affidavits, we are left to conclude that they are wholly unreliable and a product of a process deliberately designed to paint each Player's condition in the worst way possible, instead of an independent description provided by a third party. Furthermore, it was Mr. Cuthbert who uploaded these affidavits to the Players' files, so he had an opportunity to see that the language was overlapping and that, despite his providing a template that formed the basis of the affidavit, the affiants checked the box that no one assisted them in preparation of the affidavits. Yet, Mr. Cuthbert apparently took no action to address these irregularities and was evasive and defensive when questioned about it, instead of being forthcoming to our questions.

We find that affidavits that feature language that we have found to be overlapping and included in the template are not reliable.

## IX. POTENTIAL COACHING OF CLIENTS.

In addition to their concern with PET scan reports from 3T, as well as the potential influence of Mr. Cuthbert in backdating diagnosis dates, the AAPLC also observed another concerning pattern present in multiple claims represented by Mr. Cuthbert. The AAPLC noted that several of Mr. Cuthbert's Player clients, or their wives, all reported very similar information about social activities and functionality, and that the Players were largely silent and despondent during the exams, concluding that the similarities strongly indicate that the Players had been coached on how to act and what to say during their evaluations.

We identified nine Players represented by Mr. Cuthbert who appear to fit this coaching pattern. For example, Dr. Scariano's report on Todd Kelly (SPID 100008484) states that "Mr. Kelly appeared disassociated and did not talk much" and "was disoriented to place."[145] However, Mr. Kelly works as Key Opinion Manager for a Fortune 500 company,[146] and therefore it is unlikely he would normally appear "disassociated." Another of Dr. Scariano's reports states that Donald Lee Evans (SPID 100004597) "answered questions in minimal words and had almost no spontaneous speech", "seemed very withdrawn", and "[d]oes not get much social or go out to visit people."[147] Note, however, that the AAPLC pointed out about Mr. Evans' evaluation: "There are conflicting statements in Dr. Scariano's report of the player's

---

[145] Todd Kelly (SPID 100008484), Doc ID 236773, pages 1-4.
[146] SPID 100008484, Doc ID 239580, page 2.
[147] Donald Lee Evans (SPID 100004597), Doc ID 228661, pages 1-4.



communication abilities, so it is unclear which are the accurate statements. Specifically, Dr. Scariano states the player 'had no spontaneous speech,' yet was 'Able to communicate without restriction' and speech was described as 'clear in tone, volume, and rate.'"[148] Dr. Scariano's report on Ezra Johnson (SPID 100007913) states: "During the visit, Mr. Johnson was to himself and did not speak much. He has his head down… He made minimum eye contact. He looked confused and to himself during the interview… He spoke only a few sentences throughout the interview and exam part... He does not attend any social functions outside a family home… He has no spontaneous speech... he seemed very withdrawn."[149]

In another instance, Dr. Billian's report says Corey Louchiey (SPID 100009416) "is turning into a hermit and no longer wants to be around other people… appears very socially withdrawn (eyes closed during much of the conversation until directly asked questions) and situationally uncomfortable… is hunched forward in a sitting position."[150] Dr. Billian reported on Brent Fullwood (SPID 100005198): "Occasionally, he may shake, maybe in his hands and may stutter like a robot that gets stuck about what he wants to say. Continuing the interview with the patient -- this is quite difficult given his behavior and cognitive function… At times, he looks very puzzled, puts his hands up, gestures about not knowing the answer."[151] Dr. Griffith reported on Mr. Fullwood: "His wife says that he stays in a dark room and in the bed for too long."[152]

When we interviewed Mr. Cuthbert on 3/8/22, we pointed out the AAPLC's concern with possible coaching of players before they saw doctors.[153] We asked Mr. Cuthbert if he had ever coached players. He responded "no" and said he tells players "to tell the truth and be honest about their symptoms."[154]

While we have been unable to confirm that Mr. Cuthbert has in fact coached any of his clients on what to say or how to act during an exam for the Program, the AAPLC's opinion deserves consideration, especially given the multiple other concerns we have observed with Mr. Cuthbert's conduct and behavior. We will further update our findings if additional material information is found on this topic.

## X. <u>OTHER CONCERNS</u>.

So far, in this Report we summarized our concerns and findings regarding Mr. Cuthbert's overwhelming reliance on Amyloid PET scans in support of Alzheimer's Qualifying Diagnoses, the unreliability of these purportedly positive PET scans, communications with Qualified MAF Physicians urging them to consider and rely on these purportedly positive PET scans to make an Alzheimer's Qualifying Diagnosis, drafting of medical reports and creating and providing to affiants templates for creation of third-party affidavits. All these practices interfere with the

---

[148] SPID 100004597, Doc ID 239566.
[149] Ezra Johnson (SPID 100007913), Doc ID 237186, pages 1-4.
[150] Corey Louchiey (SPID 100009416), Doc ID 241178, pages 2-4.
[151] Brent Fullwood (SPID 100005198), Doc ID 241391, page 2.
[152] SPID 100005198, Doc ID 241394, page 21.
[153] Exhibit 4.
[154] *Id.*



Program's goals to pay legitimate claims, and rules designed to protect the integrity of the claims review process. But Mr. Cuthbert's questionable actions do not end there. In this section of the Audit Report, we discuss various other issues we have observed related to Mr. Cuthbert's involvement with the Program at different stages of the process.

**A. <u>Terry Bolar and Recruitment of Clients</u>.**

During a 2/15/22 call with a Player formerly represented by Mr. Cuthbert, both the Player and his wife reported that Mr. Cuthbert worked closely with Terry Bolar, a former NFL player and sports agent, who recruits, or has recruited, potential clients for him. The Player and his wife did not know how Mr. Bolar was receiving contact information for potential clients but did state that he (Mr. Bolar) was connected to Mr. Langfitt (attorney David Langfitt, discussed below in this section, who previously worked for Locks Law Firm). They stated that while they had never personally met Mr. Cuthbert during the period that he represented the Player, Mr. Bolar would check in with them periodically to see how things were going. They opined that Mr. Bolar is likely how Mr. Cuthbert is, or was, building his clientele in the Program.

We had previously spoken with Mr. Bolar on 7/28/20 in an unrelated audit of a Settlement Class Member's claim, because Mr. Bolar provided a third-party affidavit for that Player's claim and also because we received a tip indicating Mr. Bolar and another Player were working with lawyers. During that discussion, Mr. Bolar denied ever making any referrals to a law firm or ever having any relationship with a law firm. He told us he has been a sports agent since the mid-1980s, was a top NFL agent, has coached football so he knows the game well, and gets calls from players about the Settlement Program but does not refer them to any law firm. Mr. Bolar told us he always works by himself and has his own firm, Prestige Sports International, which he has operated since 2002. When we specifically asked Mr. Bolar what he tells a retired NFL player if they call and ask him for the name of a law firm to help them file an NFL Concussion Settlement claim, he said he tells them "they have choices," but he does not give them names of any specific firms.

Because the information Mr. Bolar provided us in the 7/28/20 call was vague, we followed up with him by phone on 9/25/20. We asked how often he gets calls from former NFL players who ask him about filing NFL Concussion Settlement claims or for the names of law firms to help file such claims. Mr. Bolar told us: "Like I told you last time, I'm a sports agent, I have lots of friends who played in the NFL." He then stated that when he gets such a call "I just ask other people." Mr. Bolar also told us that he gets such calls "not real often." We asked him to estimate how many and how often and asked him what time frame "not real often" meant. In response, Mr. Bolar told us that "it's random" and that he "can't really say" and "since the virus no one is calling." During our call, we also asked Mr. Bolar about his relationship with the other former NFL Player who was allegedly providing the same services. Mr. Bolar said he had heard of the Player but denied ever working with him.

During our 2/15/22 phone call with Gene Locks, he reported that Mr. Bolar was a former Player and "hustler" who telephonically solicited David Langfitt to enter into an agreement with him to represent approximately 40 to 50 Players. Mr. Langfitt agreed to a meeting in Philadelphia believing that Mr. Bolar was an attorney and, when Mr. Bolar showed up, he was accompanied by Mr. Cuthbert. During this meeting, Mr. Locks and Mr. Langfitt realized that



Mr. Bolar was not a lawyer. Mr. Bolar introduced Mr. Cuthbert as a Georgia-based attorney who had previously represented Players in disability claims. Although Mr. Locks was not certain of the amount, he believed Mr. Bolar wanted $2,500 or $3,000 for each NFL case he brought in. Mr. Locks reported that they emphatically denied Mr. Bolar's request. However, they did agree to a co-counsel relationship with Mr. Cuthbert with the understanding that Locks would pay for medical testing for those Players that Mr. Cuthbert brought over while Mr. Cuthbert would set up doctors' appointments and handle the work that went with it. Locks ultimately did not test everyone, but there were a few cases that resulted in Monetary Award claims.

Mr. Locks told us that Mr. Langfitt left Locks Law Firm and that all the remaining "Cuthbert cases" went with Mr. Langfitt. On 2/21/22, we spoke with David Langfitt. During this call, Mr. Langfitt reported that Mr. Cuthbert referred cases to Locks, and "watched" what he (Mr. Langfitt) did with those cases. When asked about Mr. Bolar, Mr. Langfitt reported that Mr. Bolar was a friend of Mr. Cuthbert's and worked as an "agent" recruiting Players. Mr. Langfitt explained that Mr. Cuthbert then started his own practice.

On 3/8/22, we interviewed Mr. Cuthbert.[155] As discussed already in several places in this Report, Mr. Cuthbert was uncooperative during this call, avoided giving us full answers to our questions, and provided vague information. During the interview, when we asked Mr. Cuthbert about Mr. Bolar, Mr. Cuthbert simply stated that Mr. Bolar is a sports agent and he worked for him years ago when he was in college and law school. Mr. Cuthbert stated that he interned under Mr. Bolar, but that Mr. Bolar had no role in referring clients to Locks. When we told Mr. Cuthbert that we had spoken to Mr. Locks and that Mr. Locks reported that Mr. Bolar referred players to their firm, Mr. Cuthbert went on mute and there was a long pause.[156] When we asked if there was anyone with Mr. Cuthbert on the call, another voice spoke for the first time, saying "Warren Hinds, attorney in Roswell, Georgia."[157] Mr. Cuthbert had not disclosed Mr. Hinds' presence prior to this. Mr. Cuthbert then said that he did not understand the relevance of our questions about Mr. Bolar. We asked Mr. Cuthbert about Mr. Bolar's involvement with Locks, to which Mr. Cuthbert stated that there was no involvement, except that they (Locks) know of Mr. Bolar as a sports agent. When asked whether Mr. Bolar was at any meetings with the Locks firm, Mr. Cuthbert simply said "no," but that Mr. Bolar knew about the meetings. We also asked if Mr. Bolar had sought a financial arrangement with Mr. Locks, to which he simply replied that he did not know.[158]

We followed up with Mr. Cuthbert on 6/17/22 and asked him when he last had any contact, written or verbal, with Mr. Bolar.[159] Mr. Cuthbert, through his new attorney, Manny

---

[155] Exhibit 4.
[156] *Id.*
[157] Online research indicates this attorney is Warren R. Hinds of Warren R. Hinds, P.C. law firm, 1303 Macy Drive, Roswell, GA 30076. Mr. Hinds' website states that his practice areas include legal malpractice and ethics/professionalism. https://www.warrenhindslaw.com/attorney/hinds-warren-r/
[158] Exhibit 4.
[159] Exhibit 2.



Arora,[160] responded simply on 6/27/22: "We spoke on 5/3/22."[161] While we do not know the content of their 5/3/22 conversation, we find it interesting that Mr. Cuthbert had spoken so recently to Mr. Bolar after Mr. Cuthbert had appeared to distance himself from Mr. Bolar during our 3/8/22 interview.

Mr. Cuthbert's explanation of his relationship to Mr. Bolar directly conflicted with the accounts of four different people, all of whom reported that Mr. Cuthbert and Mr. Bolar worked closely together on matters related to the Settlement Program. At no point did Mr. Cuthbert admit to the full extent of his relationship to Mr. Bolar, leaving us to conclude that he was trying to hide this connection from us.

### B. Dr. Amandeep Dhillon's Network Provider Application.

Dr. Amandeep Dhillon is a board-certified neurologist who examined eight of Mr. Cuthbert's clients. She is not a Qualified MAF Physician or a BAP Provider; instead, her examinations were done purportedly to bolster Qualifying Diagnoses. Mr. Cuthbert then submitted Dr. Dhillon's reports to support the Players' claims or appeals of denied claims. On 4/7/21, after we observed that she had examined several of Mr. Cuthbert's Player clients in an apparent expert capacity, Dr. Dhillon submitted a Network Provider Application to become a Qualified MAF Physician.[162], [163] This surprised us because we had not contacted Dr. Dhillon about applying to the Program. Dr. Dhillon's application mentioned prior exams of NFL Players, but it did not identify the Players nor the respective representation of those Players. Dr. Dhillon's application also provided no information about past expert testimony, something that she seemed to be heavily involved in, as online research indicated that Dr. Dhillon primarily practiced in Nevada and had experience serving as an expert witness in legal matters.[164] All documentation we received from Dr. Dhillon in support of Mr. Cuthbert's claims and appeals included a letterhead identifying her practice as Hope Neurological, a clinic in Atlanta, GA, not far from Mr. Cuthbert's office.

Dr. Dhillon's *curriculum vitae* (CV) that she submitted with her application listed her current practice in Nevada even though she applied stating she worked for Hope Neurological in Atlanta, causing us to question where Dr. Dhillon practiced and what relationship she had with Georgia, where Mr. Cuthbert practices.[165] Given the incomplete information in her application, and the fact that we previously observed her working with Mr. Cuthbert, we followed up with Hope Neurological on 4/9/21 to ask how Dr. Dhillon learned of the Program, whether anyone suggested for her to apply, and how many NFL Players Dr. Dhillon had previously examined.[166] We also asked whether the Players she examined were represented by an attorney and to identify

---

[160] Manubir "Manny" Arora of Arora Law Firm, LLC, 75 West Wieuca Road NE, Atlanta, GA 30342. Mr. Arora's biography on his firm's website states that his practice areas include criminal defense and sports law. https://www.thearoralawfirm.com/attorneys-and-staff/manubir-arora/

[161] Exhibit 3.

[162] Exhibit 25.

[163] Exhibit 26.

[164] Exhibit 27.

[165] Exhibit 26.

[166] Exhibit 25.




those lawyers.[167] Hope Neurological responded on 4/12/21 and stated that Dr. Dhillon found out about the Settlement Program online and that she has examined a total of eight patients.[168] They did not fully answer our questions and did not confirm any information about attorney representation.

We again emailed Hope Neurological on 4/12/21 to determine whether anyone suggested Dr. Dhillon apply and for the representation information of Dr. Dhillon's eight prior NFL examinations.[169] Having received no response, we followed up with the same questions on 4/22/21.[170] We received a response on 5/10/21 and stated, "No one suggested for Dr. Dhillon to apply and I don't have attorney information at this time."[171] On 5/14/21 we sent a follow-up email to Hope Neurological and asked them to confirm how long Dr. Dhillon had been with their organization, how long she had been in Georgia and why she started practicing in Georgia.[172] On 5/19/21, the office responded and stated that "Dr. Dhillon has been with us 11 months and she relocated to Georgia from Las Vegas."[173]

On 6/9/21, in an effort to learn more about her qualifications and background, we participated in a Zoom call with Dr. Dhillon, as well as the CEO and Vice President of Hope Neurological. During this call, we learned that Dr. Dhillon moved from Nevada to Georgia for the purposes of participating in the Settlement Program and that she was introduced to it through GreenLink Funding and Mr. Cuthbert. Dr. Dhillon confirmed that the eight Players she examined were Mr. Cuthbert's clients and that she examined them remotely, through telemedicine appointments. Dr. Dhillon also indicated that Mr. Cuthbert followed up with her after her examinations and may have had questions regarding her findings. The Vice President of Hope Neurological later confirmed on a separate call the same day that their practice worked directly with Mr. Cuthbert and opined, interestingly, that some players have previously been misdiagnosed, or had missed diagnoses, because of other doctors' unfamiliarity with their conditions.

We have a copy of emails between Mr. Cuthbert and a different doctor, Dr. Scariano that discuss sending a bill to GreenLink Funding.[174] On 6/17/22, we asked Mr. Cuthbert about his connection to GreenLink Funding.[175] Mr. Cuthbert responded through his attorney on 6/27/22 that this company, which he referred to as GreenLink Solutions, is a third-party funding company that purchases liens from medical service providers.[176] Mr. Cuthbert further explained: "My firm and my clients sign an acknowledgement of the lien re-assignment from the medical service providers to GreenLink for the costs of the medical service and treatment."[177]

---

[167] *Id.*
[168] *Id.*
[169] *Id.*
[170] *Id.*
[171] *Id.*
[172] *Id.*
[173] *Id.*
[174] Exhibit 18.
[175] Exhibit 2.
[176] Exhibit 3.
[177] *Id.*

Given her pre-existing relationship with Mr. Cuthbert and a funding company, as well as her relocation to Georgia and her organization's apparent opinion that diagnoses have been missed, we decided not to pursue Dr. Dhillon as a Qualified MAF Physician candidate.

When we interviewed Mr. Cuthbert on 3/8/22, we touched on his relationship with Dr. Dhillon.[178]  Mr. Cuthbert acknowledged knowing Dr. Dhillon and when asked how he started using her to examine his clients, he stated that Dr. Dhillon worked for Hope Neurology, which he had referred clients to for neurological evaluations.  Mr. Cuthbert denied knowing Dr. Dhillon when she worked in Nevada and said that he knows she is in Georgia currently but that she no longer works for Hope Neurology.  When we asked Mr. Cuthbert if he had recommended Dr. Dhillon to apply as Qualified MAF Physician, Mr. Cuthbert simply replied that Dr. Dhillon decided to apply after learning there was no Qualified MAF Physician in Atlanta, GA.[179]

### C.  Possible Misrepresentations in a Player's Appeal.

As discussed in Section VII of this report, we denied a Player's Monetary Award claim asserting a Qualifying Diagnosis of Alzheimer's Disease on 1/27/21 after the Appeals Advisory Panel Leadership Council determined that the Player's diagnosis was not made in a manner generally consistent with Settlement criteria.[180]  The Player appealed the denial of this claim on 2/26/21 and the Special Masters remanded the claim back to us on 3/2/21.  In support of this Appeal, Mr. Cuthbert submitted an addendum signed by Dr. Scariano, dated 2/23/21, and that we determined was first drafted by Mr. Cuthbert.

The addendum that Mr. Cuthbert drafted in support of the Player's appeal relied heavily on new medical records from a 2/5/21 examination with Dr. Randall Griffith and a 2/16/21 examination with Dr. Dhillon.  Regarding the Player's employment history, Dr. Griffith reported that he (the Player) "decided to retire" from his position as an NFL scout "because [he] did not feel safe any longer behind the wheel."[181]  Similarly, Dr. Dhillon reported simply that the Player retired in 2017 due to "ongoing progressive neuro degeneration."[182]  However, this information directly contradicts the true history of the Player's employment that we had learned well before the appeal when we sent the Player questions pursuant to Section 8.6(b) of the Settlement Agreement.  From those questions and the Player's Employment History Form that he submitted to us, we learned that:

1.  After the Player retired from work as an NFL Scout in 2017, he obtained his Commercial Driver's License on 10/15/18;

2.  The Player worked for three different companies driving commercial vehicles from 2018 to 2020;

---

[178] Exhibit 4.
[179] *Id.*
[180] Richard Shelton (SPID 100013792), Doc ID 232355.
[181] SPID 100013792, Doc ID 233361, page 51.
[182] *Id.* at 11.



3. The Player also worked for the Battlehawks arena football team from March 2019 to February 2020; and

4. The Player participated in a Pro Day scouting event in 2020, where he was tasked with recording completion times for running events.

We found the discrepancies surrounding the Player's employment history particularly concerning because the Player reported quitting his job as an NFL Scout due to difficulty driving, yet he then went on to obtain his CDL and work for several companies as a commercial driver. On 4/27/21, pursuant to Section 8.6(b) of the Settlement Agreement, we sent the Player additional questions, asking him to explain the discrepancies we observed and whether he reported to Drs. Griffith and Dhillon that he obtained a CDL, worked as a commercial driver for three companies, and worked with the Battlehawks. The Player did not offer any explanation for why Drs. Griffith and Dhillon did not discuss this work and provided only the same, general response, much as he did before: that he reported and discussed his full employment history with the doctors. While we gave the Player the opportunity to explain the discrepancies in his work history, his answers were incomplete and unhelpful. It is worth noting here that we have observed at least three other clients of Mr. Cuthbert's who provided similar responses to our employment-related questions. In each of these cases, we observed some level of employment or volunteer activities that was not discussed by the healthcare providers in their reports. When questioned as to whether they reported this information, the Players all simply stated or affirmed that they discussed the activities in question or their full employment history with the providers.

Because the records from Drs. Griffith and Dhillon, which contain the inaccuracies regarding the Player's post-2017 work history, were submitted in support of the Player's appeal and directly conflicted with what the Player previously reported to us, we also reached out to Mr. Cuthbert. We pointed out the inconsistent information regarding the Player's work history and asked Mr. Cuthbert to explain the steps he took to verify the accuracy of the records submitted on appeal. In response, Mr. Cuthbert stated:

> I review documents. Also, I have my clients review for grammar and accuracy. My clients verify the accuracy of the report because they are the actual patients who interact with the doctors and I'm not at any of the doctor evaluations. If my clients approve the final reports, I submit as exhibits.[183]

In a 3/10/21 public Decision, the Special Master reiterated that "Counsel must take reasonable steps to verify the accuracy of Claims made in their filings, especially when relying on Claimants whose memory may be fading."[184] In this case, Mr. Cuthbert did not meet this standard. The records Mr. Cuthbert submitted on appeal clearly presented a conflict with the information previously provided by the Player as a part of his Claim Package. The discrepancies are easily identifiable in reviewing the documents and indicate that Mr. Cuthbert did not take reasonable steps to verify the accuracy of the information he submitted.

---

[183] SPID 100013792, Doc ID 235531, page 1.
[184] https://www.nflconcussionsettlement.com/Docs/functional_impairment_sm_2.pdf



During our 3/8/22 interview with Mr. Cuthbert, we revisited this issue. When asked again what steps he takes to verify information in response to Players' audit inquiries, and whether those practices have changed at all, Mr. Cuthbert stated that he just tells his clients to be accurate and truthful. When we asked if he just takes his clients at their word, he replied that he does and that he relies on his clients (to provide accurate information) and relies on doctors to provide reports.

## XI. ATTEMPTS TO RESOLVE THE ISSUES.

The issues that we have discussed in this Audit Report call into question Mr. Cuthbert's character, motivations, and relationship with the Program. As we considered issues we were observing, we tried to address these concerns with Mr. Cuthbert instead of issuing a Rule 15 Report of Adverse Finding in Audit. Our proposal was that going forward, he work closely with another lawyer who represents Settlement Class Members and who is knowledgeable about the Program. The intent of this approach was for Mr. Cuthbert to improve his practices and re-establish a trusted relationship with us.

### A. Opportunity to Resolve Issues.

To give Mr. Cuthbert an opportunity to review our findings and help facilitate our discussion and proposal, we provided him a draft of our Audit Report on 9/14/22. We asked him to let us know once he had reviewed the draft so that we could set up a time to discuss.

On 9/29/22, we spoke with Mr. Cuthbert and his lawyer, Mr. Arora. We explained that we were looking for a solution that would eliminate the need to issue the Audit Report and the accompanying Audit Proceeding. We further explained that we would like for Mr. Cuthbert to consult with and associate with a lawyer who has experience with Claims in the Program and that while we do not recommend lawyers, we suggested we could offer the names of lawyers with such experience. Mr. Arora indicated that the proposal was reasonable and that they would contact any lawyers whose names we give them. We agreed that we would hold off on issuing the Audit Report but that we expected progress on our proposal within 30 days. That same day, we provided Mr. Arora with the names of two lawyers with extensive Program experience and reiterated that we wanted to keep in touch to make the solution work. Our impression after the call with Mr. Cuthbert and Mr. Arora was that it went well, and we were hopeful that we had made significant progress. On 10/4/22, Mr. Arora acknowledged that he received the attorneys' names and stated that he was reaching out to them.

While we awaited an update from Mr. Arora on the status of their communications with another lawyer, we also continued processing Mr. Cuthbert's claims, which included the exclusion of certain third-party affidavits and review by the AAPLC for claims that relied on PET scans (that we determined were unreliable). In addition, we concluded our Audit Investigations of six of Mr. Cuthbert's clients' claims. In our Notices of Concluded Audit that we issued to these Players, we explained (where applicable), that we determined that some of the information submitted in support of the claim was unreliable and that we would incorporate those findings into our reviews. On 10/12/22, we provided Mr. Arora with an update on the claims we removed from Audit.



**B. Mr. Cuthbert's Apparent Rejection of Our Proposal.**

On 10/20/22, while still waiting for an update from Mr. Arora or Mr. Cuthbert on their recruitment of another lawyer with whom to work, we made a surprising discovery in the Claim Packages of two of Mr. Cuthbert's clients. On 10/19/22, Mr. Cuthbert uploaded to the Claim Packages a "Request for Review of Supplemental Medical Evidence," in which he argued that Dr. Eber's PET scan report supports an Alzheimer's Disease Qualifying Diagnosis.[185] Although these documents are formatted as Court filings, they were not actually submitted to the Court. Mr. Cuthbert explained in this submission that he sought a second opinion of 3T's PET scan images from a "board certified radiologist" with "certifications in amyloid pet scan imaging," Dr. Timothy Dineen. Mr. Cuthbert argued that, like Dr. Eber, Dr. Dineen determined there is "excessive amyloid beta on the claimants brain." Mr. Cuthbert also included a report from Dr. Dineen (we discuss Dr. Dineen's reports in much greater detail in Section XII). These submissions by Mr. Cuthbert confused us because we had not heard anything from him about his retention of another lawyer to guide him in the Program, and he seemed to be taking an approach that was inconsistent with our 9/29/22 discussion.

On 10/27/22, still having heard of no update from Mr. Arora or Mr. Cuthbert on their recruitment of another lawyer with whom to work, we followed up with Mr. Arora and asked to schedule a follow-up conversation with Mr. Cuthbert to discuss the progress of that activity and to better understand the submission of the new records from Dr. Dineen. Mr. Arora agreed to a call on 11/7/22. However, when he joined the call, Mr. Arora was not accompanied by Mr. Cuthbert, and we rescheduled for 11/9/22.

When we spoke on 11/9/22, Mr. Cuthbert explained that he sought a second opinion on Dr. Eber's reports - just as we did - and because he does not agree with our findings. It became apparent during the call that Mr. Cuthbert intended to challenge the findings in the draft Audit Report, despite our earlier conversation on 9/29/22. On the subject of their attempts to contact an experienced lawyer to work with in the Program, Mr. Arora informed us that "they did not see eye to eye" with the two lawyers whose names we offered them and instead had been in contact with Rod Edmond, who they stated was experienced in class action matters.[186] Mr. Arora explained that Mr. Edmond would make sure things are "cleaned up." This surprised us, as we believed that Mr. Cuthbert had agreed to contact and work with one of the lawyers whose names we provided, or at least someone knowledgeable with the Program, and that taking a different approach was unacceptable.

After our discussion, we realized that Mr. Cuthbert was resisting our attempts to resolve the concerns with his claims. After further consideration, on 12/16/22, we emailed Mr. Arora and Mr. Cuthbert and informed them that we were resuming the Audit Investigation of claim submissions by Mr. Cuthbert's firm. Then, on 1/31/23, Mr. Edmond emailed us to suggest that

---

[185] Mr. Cuthbert submitted the first of these filings on 10/17/22 for Bobby Abrams (SPID 100000021). While the content of this initial filing is similar to that of the 10/19/22 (and subsequent) submissions, he entitled this first document "Request for Enforcement of Monetary Award."

[186] Roderick Edmond is a Trial Attorney with Edmond & Lindsay, LLP, an Atlanta, GA based law firm. https://www.med-malpracticeattorney.com/attorneys



he has been meeting with Mr. Cuthbert for the past four to six months, that Mr. Cuthbert asked his firm "to assist him in moving his NFL CTE claims through the process", and that Mr. Cuthbert "was transparent about him being reprimanded for allegation of him being too aggressive in his communications with experts and questions about the veracity of the PET scans that supported his cases," but also asked that "there may be more information that you all want to share with me about this situation.[187] Mr. Edmond's 1/31/23 email also requested a brief Zoom call with us "within the next few days."[188] Since it was not apparent, we emailed Mr. Edmond on 2/3/23 to ask whether he had reviewed the draft Audit Report that we shared with Mr. Cuthbert on 9/14/22. As of the issuance of this Report, we have not received any additional communications.

## XII. DR. DINEEN'S UNRELIABLE PET SCAN REPORTS.

Mr. Cuthbert's defense of Dr. Eber's PET scan findings, which he has argued are valid even in the face of the Program's findings, rest on "second opinion" reads of the 3T PET scan images by Dr. Timothy Dineen. We felt we needed to contact Dr. Dineen to learn more about his qualifications and second opinion reads, which we have learned are based on incorrect interpretation and analysis and cannot be relied upon.

Dr. Timothy E. Dineen has been Chief Medical Officer and Partner of National Radiology Solutions (NRAD) from 2013 to present, according to his LinkedIn profile.[189] Dr. Dineen's biography on the NRAD website lists his title as Founding Physician Partner & Chief Medical Officer and states: "Dr. Dineen is the founding physician member of our team of radiologists."[190] The biography lists 17 states in which he is purportedly licensed.[191]

Dr. Dineen's NRAD biography and LinkedIn profile both state that he is board certified with the American Board of Radiology (ABR) and the American Board of Nuclear Medicine (ABNM).[192] We have confirmed that he is certified in Diagnostic Radiology by the ABR.[193] However, after we were unable to verify online that he is certified by the ABNM, we called Dr. Dineen on 2/1/23 to ask him directly. Dr. Dineen admitted to us that he is not currently board certified by ABNM, that his certification expired over 10 years ago (he estimated this occurred around 2010) and that he never renewed it. While we find it concerning that Dr. Dineen's NRAD biography and LinkedIn profile falsely state that he is currently board certified with ABNM, he did not list this certification on any of his reports submitted to the Settlement Program.

---

[187] Exhibit 28.
[188] *Id.*
[189] https://www.linkedin.com/in/drdineenmd/
[190] https://www.nradsolutions.com/leadership-team/timothy-e-dineen-md
[191] *Id.* The 17 states listed in Dr. Dineen's online NRAD biography are Alabama, Alaska, California, Delaware, Florida, Georgia, Indiana, Kentucky, Maryland, Michigan, Missouri, New York, North Carolina, Ohio, Pennsylvania, South Carolina, and Tennessee. In our research of online state licensing databases, we were able to verify active licenses in 14 of these states as of 1/31/23.
[192] https://www.nradsolutions.com/leadership-team/timothy-e-dineen-md; https://www.linkedin.com/in/drdineenmd/.
[193] https://www.theabr.org/myabr/find-a-radiologist?fn=Timothy&ln=Dineen&st=



While Dr. Dineen's LinkedIn lists NRAD's address as Richmond, Kentucky, NRAD's website lists its address as Winter Garden, Florida.[194] Dr. Dineen's NPI (National Provider Identifier) is 1316992530.[195] He received his M.D. degree from the University of Kentucky College of Medicine in 1989;[196] completed a residency program in Diagnostic Radiology at the University of Kentucky Chandler Medical Center in 1993, and completed a fellowship program in Nuclear Medicine at the same facility in 1994.[197]

As of the issuance of this Audit Report, Mr. Cuthbert has submitted Dr. Dineen's second opinion reads on behalf of 12 Players. In each of these submissions, Dr. Dineen's overall conclusion agrees with Dr. Eber's that the 3T PET scan images are "positive."

## A. <u>Conversations with NRAD and Dr. Dineen</u>.

We first reached out to NRAD on 9/14/22 and spoke to Daniel, who did not provide his last name but identified himself as NRAD's Operations Supervisor. We explained that we had received a report from Dr. Dineen in support of Clarence Jones' (SPID 950007603) Claim and we wanted to send Dr. Dineen some questions about his report. Daniel told us that he "needed to check with his team" and to call him back in 30 minutes. When we called back, Daniel told us that because the report we received was a "read" done for a law office, all questions must go through the attorney who requested the "read," that the request must come from the attorney, and that NRAD will not accept requests from anyone else. He shared the attorney's name, Byron Cuthbert, but did not provide any further information.

We then called NRAD back on 9/19/22 and again spoke with Daniel, who told us that he had spoken to Caleb Bryant, NRAD's Director of Business Development and the main point of contact with Mr. Cuthbert. According to Daniel, Mr. Bryant told him that Mr. Cuthbert advised that all requests for information must go through him (Mr. Cuthbert). Daniel told us he does not know how many "second reads" NRAD has done for Mr. Cuthbert and noted that it was a "new venture" for them. He shared that Dr. Dineen is a radiologist and the main PET scan reader at NRAD and that Dr. Dineen is also a founding partner of the company which started around 2013.

Then we talked to Mr. Bryant on 9/20/22. He provided more details on NRAD and its review process. Mr. Bryant told us that NRAD was founded about ten years ago by Robb Kolb, a radiology industry veteran, and that the company employs 35 doctors across several states and offers both on-site and teleradiology services. Dr. Dineen is a founding partner and has a minority share in the company. Mr. Bryant then explained that Mr. Cuthbert mailed the DICOM images to NRAD on discs, that the images were subsequently uploaded into their PACS[198]

---

[194] *Id.*
[195] https://npiregistry.cms.hhs.gov/provider-view/1316992530.
[196] https://www.linkedin.com/in/drdineenmd/
[197] *Id.*
[198] Picture Archiving and Communication System. *See* https://pubs.rsna.org/doi/10.1148/radiographics.12.1.1734458: "Electronic picture archiving and communication systems (PACS) have been developed in an attempt to provide economical storage, rapid retrieval of images, access to images acquired with multiple modalities, and simultaneous access at multiple sites."



system, and then read by Dr. Dineen using MIM[199] software and assessed using the RCTU scoring system.

As we have since learned, the Regional Cortical Tracer Uptake (RCTU) / Brain Amyloid Plaque Load (BAPL) scoring system is of particular importance when evaluating the sufficiency of Dr. Dineen's reports.  According to an article published on the National Library of Medicine website:

> F-florbetaben PET images are read in a transaxial orientation using a gray scale.  The reader [the person reading the images] should compare the cortical gray-matter signal intensity to the maximum white-matter signal intensity in a systematic manner, starting at the cerebellum and scrolling up through the lateral temporal and frontal lobes, then to the area of the posterior cingulate cortex and precuneus, and finally to the parietal lobe.  Interpretation of the images is made visually comparing the activity in cortical gray matter with activity in adjacent cortical white matter. Each of these brain regions—lateral temporal cortex, frontal cortex, posterior cingulate cortex/precuneus, and parietal cortex—should be systematically visually assessed and scored according to the RCTU and BAPL scores.  The RCTU scoring system grades the tracer uptake in each of the above regions as 1 = no binding, 2 = minor binding, and 3 = pronounced binding. The RCTU scores for the frontal cortex, posterior cingulate cortex/precuneus, lateral temporal cortex, and parietal cortex are then condensed into a single three-grade scoring system for each PET scan; the BAPL score: 1 = no β-amyloid load, 2 = minor β-amyloid load, 3 = significant β-amyloid load. BAPL scores of "1" are classified as "β-amyloid-negative PET scan", and BAPL scores of "2" and "3" as "β-amyloid-positive PET scan."[200]

We then tried repeatedly to schedule an interview with Dr. Dineen through Mr. Bryant, but our requests were ignored.  We finally reached Dr. Dineen by phone on 10/28/22.  He told us that he has been board certified in nuclear medicine since 1993.  He further explained that his experience with reviewing DICOM images for amyloids dates back about five or six years as radiopharmaceuticals have dramatically improved.  Dr. Dineen informed us that he has never had any contact with Mr. Cuthbert and that when Mr. Bryant asked him to perform the second reads, he said he agreed only after being assured that he would not be involved in any legal proceedings related to the Settlement Program.

Dr. Dineen told us he does not know how NRAD procured the DICOM images he reviewed for Mr. Cuthbert and stated that all he knows is they were uploaded into NRAD's PACS system and he performed a "blind review using ERAD software."[201]  The demographic information about the patient, technique, and the procedure from the PET scan was already pre-populated into the report template he received through PACS, but the impressions and findings from the first (Dr. Eber's) report were excluded.  Dr. Dineen told us that he never reviewed Dr. Eber's initial report either before, during, or after conducting his second read, so he had no idea

---

[199] MIM Software Inc. is a company based in Beachwood, Ohio. *See* https://www.mimsoftware.com/.
[200] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4339690/
[201] Online research shows that eRAD is an imaging technology company based in Greenville, South Carolina. *See* https://erad.com/.



if his findings differed from Dr. Eber's. Dr. Dineen estimated he has done at least 25 second reads for Mr. Cuthbert.

During our interview, Dr. Dineen confirmed that he used the RCTU/BAPL scoring method, although he could not recall the specifics of that system. When we talked, Dr. Dineen was unable to remember whether the scoring system was based on a scale of "0, 1, 2" or "1, 2, 3" and only advised that the lowest number reflected a "normal" brain while the middle number (1 or 2) was indicative of "some" or "moderate" deposition of amyloids, while the highest number (2 or 3) correlated with a "severe" deposition of amyloids. In performing his reads, Dr. Dineen said he separately graded amyloid deposition in each individual region of the brain and noted those scores. The overall score for the patient was based on the highest score given. For example, if the patient had three normal scores and one abnormal score then the overall score for the patient would be the abnormal score.

We have since learned that Dr. Dineen incorrectly applied the RCTU/BAPL scoring system in his analysis of the 3T PET scan images, as discussed in Section XII.C. It is not as surprising to us now then that Dr. Dineen told us in our interview that he could not recall the specifics of the RCTU/BAPL scoring method.

**B. AAPLC Review of Dr. Dineen's Reports.**

After our talks with NRAD, we were left wondering how, if at all, Dr. Dineen's reviews may affect the Qualifying Diagnoses for Mr. Cuthbert's clients. Because Mr. Cuthbert's submission of "Requests for Review of Supplemental Medical Evidence" introduced these additional records from Dr. Dineen, we needed AAPLC review of the new records. On 11/18/22, we shared Dr. Dineen's reports on eight Players with the AAPLC who had been reviewing Mr. Cuthbert's Alzheimer's claims and the PET scan reports from Dr. Eber. For three of the eight Players, we also requested AAPLC review of additional medical records that we had received from Medici Spine & Pain.[202]

However, shortly before we received his analysis on this group, on 12/20/22, the AAPLC alerted us to "multiple red flags for potential misconduct" associated with Dr. Dineen's second read for one of Mr. Cuthbert's clients, whose claim had been remanded to us by the Special Master after Mr. Cuthbert's appeal of the Notice of Denial of Monetary Award Claim.[203] In this case, Dr. Dineen submitted both an initial report dated 7/15/22 and a revised "Addendum" report dated 9/27/22.[204] The AAPLC noted that the July 2022 report from Dr. Dineen, with a date of service in March 2021, concerned him for a variety of reasons. Most notably, AAPLC noted that "Dr. Dineen's initial report provided three RCTU scores of 0 and one score of 1, which he interpreted as 'positive.' The AAPLC noted that this interpretation "raises serious questions about the training and qualifications of the interpreting physician for rating florbetapen scans because RCTU scales do not include a rating of 0." In conclusion, the AAPLC

---

[202] Drs. Leong and Dosanjh of Medici Spine & Pain were listed as referring physician on most of the PET scan reports from Dr. Eber that Mr. Cuthbert submitted.
[203] Clarence Jones (SPID 950007603).
[204] SPID 950007603, Doc IDs 268164 and 271584.



recommended, at a minimum, an over-read by the NM Consultant who had previously reviewed Dr. Eber's findings.

On 12/27/22, the AAPLC provided feedback on the new records from Medici Spine & Pain and Dr. Dineen for the eight players in our 11/18/22 request and confirmed that in no case did the additional materials change his initial determination. The AAPLC stated about Dr. Dineen's records:

> Importantly, the PET scan over-reads by Dr. Dineen seem to include a recurring technical issue that undermines their reliability. He uses the RCTU scoring system which, to the best of my knowledge is not appropriate for use on scans conducted with the Amyvid (florbetapir) tracer. It is used with a different tracer, Neuraceq (florbetapen). A nuclear medicine expert should review the appropriateness of his methods.[205]

**C. <u>Nuclear Medicine Consultant Analysis</u>.**

On 12/29/22, we shared ten "second read" reports from Dr. Dineen, along with the notes from our call with him, with the NM Consultant who had previously reviewed Dr. Eber's findings.[206] On 1/29/23, the NM Consultant finished her review and provided us with a summary of her observations regarding Dr. Dineen's second reads. She first explained that while Dr. Dineen agreed with all of Dr. Eber's overall conclusions that the Players' PET scan images were positive, there was not "complete agreement" between the two on the specific areas of the brain affected by Amyloid deposition. She further explained that there may be variability in interpretation between readers and that "using a Standardized Uptake Value ratio (SUVr) can assist in arriving at a final diagnosis in cases that may be borderline between positive and negative or when secondary factors such as atrophy, blurry images, or patient motion can affect the interpretation."

The NM Consultant then addressed what the AAPLC had also identified: that there are different criteria for interpretation of PET scan images depending on the radiotracer that was used to capture the images. The NM Consultant stated:

> The scans reviewed by reader 1 (original reports) [Dr. Eber] and reader 2 (second opinion) [Dr. Dineen] were performed with different amyloid tracers. The criteria for amyloid PET image interpretation differs between radiotracers. The FDA or EMA guidelines are specific for a given amyloid tracer for the number of affected cortical regions required to define a "positive" scan. The SNMMI/EANM periodically defines new standards/guidelines for nuclear medicine practice. Currently, there are three tracers approved by both the US and the European authorities -18F-florbetapir (Amyvid), 18F-flutemetamol (Vizamyl), and 18F-florbetaben (NeuraCeq).[207]

---

[205] Exhibit 29.
[206] These ten were all of the Dr. Dineen reports we had received on Players for whom the NM Consultant had previously reviewed Dr. Eber's PET scan reports and accompanying DICOM images.
[207] Exhibit 30.



Then the NM Consultant pointed out that Dr. Dineen, in his interpretation of the images, used the wrong criteria in eight out of ten cases:

> Reviewing the second reader's reports, reader 2 [Dr. Dineen] follows the interpretation of the images recommended for 18F-florbetaben (NeuraCeq™) for all the cases when only two of the ten patients were performed with 18F-florbetaben as documented in the original reports. Therefore, the final assessment is inconsistent with the manufacturer's guidelines. Specifically, three cases were interpreted as positive scans. In 3/10 cases, only one region was involved, which did not reach the criteria for a positive scan based on the manufacturer's recommendations.[208]

The NM Consultant also confirmed that after reviewing each of the cases again, she did not feel that the images were "consistent with a positive scan" based on her experience performing visual assessments and using the SUVr.

As we reviewed the NM Consultant's findings on Dr. Dineen, we felt in many ways that we were having a repeat situation similar to Dr. Eber. The NM Consultant confirmed that Dr. Dineen employed an incorrect scoring system in his analysis of the 3T PET scan images and we are left to conclude that his second read reports are unreliable and not an accurate interpretation of the images. And it is on these highly questionable second reads that Mr. Cuthbert has created his defense of Dr. Eber's work.

## XIII. MATERIALITY.

Rule 12(c) of the Rules Governing the Audit of Claims states that a "fact is material if it did affect or has any potential to affect whether the Settlement Class Member qualifies for a Monetary Award, Supplemental Monetary Award or Derivative Claimant Award and/or the amount of such award in favor of the Settlement Class Member under the provisions of the Settlement Agreement."[209]

This Audit Investigation has shown that Mr. Cuthbert established his approach to the Settlement Program using and relying on PET scan reports from Dr. Eber that are overwhelmingly unreliable and a misrepresentation of the facts. Mr. Cuthbert promoted the positive PET scan reports as proof of Alzheimer's Disease, which certainly had the potential to affect, and did affect, his clients' Qualifying Diagnoses. Even when presented with our findings that Dr. Eber's conclusions were unfounded, and given the opportunity to remedy the situation, Mr. Cuthbert pushed back and sought another opinion from Dr. Dineen. As with Dr. Eber, we found that Dr. Dineen's conclusions were based on faulty interpretation methods and cannot be relied upon.

In addition, Mr. Cuthbert's attemots to have Diagnosing Physicians change their opinions or decisions on a Player's diagnosis certainly had the potential to affect their award. Similarly, his drafting of medical records to be used to support an appeal and his drafting of third-party

---

[208] *Id.*

[209] https://www.nflconcussionsettlement.com/Docs/NFL_Rules_Governing_the_Audit_of_Claims.pdf



affidavits are quite concerning. The third-party affidavits that Mr. Cuthbert drafted and then supplied to affiants contained language that was not in any way unique to each Player. Mr. Cuthbert's drafting of a medical record is also inexcusable. There is perhaps no better example of "putting words in their mouth" than the tactics Mr. Cuthbert has used.

These documents, which are meant to be an objective opinion from an independent source, are reviewed by us, various Program doctors, and members of the AAP, and certainly play into the outcome of a Player's claim. And, if the AAPLC's opinion that Mr. Cuthbert did in fact coach his clients on how to perform during examinations is in fact true, this guidance is something that can never be "forgotten" and has a lasting impact on the integrity of the Program.

On 9/29/22, after our discussion with Mr. Cuthbert and Mr. Arora, we believed that we had reached a solution, or at least taken steps in a positive direction to fix the situation for the benefit of the Program. But Mr. Cuthbert chose an entirely different path. Instead of working with us, he worked to further entrench his unsupportable position, and this has placed an extra and unnecessary burden on the Program.

## XIV. CONCLUSION.

Through his interactions with the Program, Mr. Cuthbert has displayed a pattern of questionable behavior that has placed an unnecessary burden on Qualified MAF Physicians, Program experts, and the Claims Administrator. The evidence we have obtained shows that Mr. Cuthbert orchestrated a process designed to manipulate the judgment of Diagnosing Physicians by attempting to influence their decisions and professional judgment, based largely on PET scan reports that we have determined are unreliable. Mr. Cuthbert knew these reports to be unreliable yet continued to present them as the "ticket" to a Qualifying Diagnosis of Alzheimer's Disease, even when his clients had already received a Qualifying Diagnosis of Neurocognitive Impairment. Further, Mr. Cuthbert questioned medical professionals and pressured Program doctors to change their diagnoses, drafted a medical record under a doctor's name, prepared third-party affidavits that included specific language that was not actually unique to the Players, and based on expert AAPLC opinion, possibly coached his clients on how to perform during their exams.

When presented with our findings, Mr. Cuthbert led us to believe that he was open to working with us and pursuing a solution to the issues. That does not appear to be the case, however, as his most recent actions in this Program seem to confirm our concerns. We find ourselves with no other option than to issue this Audit Report.



## XV. EXHIBIT INDEX.

| Exhibit | Title |
|---|---|
| 1 | 3/11/20 Settlement Program Email to Dr. Eber |
| 2 | 6/17/22 Questions to Mr. Cuthbert |
| 3 | 6/27/22 Letter from Manny Arora |
| 4 | 3/8/22 Byron Cuthbert Call Notes |
| 5 | 1/7/22 Byron Cuthbert Response to Questions |
| 6 | 8/28/20 Byron Cuthbert Response to Questions |
| 7 | 5/17/22 Byron Cuthbert Response to Questions |
| 8 | 3/2/21-3/3/21 Dr. Weber Emails to Settlement Program |
| 9 | 12/10/20-3/12/21 Emails between Byron Cuthbert and Dr. Weber |
| 10 | 3/15/21 Byron Cuthbert Email to Dr. Weber |
| 11 | 3/15/21-4/27/21 Emails between Byron Cuthbert and Settlement Program |
| 12 | 1/10/21 AAPLC Opinion |
| 13 | 8/13/20 Questions to Byron Cuthbert |
| 14 | 6/26/22 AAPLC Email to Settlement Program |
| 15 | 3/11/21 Settlement Program Email to Dr. Scariano |
| 16 | Feb.-Mar. 2021 Email Threads between Dr. Scariano and Mr. Cuthbert |
| 17 | 4/6/21 Settlement Program Email to Dr. Scariano |
| 18 | 4/23/21 Dr. Scariano Email to Settlement Program with Attached Emails & Draft Addendum |
| 19 | Shawna Davis Call Notes |
| 20 | Christopher Jeffries Call Notes |
| 21 | Tiffany Bell Call Notes |
| 22 | Brenda Vertison Call Notes |
| 23 | Michael Hocter Call Notes |
| 24 | Claude Roney Call Notes |
| 25 | 4/7/21-6/2/21 Emails between Hope Neurological and Settlement Program |
| 26 | Dr. Dhillon Network Provider Application with Curriculum Vitae |
| 27 | Dr. Dhillon SEAK Expert Witness Directory Listing |
| 28 | 1/31/23 Roderick Edmond Email to Settlement Program |



## XV. EXHIBIT INDEX.

| Exhibit | Title |
|---|---|
| 29 | 12/27/22 AAPLC Review of Dr. Dineen Reports |
| 30 | 1/29/23 Nuclear Medicine Consultant Analysis |

**Exhibit 1: 3/11/20 Settlement Program Email to Dr. Eber**

**From:** [redacted]
**Sent:** Wednesday, March 11, 2020 10:29 AM
**To:** rx@3tradiology.com
**Subject:** NFL Concussion Settlement - Questions for Dr. Eber

3T Radiology & Research,

My name is [redacted]. I work for the Claims Administrator of the NFL Concussion Settlement Program. To ensure the integrity of the Program, we are auditing claims from certain Retired NFL Football Players. In the course of our audit investigation, we found that some players were examined by Dr. Daryl Eber. We have questions for Dr. Eber and ask that he respond no later than **3/26/2020**. His timely responses to our questions will help us move forward with our audit of these claims and we greatly appreciate your help.

Here are our questions for Dr. Eber:

1. How did you first become involved in examining Retired NFL Football Players for the NFL Concussion Settlement Program?
2. Who first contacted you about examining Retired NFL Football Players? Who all has referred Retired NFL Football Players to you for evaluation?
3. How many Retired NFL Football Players have you examined?
4. What tests have you administered to the Retired NFL Football Players you examined?
5. Have you relied on, reviewed, or otherwise used any testing results from other providers as a part of your examinations of Retired NFL Football Players? If so, whose records did you use? In what ways did you rely on them? Who gave you those reports or records?
6. Who drafted your radiology reports for the Retired NFL Football Players you examined? Did anyone ask you to change anything in your reports? If yes, who was that person, what did he or she ask you to change, and why?
7. Have you had any contact with any lawyer or representative of a law firm about doing exams of Retired NFL Football Players? If so, please provide the names of these

lawyers or law firms and describe in detail the nature and content of your communications.

8. Do you have any arrangements or agreements with any lawyers or law firms related to your examination of Retired NFL Football Players?
9. Where did you conduct your exams of Retired NFL Football Players?
10. On average, how long did each of your exams take?
11. Who paid for the exams you administered to Retired NFL Football Players?
12. Other than the Retired NFL Football Player, who else was present at these exams?
13. What is your affiliation with Dr. Julie Swartzbard?

Pursuant to Rule 10 of the Rules Governing the Audit of Claims adopted by the Special Masters appointed by the federal court overseeing this Settlement, any request for information from us has the force and effect of a subpoena under Rule 45 of the Federal Rules of Civil Procedure. You must respond to these questions and provide all information and documents requested in detail. If you do not understand a question for some reason, then contact us and we will explain. If you fail to respond in full to these questions within 15 days, the Monetary Award claims subject to this Audit investigation will be held until complete information and documents are provided. Objections and incomplete answers can lead to the denial of the claims.

This request is confidential. You may not discuss this request with any other parties, unless necessary to provide complete answers. Additionally, pursuant to Audit Rule 9, you must preserve all information and records related to the claims from the Retired NFL Football Players you evaluated.

Please let me know if you have any questions. Thank you.



*This electronic mail is intended to be received and read only by certain individuals. It may contain information that is privileged or protected from disclosure by law. If it has been misdirected, or if you suspect you received this in error, please notify me by replying and then delete this message and your reply. These restrictions apply to any attachment to this email.*

**Exhibit 2: 6/17/22 Questions to Mr. Cuthbert**

**From:** [redacted]
**To:** byron cuthbert
**Cc:** warrenhindslaw@gmail.com
**Subject:** RE: NFL- Byron Cuthbert and Associates, LLC
**Date:** Friday, June 17, 2022 12:23:03 PM

Mr. Cuthbert:

Thank you for responding to our 5/17/22 questions. We have a few additional points of clarification that we are hoping you can help us with.

1. Please confirm if you ever sought a second opinion of Dr. Eber's interpretation of PET scan images. If so, how many times did you seek a second opinion? Why did you seek a second opinion? What was the result of that additional review?

2. In your 5/18/22 response to our questions, you stated that you stopped using 3T Radiology & Research "later in 2021" when you learned of other facilities that provided PET scans. What other facilities are you referring to? How many of your clients have had PET scans from these facilities?

3. We spoke with Dr. Eber on several occasions in February 2022. He informed us that an individual from a lawyer's office told him not to speak with us and that he was communicating with "other guys" who told him that we were "distorting the truth." Do you have any idea who Dr. Eber is referring to or who he was communicating with at this time?

4. Please provide more information on your relationship to GreenLink Funding. Describe any arrangements or agreements you have with that company related to the Settlement Program.

5. When was the last time you spoke with Humberto Carrion, either as a representative or employee of 3T or in an individual capacity? Do you know if Mr. Carrion still works for or with 3T?

6. We obtained medical records from Medici Pain & Spine for 14 Players you represent. The reports from this facility list "Med Legal: BYRON CUTHBERT" in the Insurance section. When we spoke on 3/8/22, you denied any connection to Dr. Casey Leong or Dr. Sonny Dosanj. Please confirm if you had any arrangement or agreement with Medici Pain & Spine, Dr. Casey Leong, or Dr. Sonny Dosanj to examine your clients. Why did you choose these doctors to examine your clients?

7. Eight of the reports we received from Medici Pain & Spine contain a copy of Dr. Eber's PET scan report. Did you provide this report to Drs. Leong or Dosanj or was it sent to them by 3T?

8. When was the last time you had any contact, written or verbal, with Terry Bolar?

9. During our 3/8/22 call, you indicated that you may have email communications in which

you instructed third party affiants who were completing a sworn statement on behalf of a Player to "make their own edits" to their statements.  Please produce copies of these email communications.

Thank you,



**ARORA LAW FIRM, LLC**
TRIAL ATTORNEYS
75 West Wieuca Road NE · Atlanta, Georgia · 30342
(O) 404.609.4664· (F) 404.865.3525 · manny@arora-law.com

27 June 2022

**VIA E-Mail**

[redacted]
Brown Greer PLC
250 Rocketts Way
Richmond, VA 23231

**Re: Byron Cuthbert – Response to Auditor Questions from 6/17/22**

Dear [redacted]:

I am writing to answer the questions posed in your 6/17/22 email. Mr. Cuthbert's replies to the questions are as follow:

1. Please confirm if you ever sought a second opinion of Dr. Eber's interpretation of PET scan images. If so, how many times did you seek a second opinion? Why did you seek a second opinion? What was the result of that additional review?

   **Answer:** Dr. Julie Schwartzbard originally referred me to 3T Radiology & Research ("3T") to have the imaging completed for my clients. Dr. Eber was conducting the imaging of my clients at 3T. After she reviewed the images, she requested that I get a second opinion for certain readings (6) completed by Dr. Eber. There were 2 positive results from the second opinions. Only one of the two positive results has had a claim submitted to date. The negative results were not submitted.

2. In your 5/18/22 response to our questions, you stated that you stopped using 3T Radiology & Research "later in 2021" when you learned of other facilities that provided PET scans. What other facilities are you referring to? How many of your clients have had PET scans from these facilities?

   **Answer:** Due to similar costs for conducting the PET scans being available in Atlanta, I began using Emory University Hospital. I have had approximately 10 clients scanned at Emory.

3. We spoke with Dr. Eber on several occasions in February 2022. He informed us that an individual from a lawyer's office told him not to speak with us and that he was communicating with "other guys" who told him that we were "distorting the truth." Do you have any idea who Dr. Eber is referring to or who he was communicating with at this time?

Case: 24-1910 Document: 33 Page: 173 Date Filed: 09/11/2024

**ARORA LAW FIRM, LLC**
TRIAL ATTORNEYS
75 West Wieuca Road NE · Atlanta, Georgia · 30342
(O) 404.609.4664· (F) 404.865.3525 · manny@arora-law.com

**Answer:** I do not know to whom Dr. Eber was referring.

4. Please provide more information on your relationship to GreenLink Funding. Describe any arrangements or agreements you have with that company related to the Settlement Program.

   **Answer:** GreenLink Solutions is a third-party funding company that purchases liens from medical service providers. The use of third-party funders is common in the legal field for Personal Injury claims. My firm and my clients sign an acknowledgement of the lien re-assignment from the medical service providers to GreenLink for the costs of the medical service and treatment.[1]

5. When was the last time you spoke with Humberto Carrion, either as a representative or employee of 3T or in an individual capacity? Do you know if Mr. Carrion still works for or with 3T?

   **Answer:** The last time I spoke to Humberto Carrion was in January 2022. I do not know if Mr. Carrion still works with 3T Radiology.

6. We obtained medical records from Medici Pain & Spine for 14 Players you represent. The reports from this facility list "Med Legal: BYRON CUTHBERT" in the Insurance section. When we spoke on 3/8/22, you denied any connection to Dr. Casey Leong or Dr. Sonny Dosanj. Please confirm if you had any arrangement or agreement with Medici Pain & Spine, Dr. Casey Leong, or Dr. Sonny Dosanj to examine your clients. Why did you choose these doctors to examine your clients?

   **Answer**: Mr. Cuthbert does utilize Medici for treatment of his Clients. These doctors are in the metro-Atlanta area and are highly regarded. However, he does not have any agreement or arrangement with Dr. Casey Leong or Dr. Sonny Dosanj outside of paying for medical services.

   Mr. Cuthbert is listed in the Med Legal (insurance) because the doctors operate on liens for any personal injury or workers compensation matters. As the attorney, Mr. Cuthbert has to acknowledge the lien for the cost of medical treatment and pay off the lien of Medici.

---

[1] This question is inappropriate; much like Mr. Cuthbert's interview on 3/8/22 where [redacted] the special investigator, asked him about his "financial means" to fund this litigation on behalf of his Clients.

**ARORA LAW FIRM, LLC**
TRIAL ATTORNEYS
75 West Wieuca Road NE · Atlanta, Georgia · 30342
(O) 404.609.4664· (F) 404.865.3525 · manny@arora-law.com

7. Eight of the reports we received from Medici Pain & Spine contain a copy of Dr. Eber's PET scan report. Did you provide this report to Drs. Leong or Dosanj or was it sent to them by 3T?

   **Answer:** Since we do not know the 8 cases you are referencing, Mr. Cuthbert can state that the practice is for 3T to provide their reports to Medici, and Medici in-turn will provide my office with their finding of the results.

8. When was the last time you had any contact, written or verbal, with Terry Bolar?

   **Answer:** We spoke on 5/3/22.

9. During our 3/8/22 call, you indicated that you may have email communications in which you instructed third party affiants who were completing a sworn statement on behalf of a Player to "make their own edits" to their statements. Please produce copies of these email communications.

   **Answer:** It is common practice for attorneys to provide an outline of topics that need to be covered in a witness statement for a particular case. The witness then writes the actual statement as they deem appropriate. The emails in question are attached.

Please direct any future correspondence, as it relates to the ongoing audit against Mr. Cuthbert, directly to me at the above listed address and email.

Sincerely,

Manny Arora
Counsel for Byron Cuthbert

 byron cuthbert <byroncut@gmail.com>

# Ryan Stewart - Sworn Statement

**byron cuthbert** <byroncut@gmail.com> Sun, Dec 15, 2019 at 9:33 PM
To: mrfixit30121@yahoo.com

Claude:

see a beginning draft. Edit and provide information where necessary. This is your statement so you can make any changes. Also, see attached samples to review how people write these sworn statements.

Byron Cuthbert
Attorney at Law
Telephone: (404) 403-7855
Fax: 1(866) 990-9743
byroncut@gmail.com
1860 Sandy Plains Road, Suite 204 Box 301
Marietta, Ga 30066

ATTORNEY-CLIENT PRIVILEGED; DO NOT FORWARD OR DISCLOSE WITHOUT EXPRESS PERMISSION.The information in this email transmission is privileged and confidential pursuant to applicable laws. If you are not the intended recipient, nor the employee or agent responsible for delivering it to the intended recipient, you are notified that any dissemination or copying of this transmission (including any attachments) is strictly prohibited. If you have received this email in error, please notify the sender by email reply. Thank you. There is no intent on the part of the sender to waive any privilege, including the attorney-client privilege, that may attach to this communication. Further, anything you believe to be tax advice in this communication, including attachments, cannot be used to avoid penalties under the Internal Revenue Code, nor does it promote, market, or recommend any transaction or tax-related matter. Law Offices of Byron Cuthbert & Associates does not give tax advice.

**3 attachments**

**Ryan Stewart Draft Affidavit.docx**
23K

**2nd EXAMPLE OF A REDACTED AFFIDAVIT.pdf**
277K

**Affidavit - redacted third party affidavit (FINAL Version).pdf**
133K

Case: 24-1910 Document: 33 Page: 175 Date Filed: 09/11/2024

 byron cuthbert <byroncut@gmail.com>

# NFL Concussion Develop a sworn statement for Gerald Perry - Julie

1 message

**byron cuthbert** <byroncut@gmail.com> Wed, Aug 5, 2020 at 7:29 PM
To: grantvlrobertson@gmail.com

Vashita

we need to develop a 3rd party statement about gerald functionality so Julie can add to your report.

I attach a draft template, which you can use to develop your own statement and edit to discuss any signs of impairment you disclosed to Julie.

please see attached and samples to read for educational purposes. let's discuss.

Byron Cuthbert
Attorney at Law
Telephone: (404) 403-7855
Fax: 1(866) 990-9743
byroncut@gmail.com
1143 Cameron Creek
Marietta, Ga 30062

ATTORNEY-CLIENT PRIVILEGED; DO NOT FORWARD OR DISCLOSE WITHOUT EXPRESS PERMISSION.The information in this email transmission is privileged and confidential pursuant to applicable laws. If you are not the intended recipient, nor the employee or agent responsible for delivering it to the intended recipient, you are notified that any dissemination or copying of this transmission (including any attachments) is strictly prohibited. If you have received this email in error, please notify the sender by email reply. Thank you. There is no intent on the part of the sender to waive any privilege, including the attorney-client privilege, that may attach to this communication. Further, anything you believe to be tax advice in this communication, including attachments, cannot be used to avoid penalties under the Internal Revenue Code, nor does it promote, market, or recommend any transaction or tax-related matter. Law Offices of Byron Cuthbert & Associates does not give tax advice.

**4 attachments**

**Gerald Perry NFL Concussion Sworn Statement draft.docx**
25K

**CDR summary chart - clinical dementia rating scale (with Settlement Criteria) (1) (2)-3.pdf**
227K

**2nd EXAMPLE OF A REDACTED AFFIDAVIT.pdf**
277K

**Affidavit - redacted third party affidavit (FINAL Version).pdf**
133K

 byron cuthbert <byroncut@gmail.com>

# Jeff Griffin NFL Concussion Sworn Statement

**byron cuthbert** <byroncut@gmail.com> Mon, Aug 31, 2020 at 1:30 PM
To: mylifecoachliz@gmail.com

Liz

we need to develop a 3rd party statement about Jeff functionality so Dr. Chow can consider the report.

I attach a draft template, which you can use to develop your own statement and edit to discuss any signs of impairment you want to disclose to Dr. Chow.

please see attached and samples to read for educational purposes. let's discuss.

Byron Cuthbert
Attorney at Law
Telephone: (404) 403-7855
Fax: 1(866) 990-9743
byroncut@gmail.com
1143 Cameron Creek
Marietta, Ga 30062

ATTORNEY-CLIENT PRIVILEGED; DO NOT FORWARD OR DISCLOSE WITHOUT EXPRESS PERMISSION.The information in this email transmission is privileged and confidential pursuant to applicable laws. If you are not the intended recipient, nor the employee or agent responsible for delivering it to the intended recipient, you are notified that any dissemination or copying of this transmission (including any attachments) is strictly prohibited. If you have received this email in error, please notify the sender by email reply. Thank you. There is no intent on the part of the sender to waive any privilege, including the attorney-client privilege, that may attach to this communication. Further, anything you believe to be tax advice in this communication, including attachments, cannot be used to avoid penalties under the Internal Revenue Code, nor does it promote, market, or recommend any transaction or tax-related matter. Law Offices of Byron Cuthbert & Associates does not give tax advice.

**4 attachments**

**JEFF GRIFFIN NFL Concussion Sworn Statement draft-2.docx**
25K

**CDR summary chart - clinical dementia rating scale (with Settlement Criteria) (1) (2)-3.pdf**
227K

**2nd EXAMPLE OF A REDACTED AFFIDAVIT.pdf**
277K

**Affidavit - redacted third party affidavit (FINAL Version).pdf**
133K

 byron cuthbert <byroncut@gmail.com>

# Brian Johnston NFL Concussion Sworn Statement

**byron cuthbert** <byroncut@gmail.com> Tue, Oct 13, 2020 at 3:48 PM
To: cpatchuck18@gmail.com

Per our conversation, see attached template and examples to review to help draft your sworn statement. As mentioned, the statement should be your own words and observations of the symptoms you noticed over the years. please feel free to call me if you have any questions or concerns.

Byron Cuthbert
Attorney at Law
Telephone: (404) 403-7855
Fax: 1(866) 990-9743
byroncut@gmail.com
1143 Cameron Creek
Marietta, Ga 30062

ATTORNEY-CLIENT PRIVILEGED; DO NOT FORWARD OR DISCLOSE WITHOUT EXPRESS PERMISSION.The information in this email transmission is privileged and confidential pursuant to applicable laws. If you are not the intended recipient, nor the employee or agent responsible for delivering it to the intended recipient, you are notified that any dissemination or copying of this transmission (including any attachments) is strictly prohibited. If you have received this email in error, please notify the sender by email reply. Thank you. There is no intent on the part of the sender to waive any privilege, including the attorney-client privilege, that may attach to this communication. Further, anything you believe to be tax advice in this communication, including attachments, cannot be used to avoid penalties under the Internal Revenue Code, nor does it promote, market, or recommend any transaction or tax-related matter. Law Offices of Byron Cuthbert & Associates does not give tax advice.

**4 attachments**

**NFL Concussion Sworn Statement draft template .docx**
25K

**CDR summary chart - clinical dementia rating scale (with Settlement Criteria) (1) (2)-3.pdf**
227K

**Affidavit - redacted third party affidavit (FINAL Version).pdf**
133K

**2nd EXAMPLE OF A REDACTED AFFIDAVIT.pdf**
277K

**Exhibit 4: 3/8/22 Byron Cuthbert Call Notes**

**3/8/22 Call with Byron Cuthbert**

**Date and Time:** 3/8/22, 1:00 PM EST via Zoom.

**Participants:** Byron Cuthbert (Byron Cuthbert and Associates, LLC), Warren Hinds (Cuthbert's attorney), [redacted]

**Subject:** Discussion with Byron Cuthbert of Byron Cuthbert and Associates, LLC.

**Discussion:**

1. [redacted] pointed out that Byron Cuthbert (Cuthbert) only has his audio on, not video, and Cuthbert said he would start his video when everyone was on. [However, Cuthbert never turned on his video at any time during the call.]

2. [redacted] asked Cuthbert how much time he has to talk to us today. Cuthbert said about an hour max, then said he had a recent death in his family, he has to make the funeral arrangements, he may have to leave the call, he is now responsible for a 29-year-old autistic child. [redacted] asked Cuthbert whether he was on laptop or phone, in case she needs to share her screen, and Cuthbert said he is on laptop. Then Cuthbert asked who everyone was. [redacted] introduced herself, [redacted], and [redacted] to Cuthbert, and said that [redacted] will also be joining the call in about 30 minutes.

3. [redacted] said we are finalizing the audit report and want to ask Cuthbert some questions. Cuthbert asked what it's about and said he had no notice of an audit report. [redacted] said it's part of the claims process and said he (Cuthbert) has several claims in audit. Cuthbert said [redacted] ([redacted], law firm contact) told him the audit involves sworn statements and PET scans.

4. [redacted] said let's start with some background information and asked Cuthbert how he first became involved with representing retired NFL players in the Settlement Program. Cuthbert said he knew some former NFL players, he has relatives who are former NFL players, he's a former NFL sports agent, he had referred players to the Locks Law Firm, then after he learned "the process" from Locks he started taking on retired NFL players as clients of his own. [redacted] asked what was the arrangement with Locks, and Cuthbert said it was a co-counsel arrangement.

5. [redacted] asked Cuthbert whether anyone else assisted him with the Locks arrangement, and Cuthbert said no. [redacted] then asked about Terry Bolar. Cuthbert said Terry is a sports agent, he worked for Bolar years ago when he (Cuthbert) was in college and law school, he interned under Terry, but said Terry had no role in referring clients to the Locks Law Firm, "no involvement whatsoever." [redacted] said we talked to Locks, and Locks said that Terry Bolar was the one who referred players to Locks.

6. [At this point, Cuthbert went on mute and there was a long pause.] ████ asked Cuthbert if there is anyone there with him. Another voice spoke for the first time, saying: "Warren Hinds, attorney in Roswell, Georgia."[1] ████ told Cuthbert we would have appreciated knowing from the outset that there was someone else with Cuthbert on the call. Cuthbert said he doesn't understand the relevance of questions about Terry Bolar. ████ said we're trying to understand Cuthbert's involvement in the settlement process and how it evolved over time.

7. ████ asked Cuthbert: What was Bolar's involvement with Locks? Cuthbert said: Nothing, except they knew Bolar as a sports agent. ████ asked whether Bolar was at meetings with Locks, and Cuthbert said no but that Bolar knew about the meetings. ████ asked: Was Bolar seeking a financial arrangement with Locks? Cuthbert said: I don't know. ████ asked about the timing, and Cuthbert said he didn't know exactly, but it was around the time that Locks and Langfitt split.

8. ████ asked whether Cuthbert ever had any other co-counsel arrangements. Cuthbert said he was co-counsel with Goldberg, Persky & White at one time. Cuthbert said the rest are firms that refer to him, and workers compensation firms in California. For example, Ron Mix of Mix & Namanny, he would have to look at the contracts (to know other names of firms).

9. ████ asked whether Cuthbert ever declined to take players as clients and, if so, why. Cuthbert said yes, he had declined to take players as clients. It could be because of their age, their personality, the number of years they played, or if they have no symptoms. Cuthbert said he tends to focus on older players because they tend to show signs of impairment.

10. ████ asked whether anyone works with Cuthbert or assists him and whether he has any administrative staff and, if so, for a description of their roles. Cuthbert said yes, he has two employees. His mother, Vicki Cuthbert, is also an attorney and she has been a civil litigator for 30 years and she helps him with administrative items. Rebecca Palmer is a legal assistant who assists his mother and him and also handles administrative items. ████ asked who sends out forms to players and Cuthbert said all of us, noting that they have 250 clients.

11. ████ asked Cuthbert whether he has office space and Cuthbert said he has a home office at his mother's house. ████ asked where his files are located and Cuthbert said in various places – his mother's house, Rebecca's house, and his (Cuthbert's) apartment.

12. ████ asked whether Cuthbert had ever promised a player a diagnosis and Cuthbert said no. ████ asked Cuthbert what his process is when he gets a client. Cuthbert asked whether she meant BAP or MAF, and ████ said MAF. Cuthbert said it depends, it's not standard, it depends on the records and whether it's a younger or older player. Cuthbert said, for an example of a younger player, there's the Anthony Bryant case. Bryant lives in Birmingham, Alabama. Cuthbert would look up the MAF, schedule the player to go to the MAF neurologist, but that neurologist may say to see the neuropsychologist first, in which case the

---

[1] Online research indicates this attorney is Warren R. Hinds of Warren R. Hinds, P.C. law firm, 1303 Macy Drive, Roswell, GA 30076. Mr. Hinds' website indicates that his practice areas include legal malpractice and ethics/professionalism. https://www.warrenhindslaw.com/attorney/hinds-warren-r/

player would see Dr. Griffith (neuropsychologist) first.

13. [redacted] asked Cuthbert how he knows that a player has Alzheimer's. Cuthbert said sometimes the player has already been diagnosed with Alzheimer's. For example, Cuthbert said, Wallace Francis went to Wellstar Neurology and had already been diagnosed with Alzheimer's. Cuthbert said he sees if a PET scan is appropriate by sending the player to another doctor before sending the player to the MAF neurologist. [redacted] asked why Cuthbert sends the player to an "interim" doctor before sending him to the MAF neurologist. Cuthbert said because that's what the player wanted. For example, Cuthbert said, Wallace Francis wanted to know if he had Alzheimer's and wanted to see another doctor.

14. [redacted] asked what kind of doctor Cuthbert sent players to (before sending players to the MAF neurologist). Cuthbert said it depends, that it could be a neurologist, or it could be a pain doctor, as was the case at the beginning because the player didn't know what [condition] he had. [redacted] asked (again): Why not just send the player to the MAF doctor? Why do you need an "interim" doctor just to order a PET scan? Cuthbert said that he "was not expecting this" [apparently meaning these types of questions], that he was under stress, that it was hard to talk and think, and that he is having to care for his 29-year-old cousin.

15. [redacted] pointed out that in nearly every case, where Cuthbert represents a player and there is a PET scan, the PET scan was performed before the player was examined by an MAF neurologist. [Of the 23 Cuthbert players with PET scans, 21 had the PET scan first before they were examined by an MAF neurologist.] [redacted] asked: Why go through all those steps? Cuthbert said it varies from case to case. Sometimes Dr. Schwartzbard ordered PET scans. Mr. Wallace checked with Midtown Neurology and found they were not in the MAF program any more.

16. [redacted] pointed out that the AAP was concerned that there was coaching of players before they saw doctors. [redacted] asked if Cuthbert had ever coached players. Cuthbert said no, he tells players "to tell the truth and be honest about their symptoms."

17. [redacted] then asked about 3T Radiology. [redacted] asked Cuthbert how he came to know about 3T. Cuthbert said Dr. Schwartzbard had talked to him about 3T. [redacted] asked what was 3T's standard fee and Cuthbert said it started at $5,000. [redacted] asked whether the fee increased and Cuthbert said yes, it "almost doubled" to "around $10,000." [redacted] asked why it increased. Cuthbert said he doesn't know and said he looked for other PET scan providers when 3T's price increased.

18. [redacted] asked whether Cuthbert ever talked to 3T. Cuthbert said he only talked to 3T staff for scheduling. [redacted] asked whether he talked to Humberto (Carrion at 3T) and Cuthbert said yes. [redacted] asked whether he had asked 3T about the increase to $10,000. Cuthbert said no, said he stopped using 3T about a year ago, and said in the Atlanta area PET scans can range up to $15,000. [redacted] asked if he had ever talked to Dr. Eber and Cuthbert said no and said he didn't know Eber's name until we put claims in audit. [redacted] asked whether he knew Humberto before and Cuthbert said no.



19. [redacted] pointed out that Dr. Casey Leong is listed as the referring physician on 12 PET scans. [redacted] asked Cuthbert what his relationship is with Dr. Leong. Cuthbert said there's no relationship and that Dr. Leong is a pain specialist doctor. [redacted] asked whether Dr. Leong evaluated all 12 players prior to their PET scans and Cuthbert said yes. [redacted] pointed out that Dr. Sonny Dosanjh is listed as referring physician on a few PET scans. [redacted] asked Cuthbert what he knows about Dr. Dosanjh. Cuthbert said Dr. Dosanjh was previously Dr. Casey Leong's partner but they are no longer partners as of last year. [redacted] asked whether Dr. Dosanjh evaluated all the players prior to their PET scans and Cuthbert said yes.

20. [redacted] asked who decides whether to get a PET scan, and Cuthbert said doctors. [redacted] pointed out that he (Cuthbert) pays for the PET scan, and Cuthbert said yes, but a doctor decides whether to get a PET scan. [redacted] asked Cuthbert whether he had ever gone against a doctor who recommended a PET scan and Cuthbert said "I don't think so." [redacted] pointed out that the cost of PET scans adds up, then asked if Cuthbert uses a third-party funder, and Cuthbert said sometimes, or it could be a lien or a line of credit.

21. [redacted] asked, of the 250 or so players Cuthbert represents, how many have gotten a PET scan. Cuthbert said he doesn't know and said he would have to look at the files. [redacted] asked how many PET scans were done by 3T and Cuthbert said he doesn't know. [redacted] asked Cuthbert what his process is for ordering PET scans from 3T. Cuthbert said the doctor sends the order and he (Cuthbert) works with Humberto to schedule the PET scan. [redacted] asked whether the players pay for travel for the PET scan. Cuthbert said it depends, that a lot of players live in Florida, some are close and can drive to 3T, while some are farther, and some need financial help with travel.

22. [redacted] asked Cuthbert how the PET scan results are communicated to him. Cuthbert said they are emailed to the doctor who ordered it and sometimes they are also emailed to him (Cuthbert). [redacted] asked in what format the results are sent and Cuthbert said PDF. [redacted] asked Cuthbert if he had ever questioned Dr. Eber or Humberto about the results of a PET scan and Cuthbert said "no, I'm a lawyer, not a radiologist."

23. [redacted] asked if Cuthbert had ever questioned a negative PET scan. Cuthbert said no, that there were "more negatives than positives in general", and said he would ask a neurologist to explain the PET scan result. [redacted] asked: So you talk to a neurologist and not 3T? Cuthbert said: "I rely on medical professionals. I've never talked to Dr. Eber a day in my life." [redacted] asked what Cuthbert means by "medical professionals." Cuthbert said he talks to the pain doctor or other doctor who ordered the PET scan and said "I've never talked to a radiologist a day in my life."

24. [redacted] asked Cuthbert if there were any instances where he tried to persuade an MAF neurologist to change a diagnosis. Cuthbert said no. [redacted] added: Especially after you receive a PET scan? Cuthbert said no.

25. [redacted] asked Cuthbert if he remembered Dr. Kevin Weber. At this point, [redacted] joined the call and Cuthbert said "Hey [redacted]." Cuthbert responded "yes" to the question. [redacted] said that Dr. Weber told us that Cuthbert tried to get Dr. Weber to change

his diagnosis on Harlan Huckleby. Cuthbert said no, that's incorrect, he did not ask Dr. Weber to change the diagnosis. [REDACTED] asked how Dr. Weber was different than other neurologists and Cuthbert said he was "still learning" at that time and that he "told [REDACTED]."

26. [REDACTED] asked if Mr. Huckleby went to Dr. Alan Lerner after he went to Dr. Weber and Cuthbert said yes, that's correct. [REDACTED] asked: Why send him to Dr. Lerner? Cuthbert said he thought "it was suspicious" (presumably Dr. Weber's opinion or the process in general) and said he wanted to get a second opinion but [REDACTED] tried to prevent him from getting a second opinion.

27. [REDACTED] asked Cuthbert if he had asked Dr. Scariano to back-date a QD date. Cuthbert said no, he can't dictate to doctors [what to do]. [REDACTED] said Dr. Scariano told us that Cuthbert emailed him daily to try to get him to change his diagnosis. Cuthbert said to please produce those documents and emails.

28. [REDACTED] asked Cuthbert if he had ever drafted an addendum for a doctor and Cuthbert said "no, never." [REDACTED] said, "so if we provide a copy…"—then Cuthbert said we should [provide a copy] and then he can respond properly—then [REDACTED] said we can provide a copy.

29. [REDACTED] asked how Cuthbert sends PET scan results to players. Cuthbert said it varies and that it could be emails, etc. [REDACTED] pointed out that some of the PET scans we received had a color image attached, and asked Cuthbert how that came about. Cuthbert said that started when we (BrownGreer) said we wanted a picture. [REDACTED] asked: So initially images weren't attached? Cuthbert said no. [REDACTED] asked if this was in the recent requests for discs. Cuthbert said no, not recent, it was in 2020, [REDACTED] has the records. [REDACTED] asked: On the ones that were initially produced, you called Humberto? Cuthbert said yes, based on our (BrownGreer's) requests.

30. [REDACTED] asked Cuthbert when he last talked to Dr. Eber's office. Cuthbert said he can't remember, that it's difficult for him to remember things right now because his aunt just died, but he thinks it was when we requested discs.

31. [REDACTED] said we had an expert review the 3T PET scans, and of the 21, she disagreed with 16 of them. Cuthbert said "wow." [REDACTED] said the expert said it was not a close call. [REDACTED] asked Cuthbert if he had any reason to question the results of the 3T PET scans. Cuthbert said no, he's not a radiologist.

32. [REDACTED] said that Dr. Schwartzbard got second opinions on two of the 3T PET scans and that both came back negative. Cuthbert said he does not recall that but said he remembers that the Joe DeLamielleure PET scan came back positive. Cuthbert asked if we can produce the reports on the 16 that the expert disagreed with. [REDACTED] said we will check with [REDACTED], we hope to provide them, or at least which players they relate to.

33. [REDACTED] asked Cuthbert why he stopped dealing with Dr. Schwartzbard. Cuthbert first said: "What do you mean? I have clients in Miami." [REDACTED] asked again why. Cuthbert said Dr. Schwartzbard's prices went up and her attitude got nasty and "very mean," that she was

"mean" to players, and so he started sending players to Dr. Kester Nedd, an MAF doctor.

34. pointed out that Cuthbert is involved in two lien disputes, on Bobby Abrams and Joe DeLamielleure. also pointed out that the price for 3T PET scans had changed from $5,000 to $10,000. asked Cuthbert if there was ever a price "in between" $5,000 and $10,000. Cuthbert said no and that his understanding is that it jumped immediately from $5,000 to $10,000. asked Cuthbert if he had any conversation with 3T about the price increase. Cuthbert said scans cost between $5,000 and $15,000 in general, that he thought it ($10,000) was high, so he found other imaging facilities closer to him.

35. pointed out that we found 17 affidavits with overlapping language and that five of those were on an SWS-3 form. asked Cuthbert if he ever provided any assistance to an affiant. Cuthbert asked what meant by "provide any assistance." asked Cuthbert if he ever provided assistance such as with examples or templates. Cuthbert said he sent affiants to the Concussion Settlement website, he worked with some affiants through interviews prior to doing the affidavits, and he typed their responses, but the affiants made their changes and signed the affidavits.

36. asked Cuthbert to break down the affidavit process. asked: So sometimes you just direct the affiant to the concussion website, and other times you interview them and take notes and type it up? Cuthbert said yes.

37. asked Cuthbert if there were any instances where he ever created a template or a fill-in-the-blank affidavit. Cuthbert said yes, sometimes he gave a template to the affiants in a Word document and instructed them to edit it and "make it their own." asked who created the template. Cuthbert said "we worked on it, my mother and I" and said it was based on previous affidavits, for example, from Locks, questions from the CDR, documents from the [Settlement Program] website. Cuthbert said "individuals made their edits and signed off saying their statements are true."

38. then pulled up and shared with all call participants a template [provided to by Shawna Davis, affiant for Joseph Harris (SPID 100006402), after 11/29/21 call with Davis]. The document had numbered paragraphs that were mostly typed but also included blanks that had the name "Joe" [Joe Harris] or other wording or phrases added to the blanks in handwriting. asked Cuthbert: Is this a document you created? Cuthbert said yes, the template was a Word document that he sent to affiants, but he considered it a draft that he didn't turn in, it was a "part of the interview process," he sends templates to affiants, who have the ability to change it, and he said "this lady" [Ms. Davis] was older and had "problems with computers."

39. asked: By typing up most of the information, aren't you telling the affiant what to say? Cuthbert said that's not true, it's the initial stage, he drafts it, then it goes back to the affiant and he tells them to "make it your own words." He said that sometimes the affiant comes up with the affidavit on their own, sometimes he sends them a template.

40. [redacted] said the template is a working document that you created. Cuthbert said "it's a working document for an initial draft" and said "it's no different than your instructions." [redacted] asked how many third-party affiants get a template versus an interview. Cuthbert said it depends on the affiant's skill level and what they understand, all affidavits are edited by affiants, and all have examples he "would never know."

41. Citing an example from the template that she was sharing on her screen, [redacted] asked Cuthbert: How is it reasonable to provide the affiant with the pre-typed information saying their symptoms started after the end of their NFL career and that their symptoms became elevated? Cuthbert said "they can delete that" and "it's no different than what any major law firm does."

42. [redacted] asked Cuthbert what instructions he gave affiants who signed an SWS-3 form about the box they checked saying they received no assistance with the form. Cuthbert said he gave them no instructions. [redacted] pointed out that SWS-3 statements are supposed to be their (the affiants') work. Cuthbert said "it's up to them what they think" and "I can't control what they think." [redacted] again asked Cuthbert if he gave affiants any instructions about the checkbox and Cuthbert said he left it up to them and he told them to edit and make it their own. [redacted] asked Cuthbert if he can provide us the instructions he gave to affiants. Cuthbert said no, but he may have emails where he said "make your own edits."

43. Warren Hinds (Cuthbert's attorney) asked if we can wrap up the interview. [redacted] said yes, she has two more questions.

44. [redacted] asked Cuthbert if he recalled Dr. Dhillon and Cuthbert said yes. [redacted] asked Cuthbert how he started using Dr. Dhillon. Cuthbert said Dr. Dhillon had worked for Hope Neurology and that he had referred clients to Hope Neurology for neurological evaluations. [redacted] asked Cuthbert if he had known Dr. Dhillon when she worked in Nevada. Cuthbert said no, he knows she's in Georgia now and she no longer works for Hope Neurology. [redacted] asked Cuthbert if he had urged Dr. Dhillon to become an MAF doctor. Cuthbert said Dr. Dhillon decided that after he told her there was no MAF doctor in Atlanta.

45. [redacted] said she has one last question, and it's about Richard Shelton's appeal. [redacted] said there were issues with his employment history, he had to quit his job because he couldn't drive, but then he received a CDL driver's license after that and then did work driving. [redacted] asked Cuthbert what steps he takes to verify such information and asked whether his practices have changed at all. Cuthbert said he just tells clients to be accurate and truthful. [redacted] asked: Do you just take clients at their word? Cuthbert said yes, he relies on his clients (to provide accurate information) and relies on doctors to provide reports.

46. Mr. Hinds (Cuthbert's attorney) said they have questions. He asked whether they can receive a copy of the report from the expert about the 3T PET scans. [redacted] said we are finalizing and will share information in the right time but not immediately. Cuthbert asked whether we can tell him what players the expert reported on. [redacted] said we will gather information, we may have follow-up questions, and we'll communicate with him. Cuthbert said experts vary and he wants to know what procedure she (the expert) used.

[REDACTED] said there will be due process and information will be forthcoming. Cuthbert asked whether we could tell him which five (of the 21) are positive. [REDACTED] said no, not now. Cuthbert asked if there is any timeline and said claims have been sitting in audit for six months. [REDACTED] said it's in the home stretch, it depends on the Special Masters and their guidance and it will be a month or so at least. [REDACTED] pointed out that there could have been more cooperation and truthfulness from Cuthbert and she encourages that from him. Mr. Hinds said Cuthbert has been cooperative and that leaving it open-ended is not fair to his client.

47. The call concluded at 2:26 p.m.

**Exhibit 5:  1/7/22 Byron Cuthbert Response to Questions**

Good morning, Byron:

**SCM: Joe Delamielleure**
**SPID: 100003809**

Thank you for providing these documents. Pursuant to Section 8.6 of the Settlement Agreement, we have several follow-up questions for you and ask that you send us your responses by 1/17/22. Please let us know if you have any questions about the information or documentation we need.

1. The invoices you provided from 3T Radiology & Research are dated 12/28/21 and state that the exam costs were "paid." Please submit proof of payment (cancelled checks, bank statements, etc.), showing both the payment amount and date of payment, for both Mr. Abrams' and Mr. DeLamielleure's exams with 3T Radiology.

   **Answer**: see receipts below. The numbers do not match because I pay the invoices in batches for multiple types of images and/or multiple clients.

2. Both Mr. Abrams' and Mr. DeLamielleure's invoices from 3T Radiology state that the services include "Radiology Report, PET BRAIN Scan, and dose." However, Mr. DeLamielleure's total cost is listed as $5,000, while Mr. Abrams' total cost is listed as $10,000. Please explain why the exam costs for these players are different.

   **Answer:** The exam costs are different for these players because 3T radiology prices change.

3T RADIOLOGY RESEARCH L
20803 BISCAYNE BLV #103
AVENTURA, FL 33180
786-668-2525

:27 2020 17:00:17

CREDIT CARD

VISA SALE

| | |
|---|---|
| rd # | XXXXXXXXXXXX9516 |
| :Q #: | 10 |
| itch #: | 5 |
| ans #: | 10 |
| oproval Code: | 024519 |
| ANS ID: | 380059027327743 |
| ntry Method: | Manual |
| ode: | Online |
| ax Amount: | $0.00 |
| rd Code: | M |

ALE AMOUNT $10000.00

THANK YOU

CUSTOMER COPY

02/27/2020 7:50 PM -05:00



3T RADIOLOGY RESEARCH L
20803 BISCAYNE BLV #103
AVENTURA, FL 33180
786-668-2525

04/29/2021 12:12:54
MID: XXXXXXXXXXXX403 TID: XXXXX334

CREDIT CARD

AMEX SALE

| | |
|---|---|
| Card # | XXXXXXXXXXX1002 |
| SEQ #: | 8 |
| Batch #: | 3 |
| Trans #: | 8 |
| Approval Code: | 220214 |
| TRANS ID: | 001600559596073 |
| Entry Method: | Manual |
| Mode: | Online |
| Avs Code: | Z |
| Card Code: | M |

SALE AMOUNT $16995.00

Paid over Phone

**Exhibit 6: 8/28/20 Byron Cuthbert Response to Questions**

As the Claims Administrator under the NFL Concussion Class Action Settlement Agreement, we are conducting an audit of certain Monetary Award claims submitted to us by you or your firm. As part of that audit, we ask you to answer the following questions and provide the documents requested, **within 15 days after this request**. The "you" in all questions means each lawyer or representative, employee or agent of a lawyer or law firm involved in the Monetary Awards you or your firm has submitted.

Pursuant to Rule 10 of the Rules Governing the Audit of Claims adopted by the Special Masters appointed by the federal court overseeing this Settlement, any request for information from us has the force and effect of a subpoena under Rule 45 of the Federal Rules of Civil Procedure. You must respond to these questions and provide all information and documents requested in detail. If you do not understand a question for some reason, then contact us and we will explain. If you fail to respond in full to these questions within 15 days, the Monetary Award claims subject to this Audit investigation will be held until complete information and documents are provided. Objections and incomplete answers can lead to the denial of the claims.

This request is confidential. Except for your own lawyer, you may not discuss this request with any other parties, including third party witnesses and medical examiners, unless necessary to provide complete answers. Additionally, pursuant to Audit Rule 9, you must preserve all information and records related to the claims from the Retired NFL Football Players you represent.

1. We have observed that you have used Dr. Daryl Eber with 3T Radiology and Dr. Ovsev Uzuner with Akumin Labs. Please identify any other PET scan providers you have used or intend to use for your claims in this Program.

**Answer:** As of today, besides Dr. Daryl Eber with 3T Radiology and Dr. Ovsev Uzuner with Akumin Labs, I've used or intend to use the following PET scan providers for claims in this Program:

- Orange Advanced Imaging
  230 S. Main St.
  Orange, Ca 92868

- Southwest Medical Imaging
  3501 N Scottsdale Rd #130,
  Scottsdale, AZ 85251

- University of Nuclear Medicine
  1630 Maple Rd
  Buffalo NY 14221

2. Why did you choose Dr. Eber as the PET scan provider for players you represent?

   **Answer:** I learned about 3T radiology from Dr. Julie Schwartzbard of Aventura Neurology office because they ordered their PET scans at 3T radiology. I talked to 3T Radiology staff to pay for the scan.

3. When and how did you initiate contact with Dr. Eber for purposes of rendering PET scans for players?

   **Answer:** I have never made direct contact with Dr. Eber. However, the first few clients I sent to 3T radiology was through orders from Aventura Neurology. The next few was through direct coordination with 3T Radiology staff.

4. How many players that you represent have undergone a PET scan with Dr. Eber?

   **Answer:** Approximately 25 players have been scanned at 3T Radiology.

5. Has Dr. Eber ever provided a negative result ("Negative Study") for any players you represent? If so, please provide those players' names and copies of the results of Dr. Eber's scans.

   **Answer:** Yes, I had approximately 14 negative results for players I represent. I'm providing you copies of the negative reports as proof of negative results. I have redacted the players' personal information in order not to violate HIPAA, attorney client privilege, and to prevent any potential use against the players for any potential future claims they may have. See Exhibit A

6. Do you have any arrangements or agreements with Dr. Eber related to his examinations of your clients? If so, please provide copies of these agreements and describe to us the nature of any verbal agreements or arrangements.

   **Answer:** I pay the standard amyvid/amyloid pet scan fee to 3T Radiology. Other than paying the amyvid/amyloid pet scan fee, I do not have any arrangements or agreements with Dr. Eber related to his examinations of my clients.

7. Have you provided Dr. Eber with any guidelines or instructions related to his examination of players you represent? If so, what were those instructions?

   **Answer:** No, I have not provided Dr. Eber with any guidelines or instructions related to his examination of players I represent.

8. Please explain in detail the process for obtaining a PET Scan from Dr. Eber. Who typically refers the player to Dr. Eber? Who typically schedules the

PET scan with Dr. Eber's office?  Does the PET scan occur before or after the examination with the diagnosing physician?  Where does Dr. Eber send the results of the PET scan?  Does he send them directly to the diagnosing physician or to you?

**Answer:** Generally, the MAF neurologist, the players primary care doctor or a doctor orders the players Amyloid pet scan due to cognitive complaints. I typically schedule the PET scan with 3T Radiology after I have the Order from the players doctor. Depending on who orders the PET scan, the scan can occur before the examination with the diagnosing physician or after the examination with the diagnosing physician.  It is my understanding 3T Radiology sends the results to the referring doctors and to my office.

9.  Have any players you represent received a PET scan from Dr. Eber or any other provider prior to the player's exam or consultation with the diagnosing physician?  If so, please explain why the player received a PET scan prior to his exam with the diagnosing physician.

**Answer:** Yes, a lot of my players are referred to the PET scan by other doctors due to cognitive complaints. The player undergoes the scan and then the player sees the diagnosing physician after they have the results. I had one case where one client canceled a scan that was scheduled, and the diagnosing physician ordered the scan after a telephone conference with the player, who wanted a scan. The player turned out to be positive and then received a qualifying diagnosis afterwards.

10. In responses to our audit questions, several players you represent have indicated that they do not have any raw images of their PET scans with Dr. Eber and that we should get these images directly from him. However, Dr. Eber has been unresponsive to our outreach.  We require these images to move forward with the audits of these claims and ask that you please work with Dr. Eber's office to provide us the raw image results from the PET scans for these players: J.Delamielleure, S.Towle, J.Giesler, F.Hodge, K.Henderson, R.Shelton.  As a reminder, Section 10.3(b)(ii) of the Settlement Agreement provides that we may deny, without right to appeal, the claim of a Settlement Class Member who refuses to cooperate with an audit.

**Answer:** I have contacted 3T radiology to request 2 sets of copies of  the disk of the raw images. I will forward one set of the disk to your office when I receive them.

11. Please produce copies of all written communications you have had with Dr. Eber and describe in detail the nature of any verbal communications you have had with Dr. Eber.

**Answer:** I have no written communications with Dr. Eber and I never had any verbal communications with Dr. Eber.

12. When and how did you initiate contact with Dr. Julie Schwartzbard for purposes of examining players you represent?

    **Answer:** I learned about Aventura Neurology through evaluations for clients through the BAP program. I initiated contact with Dr. Julie Schwartzbard office by calling the number posted on the NFL Concussion settlement website. I met her staff and have coordinated scheduling through her staff for all past and future appointments for my clients.

13. Why did you choose Dr. Schwartzbard to examine players you represent?

    **Answer:** I choose Dr. Schwartzbard because I learned about Aventura neurology through evaluations for clients through the BAP program. I have a lot of south Florida clients who live within 150 miles of Dr. Schwartzbard. I chose her office for the MAF evaluations because of their scheduling availability and her staff is good with communicating with you timely.

14. Do you have any arrangements or agreements with Dr. Schwartzbard related to her examinations of your clients? If so, please provide copies of these agreements and describe to us the nature of any verbal agreements or arrangements.

    **Answer:** I pay her standard $1,500 (now $1,800) MAF fee to Dr. Schwartzbard office. Other than paying the MAF fee, I have no arrangements or agreements with Dr. Schwartzbard related to her examinations of my clients

15. Have you provided Dr. Schwartzbard with any guidelines or instructions related to his examination of players you represent? If so, what were those instructions?

    **Answer:** No, I have not provided Dr. Schwartzbard with any guidelines or instructions related to his examination of players I represent.

16. Please produce copies of all written communications you have had with Dr. Schwartzbard and describe in detail the nature of any verbal communications you have had with Dr. Schwartzbard

    **Answer:** I have no written communications with Dr. Schwartzbard and any verbal discussions are about scheduling or her explaining the client's condition and symptoms.

17. When and how did you initiate contact with Dr. Scariano for purposes of examining retired NFL players?

**Answer:** I contacted Dr. Scariano office by calling the phone number posted on the NFL Concussion settlement website in May of 2020 to learn the scheduling and payment process for MAF evaluations with his office.

18. Why did you choose Dr. Scariano to examine players you represent?

**Answer:** Dr. Scariano and Dr. Counce are the only two MAF doctors within 150 miles of my clients who live in Atlanta after Midtown Neurology dropped out of the MAF program around June of 2020. I've sent clients to both offices, but I tend to choose Dr. Scariano office due to scheduling availability.

19. Do you have any agreements or arrangements with Dr. Scariano related to his examinations of your clients? If so, please provide copies of these agreements and describe to us the nature of any verbal agreements or arrangements.

**Answer:** I pay his standard $1,500 MAF fee to Dr. Scariano office. Other than paying the MAF fee, I do not have any agreements or arrangements with Dr. Scariano related to his examinations of my clients.

20. Have you provided Dr. Scariano with any guidelines or instructions related to his examination of players you represent? If so, what were those instructions?

**Answer:** I have not provided Dr. Scariano any guidelines or instructions related to his examination of players I represent.

# EXHIBIT A



Radiology
& Research

20803 Biscayne Blvd. Suite. 103 Aventura, FL 33180

| | | | |
|---|---|---|---|
| Patient Name: | [redacted] | Patient ID: | JACW282237 |
| Referring Physician: | No Pcp, No Pcp | Date of Birth: | [redacted] |
| Date of Study: | 01/28/2020 3:03 PM | Gender: | M |
| Facility: | 3T AVENTURA | Age: | 48 |
| Procedure | BRAIN IMAGING (PET) | | |

**PET-CT BRAIN AMYVID**

**INDICATION:** Cognitive impairment.

**COMPARISON:** Outside reports of a brain MRI and F-18 FDG PET/CT were available for comparison.

**TECHNIQUE:** The patient was injected with a total dose of 9.5 mCi of F18 Amyvid, followed by brain PET-CT scan 45 minute delay. PET images were acquired from the vertex of the skull through the skull base and corresponding axial noncontrast CT images were acquired and used for both attenuation correction and anatomical correction.

---

**FINDINGS:** There is normal physiologic distribution of the radiotracer activity within the white matter of the brain. No substantial cortical radiotracer accumulation is noted in the frontal lobes, parietal lobes, the anterior or posterior cingulate gyrus or in the lateral temporal lobes. There is no other area of increased cortical grey-matter uptake appreciated. No acute finding on the non-contrast CT.

**Non-contrast CT findings:** There is a linear focus of hypoattenuation adjacent to the frontal horn of the right lateral ventricle that could represent an area of encephalomalacia. No acute non-contrast CT findings in the brain.

---

**IMPRESSION:**

1. **Negative study. No substantial radiotracer activity in the cortex to suggest B-amyloid protein deposition, as described above.**
2. **There is a linear focus of hypoattenuation adjacent to the frontal horn of the right lateral ventricle that could represent an area of encephalomalacia.**



20803 Biscayne Blvd. Suite. 103 Aventura, FL 33180

| | | | |
|---|---|---|---|
| Patient Name: | [redacted] | Patient ID: | JACW282237 |
| Referring Physician: | No Pcp, No Pcp | Date of Birth: | [redacted] |
| Date of Study: | 01/28/2020 3:03 PM | Gender: | M |
| Facility: | 3T AVENTURA | Age: | 48 |
| Procedure | BRAIN IMAGING (PET) | | |

**Electronically signed**

**DARYL EBER, M.D.**
**Diplomate of the American Board of Radiology**
**Diplomate of the American Board of Nuclear Medicine**

Electronically Signed by:Eber, Daryl MD
Diplomate of the American Board of Radiology
Diplomate of the American Board of Nuclear Medicine



2

Radiology
& Research

20803 Biscayne Blvd. Suite. 103 Aventura, FL 33180

| | | | |
|---|---|---|---|
| Patient Name: | [redacted] | Patient ID: | BEGD284060 |
| Referring Physician: | No Pcp, No Pcp | Date of Birth: | [redacted] |
| Date of Study: | 02/11/2020 3:14 PM | Gender: | M |
| Facility: | 3T AVENTURA | Age: | 63 |
| Procedure | BRAIN IMAGING (PET) | | |

**INDICATION:** Cognitive impairment. Headaches. Short term memory loss.

**COMPARISON:** None available at time of dictation.

**TECHNIQUE:** The patient was injected with a total dose of 8.6 mCi of F18 Amyvid, followed by brain PET-CT scan 45 minute delay. PET images were acquired from the vertex of the skull through the skull base and corresponding axial noncontrast CT images were acquired and used for both attenuation correction and anatomical correction.

---

**FINDINGS:** There is normal physiologic distribution of the radiotracer activity within the white matter of the brain. No substantial cortical radiotracer accumulation is noted in the frontal lobes, parietal lobes, the anterior or posterior cingulate gyrus or in the lateral temporal lobes. There is no other area of increased cortical grey-matter uptake appreciated. No acute finding on the non-contrast CT.

**Non-contrast CT findings:** There is a retention cyst in the left maxillary sinus. No other acute finding.

---

**IMPRESSION:**

1. **Negative study. No substantial radiotracer activity in the cortex to suggest B-amyloid protein deposition, as described above.**

**Electronically signed**

**DARYL EBER, M.D.**
**Diplomate of the American Board of Radiology**
**Diplomate of the American Board of Nuclear Medicine**

2

Radiology
& Research

20803 Biscayne Blvd. Suite. 103 Aventura, FL 33180

| | | | |
|---|---|---|---|
| Patient Name: | [redacted] | Patient ID: | BEGD284060 |
| Referring Physician: | No Pcp, No Pcp | Date of Birth: | [redacted] |
| Date of Study: | 02/11/2020 3:14 PM | Gender: | M |
| Facility: | 3T AVENTURA | Age: | 63 |
| Procedure | BRAIN IMAGING (PET) | | |

Electronically Signed by:Eber, Daryl MD
Diplomate of the American Board of Radiology
Diplomate of the American Board of Nuclear Medicine



3

20803 Biscayne Blvd. Suite. 103 Aventura, FL 33180

| Patient Name: | [redacted] | Patient ID: | BUGD283402 |
|---|---|---|---|
| Referring Physician: | No Pcp, No Pcp | Date of Birth: | [redacted] |
| Date of Study: | 02/11/2020 2:21 PM | Gender: | M |
| Facility: | 3T AVENTURA | Age: | 23 |
| Procedure | BRAIN IMAGING (PET) | | |

**INDICATION:** History of traumatic brain injury.

**COMPARISON:** None available at time of dictation.

**TECHNIQUE:** The patient was injected with a total dose of 10.2 mCi of F18 Amyvid, followed by brain PET-CT scan 45 minute delay. PET images were acquired from the vertex of the skull through the skull base and corresponding axial noncontrast CT images were acquired and used for both attenuation correction and anatomical correction.

---

**FINDINGS:** There is normal physiologic distribution of the radiotracer activity within the white matter of the brain. No substantial cortical radiotracer accumulation is noted in the frontal lobes, parietal lobes, the anterior or posterior cingulate gyrus or in the lateral temporal lobes. There is no other area of increased cortical grey-matter uptake appreciated. No acute finding on the non-contrast CT.

**Non-contrast CT findings:** No acute finding in the brain, orbits or visualized skull-base.

---

**IMPRESSION:**

1. **Negative study. No substantial radiotracer activity in the cortex to suggest B-amyloid protein deposition, as described above.**

**Electronically signed**

**DARYL EBER, M.D.**
**Diplomate of the American Board of Radiology**
**Diplomate of the American Board of Nuclear Medicine**

Electronically Signed by:Eber, Daryl MD



3

3T Radiology
& Research

20803 Biscayne Blvd. Suite. 103 Aventura, FL 33180

| | | | |
|---|---|---|---|
| Patient Name: | [redacted] | Patient ID: | BUGD283402 |
| Referring Physician: | No Pcp, No Pcp | Date of Birth: | [redacted] |
| Date of Study: | 02/11/2020 2:21 PM | Gender: | M |
| Facility: | 3T AVENTURA | Age: | 23 |
| Procedure | BRAIN IMAGING (PET) | | |

Diplomate of the American Board of Radiology
Diplomate of the American Board of Nuclear Medicine

4

3T Radiology
& Research

20803 Biscayne Blvd. Suite. 103 Aventura, FL 33180

| | | | |
|---|---|---|---|
| Patient Name: | [redacted] | Patient ID: | JONT283947 |
| Referring Physician: | No Pcp, No Pcp | Date of Birth: | [redacted] |
| Date of Study: | 02/18/2020 4:35 PM | Gender: | M |
| Facility: | 3T AVENTURA | Age: | 53 |
| Procedure | BRAIN IMAGING (PET) | | |

**INDICATION:** Cognitive impairment over the past 3 years.

**COMPARISON:** None available at time of dictation.

**TECHNIQUE:** The patient was injected with a total dose of 9.4 mCi of F18 Amyvid, followed by brain PET-CT scan 50 minute delay. PET images were acquired from the vertex of the skull through the skull base and corresponding axial noncontrast CT images were acquired and used for both attenuation correction and anatomical correction.

---

**FINDINGS:** There is normal physiologic distribution of the radiotracer activity within the white matter of the brain. No substantial cortical radiotracer accumulation is noted in the frontal lobes, parietal lobes, the anterior or posterior cingulate gyrus or in the lateral temporal lobes. There is no other area of increased cortical grey-matter uptake appreciated. No acute finding on the non-contrast CT.

**Non-contrast CT findings:** No acute finding in the brain, orbits or visualized skull-base.

---

**IMPRESSION:**

1. **Negative study. No substantial radiotracer activity in the cortex to suggest significant B-amyloid protein deposition, as described above.**

**Electronically signed**

**DARYL EBER, M.D.**
**Diplomate of the American Board of Radiology**
**Diplomate of the American Board of Nuclear Medicine**

Electronically Signed by:Eber, Daryl MD

4

Radiology
& Research

20803 Biscayne Blvd. Suite. 103 Aventura, FL 33180

| | | | |
|---|---|---|---|
| Patient Name: | [redacted] | Patient ID: | JONT283947 |
| Referring Physician: | No Pcp, No Pcp | Date of Birth: |  |
| Date of Study: | 02/18/2020 4:35 PM | Gender: | M |
| Facility: | 3T AVENTURA | Age: | 53 |
| Procedure | BRAIN IMAGING (PET) | | |

Diplomate of the American Board of Radiology
Diplomate of the American Board of Nuclear Medicine



5

20803 Biscayne Blvd. Suite. 103 Aventura, FL 33180

| | | | |
|---|---|---|---|
| Patient Name: | [redacted] | Patient ID: | REMJ283935 |
| Referring Physician: | No Pcp, No Pcp | Date of Birth: | [redacted] |
| Date of Study: | 02/25/2020 4:09 PM | Gender: | M |
| Facility: | 3T AVENTURA | Age: | 59 |
| Procedure | BRAIN IMAGING (PET) | | |

**INDICATION:** Cognitive impairment.

**COMPARISON:** None available at time of dictation.

**TECHNIQUE:** The patient was injected with a total dose of 10.5 mCi of F18 Amyvid, followed by brain PET-CT scan 45 minute delay. PET images were acquired from the vertex of the skull through the skull base and corresponding axial noncontrast CT images were acquired and used for both attenuation correction and anatomical correction.

---

**FINDINGS:** There is normal physiologic distribution of the radiotracer activity within the white matter of the brain. No substantial cortical radiotracer accumulation is noted in the frontal lobes, parietal lobes, the anterior or posterior cingulate gyrus or in the lateral temporal lobes. There is no other area of increased cortical grey-matter uptake appreciated.

**Non-contrast CT findings:** No acute finding in the brain, orbits or visualized skull-base.

---

**IMPRESSION:**

1. **Negative study. No substantial radiotracer activity in the cortex to suggest substantial B-amyloid protein deposition, as described above.**

[signature]

Electronically Signed by:Eber, Daryl MD
Diplomate of the American Board of Radiology
Diplomate of the American Board of Nuclear Medicine



6

Radiology
& Research

20803 Biscayne Blvd. Suite. 103 Aventura, FL 33180

| | | | |
|---|---|---|---|
| Patient Name: | [redacted] | Patient ID: | CASA285627 |
| Referring Physician: | No Pcp, No Pcp | Date of Birth: | [redacted] |
| Date of Study: | 02/25/2020 4:42 PM | Gender: | M |
| Facility: | 3T AVENTURA | Age: | 41 |
| Procedure | BRAIN IMAGING (PET) | | |

**INDICATION:** Cognitive impairment.

**COMPARISON:** None available at time of dictation.

**TECHNIQUE:** The patient was injected with a total dose of 10.1 mCi of F18 Amyvid, followed by brain PET-CT scan 45 minute delay. PET images were acquired from the vertex of the skull through the skull base and corresponding axial noncontrast CT images were acquired and used for both attenuation correction and anatomical correction.

---

**FINDINGS:** There is normal physiologic distribution of the radiotracer activity within the white matter of the brain. No substantial cortical radiotracer accumulation is noted in the frontal lobes, parietal lobes, the anterior or posterior cingulate gyrus or in the lateral temporal lobes. There is no other area of increased cortical grey-matter uptake appreciated.

**Non-contrast CT findings:** No acute finding in the brain, orbits or visualized skull-base.

---

**IMPRESSION:**

1. **Negative study. No substantial radiotracer activity in the cortex to suggest B-amyloid protein deposition, as described above.**

[signature]

Electronically Signed by:Eber, Daryl MD
Diplomate of the American Board of Radiology
Diplomate of the American Board of Nuclear Medicine



7

20803 Biscayne Blvd. Suite. 103 Aventura, FL 33180

| | | | |
|---|---|---|---|
| Patient Name: | [redacted] | Patient ID: | FULB286176 |
| Referring Physician: | No Pcp, No Pcp | Date of Birth: | [redacted] |
| Date of Study: | 03/03/2020 4:11 PM | Gender: | M |
| Facility: | 3T AVENTURA | Age: | 59 |
| Procedure | BRAIN IMAGING (PET) | | |

**INDICATION:** Cognitive impairment.

**COMPARISON:** None available at time of dictation.

**TECHNIQUE:** The patient was injected with a total dose of 10.1 mCi of F18 Amyvid, followed by brain PET-CT scan 45 minute delay. PET images were acquired from the vertex of the skull through the skull base and corresponding axial noncontrast CT images were acquired and used for both attenuation correction and anatomical correction.

---

**FINDINGS:** There is normal physiologic distribution of the radiotracer activity within the white matter of the brain. No substantial cortical radiotracer accumulation is noted in the frontal lobes, parietal lobes, the anterior or posterior cingulate gyrus or in the lateral temporal lobes. There is no other area of increased cortical grey-matter uptake appreciated. No acute finding on the non-contrast CT.

**Non-contrast CT findings:** No acute finding in the brain, orbits or visualized skull-base.

---

**IMPRESSION:**

**Negative study. No substantial radiotracer activity in the cortex to suggest B-amyloid protein deposition, as described above.**

Electronically Signed by:Eber, Daryl MD
Diplomate of the American Board of Radiology
Diplomate of the American Board of Nuclear Medicine



8

3T Radiology & Research

20803 Biscayne Blvd. Suite. 103 Aventura, FL 33180

| | | | |
|---|---|---|---|
| Patient Name: | [redacted] | Patient ID: | STED288558 |
| Referring Physician: | No Pcp, No Pcp | Date of Birth: | [redacted] |
| Date of Study: | 04/02/2020 1:00 PM | Gender: | M |
| Facility: | 3T AVENTURA | Age: | 62 |
| Procedure | BRAIN IMAGING (PET) | | |

**PET/CT BRAIN AMYVID**

**INDICATION:** Cognitive impairment.

**COMPARISON:** None available at the time of dictation.

**TECHNIQUE:** The patient was injected with a total dose of 9.2 mCi of F18 Amyvid, followed by brain PET-CT scan 55 minute delay. PET images were acquired from the vertex of the skull through the skull base and corresponding axial noncontrast CT images were acquired and used for both attenuation correction and anatomical correction.

---

**FINDINGS:** There is normal physiologic distribution of the radiotracer activity within the white matter of the brain. No substantial cortical radiotracer accumulation is noted in the frontal lobes, parietal lobes, the anterior or posterior cingulate gyrus or in the lateral temporal lobes. There is no other area of increased cortical grey-matter uptake appreciated. No acute finding on the non-contrast CT.

**Non-contrast CT findings:** No acute finding in the brain, orbits or visualized skull-base.

---

**IMPRESSION:**

**Negative study. No substantial radiotracer activity in the cortex to suggest B-amyloid protein deposition, as described above.**

Electronically Signed by:Eber, Daryl MD
Diplomate of the American Board of Radiology
Diplomate of the American Board of Nuclear Medicine



9

Radiology
& Research

20803 Biscayne Blvd. Suite. 103 Aventura, FL 33180

| | | | |
|---|---|---|---|
| Patient Name: | [redacted] | Patient ID: | THOR289037 |
| Referring Physician: | No Pcp, No Pcp | Date of Birth: | [redacted] |
| Date of Study: | 04/07/2020 3:52 PM | Gender: | M |
| Facility: | 3T AVENTURA | Age: | 54 |
| Procedure | BRAIN IMAGING (PET) | | |

**PET/CT BRAIN**

**INDICATION:** Cognitive impairment.

**COMPARISON:** None available at time of dictation.

**TECHNIQUE:** The patient was injected with a total dose of 7.1 mCi of Neuraceq, followed by brain PET-CT scan at a 50, 55, 60 and 65 minute delay. PET images were acquired from the vertex of the skull through the skull base and corresponding axial noncontrast CT images were acquired and used for both attenuation correction and anatomical correction.

---

**FINDINGS:** There is normal physiologic distribution of the radiotracer activity within the white matter of the brain. No substantial cortical radiotracer accumulation is noted in the frontal lobes, parietal lobes, the anterior or posterior cingulate gyrus or in the lateral temporal lobes. There is no other area of increased cortical grey-matter uptake appreciated. No acute finding on the non-contrast CT.

**Non-contrast CT findings:** No acute finding in the brain, orbits or visualized skull-base.

---

**IMPRESSION:**

1. **Negative study. No substantial radiotracer activity in the cortex to suggest B-amyloid protein deposition, as described above.**

[signature]

Electronically Signed by:Eber, Daryl MD
Diplomate of the American Board of Radiology
Diplomate of the American Board of Nuclear Medicine



9

20803 Biscayne Blvd. Suite. 103 Aventura, FL 33180

| | | | |
|---|---|---|---|
| Patient Name: | [redacted] | Patient ID: | THOR289037 |
| Referring Physician: | No Pcp, No Pcp | Date of Birth: | [redacted] |
| Date of Study: | 04/07/2020 3:52 PM | Gender: | M |
| Facility: | 3T AVENTURA | Age: | 54 |
| Procedure | BRAIN IMAGING (PET) | | |

10

Radiology
& Research

20803 Biscayne Blvd. Suite. 103 Aventura, FL 33180

| | | | |
|---|---|---|---|
| Patient Name: | [redacted] | Patient ID: | WALS293990 |
| Referring Physician: | Dosanjh, Sonny | Date of Birth: | [redacted] |
| Date of Study: | 06/25/2020 2:00 PM | Gender: | M |
| Facility: | 3T AVENTURA | Age: | 55 |
| Procedure | BRAIN IMAGING (PET) | | |

**INDICATION:** Cognitive impairment.

**COMPARISON:** None.

**TECHNIQUE:** The patient was injected with a total dose of 11.5 mCi of F18 Amyvid, followed by brain PET-CT scan 55 minute delay. PET images were acquired from the vertex of the skull through the skull base and corresponding axial noncontrast CT images were acquired and used for both attenuation correction and anatomical correction.

---

**FINDINGS:** There is normal physiologic distribution of the radiotracer activity within the white matter of the brain. No substantial cortical radiotracer accumulation is noted in the frontal lobes, parietal lobes, the anterior or posterior cingulate gyrus or in the lateral temporal lobes. There is no other area of increased cortical grey-matter uptake appreciated. No acute finding on the non-contrast CT.

**Non-contrast CT findings:** No acute finding in the brain, orbits or visualized skull-base.

---

**IMPRESSION:**

1. **Negative study. No substantial radiotracer activity in the cortex to suggest B-amyloid protein deposition, as described above.**

Electronically Signed by:Eber, Daryl MD
Diplomate of the American Board of Radiology
Diplomate of the American Board of Nuclear Medicine



11

Radiology
& Research

20803 Biscayne Blvd. Suite. 103 Aventura, FL 33180

| | | | |
|---|---|---|---|
| Patient Name: | [redacted] | Patient ID: | GREH294157 |
| Referring Physician: | Dosanjh, Sonny | Date of Birth: | [redacted] |
| Date of Study: | 07/02/2020 2:00 PM | Gender: | M |
| Facility: | 3T AVENTURA | Age: | 60 |
| Procedure | BRAIN IMAGING (PET) | | |

**AMYVID PET-CT BRAIN:**

**INDICATION:** Cognitive impairment.

**COMPARISON:** None available at time of dictation.

**TECHNIQUE:** The patient was injected with a total dose of 10.25 mCi of F18 Amyvid, followed by brain PET-CT scan 51 minute delay. PET images were acquired from the vertex of the skull through the skull base and corresponding axial noncontrast CT images were acquired and used for both attenuation correction and anatomical correction.

---

**FINDINGS:** There is normal physiologic distribution of the radiotracer activity within the white matter of the brain. No substantial cortical radiotracer accumulation is noted in the frontal lobes, parietal lobes, the anterior or posterior cingulate gyrus or in the lateral temporal lobes. There is no other area of increased cortical grey-matter uptake appreciated. No acute finding on the non-contrast CT.

**Non-contrast CT findings:** No acute finding in the brain, orbits or visualized skull-base.

---

**IMPRESSION:**

**Negative study. No substantial radiotracer activity in the cortex to suggest B-amyloid protein deposition, as described above.**

Electronically Signed by:Eber, Daryl MD
Diplomate of the American Board of Radiology
Diplomate of the American Board of Nuclear Medicine



12

Radiology
& Research

20803 Biscayne Blvd. Suite. 103 Aventura, FL 33180

| | | | |
|---|---|---|---|
| Patient Name: | [redacted] | Patient ID: | EDWD295305 |
| Referring Physician: | Dosanjh, Sonny | Date of Birth: | [redacted] |
| Date of Study: | 07/14/2020 1:39 PM | Gender: | M |
| Facility: | 3T AVENTURA | Age: | 58 |
| Procedure | BRAIN IMAGING (PET) | | |

**PET CT BRAIN:**

**INDICATION:** R41.89. Other symptoms and signs involving cognitive functions and awareness.

**COMPARISON:** None available at time of dictation.

**TECHNIQUE:** The patient was injected with a total dose of 9.3 mCi of F18 Amyvid, followed by brain PET-CT scan 45 minute delay. PET images were acquired from the vertex of the skull through the skull base and corresponding axial noncontrast CT images were acquired and used for both attenuation correction and anatomical correction.

---

**FINDINGS:** There is normal physiologic distribution of the radiotracer activity within the white matter of the brain. No substantial cortical radiotracer accumulation is noted in the frontal lobes, parietal lobes, the anterior or posterior cingulate gyrus or in the lateral temporal lobes. There is no other area of increased cortical grey-matter uptake appreciated. No acute finding on the non-contrast CT.

**Non-contrast CT findings:** No acute finding in the brain, orbits or visualized skull-base.

---

**IMPRESSION:**

**Negative study. No substantial radiotracer activity in the cortex to suggest B-amyloid protein deposition, as described above.**

Electronically Signed by:Eber, Daryl MD
Diplomate of the American Board of Radiology
Diplomate of the American Board of Nuclear Medicine



13

20803 Biscayne Blvd. Suite. 103 Aventura, FL 33180

| | | | |
|---|---|---|---|
| Patient Name: | [redacted] | Patient ID: | BARJ296978 |
| Referring Physician: | Leong, Casey M.D. | Date of Birth: | [redacted] |
| Date of Study: | 07/16/2020 2:14 PM | Gender: | M |
| Facility: | 3T AVENTURA | Age: | 57 |
| Procedure | BRAIN IMAGING (PET) | | |

**INDICATION:** Cognitive function and awareness. R41.89.

**COMPARISON:** None available at time of dictation.

**TECHNIQUE:** The patient was injected with a total dose of 11.2 mCi of F18 Amyvid, followed by brain PET-CT scan 50 minute delay. PET images were acquired from the vertex of the skull through the skull base and corresponding axial noncontrast CT images were acquired and used for both attenuation correction and anatomical correction.

---

**FINDINGS:** There is normal physiologic distribution of the radiotracer activity within the white matter of the brain. No substantial cortical radiotracer accumulation is noted in the frontal lobes, parietal lobes, the anterior or posterior cingulate gyrus or in the lateral temporal lobes. There is no other area of increased cortical grey-matter uptake appreciated. No acute finding on the non-contrast CT.

**Non-contrast CT findings:** No acute finding in the brain, orbits or visualized skull-base.

---

**IMPRESSION:**

1. **Negative study. No substantial radiotracer activity in the cortex to suggest substantial, abnormal B-amyloid protein deposition, as described above.**

Electronically Signed by:Eber, Daryl MD
Diplomate of the American Board of Radiology
Diplomate of the American Board of Nuclear Medicine

page 1 of 1



14

310 West 41ST. Miami Beach, FL 33140

| | | | |
|---|---|---|---|
| Patient Name: | [redacted] | Patient ID: | KINE296481 |
| Referring Physician: | Leong, Casey M.D. | Date of Birth: | [redacted] |
| Date of Study: | 08/05/2020 1:48 PM | Gender: | M |
| Facility: | MIAMI BEACH | Age: | 56 |
| Procedure | BRAIN IMAGING (PET) | | |

**PET-CT OF THE BRAIN:**

**INDICATION:** Impaired cognition for the past 4-5 years.

**COMPARISON:** None available at time of dictation.

**TECHNIQUE:** The patient was injected with a total dose of 10.9 mCi of F18 Amyvid, followed by brain PET-CT scan after a 50 minute delay. PET images were acquired from the vertex of the skull through the skull base and corresponding axial noncontrast CT images were acquired and used for both attenuation correction and anatomical correction.

---

**FINDINGS:** There is normal physiologic distribution of the radiotracer activity within the white matter of the brain. No substantial cortical radiotracer accumulation is noted in the frontal lobes, parietal lobes, the anterior or posterior cingulate gyrus or in the lateral temporal lobes. There is no other area of increased cortical grey-matter uptake appreciated. No acute finding on the non-contrast CT.

**Non-contrast CT findings:** No acute finding in the brain, orbits or visualized skull-base.

---

**IMPRESSION:**

**Negative study. No substantial radiotracer activity in the cortex to suggest B-amyloid deposition, as described above.**

Electronically Signed by:Eber, Daryl MD
Diplomate of the American Board of Radiology
Diplomate of the American Board of Nuclear Medicine

**Exhibit 7:  5/17/22 Byron Cuthbert Response to Questions**

Byron:

Thank you for taking the time to talk with us on 3/8/22.  We have a few follow-up questions for you on points that we think need clarification and thank you in advance for your responses.

1. During our 3/8/22 discussion, you told us that you learned a "process" from Locks Law Firm before taking on Retired NFL Player clients of your own.  Please confirm what "process" you are referring to.

   **Answer:** The "process" I was referring to was as a referral attorney general observations on how the Locks Law firm managed their caseload for the NFL Concussion Settlement claims administration process. Through communications and review of the documents, I observed how the Locks Law firm collected medical records and sworn statements, scheduled clients to doctors, submitted individual claims to Brown Greer, and how the Locks Law firm handled Brown Greer review process of the individual claims.

2. We also pointed out to you that some of the PET scan reports we received from Dr. Eber had a color image from the scan attached.  You told us that practice started when we said we wanted a "picture" and that at first images were not attached to the reports.  For the PET scan images that were initially produced, you confirmed that you called Humberto Carrion at 3T Radiology to request the images.  Please confirm who added the PET scan images to 3T's reports, providing the relevant timeframes if more than one individual or organization is responsible.

   **Answer:** Around September 2020, I submitted Dicom Disks from 3T, and Brown Greer informed me that they could not read the disks I provided. (see Exhibit A) Subsequently, Brown Greer requested pdf  images in addition to the disks,  and I provided Brown Greer pdfs that were given to me by 3T radiology staff. After the request in September 2020, 3T radiology staff had the radiologist add the images to the reports where the radiologist found the scan was positive for amyloid protein in order for Brown Greer to be able to review the findings going forward.

3. Please confirm the date that you became aware of 3T's increase in fees (from $5,000 to $10,000) for performing a PET scan. Did you ever ask anyone at 3T why the fee increased?

   **Answer:** I do not know the exact date that I was made aware of 3T's price change, but I believe it was around December 2020. I do not recall asking anyone at 3T's why the price changed. I stopped using 3T later in 2021, when I learned of other facilities providing the PET scans.

4. How many of your clients received a PET scan from 3T?

   **Answer:** I believe approximately 99 clients conducted PET scans with 3T. I believe approximately 39 scans were positive for amyloid protein and approximately 60 scans were negative.

5. You informed us that you believe you last spoke with anyone from 3T's office around the time we requested images for your clients. Please confirm which request you were referring to. Have you, or anyone that you work with, had any additional interactions or communications with anyone from 3T since our 3/8/22 call?

   **Answer:** I was referring to the Brown Greer request for imaging disks around January 2022. (See exhibit B.) I or anyone that I work with had no additional interactions with anyone from 3T Radiology since the 3/8/22 call.

# EXHIBIT A

 byron cuthbert <byroncut@gmail.com>

# Cuthbert: Clients PET Imaging Disk Shipped to you

1 message

**byron cuthbert** <byroncut@gmail.com> Tue, Sep 1, 2020 at 10:57 AM
To: [redacted]

Dear [redacted]

I am writing this email, in response to your correspondence on August 13, 2020, which you stated:

> In responses to our audit questions, several players you represent have indicated that they do not have any raw images of their PET scans with Dr. Eber and that we should get these images directly from him. However, Dr. Eber has been unresponsive to our outreach. We require these images to move forward with the audits of these claims and ask that you please work with Dr. Eber's office to provide us the raw image results from the PET scans for these players: J.Delamielleure, S.Towle, J.Giesler, F.Hodge, K.Henderson, R.Shelton. As a reminder, Section 10.3(b)(ii) of the Settlement Agreement provides that we may deny, without right to appeal, the claim of a Settlement Class Member who refuses to cooperate with an audit

Today, I shipped overnight package, which enclosed is PET Scan images for the following:

1. Jon Giesler – SPID 950002014
2. Floyd Hodge – SPID 100006961
3. Troy Stradford – SPID 100014702
4. Stephen Towle - SPID 100015454
5. Joe DeLamielleure – SPID 100003809
6. Richard Shelton – SPID 100013792
7. Keith Henderson – SPID 100006694
8. Gerald Perry – SPID 100011956

I shipped them to [redacted], Law Firm Contact, BROWNGREER PLC 250 Rocketts Way, Richmond, Virginia 23231. Please acknowledge receipt of the disks by emailing correspondence confirming receipt when you get them tomorrow September 2, 2020. Please feel free to contact me if you have any more questions. Thank you for your help.

Byron Cuthbert
Attorney at Law
Telephone: (404) 403-7855
Fax: 1(866) 990-9743
byroncut@gmail.com
1143 Cameron Creek
Marietta, Ga 30062

ATTORNEY-CLIENT PRIVILEGED; DO NOT FORWARD OR DISCLOSE WITHOUT EXPRESS PERMISSION.The information in this email transmission is privileged and confidential pursuant to applicable laws. If you are not the intended recipient, nor the employee or agent responsible for delivering it to the intended recipient, you are notified

# EXHIBIT B

 Gmail byron cuthbert <byroncut@gmail.com>

## Bobby Abrams Monetary Award

[redacted] Tue, Dec 21, 2021 at 5:07 PM
To: [redacted], byron cuthbert <byroncut@gmail.com>
Cc: [redacted], [redacted]

Hi Byron:

After looking into this, I found that we placed Mr. Abrams' claim in Audit Pursuant to Section 10.3 of the Settlement Agreement. You will receive a Notice of Audit of Claim tomorrow. We sent you two requests related to the claim today:

1. Proof of costs asserted in the pending lien dispute related to Mr. Abrams' claim; and
2. DICOM images from Mr. Abrams' PET scan with 3T Radiology & Research.

We need this information and documentation to move forward with our Audit of the claim. Please let us know if you have any questions.

Thank you.

[redacted]

Law Firm Contact

BrownGreer PLC

250 Rocketts Way

Richmond, Virginia 23231

[redacted]

Facsimile: (804) 521-7299

www.browngreer.com

*This electronic mail is intended to be received and read only by certain individuals. It may contain information that is privileged or protected*

**Exhibit 8: 3/2/21 - 3/3/21 Dr. Weber Emails to Settlement Program**

[redacted]

**From:** Weber, Kevin <Kevin.Weber@osumc.edu>
**Sent:** Wednesday, March 3, 2021 12:21 PM
**To:** [redacted]
**Cc:** [redacted]
**Subject:** Re: NFL Concussion Settlement - MAF Training Session Materials Posted

I forwarded you the email chain. Really pressuring me to give Alzheimer's diagnosis and I'm not sure what to say in reply

Kevin Weber
M.D./M.H.A.
Assistant Professor of Neurology
Associate Residency Program Director, Neurology
Associate Fellowship Director, UCNS Headache Fellowship
The Ohio State University Neurological Institute
Department of Neurology

---

**From:** [redacted]
**Sent:** Wednesday, March 3, 2021 7:36 AM
**To:** Weber, Kevin <Kevin.Weber@osumc.edu>
**Cc:** [redacted]
**Subject:** Re: NFL Concussion Settlement - MAF Training Session Materials Posted

**CAUTION: External Email**

Hi Dr. Weber - yes, please send us the emails you mention and any other details you feel are pertinent.
We appreciate your help.
[redacted]

> On Mar 2, 2021, at 8:48 PM, Weber, Kevin <Kevin.Weber@osumc.edu> wrote:
>
> Hi [redacted], I have had an attorney for a MAF player contact me a couple of times by email trying to get me to change my diagnosis. Looking back at previous guidance, it seems that I need to notify you to see what next steps are?
>
> Kevin Weber
> M.D./M.H.A.
> Assistant Professor of Neurology
> Associate Residency Program Director, Neurology
> Associate Fellowship Director, UCNS Headache Fellowship
> The Ohio State University Neurological Institute
> Department of Neurology

---

**From:**
**Sent:** Friday, February 5, 2021 3:52 PM
**Cc:**
**Subject:** NFL Concussion Settlement - MAF Training Session Materials Posted

**CAUTION: External Email**

Good Afternoon Qualified MAF Physician Team:
We held two Zoom training sessions last month. Many of you participated and told us you found the training helpful. We are very excited to hear that!
For those who were not able to join the trainings or if you want to refer back to the training session or just review the training slides, we posted those materials to your MAF Portal. You may access the training video and the slides by clicking on the Resource Documents tab and then selecting Webinars and Trainings. The video may take a few minutes to load before you can view it.
We encourage you to review the posted training materials, but we are also happy to answer any questions you may have. If there is anything about the Settlement Program you are not clear on or just want more information about, let us know so we can consider how best to cover it in future materials.
Please let me know if you have any questions or if I can be of further assistance. I am happy to help!
Sincerely,

*This electronic mail is intended to be received and read only by certain individuals. It may contain information that is privileged or protected from disclosure by law. If it has been misdirected, or if you suspect you received this in error, please notify me by replying and then delete this message and your reply. These restrictions apply to any attachment to this email.*

**Exhibit 9: 12/10/20 - 3/12/21 Emails between Byron Cuthbert and Dr. Weber**

---

**From:** byron cuthbert <byroncut@gmail.com>
**Sent:** Friday, March 12, 2021 10:11 AM
**To:** Weber, Kevin <Kevin.Weber@osumc.edu>
**Cc:** Harlan Huckleby <hbomb32@hotmail.com>
**Subject:** Re: Harlan Huckleby MAF neuropsych records

**CAUTION: External Email**

You cannot discuss your medical
Opinion about an patient condition by reviewing other medical records and medical
Literature without guidance from the maf program? This is very concerning. I hope you have a good weekend as well.

Byron Cuthbert
Attorney at Law
Telephone: (404) 403-7855
Fax: 1(866) 990-9743
byroncut@gmail.com
1143 Cameron Creek
Marietta, Ga 30062

> On Mar 12, 2021, at 9:43 AM, Weber, Kevin <Kevin.Weber@osumc.edu> wrote:
>
> Hello there, we have been instructed to direct all questions/concerns to the MAF program, so I unfortunately not have a discussion about this per program

guidelines. I hope that you understand. Have a nice weekend!

Kevin Weber
M.D./M.H.A.
Assistant Professor of Neurology
Associate Residency Program Director, Neurology
Associate Fellowship Director, UCNS Headache Fellowship
The Ohio State University Neurological Institute
Department of Neurology

---

**From:** byron cuthbert <byroncut@gmail.com>
**Sent:** Thursday, March 11, 2021 11:34 AM
**To:** Weber, Kevin <Kevin.Weber@osumc.edu>
**Cc:** Harlan Huckleby <hbomb32@hotmail.com>
**Subject:** Re: Harlan Huckleby MAF neuropsych records

**CAUTION: External Email**

Dr. Weber:
I hope all is well with you. I'm doing a follow up to discuss this matter. Can we talk on the phone?

Byron Cuthbert

Attorney at Law
Telephone: (404) 403-7855
Fax: 1(866) 990-9743
byroncut@gmail.com
1143 Cameron Creek
Marietta, Ga 30062
ATTORNEY-CLIENT PRIVILEGED; DO NOT FORWARD OR DISCLOSE WITHOUT EXPRESS PERMISSION.The information in this email transmission is privileged and confidential pursuant to applicable laws. If you are not the intended recipient, nor the employee or agent responsible for delivering it to the intended recipient, you are notified that any dissemination or copying of this transmission (including any attachments) is strictly prohibited. If you have received this email in error, please notify the sender by email reply. Thank you. There is no intent on the part of the sender to waive any privilege, including the attorney-client privilege, that may attach to this communication. Further, anything you believe to be tax advice in this communication, including attachments, cannot be used to avoid penalties under the Internal Revenue Code, nor does it promote, market, or recommend any transaction or tax-related matter. Law Offices of Byron Cuthbert & Associates does not give tax advice.
On Tue, Mar 2, 2021 at 8:29 PM byron cuthbert <byroncut@gmail.com> wrote:

> Dr. Weber:
> I would like to discuss with you Harlan's Huckleby diagnosis. We just received a bill and I plan to pay his bill for your evaluation. However, Harlan and I did not file your diagnosis for 2.0 because there is no 2.0 CDR finding to support the diagnosis which Brown Greer always refutes with this process. Plus we had another board certified neurologist evaluate Harlan and the Dr. opined a diagnosis for Alzheimer's Disease consistent with what other MAF neurologists have done with other clients of mine in

the past. Under the Agreement, Harlan will recover larger compensation and his symptoms are supported by the Agreement DSM-5 diagnosis criteria for Alzheimer's Disease. I attached the updated report with previous records and supportive literature for why Harlan neuropsych reports, combined with amyloid pet scan and decline in moca scores are consistent with Alzheimer's Disease under the DSM-5. will you review and discuss with me? As a MAF evaluation, you are allowed to consider Level 1.5, 2.0, Alzheimer's Disease, Parkinsons and ALS. we are asking you to consider the information for Alzheimer's Disease diagnosis consideration. please advise us on your opinion?

Byron Cuthbert
Attorney at Law
Telephone: (404) 403-7855
Fax: 1(866) 990-9743
byroncut@gmail.com
1143 Cameron Creek
Marietta, Ga 30062
ATTORNEY-CLIENT PRIVILEGED; DO NOT FORWARD OR DISCLOSE WITHOUT EXPRESS PERMISSION.The information in this email transmission is privileged and confidential pursuant to applicable laws. If you are not the intended recipient, nor the employee or agent responsible for delivering it to the intended recipient, you are notified that any dissemination or copying of this transmission (including any attachments) is strictly prohibited. If you have received this email in error, please notify the sender by email reply. Thank you. There is no intent on the part of the sender to waive any privilege, including the attorney-client privilege, that may attach to this communication. Further, anything you believe to be tax advice in this communication, including attachments, cannot be used to avoid penalties under the Internal Revenue Code, nor does it promote, market, or recommend any transaction or tax-related matter. Law Offices of Byron Cuthbert & Associates does not give tax advice.
On Mon, Dec 21, 2020 at 4:51 PM Weber, Kevin <Kevin.Weber@osumc.edu> wrote:

> It was level 2, given the neuropsychologist's report.
> Kevin Weber
> M.D., M.H.A.
> Assistant Professor of Neurology, Headache Division
> Associate Director, Residency Program
> The Ohio State University Neurological Institute Department of Neurology
>
> **From:** byron cuthbert <byroncut@gmail.com>
> **Sent:** Monday, December 21, 2020 4:45 PM
> **To:** Weber, Kevin <Kevin.Weber@osumc.edu>
> **Subject:** Re: Harlan Huckleby MAF neuropsych records
>
> **CAUTION: External Email**
>
> Did you give him alzheimers?
> Alzheimers does not require affidavits under the agreement for MAF if you did the DSM -5 factors:
> 1) The criteria has been met for major neurocognitive disorder or

dementia?

1) (a) Dementia Syndrome - cognitive or behavioral impairment in at least two of the following: Memory, Reasoning and handling complex tasks, Visuospatial abilities, Language functions, Personality, behavior, or comportment

1(b) Functional impairment - decline from previous level of functioning - CDR

(2) There is insidious onset and gradual progression of impairment in one or more cognitive domains (for major neurocognitive disorder, at least two domains must be impaired)?
(3) Clear evidence of decline in memory and learning and at least one other cognitive domain (based on detailed history or serial neuropsychological)?
(4) Steadily progressive, gradual decline in cognition, without extended plateaus?
(5) No evidence of mixed etiology (i.e., absence of other neurodegenerative or cerebrovascular)?

(6) the previous 5 factors combined with positive amyloid pet scan generally consistent with Alzheimer?

Byron Cuthbert
Attorney at Law
Telephone: (404) 403-7855
Fax: 1(866) 990-9743
byroncut@gmail.com
1143 Cameron Creek
Marietta, Ga 30062
ATTORNEY-CLIENT PRIVILEGED; DO NOT FORWARD OR DISCLOSE WITHOUT EXPRESS PERMISSION.The information in this email transmission is privileged and confidential pursuant to applicable laws. If you are not the intended recipient, nor the employee or agent responsible for delivering it to the intended recipient, you are notified that any dissemination or copying of this transmission (including any attachments) is strictly prohibited. If you have received this email in error, please notify the sender by email reply. Thank you. There is no intent on the part of the sender to waive any privilege, including the attorney-client privilege, that may attach to this communication. Further, anything you believe to be tax advice in this communication, including attachments, cannot be used to avoid penalties under the Internal Revenue Code, nor does it promote, market, or recommend any transaction or tax-related matter. Law Offices of Byron Cuthbert & Associates does not give tax advice.
On Mon, Dec 21, 2020 at 4:37 PM Weber, Kevin <Kevin.Weber@osumc.edu> wrote:

> It has been submitted. It is possible he may have to have a friend fill out a third party affidavit but we'll see if what I submitted is sufficient.
> Kevin Weber
> M.D., M.H.A.
> Assistant Professor of Neurology, Headache Division
> Associate Director, Residency Program
> The Ohio State University Neurological Institute Department of Neurology

**From:** byron cuthbert <byroncut@gmail.com>
**Sent:** Monday, December 21, 2020 4:36 PM
**To:** Weber, Kevin <Kevin.Weber@osumc.edu>
**Subject:** Re: Harlan Huckleby MAF neuropsych records

**CAUTION: External Email**

Thank you. Please let me know so I can look out for it on the portal.
Byron Cuthbert
Attorney at Law
Telephone: (404) 403-7855
Fax: 1(866) 990-9743
byroncut@gmail.com
1143 Cameron Creek
Marietta, Ga 30062

On Dec 21, 2020, at 4:24 PM, Weber, Kevin
<Kevin.Weber@osumc.edu> wrote:

I have reviewed medical records and will submit my diagnosis to
the MAF program.
Kevin Weber
M.D., M.H.A.
Assistant Professor of Neurology, Headache Division
Associate Director, Residency Program
The Ohio State University Neurological Institute Department of
Neurology

**From:** byron cuthbert <byroncut@gmail.com>
**Sent:** Thursday, December 10, 2020 1:57 PM
**To:** Weber, Kevin <Kevin.Weber@osumc.edu>
**Cc:** Harlan Huckleby <hbomb32@hotmail.com>
**Subject:** Harlan Huckleby MAF neuropsych records

**CAUTION: External Email**

Dr. Weber:
see attached medical records including the new neuropsych
results from Dr. Boxley. Dr. Weber, will you consider whether the
combination of the DSM-5 factors, ICD-10/9, and the positive
amyloid pet scan all combined together are generally consistent
with Alzheimer's Disease?
consider the following factors below:
1) The criteria has been met for major neurocognitive
disorder or dementia?

1) (a) Dementia Syndrome - cognitive or behavioral impairment in at least two of the following: Memory, Reasoning and handling complex tasks, Visuospatial abilities, Language functions, Personality, behavior, or comportment

1(b) Decline from previous level of functioning impairment

(2) There is insidious onset and gradual progression of impairment in one or more cognitive domains (for major neurocognitive disorder, at least two domains must be impaired)?

(3) Clear evidence of decline in memory and learning and at least one other cognitive domain (based on detailed history or serial neuropsychological)?

(4) Steadily progressive, gradual decline in cognition, without extended plateaus?

(5) No evidence of mixed etiology (i.e., absence of other neurodegenerative or cerebrovascular)?

(6) the previous 5 factors combined with positive amyloid pet scan generally consistent with Alzheimer?

Byron Cuthbert

Attorney at Law

Telephone: (404) 403-7855

Fax: 1(866) 990-9743

byroncut@gmail.com

1143 Cameron Creek

Marietta, Ga 30062

ATTORNEY-CLIENT PRIVILEGED; DO NOT FORWARD OR DISCLOSE WITHOUT EXPRESS PERMISSION.The information in this email transmission is privileged and confidential pursuant to applicable laws. If you are not the intended recipient, nor the employee or agent responsible for delivering it to the intended recipient, you are notified that any dissemination or copying of this transmission (including any attachments) is strictly prohibited. If you have received this email in error, please notify the sender by email reply. Thank you. There is no intent on the part of the sender to waive any privilege, including the attorney-client privilege, that may attach to this communication. Further, anything you believe to be tax advice in this communication, including attachments, cannot be used to avoid penalties under the Internal Revenue Code, nor does it promote, market, or recommend any transaction or tax-related matter. Law Offices of Byron Cuthbert & Associates does not give tax advice.

**Exhibit 10: 3/15/21 Byron Cuthbert Email to Dr. Weber**

**From:** byron cuthbert <byroncut@gmail.com>
**Date:** March 15, 2021 at 3:27:53 PM EDT
**Subject:** Re: Harlan Huckleby MAF neuropsych records
**To:** Weber, Kevin <Kevin.Weber@osumc.edu>
**Cc:** Harlan Huckleby <hbomb32@hotmail.com>

**CAUTION: External Email**

Dr. Weber:

I'm following up with your email. In the FAQs, on the Concussion Website:
https://www.nflconcussionsettlement.com/FAQDetails.aspx?q=509#509 , it advises players and their attorneys can ask the MAF doctors questions (see FAQ 95). We are asking you to get understanding and clarification of your medical opinion. Besides the benefits, this is important for Mr. Huckleby future treatment and life care plan. Studies have said doctors prescribe different medicines for people with Alzheimer's vs dementia (i.e. 2.0 level) .
We just wanted your opinion based on Hope Neurology opinion and the medical literature. It's very concerning and disturbing that you are saying you cannot give a medical opinion due to guidance from the claims administrator. How can the players or the general public have confidence in the MAF program, when your medical opinion is influenced by the Claims administrator? can you please advise.

**95. What kinds of communications may I have with the Qualified MAF Physician?**

You, or your family member or other authorized representative, may communicate with a Qualified MAF Physician and his or her office staff in the same way you do with any physician you are seeing for an exam. In fact, it is very important that you talk openly and honestly with

the Qualified MAF Physician about your medical condition and that you provide complete and truthful answers to the doctor's questions about your employment, business, social, community, recreational and any other activities you do outside the home (click here for an FAQ about this). You also may cover other things with the Qualified MAF Physician and office staff, such as scheduling appointments, paying for the exam, getting records from the exam, correcting factual things the records may have wrong, and the doctor's diagnosis and advice. If you have a lawyer representing you, that lawyer may communicate with the physician and staff as well, with your permission.

Byron Cuthbert

Attorney at Law

Telephone: (404) 403-7855

Fax: 1(866) 990-9743

byroncut@gmail.com

1143 Cameron Creek

Marietta, Ga 30062

ATTORNEY-CLIENT PRIVILEGED; DO NOT FORWARD OR DISCLOSE WITHOUT EXPRESS PERMISSION.The information in this email transmission is privileged and confidential pursuant to applicable laws. If you are not the intended recipient, nor the employee or agent responsible for delivering it to the intended recipient, you are notified that any dissemination or copying of this transmission (including any attachments) is strictly prohibited. If you have received this email in error, please notify the sender by email reply. Thank you. There is no intent on the part of the sender to waive any privilege, including the attorney-client privilege, that may attach to this communication. Further, anything you believe to be tax advice in this communication, including attachments, cannot be used to avoid penalties under the Internal Revenue Code, nor does it promote, market, or recommend any transaction or tax-related matter. Law Offices of Byron Cuthbert & Associates does not give tax advice.

**Exhibit 11: 3/15/21 - 4/27/21 Emails between Byron Cuthbert and Settlement Program**

[redacted]

**From:** byron cuthbert <byroncut@gmail.com>
**Sent:** Tuesday, April 27, 2021 2:29 PM
**To:** [redacted]
**Subject:** Re: Inquiries Regarding Mr. Huckleby's MAF Exam

[redacted]:

I'm sorry, but I'm confused. How was I in your words ``Besmirching valued program professionals"? I only stated my client's opinion and feelings about their experience with Dr. Weber. I'm allowed to state or quote my client's opinion and feelings. Opinion statements are protected by the first amendment in the United States of America. If you don't believe it was their opinion please call my clients. They will be more than happy to tell you, the judge, the media, or anyone else their feelings about their experience with this program.

Also, I just cc'd Dr. Lerner office staff so you can simply confirm with the office they are allowed to schedule my client. I'm sorry if my actions offended you, but it was not my intention to offend you.

As the Administrator, you are supposed to be neutral. I mean you had no right to attempt to interfere or influence my client scheduling with Dr. Lerner, which his staff explained to my client's wife you did. The MAF rules ordered by Judge Brody state my client could see the doctors within 150 miles. I really would appreciate it if you stop misquoting me, alleging improper actions, or making unfounded allegations as well. Once again, I'm sorry if my actions offended you, but it was not intentional. I wish you a good day.

Byron Cuthbert
Attorney at Law
Telephone: (404) 403-7855
Fax: 1(866) 990-9743
byroncut@gmail.com
1143 Cameron Creek
Marietta, Ga 30062

ATTORNEY-CLIENT PRIVILEGED; DO NOT FORWARD OR DISCLOSE WITHOUT EXPRESS PERMISSION.The information in this email transmission is privileged and confidential pursuant to applicable laws. If you are not the intended recipient, nor the employee or agent responsible for delivering it to the intended recipient, you are notified that any dissemination or copying of this transmission (including any attachments) is strictly prohibited. If you have received this email in error, please notify the sender by email reply. Thank you. There is no intent on the part of the sender to waive any privilege, including the attorney-client privilege, that may attach to this communication. Further, anything you believe to be tax advice in this communication, including attachments, cannot be used to avoid penalties under the Internal Revenue Code, nor does it promote, market, or recommend any transaction or tax-

related matter. Law Offices of Byron Cuthbert & Associates does not give tax advice.

On Tue, Apr 27, 2021 at 1:13 PM [REDACTED] wrote:

> Mr. Cuthbert: Your client is obviously entitled to his opinion and can make his choices. But I really do not see value in besmirching valued program professionals and copying others on your emails. As a lawyer representing other clients in this Program, and realizing that Qualified MAF Physicians serve needs of all class members, not just your one clients', and that retaining Program doctors is our priority, I ask that you consider making public statements that truly are not supported by facts. Both Dr. Lerner and Dr. Weber are esteemed professionals, highly valued by the Program, and their services are needed by thousands of Settlement Class Members.
>
> Thank you.
>
> **From:** byron cuthbert <byroncut@gmail.com>
> **Sent:** Tuesday, April 27, 2021 12:53 PM
> **To:** [REDACTED]
> **Cc:** Harlan Huckleby <hbomb32@hotmail.com>; Elaine.Callis@UHhospitals.org
> **Subject:** Re: Inquiries Regarding Mr. Huckleby's MAF Exam
>
> :
>
> Per my conversation with my client, Harlan and his wife Michelle stated they will be evaluated by Dr. Lerner because they do not trust Dr. Weber and his opinion. They feel like he does not care about his health, future treatment and life plan. This is beyond a diagnosis for financial benefits this involves their life. I cc'd his staff so that you can confirm that Mr. Huckleby per the MAF guidelines is allowed to see Dr. Lerner because Harlan is within 150 miles of his office.
>
> Byron Cuthbert
> Attorney at Law
> Telephone: (404) 403-7855
> Fax: 1(866) 990-9743
> byroncut@gmail.com
> 1143 Cameron Creek
> Marietta, Ga 30062
>
> ATTORNEY-CLIENT PRIVILEGED; DO NOT FORWARD OR DISCLOSE WITHOUT EXPRESS PERMISSION.The information in this email transmission is privileged and confidential pursuant to applicable laws. If you are not the intended recipient, nor the employee or agent responsible for delivering it to the intended recipient, you are notified that any dissemination or copying of this transmission (including any attachments) is strictly prohibited. If you have received this email in error, please notify the sender by email reply. Thank you. There is no intent on the part of the sender to waive any privilege, including the attorney-client privilege, that may attach to this communication. Further, anything you believe to be tax advice in this communication, including attachments, cannot be used to avoid penalties under the Internal Revenue Code, nor does it promote, market, or recommend any transaction or tax-related matter. Law Offices of Byron Cuthbert & Associates does not give tax

advice.

On Mon, Apr 26, 2021 at 4:23 PM [redacted] wrote:

Mr. Cuthbert: it is your client's choice, you are correct. He can see Dr. Lerner if that is what he wants.

Dr. Weber was not answering your questions about the diagnosis he made or changes to the diagnosis, because he is not permitted to do so under the Program rules and we ask that you do not ask doctors such questions. You asked me to look into your questions, which I am happy to do and which I did by consulting the Program's neutral AAP Leadership Council and facilitated a call with Dr. Weber to discuss. As a result of that call, Dr. Weber said that he would like to see your client again to finalize his thoughts regarding the diagnosis.

As your client is free to do as he chooses (although such change of Program doctors looking for a diagnosis I would not encourage and instead would encourage him to see Dr. Weber and trust his medical judgment), I just ask that you confirm for me your client's choice, and I will let the doctors know.

Thank you.

**From:** byron cuthbert <byroncut@gmail.com>
**Sent:** Monday, April 26, 2021 4:12 PM
**To:** [redacted]; Harlan Huckleby <hbomb32@hotmail.com>
**Subject:** Re: Inquiries Regarding Mr. Huckleby's MAF Exam

:

I reviewed your emails and discussed the matter with my client. Last year, Harlan and I requested a waiver because in 2020 it was explained to us and our understanding that Dr. Lerner, who was the MAF within 150 miles of Mr. Huckleby was not taking clients during 2020 when we asked them to schedule an appointment. As you know, Harlan was evaluated by Dr. Weber, who opined that Harlan was level 2.0 but did not complete all the necessary documents for the claim to be approved in the process.

As you know, Harlan and I asked Dr. Weber for his rationale I and Mr. Huckleby question was did Dr. Weber considers the evidence of amyloid pet scan with cognitive impairment in the medical file? Did Dr. Weber consider and then rule out diseases such as Parkinson's ALS and most importantly Alzheimers in his evaluation? Specifically, if Dr. Weber ruled Alzheimers out, what was his rationale? If he did not rule it out, why did he avoid discussing Alzheimers and only pushed for level 2.0 every time we asked about Alzheimers? As you know, Mr. Hucklebyt demonstrated impairment in two domains at severe dementia levels of 2.0 through Neuropsychological testing. One domain was memory and learning, which is a

key hallmark symptom of Alzheimers.

In addition to the two impaired domains one being memory, Mr. Huckleby has a positive biomarker of amyloid pet scan, which FAQ 118 says , " This brain imaging, often called "Amyloid PET," is meant to assist clinicians in detecting whether Alzheimer's Disease is the cause of cognitive impairment ... Therefore, a PET scan showing amyloid neuritic plaque in the brain may support an Alzheimer's Disease diagnosis but does not establish an actual manifestation of cognitive impairment, which is required under Settlement criteria." With the fact that Mr. Huckebly is demonstrating impairment in two domains at severe dementia levels of 2.0 through Neuropsychological testing (one being memory domain) and a positive amyloid pet scan, Mr. Huckleby and I are trying to understand, if Dr. Weber ruled Alzheimers out, what was his rationale?

Anyway, this whole matter was very concerning to my client, his wife, and I. My clients do not trust Dr. Weber's opinion because he would not explain his rationale. As previously stated, this is very concerning when the doctors will not provide answers or explanations to their reasoning, how can the general public or the players have confidence in the doctor's diagnosis and the implementation of this suit? Other concerns expressed by my clients are you allegeing my client and I are trying to influence the doctor by simply asking for the doctor's opinion especially when there was a diagnosis of Alzhimers in his medical file. It is concerning how you the Administrator are dictating or trying to influence/tell my client what doctor he can see when 150 mile rules allow for him to see Dr. Lerner.

Dr. Weber diagnosis of 2.0 with no explanation of why it was not Alzheimers is especially disturbing since Ohio State advertises this at the following link: https://wexnermedical.osu.edu/brain-spine-neuro/memory-disorders/alzheimers .

Under ***Why Choose Ohio State for treatment of Alzhiemer's disease***?

When you scroll further down It is under the **Diagnosing Alzheimer's Disease** headline.

- Positron emission tomography (PET) scan, including amyloid PET and fludeoxyglucose (FDG) PET, a technique that *enables **definitive** early diagnosis of Alzheimer's disease*

Anyway, to answer your question, my client refuses to see Dr. Weber and under the MAF rules he is not required to see Dr. Weber anymore since Dr. Lerner office made us aware that Dr. Lerner is accepting MAF appointments again. Dr. Lerner is within 114 miles of my clients address, which is compliant with the 150 miles rule. Therefore under MAF guidelines Rule 9, my client is allowed to see Dr. Lerner and the administrator, you are not allowed to deny him of that right to be scheduled and evaluated by Dr. Lerner. This denial is improper and violates the MAF guidelines ordered by Judge Brody.

My client and I want you the Administrator to approve Dr. Lerner request for my client to attend a MAF evaluation with Dr. Lerner since Harlan is entitled to this evaluation under the MAF guidelines rule 9 ordered by Judge Brody (see attached) . Ohio State, Dr. Weber office, is beyond 150 miles and although my client has an established relationship with Dr. Weber due to the previous waiver and evaluation, it is not required nor necessary for my client to conduct a follow up evaluation with Dr. Weber because Dr. Lerner is taking clients again. Please acknowledge receipt of this email,assist with scheduling my client with Dr. Lerner, and approve the evaluation in a timely manner. Thank you for your assistance in this matter.

**1. Lerner, Alan J.**
**University Hospitals Cleveland Medical Center**
*** Brain Health and Memory Center at University Hospital Office Number: 216-464-6412 Dr. Lerner's Secretary's: Elaine 216-464-6449**

11100 Euclid Avenue
Cleveland, OH 44106
216-844-1000

*Approx. 114 miles from zip code 48322*
*Get directions*

Accepted Insurance Plans:
*Contact the provider for accepted health plans*

---

**2. Sas, Andrew**
**The Ohio State University Neurological Institute**

**Weber, Kevin**
**The Ohio State University Neurological Institute**

395 W. 12th Avenue
Columbus, OH 43210
614-293-4969

*Approx. 175 miles* from zip code 48322
*Get directions*

Accepted Insurance Plans:

Byron Cuthbert
Attorney at Law
Telephone: (404) 403-7855
Fax: 1(866) 990-9743
byroncut@gmail.com

1143 Cameron Creek
Marietta, Ga 30062

ATTORNEY-CLIENT PRIVILEGED; DO NOT FORWARD OR DISCLOSE WITHOUT EXPRESS PERMISSION.The information in this email transmission is privileged and confidential pursuant to applicable laws. If you are not the intended recipient, nor the employee or agent responsible for delivering it to the intended recipient, you are notified that any dissemination or copying of this transmission (including any attachments) is strictly prohibited. If you have received this email in error, please notify the sender by email reply. Thank you. There is no intent on the part of the sender to waive any privilege, including the attorney-client privilege, that may attach to this communication. Further, anything you believe to be tax advice in this communication, including attachments, cannot be used to avoid penalties under the Internal Revenue Code, nor does it promote, market, or recommend any transaction or tax-related matter. Law Offices of Byron Cuthbert & Associates does not give tax advice.

On Mon, Apr 26, 2021 at 2:45 PM [redacted] wrote:

Mr. Cuthbert – can you confirm whether your client is amenable to having a follow up exam with Dr. Weber? We informed Dr. Lerner that this follow up is being planned but his office just told us that they received a call from Mr. Huckleby's spouse saying that Mr. Huckleby will not see Dr. Weber. Can you please confirm?

Thanks.
[redacted]

---

**From:** [redacted]
**Sent:** Monday, April 26, 2021 11:32 AM
**To:** byron cuthbert <byroncut@gmail.com>
**Cc:** Harlan Huckleby <hbomb32@hotmail.com>
**Subject:** RE: Inquiries Regarding Mr. Huckleby's MAF Exam

Mr. Cuthbert:

Dr. Weber will be following up with you to schedule a follow up exam for Mr. Huckleby.

I would like to ask that you limit your interactions with Dr. Weber to scheduling and do not engage him in conversations about making any particular diagnoses or changes to the diagnoses he makes.

Thank you.
[redacted]

**From:** byron cuthbert <byroncut@gmail.com>
**Sent:** Monday, March 29, 2021 1:18 PM
**To:** [redacted]
**Cc:** Harlan Huckleby <hbomb32@hotmail.com>
**Subject:** Re: Inquiries Regarding Mr. Huckleby's MAF Exam

:

I and Mr. Huckleby reviewed FAQs 118 and understand it. Our question is did Dr. Weber consider the evidence in the medical file? Did Dr. Weber consider and then rule out diseases such as Parkinson's ALS and most importantly Alzheimers in his evaluation? Specifically, if Dr. Weber ruled Alzheimers out what was his rationale? If he did not rule it out, why did he avoid discussing Alzheimers and only pushed for level 2.0 every time we asked about Alzheimers? My client demonstrated impairment in two domains at severe dementia levels of 2.0 through Neuropsychological testing. One domain was memory and learning, which is a key symptom of Alzheimers.

In addition to the two impaired domains one being memory, Mr. Huckleby has a positive biomarker of amyloid pet scan, which FAQ 118 says , " This brain imaging, often called "Amyloid PET," is meant to assist clinicians in detecting whether Alzheimer's Disease is the cause of cognitive impairment ... Therefore, a PET scan showing amyloid neuritic plaque in the brain may support an Alzheimer's Disease diagnosis but does not establish an actual manifestation of cognitive impairment, which is required under Settlement criteria." With the fact that my client is demonstrating impairment in two domains at severe dementia levels of 2.0 through Neuropsychological testing (one being memory domain) and a positive amyloid pet scan, Mr. Huckleby and I are trying to understand, if Dr. Weber ruled Alzheimers out, what was his rationale?

This is disturbing since Ohio State advertises this at the following link: https://wexnermedical.osu.edu/brain-spine-neuro/memory-disorders/alzheimers .

Under ***Why Choose Ohio State for treatment of Alzhiemer's disease*?**

When you scroll further down It is under the **Diagnosing Alzheimer's Disease** headline.

- Positron emission tomography (PET) scan, including amyloid PET and fludeoxyglucose (FDG) PET, a technique that *enables **definitive** early diagnosis of Alzheimer's disease*

This is very concerning when the doctors will not provide answers or explanations to their reasoning, how can the general public or the players have confidence in the doctors diagnosis and the implementation of this suit?

In previous correspondence a few weeks ago, you stated you were going to work on getting us a response, Mr. Huckelby and I will like an explanation of Dr. Weber rationale by COB Friday April 2, 2021. All we are asking, with two severe impaired cognitive domains (one being memory) and an amyloid pet scan, what was Dr. Weber rationale that Mr. Huckleby does not have Alzheimers Disease?

Byron Cuthbert
Attorney at Law
Telephone: (404) 403-7855
Fax: 1(866) 990-9743
byroncut@gmail.com
1143 Cameron Creek
Marietta, Ga 30062

ATTORNEY-CLIENT PRIVILEGED; DO NOT FORWARD OR DISCLOSE WITHOUT EXPRESS PERMISSION.The information in this email transmission is privileged and confidential pursuant to applicable laws. If you are not the intended recipient, nor the employee or agent responsible for delivering it to the intended recipient, you are notified that any dissemination or copying of this transmission (including any attachments) is strictly prohibited. If you have received this email in error, please notify the sender by email reply. Thank you. There is no intent on the part of the sender to waive any privilege, including the attorney-client privilege, that may attach to this communication. Further, anything you believe to be tax advice in this communication, including attachments, cannot be used to avoid penalties under the Internal Revenue Code, nor does it promote, market, or recommend any transaction or tax-related matter. Law Offices of Byron Cuthbert & Associates does not give tax advice.

On Mon, Mar 29, 2021 at 12:14 PM [REDACTED] wrote:

Mr. Cuthbert: please review FAQ 118 regarding the use of a biomarker test (such as an amyloid PET, spinal fluid test) to establish a Qualifying Diagnosis of Alzheimer's Disease.

Qualified MAF Physicians can make Qualifying Diagnoses of Level 1.5 and Level 2 Neurocognitive Impairment, Alzheimer's and Parkinson's diseases, and ALS. FAQs 84 and 85 as well as the Settlement Agreement cover that.

Thank you.
[REDACTED]

**From:** byron cuthbert <byroncut@gmail.com>
**Sent:** Monday, March 29, 2021 10:45 AM
**To:** [REDACTED]
**Cc:** Harlan Huckleby <hbomb32@hotmail.com>
**Subject:** Re: Inquiries Regarding Mr. Huckleby's MAF Exam

[REDACTED]:

My client has me following up on your findings. We are asking the Administrator to provide a valid answer from Dr. Weber on whether he considered Alzheimer's and if not why/how did he rule Alzheimer's out. Please provide us with an update or an estimated timeframe for your findings by COB tomorrow. Thank you.

Below is a bullet point from the page of the link sent in prior correspondence about the Wexner Medical Center where Ohio State advertises: https://wexnermedical.osu.edu/brain-spine-neuro/memory-disorders/alzheimers . Under ***Why Choose Ohio State for treatment of Alzhiemer's disease***?

When you scroll further down It is under the **Diagnosing Alzheimer's Disease** headline.

- Positron emission tomography (PET) scan, including amyloid PET and fludeoxyglucose (FDG) PET, a technique that *enables* ***definitive*** *early diagnosis of Alzheimer's disease*

Byron Cuthbert
Attorney at Law
Telephone: (404) 403-7855
Fax: 1(866) 990-9743
byroncut@gmail.com
1143 Cameron Creek
Marietta, Ga 30062

ATTORNEY-CLIENT PRIVILEGED; DO NOT FORWARD OR DISCLOSE WITHOUT EXPRESS PERMISSION.The information in this email transmission is privileged and confidential pursuant to applicable laws. If you are not the intended recipient, nor the employee or agent responsible for delivering it to the intended recipient, you are notified that any dissemination or copying of this transmission (including any attachments) is strictly prohibited. If you have received this email in error, please notify the sender by email reply. Thank you. There is no intent on the part of the sender to waive any privilege, including the attorney-client privilege, that may attach to this communication. Further, anything you believe to be tax advice in this communication, including attachments, cannot be used to avoid penalties under the Internal Revenue Code, nor does it promote, market, or recommend any transaction or tax-related matter. Law Offices of Byron Cuthbert & Associates does not give tax advice.

On Wed, Mar 17, 2021 at 7:51 PM byron cuthbert <byroncut@gmail.com> wrote:

:

I did not ask Dr. Weber in your words to "switch his opinion", but I asked for his opinion considering the evidence already in the file and the new evidence that I presented to him. I'm trying to understand how he as a Qualified MAF Physician reached his diagnosis? I'm trying to understand how a doctor from an institution that advertises about Alzheimer's will not give his opinion about positive amyloid scan in the medical file when they advertise via this

link https://wexnermedical.osu.edu/brain-spine-neuro/memory-disorders/alzheimers the following:

> **Research:** Ohio State conducts more Alzheimer's clinical research and clinical trials than any other medical center in Ohio. Our patients have more immediate access to the most promising treatments and diagnostic techniques, often long before they are available to the public.
>
> Additionally, we have high-powered magnetic resonance imaging (MRI) and state-of-the-art positron emission tomography (PET) machines that provide highly defined images for research: the 3 Tesla MRI, 7 Tesla MRI and amyloid and tau PET imaging. This equipment produces crisp, high-resolution images at a remarkable level of accuracy.

It's disturbing that every time I asked,  did he considerAlzheimer's ?, which under the Agreement he can as a MAF (MAF program can consider: 1.5, 2.0, Alzheimer's, Parkinson's, and ALS) the Doctor ignored the inquiry and pushed for cognitive impairment level 2.0. The Doctor did not even fill out a CDR or request for a third party statement to complete the level 2.0 diagnosis.

It is disturbing that he would not answer basic questions and stated per the guidelines I can only talk to you Brown Greer the Administrator. My client and I want to know the basis of Dr. Weber rationale. Is it because my client went to the University of Michigan and the doctor is an Ohio State fan (see his biography)? Is it because my client is African American and the neurologist is a white man? As one of the few black attorneys around this litigation, this is a valid concern from my client due to the racial discrimination practices with the Heathen norms that are implemented in the BAP program algorithim when calculating impairment. Is it because the doctor has been instructed only to give Level 1.5 or Level 2.0 due to your AAP and Administrator training with doctors on how to write up reports? Is it because he wants to deny my client of benefits arbitrarily? The bottom line is this very concerning. When the doctors will not provide answers or explanations to their reasoning, how can the general public or the players have confidence in the implementation of this suit?

Per your request, I will not ask Dr. Weber any questions, but I expect a valid answer from him on whether he considered Alzheimer's and if not

why/how did he rule Alzheimer's out?

Byron Cuthbert
Attorney at Law
Telephone: (404) 403-7855
Fax: 1(866) 990-9743
byroncut@gmail.com
1143 Cameron Creek
Marietta, Ga 30062

ATTORNEY-CLIENT PRIVILEGED; DO NOT FORWARD OR DISCLOSE WITHOUT EXPRESS PERMISSION.The information in this email transmission is privileged and confidential pursuant to applicable laws. If you are not the intended recipient, nor the employee or agent responsible for delivering it to the intended recipient, you are notified that any dissemination or copying of this transmission (including any attachments) is strictly prohibited. If you have received this email in error, please notify the sender by email reply. Thank you. There is no intent on the part of the sender to waive any privilege, including the attorney-client privilege, that may attach to this communication. Further, anything you believe to be tax advice in this communication, including attachments, cannot be used to avoid penalties under the Internal Revenue Code, nor does it promote, market, or recommend any transaction or tax-related matter. Law Offices of Byron Cuthbert & Associates does not give tax advice.

On Mon, Mar 15, 2021 at 4:44 PM [REDACTED] wrote:

> Mr. Cuthbert: We are looking into the issues you raised regarding the diagnosis rendered during Mr. Huckleby's MAF exam and will follow up to discuss them with you shortly. We want to remind you that while you may ask the Qualified MAF Physician how he or she reached a diagnosis, you may not ask the doctor to change that diagnosis in any way. Each Qualified MAF Physician exercises sound professional medical judgment in evaluating Retired NFL Football Players for potential Qualifying Diagnoses and cannot be influenced or requested to change outcomes.
>
> We ask that you do not contact the Qualified MAF Physician regarding this question. We will be in touch.
>
> Thanks.
>
> [REDACTED]
>
> [REDACTED]
>
> 
> 
>
> 250 Rocketts Way
> Richmond, Virginia 23231
> [REDACTED]
> [REDACTED]
> www.browngreer.com

*This electronic mail is intended to be received and read only by certain individuals. It may contain information that is privileged or protected from disclosure by law. If it has been misdirected, or if you suspect you received this in error, please notify me by replying and then delete this message and your reply. These restrictions apply to any attachment to this email.*

**Exhibit 12: 1/10/21 AAPLC Opinion**

**From:**
**To:**
**Cc:**
**Subject:** Re: AAPLC - Scariano Input and Determination Request
**Date:** Sunday, January 10, 2021 6:52:30 PM
**Attachments:** Scariano Claim determinations 2021-01-05.pdf

---

My report is attached. I also cannot recommend approval for any of these claims.

I agree; this is not encouraging. To be blunt, D. Scariano's documentation is a mess. (It reminds me of a few of the well-meaning but ineffective physicians from Florida who were excpetionally active in Pre-ED claims). I don't think there is anything he can do to rescue these.

I believe it is likely that Dr. Scariano was originally told that these players were coming to him simply to confirm a biomarker-proved diagnosis of Alzheimer's disease, and it didn't matter what he wrote because the end of the story was already known.

Furher feedback - if planned - should emphasize the need for a good cognitive and functional history that would stand alone if neither the examiner or reader had any knowledge of his patient being a former NFL player. There must be a cogent assessment of cognition, mood, motivation, and affect that addresses red flags for poor performance validity like limited cooperation. Noncognitive factors that limit function must be addressed prospectively and not dismissed by *post hoc* summary or conclusory statements in support of paraphrased elements from the required criteria.

I am not hopeful.



**Exhibit 13: 8/13/20 Questions to Byron Cuthbert**

**From:** [redacted]
**To:** byroncut@gmail.com
**Subject:** NFL - Audit Byron Cuthbert and Associates, LLC
**Date:** Thursday, August 13, 2020 11:17:07 AM

Byron:

As the Claims Administrator under the NFL Concussion Class Action Settlement Agreement, we are conducting an audit of certain Monetary Award claims submitted to us by you or your firm. As part of that audit, we ask you to answer the following questions and provide the documents requested, **within 15 days after this request**. The "you" in all questions means each lawyer or representative, employee or agent of a lawyer or law firm involved in the Monetary Awards you or your firm has submitted.

Pursuant to Rule 10 of the Rules Governing the Audit of Claims adopted by the Special Masters appointed by the federal court overseeing this Settlement, any request for information from us has the force and effect of a subpoena under Rule 45 of the Federal Rules of Civil Procedure. You must respond to these questions and provide all information and documents requested in detail. If you do not understand a question for some reason, then contact us and we will explain. If you fail to respond in full to these questions within 15 days, the Monetary Award claims subject to this Audit investigation will be held until complete information and documents are provided. Objections and incomplete answers can lead to the denial of the claims.

This request is confidential. Except for your own lawyer, you may not discuss this request with any other parties, including third party witnesses and medical examiners, unless necessary to provide complete answers. Additionally, pursuant to Audit Rule 9, you must preserve all information and records related to the claims from the Retired NFL Football Players you represent.

1. We have observed that you have used Dr. Daryl Eber with 3T Radiology and Dr. Ovsev Uzuner with Akumin Labs. Please identify any other PET scan providers you have used or intend to use for your claims in this Program.
2. Why did you choose Dr. Eber as the PET scan provider for players you represent?
3. When and how did you initiate contact with Dr. Eber for purposes of rendering PET scans for players?
4. How many players that you represent have undergone a PET scan with Dr. Eber?
5. Has Dr. Eber ever provided a negative result ("Negative Study") for any players you represent? If so, please provide those players' names and copies of the results of Dr. Eber's scans.
6. Do you have any arrangements or agreements with Dr. Eber related to his examinations of your clients? If so, please provide copies of these agreements and describe to us the nature of any verbal agreements or arrangements.
7. Have you provided Dr. Eber with any guidelines or instructions related to his examination of players you represent? If so, what were those instructions?
8. Please explain in detail the process for obtaining a PET Scan from Dr. Eber. Who typically refers the player to Dr. Eber? Who typically schedules the PET scan with Dr. Eber's office? Does the PET scan occur before or after the examination with the diagnosing physician? Where does Dr. Eber send the results of the PET scan? Does he send them directly to the diagnosing physician or to you?
9. Have any players you represent received a PET scan from Dr. Eber or any other provider prior to the player's exam or consultation with the diagnosing physician? If so, please explain why the player received a PET scan prior to his exam with the diagnosing physician.

10. In responses to our audit questions, several players you represent have indicated that they do not have any raw images of their PET scans with Dr. Eber and that we should get these images directly from him. However, Dr. Eber has been unresponsive to our outreach. We require these images to move forward with the audits of these claims and ask that you please work with Dr. Eber's office to provide us the raw image results from the PET scans for these players: J.Delamielleure, S.Towle, J.Giesler, F.Hodge, K.Henderson, R.Shelton. As a reminder, Section 10.3(b)(ii) of the Settlement Agreement provides that we may deny, without right to appeal, the claim of a Settlement Class Member who refuses to cooperate with an audit.
11. Please produce copies of all written communications you have had with Dr. Eber and describe in detail the nature of any verbal communications you have had with Dr. Eber.
12. When and how did you initiate contact with Dr. Julie Schwartzbard for purposes of examining players you represent?
13. Why did you choose Dr. Schwartzbard to examine players you represent?
14. Do you have any arrangements or agreements with Dr. Schwartzbard related to her examinations of your clients? If so, please provide copies of these agreements and describe to us the nature of any verbal agreements or arrangements.
15. Have you provided Dr. Schwartzbard with any guidelines or instructions related to his examination of players you represent? If so, what were those instructions?
16. Please produce copies of all written communications you have had with Dr. Schwartzbard and describe in detail the nature of any verbal communications you have had with Dr. Schwartzbard
17. When and how did you initiate contact with Dr. Scariano for purposes of examining retired NFL players?
18. Why did you choose Dr. Scariano to examine players you represent?
19. Do you have any agreements or arrangements with Dr. Scariano related to his examinations of your clients? If so, please provide copies of these agreements and describe to us the nature of any verbal agreements or arrangements.
20. Have you provided Dr. Scariano with any guidelines or instructions related to his examination of players you represent? If so, what were those instructions?

Thank you,
[redacted]

Law Firm Contact
**BrownGreer PLC**
250 Rocketts Way
Richmond, Virginia 23231
[redacted]
www.browngreer.com
*This electronic mail is intended to be received and read only by certain individuals. It may contain information that is privileged or protected from disclosure by law. If it has been misdirected, or if you suspect you received this in error, please notify me by replying and then delete this message and your reply. These restrictions apply to any attachment to this email.*

**Exhibit 14: 6/26/22 AAPLC Email to Settlement Program**

[redacted]

**From:** [redacted]
**Date:** June 26, 2022 at 6:29:43 PM EDT
**To:** [redacted]
**Subject: Continued concerns re attorney influence on diagnosis**

Hi [redacted],

I reviewed two of Dr. Billian's diagnoses this weekend (SPIDs 100002465 and 100009416). Both were Alzheimer claims with significant backdating, and in neither did I find support for either the diagnosis or the backdating. This is the exact pattern I saw with Dr. Scariano's diagnoses of players represented by the same lawyer.

In Dr. S's situation, I had reason - based on his documentation - to suspect his competence. However, except for some tortured logic on coming to the qualifying diagnosis, Dr. Billian's notes are otherwise cogent and appropriately detailed. [redacted] My only conclusion is that the player's attorney is communicating an expectation about both the qualifying diagnosis and the date.

Dr. Randall Griffith is one of the neuropsychologists who has participated in

several of the claims from Dr. S and Dr. B.   I have concerns about his
test interpretations that may lie outside standards of care and be inappropriately
persuasive to neurologists not familiar with neuropsychological methods.   His
notes may warrant more systematic review by an AAPC or outside consultant.


I am of course, willing to discuss these issues in more detail as needed.



**Exhibit 15: 3/11/21 Settlement Program Email to Dr. Scariano**

[redacted]

**From:** [redacted]
**Sent:** Thursday, March 11, 2021 1:05 PM
**To:** Anastasia Hood <anastasia@scarianoneuro.com>; jscarianojr@yahoo.com
**Subject:** Request

Dr. Scariano and Anastasia:

As the Claims Administrator under the NFL Concussion Class Action Settlement Agreement, we have a duty to verify claims submitted to us and to assure compliance with the Program's Rules. We need your help to carry out this duty.

Pursuant to Rule 10 of the Rules Governing the Audit of Claims adopted by the Special Masters appointed by the federal court overseeing this Settlement, any request for information from us has the force and effect of a subpoena under Rule 45 of the Federal Rules of Civil Procedure. You must respond to these questions and provide all information and documents requested in detail. If you do not understand a question for some reason, then contact us and we will explain. If you fail to respond in full to these questions within 15 days, the Monetary Award claims subject to this Audit investigation will be held until complete information and documents are provided. Objections and incomplete answers can lead to the denial of the claims.

This request is confidential. Except for your own lawyer (if you have one), you may not discuss this request with any other parties, including third party witnesses and lawyers representing Players in the Settlement Program. Additionally, pursuant to Audit Rule 9, you must preserve all information and records.

**Request**:

We would like for you to provide us communications you had with Mr. Byron Cuthbert (and in general with anyone else from his firm), relating to Player evaluations, your reports, and diagnoses. We do not need to see communications that pertain strictly to scheduling.

Note that our request does not imply any wrongdoing on anyone's behalf, and we are fulfilling our duties under the Settlement Agreement. You can forward such communications directly to me. If possible, could you complete this request as quickly as possible, but no later than by 3/18/21?

Thank you very much for your help. Let me know if you have any questions!

[redacted]

BrownGreer PLC
250 Rocketts Way
Richmond, Virginia 23231
[redacted]
www.browngreer.com

*This electronic mail is intended to be received and read only by certain individuals. It may contain information that is privileged or protected from disclosure by law. If it has been misdirected, or if you suspect you received this in error, please notify me by replying and then delete this message and your reply. These restrictions apply to any attachment to this email.*

**Exhibit 16: Feb.-Mar. 2021 Email Threads between Dr. Scariano and Mr. Cuthbert**

**From:** Anastasia Hood <anastasia@scarianoneuro.com>
**Sent:** Tuesday, March 16, 2021 10:56 AM
**To:** [redacted]
**Subject:** Byron Email Thread

Hi [redacted]!

There is one thread that is so oddly formatted, I hope it is not too hard to read! Let me know if you need anything else!

Anastasia M. Hood
Workers' Comp / IME / Legal & Paralegal Administrator
JACK E. SCARIANO JR. MD, PLLC
139 Fox Road, Suite #201
Knoxville, TN 37922
Phone: (865) 769-9595 ext. 103
Fax: (865) 769-9510
anastasia@scarianoneuro.com

## Re: Cuthbert: Status of reports

byron cuthbert <byroncut@gmail.com>
Fri 3/12/2021 10:35 AM
**To:** Anastasia Hood <anastasia@scarianoneuro.com>

Can you let me review before we submit to the program?

Byron Cuthbert
Attorney at Law
Telephone: (404) 403-7855
Fax: 1(866) 990-9743
byroncut@gmail.com
1143 Cameron Creek
Marietta, Ga 30062

ATTORNEY-CLIENT PRIVILEGED; DO NOT FORWARD OR DISCLOSE WITHOUT EXPRESS PERMISSION.The information in this email transmission is privileged and confidential pursuant to applicable laws. If you are not the intended recipient, nor the employee or agent responsible for delivering it to the intended recipient, you are notified that any dissemination or copying of this transmission (including any attachments) is strictly prohibited. If you have received this email in error, please notify the sender by email reply. Thank you. There is no intent on the part of the sender to waive any privilege, including the attorney-client privilege, that may attach to this communication. Further, anything you believe to be tax advice in this communication, including attachments, cannot be used to avoid penalties under the Internal Revenue Code, nor does it promote, market, or recommend any transaction or tax-related matter. Law Offices of Byron Cuthbert & Associates does not give tax advice.

On Fri, Mar 12, 2021 at 10:32 AM Anastasia Hood <anastasia@scarianoneuro.com> wrote:

Gerald Perry and Harvey Armstrong is done we are just adding edits. We are still working on Graves and Harris.

Anastasia M. Hood
Workers' Comp / IME / Legal & Paralegal Administrator

JACK E. SCARIANO JR. MD, PLLC
139 Fox Road, Suite #201
Knoxville, TN 37922
Phone: (865) 769-9595 ext. 103
Fax: (865) 769-9510
anastasia@scarianoneuro.com

---

**From:** byron cuthbert <byroncut@gmail.com>
**Sent:** Friday, March 12, 2021 10:29 AM
**To:** Anastasia Hood <anastasia@scarianoneuro.com>
**Subject:** Cuthbert: Status of reports

Anastasia:

as you can imagine many of my clients and patients are inquiring about reports. can you inform me the status for the following:

1 Gerald Perry
2. Harvey Armstrong
3. Rory Graves
4. Joe Harris

Thank you for your cooperation in this matter.

Byron Cuthbert
Attorney at Law
Telephone: (404) 403-7855
Fax: 1(866) 990-9743
byroncut@gmail.com
1143 Cameron Creek
Marietta, Ga 30062

ATTORNEY-CLIENT PRIVILEGED; DO NOT FORWARD OR DISCLOSE WITHOUT EXPRESS PERMISSION.The information in this email transmission is privileged and confidential pursuant to applicable laws. If you are not the intended recipient, nor the employee or agent responsible for delivering it to the intended recipient, you are notified that any dissemination or copying of this transmission (including any attachments) is strictly prohibited. If you have received this email in error, please notify the sender by email reply. Thank you. There is no intent on the part of the sender to waive any privilege, including the attorney-client privilege, that may attach to this communication. Further, anything you believe to be tax advice in this communication, including attachments, cannot be used to avoid penalties under the Internal Revenue Code, nor does it promote, market, or recommend any transaction or tax-related matter. Law Offices of Byron Cuthbert & Associates does not give tax advice.

# Joe Harris - Previous Medicals MAF March 5, 2021

byron cuthbert <byroncut@gmail.com>
Mon 3/1/2021 7:26 PM
To: Anastasia Hood <anastasia@scarianoneuro.com>

1 attachments (5 MB)
Joe Harris Previous Medicals 3.1.2021.pdf;

see attached previous medicals for MAF evaluation.

consider the following factors below:

1) The criteria has been met for major neurocognitive disorder or dementia?

1) (a) Dementia Syndrome - cognitive or behavioral impairment in at least two of the following: Memory, Reasoning and handling complex tasks, Visuospatial abilities, Language functions, Personality, behavior, or comportment

1(b) Decline from previous level of functioning impairment

(2) There is insidious onset and gradual progression of impairment in one or more cognitive domains (for major neurocognitive disorder, at least two domains must be impaired)?

(3) Clear evidence of decline in memory and learning and at least one other cognitive domain (based on detailed history or serial neuropsychological)?

(4) Steadily progressive, gradual decline in cognition, without extended plateaus?

(5) Any evidence of mixed etiology (i.e., absence of other neurodegenerative or cerebrovascular)?

(6) the previous 5 factors combined with positive amyloid pet scan generally consistent with Alzheimer?

(7) due to the previous diagnosis and award for a 1.5 with a qualifying diagnosis date of 12/2/2015, do you believe the symptoms for Alzheimer's probable onset date should be 12/3/2015?

Byron Cuthbert
Attorney at Law
Telephone: (404) 403-7855
Fax: 1(866) 990-9743
byroncut@gmail.com
1143 Cameron Creek
Marietta, Ga 30062

ATTORNEY-CLIENT PRIVILEGED; DO NOT FORWARD OR DISCLOSE WITHOUT EXPRESS PERMISSION.The information in this email transmission is privileged and confidential pursuant to applicable laws. If you are not the intended recipient, nor the employee or agent responsible for delivering it to the intended recipient, you are notified

that any dissemination or copying of this transmission (including any attachments) is strictly prohibited. If you have received this email in error, please notify the sender by email reply. Thank you. There is no intent on the part of the sender to waive any privilege, including the attorney-client privilege, that may attach to this communication. Further, anything you believe to be tax advice in this communication, including attachments, cannot be used to avoid penalties under the Internal Revenue Code, nor does it promote, market, or recommend any transaction or tax-related matter. Law Offices of Byron Cuthbert & Associates does not give tax advice.

## Re: R. Shelton Denial

Anastasia Hood <anastasia@scarianoneuro.com>
Thu 2/25/2021 9:28 PM
**To:** byron cuthbert <byroncut@gmail.com>

Of course!!! Sorry for the added stress. I'm glad we could get it done!

Get Outlook for iOS

---

**From:** byron cuthbert <byroncut@gmail.com>
**Sent:** Thursday, February 25, 2021 9:18:41 PM
**To:** Anastasia Hood <anastasia@scarianoneuro.com>
**Subject:** Re: R. Shelton Denial

Thank you so much. I'm sorry I called a lot today but I really needed this. You and jack did a great job

Byron Cuthbert
Attorney at Law
Telephone: (404) 403-7855
Fax: 1(866) 990-9743
byroncut@gmail.com
1143 Cameron Creek
Marietta, Ga 30062

On Feb 25, 2021, at 9:16 PM, Anastasia Hood <anastasia@scarianoneuro.com> wrote:

PDF version attached.

Anastasia M. Hood
Workers' Comp / IME / Legal & Paralegal Administrator

JACK E. SCARIANO JR. MD, PLLC
139 Fox Road, Suite #201
Knoxville, TN 37922
Phone: (865) 769-9595 ext. 103
Fax: (865) 769-9510
anastasia@scarianoneuro.com

---

**From:** byron cuthbert <byroncut@gmail.com>
**Sent:** Thursday, February 25, 2021 9:01 PM
**To:** Anastasia Hood <anastasia@scarianoneuro.com>
**Subject:** Re: R. Shelton Denial

I'll do it by uploading in my appeal. I just need his signed exhibit.

Byron Cuthbert
Attorney at Law
Telephone: (404) 403-7855
Fax: 1(866) 990-9743
byroncut@gmail.com
1143 Cameron Creek
Marietta, Ga 30062

On Feb 25, 2021, at 8:59 PM, Anastasia Hood <anastasia@scarianoneuro.com> wrote:

*upload to the NFL portal correct? Or will you do it

Get Outlook for iOS

---

**From:** Anastasia Hood <anastasia@scarianoneuro.com>
**Sent:** Thursday, February 25, 2021 8:59:01 PM
**To:** byron cuthbert <byroncut@gmail.com>
**Subject:** Re: R. Shelton Denial

Upload to the report correct?

Get Outlook for iOS

---

**From:** byron cuthbert <byroncut@gmail.com>
**Sent:** Thursday, February 25, 2021 6:32:21 PM
**To:** Anastasia Hood <anastasia@scarianoneuro.com>
**Subject:** Re: R. Shelton Denial

I apologize. I see it. Please add the addendum to your report and have Dr. Jack sign. Thank you soooooo much!!!!

Byron Cuthbert
Attorney at Law
Telephone: (404) 403-7855
Fax: 1(866) 990-9743
byroncut@gmail.com
1143 Cameron Creek
Marietta, Ga 30062

ATTORNEY-CLIENT PRIVILEGED; DO NOT FORWARD OR DISCLOSE WITHOUT EXPRESS PERMISSION.The information in this email transmission is privileged and confidential pursuant to applicable laws. If you are not the intended recipient, nor the employee or agent responsible for delivering it to the intended recipient, you are notified that any dissemination or copying of this transmission (including any attachments) is strictly prohibited. If you have received this email in error, please notify the sender by email reply. Thank you. There is no intent on the part of the sender to waive any privilege, including the attorney-client privilege, that may attach to this communication. Further, anything you believe to be tax advice in this communication, including attachments, cannot be used to avoid penalties under the Internal Revenue Code, nor does it promote, market, or recommend any transaction or tax-related matter. Law Offices of Byron Cuthbert & Associates does not give tax advice.

On Thu, Feb 25, 2021 at 6:18 PM Anastasia Hood <anastasia@scarianoneuro.com> wrote:

See the attached report!

Anastasia M. Hood
Workers' Comp / IME / Legal & Paralegal Administrator

JACK E. SCARIANO JR. MD, PLLC
139 Fox Road, Suite #201
Knoxville, TN 37922
Phone: (865) 769-9595 ext. 103
Fax: (865) 769-9510
anastasia@scarianoneuro.com

---

**From:** byron cuthbert <byroncut@gmail.com>
**Sent:** Thursday, February 25, 2021 3:13 PM
**To:** Anastasia Hood <anastasia@scarianoneuro.com>; Anna Botre <scarianoneuro.anna@gmail.com>
**Subject:** Re: R. Shelton Denial

Good morning:

I'm very concerned about the discussion. Especially since 4 NFL players are being evaluated by your office within the next week. 2 tomorrow and 2 next week. Does Jack agree with the two additional reports Dr. Dhillon and Dr. Griffith are consistent with his findings of Major Neurocognitive Disorder Probable Alzheimer's type? Can he just provide addendum stating that he reviews and if he agrees then agrees with their findings?

Byron Cuthbert
Attorney at Law
Telephone: (404) 403-7855
Fax: 1(866) 990-9743
byroncut@gmail.com

1143 Cameron Creek
Marietta, Ga 30062

ATTORNEY-CLIENT PRIVILEGED; DO NOT FORWARD OR DISCLOSE WITHOUT EXPRESS PERMISSION.The information in this email transmission is privileged and confidential pursuant to applicable laws. If you are not the intended recipient, nor the employee or agent responsible for delivering it to the intended recipient, you are notified that any dissemination or copying of this transmission (including any attachments) is strictly prohibited. If you have received this email in error, please notify the sender by email reply. Thank you. There is no intent on the part of the sender to waive any privilege, including the attorney-client privilege, that may attach to this communication. Further, anything you believe to be tax advice in this communication, including attachments, cannot be used to avoid penalties under the Internal Revenue Code, nor does it promote, market, or recommend any transaction or tax-related matter. Law Offices of Byron Cuthbert & Associates does not give tax advice.

On Thu, Feb 25, 2021 at 2:25 PM byron cuthbert <byroncut@gmail.com> wrote:

no, its too late for that. I have to get opposing counsel to approve. please give me a call 404-403-7855.

Byron Cuthbert
Attorney at Law
Telephone: (404) 403-7855
Fax: 1(866) 990-9743
byroncut@gmail.com
1143 Cameron Creek
Marietta, Ga 30062

ATTORNEY-CLIENT PRIVILEGED; DO NOT FORWARD OR DISCLOSE WITHOUT EXPRESS PERMISSION.The information in this email transmission is privileged and confidential pursuant to applicable laws. If you are not the intended recipient, nor the employee or agent responsible for delivering it to the intended recipient, you are notified that any dissemination or copying of this transmission (including any attachments) is strictly prohibited. If you have received this email in error, please notify the sender by email reply. Thank you. There is no intent on the part of the sender to waive any privilege, including the attorney-client privilege, that may attach to this communication. Further, anything you believe to be tax advice in this communication, including attachments, cannot be used to avoid penalties under the Internal Revenue Code, nor does it promote, market, or recommend any transaction or tax-related matter. Law Offices of Byron Cuthbert & Associates does not give tax advice.

On Thu, Feb 25, 2021 at 2:11 PM Anastasia Hood <anastasia@scarianoneuro.com> wrote:

Could we file an extension to next Wednesday? Thanks!

Anastasia M. Hood
Workers' Comp / IME / Legal & Paralegal Administrator

JACK E. SCARIANO JR. MD, PLLC
139 Fox Road, Suite #201
Knoxville, TN 37922
Phone: (865) 769-9595 ext. 103
Fax: (865) 769-9510
anastasia@scarianoneuro.com

---

**From:** byron cuthbert <byroncut@gmail.com>
**Sent:** Thursday, February 25, 2021 1:02 PM
**To:** Anastasia Hood <anastasia@scarianoneuro.com>
**Subject:** Re: R. Shelton Denial

Look at dr Dhillon report the cdr advance to 2.0 and agreed to the onset date in 2016.

Dr Griffith - found two domains: memory and executive functioning.

Byron Cuthbert
Attorney at Law
Telephone: (404) 403-7855
Fax: 1(866) 990-9743
byroncut@gmail.com
1143 Cameron Creek
Marietta, Ga 30062

On Feb 25, 2021, at 1:00 PM, byron cuthbert <byroncut@gmail.com> wrote:

Yes dr Griffith report and dr Dhillon report

Byron Cuthbert
Attorney at Law
Telephone: (404) 403-7855
Fax: 1(866) 990-9743
byroncut@gmail.com
1143 Cameron Creek
Marietta, Ga 30062

On Feb 25, 2021, at 12:46 PM, Anastasia Hood <anastasia@scarianoneuro.com> wrote:

Doc is wondering if there are any further memory testing that was done? He wants to make a lot of edits. He thinks that the addendum does not sound like him at all.

Anastasia M. Hood
Workers' Comp / IME / Legal & Paralegal Administrator

JACK E. SCARIANO JR. MD, PLLC
139 Fox Road, Suite #201
Knoxville, TN 37922
*Phone*: (865) 769-9595 ext. 103
Fax: (865) 769-9510
anastasia@scarianoneuro.com

---

**From:** byron cuthbert <byroncut@gmail.com>
**Sent:** Thursday, February 25, 2021 12:36 PM
**To:** Anastasia Hood <anastasia@scarianoneuro.com>
**Subject:** Re: R. Shelton Denial

Review , edit and sign off the addendum to his notes then send back to me so I can file fir his appeal.

Byron Cuthbert
Attorney at Law
Telephone: (404) 403-7855
Fax: 1(866) 990-9743
byroncut@gmail.com
1143 Cameron Creek
Marietta, Ga 30062

On Feb 25, 2021, at 12:17 PM, Anastasia Hood <anastasia@scarianoneuro.com> wrote:

Just to clarify, you want us to review the addendum or what would you like us to do specifically?

Anastasia M. Hood
Workers' Comp / IME / Legal & Paralegal Administrator

JACK E. SCARIANO JR. MD, PLLC
139 Fox Road, Suite #201
Knoxville, TN 37922
Phone: (865) 769-9595 ext. 103
Fax: (865) 769-9510
anastasia@scarianoneuro.com

---

**From:** byron cuthbert <byroncut@gmail.com>
**Sent:** Thursday, February 25, 2021 11:58 AM
**To:** Anastasia Hood <anastasia@scarianoneuro.com>
**Subject:** Re: R. Shelton Denial

Thank you 🙏

Byron Cuthbert
Attorney at Law
Telephone: (404) 403-7855
Fax: 1(866) 990-9743
byroncut@gmail.com
1143 Cameron Creek
Marietta, Ga 30062

> On Feb 25, 2021, at 11:53 AM, Anastasia Hood <anastasia@scarianoneuro.com> wrote:
>
> We will be working on this during lunch.
>
> Anastasia M. Hood

Workers' Comp / IME /
Legal &
Paralegal Administrator

JACK E. SCARIANO JR.
MD, PLLC
139 Fox Road, Suite
#201
Knoxville, TN 37922
Phone: (865) 769-9595
ext. 103
Fax: (865) 769-9510
anastasia@scarianoneuro.com

---

**From:** byron cuthbert <byroncut@gmail.com>
**Sent:** Thursday, February 25, 2021 11:47 AM
**To:** Anastasia Hood <anastasia@scarianoneuro.com>; Anna Botre <scarianoneuro.anna@gmail.com>
**Subject:** Re: R. Shelton Denial

I'm following up. Will final addendum be done by cob today? The appeal is due tomorrow and I need tonight to incorporate the report in my appeal etc.

Byron Cuthbert
Attorney at Law
Telephone: (404) 403-7855
Fax: 1(866) 990-9743
byroncut@gmail.com
1143 Cameron Creek
Marietta, Ga 30062

On Feb 23, 2021, at 3:53 PM, byron cuthbert <byroncut@gmail.com> wrote:

Anastasia and Anna:

per the previous discussions, Richard Shelton was Deny. He was re-evaluated by bap Neuropysch Randal Griffith - who showed he has major neurocognitive disorder under the DSM -5 in learning and memory and Executive functioning. this Exhibit C in the pdf. He was evaluated by outside clinical Dr. Dhillon who

agreed with Dr. Scariano that Mr. Shelton has Major Neurocognitive disorder due to Alzheimers and the onset date of the symptoms is in 2016.

Per your request, I attached a document as a draft Addendum to consider as a summary opinion. Of Course, it's only educational and Dr. Jack needs to revise to his own opinion. Mr. Shelton Appeal is due Thursday. Can you have Jack review and confirm if he agrees by COB tomorrow?

Byron Cuthbert
Attorney at Law
Telephone: (404) 403-7855
Fax: 1(866) 990-9743
byroncut@gmail.com
1143 Cameron Creek
Marietta, Ga 30062

ATTORNEY-CLIENT PRIVILEGED; DO NOT FORWARD OR DISCLOSE WITHOUT EXPRESS PERMISSION.The information in this email transmission is privileged and confidential pursuant to applicable laws. If you are not the intended recipient, nor the employee or agent responsible for delivering it to the intended

recipient, you are notified that any dissemination or copying of this transmission (including any attachments) is strictly prohibited. If you have received this email in error, please notify the sender by email reply. Thank you. There is no intent on the part of the sender to waive any privilege, including the attorney-client privilege, that may attach to this communication. Further, anything you believe to be tax advice in this communication, including attachments, cannot be used to avoid penalties under the Internal

Revenue Code, nor does it promote, market, or recommend any transaction or tax-related matter. Law Offices of Byron Cuthbert & Associates does not give tax advice.

On Thu, Feb 11, 2021 at 2:04 PM Anastasia Hood <anastasia@scarianoneuro.com> wrote:

Sounds good, I will pass that on to him.

Anastasia M. Hood
Workers' Comp / IME / Legal & Paralegal Administrator

JACK E. SCARIANO JR. MD, PLLC
139 Fox Road, Suite #201
Knoxville, TN 37922
Phone: (865) 769-9595 ext. 103
Fax: (865) 769-9510
anastasia@scarianoneuro.com

---

**From:** byron cuthbert <byroncut@gmail.com>
**Sent:** Thursday, February 11, 2021 12:41 PM
**To:** Anastasia Hood <anastasia@scarianoneuro.com>
**Subject:** R. Shelton Denial

Good afternoon:

see attached denial. Tell Jack I'm appealing. I did it with another case and just recently won the award. I had Richard do a new neuropsych to see if his scores have declined and I'm waiting for the results.

I also have a neurologist evaluating him for treatment. I plan to provide both reports to Jack and may

need another Addendum of Jack reviewing that data. will discuss over the phone once closer to the deadline.

Byron Cuthbert
Attorney at Law
Telephone: (404) 403-7855
Fax: 1(866) 990-9743
byroncut@gmail.com
1143 Cameron Creek Marietta, Ga 30062

ATTORNEY-CLIENT PRIVILEGED; DO NOT FORWARD OR DISCLOSE WITHOU

T
EXPRES
S
PERMISS
ION.The
informatio
n in this
email
transmissi
on is
privileged
and
confidenti
al
pursuant
to
applicable
laws. If
you are
not the
intended
recipient,
nor the
employee
or agent
responsibl
e for
delivering
it to the
intended
recipient,
you are
notified
that any
dissemina
tion or
copying of
this
transmissi
on
(including
any
attachme
nts) is
strictly
prohibited
. If you
have
received

this email in error, please notify the sender by email reply. Thank you. There is no intent on the part of the sender to waive any privilege, including the attorney-client privilege, that may attach to this communication. Further, anything you believe to be tax advice in this communication, including attachments, cannot be used to avoid penalties under the Internal Revenue Code, nor does it promote, market, or

recommend any transaction or tax-related matter. Law Offices of Byron Cuthbert & Associates does not give tax advice.

<R. Shelton - Jack Report - addendum 2.23.2021.docx>
<Richard Shelton - Denial with relevant medical records.pdf>

<Shelton- Final Report.pdf>

# Re: R. Shelton Denial

byron cuthbert <byroncut@gmail.com>

Thu 2/25/2021 1:01 PM

**To:** Anastasia Hood <anastasia@scarianoneuro.com>; Anna Botre <scarianoneuro.anna@gmail.com>

2 attachments (23 MB)

R. Shelton - Jack Report - addendum 2.23.2021.docx; Richard Shelton - Denial with relevant medical records.pdf;

Anastasia and Anna:

per the previous discussions, Richard Shelton was Deny. He was re-evaluated by bap Neuropysch Randal Griffith - who showed he has major neurocognitive disorder under the DSM -5 in learning and memory and Executive functioning. this Exhibit C in the pdf. He was evaluated by outside clinical Dr. Dhillon who agreed with Dr. Scariano that Mr. Shelton has Major Neurocognitive disorder due to Alzheimers and the onset date of the symptoms is in 2016.

Per your request, I attached a document as a draft Addendum to consider as a summary opinion. Of Course, it's only educational and Dr. Jack needs to revise to his own opinion. Mr. Shelton Appeal is due Thursday. Can you have Jack review and confirm if he agrees by COB tomorrow?

Byron Cuthbert
Attorney at Law
Telephone: (404) 403-7855
Fax: 1(866) 990-9743
byroncut@gmail.com
1143 Cameron Creek
Marietta, Ga 30062

ATTORNEY-CLIENT PRIVILEGED; DO NOT FORWARD OR DISCLOSE WITHOUT EXPRESS PERMISSION.The information in this email transmission is privileged and confidential pursuant to applicable laws. If you are not the intended recipient, nor the employee or agent responsible for delivering it to the intended recipient, you are notified that any dissemination or copying of this transmission (including any attachments) is strictly prohibited. If you have received this email in error, please notify the sender by email reply. Thank you. There is no intent on the part of the sender to waive any privilege, including the attorney-client privilege, that may attach to this communication. Further, anything you believe to be tax advice in this communication, including attachments, cannot be used to avoid penalties under the Internal Revenue Code, nor does it promote, market, or recommend any transaction or tax-related matter. Law Offices of Byron Cuthbert & Associates does not give tax advice.

On Thu, Feb 11, 2021 at 2:04 PM Anastasia Hood <anastasia@scarianoneuro.com> wrote:

**Sounds good, I will pass that on to him.**

Anastasia M. Hood
Workers' Comp / IME / Legal & Paralegal Administrator

JACK E. SCARIANO JR. MD, PLLC
139 Fox Road, Suite #201
Knoxville, TN 37922
Phone: (865) 769-9595 ext. 103
Fax: (865) 769-9510
anastasia@scarianoneuro.com

---

**From:** byron cuthbert <byroncut@gmail.com>
**Sent:** Thursday, February 11, 2021 12:41 PM
**To:** Anastasia Hood <anastasia@scarianoneuro.com>
**Subject:** R. Shelton Denial

Good afternoon:

see attached denial. Tell Jack I'm appealing. I did it with another case and just recently won the award. I had Richard do a new neuropsych to see if his scores have declined and I'm waiting for the results.

I also have a neurologist evaluating him for treatment. I plan to provide both reports to Jack and may need another Addendum of Jack reviewing that data. will discuss over the phone once closer to the deadline.

Byron Cuthbert
Attorney at Law
Telephone: (404) 403-7855
Fax: 1(866) 990-9743
byroncut@gmail.com
1143 Cameron Creek
Marietta, Ga 30062

ATTORNEY-CLIENT PRIVILEGED; DO NOT FORWARD OR DISCLOSE WITHOUT EXPRESS PERMISSION.The information in this email transmission is privileged and confidential pursuant to applicable laws. If you are not the intended recipient, nor the employee or agent responsible for delivering it to the intended recipient, you are notified that any dissemination or copying of this transmission (including any attachments) is strictly prohibited. If you have received this email in error, please notify the sender by email reply. Thank you. There is no intent on the part of the sender to waive any privilege, including the attorney-client privilege, that may attach to this communication. Further, anything you believe to be tax advice in this communication, including attachments, cannot be used to avoid penalties under the Internal Revenue Code, nor does it promote, market, or recommend any transaction or tax-related matter. Law Offices of Byron Cuthbert & Associates does not give tax advice.

**Exhibit 17: 4/6/21 Settlement Program Email to Dr. Scariano**

**From:** [redacted]
**Sent:** Tuesday, April 6, 2021 10:55 AM
**To:** Anastasia Hood <anastasia@scarianoneuro.com>
**Subject:** RE: Byron Email Thread

Hi Anastasia:

Thank you again for passing along your communications with Byron Cuthbert regarding R. Shelton. We need your assistance with some quick follow-up items and thank you in advance for your help. Let me know if you have any questions!

1. In the communications you sent to us on 3/16/21, the 2/25/21 email from Byron Cuthbert to your office included an attachment (email is on page 24 of the PDF records you sent to us), titled "R.Shelton - Jack report - addendum – 2.23.21.docx." Can you please send me a copy of this attachment?
2. Have you had any communications with Byron Cuthbert regarding Keith Henderson (SPID 100006694)? If so, please provide us with copies of those communications and any attachments contained within those communications.
3. Has Mr. Cuthbert, or anyone from his office, provided your office with any other report addenda or asked Dr. Scariano to review or sign off on any addenda for any other players (aside from Mr. Shelton)? If so, can you please provide us with copies of those addenda and any communications you have had with Mr. Cuthbert related to those players?

Note that our request does not imply any wrongdoing on anyone's behalf, and we are fulfilling our duties under the Settlement Agreement. You can forward such communications directly to me. If possible, could you complete this request as quickly as possible, but no later than by 4/16/21?

Thank you very much for your help.

**From:** Anastasia Hood <anastasia@scarianoneuro.com>
**Sent:** Tuesday, March 16, 2021 10:56 AM
**To:** [redacted]
**Subject:** Byron Email Thread

Hi [redacted]!

There is one thread that is so oddly formatted, I hope it is not too hard to read! Let me know if you need anything else!

Anastasia M. Hood
Workers' Comp / IME / Legal & Paralegal Administrator
JACK E. SCARIANO JR. MD, PLLC
139 Fox Road, Suite #201
Knoxville, TN 37922
Phone: (865) 769-9595 ext. 103
Fax: (865) 769-9510
anastasia@scarianoneuro.com

**Exhibit 18: 4/23/21 Dr. Scariano Email to Settlement Program with Attached Emails & Draft Addendum**

[redacted]

**Attachments:** R. Shelton - Jack Report - addendum 2.23.2021.docx
henderson thread part two.pdf
henderson thread.pdf

---

**From:** Anastasia Hood <anastasia@scarianoneuro.com>
**Sent:** Friday, April 23, 2021 12:18 PM
**To:** [redacted]
**Subject:** Requested emails from Byron

Sorry for the delay, realized that I had gotten what you requested together, just never sent them to you!
Let me know if you need anything else.
Thank you!

Anastasia M. Hood
Workers' Comp / IME / Legal & Paralegal Administrator
JACK E. SCARIANO JR. MD, PLLC
139 Fox Road, Suite #201
Knoxville, TN 37922
Phone: (865) 769-9595 ext. 103
Fax: (865) 769-9510
anastasia@scarianoneuro.com

# JACK E SCARIANO JR MD PLLC

**Jack E Scariano**
**139 Fox Road Suite 201 Knoxville, TN 37922-3472**
**Phone: (865) 769-9595 Fax: (865 ) 769-9510**

**Richard Shelton** DOB: 01/02/1966 (54 yrs. M)
4186 BROOKWOODDRIVE
AUSTELL, GA 30106
(615) 972-1720

Visit Date: 06/29/2020

---

**Race:** No race saved for patient
**Ethnicity:** No ethnicity for patient saved
**Preferred Language:** English

**Curr en t Allergies:**
No allergies on file

**Current Medications:**
No current medications on file

**Vitals:**
Height: 71 in.
Weight: 264.3 lbs.
BMl : 36.9

**Family History**
NATURAL PARENTS:
Father- Not sure.
Mother: Diabetes.
NATURAL SIBLINGS:
Sister- Diabetes, Seizure
NATURAL CHILDREN: NA

**Soc ial History**
Nonsmoker.
ALCOHOL USE: Patient denies alcohol use.
DRUG USE: Patient denies drug use.
CAFFEINE: Patient denies caffeine use.

**Problem List:**
No known problems

**Chief Complaint:** NFL Player.

Neuropshycbological Evaluation perfonned by Larry G. Brooks Ph.Don 5/02/2019showed 1.5 level of impainnent in executive functioning.

l11ird party sworn affidavit of Jerome Fulton dated 01/06 /2017 - Mr, Fulton bas been a close friend of Mr. Shelton since 197 6. He mentioned that he noticed memory issues when, at a class rem1io11, Mr. Shelton was not able to remember the names of the people with whom he wasclosely associated with. He also noticed some disorientation issues where Mr. Shelton would forget where be parked bis car, and at one point in time he thought that it wasa Saturday when it was a Monda y. He also not iced time management issues with Mr. Shelton.

Neurologicalevaluation of performed on 11/28/2016 by Dr. Clark Espy. MD mentioned that Mr. Shelton had scored a rating of 1.5 for neurocognitivc impairment and mild dementia under the National Alzheimer's Coordinating Center's CDR Scale.

PET-CT brain Amyloid study performed on 06/16/2020showed physiologic distribution of the radiotraceractivity in the brain. Decrease contrast of the radio tracer activity between thecortical gray matter and deeper white matter. There was substantial increased cortical radiotracer accumulation in the bilateral frontal lobes, the parietal lobes, the lateral temporal lobes and in the cingulate gyrus.

**History of Present Illness:** Mr. Richard Shelton is a 54-year-oldAfrican Ame1ican male who played for NFL from 1989-1995. He wasseen today in my office for his NFL MAF evaluatiot1. He has played for the Broncos, Stee lers, and Seahawks in NFL and retired in 1995. He wasaccompanied for theevaluation by his brother. Mr. Shelton presented with a complaint of heavy migraines, which sta rted when he was in high schoo l but they have gotten worse over a past couple of years. He also complained that he bas markedly lost his executive skills and is dealing with depression and anxiety. He does not like to go out and meet other people or be a part of

(615) 972-1720

Visit Date: 06/29/2020

any community. He likes to remain at home at all times, unless ot hetwise necessary.

I had a long discussion with him and his brother. I reviewed Mr. She lton's athletic perfonnance records which indicated that he was quite talented and worked with some very professional teams. ln him beiug a defensive back often involved complexities with placement, reading signs, movements of the otherplayers, listeningto the auditory input, all of which is higher cortical function.I asked him about concussions and he did state that he had multiple head injuries. At the time when he was playing in NFL they did not have any organized screening protocol to use on the side line or even use in practice which could test and validatea patie nt's higher cort ical functions. He was a very excellent player for 3-4 years butthen his skills rapidly d eclin.ed where he had problems understanding the complexity of being a NFL defensive back. Heeventually became a NFL football scout covering the East Coast. It was his job to evaluate players' underlying perfonnance in games, their academic pcrfonnance, their physical and mental fitness. He stated t.hat it became much more d ifficult to keep a track of all the players he was interviewing and reviewing their stats and how they would fit into the organization needs. In ai1 average year he would evaluate up to 100 potential NFL players befo re turning in to his recommendations. This became more and more difficult and then when his contract ran out, he decided that he wouId not search for any other employment as an NFL scout. At one time however he was viewed as being ooe or the top NFL scouts. He was awarded as Scout of the year in the year 2015. He was a scout for 14 years.

Now he is currently going through a divorcefrom someone that he was married for29 years. He has three grown up boys who are all living independently. Hestated that his ex-wife felt like he had personality changes including more irrita bility. His family has stated that he is very qu ick to anger and is no longer the same person.

Now, he states that he basically does very little other than stay at home and play video games. He states he does not like to drive and has people drive him places. Upon intensive questioning it appears that he at times would get lost and would go to the wrong street and wrong locatio,ns which is ooe of the reasons he no longer likes driving.

He said that he wason no medications and doesnot drink alcohol. He is a nonsmoker. He recalls that when he worked for the Titans, he would have a hard time remembering details. He recalls waking up in the middle of the night and not remembering where be was. His brother stated that sometimes he will te ll Richardabout his mother and Richard will forget very quickly

(615) 972-1720

Visit Date: 06/29/2020

what was said. Mr. Shelton complained of getting dizzy when he gets tired or fatigued.

PAST MEDICAL HISTORY:
MEDICAL: Diabetes, High Blood pressure, Depression, Heart Disease, Concussion, Migraine, Anxiety, Arthritis, High Cholesterol, and Sleep Apnea.
Medical - Illness, I njuries, Operations, and Treatments: Record Review:

**ROS:**
Positive and pertinent negative responses below. All other areas negative.
CONSTIT UTIONA L: Fatigue.
EYES: Blurred vision, Double vision.
ENMT: Ringing in ears.
CARD IOVASC ULAR:Chest pain.
NEUROLOG !CAL: Episodes of confusion, memory loss, anxiety, depression.
Past medical history, **famil}** bisto . social history, & reviel'> of 5)-Stems fields have been re iewed & pertiaent information has been updated on : **7/1/2020 J0 :3 1 AM**

**Exam:**
Functionalstatus assessed
Cognitive status assessed

GENERAL: Well nourished and well groomed, able to communicate without restrictions, healthy and in no apparent distress, no defonuitics or obvious deficiencies noted.
MENTAL STATUS: Normal - Oriented to person, place, and time during the interview. Behavior was pleasant and cooperative. Recent and remote memory was impaired, needed fair amount of tim e to recall. Attention span, concentration, language, and fund of knowledge sufficient. Speech is clear in tone, volume, and rate.
GAIT *I* STATION: Normal - Appropriate gait, stance, and swing phase with no antalgic component.
MUSCULOSKELETAL:Normal• No111isa lign111ent, asymmetry, crepitation, defects, tendemess, masses, or effusions. No decreased range of motion, instability, atrophy, abnorma l strength or tone in the neck, spine, ribs, or pelvis.
**Other Test:**
CEREBELLAR TESTING: Good finger-to-nose, heel-to-shin, and rapid altema ting movements. No t remor. No focal cerebellar signs.
MOTOR STRENGTH: Normal motor strength of 5/5 in aU fourextremities.

Visit Date: 06/29/2020

SENSORY TESTING: Normal to pinprick and light touch both arms. No variations distally to proximally in amis. In lower extremities, nonnal sensation to pinprick and light touch distal compared to proximal.
EXTRAPYRA MJOAL: No signof tremor or other involuntary movements.
REFLEXES: Noabnonual reflexes in anns or legs

**Cranial Nerve Assessment:**
CNII: Normal - Funduscopic exam b>Tossly normal. Optic vessels and nerves within normal limits. Ext raocular movement has full range of motion.
CN 111, IV, VI: Norma l - Extraocular muscle are intact and strength within normal limits. Noevidence of nystagmus . Motility has full range of motion. Pupils are equally rouod and reactive to light and acconuuodation.
CN V: Normal - Facial sensation and corneal blink reflexes within normal limits bilaterally. Masseters and temporal muscle st rength within normal limits.
CN VII: Nonna] - Wrinkling of the forehead and smiling are equal in strength and symmetry.
CN VIII : Normal - Hearing within nomial limits to finger rub, whisper test, or tuning fork test.
CN XI: Normal - S temocleidornasto id and trapczius muscle strengthand symmetry within normal limits.
CN XII:Normal - Tongue protrudes midline without fasciculation or tremors.

**Spinal Exam:**

**Diagnosis:**

- G30.9 ALZHEIMERS DISEASE UNS PECWIEO

**Assessment**
I have reviewed some previous neuropsychological testing which did show significant decline in executive function but it was ambiguous in regards to other cognitive problems. At this time in regards to his clinical dementia rating, he scored a I in memory, orientation, judgement and problem solving, community affairs ( as he no longer is involved in NFL community or does not like to leave the home), and home and hobbies. He has lost interest in many of the life activities that he used to do. He scored a O in personal care. He underwent a PET-CT scan with marked antibodies against amyloid. This test is now being used a the most objective test available in regards to structural brain damage. It has been shown in numerous studies that multiple concussions over time leads to deposition of amyloid which results in Alzhiemer's type clinical presentation. The study showed all of the classical objective signs. The actual image was valid in that it showed physiological distribution of the radio acer in the brain. However, there was a significant decrease of the radiotracer activity in between the cortical grey

and white matter. There was also accumulation of amyloid binding radiotracer in both frontal lobes, parietal lobes and lateral temporal lobes. These are the areas that are often damaged in concussions. Based on bis history of the progression of his symptoms overtime and clinical presentation seen on the PET-CT scan amyloid tracer, this patient definitely has the diagnosis of Alzheimer related to multiple concussions.

Even though the MMSE score was minimally change he did appear to have significant problem in his cognitive issues. He is having hard time finding a job. He has clinical signs of cognitive decline plus mild abnom1alities seen on PET-CT. Affidavits from his friends indicate underlying decline which is consistent with Alzheimer's disease.

I have extensively reviewed his medical records provided to rue and it is evident from the medical records that Mr. Shelton did suffer from moderate-to-severe memory loss and cognitive issues in 2016 when Neurological evaluation of performed on 11/28/2 0 16 by Dr. Clark Espy, MD mentioned that Mr. Shelton had scored a rating of 1.5 for neurocognitive impairment and mild dementia under the National Alzheimer's Coordinating Center's CDR Scale. Both the reports were clinically significant with Alzheimer's disease. His Neuropsychology report and report from Dr. Epsy met the criteria of significantly impaired cognition and memory loss.

In addition to meeting the clinical criteria for Alzhein1er's from multiple head injuries he also underwent amyloid PET scan which was read by a Board Certified Neuroradiologist. It was concluded that findings that were present on the PET scan were consistent with Alzheimer's disease. The actual changes that we see on the PET scan arc chronic in nature and take years to actually develop and with reasonable medical probability the symptoms would have been present around I 1 /28/20 16. He did have post-concussion dementia in 20 16. Therefore, in my medical opinion Mr. Shelton's Alzheimer's diagnosis eff active date should be 11/28 /20 16 due to his symptoms being present around that date.

Addendwn I - D e tenni na tio n of Diagnosis - Explanation
Time: 08/ l 2i2020

Details:
Diagnosis of Alzheimer's Disease based on !CD- LO criteria and DSM-5.

l. C lear evidence of decline in memory and team ing
   a. Mr. Shelton has exhibited progressive functional decline as evidenced by overall CDR of 1.0. His brother in in te rviews and friend Jerome Fulton d escribe a history consisted with a diagnosis of Alzheimer's disease

**Richard Shelton** DOB: 01/02/1966 (54 yrs. M)
4186 BROOKWOOD DRIVE
AUSTELL, GA 30106
(615) 972-1720

Visit Date: 06/29/2020

including a progressive loss of independent functioning based on poor memory and impaired executive function.

2. Steadily progressive, gradual decline in cognition, without extended plateaus
   a. The diagnosis of Alzheimer's disease is further substantiated on Dr. Larry Brook's neuropsycbological evaluation on 05/02/2019.The neuropsychological evaluation demonstrated 1.5 neurocognitive impairment in executive functioning. The patient's overall cognition impairment hasdecline significantly since 2016.

3. No evidence of mixed etiology (i.e., absence of other neurodegenerative or cerebrovascular disease, or another neurological or systemic disease or condition likely contributing to cognitive decline)
   a. He doesnot meet criteria for depression, excessive daytime sleepiness, and his blood work rule out a structuml or metabolic patient's cognitive impaument

The positive results of the Amyloid Pet scan arc highly consistent with the diagnosis of Alzheimer's disease based on findings that include an abnonnal increa5e in Amyloid plaque burden see in thecortical regions of greater than twoareas of the brain. Amyloid Pet sensitivity is higher in younger populations. Asa result, this data is extraordinarily reliable (Jansen, 20 t5 and Ossenkoppele, 2015).

In conclusion, the patient's history, examination and Amyloid Pet combine to meet both DSM and WHO diagnostic criteria for Alzheimer's disease in this patient.

Sincerely,

Jack E. Scariano Jr. MO FAAN
Board Certified Neurologist
Fellow of the American Academy of Neurology
TN State License# 11457

**ADDENDUM #2 RESPONSE TO DENIAL - FEBRUARY 23, 2021**

I'm writing this addendum to my report (dated July 2, 2020 with effective diagnosis date of November 28, 2016) in response to the January 27, 2021 denial notice of monetary award claim for Mr. Shelton. I'm writing this addendum taking in consideration new medical records provided to me from Dr. Randall Griffith and Hope Neurology that further support my diagnosis of Major Neurocognitive Disorder due to Probable Alzheimer's Disease.

Mr. Shelton meets major neurocognitive disorder because of his cognitive deficits in the executive functioning domain and learning and memory domain. Also, Mr. Shelton exhibits functional decline due to his cogntive impairment.

The cogntive impairment in two domains is evident in his Neuropsychological report by Dr. Randall Griffith dated 2/15/2021. This is consistent with the finding of impairment of two cognitive domains noted by Dr. Anders and Dr. Epsy in 2016.

Mr. Shelton functional impairment with a decline in previous level of functioning is demonstrated with an overall CDR rating of 1.0 made by me on July 2, 2020 due to his cognitive impairments and corroborated by interviews in person with his brother, his friend Ron Porter, and documented letter from Friend Jerome Fulton. Dr. Griffith recently gave Mr. Shelton a CDR rating of 1.0 due to his cognitive impairments corroborated with interviews with his girlfriend Jannette Gardenhire and other medical records. Another Neurologist Dr. Dhillon from Hope Neurology opined Mr. Shelton CDR should be a 2.0 due to 2.0 scores in the memory and homes hobbies, which were supported by cogntive decline in the MOCA score administered and interview corroborated by his girlfriend Jannette Gardenhire. Dr. Dhillon also opined more functionality decline at 2.0 level in personal care category due to the fact Mr. Shelton suffers Urinary Incontinence, which was caused from significant atrophy in his frontal lobe. Dr. Dhillon opined development of Urinary Incontinence is seen in 72.4% of AD. The occurrence of Urinary Incontinences considered a marker for progression of Dementia. There is also no correlation of Urinary Incontinences causing drop of scores in the Neurocognitive tests such as MMSE or MOCA. Overall, I found that Mr. Shelton functionality had decline from previous level functioning due to cognitive impairments in the executive functioning and learning and memory. Dr. Griffith, Dr. Dhillon and I found a CDR score of 1.0 or higher. These findings all are consistent with Dementia level impairment in functionality and support a diagnosis of Major Neurocognitive Disorder due to Probable Alzheimer's Disease.

There is a clinical evidence of decline in memory and learning and at least one other cognitive domain because of his cognitive impairment in learning and memory domain and executive functioning domain documented by Dr. Griffith and the findings are consistent with Dr. Anders and Dr. Epsy findings in 2016.

Mr. Shelton meets insidious onset with gradual progression of impairment in one or more cognitive domains because of his cognitive impairment in learning and memory domain and executive functioning domain documented by Dr. Griffith in 2021 and consistent with Dr. Anders and Dr. Epsy findings in 2016. Per Dr. Griffith, the BAP report by Dr. Brooks uses a methodology laid out in the Concussion Settlement, but Alzheimer's disease diagnoses allows Dr. Griffith and I to consider the DSM-5 standard to determine cogntive deficits. This may explain why Dr. Anders and Dr. Epsy in 2016 showed two cognitive domains of impairment: executive functioning and processing, and Dr. Brooks BAP report only showed one domain of impairment in executive functioning.

Mr. Shelton demonstrated no evidence of mixed etiology (i.e., absence of other neurodegenerative or cerebrovascular disease, or another neurological or systemic disease or condition likely contributing to cognitive decline). As stated in my previous report, Mr. Shelton does not meet the criteria for depression, which is supported by Dr. Brooks, Dr. Butala, Dr. Griffith and Dr. Dhillon findings. Mr. Shelton does not meet excessive daytime sleepiness. There is no evidence of structural or metabolic reasons to contribute to Mr. Shelton cognitive impairment. As documented by Dr. Epsy, Dr. Griffith and Dr. Dhillon the cognitive deficits do not occur exclusively in the context of a delirium, He was generally awake, alert, and oriented to person, place, and time

during testing. I agree with Dr. Griffith the cognitive deficits are not better explained by another mental disorder. Per Dr. Griffith, Mr. Shelton met criteria for Generalized Anxiety Disorder, it is highly atypical for a person's anxiety to manifest with difficulties in memory and executive functioning. I agree there has been some level of anxiousness present since Mr. Shelton underwent neuropsychological testing in 2016; anxiety can be a consequence of cognitive and functional changes and thus its presence should not automatically exclude the diagnosis of Major Neurocognitive disorder.

In addition to the DSM-5 measures explained above, Mr. Shelton demonstrated objective evidence of the Amyloid PET scan done on 6/29/2020: the positive study for amyloid protein showed substantial increased cortical radiotracer accumulation in the bilateral frontal lobes, the parietal lobes, the lateral temporal lobes and in the cingulate gyrus. This correlates with the diagnosis of Neurocognitive disorder of Alzheimer's type especially due to his young age in his 50s, which is significantly under the age of 65.

The age of onset of Mr. Shelton symptoms is 50 years old due to the symptoms expressed in the 2016 neurologist and neuropsychologist reports discussed earlier.  The fact that Mr. Shelton demonstrated symptoms at 50 supports the cognitive impairment is associated with triggering factors because generally dementia and MCI starts after the age of 65 years old. In this case, the triggering factors are the patient's repeated untreated concussions from playing football. In addition, the Positive Amyloid Pet scan at 54 further supports evidence that Mr. Shelton had Alzheimer's Disease symptoms at 50 because the accumulation of amyloid in multiple lobes of the brain is a process that takes years to develop.

In conclusion, the continued progressive Neurocognitive decline in 2 neurocognitive domains: executive functioning and learning and memory over a period of  6 yrs., with decline in functionality documented with the CDR score of 1.0 or higher, all combined to meet the criteria for Major Neurocognitive Disorder of the Alzheimer's type. The positive Amyloid PET scan further supports the symptoms are consistent with diagnosis of Alzheimer's Disease. As stated earlier in my reports the onset date of the symptoms were documented on 11/28/2016. Therefore, 11/28/2016 should be the effective date of the qualifying diagnosis due to Mr. Shelton's documented symptoms of functionality decline and deficits in executive functioning and memory (CDR score of 1.0 in memory  by Dr. Epsy). This evidence shows with reasonable medical probability Mr. Shelton had symptoms of post-concussion dementia in 2016, and those symptoms have continue to progress to Alzheimer's Disease. Alzheimer's Disease is a progressive illness and overtime Mr. Shelton will need further assistance at home or in  assisted living to have a functional life.

Sincerely,


Jack E. Scariano Jr. MD, FAAN
Board Certified Neurologist
Fellow of the American Academy of Neurology
TN State License # 11457

## Re: HENDERSON

byron cuthbert <byroncut@gmail.com>

Wed 2/17/2021 4:47 PM

**To:** Anastasia Hood <anastasia@scarianoneuro.com>

Why are you making more edits to Keith Henderson? The bill would go to Greenlink. They did not provide any communication to me.

Byron Cuthbert
Attorney at Law
Telephone: (404) 403-7855
Fax: 1(866) 990-9743
byroncut@gmail.com
1143 Cameron Creek
Marietta, Ga 30062

> On Feb 17, 2021, at 4:35 PM, Anastasia Hood <anastasia@scarianoneuro.com> wrote:
>
> Hi Byron,
>
> I am sure you are aware, but we are making more edits to Hendersons case. We have probably logged at least 6 more hours of work into his report. Dr. Scariano would like to bill for additional time spent. Would you want this to also go through GreenLink?
>
> Thanks in advance!
>
> Anastasia M. Hood
> Workers' Comp / IME / Legal & Paralegal Administrator
>
> JACK E. SCARIANO JR. MD, PLLC
> 139 Fox Road, Suite #201
> Knoxville, TN 37922
> Phone: (865) 769-9595 ext. 103
> Fax: (865) 769-9510
> anastasia@scarianoneuro.com

# Re: Cuthbert - Keith Henderson Report

Anastasia Hood <anastasia@scarianoneuro.com>
Tue 3/23/2021 10:44 AM
**To:** byron cuthbert <byroncut@gmail.com>

Yes I uploaded it.

Anastasia M. Hood
Workers' Comp / IME / Legal & Paralegal Administrator

JACK E. SCARIANO JR. MD, PLLC
139 Fox Road, Suite #201
Knoxville, TN 37922
Phone: (865) 769-9595 ext. 103
Fax: (865) 769-9510
anastasia@scarianoneuro.com

---

**From:** byron cuthbert <byroncut@gmail.com>
**Sent:** Tuesday, March 23, 2021 10:25 AM
**To:** Anastasia Hood <anastasia@scarianoneuro.com>
**Subject:** Re: Cuthbert - Keith Henderson Report

thank you. Did you upload it on the portal, so they know it came from you? I appreciate the copy. I'll need it when they deny it and I have to appeal.

Byron Cuthbert
Attorney at Law
Telephone: (404) 403-7855
Fax: 1(866) 990-9743
byroncut@gmail.com
1143 Cameron Creek
Marietta, Ga 30062

ATTORNEY-CLIENT PRIVILEGED; DO NOT FORWARD OR DISCLOSE WITHOUT EXPRESS PERMISSION.The information in this email transmission is privileged and confidential pursuant to applicable laws. If you are not the intended recipient, nor the employee or agent responsible for delivering it to the intended recipient, you are notified that any dissemination or copying of this transmission (including any attachments) is strictly prohibited. If you have received this email in error, please notify the sender by email reply. Thank you. There is no intent on the part of the sender to waive any privilege, including the attorney-client privilege, that may attach to this communication. Further, anything you believe to be tax advice in this communication, including attachments, cannot be used to avoid penalties under the Internal Revenue Code, nor does it promote, market, or recommend any transaction or tax-related matter. Law Offices of Byron Cuthbert & Associates does not give tax advice.

On Tue, Mar 23, 2021 at 9:36 AM Anastasia Hood <anastasia@scarianoneuro.com> wrote:

> Hi Byron,

I have attached the report. Thank you for being patient with me as yesterday was a crazy day here in the office.

Anastasia M. Hood
Workers' Comp / IME / Legal & Paralegal Administrator

JACK E. SCARIANO JR. MD, PLLC
139 Fox Road, Suite #201
Knoxville, TN 37922
Phone: (865) 769-9595 ext. 103
Fax: (865) 769-9510
anastasia@scarianoneuro.com

---

**From:** byron cuthbert <byroncut@gmail.com>
**Sent:** Saturday, March 20, 2021 8:24 PM
**To:** Anastasia Hood <anastasia@scarianoneuro.com>; Anna Botre <scarianoneuro.anna@gmail.com>
**Subject:** Re: Cuthbert - Keith Henderson Report

good evening:

on monday, can you send me the copy of the revised report because I got a notice you uploaded a document to the portal, but on the portal it was only the certification. I need the copy of the record where you respond about the depression. Thank you for all your work.

Byron Cuthbert
Attorney at Law
Telephone: (404) 403-7855
Fax: 1(866) 990-9743
byroncut@gmail.com
1143 Cameron Creek
Marietta, Ga 30062

ATTORNEY-CLIENT PRIVILEGED; DO NOT FORWARD OR DISCLOSE WITHOUT EXPRESS PERMISSION.The information in this email transmission is privileged and confidential pursuant to applicable laws. If you are not the intended recipient, nor the employee or agent responsible for delivering it to the intended recipient, you are notified that any dissemination or copying of this transmission (including any attachments) is strictly prohibited. If you have received this email in error, please notify the sender by email reply. Thank you. There is no intent on the part of the sender to waive any privilege, including the attorney-client privilege, that may attach to this communication. Further, anything you believe to be tax advice in this communication, including attachments, cannot be used to avoid penalties under the Internal Revenue Code, nor does it promote, market, or recommend any transaction or tax-related matter. Law Offices of Byron Cuthbert & Associates does not give tax advice.

On Tue, Mar 16, 2021 at 7:23 PM byron cuthbert <byroncut@gmail.com> wrote:

> Anastasia:
>
> Keith Henderson is constantly asking me about his claim. I know you mentioned that you were providing response to the depression request. Did you ever provide it to the claims administrator?

If so, can you send it to me, so I can know what was said and be prepared for any appeal.

Byron Cuthbert
Attorney at Law
Telephone: (404) 403-7855
Fax: 1(866) 990-9743
byroncut@gmail.com
1143 Cameron Creek
Marietta, Ga 30062

ATTORNEY-CLIENT PRIVILEGED; DO NOT FORWARD OR DISCLOSE WITHOUT EXPRESS PERMISSION.The information in this email transmission is privileged and confidential pursuant to applicable laws. If you are not the intended recipient, nor the employee or agent responsible for delivering it to the intended recipient, you are notified that any dissemination or copying of this transmission (including any attachments) is strictly prohibited. If you have received this email in error, please notify the sender by email reply. Thank you. There is no intent on the part of the sender to waive any privilege, including the attorney-client privilege, that may attach to this communication. Further, anything you believe to be tax advice in this communication, including attachments, cannot be used to avoid penalties under the Internal Revenue Code, nor does it promote, market, or recommend any transaction or tax-related matter. Law Offices of Byron Cuthbert & Associates does not give tax advice.

**Exhibit 19: Shawna Davis Call Notes**

On November 29, 2021, Shawna Davis (Ms. Davis) was telephonically interviewed by investigator [redacted] regarding a third party sworn statement submitted by her on behalf of former NFL player Joseph Harris (SPID 100006402). After being advised of the identity of the interviewing investigator and the nature of the interview, Ms. Davis provided the following information:

Ms. Davis first met Joseph Harris (Mr. Harris) in the mid to late 1980's at a local Marriott hotel. She used to frequent the hotel bar and met Mr. Davis as he exited the gym after a workout. She thought he was handsome and introduced herself. The two were never romantically involved but became best friends. Up until Ms. Davis had back surgery in August 2021, she saw Mr. Harris two to three times per week. Now, their visits are about once per week. They talk on the phone multiple times per day and have done so "forever."

Ms. Davis stated that she was the person who pushed Mr. Harris to see a doctor because of changes she noticed in him. She described many of the same issues reported in her affidavit including Mr. Harris forgetting the details of conversations they had a short while ago and issues with dressing himself.

When asked how she came to write the third party sworn statement on behalf of Mr. Harris, Ms. Davis initially believed she was contacted by a doctor; however, she later recalled that it was a male attorney and acknowledged that the name, Byron Cuthbert, was familiar to her. In addition to telling her that he intended to send Mr. Harris to visit doctors in Tennessee and Tampa, the attorney asked her a "slew" of questions about changes she had noticed in Mr. Harris and then requested that she write a statement describing those things. As a result, Ms. Davis prepared a two-page letter addressed, "To whom it may concern," which outlined her observations. She provided this letter to the interviewing investigator (see Exhibit 1). Ms. Davis believed this letter was emailed to the law firm.

Ms. Davis also received a fill-in-the-blank template from the law firm which she completed and returned by email. She also provided a copy of this document to the interviewing investigator (see Exhibit 2). Ms. Davis did not have a copy of the final version of her third party sworn statement which was submitted in connection with Mr. Harris's claim, so the interviewing investigator provided it to her. After having a chance to review it, Ms. Davis acknowledged that the law firm prepared it with her input and agreed that the sentence in number 60 was inaccurate to the extent that she is the only person from her family who assists Mr. Harris. She stated that she saw this document and approved its contents before affixing her signature. Ms. Davis checked the "No" box on page one of the form because she did not believe she had any help in the completion of the sworn statement and pointed to her two-page letter which formed the basis of the information contained therein.

**EXHIBIT 1**

**Shawna D. Davis**

266 Grapevine Drive Drive

Douglasville, Georgia 30134

(770) 510-6131

shawnalytledavis100@gail.com

To who it may concern,

I Shawna Davis do solemnly swear that what I'm about to write is the truth, the whole truth and nothing but the truth, so help me God.

I have known Joseph Alexander Harris in excess of 29 years. He has been a very dear and close friend of mine then, now and forever. Over the years, I have noticed many drastic changes in him over all as a person. There was a time when he was a very outgoing and vibrant human but, that began to change several years ago. He used to be very active in the community recreational facilities, helping out with the youth football teams as well as helping them to aspire in conditioning and training. He to used to be big on swimming, working out and running. Now, he however never hardly visits the gym and never helps with the youth in the community. Joe Harris is a proud Georgia Institute of Technology graduate, unfornately, this doesn't seem to phase him in the least bit nowadays. Joe would requently would go to the training for the up and coming students during summer camps. Joe in the recent past has neglected to do such activities. He also has failed to do the excercises that he used to love to do.

His appearance and grooming has been on the decline or many years now. Joe Harris used to take great pride in the way he dressed and groomed. Now, however, he hardly shaves, often comes out of the house partially undressed. For example, we were headed out of the house one day and I realized that he had forgotten his pants, his shoes were on the wrong feet and his shirt was turned inside out. He often gets agitated when he has to be reminded of his mishaps and gets angry at times. More than often, he urinates on himself without even noticing that he is wet. This, of course would seems embarrassing to the average person but not to Joe. It is as if this is the new normal for him, not like the old Joe... He regularly forgets to brush his teeth and must be reminded. He sometimes forgets to turn the water on in the shower and when asked what he is doing, he gets angry and then realizes that he is still fully dressed and that the water is not turned on. Several times I have visited him at his place and have walked in facing the dreaded smell of gas where he has left the stove on. There again, once I visited and the house thermostate was set at well above 90 degrees in mid summer.

Joe Harris also, often ... crowds at various ... speach is sometimes ... recognizing it. I make ... times daily to check to ... sometimes informs me ... parking lot gathering h... my constant calls to hi... back calls. It's almost ... before... Repeated con... doesn't remember that ...

As far as his driving ca... we came to a stop sig... for at least 15 minutes ... can go through that st... green." It was at that ... had taken a toll on him...

I could go on and on ... need any further assi... texts or call me anyti...

Sincerely,

Shawna Davis





Joe Harris also, oftentimes used to do alot of motivational speaking to large crowds at various elementary and high schools, which is now null and void. His speach is sometimes slurred and he finds himself drowling without even recognizing it. I make it my personal business to call him at least six to seven times daily to check to see where he is and to make sure that he is okay. Joe sometimes informs me that he is just sitting in the home depot or the Kroger parking lot gathering his thoughts for hours on end. This freightens me. During my constant calls to him, we seriously have repeated conversations, on back to back calls. It's almost as if we never talked twenty minutes before or the night before... Repeated conversations, even our greetings to one another because he doesn't remember that he has recently spoken to me.

As far as his driving capabilities, I often question... Once we were heading out and we came to a stop sign. I noticed that he was just "sitting" there at the stop sign for at least 15 minutes and I politely touched his arm and said, "Joe, you know we can go through that stop sign!" He said, "Oh, I was waiting for the light to turn green." It was at that very moment that I truly realized just how extreme his mind had taken a toll on him. Immediately, we switched drivers.

I could go on and on about the decline in Joe Harris' mental state. But, should you need any further assistance from me, please feel free to contact me via email, texts or call me anytime, day or night.

Sincerely,

Shawna Davis 0/23/2021

Shawna Davis

**EXHIBIT 2**

SWS-2

THIRD-PARTY SWORN STATEMENT: FUNCTIONAL IMPAIRMENT

HOME AND HOBBIES

COMMUNITY AFFAIRS

no longer works due to his progressing illness.

PERSONAL CARE

forget to go to the bathroom



**Exhibit 20: Christopher Jeffries Call Notes**

On February 3, 2022, Christopher Jeffries (Mr. Jeffries) called investigator [redacted] [redacted] after a series of earlier telephone contacts and text messages. The conversation concerned Mr. Jeffries' third-party sworn statement that he submitted on behalf of former NFL player Reginald (Reggie) L. Singletary (SPID 100013989). After being advised of the identity of the interviewing investigator and the nature of the interview, Mr. Jeffries provided the following information:

Mr. Jeffries advised that he met Reggie Singletary (Mr. Singletary) over 35 years ago at North Carolina State University (NC State). Mr. Jeffries was in his twenties and often went to NC State to "party" with a friend and met Mr. Singletary on campus. During that period, he and Mr. Singletary became close friends. For a stretch of time, they did not see each other very often because Mr. Singletary moved to Philadelphia to play for the Philadelphia Eagles. The exception was during the off-season when Mr. Singletary came home and they would get together to hunt, fish and ride motorcycles.

Mr. Singletary was originally from Whitfield, North Carolina and now lives in Burlington, North Carolina where Mr. Jeffries once lived. In 2019, Mr. Jeffries moved to the Florida Keys and has returned home to North Carolina only once in two years. That trip occurred approximately six months ago which was the last time he saw Mr. Singletary. They talk occasionally on the phone, but Mr. Jeffries advised that he doesn't regularly talk to his friends on the telephone. Prior to his move to Florida, he saw Mr. Singletary about once a week. He has no role in taking care of Mr. Singletary and assumes his wife handles the daily responsibilities and makes sure Mr. Singletary takes his medications.

Mr. Jeffries doesn't recall the date or the circumstances surrounding his completion of the third-party sworn statement but does remember that Mr. Singletary asked him to fill out a form concerning the NFL Concussion Settlement and mentioned that it could not be done by a family member or blood relative. Mr. Jeffries generally understood that he was to discuss changes he observed in Mr. Singletary over the years.

After Mr. Jeffries agreed to complete the form, Mr. Singletary told him that his lawyer would be in contact and direct him on the next steps. When asked the name of the lawyer, Mr. Jeffries couldn't remember but, when provided with the name Byron Cuthbert (Cuthbert), he acknowledged that might have been who he spoke to on the phone. Cuthbert or an associate from the law firm provided Mr. Jeffries with a web address and directed him to follow the instructions on the form as it was self-explanatory. Mr. Jeffries went to the website and followed the instructions as best he could. After Mr. Jeffries "filled it in," he submitted the completed .pdf from his personal computer. Mr. Jeffries does not recall to whom he sent the completed document but was sure that he never got it back to approve any edits or corrections. Mr. Jeffries has no memory whether the website he was directed to belonged to the law firm or was the NFL Concussion Settlement website. Mr. Jeffries stated that he had no help from anyone in completing the document, including receiving a template or "go-by." He does not recall checking a box on the form affirming that he completed the document himself, but if it was required then he must have done so. When asked if he electronically signed the document he

replied, “I don’t have a degree in computer science, but I did the best I could.” He described the entire process as “cumbersome.”

After being given some examples of overlapping statements between his sworn statement and those of others that were submitted on behalf of unnamed NFL players, Mr. Jeffries was unable to explain how some of the language was identical. He has no knowledge if his affidavit was ever edited or changed. The computer that Mr. Jeffries used to write the affidavit has since crashed so he was unable to review it or send the document to the interviewing investigator. When the investigator offered to send Mr. Jeffries a copy, he declined and stated, “I don’t need my document back.” Mr. Jeffries reiterated that it was his understanding that the purpose of the affidavit was for him to comment on the changes he had noticed in his friend over the years. He added that he thought Mr. Singletary had been diagnosed with dementia or Alzheimer’s disease.

**Exhibit 21: Tiffany Bell Call Notes**

On January 8, 2022, Tiffany Bell (Ms. Bell) was telephonically interviewed by investigator [redacted] regarding a third-party sworn statement submitted by her on behalf of former NFL player Corey Louchiey (SPID 100009416). After being advised of the identity of the interviewing investigator and the nature of the interview Ms. Bell provided the following information:

Ms. Bell first met Corey Louchiey (Mr. Louchiey) in college where they both attended the University of South Carolina. They are currently engaged to be married and have lived together for almost eight years. Ms. Bell works from home and Mr. Louchiey does not work.

Mr. Louchiey's attorney Byron (last name unknown) called her about a year ago and asked her to complete a third-party affidavit in connection with the NFL Concussion Settlement (Concussion Settlement) and Mr. Louchiey's claim. Byron sent her a link to the Concussion Settlement website and told her to complete the form. He asked that she include some history of their relationship, examples of Mr. Louchiey's behavior and organize it by numbering each individual statement. Ms. Bell downloaded the form and completed it by herself without any drafts, prompts or assistance from others. She explained that she used the examples provided on the form to "leverage" or influence her discussion of Mr. Louchiey's decline. When she finished, she signed it and remembers checking the box indicating that no one assisted her with the affidavit. Ms. Bell sent it to Byron as a PDF, and he did not send it back or make any changes to her knowledge. She believes that she has a copy of the document she sent to Byron and agreed to forward it and any related emails to the investigator.

Upon being given several examples of her statements that overlapped with statements made on other players' third-party sworn statements, Ms. Bell insisted that she wrote it herself and without assistance. In addition, Ms. Bell was asked if she was ever provided with a "fill-in-the-blank" document from Byron's law firm that related to the third-party sworn statement. She denied ever receiving anything of that nature from Byron or his law firm. Ms. Bell was presented with samples of identical statements from that document that were also found in her affidavit and Ms. Bell was unable to explain how this could have happened. She questioned the timing of the other affidavits and wondered if they were submitted before or after hers.

Ms. Bell stated that she does not know any other NFL players. She further stated that she has not spoken to Byron since being contacted by the investigator.

**Note:** Ms. Bell subsequently emailed the investigator a copy of the affidavit she submitted on behalf of Mr. Louchiey and it was identical to the document that appears in the portal.

**Exhibit 22: Brenda Vertison Call Notes**

On January 4, 2022, Brenda Vertison (Ms. Vertison) was telephonically interviewed by investigator [redacted] regarding two third-party sworn statements submitted by her on behalf of former NFL player Lester Holmes (SPID 100007068). After being advised of the identity of the interviewing investigator and the nature of the interview, Ms. Vertison provided the following information:

Ms. Vertison first met Lester Holmes (Mr. Holmes) a long time ago at a party in Atlanta. They started dating a few years later and have been dating off and on for the last twenty years. When they first met, Mr. Holmes was playing NFL football but later retired and went on to coach at his alma mater, Jackson State University.

Regarding Mr. Holmes' employment as a real estate consultant and professional, Ms. Vertison stated that he no longer performs that type of work since he had a stroke in February 2021. Prior to that, he was somewhat active in that field, but she never knew what his duties and responsibilities entailed.

In approximately 2017, Ms. Vertison first noticed changes in Mr. Holmes' behavior. At times she would explain something to him and ask if he understood but based on his actions, it did not appear that he was "getting it." This has only gotten worse over the years.

Ms. Vertison is a permanent resident of Texas. Her job allows her to work remotely and if she has her computer and access to the internet she can work from anywhere. She sees Mr. Holmes at least once a week and often for a few days a week, although that is not the case over the holidays. She explained that it is a six-hour drive between her home in Texas and his in Tylertown, Mississippi. In the past, Mr. Holmes would come to visit her but since the stroke she makes the trip to see him. When Ms. Vertison is home, she speaks by phone to Mr. Holmes every day.

In 2017, Mr. Holmes asked her to "fill out" a third-party sworn statement to answer questions about any changes that she had observed in his behavior. When first asked, Ms. Vertison could not remember if Mr. Holmes gave her any prompts or drafts to follow. She believed they discussed what was required and she thought Mr. Holmes may have given her some examples of the types of behavior that qualified for her to put into her statement. Ms. Vertison was concerned that some of her accounts could hurt Mr. Holmes' feelings, but he insisted that she be totally honest. Later in the interview, Ms. Vertison added that Mr. Holmes may have shown her some samples, but he cautioned her to tell the truth and detail specific instances where she noticed differences in his behavior. She noted that no one helped her create the affidavit and that she "mostly" talked to Mr. Holmes about what should be included. Ms. Vertison was unsure if she still had a copy of the original affidavit that she prepared in 2017.

Ms. Vertison was aware that Mr. Holmes had an attorney for the NFL Concussion Settlement and believed his first name was Byron but did not recognize Cuthbert as his last name. She thought that she "may" have had a conversation with Byron on the phone but did not remember receiving any documents from him or the law firm. Although Ms. Vertison mostly

worked with Mr. Holmes on the sworn statement, Byron may have told her what should be included.  Upon being given examples of overlapping statements in another unnamed players affidavits who were also represented by Byron, Ms. Vertison acknowledged that they were the "type of things" that she and Mr. Holmes discussed and also maybe "a little with the attorney." Ms. Vertison believed she emailed her statement to the attorney and thought he may have emailed it back to her with some spelling and grammatical changes.

Concerning the support Mr. Holmes receives from family and friends, she advised that his family does almost everything for him including handling his finances and medical care. Since the stroke, Mr. Holmes has lost power on his left side and is in therapy.  Ms. Vertison helps with his care whenever she is there.  When asked about his personal care, Ms. Vertison observed that Mr. Holmes does not take medication nor is he sloppy with his personal hygiene.

Noting that Ms. Vertison's 2017 statement indicated that he spent most nights with his sister and, in the 2020 document, that he spent most nights with his brother, she believed that his brother lived with him at one point and advised his sister is very involved in his care.

Ms. Vertison was not sure why Mr. Holmes asked her to complete a second sworn statement in 2020, only that he said it had to be updated.  She recalled that it was requested around a time when Mr. Holmes had a doctor's appointment.  She did not question him about his Settlement claim and did not know the status of the first affidavit.  For the 2020 sworn statement, Ms. Vertison was not certain that she drafted the document entirely by herself and cannot remember if she was given any prompts, drafts or fill-in-the-blank forms to assist her.  She "possibly" talked to the attorney (Byron) about the changes she observed in Mr. Holmes' daily life and the specific areas she needed to discuss in the second affidavit.  Their conversation revolved around the following areas: 1) how Mr. Holmes functions on a daily basis; 2) how has his behavior changed over the years; 3) who handles his finances; 4) what exactly does she do to help him; and 5) what assistance does his family provide.  Ms. Vertison was fairly certain she emailed the draft of her statement to Byron in 2020 and he may have asked her to expand on some of the areas.  She believed that he wanted more discussion about the various events that caused her think something was wrong with Mr. Holmes and asked her to detail it more fully in her statement.  Ms. Vertison said that she honestly did not remember getting a document that told her what to write in the affidavit.

Ms. Vertison believed she had a copy on her computer of the 2020 third-party sworn statement that she sent to the attorney and possibly emails related to the same.  She agreed to forward them to the investigator if located.

**Exhibit 23: Michael Hocter Call Notes**

On December 13, 2021 and December 16, 2021, Michael Hocter (Hocter) was telephonically interviewed by investigators [redacted] regarding a third party sworn statement submitted by him on behalf of former NFL player Tommy Barnhardt (SPID 100000793). After being advised of the identities of the interviewing investigators and the nature of the interview, Hocter provided the following information:

Hocter first met Tommy Barnhardt (Barnhardt) approximately seven and a half years ago at a friend's party and they have remained close friends since then. At present, Hocter sees Barnhardt a few times a week and frequently checks in on him by phone. Hocter primarily assists Barnhart by helping around the house and occasionally bringing him food.

When asked how it came about that Hocter was asked to write the third party sworn statement on behalf of Barnhardt, he initially stated that Barnhardt requested he do it and directed him to the NFL Concussion Settlement website for guidance. Hocter reviewed and printed the relevant information from that website, noting how they wanted the statement structured and then used that format to create his affidavit. Hocter had no contact with Barnhardt's attorney nor did he receive any assistance from the law firm in the completion of the sworn statement. After Hocter completed the document, he gave it to Barnhardt. Hocter was subsequently questioned about an earlier statement he provided to BrownGreer in June 2021 where he advised that he was asked by Barnhardt's attorney to produce the sworn statement. Hocter stated that he answered the question in that manner because, despite Barnhardt asking him to draft the sworn statement, he assumed the request came from Barnhardt's attorney.

Hocter was then asked about specific information contained in his sworn statement where the word, "we," was occasionally used to describe the persons who provided assistance to Barnhardt. When Hocter was specifically asked which of his own family members assisted with Barnhardt's care, he stated no one other than himself. Hocter was also asked about any of Barnhardt's family members who aided in his care. He advised that none of them did as Barnhardt lives alone. Barnhardt's mother passed away about 2 years ago and his sister lives 1 ½ hours away. Hocter acknowledged that he made a mistake in his sworn statement whenever he said, "we" and, instead, should have written, "I."

Hocter was also asked about a comment in his sworn statement related to Barnhardt's memory loss. Specifically, Hocter stated, "The initial signs were memory loss in Tommy started after his NFL career ended, which over the years elevated to severe memory loss." Barnhardt retired from the NFL in 2003 and, by Hocter's own admission, he has only known him since about 2014. When asked how he was aware of the progression of Barnhardt's memory loss beginning in 2003 and for the approximately 11 years thereafter before he met him, Hocter acknowledged that this statement was somewhat misleading. He explained that it was his "assumption" that Barnhardt's memory loss started after his playing career ended considering how often "he got knocked around." Hocter learned about those instances from stories that Barnhardt frequently told about his time in the NFL.

Hocter noted that Barnhardt seems "stuck in the 70's." During Hocter's visits with Barnhardt, he has seen him unshaven and not wearing the cleanest of clothes. Hocter has also seen Barnhardt walk outside wearing his underwear. When asked how often this occurred, Hocter replied "occasionally."

Hocter denied being provided a fill-in-the-blank or template of a sworn statement to use as a go-by when creating his document for Barnhardt. He was then asked to opine how, in many instances, the exact same verbiage he used in his statement appeared in other player's affidavits who were also represented by Barnhardt's attorney. Hocter was unable to explain how that could have occurred. A request was made of Hocter to search his computer and other records for his original affidavit, notes or other materials he may have relied on to create his sworn statement. He reported via email on 12/18/21 that he could not locate anything but confirmed that a copy of the affidavit provided to him by investigators was a true and accurate copy of what he produced. He also advised that the link to the third party sworn statement page on the NFL Concussion Settlement website provided to him by investigators was the site he personally visited when preparing his affidavit.

**Exhibit 24: Claude Roney Call Notes**

On January 4, 2022, Claude Roney, Affiant for former NFL player Ryan Stewart (Stewart) (SPID 100014629) was telephonically interviewed by investigator [redacted] regarding the process he followed for completing the third-party affidavit for Stewart including any assistance he may have received along the way. After being advised of the identity of the interviewing investigator and the nature of the interview, Roney provided the following information:

Roney and Stewart met in 1991 at Georgia Tech when they pledged the same fraternity and became best friends. The remain close 30 years later and presently talk or text with each other every day or every other day and see each other in person once a month or once every other month. They live about an hour away from each other in the Atlanta, GA area. Roney is the godfather to Stewart's kids who range in age from 5 to 11 years old.

After Stewart's NFL career ended, he worked as a sports talk radio host and could remember any number of details about his playing days which he regularly referred to during his show. Although no longer on the radio, Roney noticed that over the last few years Stewart can no longer recall those stories when asked about them and apologizes for his poor memory.

Roney has also seen a change in Stewart's personality over the last several years. He discussed an instance where he accompanied Stewart and his kids to the circus and Stewart became incensed after a $10 flashlight purchased at the event stopped working a short time later. In the past, Stewart would have let it go but, on this occasion, he approached the vendor and asked for a refund. When the vendor declined, Stewart snatched another flashlight from his hand and walked away. Roney stated that behavior was totally out of character for Stewart.

"Someone" explained to Roney what the Settlement was all about, and he opined that more needs to be done to protect players from brain injury. Roney believed that Stewart asked him to complete the affidavit in question. Roney could not recall how he knew the various areas to address in the affidavit. He denied any contact with Stewart's law firm regarding the affidavit and denied receiving any assistance in crafting it, including being given a template to follow. After it was pointed out to Roney that certain aspects of his affidavit were similar to those submitted on behalf of other former players represented by the same law firm as Stewart, Roney had no explanation for it. He noted that the overlapping language was general in nature and did not reflect the examples he went on to cite in his affidavit to illustrate the point.

Roney stated that not all affiants were from the same educational background or had the same intelligence level, so he suggested that perhaps some needed assistance in completing the affidavit. He saw nothing wrong with those persons getting help if that's what occurred as long as the information provided was truthful. The interviewing investigator agreed with Roney's premise but advised that any assistance provided to the affiant needed to be disclosed. Roney stated that perhaps the "box wasn't checked" because the affiant feared their affidavit would be flagged or scrutinized and hold up the player's claim.

**Exhibit 25: 4/7/21-6/2/21 Emails between Hope Neurological and Settlement Program**

[redacted]

**From:** Liz Upegui <liz@hopeneuromed.com>
**Sent:** Wednesday, June 2, 2021 1:13 PM
**To:** [redacted]
**Subject:** Re: FW: Dr. Amandeep Dhillon

I apologize, if 9 AM is the only time available we can do June 9th at 9 AM.

Thank you

On Wed, Jun 2, 2021 at 1:12 PM Liz Upegui <liz@hopeneuromed.com> wrote:

> Good afternoon [redacted],
>
> We can do Wednesday June 9th at 11 AM. Please let me know if that works for you.
>
> Thank you
>
> On Wed, Jun 2, 2021 at 11:34 AM [redacted] wrote:
>
> > Good Morning,
> > We would like to schedule a call with Dr. Dhillon. We are available on Wednesdays at

9AM ET. We currently have following dates available: June 9th, June 23rd and June 30th.
Please let me know which date/time works best for her and I will coordinate this.
Thanks,
[redacted]

**From:** Liz Upegui <liz@hopeneuromed.com>
**Sent:** Wednesday, May 19, 2021 10:32 AM
**To:** [redacted]
**Subject:** Re: FW: Dr. Amandeep Dhillon

Hi [redacted],
Dr. Dhillon has been with us 11 months and she relocated to Georgia from Las Vegas.
Thank you,

Liz Upegui
Business Development/Operations
Hope Neurological & Medical Services
(o) 404-631-6156
(c) 404-801-9188
(f) 404-793-0772
liz@hopeneuromed.com

On Fri, May 14, 2021 at 2:49 PM [redacted] wrote:

> Hi Liz,
> Can you please confirm how long Dr. Dhillon has been with Hope? How long Dr. Dhillon has been in Georgia? And why Dr. Dhillon started practicing in Georgia?
> Thanks for all of your help,
> [redacted]
>
> **From:** Liz Upegui <liz@hopeneuromed.com>
> **Sent:** Monday, May 10, 2021 10:56 AM
> **To:** [redacted]
> **Subject:** Re: FW: Dr. Amandeep Dhillon
>
> Good morning,
> I am so sorry, this was in my Spam folder. No one suggested for Dr. Dhillon to apply and I don't have attorney information at this time.
> Thanks,
>
> Liz Upegui
> Business Development/Operations
> Hope Neurological & Medical Services
> (o) 404-631-6156

(c) 404-801-9188
(f) 404-793-0772
liz@hopeneuromed.com

On Thu, Apr 22, 2021 at 5:06 PM [REDACTED] wrote:

Hi Liz,
I hope all is well. I just wanted to circle back to see if Dr. Dhillon was able to provide responses to the follow-up questions below.

2. Did anyone suggest or recommend that you apply?
3. Were these players referred to you by an attorney?

Looking forward to hearing from you soon.
Thanks!

**From:** [REDACTED]
**Sent:** Monday, April 12, 2021 2:08 PM
**To:** Liz Upegui <liz@hopeneuromed.com>
**Subject:** RE: FW: Dr. Amandeep Dhillon

Hi Liz,
Thanks for your quick response. We need just a little more information to help us process Dr. Dhillon's application. Please reply to question 2 and the remainder of question #3.

2. Did anyone suggest or recommend that you apply?
3. Were these players referred to you by an attorney?

Let me know if you have any questions. I'm happy to help!

Thanks,

**From:** Liz Upegui <liz@hopeneuromed.com>
**Sent:** Monday, April 12, 2021 10:09 AM
**To:** [REDACTED]
**Subject:** Re: FW: Dr. Amandeep Dhillon

Good morning [REDACTED],
We found out about this program online. Dr. Dhillon has treated former NFL players, a total of 8 patients.
Thank you,

Liz Upegui
Director of Operations
Hope Neurological & Medical Services
(o)404-631-6156
(f)404-793-0772
liz@hopeneuromed.com

On Fri, Apr 9, 2021 at 11:26 AM [REDACTED] wrote:

Hi Liz,
Thanks for submitting Dr. Dhillon's application. Our team is currently reviewing it and we just have a few follow-up questions.

1. How did you learn of the Program?

2. Did anyone suggest or recommend that you apply?

3. You indicated on the application that you have treated current or former NFL players. How many players have you examined? Were these players referred to you by an attorney? If so, who?

Please let me know if you have any questions. I'm happy to help!

Thanks,
[REDACTED]

**From:** Liz Upegui <liz@hopeneuromed.com>
**Sent:** Wednesday, April 7, 2021 10:13 AM
**To:** NFL Claims Administrator <claimsadministrator@nflconcussionsettlement.com>
**Subject:** Dr. Amandeep Dhillon
Good afternoon,
Please see attached completed application for Dr. Amandeep Dhillon. Please let me know you need anything else.

Thank you,

Liz Upegui
Director of Operations
Hope Neurological & Medical Services
(o)404-631-6156
(f)404-793-0772
liz@hopeneuromed.com





Secured by Paubox - HITRUST CSF Certified

Secured by Paubox - HITRUST CSF Certified

Secured by Paubox - HITRUST CSF Certified

Secured by Paubox - HITRUST CSF Certified

--

Liz Upegui Director of Office Administration Hope Neurological & Medical Services (o)404-631-6156 (c) 678-551-9298 liz@hopeneuromed.com

--

Liz Upegui Director of Office Administration Hope Neurological & Medical Services (o)404-631-6156 (c) 678-551-9298 liz@hopeneuromed.com

Secured by Paubox - HITRUST CSF Certified

NFL CONCUSSION SETTLEMENT

*In re: National Football League Players' Concussion Injury Litigation* No. 2:12-md-02323 (E.D. Pa.)

# NETWORK PROVIDER APPLICATION

Please complete and return this application with the following supporting documents:

- A copy of your state license to operate;
- Certificate(s) of Insurance proving current general liability and professional liability/medical malpractice insurance coverage and amounts of coverage;
- A copy of your organization's W-9 form (most recent IRS version); and
- If you or any of the facilities or practice sites in your system participate in one or more state-sponsored or state-affiliated patient compensation funds, please include (a) the name of the fund(s), (b) a list of your service or practice sites participating in each such fund, (c) your certificate(s) of coverage, and (d) the declaration page(s) for your underlying primary coverage(s), general and professional liability.
- Please also attach a current curriculum vitae for each proposed practitioner.

**NOTE:** *If you require more space than is provided by any of the boxes on this form, please submit additional pages as needed.*

ACORD

# CERTIFICATE OF LIABILITY INSURANCE

DATE (MM/DD/YYYY) 04/06/21

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

PRODUCER
AGUILAR GRANILLO INSURANCE AGENCY
620 N Resler Drive
El Paso, TX 79912

CONTACT NAME:
PHONE (A/C, No, Ext): (915)845-5100 FAX (A/C, No): (915)845-5114
E-MAIL ADDRESS: cynthia@agi-insurance.com

| INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|
| INSURER A: Travelers | 0ccy38 |
| INSURER B: | |
| INSURER C: | |
| INSURER D: | |
| INSURER E: | |
| INSURER F: | |

INSURED
Hope Neurological & Medical Service
3970 Five Forks Trickum Rd SW

Lilburn, GA 30047
(469)525-9966

COVERAGES CERTIFICATE NUMBER: REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | COMMERCIAL GENERAL LIABILITY; CLAIMS-MADE / OCCUR; GEN'L AGGREGATE LIMIT APPLIES PER: POLICY / PRO-JECT / LOC; OTHER: | | | 680-7P595870 | 03/07/2021 | 03/07/2022 | EACH OCCURRENCE | $ 1000000 |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 300000 |
| | | | | | | | MED EXP (Any one person) | $ 5000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1000000 |
| | | | | | | | GENERAL AGGREGATE | $ 2000000 |
| | | | | | | | PRODUCTS - COMP/OP AGG | $ 2000000 |
| | | | | | | | | $ |
| | AUTOMOBILE LIABILITY; ANY AUTO; OWNED AUTOS ONLY; SCHEDULED AUTOS; HIRED AUTOS ONLY; NON-OWNED AUTOS ONLY | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | UMBRELLA LIAB / EXCESS LIAB; OCCUR / CLAIMS-MADE; DED; RETENTION $ | | | CUP-7P779019 | 3/7/2021 | 03/07/2022 | EACH OCCURRENCE | $ 1,000,000 |
| | | | | | | | AGGREGATE | $ |
| | | | | | | | | $ |
| A | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY; ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) Y/N: X; If yes, describe under DESCRIPTION OF OPERATIONS below | N/A | | UB-7P596215 | 3/07/2021 | 03/07/2022 | PER STATUTE / OTH-ER | |
| | | | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)

CERTIFICATE HOLDER

CANCELLATION

SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.

AUTHORIZED REPRESENTATIVE
Cynthia Aguilar-Granillo

© 1988-2015 ACORD CORPORATION. All rights reserved.

The ACORD name and logo are registered marks of ACORD

# AMANDEEP KAUR DHILLON, M.D.

2882 ASHBY AVENUE
LAS VEGAS, NEVADA - 89131

E-mail - neurodhillon@gmail.com
Ph# - 315 790-9272

## PROFILE - A little about me.

I would like to describe myself as a well qualified, compassionate -- may sometimes be perceived to be a little neurotic Neurology professional. In the care of my critically ill neurological Patients I have a very custom made analytic fact based approach pertaining to each individual case. I treat my patients based on their primary neurological complain but also taking into consideration the patient's leu of other comorbid medical conditions with the final goal being to recognizing the true etiology of the neurological disease with treatment plan thus directed towards the cause and also addressing any preventive measures. Recently, I was molded through my recent Position As Stroke Director of Spring Valley hospital las Vegas and an Associate Neurological Professor at the University of Las Vegas to be an articulate communicator with effective interpersonal skills with ability to quickly establish rapport with patients, staff and medical professionals.

*Core Competencies*

1. *DIAGNOSIS /TREATMENT /MANAGEMENT*
   *Ischemic stroke /I.V and Intra Arterial TPA*
   *Intracerebral hemorrhage*
   *Subarachnoid hemorrhage*
   *Acute nontraumatic weakness*
   *Traumatic brain and spine injury including epidural and subdural hematoma, diffuse axonal injury*
   *Anoxic brain injury*
   *Coma*
   *Intracranial hypertension*
   *Meningitis and encephalitis*
   *Spinal cord compression*
   *Status epilepticus*
2. *RADIOLOGY*
   *CT brain imaging interpretation*
   *MRI brain and spinal cord interpretation*
   *4 vessel Angiography interpretation*
   *Transcranial Brain Doppler Ultrasound*
   *Brain flow Nuclear study interpretation*
   *EEG test interpretation*
   *APNEA TESTING- Brain Death declaration*

3. *BEDSIDE PROCEDURES*
   *EVD interpretation and weaning*
   *lumbar Puncture*
   *APNEA TESTING*
   *NGT or Dobhoff tube insertion*
4. *REQUIRED CERTIFICATES*
   *BCLSACLS - ACTIVE - EXPIRES 5/2020*

## PROFESSIONAL HISTORY

***2013-PRESENT***

## NEUROLOGY STROKE SPECIALIST (Independent contractor)

***1. STROKE PROGRAM DIRECTOR FOR SPRING VALLEY HOSPITAL LAS VEGAS NEVADA --***

***Neurocritical care Director for the Spring Valley Hospital Las Vegas Nevada***

***2. NEUROLOGY ASSOCIATE PROFESSOR FOR UNIVERSITY OF LAS VEGAS - 2013- TO PRESENT***

***3. ADVISORY BOARD MEMBER FOR NEVADA ORGAN DONATION***

***4. Advisory COMMITTEE MEMBER FOR MEDICAL COMMITTEE AT SPRING-VALLEY HOSPITAL***

***5 ADVISORY COMMITTEE MEMBER FOR THE ETHICS COMMITTEE***

***2011 - 2012***

***1. PROVIDENCE HEALTH AND SERVICE -- PORTLAND OR.***

***- NEUROHOSPITALIST -***

**EDUCATION SUMMARY - (Diplomas can be presented as needed)**

MAYO CLINIC, ROCHESTER, MN ***Neurocritical Care/Neurohospitalist Fellowship, Completed*** *July 2011*

STATE UNIVERSITY OF SYRACUSE NEW YORK CITY ***Neurology Residency,***

***Completed*** *July 2006 June 2009 -* ***Chief Resident, 2009***

ST VINCENT'S HOSPITAL JAMAICA NY ***Internal Medicine Internship***

***Completed*** *July 2005 June 2006*

SRI SIDDHARTHA MEDICAL COLLEGE BANGALORE INDIA ***Bachelor of Medicine and Surgery,***

***Completed*** *2000 2006*

***LICENSE ACQUIRED current and IN THE PAST***

- ***STATE OF NEVADA LIC # - 14414 . DEA - FD2219827 STATUS - ACTIVE***
- ***STATE OF OREGON LIC # MD 15469 STATUS - INACTIVE***
- ***STATE OF MINNESOTA LIC # 53311 STATUS - INACTIVE***

**Memberships - Current**

- **American Heart and Stroke Association**
- **American Academy of Neurology**
- **Nevada Organ Donation**
- **Ethics Committee of Valley hospitals**

- **ECFMG (Educational Commission for Foreign Medical Graduates) Certified, 2005**

# APPEARANCE

**AUTHOR AND PRESENTER**

- NEUROCRITICAL CARE SOCIETY 18 TH ANNUAL MEETING - OCT 2018
- NEUROCRITICAL CARE SOCIETY 17TH ANNUAL MEETING -- OCT 2017
  **Title : NEVADA LEGISLATIVE LAW OF BRAINDEATH**
- INTERNATIONAL STROKE SYMPOSIUM -- Aug 2016
- AMERICAN BOARD OF NEUROCRITICAL CARE CONFERENCE - 2010
  **Title : CSF Hypovolemia Coma Poster Presentation, September 2009**
- BETHESDA BRAIN INJURY AND REHAB CONFERENCE, PLYMOUTH MN -2010
  **Title : The Comatose Patient October 2010**

# PUBLICATIONS

## Current Projects.

### 2018- PILOT STUDY

**HYBRID LARGE VESSEL OCCLUSION SCALE ( PILOT STUDY ) - Combining NIHSS+ RACE**

**PURPOSE :** QUICK EMS--- ABILITY TO RECOGNIZE PATIENTS LARGE VESSEL OCCLUSION STROKES IN THE FIELD

**DESIGN :** FORMULATING SIMPLE PROTOCOL/FLOW CHARTS FOR EMS FOR EARLY DETECTION, RECOGNITION OF LARGE STROKES / BASED ON THE DEVIATION OF THE EYES. RACE + NIHSS COMBINED.

**GOAL :** DIRECTED TOWARDS FASTER TRANSPORT OF THE PATIENT TO THE APPROPRIATE FACILITY WITH CAPABILITIES OF THROMBECTOMIES AND INTRA-ARTERIAL TPA.

### *2018- PILOT STUDY*

***Sleep Disruption in NICU, Is melatonin the answer?***
**PILOT Prospective study**

**Goal:** to measure melatonin levels in Intraventricular Hemorrhage vs Parenchymal hemorrhage If there is a mismatch in levels this could explain why brain injury patients have abnormal sleep wake cycles and maybe treatment with Melatonin replacement can avoid the use of narcotics and Sedative medications.

## PUBLICATIONS IN PRINT

2017 -- BILL 424 Passed
**Standardization of Brain Death Determination in Legislation:**

**Bill 424 PASSED IN MAY 2017 .** MAKING NEVAD THE FIRST IN THE NATION TO ADOPT THE GUIDELINES FOR DETERMINING A PATIENT BRAIN DEAD

**Key provisions of Assembly Bill 424 to determine when someone is brain dead:**

- Adopts guidelines as set by the American Academy of Neurology for adults; and the Pediatric Section of the Society of Critical Care Medicine for children and infants.
- Does not require consent of patient's family or authorized representative.
- Prohibits withholding life-sustaining treatment if the person is pregnant and it is probable that the fetus will develop to the point of live birth with ongoing treatment.
- If the person is an organ donor, prohibits withholding organ-sustaining treatment until organs can be harvested.

### *Painful Pause*

Authors: K. Dhillon; Alejandro A. Rabinstein Mayo Clinic Proc. March 2010 (3): ; Published February 22, 2010 DOI: 10 4065/MCP.2009.0591

### *Coma from Worsening Spontaneous Intracranial Hypotension After Subdural Hematoma Evacuation*

Authors: Amandeep K Dhillon; Alejandro A Rabinstein; Eelco . M. Wijdicks
Neurocrit Care (2010) 12:390 394 DOI 10.1007/s12028-009-9323-8

### *Malignant Cerebral Venous Thrombosis and Pulmonary Emboli*

Authors Dhillon Amandeep K , M.D.; Rabinstein, Alejandro A., M.D.; Wijdicks, Eelco F., M.D., Ph.D.
NEUROLOGY Journal ID#: NEUROLOGY/2010/326389

# AWARDS

## 2015- 2019

- Get With The Guidelines® - Stroke Gold Plus Quality Achievement Award

## 2017-

- LEADING PHYSICIANS OF THE WORLD Ranked and honorably mentioned in the Leading Physicians of the World.( Details of Ranking can be provided as needed )

## 2016 and 2018 -

- **Target Stroke Elite Plus Honor Roll.** (req:TPA to be administered under 45 min) This Award was only achieved by Spring valley hospital in all of Las Vegas with only very limited hospitals in the West coast.

***References Available Upon Request***

***DIPLOMAS AND CERTIFICATES AVAILABLE UPON REQUEST***

**This application does not constitute a contract.**
Please furnish the information below. Indicate "N/A" if an item is not applicable.

## I. GENERAL INFORMATION

Please provide the following general information about your organization:

Organization Name: Hope Neurological and Medical Services

State License Number: 

Expiration Date: 

Tax ID: 84-2415247

NPI: 

Street Address 1: 2021 North Druid Hills Rd

Street Address 2: Suite 102

City: Atlanta

State: GA

ZIP: 00000-0000 30329

Primary Contact Name: Liz Upegui

Title: Director of Operations

Primary Contact Phone: 404-801-9188

Primary Contact E-mail: liz@hopeneuromed.com

Parent company or organization (if applicable): 

## II. LIABILITY COVERAGE

| **A. Does your organization maintain the following types of insurance coverage?** | **Yes** | **No** | **N/A** |
|---|---|---|---|
| 1. Commercial general liability for bodily injury/property damage and contractual liability | ☑ | ☐ | ☐ |
| If so, in what amounts? $ 1 million (occurrence) $ 2million (aggregate) | | | |
| 2. Professional liability and/or medical malpractice insurance | ☑ | ☐ | ☐ |
| If so, in what amounts? $ ____ (occurrence) $ ____ (aggregate) | | | |

| **B. Has your organization experienced any of the following:** | **Yes** | **No** | **N/A** |
|---|---|---|---|
| 1. Malpractice liability insurance cancellation in the past five (5) years? | ☐ | ☑ | ☐ |
| 2. General liability insurance cancellation in the past five (5) years? | ☐ | ☑ | ☐ |
| 3. Revocations or suspensions as a Medicare or Medicaid Provider? | ☐ | ☑ | ☐ |
| 4. State licensing investigations or actions? | ☐ | ☑ | ☐ |

If you answered "Yes" to any question(s) in Section B, please provide an explanation below, as well as any additional relevant information about your organization:

What percentage of your practice is related to each of the Qualifying Diagnoses, meaning what percentage of the patients that you treat or evaluate are diagnosed with each of the Qualifying Diagnoses?

**LEVEL 1.5 NEUROCOGNITIVE IMPAIRMENT (EARLY DEMENTIA):**

Percentage: %

Description:

**LEVEL 2 NEUROCOGNITIVE IMPAIRMENT (MODERATE DEMENTIA):**

Percentage: %

Description:

**ALZHEIMER'S DISEASE:**

Percentage: %

Description:

**PARKINSON'S DISEASE:**

Percentage: %

Description:

**AMYOTROPHIC LATERAL SCLEROSIS ("ALS"):**

Percentage: %

Description:

**Please see Application Instructions on page 1 for documentation requirements.**

## III. DELIVERY SITES

Please provide the following information for each site your organization proposes to provide services in connection with the NFL Concussion Settlement. Please include a separate entry for each proposed site:

Hope Neurological and Medical Services
Name of Facility 1

2021 North Druid Hills Rd Ste. 102
Street Address

Atlanta
City

GA
State

00000-0000 30329
ZIP

404-631-6156
Primary Telephone Number

Same
Scheduling Telephone Number

404-793-0772
Fax Number

# 87155
State License Number

1386800415
NPI Number

Hope Neurological and Medical Services
Name of Facility 2

5730 Glenridge Dr. T-300
Street Address

Atlanta
City

GA
State

00000-0000 30328
ZIP

404-631-6156
Primary Telephone Number

Scheduling Telephone Number

404-793-0772
Fax Number

87155
State License Number

1386800415
NPI Number

Name of Facility 3

Street Address

City

State

00000-0000
ZIP

Primary Telephone Number

Scheduling Telephone Number

Fax Number

State License Number

NPI Number

Please see Application Instructions on page 1 for documentation requirements.

## IV. PRACTITIONERS

Please provide the following information for each practitioner that your organization proposes to provide services covered under the NFL Concussion Settlement. Please include a separate entry for each practitioner.

Qualified BAP Providers must be one of the following:

- A clinical neuropsychologist certified by the ABPP or ABCN in the specialty of Clinical Neuropsychology; or
- A board-certified neurologist.

Qualified MAF Physicians must be one of the following:

- A board-certified neurologist;
- A board-certified neurosurgeon; or
- A board-certified neuro-specialist physician.

All practitioners seeking to serve as a Qualified BAP Provider or Qualified MAF Physician must meet the following requirements:

- Possess a current, active, unrestricted state license;
- Hospital staff privileges not revoked or restricted within the past five (5) years;
- Is covered by proper insurance under state law;
- Not excluded from participation in any federal or state health care program; and
- Medical license not subjected to any disciplinary action or any restrictions within the past five (5) years.

Last Name: Dhillon.

First Name: Amandeep

MI:

Professional Designation (e.g., M.D., Ph.D.): MD.

State License Number: # 87155

NPI: 1386800415

Specialty: Neurology.

No. of Years in Practice as a Healthcare Provider: 10 yr

Hours per Month Available To See Settlement Participants:

Languages Spoken:

Average wait time for new patient evaluations (number of days from request for appointment until the patient can be seen by the practitioner): 1-2

Practitioner Education:

Please see Application Instructions on page 1 for documentation requirements.

Neurology.
Neurocritical Care.

Practitioner Training

Practitioner Experience with Sports-Related Concussions or Traumatic Brain Injury

YES.

Practitioner Board Certification

Location(s) Where the Practitioner Provides Services

Is the practitioner an employee of your organization? Yes ☒ No ☐

If you answered "No" to the preceding question, please describe the relationship between the practitioner and the organization and name the practitioner's employer:

Please see Application Instructions page 1 for documentation requirements.

## LIABILITY COVERAGE

| **A. Does the practitioner carry these types of insurance coverage?** | **Yes** | **No** | **N/A** |
|---|---|---|---|
| Professional liability and/or medical malpractice insurance | ☑ | ☐ | ☐ |
| If No, is the practitioner covered by your organization's liability and/or malpractice insurance? | ☐ | ☐ | ☐ |

If Yes, please indicate the following:

Type of insurance: ________ Amounts: $ ________ (occurrence) $ ________ (aggregate)

Type of insurance: ________ Amounts: $ ________ (occurrence) $ ________ (aggregate)

Type of insurance: ________ Amounts: $ ________ (occurrence) $ ________ (aggregate)

| **B. Has the practitioner experienced any of the following:** | Yes | No | N/A |
|---|---|---|---|
| 1. Malpractice liability insurance cancellation? | ☐ | ☑ | ☐ |
| 2. General liability insurance cancellation? | ☐ | ☑ | ☐ |
| 3. Cancellation of any other insurance policies related to the practice of medicine? | ☐ | ☑ | ☐ |
| 4. Revocations or restrictions of hospital staff privileges? | ☐ | ☑ | ☐ |
| 5. Revocations or suspensions as a Medicare or Medicaid Provider? | ☐ | ☑ | ☐ |
| 6. State licensing investigations or actions? | ☐ | ☑ | ☐ |

If you answered "Yes" to any of the preceding questions, please provide details and dates below:

Percentage of practice related to litigation (expert/consulting engagements) for plaintiffs, defendants and court/administrative bodies, and a description of such practice since July 1, 2011:

**PLAINTIFFS:**

Percentage: Description:

%

**DEFENDANTS:**

Percentage: Description:

%

**COURT/ADMINISTRATIVE BODIES:**

Percentage: Description:

%

**Please see Application Instructions on page 1 for documentation requirements.**

List all engagements as a litigation expert consultant or expert witness arising out of, or relating to, head, brain and/or cognitive injury. Please include any and all engagements (irrespective of date) and list the subject matter, client, and date range. If the engagement included testimony (including, but not limited to, the preparation of an expert report), provide the title, docket number and court of the proceeding:

Does the practitioner specialize in any of the Qualifying Diagnoses?

- [x] Level 1.5 Neurocognitive Impairment (early Dementia)
- [x] Level 2 Neurocognitive Impairment (moderate Dementia)
- [x] Alzheimer's Disease
- [x] Parkinson's Disease
- [x] Amyotrophic Lateral Sclerosis ("ALS")

Has the practitioner served on or after April 22, 2015 as a litigation expert consultant or expert witness for an Opt Out of the NFL Concussion Settlement, in connection with litigation relating to head, brain and/or cognitive injury? If Yes, please provide details below:

Yes ☐ No ☑

Has the practitioner ever treated or evaluated a current or former NFL player? If yes, please provide how many NFL players were seen, when the evaluation(s) took place, and whether you evaluated the NFL players at the request of an attorney or as part of your usual clinical practice. Provide the name(s) of any attorney(s) who referred NFL players to be evaluated by you. Do not identify any specific NFL players in your response.

Yes ☑ No ☐

Has the practitioner ever been in a salaried position or consulting relationship with the National Football League, NFL Properties, or any NFL Member Clubs? If Yes, please provide details below, including the title of the practitioner's position/role:

Yes ☐ No ☒

Has the practitioner ever served as a neutral physician or consultant
for benefits under the NFL Player Disability & Neurocognitive Benefit
plan, the Bert Bell/Pete Rozelle NFL Retirement Plan or the 88 Plan?
If Yes, please provide details below, including the title of practitioner's
position/role:

Yes ☐  No ☑

Has the practitioner ever been convicted of a crime of dishonesty?
If Yes, please describe the crime and date of conviction:

Yes ☐  No ☑

## V. BILLING/CLAIMS PROCESS

*Please note: This information pertains only to the Baseline Assessment Program. All services provided by Qualified MAF Physicians are the responsibility of the Retired NFL Football Player and/or his insurer.*

What is your preferred billing process?

- ☑ Electronic claim submission
- ☐ Fax
- ☐ Upload to a secure portal
- ☑ Mail (e.g., CMS1500, UB04)

Does your system contract with a third-party company to manage billing? Yes ☐ No ☑

If "Yes," please provide the following information:

Billing Company Name

Street Address 1

Street Address 2

City County State ZIP 00000-0000

Billing Contact Name Phone

Is your billing address different from your mailing address? If so, please provide the billing address:

Name

Street Address 1

Street Address 2

City County State ZIP 00000-0000

Phone Fax

Contact Person Title Phone E-mail

## VI. PAYMENT

*Please note: This information pertains only to the Baseline Assessment Program. All services provided by Qualified MAF Physicians are the responsibility of the Retired NFL Football Player and/or his insurer.*

Do you prefer to be paid by check or ACH deposit?

☑ Check ☐ ACH Deposit

Provide the mailing address to which Explanations of Payment should be mailed:

2021 North Druid Hills Rd Ste 102
Street Address 1

Street Address 2

Atlanta — Dekalb — GA — 00000-0000 30329
City — County — State — ZIP

Provide the mailing address to which 1099 Statements should be mailed:

2021 North Druid Hills Rd Ste. 102
Street Address 1

Street Address 2

Atlanta — Dekalb — GA — 00000-0000 30329
City — County — State — ZIP

## VII. INSURANCE PLANS ACCEPTED

*Please note: This information pertains only to the those applying for participation as a Qualified MAF Physician. Anyone applying for participation as a Qualified BAP Provider only may omit this information.*

List the insurance plans accepted by your organization:

Please see Application Instructions on page 1 for documentation requirements.

# DECLARATION

The undersigned attests that he or she has the authority to act on behalf of the applicant for the purpose of this application. The applicant, by and through the undersigned, attests that to the best of its knowledge and belief, after reasonable inquiry, all of the information provided on this application and in connection with this application is complete and accurate. The applicant understands that this application does not entitle the applicant to participate in any program or work arising out of the NFL Concussion Settlement activities or any other program. The applicant further understands that any misrepresentations made in this application shall be grounds for immediate disqualification from participation in the programs arising out of the NFL Concussion Settlement. The applicant agrees that entities that in good faith provide information to the BAP Administrator and/or the Claims Administrator to assist them in evaluating and/or verifying the information contained in this application and in any documentation submitted in support of this application shall not be liable for any act or omission related to the provision, evaluation, or verification of such information. The applicant further agrees to notify the BAP Administrator and/or the Claims Administrator in a timely manner of any changes to the information provided on this application.

The applicant hereby authorizes any accrediting body, governmental entity, insurance company, association, organization, entity, or person to release the information requested herein and to provide confirmation of the answers contained herein to the BAP Administrator and/or the Claims Administrator and their affiliates, subsidiaries, and agents. This authorization shall be valid until and unless the applicant withdraws its application. A copy of the signature is as binding as the original.

**Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the information provided in this form, and in any attachments hereto, is true and correct to the best of my knowledge, information, and belief.**

[signature] 3/25/2021
Authorized Signature Date

Dr. Amandeep Dhillon
Print Name

Hope Neurological and Medical Services
Organization Name

2021 North Druid Hills Rd.
Street Address 1

Ste 102
Street Address 2

Atlanta Dekalb GA 00000-0000 30329
City County State ZIP

Please see Application Instructions on page 1 for documentation requirements.

Form **W-9**
(Rev. October 2018)
Department of the Treasury
Internal Revenue Service

# Request for Taxpayer Identification Number and Certification

▶ Go to *www.irs.gov/FormW9* for instructions and the latest information.

**Give Form to the requester. Do not send to the IRS.**

Print or type. See Specific Instructions on page 3.

1 Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.
Hope Neurological & Medical Services

2 Business name/disregarded entity name, if different from above

3 Check appropriate box for federal tax classification of the person whose name is entered on line 1. Check only **one** of the following seven boxes.

☒ Individual/sole proprietor or single-member LLC ☐ C Corporation ☐ S Corporation ☐ Partnership ☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=Partnership) ▶ ______

**Note:** Check the appropriate box in the line above for the tax classification of the single-member owner. Do not check LLC if the LLC is classified as a single-member LLC that is disregarded from the owner unless the owner of the LLC is another LLC that is **not** disregarded from the owner for U.S. federal tax purposes. Otherwise, a single-member LLC that is disregarded from the owner should check the appropriate box for the tax classification of its owner.

☐ Other (see instructions) ▶

4 Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):

Exempt payee code (if any) ______

Exemption from FATCA reporting code (if any) ______

*(Applies to accounts maintained outside the U.S.)*

5 Address (number, street, and apt. or suite no.) See instructions.
2021 North Druid Hills Rd Ste. 102

Requester's name and address (optional)

6 City, state, and ZIP code
Atlanta, GA 30329

7 List account number(s) here (optional)

## Part I Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the instructions for Part I, later. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN,* later.

**Note:** If the account is in more than one name, see the instructions for line 1. Also see *What Name and Number To Give the Requester* for guidelines on whose number to enter.

**Social security number**
☐☐☐ - ☐☐ - ☐☐☐☐

or

**Employer identification number**
84 - 2415247

## Part II Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and
2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and
3. I am a U.S. citizen or other U.S. person (defined below); and
4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions for Part II, later.

**Sign Here** **Signature of U.S. person ▶** [signature] **Date ▶** 4-5-2021

# General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** For the latest information about developments related to Form W-9 and its instructions, such as legislation enacted after they were published, go to *www.irs.gov/FormW9.*

## Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following.

- Form 1099-INT (interest earned or paid)
- Form 1099-DIV (dividends, including those from stocks or mutual funds)
- Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)
- Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)
- Form 1099-S (proceeds from real estate transactions)
- Form 1099-K (merchant card and third party network transactions)
- Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)
- Form 1099-C (canceled debt)
- Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

*If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding. See* What is backup withholding, *later.*

**Exhibit 27: Dr. Dhillon SEAK Expert Witness Directory Listing**

# Amandeep K Dhillon, MD

las Vegas, Nevada

## Contact Information

**Company:** Neurology stroke specialist
**Phone:** (315) 790-9272

## Specialties & Experience

**General Specialties:** Neurology

**Specialty Focus:** NeuroCritical trained with expertise in the following cases. Stroke, TPA cases, Traumatic brain Injury, Brain Death, Coma, Vegetative State, Brain hemorrhages, Spinal Cord injuries, Status Epileptics, Hypoxic brain injury Neuro Radiology and Electrophysiology diagnostic test/study

**Education:** MD, Mayo Clinic

**Years in Practice:** 6

**Number of Times Deposed/Testified in Last 4 Yrs:** 2

## Additional Information

Mayo Clinic Graduate, Board certified, fellowship trained in Neurocritical care, Vascular Stroke Neurology. Training included interpretation of Neurol-Radiology scan (CT, MRI, CTA, Nuclear medicine Scan, CTP, Brain Doppler Studies ), Electrophysiology test ( EEG, EMG, Vestibular testing, Evoked potential testing,). Brain Death Examination and Determination,

I have been in practice for 6 yrs - Professional history - Stroke Director for Spring Valley hospital, las Vegas Nevada - which was Awarded the Stroke Gold Plus Elite award x2 (2016, 2018) The highest award for a Accredited stroke hospital. Assistant Neurology Professor for Medical University of Nevada Resident program.
Author and lead physician to help pass a Bill 424 passed in May 2017. In the State of Nevada, which would be first of its kind in the Our Nation, This Bill entails criteria and tests with which by law a individual can be declared brain dead.

Awarded and Ranked 28th neurologist in the World by the award in 2016 By Leading Physicians of the World Collaboration.

I have been primary author on multiple Published papers and hold copyrights to my book titled " Surviving NeuroCritical Care"

Active  IMCL ( Interstate medical Compact License).  IMLC provides eligibility to acquire licenses and practice neurology in 22 states of USA.

During my only very short time in practice, I have also had a opportunity to be a lead physician in 3 Depositions and One trial which was settled out of court.  I found the experience to be very exciting and educational thus sparking my interest in this field.

**mail@seak.com**   Phone: **508.457.5150**   Fax: **508.540.8304**                    © 2021 SEAK, Inc. All Rights Reserved.

Terms of Use: The information on individual listees is as provided and had not been independently verified. SEAK's Directories are promotional media - listees are not employees or contractors of SEAK and SEAK has not vetted the listees.

**Exhibit 28: 1/31/23 Roderick Edmond Email to Settlement Program**

[redacted]

**From:** Roderick Edmond <drrod4u@edmondfirm.com>
**Sent:** Tuesday, January 31, 2023 6:01 PM
**To:** [redacted]; mrosenberg@seegerweiss.com
**Cc:** Manny Arora <manny@arora-law.com>; byron cuthbert <byroncut@gmail.com>; cseeger@seegerweiss.com; Keith Lindsay <klindsay@edmondfirm.com>; Beverly Dudley <bdudley@edmondfirm.com>
**Subject:** RE: Status- Byron Cuthbert's NFL CTE cases

[redacted], [redacted] & Mike,

I've been meeting with Byron for the past 4-6 months. He asked my firm to assist him in moving his NFL CTE claims through the process. And, he was transparent about him being reprimanded for allegation of him being too aggressive in his communications with experts and questions about the veracity of the PET scans that supported his cases.

Our firm is committed to assisting Attorney Cuthbert in any way possible to efficiently and expeditiously move his claims.

There may be more information that you all want to share with me about this situation.

Let's set up a brief Zoom within the next few days to hash this out so that these clients can realize their damages sooner than later. Rod

Roderick E. Edmond, M.D.,J.D.



344 WOODWARD AVENUE
ATLANTA, GEORGIA 30312
PHONE: 404-525-1080
FAX: 404-525-1073
www.edmondfirm.com

Confidentiality Notice: This email and all attachments are CONFIDENTIAL and intended SOLELY for the recipients as identified in the "To", "Cc" and "Bcc" lines of this email. If you are not an intended recipient, your receipt of this email and its attachments is the result of an inadvertent disclosure or unauthorized transmittal. Sender reserves and asserts all rights to confidentiality, including all privileges which may apply. Pursuant to those rights and privileges, immediately DELETE and DESTROY all copies of the email and its attachments, in whatever form, and immediately NOTIFY the sender of your receipt of this email. DO NOT review, copy, forward or rely on the email and its attachments in any way. NO DUTIES ARE INTENDED OR CREATED BY THIS COMMUNICATION. If you have not executed a fee contract or an engagement letter, this firm does NOT represent you as your attorney. You are encouraged to retain counsel of your choice if you desire to do so. All rights of the sender for violations of the confidentiality and privileges applicable to this email and any attachments are expressly reserved.

---

**From:** byron cuthbert <byroncut@gmail.com>
**Sent:** Tuesday, January 31, 2023 5:43 PM
**To:** Roderick Edmond <drrod4u@edmondfirm.com>
**Cc:** Manny Arora <manny@arora-law.com>
**Subject:** Fwd: Status

Rod:

Please review the email and respond to set up a call stating you been working with me on my cases and plan to supervise me moving forward.

Byron Cuthbert
Attorney at Law
Telephone: (404) 403-7855
Fax: 1(866) 990-9743
byroncut@gmail.com

1143 Cameron Creek
Marietta, Ga 30062

Begin forwarded message:

**From:** byron cuthbert <byroncut@gmail.com>
**Date:** December 16, 2022 at 4:57:26 PM EST
**To:** Manny Arora <manny@arora-law.com>
**Subject: Re: Status**

I'm in Nyc for my mother's birthday.Last time, dr rod edmond discuss with them was around November but no one gave me an update since then.

Byron Cuthbert
Attorney at Law
Telephone: (404) 403-7855
Fax: 1(866) 990-9743
byroncut@gmail.com
1143 Cameron Creek
Marietta, Ga 30062

On Dec 16, 2022, at 4:18 PM, Manny Arora <manny@arora-law.com> wrote:

Can you update me on this?

---------- Forwarded message ---------
From: [redacted] [redacted]
Date: Fri, Dec 16, 2022 at 15:14
Subject: Status
To: Manny Arora <manny@arora-law.com>
CC: byron cuthbert <byroncut@gmail.com>, [redacted] [redacted]

Manny:

In the 9/29/22 call with [redacted], you discussed various issues that we saw in the claim submission process for Players represented by the Cuthbert and Associates law firm. During that call, you agreed with our suggestion to consult with and associate with a lawyer who can help get claims done correctly. We sent you suggestions of two lawyers with significant experience in the NFL Program. In a follow up call we had with you on 11/9, you suggested that you may be engaging with a lawyer experienced in class actions, but with no experience in the NFL Program. To date, however, we

have not seen proof that you have consulted with any counsel as discussed on those calls.

With our continuous concerns with regards to submissions of claims and representations made in connection with claims, we will continue with the audit process.

Thank you.

BROWNGREER PLC
250 Rocketts Way
Richmond, Virginia 23231
www.browngreer.com
<image001.jpg>

*This electronic mail is intended to be received and read only by certain individuals. It may contain information that is privileged or protected from disclosure by law. If it has been misdirected, or if you suspect you received this in error, please notify me by replying and then delete this message and your reply. These restrictions apply to any attachment to this email.*

--

Manny Arora
The Arora Law Firm, LLC
75 W. Wieuca Road, NE
Atlanta, GA 30342
404.609.4664 - office
404.865.3525 - fax
manny@arora-law.com

Please be advised that this e-mail and any files transmitted with it may be confidential attorney-client communication or may otherwise be privileged or confidential and are intended solely for the individual or the entity to whom they are addressed. If you are not the intended recipient, please do not read, copy or retransmit this communication but destroy it immediately. Any unauthorized dissemination, distribution or copying of this communication is strictly prohibited. We do not waive attorney-client or work product privilege by the transmission of this message

Sent from my iPhone

**Exhibit 29: 12/27/22 AAPLC Review of Dr. Dineen Reports**

[redacted]

**From:** [redacted]
**Sent:** Tuesday, December 27, 2022 9:57 AM
**To:** [redacted]
**Cc:** [redacted]
**Subject:** Re: Cuthbert claims with new materials

I have reviewed the new materials on the claims listed in the table from 11/18/22 at 4:49. In no case does the added material alter my original determination.

For both SPID 100000021 and 100006402, clinical criteria for AD were documented as being fulfilled several years before the scan. The revised PET results therefore do not materially affect the qualifying diagnosis of AD.

The added materials from Medici offer little to no information to support the Alzheimer's disease diagnoses, and in some cases actually further undermine the claim (e.g. SPID 100010229, where the Medici evaluation leading to the PET scan shows an MMSE of 30/30 four years after a claimed diagnosis of AD).

Importantly, the PET scan over-reads by Dr. Dineen seem to include a recurring technical issue that undermines their reliability. He uses the RCTU scoring system which, to the best of my knowledge is not appropriate for use on scans conducted with the Amyvid (florbetapir) tracer. It is used with a different tracer, Neuraceq (florbetapen). A nuclear medicine expert should review the appropriateness of his methods.

The FDA interpretation guidance for Amyvid is explicit:

> *Images are designated as positive or negative by comparing the radioactivity in cortical gray matter with activity in the adjacent white matter. This determination is made only in the cerebral cortex; the signal uptake in the cerebellum does not contribute to the scan interpretation (for example, a positive scan may show retained cerebellar gray-white contrast even when the cortical gray-white contrast is lost).*

- ***Negative*** *scans show more radioactivity in white matter than in gray matter, creating clear gray-white contrast.*
- ***Positive*** *scans show cortical areas with reduction or loss of the normally distinct gray-white contrast. These scans have one or more areas with increased cortical*

*gray matter signal which results in reduced (or absent) gray-white contrast. Specifically, a positive scan will have either:*

*a) Two or more brain areas (each larger than a single cortical gyrus) in which there is reduced or absent gray-white contrast. This is the most common appearance of a positive scan.*

*or*

*b) One or more areas in which gray matter radioactivity is intense and clearly exceeds radioactivity in adjacent white matter.*

However, I did not use the PET scan results as a decisive element in any of my prior determinations, for either approval or denial. As I have noted previously, the FDA labeling for Amyvid explicitly states:

> *A positive Amyvid scan indicates moderate to frequent amyloid neuritic plaques; neuropathological examination has shown this amount of amyloid neuritic plaque is present in patients with AD, but may also be present in patients with other types of neurologic conditions as well as older people with normal cognition.*

The label continues:

- *A positive Amyvid scan does not establish a diagnosis of AD or other cognitive disorder (1).*
- *Safety and effectiveness of Amyvid have not been established for:*
  - *Predicting development of dementia or other neurologic condition;*

Thus a positive Amyvid scan is neither necessary nor sufficient to establish the diagnosis of AD by Settlement Program criteria, especially in persons with a history of repetitive head injury. As noted by Schneider ALC et al: (J Neurotrauma. 2019 Sep 1; 36(17): 2549–2557), among people without dementia:

> *head injury was associated with increased amyloid deposition globally and in the frontal cortex and posterior cingulate, with suggestion of a dose–response association of head injuries with beta-amyloid deposition.*

[redacted]

---

**From:** [redacted]
**Sent:** Thursday, December 1, 2022 10:28 AM
**To:** [redacted]
**Cc:** [redacted]

**Subject:** EXT MSG RE: Cuthbert claims with new materials

For SPID 100007068, I also wanted to point out the New Method results for the NP testing you referenced in your review – please see Doc IDs 262684 and 273933 for those.

Thank you,

[redacted]

**From:** [redacted]
**Sent:** Friday, November 18, 2022 4:49 PM
**To:** [redacted]
**Cc:** [redacted]
**Subject:** Cuthbert claims with new materials

Hi [redacted]:

This is related to item #17 in the priority assignment list I sent you today. These are all claims you previously reviewed, but since your review, the Player's representative has uploaded additional materials. I have included the relevant Doc IDs below. Please review and let us know what, if anything, you would add to your prior determinations to address these materials.

| SPID | Claim ID | QD | Name | Doc ID(s) for new materials |
|---|---|---|---|---|
| 100006402 | 11294 | ALZ | Harris, Joseph | 271583 |
| 100000021 | 11319 | ALZ | Abrams, Bobby | 271374 |
| 100010229 | 11355 | ALZ | Mckenzie, Raleigh | 268098; 271995 |
| 100013989 | 11208 | ALZ | Singletary, Reginald | 268099; 271996 |
| 100002185 | 5406 | ALZ | Burroughs, Derrick | 268091; 271997 |
| 100013792 | 11067 | ALZ | Shelton, Richard | 271992 |
| 100008484 | 11354 | ALZ | Kelly, Todd E. | 271580 |
| 100007068 | 11033 | ALZ | Holmes, Lester | 271577; 273933 |

Thank you,

[redacted]

[redacted]
**BROWNGREER PLC**
250 Rocketts Way
Richmond, VA 23231
[redacted]
www.browngreer.com



*This electronic mail is intended to be received and read only by certain individuals. It may contain information that is privileged or protected from disclosure by law. If it has been misdirected, or if you suspect you received this in error, please notify me by replying and then delete this message and your reply. These restrictions apply to any attachment to this email.*

**Exhibit 30: 1/29/23 Nuclear Medicine Consultant Analysis**

**From:** [redacted]
**Sent:** Sunday, January 29, 2023 7:22 PM
**To:** [redacted]
**Cc:** [redacted]
**Subject:** RE: Additional Materials for Review

Dear All,
Thank you for providing the second reader's reports. I have reviewed the second reader's opinion on ten scans and compared them with the first reader's interpretation, and I have the following comments:

- The visual interpretation is a qualitative binary reading algorithm with a positive and negative outcome. All the cases were interpreted as positive scans by the second reader (reader 2) in complete agreement with the original reports (reader 1). There is no complete agreement in all the cases between two readers 1 and 2 on the areas affected in the brain by amyloid deposition. Cases may present challenges to classify as positive or negative, which can explain variability in readers. Therefore, using a Standardized Uptake Value ratio (SUVr) can assist in arriving at a final diagnosis in cases that may be borderline between positive and negative or when secondary factors such as atrophy, blurry images, or patient motion can affect the interpretation.

- The scans reviewed by reader 1 (original reports) and reader 2 (second opinion) were performed with different amyloid tracers. The criteria for amyloid PET image interpretation differs between radiotracers. The FDA or EMA guidelines are specific for a given amyloid tracer for the number of affected cortical regions required to define a "positive" scan. The SNMMI/EANM periodically defines new standards/guidelines for nuclear medicine practice. Currently, there are three tracers approved by both the US and the European

authorities -18F-florbetapir (Amyvid), 18F-flutemetamol (Vizamyl), and 18F-florbetaben (NeuraCeq).

- Reviewing the second reader's reports, reader 2 follows the interpretation of the images recommended for 18F-florbetaben (NeuraCeq™) for all the cases when only two of the ten patients were performed with 18F-florbetaben as documented in the original reports. Therefore, the final assessment is inconsistent with the manufacturer's guidelines. Specifically, three cases were interpreted as positive scans. In 3/10 cases, only one region was involved, which did not reach the criteria for a positive scan based on the manufacturer's recommendations.

- As requested during our meeting, I reviewed these three cases again. The quality is acceptable, somewhat burry, and was not consistent with a positive scan based on my experience performing visual assessments and Standardized Uptake Value ratio (SUVr).

Regards,



ARORA LAW FIRM, LLC
TRIAL ATTORNEYS
75 West Wieuca Road NE · Atlanta, Georgia · 30342
(O) 404.609.4664· (F) 404.865.3525 · manny@arora-law.com

3 May 2023

**VIA Certified Mail & E-Mail**
David Hoffman (dhoffman@law.upenn.edu)
Jo-Ann Verrier (jverrier@law.upenn.edu)
NFL Concussion Settlement – Special Masters
Penn Carey Law
University of Pennsylvania
3501 Samson Street
Philadelphia, PA 19104

**Re: Attorney Byron Cuthbert – Response to Audit Report**

Dear Mr. Hoffman and Ms. Verrier:

I am writing on behalf of Byron Cuthbert to appeal the findings of the Claims Administrator's Audit Report dated 2/15/23. Mr. Cuthbert responds to the Audit Report as follows (to include 17 attached exhibits):

**BACKGROUND**

On 3/3/23, the Claims Administrator referred to the Special Master an Audit Report dated 2/15/23 regarding 12 claims filed by Byron Cuthbert and Associates, LLC ("Attorney Cuthbert") on behalf of Settlement Class Members.[1]
Attorney Cuthbert represents a total of 211 Settlement Class Members (of which 18 claims have been awarded, with 40 more claims that are pending. Of the 40 pending claims, 28 are being processed with the additional 12 being the subjects of this audit). Attorney's responses/defenses *infra* will address the 12 Class Members that are subject to this Audit Report.[2]

[1] Three of the twelve class members whose claims are being audited are not referenced in the Audit Report.

[2] Individual facts as to each Class Member are attached as exhibits 1 – 12.

ARORA LAW FIRM, LLC
TRIAL ATTORNEYS
75 West Wieuca Road NE · Atlanta, Georgia · 30342
(O) 404.609.4664· (F) 404.865.3525 · manny@arora-law.com

The Audit Report details the Claims Administrator's review of Class Member claims filed by Attorney Cuthbert. The basis for the audit lists a variety of allegations to include : (1) Attorney Cuthbert used unreliable PET scans; (2) Attorney Cuthbert questioned medical professionals and pressured them to change their diagnoses; (3) Attorney Cuthbert drafted one medical record for a doctor to sign; (4) Attorney Cuthbert drafted third party affidavits to use language that's not unique to the specific Class Member; and (5) Attorney Cuthbert "possibly" coached Class Members on how to perform during the medical examinations.[3] The Audit Report further states that Attorney Cuthbert did not accept the Claims Administrator's proposal to resolve the audit findings and avoid a hearing before the Special Master.[4]

## RESPONSES TO ALLEGATIONS 1 – 5

### I. Attorney Did Not Use Unreliable PET Scans

The allegation that Attorney Cuthbert used unreliable PET scans is flawed and false. This allegation simply comes down to whether the medical judgment of two board certified radiology experts, Dr. Daryl Eber and Dr. Timothy Dineen, is less accurate than

[3] These allegations are subjective in nature and do not apply uniformly to all of the Class Members whose claims are subject to this audit.

[4] The Claims Administrator suggested that Attorney Cuthbert retain co-counsel Justin Wyatt and/or Amir Shenaq. Attorney chose to co-counsel with attorney Roderick Edmond, who has an M.D., substantial medical litigation experience, class action experience and is based in Atlanta. Attorney Cuthbert agreed to follow the guidance provided by the Claims Administrator and set up a co-counsel relationship with Attorney Edmond.

**ARORA LAW FIRM, LLC**
TRIAL ATTORNEYS
75 West Wieuca Road NE · Atlanta, Georgia · 30342
(O) 404.609.4664· (F) 404.865.3525 · manny@arora-law.com

that of the expert(s) used by the Claims Administrator.[5,6] Further, in the Audit Report the Claims Administrator acknowledges there is no substantive basis for this allegation—yet this allegation remains in the Audit Report that is being forwarded to the Special Master.[8] Attorney Cuthbert has no medical training and he would have no specific knowledge as to the "reliability" of any of the PET scans that were taken by the medical professionals.[9]

---

[5] Dr. Dineen did an independent review of the PET scans with no knowledge of any prior findings by Dr. Eber.

[6] The Claims Administrator's radiologist is using the Hermes Brass Software with Standardized Uptake Value ratio (SUVr) to support their interpretation of the scans (as mentioned in Exhibit 14).

**Please note that there is no footnote 7 (due to software error).

[8] Specifically, the Audit Report states, "Throughout our Audit investigation of Dr. Eber's reports, we explored the possibility that Mr. Cuthbert may have had an arrangement with Dr. Eber to provide 'positive' PET scan reports, or that a third party may have fabricated or altered Dr. Eber's reports. **We have not found evidence confirming either scenario**. **We also considered several factors that do not seem to support either situation.** When questioned, Dr. Eber specifically denied any wrongdoing on his part or someone else's, citing that such actions would be unethical and illegal. We also identified at least one PET scan report from Dr. Eber for a Player who was represented by a different attorney. Like those reports for Attorney Cuthbert's clients, Dr. Eber found the Player's PET scan to be positive for Amyloid deposition but the NM Consultant's finding was negative. This indicates to us that Dr. Eber's medical judgment is flawed and not that only Mr. Cuthbert's clients were receiving false positive results. **While we have no way to absolutely confirm it, these factors have led us to believe that there was not a malicious collaboration or arrangement between Mr. Cuthbert and Dr. Eber related to the Program**." *See* page 11-12 of the Audit Report.

[9] The Claims Administrator has stated that some of the Class Members have "unreliable" PET scans; however, Attorney Cuthbert has not been advised as to the identity of the Class Members so that he can better challenge this allegation.

ARORA LAW FIRM, LLC 75 West Wieuca Road NE · Atlanta, Georgia · 30342
TRIAL ATTORNEYS
(O) 404.609.4664· (F) 404.865.3525 · manny@arora-law.com

Specifically, Attorney Cuthbert contacted MAF neurologist, Dr. Julie Schwartzbard, to conduct initial evaluations for his clients in 2019.[10] Dr. Schwartzbard referred Attorney Cuthbert to Dr. Eber to have the PET scans completed. Based on Dr. Eber's and Dr. Schwartzbard's medical findings, these initial claims were awarded by the Claims Administrator.

Subsequent to these awards, the Claims Administrator has decided that they would now begin to question Dr. Eber's professional opinion (as it applies to the relevant Class Members in audit).[11]

Based on the Claims Administrator's questioning of Dr. Eber's work, in 2021, Dr. Schwartzbard requested that Attorney Cuthbert get another opinion regarding the amyloid PET scans from Dr. Barry Siegel (who is currently the Claims administrator's expert radiologist). Mr. Cuthbert retained Dr. Siegel who review six PET scans. Dr. Siegel determined four out of the six PET scans to be negative. As such, Attorney Cuthbert never filed these four claims.[12]

Attorney Cuthbert was interviewed on 3/8/2022. At this time the Claims Administrator advised that they were now challenging 21 positive PET scans on claims that had been filed (involving Dr. Eber). This challenge was based on the Claims

[10] Dr. Schwartzbard is one of the MAF neurologists for the NFL Concussion Settlement.

[11] Dr. Eber's work has been accepted by the Claims Administrator in the past and those players claims have been approved. *See* exhibit 13.

[12] Curiously, one of the players whose PET scan was negative, retained attorney Geoff Gibbon, who filed the claim and it was approved by the Claims Administrator. *See* exhibit 15.

ARORA LAW FIRM, LLC
TRIAL ATTORNEYS
75 West Wieuca Road NE · Atlanta, Georgia · 30342
(O) 404.609.4664· (F) 404.865.3525 · manny@arora-law.com

Administrator's radiological expert who determined that only 5 of the PET scans to be positive out of the 21 filed. During the interview, Attorney Cuthbert requested that the Claims Administrator's radiological reports be provided for his review, but the Claims Administrator would not provide the documentation.[13]

Without any way of knowing what evidence the Claims Administrator was disputing, Attorney Cuthbert retained Dr. Dineen, a board-certified radiologist, to conduct a review of all disputed PET scans on 9/1/22. Dr. Dineen's findings were disclosed to the Claims Administrator. The Claims Administrator claimed Dr. Dineen's medical findings were also unreliable.[14]

The Claims Administrator has a duty to process claims consistently. After Attorney Cuthbert's former clients retained other counsel, the Claims Administrator processed and awarded the claims with the same medical records originally obtained by Attorney Cuthbert. The Claims Administrator's actions shows bias towards Attorney Cuthbert—as claims with the same PET scan evidence are being approved for other

---

[13] *See* Audit Report, exhibit 4, paragraph 46. "Cuthbert asked whether we could tell him which five (of the 21) are positive. [Roma Petkauskas] said no, not now."

[14] The Claims Administrator use of the computer software for the "Standardized Uptake Value ratio (SUVr)" computer process in reviewing the Dicom images (for a finding of excessive amyloid beta protein) is creating a requirement beyond what is required by the manufacture and FDA guidelines. The Claims Administrator is also requiring two impacted regions even though the Amyvid guidelines only require one impacted region for the result to be actionable. The difference in the interpretation process does not constitute fraud nor unreliability.

**Please note that there is no footnote 15 (due to software error).

ARORA LAW FIRM, LLC
TRIAL ATTORNEYS
75 West Wieuca Road NE · Atlanta, Georgia · 30342
(O) 404.609.4664· (F) 404.865.3525 · manny@arora-law.com

Attorneys but not Attorney Cuthbert.[16]

Based on the evidence, there is no basis for allegation number one. Attorney Cuthbert did not knowingly use "unreliable" PET scans.

**II. Attorney Did Not Pressure Any Medical Professionals To Change Their Findings**

This allegation involves Attorney Cuthbert's interaction with Dr. Weber (MAF) regarding his evaluation of Class Member, SPID# 100007249, Harlan Huckleby. Attorney appropriately questioned the basis for Dr. Weber's findings as to his exclusionary findings—these questions were asked since Class Member Huckleby was diagnosed by Dr. Dhillon, who found that an Alzheimer's diagnosis was appropriate.[17]

Competent Attorneys are trained to question evidence, ask probing and difficult questions and act in the best interest of their client. As to this allegation, Attorney Cuthbert posited reasonable questions based on the conflicting findings. Attorney Cuthbert never spoke to Dr. Weber on the telephone. The "pressure" consisted of emails asking for clarification as to the basis of the findings (on 12/10/20, 12/21/20,

---

[16] The Claims Administrator is actively processing and approving other law firms claims based on medical evidence provided by Drs. Eber and Dineen. *See* the Claims Administrator award for SPID 100006836 Mark Higgs (exhibit 15), documentation related to SPID 100017085 Felix Wright (exhibit 16), and documentation related to SPID 100000021 Bobby Abrams (exhibit 17). Since Special Masters have portal access, we request the Special master review the portal documents for the reference cases.

[17] The Audit Report also references Drs. Lerner and Scariano as possibly being "pressured." However, neither doctor changed any of their medical findings based on any "pressure." Lastly, the Claims Administrator has not provided the evidence supporting an inference of any malfeasance between the Attorney Cuthbert and Drs. Lerner and Scariano. Undersigned counsel has contacted these two medical providers, in accordance with FAQ 95, and has been advised that the allegations in the Audit Report are not accurate.

ARORA LAW FIRM, LLC
TRIAL ATTORNEYS
75 West Wieuca Road NE · Atlanta, Georgia · 30342
(O) 404.609.4664· (F) 404.865.3525 · manny@arora-law.com

3/2/21, 3/11/21 and 3/12/21).[18] Questioning an expert is not "pressure", regardless of how a medical expert's fragile ego may react to having their finding questioned.

Not willing to accept Dr. Weber's findings at face value, Attorney Cuthbert, in the best interest of his client, sought a second opinion. The Attorney asked MAF neurologist Dr. Lerner to evaluate Class Member Huckleby. Dr. Lerner diagnosed him with Alzheimer's disease, which claim was awarded in late 2022 but has yet to be paid due to the pending audit.[19]

Based on the evidence, there is not any basis for allegation number two. Regardless of how the Claims Administrator chooses to interpret the emails, Attorney Cuthbert did not pressure Dr. Weber to change his diagnosis. Based on the subsequent evaluation, Dr. Weber's analysis was flawed. Regardless of whether Attorney Cuthbert "pressured" Dr. Weber or any other medical professional, the Huckleby claim is valid and should be paid.

**III. Attorney Did Not Draft A Medical Report To Present To The Claims Administrator**

Attorney acknowledges he provided an overview of the medical history for Class Member SPID #100013792, Richard Shelton, that was originally requested by Dr. Scariano.[20] Regardless of what Attorney Cuthbert sent to Dr. Scariano, this medical

---

[18] Attorney is allowed to question a medical conclusion (under FAQ 95).

[19] The NFL did not appeal Dr. Lerner's finding of Alzheimer's disease for Class Member Huckleby.

[20] Case law supports that as long as the substance of the opinion is from the expert, an attorney's involvement in the written expression of those opinions does not make them invalid.

**ARORA LAW FIRM, LLC**
TRIAL ATTORNEYS
75 West Wieuca Road NE · Atlanta, Georgia · 30342
(O) 404.609.4664· (F) 404.865.3525 · manny@arora-law.com

professional drafted his own response based on his medical findings and opinion. In the audit report, the Claim's Administrator agreed that "Mr. Cuthbert's initial draft of Dr. Scariano's addendum **differs substantially** in phrasing from the final version of the addendum submitted to the Program in support of the appeal." Yet this allegation remains and is being presented to the Special Master.

### IV. Attorney Did Not Prepare Third-Party Affidavits That Were Not Unique To Players

As a practicing attorney, the Claims Administrator should understand that it is routine for an attorney to provide an outline of topics that need to be covered for court testimony, witness statement, affidavits and character letters. Lay people don't know to explain issues, identify what topics may be of importance, etc. In this case, Attorney Cuthbert provided a template to third parties as a working document. The third party actually wrote the statement as they deemed appropriate. The third parties were contacted by the Claims Administrator to find any evidence of malfeasance by Attorney Cuthbert. No third party ever confirmed that Attorney Cuthbert told them what to say. Overlapping language does not make the third-party statements unreliable (this is simply a subjective finding by the Claim Administrator). Neurological injuries have many common traits (as is evidenced by the template created by the Claims Administrator that describes common traits suffered by Class Members, see SWS-3). Regardless of what is stated in the third-party statement(s), the medical professional(s) found substantive medical evidence to support the claims to include their interviews of the third parties and Class Members.

ARORA LAW FIRM, LLC
TRIAL ATTORNEYS
75 West Wieuca Road NE · Atlanta, Georgia · 30342
(O) 404.609.4664· (F) 404.865.3525 · manny@arora-law.com

Allegation number four is unfounded as the finding is based on subjective opinion and not on any objective evidence.

**V. Attorney Did Not Tell Players How To Act During Their Medical Evaluations**

This allegation is based on the subjective opinion of the AAPLC, which was formed by reading five medical reports of MAF neurologists. Based on the medical reports, the AAPLC extrapolates that due to the Class Members' demeanor being similar, they must have been coached.[21] No Class Members were interviewed to determine the validity of the AAPLC opinion—this is curious since the third parties were interviewed by the Claims Administrator (as it pertains to allegation number 4).

Presumably board certified doctors are not subject to being easily duped. There are numerous protocols undertaken by medical personnel in their testing to determine the validity of a patient's behavior and thereby validating the diagnostic findings.

The symptoms that AAPLC was describing in the draft audit report are common amongst people with neurological disorders (as stated in SMS-3, referenced *supra*). There is no objective evidence to support allegation number 5.

**CONCLUSION**

Attorney Cuthbert asks the Special Master to dismiss this audit and order the claims be processed. In the alternative, under Audit Rule 24, Attorney Cuthbert respectfully asks that the Special Master conduct a hearing, so that the Special Master can take live testimony (from Attorney Cuthbert, the relevant doctors, third parties and

[21] Attorney Cuthbert does not know which AAPLC member(s) reviewed the four files (the presumption is that it was done by just one AAPLC member).

**ARORA LAW FIRM, LLC**
TRIAL ATTORNEYS
75 West Wieuca Road NE · Atlanta, Georgia · 30342
(O) 404.609.4664· (F) 404.865.3525 · manny@arora-law.com

Class Members) in order to make individual determinations as to the credibility and validity of the evidence before making a ruling on the merits of the Audit Report's allegations.

Please direct any correspondence to me at the above listed address and email.

Sincerely,

Manny Arora
Counsel for Byron Cuthbert

# SPECIAL MASTERS' RULE 27 DECISION ON THE REPORT OF ADVERSE FINDING REGARDING BYRON CUTHBERT AND ASSOCIATES, LLC

## Introduction

On April 13, 2021, Dr. Jack Scariano, a MAF neurologist, called the Program to report that Attorney Byron Cuthbert had been calling him daily to "twist [his] arm." Doc. 277525, at 21. Mr. Cuthbert, said the Program's doctor, was "breaking the law": his communications felt like "mafia letters." *Id*. Dr. Scariano revealed that Mr. Cuthbert was telling him "what to do with a claim, including instructions to backdate a diagnosis to a particular date." *Id*.

Dr. Scariano's allegations formed part of a thick file of complaints about Mr. Cuthbert's practice habits regarding this Settlement that ultimately generated today's Opinion. Under Section 10.3 of the Settlement Agreement and Rule 7(b) of the Rules Governing Audit of Claims, the Claims Administrator audited Byron Cuthbert and Associates, LLC. After conducting interviews with nineteen individuals, it issued a 225-page Rule 15 Audit Report that found that Mr. Cuthbert "displayed a pattern of questionable behavior" including persisting in using PET scans he knew were unreliable, pressuring doctors to change and backdate diagnoses, drafting a medical record under a doctor's name, and preparing third-party affidavits with specific language not unique to Players. Doc. 277525, at 49. The Claims Administrator found that these were material misrepresentations, made for the purpose of securing awards. *Id*. at 48. Finally, the Claims Administrator identified some evidence that Mr. Cuthbert coached Players on how to behave during medical evaluations. *Id*. at 49.

Pursuant to Rule 16(a), the Claims Administrator referred its Audit Report to us, but did not make a specific remedial recommendation. By contrast the NFL Parties, submitting a Rule 17 Statement of Position, asked that Mr. Cuthbert be barred from the Program, among other remedies. Doc. 279582. Mr. Cuthbert submitted a responsive memorandum under Audit Rule 20, Doc. 282199, and the NFL Parties then submitted a reply memorandum under Rule 21. Doc. 283621. Class Counsel did not participate.

Ultimately, we are charged under Rule 28 with determining whether Mr. Cuthbert has "established that there is no reasonable basis" to support the Audit Report's finding "that there has been a misrepresentation, omission or concealment of a material fact made in connection with a Claim by the Settlement Class Member." We have reviewed the full record of the Audit Proceeding, considered the responsive memoranda, and now issue this Decision regarding Byron Cuthbert and Associates.

## Factual and Procedural Background

As of February 15, 2023, the date of the Rule 15 Audit Report, Byron Cuthbert and Associates represented "223 registered Settlement Class Members in the Settlement Program, 83 of whom have filed 114 Monetary Award claims." Doc. 277525, at 1. Twenty-four of these claims

have been paid. *Id.* at 2. A total of twelve claims of Players currently represented by Byron Cuthbert and Associates are implicated in this Audit.[1]

Beginning in January of 2019 and continuing through March of 2022, the Claims Administrator received five tips from five separate sources implicating Mr. Cuthbert in unethical conduct relating to the Settlement Program. *Id.* at 3–6. Three of these were from different lawyers who represent Players in the Program. Those lawyers shared concerns that Mr. Cuthbert had purported to guarantee to prospective clients that he could win them a Monetary Award using (what the informants thought were unreliable) Amyloid PET scans to secure Alzheimer's Disease diagnoses. *Id.* at 3–4.

Another tip came from an individual who raised concerns that a Player represented by Mr. Cuthbert was receiving a Monetary Award despite being able to participate in rodeos.[2] The Claims Administrator, investigating, found that the Player in question had not yet filed a Claim. But its suspicions grew that Mr. Cuthbert was representing to Players that he could guarantee an Award. *Id.* at 4–5.

Finally, the Claims Administrator spoke thirteen times with a woman "who has wished to remain anonymous due to concerns for her safety." *Id.* at 5. She alleged that one of the Players Mr. Cuthbert represents "filed a claim but had faked his symptoms and had submitted an affidavit to support his claim which contained false information." *Id.* Again, as of today, this Player has not yet filed a claim.

The Claims Administrator investigated these issues extensively, over years. *Id.* at 2. On March 8, 2022, it interviewed Mr. Cuthbert. It concluded that Mr. Cuthbert dissembled during that conversation.[3]

In September 2022, the Claims Administrator shared its preliminary findings with Mr. Cuthbert "in an effort to address these concerns." *Id.* It sought, ultimately, to pair Mr. Cuthbert with an attorney mentor experienced with the ins and outs of the Settlement, in the hopes of correcting what it saw as Mr. Cuthbert's wrongful behavior going forward. *Id.* at 42.

Mr. Cuthbert largely rejected this approach. He sought second opinions for the questionable PET scans from another doctor, and consulted with a different attorney from those offered as mentors by the Claims Administrator. *Id.* The doctor who purported to verify the

[1] These are Tommy Barnhardt (SPID 100000793), Donald Lee Evans (SPID 100004597), Brent Fullwood (SPID 100005198), Rory Graves (SPID 100005756), Jeff Griffin (SPID 100005916), Mark Higgs (100006836), Ezra Johnson (SPID 100007913), Joe Cocozzo (SPID 100002921), Stan Edwards (SPID 100004410), Harlan Huckleby (SPID 100007249), Gerald Perry (SPID 100011956), and Jackie Walker (SPID 260001260).

[2] This Player was Antwan Odom (SPID 100011429).

[3] For example, when asked if he had ever drafted an addendum for a doctor, Mr. Cuthbert replied, "'no, never.'" Doc. 277525, at 67. This is simply not true: Mr. Cuthbert sent Dr. Scariano a draft addendum report under Dr. Scariano's name and specifically asked Dr. Scariano's office to "'[r]eview, edit and sign off the addendum to his notes then send back to me so I can file fir his appeal.'" *Id.* at 23. The original draft as it was sent to Dr. Scariano's office shows that Mr. Cuthbert was the last user to modify the document. *Id.*

unreliable PET scan findings incorrectly applied the relevant scoring system, rendering the second opinions of the unreliable PET scans themselves unreliable. *Id.* at 46.

Given Mr. Cuthbert's refusal to work with the Claims Administrator to resolve its concerns, it renewed the audit investigation. On February 15, 2023, the Claims Administrator issued a Rule 15 Audit Report. That Report in relevant part concludes that Mr. Cuthbert:

- submitted to the Program and pressured physicians to rely upon Amyloid PET scans that he knew were unreliable;
- attempted to influence and change Qualified MAF Physicians' diagnoses in order to secure Alzheimer's diagnoses in contravention of FAQ 94's guidelines for appropriate communications with Qualified MAF Physicians;
- submitted inaccurate costs in relation to lien disputes;
- drafted medical records for at least one Diagnosing Physician to be used in support of an Appeal;
- drafted affidavits for third parties asserting specific information that was not unique to the Settlement Class Member;
- may have coached Settlement Class Members on how to behave during medical examinations to obtain given diagnoses;
- was not truthful when questioned about the above;
- did not accept the opportunity to resolve these concerns and instead doubled down on his position.

*Id.* at 2–3.

The Claims Administrator found that Mr. Cuthbert using the unreliable Amyloid PET scans, attempting to have Diagnosing Physicians change their diagnoses, drafting of medical records and third-party affidavits, and (if true) coaching of Players were material misrepresentations and omissions related to Claim filings. *Id.* at 48–49.

**<u>Discussion</u>**

Mr. Cuthbert's burden in this Audit is to show "that there is no reasonable basis" for the Claims Administrator's factual findings about his misrepresentations and omissions. This he has plainly failed to do. His briefing was tendentious when it was not evasive:[4] he in no way satisfied

[4] Mr. Cuthbert responds to the Claims Administrator's finding that he pressured doctors into changing their diagnoses by insisting, "Questioning an expert is not 'pressure', regardless of how a medical expert's fragile ego may react to having their finding questioned." Doc. 282199, at 7. This is simply not responsive to the Claims Administrator's concerns. Mr. Cuthbert insists that the third-party affidavits he provided were nothing more than an attorney's "routine" provision of an "outline of topics that need to be covered" in the form of a "template." Doc. 282199, at 8. But "template" mischaracterizes the documents Mr. Cuthbert provided to third-party affiants. The Rule 15 Audit Report documents multiple examples of affidavits purportedly authored by different individuals, about different individuals with identical language. Doc. 277525, at 25–26. An affidavit "template" provided by Mr. Cuthbert to one of the third-party affiants—containing some of the identical language that raised red flags in the first place—reveals

the "no reasonable basis" burden he faces in this Audit. We have considered the record and adopt the factual findings of the Claims Administrator. Mr. Cuthbert knowingly used unreliable Amyloid PET scans, attempted to have Diagnosing Physicians change their diagnoses, and drafted both medical records and third-party affidavits. These were material omissions or misrepresentations connected to Claim submissions. We also conclude that Mr. Cuthbert was not truthful in responding to the investigatory process, making it more difficult for the Claims Administrator to carry out its duties.

However, like the Claims Administrator, we are not sure that Mr. Cuthbert coached Players. Despite the Appeals Advisory Panel Leadership Counsel (AAPLC)'s opinion that similarities in how Players acted at medical evaluations strongly indicated that they had been coached, the Claims Administrator was ultimately "unable to confirm that Mr. Cuthbert has in fact coached any of his clients on what to say or how to act during an exam for the Program." *Id.* at 34. Needless to say, coaching Players on what they should say and how they should act during medical evaluations violates the honesty and openness required of Players in their interactions with doctors in the Program.[5]

## Conclusion

The Claims Administrator ended its thorough report with the following trenchant summary:

> Through his interactions with the Program, Mr. Cuthbert has displayed a pattern of questionable behavior that has placed an unnecessary burden on Qualified MAF Physicians, Program experts, and the Claims Administrator. The evidence we have obtained shows that Mr. Cuthbert orchestrated a process designed to manipulate the judgment of Diagnosing Physicians by attempting to influence their decisions and professional judgment, based largely on PET scan reports that we have determined are unreliable.
>
> Mr. Cuthbert knew these reports to be unreliable yet continued to present them as the "ticket" to a Qualifying Diagnosis of Alzheimer's Disease, even when his clients had already received a Qualifying Diagnosis of Neurocognitive Impairment. Further, Mr. Cuthbert questioned medical professionals and pressured Program doctors to change their diagnoses, drafted a medical record under a doctor's name, prepared third-party affidavits that included specific language that was not actually unique to the Players, and, based on expert AAPLC opinion, possibly coached his clients on how to perform during their exams.

that Mr. Cuthbert provided full, substantive, and conclusory wording around symptoms and experiences meant to be individualized and specific to each Player, with fill-in-the-blank spaces for each Player's name. *Id.* at 28.

[5] FAQ 94 emphasizes that Players must "talk openly and honestly with the Qualified MAF Physician" and "provide complete and truthful answers to the doctor's questions." *Frequently Asked Questions: FAQ #94* (regarding communications with MAF Physicians), NFL CONCUSSION SETTLEMENT, https://www.nflconcussionsettlement.com. Players cannot be open, honest, complete, and truthful if they have been coached in advance about what to say and how to say it.

*Id*. at 49.

With respect to next steps, we consider the Claims Administrator's factual findings in light of remedial action we might take. In the event of a "misrepresentation, omission, or concealment of a material fact made in connection with the claim," Settlement Section 10.3(i) allows us to, "without limitation," direct the following as possible remedies:

> (a) denial of the claim in the event of fraud; (b) additional audits of claims from the same law firm or physician (if applicable), including those already paid; (c) referral of the attorney or physician (if applicable) to the appropriate disciplinary boards; (d) referral to federal authorities; (e) disqualification of the attorney, physician and/or Settlement Class Member from further participation in the Class Action Settlement; and/or (f) if a law firm is found by the Claims Administrator to have submitted more than one fraudulent submission on behalf of Settlement Class Members, claim submissions by that law firm will no longer be accepted, and attorneys' fees paid to the firm by the Settlement Class Member will be forfeited and paid to the Settlement Trust for transfer by the Trustee into the Monetary Award Fund.

Settlement Agreement, Section 10.3 (i).

In short, our remedial options are broad. And Mr. Cuthbert's wrongful conduct—and his unrepentant behavior when confronted with the problems he caused—was persistent.

Attorneys may legitimately communicate with Qualified MAF Physicians about administrative and scheduling matters, even up to "correcting factual things the records may have wrong."[6] But FAQ 94 expressly prohibits attorneys from attempting "to instruct or influence how the doctor performs the examination and makes a diagnosis," and from asking "the doctor to change a diagnosis in any way." *Id*. Mr. Cuthbert's communications with MAF Physicians Dr. Kevin Weber, Dr. Alan Lerner, and Dr. Jack Scariano ran afoul of this standard. Doc. 277525, at 16–22. Emailing and calling doctors on a daily basis, asking for in person meetings, requesting doctors to backdate or change diagnoses, pre-writing medical records, and questioning a doctor's methodology are illustrative of conduct that crosses the line.

Just as communications between attorneys and physicians in the Program must adhere to high standards of propriety, diagnoses must adhere to the criteria laid out in Exhibit A-1 of the Settlement. FAQ 116 is explicit that "a positive amyloid PET scan does not establish a diagnosis of Alzheimer's Disease or any other cognitive disorder."[7] Rather, it is one tool among many used by clinicians in diagnosing Alzheimer's Disease. Mr. Cuthbert's representations to potential clients,

---

[6] *Frequently Asked Questions: FAQ #94* (regarding communications with MAF Physicians), NFL CONCUSSION SETTLEMENT, https://www.nflconcussionsettlement.com.

[7] *Frequently Asked Questions: FAQ #116* (regarding use of biomarker tests in diagnosing Alzheimer's Disease), NFL CONCUSSION SETTLEMENT, https://www.nflconcussionsettlement.com.

therefore, to the effect that a positive PET scan was all that was needed for a Qualifying Diagnosis under the Settlement Program were improper.[8] Mr. Cuthbert additionally erred in relying on PET scans from Dr. Eber's office well after being alerted that these scans were unreliable.[9] This conduct evidenced a sustained attempt to secure Claim Awards using medical records that Mr. Cuthbert knew, or should have known, were defective.

It is also clear from the Audit Report that Mr. Cuthbert pushed doctors harder than the Settlement allows. The pressure he exerted on them to modify diagnoses was inappropriate. The PET scans he relied on were unreliable, a fact of which he was on notice. And his drafting of medical records and third-party affidavits crossed the line between an ordinary template common in legal practice and putting words in the mouths of people who needed to use their own independent judgment.

The Claims Administrator is correct in concluding that Mr. Cuthbert's overreliance on unreliable PET scans as proof of Alzheimer's Disease "certainly had the potential to affect, and did affect, his clients' Qualifying Diagnoses." Doc. 277525, at 48. So, too, were Mr. Cuthbert's efforts to pressure Diagnosing Physicians to change or backdate diagnoses and his drafting of medical records and third-party affidavits. *Id*. The integrity of the Settlement depends on reliable, accurate diagnoses, and Mr. Cuthbert's conduct had a material impact on the reliability and accuracy of his clients' diagnoses. His conduct throughout the Audit investigation then made things worse, attenuating the process of getting to the bottom of what happened and running up costs. That the Claims Administrator did not find that Mr. Cuthbert filed a Claim knowing it rested on falsified documentation (rather than a mix of unreliable and pre-drafted records) does not clear Mr. Cuthbert from wrongdoing.

Under Section 10.3 (i)(e) and (f), we have the power to bar Mr. Cuthbert and his law firm entirely from further participation in the Settlement Program. His conduct led to multiple material misstatements in Claims submitted on behalf of Settlement Class Members. It has diverted the attention of the Claims Administrator, raised the administrative cost of this Program, and ultimately harmed his clients. However, we do not exercise this power today because we conclude that Mr. Cuthbert's conduct, though wrongful, was not provably malicious. Instead, we issue the following remedies:[10]

---

[8] For example, one Player told the Claims Administrator that Mr. Cuthbert advocated for avoiding the "'regular way' of going through the MAF or BAP process" in favor of "undergoing a PET scan, which 'looked at your brain.'" Doc. 277525, at 6.

[9] In total, Mr. Cuthbert sent 99 clients to Dr. Eber for PET scans. Doc. 277525, at 8. On April 19, 2021, an MAF Physician's assistant directly communicated with Mr. Cuthbert that the Physician recommended getting re-reads of several Dr. Eber PET scans. *Id*. at 12. At this point, Mr. Cuthbert was "on notice about possible unreliability of Dr. Eber's findings." *Id*. Yet Mr. Cuthbert continued to send clients to Dr. Eber. When confronted by the Claims Administrator, instead of seeking accurate scans from a reliable source, Mr. Cuthbert sought a second opinion on the Dr. Eber scans from another physician who used unreliable criteria. *Id*. at 16.

[10] These remedies shall apply to all Monetary Award claims that exhibit the issues discussed in the Audit, regardless of current representation.

1. Under Section 10.3 (i)(a), the twelve Claims directly implicated in this Audit are now denied. We emphasize that Mr. Cuthbert, not his clients, is at fault. But the issues described in this Audit are intractable, ranging from unreliable PET scans to undue pressure on doctors. The task of separating out the genuine from the tainted in the medical evidence behind each Qualifying Diagnosis would be difficult, time-consuming, and in our experience unlikely to lead to successful submissions based on the existing medical records. We thus deny the Claims now to expedite the process of Claimants obtaining new medical records unsullied by the issues described in this Audit.
2. Under Section 10.3 (i)(b), we direct the Claims Administrator to first suspend the processing of all Claims currently or formerly represented by Mr. Cuthbert, whether on review or on appeal, and review them with care as follows:
   - Any additional Claims supported by a PET scan from Dr. Eber's office should be Denied.
   - Further the Claims Administrator shall certify, before continuing to process each Claim, and before permitting the continued processing of any Appeal, that the Claim is entirely free of the issues discussed in the Audit. We will consider that determination to be dispositive.
   - If the Claims Administrator cannot determine that the pending Claim or Appeal is free of the issues raised by this Audit, they shall notify the Special Masters, who will deny that Claim without prejudice pursuant to this Order.
3. These remedies result from Mr. Cuthbert's actions, and the burdens of delay and expense caused by his conduct. We condemn Mr. Cuthbert's conduct as described in this Decision and the underlying Audit Report. We hereby censure him. The Claims Administrator shall make a copy of this Opinion available on the NFL Concussion Settlement Website, redacting all names but those of Mr. Cuthbert and Dr. Eber.

David A. Hoffman

Jo-Ann M. Verrier

Dated June 28, 2023

**OBJECTION STATETMENT TO RULE 27 DECISION**

**BACKGROUND**

On 3/3/23, BrownGreer PLC ("BrownGreer" and "the Claim Administrator") referred to the Special Master an Audit Report dated 2/15/23, regarding 12 claims filed by Byron Cuthbert and Associates, LLC ("BCA" and "Attorney Cuthbert") on behalf of Settlement Class Members.[1] Attorney Cuthbert represents a little over 200 Settlement Class Members (18 claims have been awarded, with 40 more claims pending. Of the 40 pending claims, 28 are being processed with the additional 12 being the subjects of this Audit). BCA responses/defenses *infra* will address the 12 Class Members that are subject to this Audit Report.[2] The basis for the audit lists a variety of allegations to include: (1) Attorney Cuthbert used unreliable PET scans; (2) Attorney Cuthbert questioned medical professionals and pressured them to change their diagnoses; (3) Attorney Cuthbert drafted one medical record for a doctor to sign; (4) Attorney Cuthbert drafted third party affidavits to use language that's not unique to the specific Class Member; and (5) Attorney Cuthbert "possibly" coached Class Members on how to perform during the medical examinations.[3] The Audit Report further states that Attorney Cuthbert did not accept the Claims Administrator's proposal to resolve the audit findings to avoid a referral to the Special Masters. On July 2, 2023, Pursuant to Rule 27 of the Rules Governing the Audit of Claims, BrownGreer provided Mr. Cuthbert with the Special Masters Decision[4] on the BCA Audit Proceeding. Pursuant to Rule 34, BCA and Attorney Cuthbert object to the Rule 27 Decision, specifically the conclusions of law stated by the Special Masters and respectfully request that this Court consider the responses below through a de novo review, and modify or reverse the Special Master's conclusions and order such other further relief as the Court deems appropriate.

---

[1] Four of the twelve class members whose claims are being audited are not referenced in the Audit Report.
[2] Refer to Exhibit **B - Cuthbert Response to Audit exhibits 1 – 12** for the Individual facts to each Class Member.
[3] These allegations are subjective in nature and do not apply uniformly to all of the Class Members whose claims are subject to this audit.
[4] Refer to Exhibit **A**

## OBJECTIONS TO CONCLUSIONS OF LAW

### I. The Special Masters Review applied the wrong legal standard.

The Special Masters stated the following standard in their decision as follows, "Ultimately, we are charged under Rule 28 with determining whether Mr. Cuthbert has 'established that there is no reasonable basis' to support the Audit Report's finding 'that there has been a misrepresentation, omission or concealment of a material fact made in connection with a Claim by the Settlement Class Member." Under the Audit Rules the Audit Report does not have to show the intent, Audit Rule 28 does not epxlicitly exclude the intent requirement, and in previous decisions, Judge Brody established the appropriate standard with the following, "A central piece of this …audit program, through which the Claims Administrator reviews claims is to determine whether any **intentional** misrepresentation, omission, or concealment occurred."[5] The Special Masters condemned and censured Attorney Cuthbert and denied the 12 Players claims by applying the wrong legal standard as stated by Judge Brody because the Special Masters ignored the "intent" requirement for <u>misrepresentation, omission, or concealment</u>. The following analysis supports that their decision was made based on the wrong standard, "his conduct evidenced a sustained attempt to secure Claim Awards using medical records that Mr. Cuthbert knew, or should have known, were defective." The standard "knew or should have known" is a negligence standard. This shows the Special Masters made the decision without proof of "actual intent" which is a necessary element to find <u>misrepresentation, omission, or concealment.</u> The Rule 27 Decision did not meet that burden because Mr. Cuthbert did not "knowingly" present unreliable Amyloid Pet Scans.[6] The timeline shows that Mr. Cuthbert presented medical records based off board certified radiologists medical opinions in support of the claims.[7] The Special Master Decision shows there was no intent, "we concluded that Mr. Cuthbert's conduct, though wrongful, <u>was not</u>

---

[5] Refer to Case 2:12-md-02323-AB Document 10811 Filed 08/20/2019
[6] See Exhibit **B -** Cuthbert's Response to Audit Report section I. Attorney Did Not Use Unreliable PET Scans. Refor to footnote 8 in Cuthbert's Response section I where the Claims Administrator acknowledge theres no basis for this allegation.
[7] See Exhibit **B -** Cuthbert's Response to Audit Report section I. Attorney Did Not Use Unreliable PET Scans

provably malicious". The Decision goes on to broadly deny 12 claims without reviewing the facts and merits of each case. [8]

Further analysis of their Decision shows there was a lack of evidence of intent with respect to the allegation of coaching Players, "however, like the Claims Administrator, we are not sure that Mr. Cuthbert coached Players…Id.at 34." This further supports the fact that their Decision was made utilizing the wrong standard and insufficient evidence.

II. **The Special Masters abused their discretion because their Decision improperly modified the Settlment Agreement Injury Protocols.**

In order to prevail on a motion for reconsideration, the moving party must demonstrate, "the need to correct a clear error of law or fact or to prevent a manifest injustice." [9] *Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999). The Rule 27 Decision procedurally violates and modifies the Settlement Agreement section 6.6 injury protocols for qualifying diagnosis and medical science guidelines for the 10-year timeframes.[10] BrownGreer's new requirement for the use of the "Standardized Uptake Value ratio (SUVr)" software instead of trained radiologist physical eye review

[8] This is a violation of due process. see Truax v. Corrigan, 257 U.S. 312, 320, 42 S. Ct. 124, 125, 66 L.Ed. 254, 258 (1921) The due process clause requires that every man shall have the protection of his day in court, and the benefit of the general law, a law which hears before it condemns, which proceeds not arbitrarily or capriciously but upon inquiry, and renders judgment only after trial, so that every citizen shall hold his life, liberty, property and immunities under the protection of the general rules which govern society. The **Decision denies the Settlement class members:** Harlan Huckleby, Jeff Griffin, Ezra Johnson and Mark Higgs **from their vested interest of their monetary awards after the appeal deadline clearly elapsed**; **the Decision denied claims on appeal:** Donald Evans, Brent Fullwood , Gerald Perry, Rory Graves, and Tommy Barnhardt without any actual evidence of coaching. **the Decision denies claims that are not referenced in the Audit Report** with the Settlment class members claims including: Joe Cocozzo, Jackie Walker, and Stan Edwards.

[9] See Definition of Manifest Injustice - As found in *Black's Law Dictionary,* a manifest injustice is defined as "'[a]n **error in the trial court that is direct, obvious and observable** such as a defendant's guilty plea that is involuntary . . . .'" In re Looper, 2007 Bankr. LEXIS 2071, 2007 WL 1725251, at *2 (Bankr. E.D. Tenn., June 12, 2007) (quoting *Black's Law Dictionary* 974 (7th ed. 1999)).What is clear from case law, and from a natural reading of the term itself, is that a showing of manifest injustice requires that there exist a fundamental flaw in the court's decision that without correction would lead to a result that is both inequitable and not in line with applicable policy." In re Bunting Bearings Corp., 321 B.R. 420, 423 (Bankr. N.D. Ohio 2004).

[10] Refer to **FAQ 28 -** Periodically, but not more than once every 10 years, Class Counsel and the NFL Parties will discuss possible changes to the definitions of the Qualifying Diagnoses and/**or the protocols for making them**, in light of generally accepted advances in medical science. **Refer to Section 6.6. of the Settlment Agreement -** No such modifications **can be made absent written agreement between Co-Lead Class Counsel and Counsel for the NFL Parties and approval by the Court,** and neither Co-Lead Class Counsel nor Counsel for the NFL Parties shall seek modification to the definitions of Qualifying Diagnoses and/or the protocols for making Qualifying Diagnoses other than with the written agreement of the other regarding such modifications.

exceeds the standard and unduly challenges the interpretation of the two radiologist findings beyond the manufacture guidelines and FDA requirements for Amyloid PET Imaging. This new SUVr requirement modifies section 6.6 of the Settlement Agreement by making and implementing a new injury protocol requirement for imaging that was not utilized, or required from 2017 through 2022, that is, the period covered by the Settlement Agreement.[11] The modidfication did not follow the procedural requirements of section 6.6 of the Agreement. This demonstrates that the Rule 27 Decision improperly modified the concussion injury protocol and is therefore not in line with the Settlement and erroneous.

III. **The Rule 27 Decision was unreasonable because it violated 42 U.S.C. § 1981**

In order to prevail on a motion for reconsideration, the moving party must demonstrate, "the need to correct a clear error of law or fact or to prevent a manifest injustice." *Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999). The actions of the Claims Administrator supports a violation of 42 U.S.C. § 1981.[12] The Special Masters' Decision recommends denial of claims with medical imaging read by Dr. Eber despite the fact that BrownGreer allowed the claims of BCA's former clients Felix Wright and Bobby Abrams to be processed using the medical imaging and diagnosis by the same doctors that Attorney Cuthbert used to support his claims. The science is the same, so why are the claims being treated differently? What is the difference? The only obvious distinction is that these individuals are now represented by non-black attorneys, Amir Shenaq and JR Wyatt. This demonstrates the bias against and discrimination toward Mr. Cuthbert, a black attorney and a member of a protected class, and his clients,

---

[11] Refer to **Exhibit B – exhibit number 13-** evidence of previous monetary awards that include or considered Dr. Eber medical imaging reports.

[12] See Crane v. Mary Free Bed Rehab. Hosp., 634 F. App'x 518, 519 (6th Cir. 2015) A discrimination case relying on circumstantial evidence is analyzed under the burden-shifting framework delineated in McDonnell Douglas, and later clarified in Texas Department of Community Affairs.To establish a prima facie case for race discrimination under 42 U.S.C.S. § 1981, a plaintiff must show that **(1) she belongs to an identifiable class of persons who are subject to discrimination based on their race; (2) the defendant intended to discriminate against her on the basis of race; and (3) the defendant's discriminatory conduct abridged a right enumerated in § 1981(a).** Under Michigan's Elliott-Larsen Civil Rights Act, a plaintiff may prove disparate treatment by showing that she was a member of a protected class and that she was treated differently than members of a different class for the same or similar conduct.

including but not limited to, Stan Edwards, Jackie Walker, Gerald Perry and the others with Amyloid PET Scans. The Special Masters' decision supports the disparate treatment in which BrownGreer considers the PET scan findings related to Mr. Cuthbert's claims to be unreliable while BrownGreer is actively processing and approving other law firms' claims that are filed by white attorneys with medical evidence provided by Dr. Eber, Dr. Dineen, and MAF doctors.

For example, the Claim Administrator processed and awarded an Alzheimer claim, **SPID 100017085 Felix Wright[13],** with Justin Wyatt as the lead attorney **within the time frame** consistent with the Settlement Agreement. This claimant fired BCA when **the MAF** failed to publish the medical report until after a delay of one (1) year. It is not a coincidence that the settlement class member hired the white attorney, Justin Wyatt, who Brown Greer recommended that Mr. Cuthbert work with and accept as a mentor.[14] However, in another Alzheimer's claim, from the same MAF as **SPID 100004410 Stan Edwards,** that was not processed within a timeframe consistent with the Settlement Agreement, where BCA was the primary lead counsel, the Special Masters recommended denial.

Additionally, **SPID 100000021 Bobby Abrams[15]** was awarded a monetary award on September 20, 2021. The appeal deadline was October 20, 2021, and there wasn't an appeal. Bobby Abrams' funds should have been disbursed around December 20, 2021. BrownGreer audited the claim on January 4, 2022. Judge Strawbridge ordered the fees to be released on June 10, 2022. Nevertheless, Bobby Abrams did not receive any funds while represented by BCA. BrownGreer revoked the award after the appeal deadline. The funds were not processed timely. As a direct and proximate result, Bobby Abrams terminated BCA on or around December 21, 2022 due to the Administrators' refusal to administer the process and disburse the monetary award pursuant to the terms of the Settlement Agreement. Subsequently, Bobby Abrams hired a law firm, Shenaq, PC, (another non-black Attorney), that BrownGreer recommended Attorney Cuthbert use as a mentor.[16] Bobby Abrams monetary award was awarded shortly afterwards, sometime in 2023.

---

[13] Refer to exhibit **B – exhibit number 16 – Documents Related to Felix Wright Claim**
[14] Refer to and read section 3(b) herein
[15] Refer to exhibit **B – exhibit number 17 – Documents Related to Bobby Abram Claim**
[16] Refer to and read section 3(b) herein

Lastly, SPID **100006836 Mark Higgs**[17] hired another white attorney, Geoff Gibbon, of the law firm Fassyoux and Landis. Mr. Higgs Alzheimer's claim was filed with medical records from Dr. Dineen, Dr. Eber, and a report with a negative result finding from Dr. Siegel in his file. Mr. Higgs' claim was awarded within 2 months of filing, on or about April 8, 2023, without an appeal. **Mark Higgs'** approval has now been added to the Audit, after BCA raised this as an issue. **Joseph Harris'** claim has been removed from the Audit, although, Mr. Harris is in the Audit Report and Mr. Higgs is not. This procedure is improper, unreasonable, and a violation of the Players' due process[18] rights. The Players are entitled to equal treatment in the Audit Review process by applying the same standard formulated by the Settlement Agreement.

BrownGreer has a duty to process claims consistently. BrownGreer's processing and awarding Alzheimer's claims filed by other attorneys, utilizing the medical records previously arranged by Mr. Cuthbert, while auditing and disputing all claims filed by Mr. Cuthbert, a black attorney, shows a pattern of discrimination, disparate treatment, and consequential economic injury. Allowing this decision to stand will violate 42 U.S.C. § 1981 by denying Attorney Cuthbert, a black attorney, and the 12 Settlement class members "the same right in every State and territory to make and enforce contracts, ... as is enjoyed by white citizens".

*3(b) BrownGreer endorsement of "Mentor Co-Counsel" was discriminatory*

BrownGreer shared its preliminary findings with Mr. Cuthbert in which it "sought to pair Mr. Cuthbert with an attorney mentor experienced with the ins and outs of the Settlement Program, but Mr. Cuthbert rejected this approach" and the Special Masters' conclusion "that Mr. Cuthbert, not his clients, is at fault" is incorrect. The Audit Report doesn't reveal that Amir Shenaq and JR Wyatt (non-black attorneys) were the two recommended attorneys or that Mr. Cuthbert explained to Seeger Weiss and Brown Greer that he could not and would not work with **those specific attorneys** and requested names of other attorneys for him to consider and discuss with his clients. No one who reads the Audit Report or Special Masters' Report

[17] Refer to exhibit **B – exhibit number 15 – Mark Higgs Monetary Award Claim**
[18] See Truax v. Corrigan, 257 U.S. 312, 320, 42 S. Ct. 124, 125, 66 L.Ed. 254, 258 (1921)

would work with two attorneys who BCA knew had a history of stealing his clients and disparaging his name.

It was only after BrownGreer did not offer any other names of experienced attorneys that Attorney Cuthbert consulted with attorney Dr. Rod Edmond, who is a medical doctor with experience in medical malpractice, traumatic brain injury cases, and class actions. Dr. Edmond is an experienced black attorney, but BrownGreer did not find him sufficient to be a mentor. Mr. Cuthbert would have loved to work with the Claim Administrator to stop the 12 Players and their families from suffering as a result of the delay caused by the Audit. However, BrownGreer refused to work with Mr. Cuthbert or Mr. Edmond, who called and spoke to BrownGreer to discuss what was needed to resolve the Audit process. The Claim Administrator issued its Rule 15 Audit Report in retaliation for Mr. Cuthbert's refusal to hand over his clients to Attorneys JR Wyatt and Shenaq. This is evidence of BrownGreer's refusal to allow the Players to exercise their rights to choose their own attorneys to represent them. Neither the overall Settlement Agreement, nor the Audit Rules, as formulated, allow the Claim Administrator to choose the Players' attorney(s). As it is, the Settlement Program determines what doctors they can seek treatment or evaluations from. All autonomy has been stripped from the Players which is a violation of their due process rights and some state bar rules.[19] The Decision was a clear error of law because BrownGreer's actions violated the Players's due process rights and 42 U.S.C. § 1981. The actions show disparate treatment of the claims filed by black attorneys.The result is that claims filed by non-black attorneys are treated and processed differently than claims filed by black attorneys resulting in injury to black attorneys and their clients.

## IV. The Special Masters' Decision was arbitrary and unreasonable because their Decision was based on insufficient evidence and hearsay.

A Court may only set aside the Special Masters' ordered relief if the Special Masters abused their discretion. Fed. R. Civ. Pro. 53(f)(5). "An abuse of discretion occurs only where the [Special Masters'] decision is 'arbitrary, fanciful, or clearly unreasonable'—in short, where 'no reasonable person would adopt

[19] See the **Georgia State Bar Rules of Professional Conduct Rule 1.5** which specifically require lawyers to obtain a client's express written consent for working with other lawyers and fee splitting.

the [Special Masters'] view. The Rule 27 Decision was unreasonable because it was made with insuffeceient evidence and many different hearsay statements[20] as evidence to make the Decision. Nowhere in the Factual and Procedural Background section is it acknowledged by the Special Masters that, in the investigation by BrownGreer of the accusations made, beginning in January of 2019, and continuing through March of 2022, Mr. Cuthbert was provided the names of the 3 attorneys who alleged that he purportedly guaranteed perspective clients that he could win them a monetary award using Amyloid PET Scans, despite Mr. Cuthbert's continual requests. This allegation is a blatant lie because the BCA Retainer, which can be found in many settlement class members' portals, clearly shows that BCA Retainer, ( which is executed by all clients), provides a disclaimer against any gurantees. [21] BrownGreer's 235 page Audit Report lacks any indication that Mr. Cuthbert's active clients were interviewed by telephone or email regarding the veracity of the allegations. Instead, the Claim Administrator chose to rely on 3 unidentified attorneys who wanted to poach BCA's clients, and who obviously had a nefarious motive for attempting to get BCA removed from the Settlement Program. The Claim Administrator never provided the names of the perspective clients who supposedly made the allegations so that BCA could confront them and personally refute their allegations. BCA could not verify whether he had ever spoken to these potential clients, or had contact with them by email, text or had recorded voice conversations with them. This is but one example of BrownGreer accusing BCA of something without providing him with specific information to rebut the allegations prior to its issuance of a report. It was stated that BrownGreer interviewed nineteen individuals, many whose names were not provided to BCA. BCA only knows the Doctors names.

---

[20] See USCS Fed Rules Evid R 801(3)(c) **Hearsay.** "Hearsay" means a statement that: **(1)** the declarant does not make while testifying at the current trial or hearing; and **(2)** a party offers in evidence to prove the truth of the matter asserted in the statement.

[21] See retainer language: DISCLAIMER. Notwithstanding anything to the contrary, Byron Cuthbert & Associates, LLC does not expressly or implicitly guaranty, represent, warrant or covenant that any NFL Concussion settlement or award will be awarded or paid to the Client. Notwithstanding anything to the contrary, the Client expressly acknowledges and agrees that Byron Cuthbert & Associates, LLC has made the foregoing disclaimer

The conclusion that "Mr. Cuthbert's communications with MAF Physicians Dr. Kevin Weber, Dr. Alan Lerner, and Dr. Jack Scariano "ran afoul of this standard" was made with insufficient evidence because Counsel Manny Arora contacted the two medical providers (Drs. Scariano and Lerner), in accordance with FAQ 95, and he was advised by the doctors that the allegations and statements in the Audit Report are not accurate. This information was provided in Cuthbert's response to the Audit Report. Additionally, none of the doctors changed any of their medical findings based on any alleged "pressure". Lastly, BrownGreer did not provide the evidence supporting any inference of malfeasance between Attorney Cuthbert and Dr. Lerner and Dr. Scariano. Under Audit Rule 24, Attorney Cuthbert respectfully requested that the Special Master conduct a hearing, so that they could take live testimony from Attorney Cuthbert, the relevant doctors, third parties and Class Members in order to make individual determinations as to the credibility and reliability of the conflicting evidence before making a ruling on the merits of the 5 allegations listed in the Audit Report. While the decision to have a hearing is in the discretion of the Special Masters, the fact that they refused to have the hearing and made their decision by applying the incorrect standard of review with insufficient evidence led to an improper conclusion of law. All the above hearsay evidence and statements were included without allowing Mr. Cuthbert the opportunity to address the individuals and accusers who made these statements. This violates Mr. Cuthbert's fundamental right to due process[22] and to have an opportunity to address his accusers and defend himself against the allegations. The Rule 27 decision was based on insufficient evidence and hearsay statements.[23] Therefore, it was arbitrary, unreasonable, and violated Mr. Cuthbert's due process.

## V. The Decision was arbitrary and unreasonable because it violated Due Process

Mr. Cuthbert cooperated with BrownGreer by participating in interviews and providing answers and imaging evidence anytime it was requested. BrownGreer never provided in their Audit Report that,

[22]See Truax v. Corrigan, 257 U.S. 312, 320, 42 S. Ct. 124, 125, 66 L.Ed. 254, 258 (1921)

[23] **Federal Rule of Evidence Rule 802. The Rule against Hearsay -** Hearsay is not admissible unless any of the following provides otherwise a federal statute; these rules [federal rules of evidence]; or other rules prescribed by the Supreme Court.

when Mr. Cuthbert was interviewed on March 8, 2022, he informed them that his (only Paternal) Aunt had died on March 3, 2022 , and left him to make her funeral arrangements and accept custody of her 29-year-old Autistic son. Yet, they put in the Decision that he "dissembled during their conversation", which was really an interrogation, even after he informed the Investigator Vicki Humphries, former FBI Agent, that he wasn't in the frame of mind to go forward with the meeting that day. She insisted that she only had a few questions to ask, which turned into hours when she should have had the decency to reschedule to another day. Furthermore, if Vicki Humphries was going to question him about specific documents, she should have showed them to him when questioning him, rather than requiring him to try to remember the documents. No such courtesy was ever given to Mr. Cuthbert during the entirety of the BrownGreer investigation. (Doc.277525, at 67). In addition, subsequent to the interview, Mr. Cuthbert requested a copy of the interview transcript or recording of the interview. BrownGreer did not provide such communication, which did not give Mr. Cuthbert the opportunity to clarify or verify the statements made in the interview, which violated Mr. Cuthbert's due process rights because the statements were made when Mr. Cuthbert was not in a clear frame of mind and the interviewers were aware of it.

**VI. Prayers for Relief**

Byron Cuthbert & Associates, LLC and the Settlement Class Members pray for Relief as follows:

a) That a de novo review be granted;
b) That the Special Masters Rule 27 decision be reversed and dismissed;
c) Modify the Special Masters Rule 27 decision to order the 12 Players claims be processed and awarded based on the established policies and procedures of the Settlement Agreement;
d) Modify the Special Masters Rule 27 decision to direct BrownGreer PLC to award the 4 Players who had an established vested interest in their monetary awards prior to the Audit to be paid;
e) Modify to order the other 8 Players claims to be immediately reviewed individually and issued a decision based on the established policies and procedures of the Settlement Agreement;
f) Modity the order to deny publishing the Decision and Audit Report on the website;
g) Attorney Cuthbert asks your honor to modify the decision and order such other further relief as the Court deems appropriate that will provide justice to the Players and their families and to their attorney.

This 21st date of July, 2023.

Respectfully submitted,

By: /s/ Byron Cuthbert

***Byron Cuthbert & Associates, LLC***

**CERTIFICATE OF SERVICE**

The undersigned does hereby certify that a true and correct copy of the foregoing Objection Statement to Rule 27 was filed via email to the ClaimsAdministrator@nflconcussionsettlement.com and the NFL Concussion Settlment Portal designated by the Electronic Case Filing System in the United States District Court for the Eastern District of Pennsylvania, on all parties registered for *CM/ECF* in the litigation.

Date: July 21, 2023

Respectfully submitted,

/s/ Byron Cuthbert

***Byron Cuthbert & Associates, LLC***
1143 Cameron Creek
Marietta, GA 30062
Phone: 404-403-7855
Fax: 1(866) 990-9743

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323<br><br>Hon. Anita B. Brody |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*,<br><br>Plaintiffs,<br><br>v.<br><br>National Football League and NFL Properties LLC, successor-in-interest to NFL Properties, Inc.<br>Defendants. | Civ. Action No.: 14-cv-00029-AB |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | Hon. Anita B. Brody |

**RESPONSE OF THE NATIONAL FOOTBALL LEAGUE AND NFL PROPERTIES LLC IN OPPOSITION TO BYRON CUTHBERT & ASSOCIATES, LLC's OBJECTION TO THE SPECIAL MASTERS' RULE 27 DECISION**

The National Football League and NFL Properties LLC (the "NFL Parties") respectfully submit this opposition to Byron Cuthbert and Associates, LLC's objection to the Special Masters' Rule 27 Decision (the "Decision").

The Objection—a collection of meritless arguments and unfounded complaints about the Claims Administrator's multi-year investigation into Mr. Cuthbert's extensive misconduct and the resulting Special Masters' Decision—is baseless. For example, the Objection contends that the Decision employed the wrong legal standard when the Decision explicitly used the standard mandated by the Audit Rules; in the same vein, the Objection contends that the Decision improperly modified the Settlement Agreement's Injury Definitions even though the Decision never mentioned those Definitions, much less purported to modify them. The Objection also asserts frivolous claims of racial discrimination against the Claims Administrator that are so devoid of merit they were never even advanced by Mr. Cuthbert to the Special Masters. The Objections' other arguments are simply improper attempts to relitigate the Special Masters' final and binding factual determinations. The Objection cannot remotely meet the standard of showing that "no reasonable person" could have reached the Special Masters' conclusions, and the Objection should be denied.

## BACKGROUND

On March 3, 2023, the Claims Administrator referred to the Special Masters a February 15, 2023 Audit Report (the "Audit Report") concerning Byron Cuthbert and his law firm, Byron Cuthbert and Associates, LLC. The Audit Report details the Claims Administrator's multi-year investigation of Mr. Cuthbert, which uncovered widespread fraudulent practices. Specifically, the Audit Report sets forth overwhelming evidence that Mr. Cuthbert "orchestrated a process designed to manipulate the judgment of Diagnosing Physicians by attempting to influence their decisions and professional judgment," including based on PET scan reports from Dr. Daryl Eber that Mr. Cuthbert

*knew were unreliable*, but nevertheless "continued to present [] as the 'ticket' to a Qualifying Diagnosis of Alzheimer's Disease." (*See* Audit Report at 49.) The Audit Report also demonstrated that Mr. Cuthbert, among other things, pressured Program doctors to change their diagnoses, drafted a medical record under a doctor's name, and prepared third-party affidavits that included specific language that was not actually unique to the Players. (*See id.* at 2–3.) The Audit Report found that these constituted material misrepresentations, made for the purpose of securing awards. (*Id.* at 48) Finally, the Audit Report found some evidence, based on expert AAPLC opinion, that Mr. Cuthbert coached his clients on how to perform during their exams. (*See id.* at 16–34, 49.) When questioned by the Claims Administrator during the investigation, Mr. Cuthbert directly lied (*see id.* at 24) and, even after Mr. Cuthbert received a draft of the Audit Report and spoke to the Claims Administrator about these issues, Mr. Cuthbert continued to submit unreliable records and "[i]nstead of working with [the Claims Administrator], he worked to further entrench his unsupportable position, [which] has placed an extra and unnecessary burden on the Program" (*see id.* at 41–49).

The Special Masters accepted the referral of the Audit Report pursuant to Section 10.3 of the Settlement Agreement and the Audit Rules. Following additional briefing by Mr. Cuthbert and the NFL Parties, the Special Masters issued their Rule 27 Decision on June 28, 2023, "adopt[ing] the factual findings of the Claims Administrator" including that "Mr. Cuthbert knowingly used unreliable Amyloid PET scans, attempted to have Diagnosing Physicians change their diagnoses, and drafted both medical records and third party affidavits," and that "Mr. Cuthbert was not truthful in responding to the investigatory process, making it more difficult for the Claims Administrator to carry out its duties." (Decision at 3–4.) Indeed, the Special Masters found that "Mr. Cuthbert's wrongful conduct—and his unrepentant behavior when confronted with the problems he caused—was persistent." (*Id.* at 5.) The Decision concluded that Mr. Cuthbert's "conduct led to multiple

material misstatements in claims submitted on behalf of Settlement Class Members. It has diverted the attention of the Claims Administrator, raised the administrative cost of this Program, and ultimately harmed his clients." (*Id.* at 6.) Accordingly, the Special Masters found that Mr. Cuthbert "plainly failed" to meet his burden "to show 'that there is no reasonable basis' for the Claims Administrator's factual findings about his misrepresentations and omissions"—indeed, the Special Masters characterized Mr. Cuthbert's briefing as "tendentious when it was not evasive." (*Id.* at 3) In light of Mr. Cuthbert's "persistent" and "unrepentant" conduct, the Special Masters issued remedies pursuant to Section 10.3(i) of the Settlement Agreement, including (i) denying 12 claims directly implicated in the Audit; (ii) directing the Claims Administrator to review all unpaid claims currently or formerly represented by Mr. Cuthbert, and deny them if they are supported by an unreliable PET scan or if the Claims Administrator cannot certify that the claim is "entirely free of issues discussed in the Audit"; and (iii) censuring Mr. Cuthbert and ordering that a copy of the Decision be made available on the NFL Concussion Settlement Website, redacting all names other than those of Mr. Cuthbert and Dr. Eber. (*Id.* at 7). The Special Masters specifically noted that while they had the "power to bar Mr. Cuthbert and his law firm entirely from further participation in the Settlement Program," they "do not exercise this power today because we conclude that Mr. Cuthbert's conduct, though wrongful, was not provably malicious." (Decision at 6.) In response, Mr. Cuthbert filed the instant Objection, baselessly accusing the Special Masters and Claims Administrator of wrongdoing in their thorough investigation of Mr. Cuthbert and resulting Decision, and asking the Court to overturn the remedies the Special Masters directed pursuant to the Settlement Agreement.

## **ARGUMENT**

The Objection's legal arguments are meritless and its arguments challenging the Claims Administrator's extensive investigation and the Special Masters' factual findings are both

procedurally improper and substantively unfounded.

## I.    The Special Masters Applied the Correct Legal Standard

While the Objection contends that the Special Masters employed the wrong legal standard, the Special Masters employed the standard explicitly provided in Rule 28, finding that Mr. Cuthbert "plainly failed" to meet his burden under Rule 28 to "'establish[] that there is no reasonable basis' to support the Audit Report's finding 'that there has been a misrepresentation, omission, or concealment of material fact made in connection with a Claim by the Settlement Class Member.'"  (Decision at 1, 6 (quoting Rule 28); *see also* Rule 12 (standard of proof for Claims Administrator is "a reasonable basis to support a finding that there has been a misrepresentation, omission or concealment of a material fact").)

The Objection nonetheless asserts that the Decision ignored a purported "intent" requirement, but neither the Settlement Agreement nor the Audit Rules require that the Special Masters find "actual intent" to defraud the Settlement Program before issuing an adverse Rule 27 decision.  As described above, the Special Masters explicitly utilized the standard set forth in Rule 28.  In fact, Rule 28 further provides that "[t]he Special Master ***also may find*** such misrepresentation, omission or concealment was intentional if the record contains substantial evidence of such intent" (Rule 28 (emphasis added)), making abundantly clear that a finding of intent is not necessary for an adverse Rule 27 Decision, but is simply an additional finding the Special Masters may make.  Likewise, the Settlement Agreement provides that, in fashioning a remedy, the Special Masters "shall ***take into account*** whether the misrepresentation, omission, or concealment was intentional" (Settlement Agreement § 10.3(i) (emphasis added)), further demonstrating that a finding of intent is not required for an adverse Rule 27 decision, but is simply one factor the Special Masters are to consider when determining remedies.  And that is precisely what the Special Masters did here:  they explicitly chose not to exercise their power to bar Mr.

Cuthbert and his law firm from all further participation in the Settlement Program based on their conclusion that "Mr. Cuthbert's conduct, though wrongful, was not provably malicious." (Decision at 6.) There is no basis in the Settlement Agreement or Rules for "proof of 'actual intent'" (Objection at 2) to support an adverse Rule 27 Decision;[1] the Special Masters' finding on "actual intent" properly informed their choice of remedies.[2]

## II. The Special Masters Did Not Modify The Settlement Agreement's Injury Definitions

The Objection next claims that the Decision improperly modified the Settlement Agreement's Injury Definitions because the Claims Administrator utilized "Standardized Uptake Value ratio (SUVr) software instead of trained radiologist physical eye review" when evaluating the reliability of the PET scans Mr. Cuthbert pushed onto MAF Physicians despite his knowledge that they were unreliable. (Objection at 3–4.) The use of SUVr—"the most widely used and established metric" for measuring amyloid burden (*see* Ex. 1 at 3512)—has nothing to do with the Injury Definitions and falls well within the Claims Administrator's well established discretion to both "undertake or cause to be undertaken further verification and investigation, including into the nature and sufficiency of any Claim Package" and the Claims Administrator's broad investigative

---

[1] The Objection relies on a snippet of a 2019 order for this putative "actual intent" requirement. (Objection at 2 (citing Order at 2, ECF No. 10811).) In that Order, the Court states that, in the audit program, the Claims Administrator "reviews claims to determine whether any intentional misrepresentation, omission, or concealment occurred." But the Order in no way suggests that only intentional misrepresentations can support an adverse Rule 27 decision. Nor is it credible to suggest that this shorthand description of the audit process constituted a *sub silentio* amendment to the Settlement Agreement and Audit Rules. To the contrary, the Order made clear that the Settlement Agreement provides the Claims Administrator with "broad discretion," and that the Audit Rules—which provide the standard applied by the Special Masters—"are fully consistent with the text of the Settlement Agreement." (*Id.* at 3–4.)

[2] The Objection also argues that the Special Masters' decision to "deny 12 claims without reviewing the facts and merits of each case" is a "violation of due process" (Objection at 3 & n.8), but the Settlement Agreement—which was approved by this Court and affirmed by the Third Circuit—grants the Special Masters the express discretion to order relief as the Special Master deems appropriate, which includes "without limitation," "den[ying] . . . the claim[s]" at issue." (Settlement Agreement § 10.3(i).) In all events, Class Members do not have any "vested interest [in] their monetary awards" until, at the absolute earliest, when the NFL Parties deadline to object to a claim's inclusion on a funding request has passed. The Claims Administrator's investigation and Special Masters' Decision were proper under the Settlement Agreement and Audit Rules, and were consistent with due process.

powers under the Audit Rules. (Settlement Agreement § 8.6(b), Art. X.) Accordingly, the Objection's contention that the Decision modified the Injury Definitions, despite never mentioning those Injury Definitions, much less purporting to modify them, is without merit.

## III. The Objection Is Procedurally Improper And Substantively Baseless

The remainder of the Objection attempts to challenge the Special Masters' findings and remedies—rather than their conclusions of law—based on unfounded claims of discrimination and other procedural complaints concerning the conduct of the audit. Although the Objection repeatedly cites the inapplicable standard on a motion for reconsideration (which Mr. Cuthbert also cannot meet) (Objection at 3, 4), it elsewhere appears to acknowledge that the Objection may only challenge "the conclusions of law stated by the Special Masters" (*id.* at 1) and that the applicable standard is whether "no reasonable person would adopt the [Special Masters'] view" (*id.* at 7–8). Mr. Cuthbert plainly cannot meet that high bar here.

### 1. <u>The Decision Was Not Discriminatory And Did Not Violate 42 U.S.C. § 1981</u>

The Objection argues that the Decision "was unreasonable because it violated 42 U.S.C. § 1981" based on utterly unfounded allegations that "the actions of the Claims Administrator," in discriminating between similar claims based on the race of the attorney that filed them and in recommending that Mr. Cuthbert work with non-Black attorneys, constituted racial discrimination proscribed by Section 1981. These allegations, which were never made to the Special Masters, have no basis in reality.

*First*, the Objection claims that the Claims Administrator violated Section 1981 because two claimants whose Claim Packages included potentially unreliable PET scan readings by Dr. Eber received monetary awards and the "only obvious distinction is that these individuals [previously represented by Mr. Cuthbert] are now represented by non-black attorneys." (Objection at 4.) In fact, the Objection ignores the more pertinent distinction: these two monetary awards

were received before the Audit Report had been issued as well as the crucial fact that, before the Audit Report had been issued, ***at least seven claimants*** still represented by Mr. Cuthbert whose claim packages contained potentially unreliable PET scans also received monetary awards.[3] The determinative issue was clearly the timing of the Claims Administrator's processing of the claim in relation to the issuance of the Audit Report and not the race of the attorney. The allegations of discrimination are entirely meritless (and appear to have been made in bad faith).[4]

*Second*, the Objection contends that the Claims Administrator also engaged in racial discrimination when it recommended that Mr. Cuthbert be paired with an attorney mentor experienced in the Program and suggested two non-Black attorneys (who were not acceptable to Mr. Cuthbert) but rejected Mr. Cuthbert's desire to be mentored by a Black attorney. (Objection at 6–7.) While the Objection characterizes the Black attorney as "experienced," it fails to mention the important fact that he had no experience in the Program. The Objection's contention that "the Claims Administrator issued its Rule 15 Audit Report in retaliation for Mr. Cuthbert's refusal to hand over his clients to [two non-Black attorneys]" is baseless. Having uncovered significant evidence that "call[ed] into question Mr. Cuthbert's character, motivations, and relationship with the Program," the Claims Administrator could have issued an adverse audit report at that time. (Audit Report at 41.) Instead, the Claims Administrator generously offered Mr. Cuthbert the opportunity to "work closely with another lawyer who represents Settlement Class Members and who is knowledgeable about the Program" with the intent of allowing "Mr. Cuthbert to improve

---

3 (SPIDs 100005068, 100000597, 100015454, 100003809, 950002014, 100006961, and 100014702.) Moreover, the fact that potentially unsubstantiated claims were paid before the Claims Administrator fully uncovered information casting doubt on the reliability of the PET scans and the extent of Mr. Cuthbert's misconduct does not mean that the Claims Administrator is thereafter obligated to pay all future claims relying on such unreliable Claims Packages. Such a result would make a mockery of the Settlement Agreement and its Audit protections.

4 The Objection also claims that "Joseph Harris' claim has been removed from audit although Mr. Harris is in the Audit Report and Mr. Higgs is not," purportedly because Mr. Higgs is now represented by a non-Black attorney. (Objection at 6.) Contrary to Mr. Cuthbert's claims, however, *both claims* were appropriately denied as a result of the Decision, so the argument that these claimants were treated differently is yet another unfounded allegation.

his practices and re-establish a trusted relationship with [the Claims Administrator]." (*Id.*) Mr. Cuthbert's counsel initially "indicated that the proposal was reasonable," and the Claims Administrator provided him "with the names of two lawyers with extensive Program experience." (*Id.*) Shortly thereafter, however, Mr. Cuthbert's counsel informed the Claims Administrator that Mr. Cuthbert would not work with either of the attorneys that were suggested and would instead work with Rod Edmond, an attorney who has never represented a Class Member in the Program, and then Mr. Edmond stopped responding to the Claims Administrator's attempted outreach. (*Id.* at 42–43.)[5] This "surprised" the Claims Administrator, who believed "that Mr. Cuthbert had agreed to contact and work with one of the lawyers whose names [were] provided, ***or at least someone knowledgeable with the Program***." (*Id.* (emphasis added).) Thus, the recommendation of the Claims Administrator—who had no obligation whatsoever to attempt to rehabilitate Mr. Cuthbert—and its issuance of the Audit Report, had nothing to do with the race of Mr. Cuthbert, Mr. Edmonds, or the attorneys the Claims Administrator suggested Mr. Cuthbert contact, and instead was the direct result of Mr. Cuthbert's well-documented misconduct and his refusal to work with someone "at least knowledgeable with the Program," or to meaningfully engage with the Claims Administrator. The extreme lengths the Claims Administrator went to *help* Mr. Cuthbert certainly were not a violation of due process or Section 1981.

2. The Decision Was Not Arbitrary or Unreasonable

Finally, the Objection asserts that the Decision was "arbitrary and unreasonable" because it was "based on insufficient evidence and hearsay" and "violated due process," but these complaints represent a transparent attempt to challenge the Special Masters' factual findings,

[5] Indeed, Mr. Edmond's email to the Claims Administrator stating that Mr. Cuthbert asked him to assist "in moving his NFL CTE claims through the process," demonstrates Mr. Edmonds' unfamiliarity with the Program, as none of Mr. Cuthbert's clients assert a Qualifying Diagnosis of Death with CTE and the deadline to submit such claims passed over four years ago. (*See* Audit Report at 42–43.)

which is plainly improper under the Audit Rules, which provide that "[t]he decision of the Special Master on a referred Audit Report is final and binding on the Parties to the Audit Proceeding and the Claims Administrator and is not subject to appeal or review by the Court, except that . . . the Court will review de novo . . . any objection to the Special Master's conclusions of law." (Rule 33.) As a result, any portion of the Objection attempting to relitigate the Special Masters' factual determinations should be denied as procedurally improper. Even if the Objection's arguments were not procedurally improper, however, they are substantively baseless and come nowhere close to demonstrating that "no reasonable person" would reach the Special Masters' conclusions.

*First*, Mr. Cuthbert argues that the Decision was based on insufficient evidence and hearsay, including because the Claims Administrator did not identify the three lawyers and the prospective clients who provided *anonymous* tips, and thus Mr. Cuthbert could not "confront" them and "personally refute their allegations." (*See* Objection at 8.) These complaints are meritless. The Claims Administrator undertook an exhaustive investigation into Mr. Cuthbert's wide-ranging misconduct over the course of four years, resulting in a 225-page Audit Report. Each finding in that Audit Report (and the Special Masters' Decision) is supported by ample evidence the Claims Administrator uncovered during the course of its extensive investigation.[6] Moreover, despite Mr. Cuthbert's attempt to invoke the Federal Rules of Evidence, they do not apply in audit proceedings under the Settlement Agreement and Audit Rules.[7]

Mr. Cuthbert also vastly overstates the import of the anonymous tips received by the

---

[6]  For example, the Objection claims that the allegation that Mr. Cuthbert promised Class Members Alzheimer's diagnoses, is a "blatant lie" that he could have disproved based on boilerplate language in his retainer agreements disclaiming any guaranteed outcome. (Objection at 8.) But language in a boilerplate retainer agreement language does not exclude the possibility that Mr. Cuthbert promised diagnoses to former players and, in all events, the anonymity of the tipsters clearly did not preclude Mr. Cuthbert from making the argument.

[7]  The Objection also takes issue with the Special Masters' denial of Mr. Cuthbert's request that the Special Masters conduct a hearing and take testimony (Objection at 9), but the Audit Rules allow only oral argument in the Special Masters' discretion, and expressly prohibit "testimony, cross-examination, or other evidentiary hearing[s] on an Audit Proceeding." (Rule 24.)

Claims Administrator. Many of these (including all of the attorney tips) were received more than three years before the Claims Administrator issued the Audit Report, and the findings in the Audit Report (and Decision) were based on the Claims Administrator's subsequent investigation. Anonymous tips are a key tool for uncovering potential misconduct in the Settlement Program, and revealing tipsters' identities—whether the tipsters are lawyers or class members—would have a significant chilling effect and impede the Claims Administrator's efforts to identify fraud in the Program. Nothing in the Settlement Agreement or Audit Rules gives Mr. Cuthbert the right to the identity of anonymous tipsters or the right to confront them.

*Second*, the Objection claims that Mr. Cuthbert's due process rights were violated because he was dealing with a family issue when he agreed to be interviewed. This argument is barred because it attempts to present new evidence that was not in the Record of the Audit Proceeding before the Special Masters. (*See* Rule 34(c) ("no party may refer to or attach any evidence that was not in the Record of the Audit Proceeding before the Special Master").) In any event, nothing in the Settlement Agreement or Audit Rules allows Mr. Cuthbert to dictate the terms of his interview, and the Special Masters' conclusion that he "dissembled" during that interview was not based on Mr. Cuthbert's "frame of mind," but instead on statements he made which were "simply not true." (Decision at 2 & n.3.)

The Claims Administrator's painstaking multi-year investigation into Mr. Cuthbert's misconduct was entirely consistent with the Settlement Agreement, the Audit Rules, and due process, and the Objection does not remotely meet the requisite standard of showing that "no reasonable person" would have adopted the Special Masters' conclusions.

## CONCLUSION

For the foregoing reasons, the NFL Parties respectfully request that the Court deny the Objection and affirm the findings of the Special Master.

Dated: August 28, 2023

Respectfully submitted,

/s/ Brad S. Karp

PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
Brad S. Karp
Bruce Birenboim
Claudia Hammerman
Lynn Bayard
1285 Avenue of the Americas
New York, NY 10019-6064
Tel: (212) 373-3000
bkarp@paulweiss.com

*Attorneys for the National Football League and NFL Properties LLC*

**SUPPLEMENTAL OBJECTION STATEMENT TO AUDIT RULE 27 DECISION**

**BACKGROUND**

On 3/3/23 BrownGreer PLC ("BrownGreer" and "the Claim Administrator") referred to the Special Master an Audit Report dated 2/15/23, regarding 12 claims filed by Byron Cuthbert and Associates, LLC ("BCA" and "Attorney Cuthbert") on behalf of Settlement Class Members ("SCM" or "SCMs").[1] Attorney Cuthbert represents a little over 200 Settlement Class Members (18 claims have been awarded, with 40 more claims pending). Of the 40 pending claims, 19 are being processed with 21 claims now being the subjects of this Audit Decision. BCA provided objection to the 12 Class Members that were the original subjects of the Audit Rule 27 decision. This objection *infra* will supplement and address the additional individual facts of Class Members claims that have been denied utilizing the Audit Rule 27 decision maded based on the Audit Report in the exhibits number 1-23. [2] On July 2, 2023, Pursuant to Rule 27 of the Rules Governing the Audit of Claims, BrownGreer provided Mr. Cuthbert with the Special Masters Decision[3] of the BCA Audit Proceeding. On July 28, 2023, the Claims Administrator issued notice of the decisions to the 12 settlement class members and 9 additional settlement class members to make a total of 21 settlement class members claims to be denied. Pursuant to Rule 34, BCA and Attorney Cuthbert object to the Rule 27 Decision, specifically the conclusions of law stated by the Special Masters and respectfully request that this Court consider the responses below for a de novo review, and modify or reverse the Special Master's conclusions and order such other further relief as the Court deems appropriate.

**OBJECTIONS TO CONCLUSIONS OF LAW**

**I. The Special Masters Review applied the wrong legal standard.**

The Special Masters stated the following standard in their decision as follows, "Ultimately, we are charged under Rule 28 with determining whether Mr. Cuthbert has 'established that there is no reasonable basis' to support the Audit Report's finding 'that there has been a misrepresentation, omission or concealment of a

[1] Multiple of the class members whose claims are being audited are not referenced in the Audit Report.
[2] Refer to Exhibit **B - Cuthbert Response to Audit exhibits 1 – 12** for the Individual facts to each Class Member.
[3] Refer to Exhibit **A**

material fact made in connection with a Claim by the Settlement Class Member." Under the Audit Rules the Audit Report does not have to show intent. Audit Rule 28 does not epxlicitly exclude the intent requirement, and in previous decisions, Judge Brody established the appropriate standard with the following, "A central piece of this …audit program, through which the Claims Administrator reviews claims is to determine whether any **intentional** misrepresentation, omission, or concealment occurred."[4] Thus, the Special Masters condemned and censured Attorney Cuthbert and denied the 12 Players claims by applying the wrong legal standard as stated by Judge Brody because the Special Masters ignored the "intent" requirement for misrepresentation, omission, or concealment. The following analysis supports that their decision was made based on the wrong standard, "the Claims Administrator did not find that Mr. Cuthbert filed a Claim knowing it rested on falsified documentation… does not clear Mr. Cuthbert from wrongdoing." Further analysis, supports the decision was made based on the wrong standard, "his conduct evidenced a sustained attempt to secure Claim Awards using medical records that Mr. Cuthbert knew, or should have known, were defective." The standard "knew or should have known" is a negligence standard. This shows the Special Masters made the decision without proof of "actual intent" which is a necessary element to find misrepresentation, omission, or concealment. The Rule 27 Decision did not meet that burden because Mr. Cuthbert did not "knowingly" present unreliable Amyloid Pet Scans.[5] The timeline shows that Mr. Cuthbert presented medical records based on board certified radiologists medical opinions to support the claims.[6] The Special Master Decision shows there was no intent, "we concluded that Mr. Cuthbert's conduct, though wrongful, was not provably malicious". The Decision goes on to broadly deny 12 claims and now 9 additional claims for a total of 21 claims without reviewing the facts and merits of each case. [7] Further analysis of their Decision shows there

---

[4] Refer to Case 2:12-md-02323-AB Document 10811 Filed 08/20/2019

[5] See Exhibit **B -** Cuthbert's Response to Audit Report section I. Attorney Did Not Use Unreliable PET Scans. Refor to footnote 8 in Cuthbert's Response section I where the Claims Administrator acknowledge there is no basis for this allegation.

[6] See Exhibit **B -** Cuthbert's Response to Audit Report section I. Attorney Did Not Use Unreliable PET Scans

[7] This is a violation of due process. see Truax v. Corrigan, 257 U.S. 312, 320, 42 S. Ct. 124, 125, 66 L.Ed. 254, 258 (1921) The due process clause requires that every man shall have the protection of his day in court, and the benefit of the general law, a law which hears before it condemns, which proceeds not arbitrarily or capriciously but upon inquiry, and renders judgment only after trial, so that every citizen shall hold his life, liberty, property and immunities under the protection of the general rules which govern society. The **Decision denies the Settlement**

was a lack of evidence of intent with respect to the allegation of coaching Players, "however, like the Claims Administrator, we are not sure that Mr. Cuthbert coached Players…Id.at 34." This further supports the fact that their Decision was made utilizing the wrong standard and insufficient evidence.

**II. The Decision was arbitrary and unreasonable because it violated the SCM's Due Process**

In order to prevail on a motion for reconsideration, the moving party must demonstrate, "the need to correct a clear error of law or fact or to prevent a manifest injustice." *Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999). The Decision is arbitrary and abused discretion because it goes on to broadly deny an additional 9 claims along with the first 12 claims without reviewing the facts and merits of each case and providing explanation of how the facts align to any malfeasance. In the **Notices** provided by the Claims Administrator, it just states, " **Pursuant to the Special Masters' decision, your claim is denied.** This decision is final and binding pursuant to the Court's July 13, 2016 Order (Doc. No. 6871)." The Special master stated, "The task of separating out the genuine from the tainted in the medical evidence behind each Qualifying Diagnosis would be difficult, time- consuming, and in our experience unlikely to lead to successful submissions based on the existing medical records." This is an over broad determination that denies the SCMs due process because it allows for denying claims without any proof of malfeasance with the individual claim.

The reason the issues described in the Audit are difficult to weigh is because there is no substantial evidence to show the issues truly exists for each individual claim**.** As stated earlier, the due process clause in the fifth amendment and the fourteen amendment and as described in Truax v. Corrigan, 257 U.S. 312, 320, 42 S. Ct. 124, 125, 66 L.Ed. 254, 258 (1921) due process requires that every man shall have "the protection of his day in court, and the benefit of the general law, a law which hears before it condemns,..." As expressed in the exhibits, several of the claims are being denied when their clinical findings and their PET scans were found

---

**class members:** Harlan Huckleby, Jeff Griffin, Ezra Johnson and Mark Higgs **from their vested interest of their monetary awards after the appeal deadline clearly elapsed**; **the Decision denied claims on appeal:** Donald Evans, Brent Fullwood , Gerald Perry, Rory Graves, and Tommy Barnhardt without any actual evidence of coaching. **The Decision denies claims that are not referenced in the Audit Report** with the Settlment class members claims including: Joe Cocozzo, Jackie Walker, and Stan Edwards.

reliable by the Claims Administrator radiologist. As expressed in the exhibits, other claims have history of medical records including years of treatment from outside doctors of cognition of impairment and have no evidence of any affidavits with overlapping language. As expressed in the exhibits, other claims have been denied where they were diagnosed by other doctors who did not report any undue influence. None of the doctors changed any of their medical findings based on any alleged "pressure". Two of those alleged doctors stated the allegations and statements in the Audit Report are not accurate. This information was provided in Cuthbert's response to the Audit Report but the Special Masters refused to have a hearing so the matter could be properly heard. Lastly, other claims are being denied for "potential coaching of SCM" with no objective proof to support this allegation. For the above reasons, this Decision is overly broad, arbitrary, and abused discretion because it allows for the Claims Administrator and the Special Masters to deny a total of 21 claims worth over a total aggregate amount of $30 million dollars of benefits without providing an explanation of how the facts align to any malfeasance. This is a manifest injustice that only the Court can prevent because it is violating the due process of 21 SCM claims.

## III. The Special Masters abused their discretion because their Decision improperly modified the Settlment Agreement Injury Protocols.

In order to prevail on a motion for reconsideration, the moving party must demonstrate, "the need to correct a clear error of law or fact or to prevent a manifest injustice." [8] *Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999). The Rule 27 Decision procedurally violates and materially modifies the unabigous terms in section 6.6 of the Settlment Agreement about injury protocols for qualifying diagnosis and medical science guidelines for the 10-year timeframes.[9] Section 6.6(b) of the Settlement

---

[8] See Definition of Manifest Injustice - As found in *Black's Law Dictionary,* a manifest injustice is defined as "'[a]n **error in the trial court that is direct, obvious and observable** such as a defendant's guilty plea that is involuntary . . . .'" In re Looper, 2007 Bankr. LEXIS 2071, 2007 WL 1725251, at *2 (Bankr. E.D. Tenn., June 12, 2007) (quoting *Black's Law Dictionary* 974 (7th ed. 1999)).What is clear from case law, and from a natural reading of the term itself, is that a showing of manifest injustice requires that there exist a fundamental flaw in the court's decision that without correction would lead to a result that is both inequitable and not in line with applicable policy." In re Bunting Bearings Corp., 321 B.R. 420, 423 (Bankr. N.D. Ohio 2004).

[9] Refer to **FAQ 28 -** Periodically, but not more than once every 10 years, Class Counsel and the NFL Parties will discuss possible changes to the definitions of the Qualifying Diagnoses and/**or the protocols for making them**, in light of generally accepted advances in medical science. **Refer to Section 6.6. of the Settlment Agreement** - No such modifications **can be made absent written agreement between Co-Lead Class Counsel and Counsel for the NFL Parties and approval by the Court,** and neither Co-Lead Class Counsel nor Counsel for the NFL Parties

Agreement, explains a diagnosis cannot be made solely off imaging technique and a player must experience actual cognitive impairment and/or actual neuromuscular impairment. However, the DSM-5, section 6.6(b) combined with sections 6.4(b) and 6.3(b) of the Agreement, and FAQ #118 provide that the MAF doctors can use imaging techniques as long as actual cognitive impairment and/or actual neuromuscular impairment is experienced by the Retired NFL Football Player. Specifically, FAQ 118 states, "Amyloid PET," is meant to assist clinicians in detecting whether Alzheimer's Disease is the cause of cognitive impairment."[10] As provided in the individual reports, the MAFs found clinical cognitive impairment and used the PET imaging as a supporting factor for the Alzheimers Diagnosis. The denial purports to be based solely on an allegedly unreliable PET scan with no consideration to the MAF physician diagnosis. This amounts to a breach of the Settlement Agreement due to the deviation from the agreed-upon injury protocols agreed to by the NFL Parties and Class Members. Specifically, Section 6.3(b) of the Settlement Agreement is clear that an Alzheimer's diagnosis cannot be based on anything but the opinion of a qualified MAF physician. See Section 6.3(b) Settlement Agreement and Exhibit A-1, Paragraph 3 of Settlement Agreement. Even assuming arguendo that the Dr. Eber report was not reliable, the reliability is not material to the claims because the Alzheimer's diagnosis <u>cannot</u> be based solely on a PET scan and there was other evidence of cognitive impairment consistent with the Alzheimer's diagnosis determined by the MAFs opinion. Also, there is no mention in the injury protocol nor the settlement agreement terms that "Standardized Uptake Value ratio (SUVr)" software is required for imaging. This is BrownGreer, the AAP, the NFL and the Special Masters inseting a requirement into the Settlement Agreement that simply does not exist. This **new requirement** for the use of the "Standardized Uptake Value ratio (SUVr)" software instead of trained radiologist physical eye review exceeds the standard and unduly challenges the interpretation of the two radiologist findings beyond the manufacture

---

shall seek modification to the definitions of Qualifying Diagnoses and/or the protocols for making Qualifying Diagnoses other than with the written agreement of the other regarding such modifications.

[10] Per DSM-5 under Major or Mild Neurocognitive Disorder Due to Alzheimer's Disease page 613 subsection Diagnostic Markers, the DSM-5 states the following:Since amyloid beta-42 deposition in the brain occurs early in the pathophysiological cascade, amyloid-based diagnostic tests such as amyloid imaging on <u>brain positron emission tomography (PET) scans and reduced levels of amyloid beta-42 in the cerebrospinal fluid (CSP) may have diagnostic value</u>

guidelines and FDA requirements for Amyloid PET Imaging. This new SUVr requirement materially and rectroactively modifies section 6.6 of the Settlement Agreement by making and implementing a new injury protocol requirement for imaging that was not utilized, or required from 2017 through 2022, that is, the period covered by the Settlement Agreement.[11] The modification did not follow the procedural requirements of section 6.6 of the Agreement. That is not a fctual issue but its an issue of law this Court must correct.[12] This demonstrates that the Rule 27 Decision improperly modified the concussion injury protocol and is therefore not in line with the Settlement and clearly erroneous.

IV. **The Rule 27 Decision was unreasonable because it violated 42 U.S.C. § 1981**

In order to prevail on a motion for reconsideration, the moving party must demonstrate, "the need to correct a clear error of law or fact or to prevent a manifest injustice." *Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999). The Decision supports a violation of 42 U.S.C. § 1981.[13] The Special Masters' Decision recommends denial of claims with medical imaging read by Dr. Eber despite the fact that BrownGreer allowed the claims of BCA's former clients Felix Wright and Bobby Abrams to be processed using the medical imaging and diagnosis by the same doctors that Attorney Cuthbert used to support his claims. The science is the same, so why are the claims being treated differently? What is the difference? The only obvious distinction is that these individuals are now represented by non-black attorneys, Amir Shenaq and JR Wyatt. This demonstrates the bias against and discrimination toward Mr. Cuthbert, a black attorney and a member of a protected class, and his clients, including but not limited to, Stan Edwards, Jackie Walker,

[11] Refer to **Exhibit B – exhibit number 13-** evidence of previous monetary awards that include or considered Dr. Eber medical imaging reports.

[12] See " Doe v. Trs. of the Univ. of Pa., 270 F. Supp. 3d 799, 811 (E.D. Pa. 2017) The meaning of an unambiguous written instrument presents a question of law for resolution by the court (emphaisis added).

[13] See Crane v. Mary Free Bed Rehab. Hosp., 634 F. App'x 518, 519 (6th Cir. 2015) A discrimination case relying on circumstantial evidence is analyzed under the burden-shifting framework delineated in McDonnell Douglas, and later clarified in Texas Department of Community Affairs.To establish a prima facie case for race discrimination under 42 U.S.C.S. § 1981, a plaintiff must show that **(1) she belongs to an identifiable class of persons who are subject to discrimination based on their race; (2) the defendant intended to discriminate against her on the basis of race; and (3) the defendant's discriminatory conduct abridged a right enumerated in § 1981(a).** Under Michigan's Elliott-Larsen Civil Rights Act, a plaintiff may prove disparate treatment by showing that she was a member of a protected class and that she was treated differently than members of a different class for the same or similar conduct.

Gerald Perry and the others with Amyloid PET Scans. The Special Masters' decision supports the disparate treatment in which BrownGreer considers the PET scan findings related to Mr. Cuthbert's claims to be unreliable while BrownGreer is actively processing and approving other law firms' claims that are filed by white attorneys with medical evidence provided by Dr. Eber, Dr. Dineen, and MAF doctors.

For example, the Claim Administrator processed and awarded an Alzheimer claim, **SPID 100017085 Felix Wright[14],** with Justin Wyatt as the lead attorney **within the time frame** consistent with the Settlement Agreement. This claimant fired BCA when **the MAF** failed to publish the medical report until after a delay of one (1) year. It is not a coincidence that the settlement class member hired the white attorney, Justin Wyatt, who Brown Greer recommended that Mr. Cuthbert accept as a mentor.[15] However, in another Alzheimer's claim, from the same MAF, **SPID 100004410 Stan Edwards,** that was not processed within a timeframe consistent with the Settlement Agreement, where BCA was the primary lead counsel, the Special Masters recommended denial. Additionally, **SPID 100000021 Bobby Abrams[16]** was awarded a monetary award on September 20, 2021. The appeal deadline was October 20, 2021, and there wasn't an appeal filed. Bobby Abrams' funds should have been disbursed around December 20, 2021. BrownGreer audited the claim on January 4, 2022. Judge Strawbridge ordered the fees to be released on June 10, 2022. Nevertheless, Bobby Abrams did not receive any funds while represented by BCA. BrownGreer revoked the award after the appeal deadline. The funds were not processed timely. As a direct and proximate result, Bobby Abrams terminated BCA on or around December 21, 2022 due to the Administrators' refusal to administer the process and disburse the monetary award pursuant to the terms of the Settlement Agreement. Subsequently, Bobby Abrams hired a law firm, Shenaq, PC, (another non-black Attorney), that BrownGreer also recommended Attorney Cuthbert use as a mentor to process claims.[17] Bobby Abrams monetary award was awarded shortly afterwards, sometime in 2023. Lastly, SPID **100006836 Mark Higgs[18]** hired another white attorney, Geoff Gibbon, of the law firm Fassyoux and Landis. Mr. Higgs Alzheimer's claim was filed with medical records from Dr. Dineen, Dr. Eber,

---

[14]  Refer to exhibit **B – exhibit number 16 – Documents Related to Felix Wright Claim**
[15] Refer to and read section 3(b) herein
[16] Refer to exhibit **B – exhibit number 17 – Documents Related to Bobby Abram Claim**
[17] Refer to and read section 3(b) herein
[18] Refer to exhibit **B – exhibit number 15 –Documents Related Mark Higgs Monetary Award Claim**

along with a report containing a negative result finding from Dr. Siegel in his file. Mr. Higgs' claim was awarded within 2 months of filing, on or about April 8, 2023, without an appeal. **Mark Higgs'** approval has now been added to the Audit, after BCA raised this as an issue. Whereas, **Joseph Harris'** claim has been removed from the Audit after he terminated BCA, although, Mr. Harris is in the Audit Report and Mr. Higgs is not. This procedure is improper, unreasonable, and a violation of the Players' due process rights.[19] The Players are entitled to equal treatment in the Audit Review process by applying the same standard formulated in the Settlement Agreement. BrownGreer has a duty to process claims consistently. As a reminder provided in section 3(a) of the original objection, JR Wyatt and Shenaq are the non-black attorneys Brown Greer endorsed Mr. Cuthbert to hand over his clients to in order for the claims to be processed.[20] BrownGreer's processing and awarding Alzheimer's claims filed by other attorneys endorsed by Brown Greer, utilizing the medical records previously arranged by Mr. Cuthbert, while auditing and disputing all claims filed by Mr. Cuthbert, a black attorney, shows a pattern of discrimination, disparate treatment, and consequential economic injury. Allowing this decision to stand violates 42 U.S.C. § 1981 by denying Attorney Cuthbert, a black attorney, and the 21 Settlement class members "the same right in every State and territory to make and enforce contracts, ... as is enjoyed by white citizens".

V. **The Special Masters' Decision was arbitrary and unreasonable because their Decision was based on insufficient evidence and hearsay.**

A Court may only set aside the Special Masters' ordered relief if the Special Masters abused their discretion. Fed. R. Civ. Pro. 53(f)(5). "An abuse of discretion occurs only where the [Special Masters'] decision is 'arbitrary, fanciful, or clearly unreasonable'—in short, where 'no reasonable person would adopt the [Special Masters'] view. The Rule 27 Decision was unreasonable because it was made with insufficeient evidence and many different hearsay statements to support their Decision. [21] Nowhere in the Factual and Procedural Background section is it acknowledged by the Special Masters that, in the investigation by BrownGreer of the

[19] See Truax v. Corrigan, 257 U.S. 312, 320, 42 S. Ct. 124, 125, 66 L.Ed. 254, 258 (1921)

[20] See exhibit C - communications endorsing attorneys

[21] See USCS Fed Rules Evid R 801(3)(c) **Hearsay.** "Hearsay" means a statement that: **(1)** the declarant does not make while testifying at the current trial or hearing; and **(2)** a party offers in evidence to prove the truth of the matter asserted in the statement.

accusations made, beginning in January of 2019, and continuing through March of 2022, Mr. Cuthbert was provided the names of the 3 attorneys who alleged that he purportedly guaranteed perspective clients that he could win them a monetary award using Amyloid PET Scans, despite Mr. Cuthbert's continual requests. This allegation is a blatant lie because the BCA Retainer, which can be found in many settlement class members' portals, clearly shows that BCA Retainer, ( which is executed by all clients), provides a disclaimer against any gurantees. [22] BrownGreer's 235 page Audit Report lacks any indication that Mr. Cuthbert's active clients were interviewed by telephone or email regarding the veracity of the allegations. Instead, the Claim Administrator chose to rely on 3 unidentified attorneys with no objective evidence but subjective opinons who wanted to poach BCA's clients, and who obviously had a nefarious motive for attempting to get BCA removed from the Settlement Program.[23] The Claim Administrator never provided the names of the individuals who supposedly made the allegations so that BCA could confront them and personally refute their allegations. BCA could not verify whether he had ever spoken to these potential clients, or had contact with them by email, text or had recorded voice conversations with them. This is but one example of BrownGreer accusing BCA of something without providing him with specific information to rebut the allegations prior to its issuance of it's report. It was stated that BrownGreer interviewed nineteen individuals, many whose names were not provided to BCA. BCA only knows the Doctors names.

Further, the conclusion that "Mr. Cuthbert's communications with MAF Physicians Dr. Kevin Weber, Dr. Alan Lerner, and Dr. Jack Scariano "ran afoul of this standard" was made with insufficient evidence because Counsel Manny Arora contacted the two medical providers (Dr. Scariano and Dr. Lerner), in accordance with FAQ 95, and he was advised by the doctors that the allegations and statements in the Audit Report are not accurate. Also, Dr. Schwartzbard provided she did not consider Mr. Cuthbert unethical. This information was provided in Cuthbert's response to the Audit Report. Additionally, none of the doctors changed any of their

[22] See retainer language: DISCLAIMER. Notwithstanding anything to the contrary, Byron Cuthbert & Associates, LLC does not expressly or implicitly guaranty, represent, warrant or covenant that any NFL Concussion settlement or award will be awarded or paid to the Client. Notwithstanding anything to the contrary, the Client expressly acknowledges and agrees that Byron Cuthbert & Associates, LLC has made the foregoing disclaimer

medical findings based on any alleged "pressure". Lastly, BrownGreer did not provide any evidence supporting any inference of malfeasance between Attorney Cuthbert and Dr. Lerner and Dr. Scariano. Under Audit Rule 24, Attorney Cuthbert respectfully requested that the Special Master conduct a hearing, so that they could take live testimony from Attorney Cuthbert, the relevant doctors, third parties and Class Members in order to make individual determinations as to the credibility and reliability of the conflicting evidence before making a ruling on the merits of the 5 allegations listed in the Audit Report. While the decision to have a hearing is in the discretion of the Special Masters, the fact that they refused to have the hearing and made their decision by applying the incorrect standard of review with insufficient evidence led to an improper conclusion of law. All the above hearsay evidence and statements were included without allowing Mr. Cuthbert the opportunity to address the individuals and accusers who made these statements. This violates Mr. Cuthbert's fifth and fourteenth amendments fundamental right to due process and to have an opportunity to address his accusers and defend himself against the allegations. [24] The Rule 27 decision was based on insufficient evidence and hearsay statements.[25] Therefore, it was arbitrary, unreasonable, and violated Mr. Cuthbert's due process.

## VI. Prayers for Relief

Byron Cuthbert & Associates, LLC and the Settlement Class Members pray for Relief as follows:

a) That a de novo review be granted;
b) That the Special Masters Rule 27 decision be reversed and dismissed;
c) Modify the Special Masters Rule 27 decision to order the 21 Players claims be processed and awarded based on the established policies and procedures of the Settlement Agreement;
d) Modify the Special Masters Rule 27 decision to direct BrownGreer PLC to award the 4 Players who had an established vested interest in their monetary awards prior to the Audit to be paid;
e) Modify to order the other 17 Players claims to be immediately reviewed individually and issued a decision based on the established policies and procedures of the Settlement Agreement;
f) Modify the order to deny publishing the Decision and Audit Report on the website;
g) Attorney Cuthbert asks your honor to modify the decision and order such other further relief as the Court deems appropriate that will provide justice to the Players and their families and to their attorney.

This 16th date of August, 2023.

Respectfully submitted,
By: /s/ Byron Cuthbert

***Byron Cuthbert & Associates, LLC***

---

[24]See the Due Process Clauses of the Fifth and Fourteenth Amendments also require confrontation as an element of due process.

[25] **Federal Rule of Evidence Rule 802. The Rule against Hearsay -** Hearsay is not admissible unless any of the following provides otherwise a federal statute; these rules [federal rules of evidence]; or other rules prescribed by the Supreme Court.

**CERTIFICATE OF SERVICE**

The undersigned does hereby certify that a true and correct copy of the foregoing Supplemental Objection Statement to Rule 27 was filed via email to the ClaimsAdministrator@nflconcussionsettlement.com and the NFL Concussion Settlment Portal designated by the Electronic Case Filing System in the United States District Court for the Eastern District of Pennsylvania, on all parties registered for *CM/ECF* in the litigation.

Date: August 16, 2023

Respectfully submitted,

/s/ Byron Cuthbert

***Byron Cuthbert & Associates, LLC***
1143 Cameron Creek
Marietta, GA 30062
Phone: 404-403-7855
Fax: 1(866) 990-9743

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323<br><br>Hon. Anita B. Brody |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*,<br><br>Plaintiffs,<br><br>v.<br><br>National Football League and NFL Properties LLC, successor-in-interest to NFL Properties, Inc.<br>Defendants. | Civ. Action No.: 14-cv-00029-AB |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | Hon. Anita B. Brody |

**RESPONSE OF THE NATIONAL FOOTBALL LEAGUE AND NFL PROPERTIES LLC IN OPPOSITION TO BYRON CUTHBERT & ASSOCIATES, LLC's SUPPLEMENTAL OBJECTION TO THE SPECIAL MASTERS' RULE 27 DECISION**

The National Football League and NFL Properties LLC (the "NFL Parties") respectfully submit this opposition to Byron Cuthbert and Associates, LLC's Supplemental Objection to the Special Masters' Rule 27 Decision (the "Decision").

The Supplemental Objection largely a verbatim recitation of the Objection's meritless arguments and unfounded complaints about the Claims Administrator's multi-year investigation into Mr. Cuthbert's extensive misconduct and the resulting Special Masters' Decision—is similarly baseless.  As the NFL Parties' response to Mr. Cuthbert's initial Objection (the "Response") demonstrated, the Decision explicitly used the legal standard mandated by the Audit Rules, (*see* Response at 4–5); the Decision does not mention, much less modify the Settlement Agreement's Injury Definitions (*see id.* at 5–6); any claim of racial discrimination by the Claims Administrator is entirely frivolous (*see id.* at 6–8); any claim that the Claims Administrator's investigation of Mr. Cuthbert's extensive misconduct violated due process lacks merit (*see id.* at 8–9); and the Objection's remaining arguments are improper attempts to relitigate the Special Master's final and binding factual findings (*see id.*).  The only new argument advanced in the Supplemental Objection is that the Decision's denial of claims without individualized review purportedly violates Class Members' due process rights.  This argument, like the others, lacks any merit.  As this Court has previously held, the Special Masters may deny claims through the audit process without individualized review and such denials can only be set aside for abuse of discretion, meaning that "no reasonable person" would adopt the Special Masters' views.  (*See* Order at 5–7, ECF No. 11255 ("Order").)  Mr. Cuthbert cannot remotely meet that standard here. The Special Masters cogently explained the basis for denying the claims at issue:  Mr. Cuthbert's wrongdoing was so widespread that "[t]he task of separating out the genuine from the tainted in the medical evidence behind each Qualifying Diagnosis would be difficult, time-consuming, and . . .

unlikely to lead to successful submissions based on the existing medical records." (Decision at 7.) As a result, denying the claims now will actually expedite the process of any deserving claimants potentially obtaining new Qualifying Diagnoses. (*See id.*)

There can be no credible argument that "no reasonable person" would have reached the Special Masters' conclusions, and the Supplemental Objection should be denied.

**BACKGROUND**

On March 3, 2023, the Claims Administrator referred to the Special Masters a February 15, 2023 Audit Report (the "Audit Report") concerning Byron Cuthbert and his law firm, Byron Cuthbert and Associates, LLC. The Audit Report details the Claims Administrator's multi-year investigation of Mr. Cuthbert, which uncovered widespread fraudulent practices. Specifically, the Audit Report sets forth overwhelming evidence that Mr. Cuthbert "orchestrated a process designed to manipulate the judgment of Diagnosing Physicians by attempting to influence their decisions and professional judgment," including based on PET scan reports from Dr. Daryl Eber that Mr. Cuthbert *knew were unreliable*, but nevertheless "continued to present [] as the 'ticket' to a Qualifying Diagnosis of Alzheimer's Disease." (*See* Audit Report at 49.) The Audit Report also demonstrated that Mr. Cuthbert, among other things, pressured Program doctors to change their diagnoses, drafted a medical record under a doctor's name, and prepared third-party affidavits that included specific language that was not actually unique to the Players. (*See id.* at 2–3.) The Audit Report found that these constituted material misrepresentations, made for the purpose of securing awards. (*Id.* at 48) Finally, the Audit Report found some evidence, based on expert AAPLC opinion, that Mr. Cuthbert coached his clients on how to perform during their exams. (*See id.* at 16–34, 49.) When questioned by the Claims Administrator during the investigation, Mr. Cuthbert directly lied (*see id.* at 24) and, even after Mr. Cuthbert received a draft of the Audit Report and spoke to the Claims Administrator about these issues, Mr. Cuthbert continued to submit unreliable records and "[i]nstead of working

with [the Claims Administrator], he worked to further entrench his unsupportable position, [which] has placed an extra and unnecessary burden on the Program" (*see id.* at 41–49).

The Special Masters accepted the referral of the Audit Report pursuant to Section 10.3 of the Settlement Agreement and the Audit Rules. Following additional briefing by Mr. Cuthbert and the NFL Parties, the Special Masters issued their Rule 27 Decision on June 28, 2023, "adopt[ing] the factual findings of the Claims Administrator" including that "Mr. Cuthbert knowingly used unreliable Amyloid PET scans, attempted to have Diagnosing Physicians change their diagnoses, and drafted both medical records and third party affidavits," and that "Mr. Cuthbert was not truthful in responding to the investigatory process, making it more difficult for the Claims Administrator to carry out its duties." (Decision at 3–4.) Indeed, the Special Masters found that "Mr. Cuthbert's wrongful conduct—and his unrepentant behavior when confronted with the problems he caused—was persistent." (*Id.* at 5.) The Decision concluded that Mr. Cuthbert's "conduct led to multiple material misstatements in claims submitted on behalf of Settlement Class Members. It has diverted the attention of the Claims Administrator, raised the administrative cost of this Program, and ultimately harmed his clients." (*Id.* at 6.) Accordingly, the Special Masters found that Mr. Cuthbert "plainly failed" to meet his burden "to show 'that there is no reasonable basis' for the Claims Administrator's factual findings about his misrepresentations and omissions"—indeed, the Special Masters characterized Mr. Cuthbert's briefing as "tendentious when it was not evasive." (*Id.* at 3)

The Special Masters also determined that Mr. Cuthbert's conduct was material because "[t]he Claims Administrator is correct in concluding that Mr. Cuthbert's overreliance on unreliable PET scans as proof of Alzheimer's Disease 'certainly had the potential to affect, and did affect, his clients' Qualifying Diagnoses,'" and "[s]o, too were Mr. Cuthbert's efforts to pressure the Diagnosing Physicians to change or backdate diagnoses and his drafting of medical records and

third-party affidavits," as "[t]he integrity of the Settlement depends on reliable, accurate diagnoses, and Mr. Cuthbert's conduct had a material impact on the reliability and accuracy of his clients' diagnoses." (*Id.* at 6 (quoting Audit Report at 48).)

In light of Mr. Cuthbert's "persistent" and "unrepentant" conduct, the Special Masters issued remedies pursuant to Section 10.3(i) of the Settlement Agreement, including (i) denying 12 claims directly implicated in the Audit, and (ii) directing the Claims Administrator to review all unpaid claims currently or formerly represented by Mr. Cuthbert, and deny them if they are supported by an unreliable PET scan or if the Claims Administrator cannot certify that the claim is "entirely free of issues discussed in the Audit," which resulted in the denial of nine additional claims. (*See id.* at 7.) When fashioning these remedies, the Special Masters explained that the issues created by Mr. Cuthbert's conduct are "intractable, ranging from unreliable PET scans to undue pressure on doctors," such that "[t]he task of separating out the genuine from the tainted in the medical evidence behind each Qualifying Diagnosis would be difficult, time-consuming, and in our experience unlikely to lead to successful submissions based on the existing medical records," so denying those claims would "expedite the process of Claimants obtaining new medical records unsullied by the issues described in this Audit." (*Id.* at 7.)

The Special Masters also censured Mr. Cuthbert and ordered that a copy of the Decision be made available on the NFL Concussion Settlement Website, redacting all names other than those of Mr. Cuthbert and Dr. Eber. (*Id.* at 7.) The Special Masters noted that while they had the "power to bar Mr. Cuthbert and his law firm entirely from further participation in the Settlement Program," they "do not exercise this power today because we conclude that Mr. Cuthbert's conduct, though wrongful, was not provably malicious." (*Id.* at 6.)

In response to the Decision, Mr. Cuthbert filed an Objection pertaining to the denial of the

12 claims directly implicated in the Audit Report. Pursuant to the Decision, the Claims Administrator denied the claims of nine additional claimants represented by Mr. Cuthbert on or around July 28, 2023. This Supplemental Objection was then filed in response to the Claims Administrator's denial of these additional nine claims.

## ARGUMENT

The only new argument presented in the Supplemental Objection—that the Decision's denial of claims through the audit process and without individualized review purportedly violated the due process rights of Settlement Class Members—is inconsistent with this Court's prior holdings, and falls far short of showing that "no reasonable person" would have adopted the Special Masters' conclusions.

### I. The Decision Did Not Deny the Class Members Due Process

The Objection contends that the Decision "den[ied] [Class Members] due process because it allow[ed] for denying claims without any proof of malfeasance with the individual claim" (Suppl. Objection at 3)[1]; but this Court has previously rejected this argument, holding that "the Special Masters did not err in denying without prejudice all claims relying on [unreliable neuropsychological] testing without allowing individualized review," as the Settlement Agreement and Audit Rules specifically contemplate such denial of claims through the audit process. (*See* Order at 5–7.)

Specifically, the Audit Rules expressly provide the Special Masters with the authority to "direct such relief as deemed appropriate, including without limitation . . . [d]enial of the Claim(s) subject to the Audit Proceeding," "[r]e-examination of a living Retired NFL Football Player by a

[1] The Supplemental Objection appears to advance this new argument on behalf of 21 claimants. (*See* Suppl. Objection at 3.) However, the argument is untimely with respect to the 12 claims initially denied by the Decision because it was not timely raised in Mr. Cuthbert's initial Objection.

Qualified BAP Provider (if the Retired NFL Football Player is eligible for the BAP) or by a Qualified MAF Physician," and "[s]uch other and further relief as the Special Master[s] may deem appropriate." (Rule 31.) The Settlement Agreement, similarly, permits the Special Masters to direct relief, including "without limitation," "den[ying] . . . the claim[s]" at issue and directing "additional audits of claims from the same law firm . . . ." (Settlement Agreement § 10.3(i).) "The sole remedy for players with affected claims is to file an objection to the Special Masters' ruling," which the Class Members have done here. (*See* Order at 5–6.)[2]

The Court may only set aside the remedies directed by the Special Masters' decision for an abuse of discretion, which "occurs only where the [Special Masters'] decision is 'arbitrary, fanciful, or clearly unreasonable'—in short, where 'no reasonable person would adopt the [Special Masters'] view." *United States* v. *Green*, 617 F.3d 233, 239 (3d Cir. 2010) (quoting *United States* v. *Starnes*, 583 F.3d 196, 214 (3d Cir. 2009)); *see also* Order at 6. Mr. Cuthbert cannot remotely meet that high bar here.

As an initial matter, the Supplemental Objection—like the Objection—improperly attempts to relitigate the final and binding factual determinations of the Special Masters by arguing that the Program's doctors did not change their medical findings based on any pressure, that certain of those doctors purportedly disputed certain statements in the Audit Report, and that there was insufficient support for the Program's neutral expert's opinion that Mr. Cuthbert likely coached his clients on how to act during their evaluations. (*See* Suppl. Objection at 4.)[3] But the Special

---

[2]   The Supplemental Objection suggests in passing that these procedures violate the due process clause of Fifth and Fourteenth Amendments "as described in" *Truax* v. *Corrigan*, a case decided more than a century ago. 257 U.S. 312 (1921); Suppl. Objection at 3. But *Truax*—which struck down a state law preventing state courts from granting an injunction against ex-employee defendants' "illegal" and "palpable wrongs" including their "plain[] conspiracy" to commit "moral coercion by illegal annoyance and obstruction" in order to harm plaintiffs' business—was premised on the "distinction [] between ex-employees and other tort-feasors," is completely inapposite and has no relevance here. *See Truax*, 257 U.S. at 327–28, 336–37.

[3]   The Supplemental Objection continues to complain that "the Special Masters refused to have a hearing so the matter could be properly heard" (Suppl. Objection at 4), but as the NFL Parties have repeatedly explained, the

Masters' findings on these issues and the weight they chose to assign to specific evidence are quintessential factual determinations, which are final and binding under the Audit Rules. (*See* Rule 33.)

In all events, the remedies imposed by the Special Masters were not an abuse of discretion but, instead, eminently reasonable. In light of Mr. Cuthbert's "unrepentant" and "persistent" wrongful conduct, the Special Masters directed the Claims Administrator to deny all claims containing the "issues discussed in the Audit," including a PET scan from Dr. Eber. (Decision at 6–7.) As the Special Masters explained:

> [T]he issues described in this Audit are intractable, ranging from unreliable PET scans to undue pressure on doctors. The task of separating out the genuine from the tainted in the medical evidence behind each Qualifying Diagnosis would be difficult, time-consuming, and in our experience unlikely to lead to successful submissions based on the existing medical records. We thus deny the Claims now to expedite the process of Claimants obtaining new medical records unsullied by the issues described in this Audit.

(*Id.* at 7.)

Mr. Cuthbert's disagreement with the Special Masters' conclusions and remedies does not render them an abuse of discretion or a violation of due process. The Special Masters' rationale for the remedies is reasonable on its face. For those claims that involve the issues raised in the Audit Report—including unreliable PET scans, pressuring physicians, etc.—the difficulty of untangling the tainted from untainted medical records is "intractable," and denying these claims now will expedite the process of any deserving claimants obtaining new Qualifying Diagnoses, as all denials are without prejudice and allow the claimants to submit new claims in the future. Accordingly, the Supplemental Objection plainly fails to show that "no reasonable person" would

Audit Rules allow only oral argument in the Special Masters' discretion, and expressly prohibit "testimony, cross-examination, or other evidentiary hearing[s] on an Audit Proceeding." (Rule 24.)

adopt the Special Masters' findings, and the Supplemental Objection should be denied.[4]

**CONCLUSION**

For the foregoing reasons, the NFL Parties respectfully request that the Court deny the Supplemental Objection and affirm the findings of the Special Master.

Dated: September 5, 2023

Respectfully submitted,

/s/ Brad S. Karp
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
Brad S. Karp
Bruce Birenboim
Claudia Hammerman
Lynn Bayard
1285 Avenue of the Americas
New York, NY 10019-6064
Tel: (212) 373-3000
bkarp@paulweiss.com

*Attorneys for the National Football League and NFL Properties LLC*

[4] The Supplemental Objection also adds several sentences in an attempt to bolster the Objection's argument that the Decision's denial of claims relying on Dr. Eber's PET scans somehow modifies the Settlement Agreement's Injury Definitions. In these additional sentences, Mr. Cuthbert argues that, because PET scans are not required for an Alzheimer's diagnosis and cannot solely establish such a diagnosis, "the reliability [of the PET scans] is not material to the claims." (Suppl. Objection at 3.) This argument is specious. It is irrelevant that the unreliable PET scans were not outcome determinative evidence in support of these Alzheimer's diagnoses. As the Audit Rules provide, "[a] fact is material if it did affect or ***has any potential to affect*** whether the Settlement Class Member qualifies for a Monetary Award." (Rule 12(c) (emphasis added).) Because these unreliable PET scans were part of the mix of evidence the MAF Physician considered in rendering the Alzheimer's diagnosis, they clearly had the "potential to affect" the diagnosis. The Supplemental Objection's arguments to the contrary are baseless.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION**<br><br>Kevin Turner and Shawn Wooden, on Behalf of themselves and others similarly situated.<br><br>Plaintiffs,<br><br>v.<br><br>National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.<br><br>Defendant.<br><br>**THIS DOCUMENT RELATES TO:**<br><br>**Byron Cuthbert and Associates, LLC Audit** | **No. 12-md-2323 (AB)**<br><br>**MDL No. 2323**<br>**MOTION FOR RECONSIDERATION** |

COMES NOW, Movants, who are identified as Settlement Program ID numbers below and Byron Cuthbert & Associates, LLC (herein after referred to as "Plaintiffs) by and through their attorneys JMeyers Group, LLC and the Cuthbert Firm, LLC, and file this Motion to Reconsider Settlement Implementation Determination Order (Doc. No. 12377) for the following SPID case numbers:

1. SPID 100004410
2. SPID 100004597
3. SPID 100007249
4. SPID 100007913
5. SPID 260001260
6. SPID 100002921
7. SPID 100005756
8. SPID 100005198
9. SPID 100000435
10. SPID 100002185
11. SPID 100007068
12. SPID 100008484
13. SPID 100013989
14. SPID 100002465

## BACKGROUND

On February 29, 2024, this Court entered a Settlement Implementation Determination Order (Doc. No. 12377) denying objections (the "Objections") by Byron Cuthbert and Associates, LLC ("BCA") and its principal, Attorney Byron Cuthbert ("Mr. Cuthbert"), to the Special Masters' Rule 27 Decision on the Report of Adverse Finding Regarding Byron Cuthbert and Associates, LLC issued on June 28, 2023 (Doc. No. 289084) (the "SM Decision"). Plaintiff respectfully moves this Court to reconsider the dismissal of the Objections pursuant to Federal Rule of Civil Procedure 60(b).

A trial court may reconsider a prior ruling when "manifest errors of law or fact" justify granting such a motion. Respectfully, the Courts order denying the Objections by Byron Cuthbert and Associates, LLC ("BCA") and its principal, Attorney Byron Cuthbert ("Mr. Cuthbert"), to the Special Masters' Rule 27 Decision on the Report of Adverse Finding Regarding Byron Cuthbert and Associates, LLC issued on June 28, 2023 contains a manifest error that warrants a correction.

Accordingly, before the parties embark on costly, time-consuming appeal to the Third Circuit, BCA respectfully requests that the Court reconsider the dismissal of the Objection pursuant to Federal Rule of Civil Procedure 60(b) or pursuant the Court general equitable powers.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 60(b) provides that:

> On motion and upon such terms as are just, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment.

The purpose of a motion for reconsideration is to "correct manifest errors of law or fact or to present newly discovered evidence." Harsco Corp. v. Zlotnicki, 779 F.2d 906, 909 (3d Cir. 1985). Accordingly, reconsideration is appropriate if the moving party shows "(1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court granted the motion for summary judgment; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice." Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros, 176 F.3d 669, 677 (3d Cir. 1999). Where errors of law or fact are alleged, factual or legal issues may be reconsidered if they were "overlooked by the court in its decision," but "[a] motion for reconsideration is not properly grounded on a request that a court reconsider repetitive arguments that have [been] fully examined by the court." Blue Mountain Mushroom Co. v. Monterey Mushroom, Inc., 246 F. Supp. 2d 394, 398-99 (E.D. Pa. 2002) (internal quotation marks omitted).

## ARGUMENT

1. *Allegations of Bias by the Claims Administrator were brought in BCA's briefing to the Special Masters*

Reconsideration of BCA's Objection is warranted because allegations of bias by the Claims Administrator **were raised** in BCA's briefing to the Special Masters.[1] A trial court may reconsider

[1] See Exhibit A

a prior ruling when "manifest errors of law or fact" justify granting such a motion. Respectfully, the Court's order denying the Objections by Byron Cuthbert and Associates, LLC and its principal, Attorney Byron Cuthbert, to the Special Masters' Rule 27 Decision issued on June 28, 2023 meets this standard.

Specifically, the Court under the section titled, "BCA's contention that the Audit activity, as affirmed by the Special Masters' decision, violated 42 U.S.C. § 1981 exceeds the scope of this appeal" of the Settlement Implementation Determination Order incorrectly concluded that, "BCA did not present this argument concerning alleged bias by the Claims Administrator in its briefing to the Special Masters. It is outside the scope of this review of the Special Masters' Rule 27 Decision. This objection is dismissed."

The conclusion was an error because allegations of bias by the Claims Administrator were indeed raised in the initial response brief to the Special Master. Specifically, on **page 5 & 6 of BCA initial response to the Special Masters**, Attorney Manny Arora and BCA raised allegations of bias by the Claims Administrator to the Special Master with the following, " the Claims Administrator actions **shows bias** towards Mr. Cuthbert – as claims with the same PET scan evidence are being approved for other attorneys but not attorney Cuthbert."[2] Further, **on page 6 of BCA initial response to the Special Masters**, Manny Arora and BCA provided **footnote 16**, which provided exhibits, details, and example cases to support the allegation of bias and show the different treatment, processing of claims and awards for other law firms with medical evidence provided by radiologist Dr. Eber and Dr. Dineen. **Footnote 16 on page 6** of the **initial response** [3] to the Special Masters stated the following:

> 16 The Claims Administrator is actively processing and approving other law firms claims based on medical evidence provided by Drs. Eber and Dineen. See the

[2] Id.
[3] Id.

Claims Administrator award for SPID 100006836 [redacted] (exhibit 15), documentation related to SPID 100017085 [redacted] (exhibit 16), and documentation related to SPID 100000021 [redacted] (exhibit 17). Since Special Masters have portal access, we request the Special master review the portal documents for the reference cases.

The record shows there were bias allegations in the initial briefing to the Special Masters, and thus the dismissal of the Objections is a manifest injustice that the Court needs to address.[4] The allegations of bias by the Claims Administrator were within the scope of the initial response to the Special Master and the details of the bias were furthered clarified in the Objections to the Court depicting how the actions of the Claims Administrator showed disparate treatment and violated 42 U.S.C. § 1981.[5] These allegations in the Objections should be explored and addressed by the Court with a de novo review of the Special Master Decision.

The Claims Administrator has a duty to process claims consistently. The Claims Administrator processing and awarding Alzheimer's claims filed by Caucasian attorneys, utilizing the medical records previously arranged by Mr. Cuthbert, while auditing and disputing all claims filed by Mr. Cuthbert, a black attorney, shows a pattern of discrimination, disparate treatment, and

---

[4] Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros, 176 F.3d 669, 677 (3d Cir. 1999) In order to prevail on a motion for reconsideration, the moving party must demonstrate, "the need to correct a clear error of law or fact or to prevent manifest injustice."

[5]See Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508, 122 S. Ct. 992, 995 (2002)We hold that an employment discrimination complaint need not include such facts and instead must contain only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. Rule Civ. Proc. 8(a)(2); Inner City Contracting, LLC v. Charter Twp. of Northville, 87 F.4th 743, 756 (6th Cir. 2023)We do not require civil rights plaintiffs to use magic words in their complaints to obtain relief. Rather, we require plaintiffs to state a claim for relief. *See, e.g., Knapp v. City of Columbus*, 93 F. App'x 718, 720 (6th Cir. 2004) ("The court's duty is to look to the facts and grant the necessary [**19] relief as justice requires—not to demand that certain citations or phrases are used."). The Federal Rules of Civil Procedure, as well as Supreme Court and Sixth Circuit precedent, seek to protect the goals of notice pleading. ICC alleged sufficient facts, claiming rights under statutes that protect against racial discrimination, to give F&V "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 512, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002).

consequential economic injury. The facts as shown demonstrates the bias against and discrimination toward Mr. Cuthbert, a black attorney and a member of a protected class, and his clients referenced in the initial response to the Special Masters. Allowing this audit decision to stand without reconsideration ignores the protections afforded by 42 U.S.C. § 1981 by denying Attorney Cuthbert, a black attorney, and the Settlement class members "the same right in every State and territory to make and enforce contracts, ... as is enjoyed by white citizens".

2. *The Settlement Agreement Does Not Mandate the use of SUVR for Imaging*

In order to prevail on a motion for reconsideration, the moving party must demonstrate, "the need to correct a clear error of law or fact or to prevent a manifest injustice."[6] Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros, 176 F.3d 669, 677 (3d Cir. 1999). Reconsideration of BCA's Objection is warranted because the plain language of the Settlement Agreement does not require that SUVR Software be used – or that the software presumptively be used absent a specific reason not to use the software – when a radiologist is reviewing PET imaging.

Section 6.6(b) of the Settlement Agreement, explains a diagnosis cannot be made solely off imaging technique and a player must experience actual cognitive impairment and/or actual neuromuscular impairment. However, the DSM-5, section 6.6(b) combined with sections 6.4(b)/6.3(b) of the Agreement and FAQ #118, provide that MAF doctors can use imaging techniques as long as actual cognitive impairment and/or actual neuromuscular impairment is experienced by the Retired NFL Football Player. Specifically, FAQ 118 states, "Amyloid PET,"

[6] See Definition of Manifest Injustice - As found in *Black's Law Dictionary*, a manifest injustice is defined as "'[a]n **error in the trial court that is direct, obvious and observable** such as a defendant's guilty plea that is involuntary . . . .'" In re Looper, 2007 Bankr. LEXIS 2071, 2007 WL 1725251, at *2 (Bankr. E.D. Tenn., June 12, 2007) (quoting *Black's Law Dictionary* 974 (7th ed. 1999)).What is clear from case law, and from a natural reading of the term itself, is that a showing of manifest injustice requires that there exist a fundamental flaw in the court's decision that without correction would lead to a result that is both inequitable and not in line with applicable policy." In re Bunting Bearings Corp., 321 B.R. 420, 423 (Bankr. N.D. Ohio 2004).

is meant to assist clinicians in detecting whether Alzheimer's Disease is the cause of cognitive impairment."[7] As provided in the individual reports, the MAFs found clinical cognitive impairment and used the PET imaging as a supporting factor for the Alzheimer's Diagnosis. The Special Master Decision purports to be based solely on an allegedly unreliable PET scan with no consideration to the MAF physician diagnosis. This amounts to a breach of the Settlement Agreement due to the deviation from the agreed-upon injury protocols agreed to by the NFL Parties and Class Members. Specifically, Section 6.3(b) of the Settlement Agreement is clear that an Alzheimer's diagnosis cannot be based on anything but the opinion of a qualified MAF physician. See Section 6.3(b) Settlement Agreement and Exhibit A-1, Paragraph 3 of Settlement Agreement

As discussed in Mr. Cuthbert initial response to the Special Masters on page 5 footnote 14, the basis for the Claims Administrator and Special Masters determination that Dr. Eber and Dineen reports are unreliable is because the Claims Administrator radiologist used Standardized Uptake Value ratio ("SUVr") to review the PET images. Dr. Dineen and Dr. Eber did review the images with their trained radiologist eye review and did not use SUVr software. The Settlement Agreement and the injury protocol have clear and unambiguous terms, and there is no mention in the terms that SUVr software is required for the review of PET imaging. This is the Claims Administrator, the AAP, the NFL, and the Special Masters retroactively implementing the use of SUVr software into the Settlement Agreement that simply does not exist for the purpose of concluding Dr. Eber and Dr. Dineen reviews of the PET imaging are unreliable. Accordingly, the Claims Administrator and Special Master wrongfully conclude Mr. Cuthbert knowingly knew the

---

[7] Per DSM-5 under Major or Mild Neurocognitive Disorder Due to Alzheimer's Disease page 613 subsection Diagnostic Markers, the DSM-5 states the following: Since amyloid beta-42 deposition in the brain occurs early in the pathophysiological cascade, amyloid-based diagnostic tests such as amyloid imaging on brain positron emission tomography (PET) scans and reduced levels of amyloid beta-42 in the cerebrospinal fluid (CSP) may have diagnostic value

scans were unreliable when Mr. Cuthbert never filed any claims where he was on notice that the MAF radiologist second opinion was a negative finding. After the Claims Administrator informed Mr. Cuthbert that the Claims Administrator radiologist disagreed with Dr. Eber findings, Mr. Cuthbert went to obtain second opinion for the other scans already submitted due to the Claims Administrator's unwillingness to provide Mr. Cuthbert with the Claims Administrator radiologist scan findings to review. This **new implementation** rule requiring the use of the SUVr software instead of trained radiologist physical eye review exceeds the Settlement Agreement terms and unduly challenges the interpretation of the two radiologists' mutual findings beyond the manufacture guidelines and FDA requirements for Amyloid PET Imaging. This new SUVr requirement materially and retroactively implements a new SUVr software requirement for imaging that was not utilized or required from 2017 through 2022 - the period covered by the Settlement Agreement. This discrepancy is not a factual issue, but the interpretation and implementation of the terms of the Settlement Agreement is an issue of law this Court can correct through a de novo review of the Special Master Decision.

## CONCLUSION

The Claims Administrator has a duty to process claims consistently. This retroactive change in the implementation of SUVr software for PET imaging for reviews of claims filed by Mr. Cuthbert, but not other attorneys will cause an extreme hardship to the players identified with the SPIDs and will require additional delays through new testing and costs to pursue future claims. The Court has held "the investigation spanned a period of years", so it's inexplicable that such a thorough investigation failed to address BCA's repeated allegations of bias. Here, the Court is empowered to grant relief under several parts of Rule 60(b), including but not limited to Rule

60(b)(1), mistake and surprise; and Rule 60(b)(6), any other reason justifying relief from the operation of the judgment. See Satterfield v. D.A. Philadelphia, 872 F.3d 152 (3rd Cir. 2017).

Pursuant to Federal Rule of Civil Procedure 60(b), Plaintiffs respectfully request that this Court reconsider the Settlement Implementation Determination Order denying objections by Byron Cuthbert and Associates, LLC and its principal, Attorney Byron Cuthbert, to the Special Masters' Rule 27 Decision issued on June 28, 2023.

This 4th day of *March, 2024*.

Respectfully submitted,

**JMEYERS GROUP LLC**
By: /s/ John F. Meyers

GEORGIA STATE BAR NUMBER 503692
1755 The Exchange SE, Suite 339
Atlanta, GA 30339
Telephone: (404) 597-1275
E-Mail: john@jmeyersgroup.com

***THE CUTHBERT FIRM, LLC***

By: /s/ *Vicki Trammell Cuthbert*

***Vicki Trammell Cuthbert***

GEORGIA STATE BAR NUMBER. 304790

*540 Powder Springs Street*

*Suite C-15*

*Marietta GA 30064*

*Telephone: (470) 317-7717*

Fax: *1(866)990-9743*

E-mail: vicki@cuthbertfirm.com

***BYRON CUTHBERT &ASSOCIATES, LLC***

By: /s/ *Byron Cuthbert*

***Byron Cuthbert***

GEORGIA STATE BAR NUMBER 890534

*1143 Cameron Creek*

*Marietta GA 30062*

*Telephone: (404) 403-7855*

Fax: *1(866)990-9743*

E-mail: Byroncut@gmail.com

**CERTIFICATE OF SERVICE**

I hereby certify that I caused the foregoing Motion to Reconsider Settlement Implementation Determination Order (Doc. No. 12377) to be served via the Electronic Case Filing (ECF) system in the United States District Court for the Eastern District of Pennsylvania on all parties registered for CM/ECF in the litigation.

Dated March 4, 2024

Respectfully submitted,

***BYRON CUTHBERT &ASSOCIATES, LLC***

By: /s/ *Byron Cuthbert*
Byron Cuthbert

# EXHIBIT A

ARORA LAW FIRM, LLC
TRIAL ATTORNEYS
75 West Wieuca Road NE · Atlanta, Georgia · 30342
(O) 404.609.4664· (F) 404.865.3525 · manny@arora-law.com

Administrator's radiological expert who determined that only 5 of the PET scans to be positive out of the 21 filed. During the interview, Attorney Cuthbert requested that the Claims Administrator's radiological reports be provided for his review, but the Claims Administrator would not provide the documentation.[13]

Without any way of knowing what evidence the Claims Administrator was disputing, Attorney Cuthbert retained Dr. Dineen, a board-certified radiologist, to conduct a review of all disputed PET scans on 9/1/22. Dr. Dineen's findings were disclosed to the Claims Administrator. The Claims Administrator claimed Dr. Dineen's medical findings were also unreliable.[14]

The Claims Administrator has a duty to process claims consistently. After Attorney Cuthbert's former clients retained other counsel, the Claims Administrator processed and awarded the claims with the same medical records originally obtained by Attorney Cuthbert. The Claims Administrator's actions shows bias towards Attorney Cuthbert—as claims with the same PET scan evidence are being approved for other

[13] *See* Audit Report, exhibit 4, paragraph 46. "Cuthbert asked whether we could tell him which five (of the 21) are positive. [Roma Petkauskas] said no, not now."

[14] The Claims Administrator use of the computer software for the "Standardized Uptake Value ratio (SUVr)" computer process in reviewing the Dicom images (for a finding of excessive amyloid beta protein) is creating a requirement beyond what is required by the manufacture and FDA guidelines. The Claims Administrator is also requiring two impacted regions even though the Amyvid guidelines only require one impacted region for the result to be actionable. The difference in the interpretation process does not constitute fraud nor unreliability.

**Please note that there is no footnote 15 (due to software error).

ARORA LAW FIRM, LLC
TRIAL ATTORNEYS
75 West Wieuca Road NE · Atlanta, Georgia · 30342
(O) 404.609.4664· (F) 404.865.3525 · manny@arora-law.com

Attorneys but not Attorney Cuthbert.[16]

Based on the evidence, there is no basis for allegation number one. Attorney Cuthbert did not knowingly use "unreliable" PET scans.

## II. Attorney Did Not Pressure Any Medical Professionals To Change Their Findings

This allegation involves Attorney Cuthbert's interaction with Dr. [redacted] (MAF) regarding his evaluation of Class Member, SPID# 100007249, [redacted]. Attorney appropriately questioned the basis for Dr. [redacted] findings as to his exclusionary findings—these questions were asked since Class Member [redacted] was diagnosed by Dr. [redacted], who found that an Alzheimer's diagnosis was appropriate.[17]

Competent Attorneys are trained to question evidence, ask probing and difficult questions and act in the best interest of their client. As to this allegation, Attorney Cuthbert posited reasonable questions based on the conflicting findings. Attorney Cuthbert never spoke to Dr. [redacted] on the telephone. The "pressure" consisted of emails asking for clarification as to the basis of the findings (on 12/10/20, 12/21/20,

---

[16] The Claims Administrator is actively processing and approving other law firms claims based on medical evidence provided by Drs. Eber and Dineen. *See* the Claims Administrator award for SPID 100006836 [redacted] (exhibit 15), documentation related to SPID 100017085 [redacted] (exhibit 16), and documentation related to SPID 100000021 [redacted] (exhibit 17). Since Special Masters have portal access, we request the Special master review the portal documents for the reference cases.

[17] The Audit Report also references Drs. [redacted] and [redacted] as possibly being "pressured." However, neither doctor changed any of their medical findings based on any "pressure." Lastly, the Claims Administrator has not provided the evidence supporting an inference of any malfeasance between the Attorney Cuthbert and Drs. [redacted] and [redacted]. Undersigned counsel has contacted these two medical providers, in accordance with FAQ 95, and has been advised that the allegations in the Audit Report are not accurate.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | : | No. 2:12-md-02323-AB |
| | : | MDL No. 2323 |
| THIS DOCUMENT RELATES TO: | : | Hon. Anita B. Brody |
| ALL ACTIONS | : | |

**CLAIMS ADMINISTRATOR STATUS REPORT NO. 23**

## I. INTRODUCTION

**1.** ***The Purpose and Scope of this Status Report.*** BrownGreer PLC, the Court-appointed Claims Administrator of the Settlement Program established under the Class Action Settlement Agreement in this litigation, submits this Status Report No. 23 to apprise the Court on the implementation of its duties as the Claims Administrator and developments since Status Report No. 22 filed on March 25, 2024 (Document 12386). Our earlier Status Reports are posted to the Settlement Website (under "Useful Information," click "Status Reports"). We do not repeat here what we covered in them. All numbers and other information in this Status Report No. 23 are as of June 3, 2024. We will cover developments after that date in future reports.

## II. NORMING AGREEMENT IMPLEMENTATION

**2.** ***Current Status.*** On March 4, 2022, Judge Brody entered an Order approving certain modifications to the NFL Concussion Settlement Agreement Pursuant to Section 6.6 of the Class Action Settlement Agreement. These modifications, outlined in the Norming

Agreement, removed race norms and demographic estimates based on race from the NFL Concussion Settlement Program. We have notified all affected Settlement Class Members whether they qualified for Automatic Retrospective Rescoring and if so, the result of that Rescoring and/or whether they qualified for an Expanded BAP exam. Table 1 summarizes the outcome of our analysis of BAP evaluations and settlement claims:

| **Table 1** | **NORMING AGREEMENT ANALYSIS** | |
|---|---|---|
| | **REVIEW OUTCOME** | **TOTAL** |
| **1.** | **Qualified for Automatic Retrospective Rescoring** | **647** |
| | (a) BAP No Impairment to Level 1: Section 2.5(g)(i) | 246 |
| | (b) BAP No Impairment or Level 1 to Level 1.5 or Level 2: Section 2.5(g)(ii) | 51 |
| | (c) BAP diagnosis of No Impairment or Level 1 remains unchanged: Section 2.5(g)(iii) | 338 |
| | (d) Level 1.5 or 2 Settlement Claim remains unchanged: Section 2.5(g)(iv) | 1 |
| | (e) Level 1.5 or 2 Settlement Claim now qualifies for a Monetary Award (or an increased Monetary Award): Section 2.5(g)(v) | 11 |
| **2.** | **Qualified for an Expanded BAP exam** | **2,750** |
| **3.** | **BAP evaluations to be processed under New Method that removes race from consideration** | **1,572** |
| **4.** | **Submitted Settlement Claims to be processed under New Method that removes race from consideration** | **49** |
| **5.** | **Not directly affected** | **11,119** |
| **6.** | **Excluded from eligibility for Automatic Retrospective Rescoring or Expanded BAP Exam** | **3** |
| **7.** | **Total Registered Settlement Class Members** | **16,140** |

The 1,572 BAP evaluations (Row 3) include 691 cases where the Settlement Class Member is eligible for the BAP but had not yet attended a BAP appointment and 881 cases where the Settlement Class Member had attended one or both appointments but the results had not yet been finalized. The New Method will be applied to all BAP evaluations finalized for these 1,572 Settlement Class Members, and the BAP Administrator continues to notify Settlement Class Members who have attended both appointments about those results. Similarly, we have processed the 49 Settlement Claims in Row 4 using the New Method and

issued Determination Notices incorporating those results. Finally, the 11,119 Settlement Class Members found to be not directly affected by the Norming Agreement (Row 5) could potentially have been eligible for an Expanded BAP exam or to submit a New Settlement Claim under Section 2.7 of the Norming Agreement if they were examined by a Qualified MAF Physician but not diagnosed with a Qualifying Diagnosis in part because of the insufficiency of their valid neuropsychological test scores. The deadline for those Settlement Class Members to request an Expanded BAP exam or submit a New Settlement Claim under Section 2.7 passed on March 4, 2024.

## III. MONETARY AWARD CLAIMS

**3.** ***Total Claims Received.*** We have received 67 new Monetary Award claims since Status Report No. 22 and have completed a review of all but 14 claims. As of June 3, 2024, 3,224 unique Retired NFL Football Players and Representative Claimants (20.0% of the Retired NFL Football Players and Representative Claimants who received favorable registration determinations) submitted 3,864 Monetary Award Claim Packages. Seventeen of the 3,864 claims[1] were denied as untimely.[2] We have received about five new claims per week since Status Report No. 22 in March 2024. Of the 3,864 Monetary Award claims submitted, 1,980 (51.2%) rest on pre-Effective Date diagnoses, while 1,590 (41.2%) are for post-Effective Date diagnoses, of which 445 (11.5% of the 1,590) were made in the Baseline Assessment Program ("BAP")[3]

[1] Of these Monetary Award claims, 661 (17%) have at least one associated Derivative Claimant who has registered and 3,203 (83%) have no registered Derivative Claimants. Note the total number of Retired NFL Football Players and Representative Claimants with favorable registration determinations (16,139) is shown in Section 2 of the Summary Report on the Settlement Website (BAP Eligible + Not BAP Eligible).

[2] We reviewed 58 claims for potential untimeliness and denied 17 as untimely. We accepted 41 as timely, which includes three claims that showed substantial hardship under Section 8.3(a)(i) of the Settlement Agreement.

[3] Although a Retired NFL Football Player may have received a Qualifying Diagnosis in the BAP, we do not report on it until he (or his Representative Claimant) submits a Claim Package seeking a Monetary Award. The BAP Administrator's status reports explain more about BAP diagnoses.

and 1,145 (29.6% of the 1,590) were made by Qualified MAF Physicians.[4] The other 294 claims (7.6%) did not tell us what diagnosis date they assert. Table 2 compares these numbers to those in Status Report No 22:

| Table 2 | QUALIFYING DIAGNOSIS DATES IN MONETARY AWARD CLAIMS | | | | | | |
|---|---|---|---|---|---|---|---|
| | DATE | HOW MANY | | | % OF TOTAL | | |
| | | AS OF 3/4/24 | AS OF 6/3/24 | CHANGE | AS OF 3/4/24 | AS OF 6/3/24 | CHANGE |
| 1. | Pre-Effective Date | 1,979 | 1,980 | 1 | 52.1% | 51.2% | -3.1% |
| 2. | Post-Effective Date | 1,525 | 1,590 | 65 | 40.2% | 41.1% | 2.9% |
| | (a) *BAP* | *431* | *445* | 14 | *11.4%* | 11.5% | 0.3% |
| | (b) *MAF* | *1,094* | *1,145* | 51 | *28.8%* | 29.6% | 2.6% |
| 3. | No Date Asserted | 293 | 294 | 1 | 7.7% | 7.6% | 0.0% |
| **4.** | **Totals** | **3,797** | **3,864** | **67** | | | |

Table 3 shows by diagnosis date how many claims we have for each type of Qualifying Diagnosis:

| Table 3 | MONETARY AWARD CLAIMS BY QUALIFYING DIAGNOSIS TYPE | | | |
|---|---|---|---|---|
| | DIAGNOSIS | PRE-EFFECTIVE DATE | POST-EFFECTIVE DATE | |
| | | | MAF | BAP |
| 1. | Death with CTE | 126 | 0 | N/A |
| 2. | ALS | 51 | 13 | |
| 3. | Alzheimer's Disease | 425 | 205 | |
| 4. | Parkinson's Disease | 137 | 161 | |
| 5. | Level 2 | 505 | 284 | 130 |
| 6. | Level 1.5 | 736 | 481 | 308 |

We highlight the asserted Qualifying Diagnoses in Section 4 of the Summary Report on the Settlement Website. We also show the current status of all Monetary Award claims based on final determination in Section 6 of the Summary Report on the Settlement Website. A "Review in Progress" status means that the claims have not reached a final determination. Section 7

[4] This includes claims submitted by the Settlement Class Members after the Effective Date, but the diagnoses were not rendered by MAF Physicians. Given unique circumstances, the Parties allowed an AAP member or AAP Consultant to review the medical records to determine if there was a Qualifying Diagnosis.

highlights the review status of claims that asserted Qualifying Diagnoses of Level 2 Neurocognitive Impairment and Level 1.5 Neurocognitive Impairment.

**4.** ***Monetary Awards and Payments.***

(a) We show Monetary Awards and payments in Sections 1 and 2 of the Summary Report on the Settlement Website. As of June 3, 2024, we have issued 1,701 Notices of Monetary Award for claims totaling $1,291,671,108.[5] We request funding from the NFL Parties by the 10th of each month (or the next business day if the 10th falls on a weekend or holiday) for claims that have received a Notice of Monetary Award for which the appeals process is complete (or the appeal deadline has passed with no appeal) and that are not in Audit. Of the 1,701 claims with Notices of Monetary Award, we requested $1,253,084,827.01 from the NFL Parties for the 1,662 claims that have reached the point at which we can request funding. The NFL Parties have deposited funds for 1,648 of those claims.[6] Of the 1,648 Monetary Award claims for which the NFL Parties have deposited funds, the Program paid 1,644 claims for a total of $1,207,979,045. The remaining four funded claims were not yet ready for payment when we submitted the most recent Disbursement Report; some have holds preventing payment, some do not have a submitted Payment Election Form or SWS-5, and some have holdbacks for potential Liens which, together with the 5% deduction for the Common Benefit Fund, exceeded the gross award amount. Of the 1,644 paid claims from Retired NFL Football Players and Representative Claimants, the Trustee sent $59,738,021 (5% or 1% of those Monetary Awards, depending on when the payment was issued) to the Attorneys' Fees Qualified Settlement Fund, in

[5] The amount of these Notices of Monetary Award includes the 1% Derivative Claimant Award deductions allocated to eligible Derivative Claimants (see Paragraph 21 of this Status Report).
[6] The NFL Parties have 30 days from the date of the Funding Request to fund the amount requested.

accordance with the Court's June 27, 2018 Order Regarding the Common Benefit Fund (Document 10104) and the Court's December 21, 2023 Order. Beginning with the February 24, 2024 disbursement, we reduced the percentage we send to the Attorneys' Fees Qualified Settlement Fund to 1% of Monetary Awards in accordance with the Court's December 21, 2023 Order. The Court also ordered that 4% of the holdback from each paid claim be returned to the attorney managing the case or to the Player or family, if they proceeded without an attorney. That process is underway. As of June 3, 2024, we have released $31,240,846 of previously withheld Common Benefit Funds to Players or their attorneys. Finally, we are required to withhold money for unresolved Liens and for third-party funders. Table 4 shows the distribution of the $1,207,979,045 paid by the Settlement Program and compares the totals to those reported in Status Report No. 22:

| Table 4 | MONETARY AWARD PAYMENTS | | | |
|---|---|---|---|---|
| | PAID TO | AS OF 3/4/24 | AS OF 6/3/24 | CHANGE |
| 1. | **Settlement Class Members** (or their lawyers on their behalf, if represented) | $1,082,532,581 | $1,164,007,720 | $81,475,139 |
| 2. | **Medical Lienholders** (on behalf of Settlement Class Members to the Lien Resolution Administrator to resolve medical Liens when a final Lien resolution amount is determined) | $4,182,342 | $4,194,858 | $12,516 |
| 3. | **Non-Medical Lienholders** (on behalf of Settlement Class Members to lienholders to resolve non-medical Liens) | $16,844,685 | $17,842,955 | $998,270 |
| 4. | **Third-Party Funders** (on behalf of Settlement Class Members to third-party funders who have accepted rescission of and/or terminated prohibited assignments that they had entered into with Settlement Class Members) | $21,111,935 | $21,933,512 | $821,577 |
| **5.** | **Totals** | **$1,124,671,543** | **$1,207,979,045** | **$83,307,502** |

(b) Table 5 shows the changes in figures for payments and claims with Notices of Monetary Award since Status Report No. 22:

| Table 5 | MONETARY AWARD CHANGES SINCE STATUS REPORT NO. 22 | | | | | | |
|---|---|---|---|---|---|---|---|
| | STATUS | HOW MANY | | | AMOUNT | | |
| | | AS OF 3/4/24 | AS OF 6/3/24 | CHANGE | AS OF 3/4/24 | AS OF 6/3/24 | CHANGE |
| 1. | Notice of Monetary Award Issued | 1,658 | 1,701 | 43 | $1,242,368,389 | $1,291,671,109 | $49,302,720 |
| 2. | Paid | 1,614 | 1,649 | 35 | $1,124,671,543 | $1,207,979,045 | $83,307,502 |

(c) Table 6 shows how many claims for each type of Qualifying Diagnosis have received a Notice of Monetary Award and been paid[7]:

**Table 6 — MONETARY AWARDS AND PAYMENTS BY QUALIFYING DIAGNOSIS[8]**

| | DIAGNOSIS | CLAIMS SUBMITTED | NOTICE OF MONETARY AWARD | | PAID | |
|---|---|---|---|---|---|---|
| | | | HOW MANY | %[9] | HOW MANY | %[10] |
| 1. | Death with CTE | 126 | 80 | 63% | 80 | 63% |
| 2. | ALS | 64 | 47 | 73% | 47 | 73% |
| 3. | Alzheimer's Disease | 630 | 416 | 66% | 407 | 65% |
| 4. | Parkinson's Disease | 298 | 238 | 80% | 230 | 77% |
| 5. | Level 2 | 919 | 293 | 32% | 282 | 31% |
| 6. | Level 1.5 | 1,525 | 627 | 41% | 603 | 40% |

**5. *Monetary Award Claims Reviewed by the AAP.***

(a) In addition to reviewing claims based on pre-Effective Date diagnoses, the Appeals Advisory Panel ("AAP") and Appeals Advisory Panel Leadership Council ("AAPLC") assist us with the medical aspects of claims review. Many of the claims being reviewed by the AAP are based on Level 1.5 or Level 2 Neurocognitive Impairment diagnoses for which the AAP members may request input from Appeals Advisory Panel Consultants ("AAPC"), as highlighted in sub-paragraph (b) below. The AAP has completed reviews on 1,142 pre-Effective Date diagnosis Monetary Award claims, approving 565 (49%) of those claims.[11] Under FAQ 149 ("Can I be found eligible for a Monetary Award based

[7] Section 6 of the Summary Report on the Settlement Website identifies where claims that have not received a Notice of Monetary Award or been paid stand in the process.
[8] These do not include claims submitted where the Settlement Class Member asserted more than one Qualifying Diagnosis or the claim is so incomplete that we cannot tell what Qualifying Diagnosis is claimed.
[9] This column shows the percentage of claims submitted with the Qualifying Diagnosis in each row that received a Notice of Monetary Award.
[10] This column shows the percentage of claims submitted with the Qualifying Diagnosis in each row that were paid.
[11] Broken down by Qualifying Diagnosis, the AAP members approved 100% of Death with CTE claims, 91% of ALS claims, 75% of Alzheimer's claims, 87% of Parkinson's claims, 27% of Level 2 claims and 29% of Level 1.5 claims. The number of claims approved or denied by the AAP may fluctuate depending on multiple factors including ongoing audit investigations, remands of AAP decisions, and re-review of determinations that have not yet been finalized to ensure compliance with current Settlement Program rules and guidelines.

on a Qualifying Diagnosis that is different than the one I claimed?"), the AAP has found a lower level diagnosis (meaning a Qualifying Diagnosis that is less severe medically or with a lower Award amount under the Monetary Award Grid) on 164 claims. In accordance with Rules 23 and 27 of the Rules Governing Qualified MAF Physicians, the AAP and AAPLC have reviewed 533 out of the 1,145 total Monetary Award claims submitted for diagnoses made by Qualified MAF Physicians, approving 214 (41%) of those claims.[12] Section 2 of Exhibit A-2 to the Settlement Agreement states that a Player's failure on two or more effort tests may result in the Player's test results being subject to independent review. Under that provision, as well as Section 8.6(b) of the Settlement Agreement, which provides the Claims Administrator with the discretion to verify and investigate the sufficiency of a Claim Package to determine if it qualifies for a Monetary Award, the AAP and AAPLC have reviewed 87 claims out of the 445 total claims submitted based on Qualifying Diagnoses made through the BAP, approving 45 (52%) of those reviewed claims.

(b) We have assigned 806 claims (including pre- and post-Effective Date claims) to the AAPC based on requests by AAP members for their input on Level 1.5 and Level 2 Neurocognitive Impairment Qualifying Diagnoses or the neuropsychological testing supporting an Alzheimer's Disease diagnosis. The AAPC have completed all the reviews assigned to them and provided their assessments to the AAP.

**6.** ***Notices for Missing Materials.*** We have sent one or more notices requesting additional documents or information on 2,285 Monetary Award claims (11 more since Status Report No. 22), as shown in Table 7:

[12] This figure includes those claims reviewed by the AAP under Section 8.6(b) of the Settlement Agreement as well as claims based on diagnoses made by Qualified MAF Physicians who have been terminated from participation in the Program under Rule 27 of the Rules Governing Qualified MAF Physicians.

| Table 7 | | NOTICES FOR MISSING MATERIALS | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **CLAIMS** | **DEATH WITH CTE** | **ALS** | **ALZHEIMER'S DISEASE** | **PARKINSON'S DISEASE** | **LEVEL 2** | **LEVEL 1.5** | **MULTIPLE/ UNKNOWN[13]** | **TOTAL** |
| 1. | Total Reviewed | 126 | 64 | 629 | 296 | 919 | 1,519 | 297 | 3,850 |
| 2. | Notice Issued | 48 | 29 | 335 | 118 | 583 | 930 | 242 | 2,285 |
| 3. | % Missing Materials | 38% | 45% | 53% | 40% | 63% | 61% | 81% | 59% |

So far, 89% of the Settlement Class Members who received a notice requesting additional documents have responded to the notice. Settlement Class Members take an average of about 60 days to respond. We generally receive up to one response to these notices each week and review each reply to determine if it cures the problem. Of those who responded, 46% cured the problem.

**7.** ***Monetary Award Denials.*** There are 1,202 denials of Monetary Award claims for reasons other than an Audit (20 more since Status Report No. 22), as shown in Table 8:

| Table 8 | | MONETARY AWARD DENIALS | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **CLAIMS** | **DEATH WITH CTE** | **ALS** | **ALZHEIMER'S DISEASE** | **PARKINSON'S DISEASE** | **LEVEL 2** | **LEVEL 1.5** | **MULTIPLE/ UNKNOWN** | **TOTALS** |
| 1. | Total Reviewed | 126 | 64 | 629 | 296 | 919 | 1,519 | 297 | 3,850 |
| 2. | Denied | 43 | 3 | 93[14] | 15 | 276 | 512 | 260 | 1,202 |
| 3. | % Denied | 34% | 5% | 15% | 5% | 30% | 34% | 88% | 31% |

Overall, the AAP has recommended denial of 698 claims for not having a valid Qualifying Diagnosis, which is 52% of the claims that currently have a denial notice. When we deny a

[13] These "Multiple/Unknown" claims are ones where the Settlement Class Member asserted more than one Qualifying Diagnosis, or the claim is so incomplete that we cannot tell what Qualifying Diagnosis is claimed. We process and pay a person for only one Qualifying Diagnosis per claim submission.

[14] We reported 97 Alzheimer's Disease Denials in Claims Administrator Status Report No. 22. This number decreased by four because six Alzheimer's Disease claims with Denial Notices were appealed and then remanded, which removed them from the Denial Notice count, and we have issued two new Alzheimer's Disease Denial Notices since March 4. 2024.

claim based on the recommendation of an AAP member, we include in the notice comments from that AAP member explaining why. When a claim is denied on other grounds, we typically call or email the Settlement Class Member (or his or her lawyer, if represented) to explain why the claim is being denied and discuss options for resubmitting the claim, appealing the denial, or withdrawing the claim until the claimant can obtain the missing mandatory information and/or documents. Our denial notices explain all appeal rights and that another claim may be submitted if circumstances change or if the claimant receives a new diagnosis from a Qualified MAF Physician or after a BAP exam. Settlement Class Members have appealed a total of 449 denial notices; four of the currently active denial notices are under appeal.

## IV. SUPPLEMENTAL MONETARY AWARD CLAIMS

**8.** ***Supplemental Monetary Award Claims Received.*** A Retired NFL Football Player (or Representative Claimant) who was paid a Monetary Award may be eligible for a Supplemental Monetary Award if the Retired NFL Football Player later is diagnosed while living with a different Qualifying Diagnosis. The new Qualifying Diagnosis must have occurred after the Qualifying Diagnosis for which the Award was paid and the amount payable for the new Qualifying Diagnosis must be more than the Monetary Award already paid. Sections 12, 13 and 14 of the Summary Report on the Settlement Website show the total Supplemental Monetary Award claims submitted. We have received claims from 106 Retired NFL Football Players and 10 Representative Claimants seeking Supplemental Monetary Awards: 54 for Qualifying Diagnoses of Alzheimer's Disease, 21 for Qualifying Diagnoses of Parkinson's Disease, 39 for Qualifying Diagnosis of Level 2 Neurocognitive Impairment, one for Qualifying Diagnosis of ALS (Amyotrophic Lateral Sclerosis), and one did not assert a Qualifying Diagnosis. This is six

more Supplemental claims than we reported in Status Report No. 22. Sections 15-18 of the Summary Report on the Settlement Website provide the status of Supplemental Monetary Award claims.

**9.** ***Supplemental Monetary Award Reviews and Payments.*** A Supplemental Monetary Award is the difference between the Monetary Award Grid value of the new Qualifying Diagnosis and the amount of the earlier Award for a different Qualifying Diagnosis. We have issued 66 Notices of Supplemental Monetary Award to eligible Settlement Class Members and denied 25 claims for a Supplemental Monetary Award. The combined Monetary Award After Offset value of these 66 Supplemental Monetary Awards was $70,630,301, but after subtracting the prior Monetary Award payments, totaled $36,175,533 as set out below in Table 9 (an increase of three claims totaling $226,831 since Status Report No. 22):

| Table 9 | SUPPLEMENTAL MONETARY AWARD CALCULATIONS | | | | |
|---|---|---|---|---|---|
| | SUPPLEMENTAL CLAIM | | PREVIOUSLY PAID CLAIM | | SUPPLEMENTAL MONETARY AWARD AMOUNT |
| | QUALIFYING DIAGNOSIS | AMOUNT | QUALIFYING DIAGNOSIS | AMOUNT | |
| | **Total for Claims 1-63**[15] | $69,901,617 | | $33,952,915 | $35,948,702 |
| 64. | Level 2.0 | $549,756 | Level 1.5 | $338,723 | $211,034 |
| 65. | Alzheimer's Disease | $11,619 | Level 1.5 | $7,984 | $3,635 |
| 66. | Alzheimer's Disease | $167,310 | Level 1.5 | $155,146 | $12,163 |
| | **Totals** | **$70,630,301** | | **$34,454,769** | **$36,175,533** |

[15] The payment amounts for the previous 63 Monetary Awards increased slightly from what was reported in Claims Administrator Status Report No. 22 because of inflation adjustments between the time of the Monetary Award Notice and payment and the release of 1% holdback amounts for Derivative Claimant payments associated with a claim.

The Program has paid 56 Retired NFL Football Players and five Representative Claimants a total of $33,728,914 for their Supplemental Monetary Awards. Section 2 of the Summary Report provides the payment details for Supplemental Monetary Awards by Qualifying Diagnosis.

## V. QUALIFIED MAF PHYSICIANS

**10.** ***Maintaining the MAF Network.*** Settlement Class Members and lawyers can locate Qualified MAF Physicians using the MAF Physician Locator Tool on the Settlement Website. There are 59 Qualified MAF Physicians on the website now, representing 32 of the 53 target cities closest to where the majority of living Retired NFL Football Players reside. Table 10 shows the changes in these numbers since Status Report No. 22:

| Table 10 | QUALIFIED MAF PHYSICIANS | | | |
|---|---|---|---|---|
| | ASPECT | AS OF 3/4/24 | AS OF 6/3/24 | CHANGE |
| 1. | Approved Physician – On Posted List | 64 | 59 | -5 |
| 2. | Target Cities Represented by Approved Physicians on Posted List | 32 | 32 | 0 |
| 3. | Approved Physician – Not yet Posted | 14 | 4 | -10 |

Unfortunately, the total number of actively scheduling physicians has declined since Status Report No. 22 because of the following reasons: one physician retired, another is recovering from surgery, and three physicians requested temporary hold status due to time constraints for evaluating players. A temporary hold means that the physician is removed from the posted list on the Public Website so that Players and firms will not call to schedule an MAF evaluation. We are prepared to reach out to our physicians on temporary hold in three to six months, depending on the circumstance, to confirm their scheduling status.

The Parties have recently approved four new Qualified MAF Physicians for the Program. These providers are located in or near the following target cities: Phoenix, Chicago, San Francisco, and Tampa. We are coordinating with these providers to schedule orientation training

within the next 4-6 weeks so they can start scheduling MAF exams soon. The number of approved physicians who are not yet scheduling has decreased by 10 because those doctors have been unresponsive to our attempts to contract with them, or they are no longer interested in participating.

Finally, we are continually exploring ways to enhance and strengthen the MAF Physician Network. Next quarter, in addition to recruiting new providers, we will revisit providers who are on temporary hold status to determine if they are willing to return to actively scheduling with Retired NFL Football Players. Also, we will reach out to providers who were approved but chose not to participate previously to see if their circumstances have changed and they wish to participate now.

**11.** ***150-Mile Rule.***

(a) Rule 9 of the Rules Governing Qualified MAF Physicians requires that a Retired NFL Football Player be examined by a Qualified MAF Physician whose office is within 150 miles of his primary residence.[16] We can make exceptions to this 150-Mile Rule if the exception is requested prior to the appointment.

We have received 338 requests for exceptions to the 150-Mile Rule, of which we granted 309 (91.4%) and denied 29 (8.6%). Table 11 shows the changes since Status Report No. 22:

[16] This requirement applies only to appointments made after April 11, 2019. Appointments made on or before April 11, 2019, did not need to be rescheduled with a different Qualified MAF Physician.

| Table 11 | REQUESTS FOR EXCEPTIONS TO 150-MILE RULE | | | | | | |
|---|---|---|---|---|---|---|---|
| | DECISION | HOW MANY | | | % OF TOTAL | | |
| | | AS OF 3/4/24 | AS OF 6/3/24 | CHANGE | AS OF 3/4/24 | AS OF 6/3/24 | CHANGE |
| 1. | Granted | 275 | 309 | +34 | 90.5% | 91.4% | +0.9% |
| 2. | Denied | 29 | 29 | 0 | 9.5% | 8.6% | -0.9% |
| 3. | Pending | 0 | 0 | 0 | 0.0% | 0.0% | 0.0% |
| **4.** | **Totals** | **304** | **338** | **+34** | | | |

(b) The 150-Mile Rule is a flexible rule with broad exceptions. Of the living Retired NFL Football Players registered in the Program, 83.6% have a Qualified MAF Physician within 150 miles of their primary residence. We work with those who do not to help them schedule appointments with physicians further away, when they tell us they are ready to be examined.

**12.** ***50-Mile Rule.*** Rule 10(b) of the Rules Governing Qualified MAF Physicians requires that, where neuropsychological testing is necessary as part of an MAF examination, the Qualified MAF Physician must refer a Retired NFL Football Player to a neuropsychologist who is located within 50 miles of the Qualified MAF Physician's office. Like the 150-Mile Rule, we have discretion to grant exceptions. We have received 49 requests for exceptions to the 50-Mile Rule, of which we granted 47 (95.9%) and denied two (4.1%). Table 12 shows how many exception requests we have received and our decisions on those requests (an increase of one since Status Report No. 22):

| Table 12 | REQUESTS FOR EXCEPTIONS TO 50-MILE RULE | | | | | | |
|---|---|---|---|---|---|---|---|
| | DECISION | HOW MANY | | | % OF TOTAL | | |
| | | AS OF 3/4/24 | AS OF 6/3/24 | CHANGE | AS OF 3/4/24 | AS OF 6/3/24 | CHANGE |
| 1. | Granted | 46 | 47 | +1 | 95.8% | 95.9% | +0.1 |
| 2. | Denied | 2 | 2 | 0 | 4.2% | 4.1% | -0.1 |
| **3.** | **Totals** | **48** | **49** | **+1** | | | |

Of the 59 Qualified MAF Physicians who are actively scheduling appointments, 53 (89.8%) have an approved neuropsychologist within 50 miles of their office, and we will grant exceptions on a case-by-case basis for the six Qualified MAF Physicians who do not.

**13.** ***Deviation Explanations for Level 1.5 and Level 2 Diagnoses.*** Under Rule 20 of the Rules Governing Qualified MAF Physicians, we request an explanation from a Qualified MAF Physician and/or neuropsychologist whenever the BAP criteria are not strictly followed on a diagnosis of Level 1.5 or Level 2 Neurocognitive Impairment, and we determine more information is needed. We cannot process these claims further until we receive the required explanation. There are currently 15 claims based on a diagnosis of either Level 1.5 Neurocognitive Impairment or Level 2 Neurocognitive Impairment that require additional explanation from a Qualified MAF Physician and/or neuropsychologist, representing less than 10% of all MAF Level 1.5 and Level 2 Claim Packages submitted to the Program. Table 13 shows how many claims require additional explanation from the Qualified MAF Physician before we can issue award or denial notices:

| Table 13 | CLAIMS REQUIRING ADDITIONAL EXPLANATION FROM QUALIFIED MAF PHYSICIANS[17] | | | | | | |
|---|---|---|---|---|---|---|---|
| | DIAGNOSIS TYPE | HOW MANY | | | % OF TOTAL | | |
| | | AS OF 3/4/24 | AS OF 6/3/24 | CHANGE | AS OF 3/4/24 | AS OF 6/3/24 | CHANGE |
| 1. | Level 1.5 | 4 | 4 | 0 | 0.9% | 0.5% | -0.4% |
| 2. | Level 2 | 13 | 11 | -2 | 4.8% | 2.7% | -2.1% |
| **3.** | **Totals** | **17** | **15** | **-2** | | | |

**14.** ***AAP Leadership Council.*** Two AAP members serve as our AAP Leadership Council to provide advice and assistance on medical issues arising in our oversight of the Qualified MAF Physician Network. We enlist their help, as needed, to review specific claims

[17] In Table 13 we updated how we calculated the % of total to include all MAF Level 1.5 and 2 claims submitted since the start of the Settlement Program.

or groups of claims to determine compliance by Qualified MAF Physicians with the Settlement Agreement, the Qualified MAF Physician Manual and any guidance materials or instructions we issued, and whether Claim Packages reflect and support the stated Qualifying Diagnoses. In addition, the AAP Leadership Council assists us by participating in our calls with Qualified MAF Physicians to offer medical guidance on making diagnoses under the Settlement Agreement criteria. The AAP Leadership Council also facilitates discussions and solicits guidance from the MAF Steering Committee, a group of five Qualified MAF Physicians, who render advice and assistance on providing peer-to-peer feedback to Qualified MAF Physicians and provide suggestions on how to improve the operations and performance of the network of Qualified MAF Physicians. Overall, our collaboration with the AAP Leadership Council has been successful, and the Qualified MAF Physicians have responded positively to receiving feedback from AAP members.

**15.** ***MAF Steering Committee.*** Five Qualified MAF Physicians serve on the MAF Steering Committee as authorized by Rule 24 of the Rules Governing Qualified MAF Physicians. The Committee members have participated in regular roundtable discussions with the AAP Leadership Council, assisted in developing training for the Qualified MAF Physicians to address most common issues, and provided other suggestions for improvement of the Qualified MAF Physicians network. Overall, the peer-to-peer communications regarding the operation and performance of the network of Qualified MAF Physicians has been positive.

## VI. AUDIT

**16.** ***Reports of Adverse Finding in Audit.*** Since Audit Report 22, we have issued one new Report of Adverse Finding in Audit, and we referred the Report to the Special Masters for a Rule 18 decision on whether they will accept it for an Audit Proceeding. We

have issued to the Parties 22 Reports of Adverse Finding in Audit affecting 595 Monetary Award claims. All 22 Audit Reports were then referred to the Special Masters. The 22 Audit Reports concern four neurologists, 12 neuropsychologists, five law firms, seven individual Settlement Class Members and one claims preparation company. Table 14 summarizes the Special Masters' and/or Court's decisions on these Audit Reports:

| Table 14 | DECISIONS ON AUDIT REPORTS | |
|---|---|---|
| | **DECISION** | **AUDIT REPORTS** |
| **1.** | Claims Denied in Audit | 12 |
| **2.** | Claims Removed from Audit and Subjected to Specialized Review | 4 |
| **3.** | Claims Removed from Audit and Returned to Normal Review | 3 |
| **4.** | All Claims Withdrawn before Decision | 1 |
| **5.** | Audit Proceeding Still in Progress | 2 |
| **6.** | **Total** | **22** |

**17.** ***Audit Proceeding Decisions.*** We have denied 395 claims after Audit based on decisions by the Court or Special Masters.[18] Sections 6, 9, and 15 of the Summary Report on the Settlement Website show these denials. A Settlement Class Member whose claim is denied after Audit may submit a new claim if based on a Qualifying Diagnosis that does not rely on records or opinions from disqualified doctors. There are 146 Settlement Class Members who submitted a new Monetary Award Claim following an Audit Denial, and 63 of them have been paid or are in the payment process.

**18.** ***Ongoing Audit Investigations.*** We have Audit investigations underway affecting 25 Monetary Award claims (three more than the number we reported in Status

[18] Of the 395 denials, 195 are associated with providers the Special Masters disqualified from participating in the Program: neurologist Dr. Ena Andrews (47 claims) and neuropsychologists Dr. Serina Hoover (139 claims), Dr. August Dolan-Henderson (four claims) and Dr. Darren Fuerst (five claims). Six individual Retired NFL Football Players' claims have been denied. The Special Masters directed us to deny 170 claims based on their findings related to the Special Investigator's investigation of a law firm. The Special Masters directed us to deny 23 claims based on their findings related to the investigation of a second law firm. We denied the remaining claim for failing to cooperate with our requests for information during an Audit.

Report No. 22). Of these, six are part of a possible multi-claim pattern, and the other 19 are individual claims.

**19.** ***Closed Audits.*** We have concluded the Audit investigations of 1,300 Settlement Class Members with Monetary Award claims by denying a claim through Audit, by making no adverse finding and removing a claim from Audit, or because the Settlement Class Member withdrew his or her claim during our Audit. Table 15 summarizes the reasons for these closures and changes in the numbers since Status Report No. 22:

| **Table 15** | **CLOSED AUDITS** | | | |
|---|---|---|---|---|
| | **REASON FOR CLOSURE** | **AS OF 3/4/24** | **AS OF 6/3/24** | **CHANGE** |
| 1. | Claim Denied in Audit | 395 | 395 | +0 |
| 2. | No Finding of Misrepresentation, Omission, or Concealment | 687 | 698 | +11 |
| 3. | Claim Withdrawn by Settlement Class Member | 207 | 207 | +0 |
| **4.** | **Totals** | **1,289** | **1,300** | **+11** |

**20.** ***Claims Investigated More than Once.*** Claims on which we have concluded an Audit may be the subject of another Audit if we later learn of information that requires further investigation. We notify Settlement Class Members when this happens. We have audited 102 Monetary Award claims more than one time (the same as we reported in Status Report No. 22); the most times a Monetary Award claim has been audited is twice.

## VII. DERIVATIVE CLAIMANTS

**21.** ***Derivative Claims.*** We have received 617 Derivative Claim Packages (an increase of one since Status Report No. 22). Table 16 shows the status of these claims:

| Table 16 | DERIVATIVE CLAIMS | | |
|---|---|---|---|
| | **STATUS** | **HOW MANY** | **% OF TOTAL** |
| 1. | Paid Derivative Claimant Award ($1,104,672[19]) | 240 | 39% |
| 2. | Derivative Claimant Award Notice Issued but Not Paid ($5,837) | 2 | <1% |
| 3. | Denied – Associated Retired NFL Football Player's Claim Denied | 48 | 8% |
| 4. | Denied – No Timely Claim for Associated Retired NFL Football Player | 42 | 7% |
| 5. | Denied – No Timely or Proper Registration for Associated Retired NFL Football Player | 35 | 6% |
| 6. | Denied – Retired NFL Football Player's Claim Withdrawn During Statute of Limitations Proceeding | 16 | 3% |
| 7. | Denied – Untimely Derivative Claim Package | 13 | 2% |
| 8. | Denied – Deceased Derivative Claimant | 4 | 1% |
| 9. | Denied – Derivative Claimant Not Registered | 1 | <1% |
| 10. | Successful Challenge to Derivative Claimant - Not Eligible | 15 | 2% |
| 11. | Withdrawn | 8 | 1% |
| 12. | Derivative Claim Package Receipt Notice Issued (no action required because the associated Retired NFL Football Player has not yet submitted a claim, or his claim status was not final) | 193 | 31% |
| **13.** | **Total** | **617** | |

We have not issued any Notices of Derivative Claimant Award since Status Report No. 22. Table 17 shows how many eligible Derivative Claimants received the entire 1% amount deducted from the associated Retired NFL Football Player's Monetary Award, and how many shared that 1% amount with other eligible Derivative Claimants:

[19] This includes payment for additional Derivative Claimant Awards issued because the associated Retired NFL Football Player's Monetary Award, and resulting 1% deduction, increased after rescoring under the Norming Agreement.

| Table 17 | SHARED AWARD STATUS FOR ELIGIBLE DERIVATIVE CLAIMANTS | | | | | | |
|---|---|---|---|---|---|---|---|
| | **STATUS** | **HOW MANY** | | | **% OF TOTAL** | | |
| | | **AS OF 3/4/24** | **AS OF 6/3/24** | **CHANGE** | **AS OF 3/4/24** | **AS OF 6/3/24** | **CHANGE** |
| 1. | Received Entire 1% Amount | 64 | 64 | 0 | 26% | 26% | 0% |
| 2. | Shared 1% Amount with Other Eligible Derivative Claimants[20] | 178 | 178 | 0 | 74% | 74% | 0% |
| **3.** | **Totals** | **242** | **242** | **0** | | | |

The 242 Derivative Claimants who received Notices of Derivative Claimant Award are associated with 120 Retired NFL Football Players. We issued payment to two Derivative Claimants since Status Report No. 22 and have paid 240 (99%) of the 242 Derivative Claimants with Notices of Derivative Claimant Award; both of the eligible Derivative Claimants who have not been paid are in the payment process.

**22.** ***Additional Derivative Claimant Details.*** We received challenges from 29 Retired NFL Football Players (or their Representative Claimants) to 41 Derivative Claimants (no change since Status Report No. 8); 19 (46%) of those 41 challenged Derivative Claimants are not eligible for a Derivative Claimant Award because they never submitted a timely Derivative Claim Package. We have issued a Notice of Derivative Claim Package Submission Deadline to 522 registered Derivative Claimants. Table 18 summarizes their claim submission statuses and the changes since Status Report No. 22:

[20] We have not received an Allocation Objection from any of the Derivative Claimants who equally shared a 1% Derivative Claimant Award with other Derivative Claimants associated with the same Retired NFL Football Player.

| Table 18 | CLAIM STATUS FOR DERIVATIVE CLAIMANTS WITH DERIVATIVE CLAIM PACKAGE SUBMISSION DEADLINE NOTICE | | | | | | |
|---|---|---|---|---|---|---|---|
| | STATUS | HOW MANY | | | % OF TOTAL | | |
| | | AS OF 3/4/24 | AS OF 6/3/24 | CHANGE | AS OF 3/4/24 | AS OF 6/3/24 | CHANGE |
| 1. | Claim Submitted | 161 | 162 | +1 | 31% | 31% | 0% |
| 2. | No Claim Submitted | 356 | 360 | +4 | 69% | 69% | 0% |
| 3. | Within 30-Day Deadline | 2 | 0 | -2 | <1% | 0% | -<1% |
| **4.** | **Totals** | **519** | **522** | **+3** | | | |

**23.** ***Supplemental Derivative Claimant Awards.*** Section G of the Overview of Derivative Claimant Process on the Settlement Website (https://www.nflconcussionsettlement.com/Docs/DerivativeClmtProcessOverview.pdf) explains how Supplemental Derivative Claimant Awards are handled. As discussed in Paragraph 9 of this Status Report, we issued Notices of Supplemental Monetary Award to 66 Retired NFL Football Players (an increase of three since Status Report No. 22). Of those 66, 57 Retired NFL Football Players had no registered Derivative Claimants associated with them, and five Retired NFL Football Players each had one registered Derivative Claimant, but those five Derivative Claimants did not submit Derivative Claim Packages to share 1% of the Retired NFL Football Players' earlier Monetary Awards and were not eligible for any portion of the Players' Supplemental Monetary Awards. The last four Players' Supplemental Monetary Award Notices had a 1% offset for potential Derivative Claimant Awards, which have been issued to the associated Derivative Claimants, as described in Table 19:

| Table 19 | SHARED SUPPLEMENTAL AWARD STATUS FOR ELIGIBLE DERIVATIVE CLAIMANTS | | | | | | |
|---|---|---|---|---|---|---|---|
| | STATUS | HOW MANY | | | % OF TOTAL | | |
| | | AS OF 3/4/24 | AS OF 6/3/24 | CHANGE | AS OF 3/4/24 | AS OF 6/3/24 | CHANGE |
| 1. | Received Entire 1% Amount | 3 | 3 | +0 | 100% | 43% | -57% |
| 2. | Shared 1% Amount with Other Eligible Derivative Claimants | 0 | 4 | +4 | 0% | 57% | +57% |
| **3.** | **Totals** | **3** | **7** | **+4** | | | |

Three of the Derivative Claimants with Supplemental Derivative Claimant Awards have been paid a total of $20,563; the other four, whose gross awards total $2,132, are not yet ready for the payment process.

## VIII. OTHER CLAIM PROCESSES

**24.** ***Handling of Attempted Assignments of Claims.*** On September 27, 2019, the Court issued a Notice (Document 10858) directing us to streamline the process regarding attempted assignments by Settlement Class Members of claims to third-party lenders. At that time, we suspended the process for handling such assignment questions under the Rules Governing Assignment of Claims and worked with the Court and the Special Master to modify these Rules. On March 19, 2020, the Special Masters adopted the Rules Governing Payment of Claims Involving Third-Party Funders and the Rules Governing Third-Party Funding Resolution Protocol, which superseded the previous Rules (collectively, the "New Payment Rules"). Under the New Payment Rules Governing Payment of Claims Involving Third-Party Funders, all Settlement Class Members must complete and submit a Sworn Statement regarding the Status of Assignment of Monetary Claim ("SWS-5") to receive payment. There are two versions of the SWS-5, one for those identified as a borrower by a Third-Party Funder that is participating in the Rules Governing Third-Party Funding Resolution Protocol ("Resolution Protocol") (the SWS-5(A)) and another for those not so

identified (the SWS-5(B)). As of June 3, 2024, 25 Third-Party Funder entities are participating in the Resolution Protocol. We have worked with those participating funders to resolve cash advances for 50 Settlement Class Members since the adoption of the New Payment Rules.

**25.** ***Petitions for Deviation from the Attorneys' Fee Cap.***[21] We have received eight Petitions for Deviation, one of which was withdrawn. The Court resolved three of the remaining seven Petitions for Deviation in conjunction with the Attorneys' Liens Dispute Process: two by final decision, and one upheld on appeal by the Third Circuit. The other four Petitions are pending final resolution.

**26.** ***Non-Medical Liens Process and Attorneys' Lien Disputes.***

(a) On September 21, 2023, the Court issued an order referring attorney lien disputes to the Special Masters following the retirement of Magistrate Judge David Strawbridge. The Special Masters authored new Rules Governing Attorney Liens, which were approved by the Court on September 27, 2023. These Rules are available on the Settlement Website – under "Governing Documents", click "Governing Rules" and "Attorney Liens".

(b) Table 20 summarizes Non-Medical Lien assertions, notices and disputes by Lien type and reflects changes to those numbers since Status Report No. 22:

[21] Judge Brody entered a Memorandum and Order in April of 2018 limiting attorneys' fees in the Program to 22% of each SCM's Monetary Award, plus reasonable costs (ECF Nos. 9862 and 9863). In the Memorandum, the Judge decided that attorneys should have the opportunity to petition the Court to go above and beyond the cap in exceptional circumstances, which is what the Petitions for Deviation process is meant to cover.

| Table 20 | NON-MEDICAL LIENS SUMMARY | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | LIEN TYPE | LIENS ASSERTED | | | NOTICES OF LIEN ISSUED BY CLAIMS ADMINISTRATOR | | | LIENS DISPUTED BY SETTLEMENT CLASS MEMBERS | | |
| | | AS OF 3/4/24 | AS OF 6/3/24 | CHANGE | AS OF 3/4/24 | AS OF 6/3/24 | CHANGE | AS OF 3/4/24 | AS OF 6/3/24 | CHANGE |
| 1. | Attorneys' | 2,155[22] | 2,183[23] | 28 | 599 | 623 | 24 | 247 | 258 | 11 |
| 2. | Child Support | 357 | 358 | 1 | 58 | 63 | 5 | 16 | 19 | 3 |
| 3. | Judgment | 70 | 71 | 1 | 19 | 19 | 0 | 9 | 9 | 0 |
| 4. | Tax | 57 | 57 | 0 | 3 | 3 | 0 | 0 | 0 | 0 |
| **5.** | **Totals** | **2,639** | **2,669** | **30** | **679** | **708** | **29** | **272** | **286** | **14** |

(c) Table 21 shows the status of Liens in the Attorneys' Liens dispute resolution process:

| Table 21 | ATTORNEYS' LIENS IN DISPUTE RESOLUTION PROCESS[24] | | |
|---|---|---|---|
| PENDING | RESOLVED | | TOTAL |
| | BY AGREED WITHDRAWAL | BY COURT DETERMINATION | |
| 17 | 238 | 30 | 285 |

(d) Table 22 breaks down the Non-Medical Lien holdbacks[25] by Lien type:

| Table 22 | NON-MEDICAL LIEN HOLDBACKS | | | |
|---|---|---|---|---|
| | LIEN TYPE | MONETARY AWARDS AFFECTED | MONETARY AWARD AMOUNTS | LIEN HOLDBACKS |
| 1. | Attorneys' | 14 | $35,588,150.28 | $2,257,823.96 |
| 2. | Child Support | 2 | $946,969.00 | $238,168.14 |
| 3. | Judgment | 2 | $2,036,500 | $846,926 |
| 4. | Tax | 0 | N/A | N/A |

[22] These 2,155 Liens were asserted by 67 law firms.
[23] These 2,183 Liens were asserted by 67 law firms.
[24] Attorneys' Liens enter the dispute resolution process after a Settlement Class Member's Monetary Award is funded and we issue a Notice of Duty to Resolve Lien Dispute.
[25] The holdbacks are the amount of funds we are withholding pending resolution of a Dispute. As of 6/3/24, there are 17 disputed Attorneys' Liens currently pending resolution where the Settlement Class Member has or will receive payment of the rest of his Monetary Award. After the Court enters a final order resolving the Disputes and any appeal period passes, or the parties submit an agreed Withdrawal, we disburse the held back funds on the next available monthly Disbursement.

Case 2:12-md-02323-AB Document 12419 Filed 07/17/24 Page 28 of 34

| Table 22 | NON-MEDICAL LIEN HOLDBACKS | | | |
|---|---|---|---|---|
| | **LIEN TYPE** | **MONETARY AWARDS AFFECTED** | **MONETARY AWARD AMOUNTS** | **LIEN HOLDBACKS** |
| 5. | **Totals** | **18** | **$38,571,619.28** | **$3,342,918.10** |

(e) Table 23 summarizes the Non-Medical Lien payments from initial Monetary Awards[26] by Lien type:

| Table 23 | NON-MEDICAL LIEN PAYMENTS FROM INITIAL MONETARY AWARDS | | | |
|---|---|---|---|---|
| | **LIEN TYPE** | **MONETARY AWARDS AFFECTED** | **MONETARY AWARD AMOUNTS** | **LIEN PAYMENTS** |
| 1. | Attorneys' | 222 | $258,068,305 | $13,174,573 |
| 2. | Child Support | 21 | $17,590,635 | $1,712,697 |
| 3. | Judgment | 8 | $9,603,542 | $2,949,192 |
| 4. | Tax | 1 | $33,283 | $6,493 |
| **5.** | **Totals** | **252** | $285,295,765 | $17,842,955 |

## IX. COMMUNICATIONS CENTER FOR THE PROGRAM

**27.** ***Our Contact Activity.*** Since our contact center opened on February 6, 2017, we have handled 107,478 total communications, including 63,294 calls made or received and 39,267 emails to us at our Claims Administrator email box. Since Status Report No. 22, we handled 2,840 such total communications. The most common topics of these communications have been Payment, General Settlement Information, Change in Lawyers, Baseline Assessment Program (BAP), and Represented Claimant.

**28.** ***Law Firm Contacts.*** Our Law Firm Contacts are assigned to 585 different law firms or lawyers representing Settlement Class Members in the Program. This is two more law

[26] We also have issued $115,348.30 in Lien payments from Supplemental Monetary Awards and $1,442.10 from Derivative Claimant Awards.

Case 2:12-md-02323-AB Document 12419 Filed 07/17/24 Page 12 of 34

firms or lawyers than we reported in Status Report No. 22. The calls and emails handled by the Law Firm Contacts are part of the total contact activity described in Paragraph 27 above.

**29.** ***Insights Newsletters.*** Since Status Report No. 22, we issued one new edition of our quarterly "Insights" newsletter (First Quarter 2024). We send the newsletters to unrepresented Settlement Class Members and lawyers by email or mail. We also post them to the Settlement Website at https://www.nflconcussionsettlement.com/Newsletters.aspx (under "Useful Information" click "Newsletters"). We invite all lawyers and Settlement Class Members to send us suggested topics for our newsletters by email to ClaimsAdministrator@NFLConcussionSettlement.com or through the online submission screen on the Newsletters page of the Settlement Website.

**30.** ***Program Doctors Newsletters.*** In the fourth quarter of 2020, we issued our first newsletter to MAF Physicians as a tool to share relevant and valuable information. With the Second Quarter 2021 edition, we expanded our newsletter audience to include all Program doctors. We emailed the Second Quarter 2024 Program Doctors Newsletter on May 16, 2024, to all Qualified MAF Physicians, Qualified BAP Providers and other approved evaluating Neuropsychologists. All Program Doctors also can access the newsletters on their Provider Portals. The newsletter provided information on communications with Retired NFL Football Players and their lawyers, preparing Players for exams, informants at exams, Provider Portal tips and reminders, and applying the CDR Scale.

**31.** ***Settlement Program Website.*** We regularly update the Settlement Website to reflect progress and changes to the Program. Since Status Report No. 22 in March 2024, we made these changes:

(1) Posted a Report of the Special Masters (Document 12384, filed March 25, 2024), BAP Administrator Status Report No. 20 (Document 12385, filed

March 25, 2024), and Claims Administrator Status Report No. 22 (Document 12386, filed March 25, 2024) to the Status Reports page at https://www.nflconcussionsettlement.com/Status_Reports.aspx.

(2) Created a new "Attorneys' Lien Disputes" category under the Special Master section on the Governing Decisions page with 28 documents related to the resolution of attorney fee issues (https://www.nflconcussionsettlement.com/PD-SpecialMasterDecisions-AttorneyLienDispute.aspx).

Special Master Decisions
Click on the 'Court' button to view governing decisions issued by the Court and the 'Special Master' button to view governing Special Master decisions. The material on each page is grouped by subject matter. Use the buttons on each page to view decisions under the subject matter you are interested in.
Special Master
Court
Monetary Award Claims
Audit
Attorneys' Lien Disputes

(3) The Program's Home page has had 20,270 visits since Status Report No. 22, with 33,964 unique page views. The five most frequently visited pages since March, after Home and Login, were Governing Decisions – Special Master – Monetary Award Claims (811 unique views), Physician Search (717 unique views), Alerts (639 unique views), Reports and Statistics (561 unique views), and Frequently Asked Questions (330 unique views). Also since March, visitors conducted 3,257 searches on the website using 971 unique keywords and completed 2,801 unique downloads. The top five downloaded documents were the November 21, 2023 update on transition of BAP Administrator duties to BrownGreer, accessed through the link on the Home page of the public website and all Portals (627 clicks), Settlement Agreement (580 clicks), the February 12, 2024 Alert regarding the release of Common Benefit Fund holdbacks (275 clicks), Monetary Award Grid (126 clicks), and Claims Administrator Status Report No. 22 (60 clicks).

## X. SPECIAL MASTERS

**32.** ***Our Work with the Special Masters.*** Since the Program's inception, we have continued to have regularly scheduled calls with the Special Masters to discuss policy and operational issues. We also participate in many other calls and exchange countless emails with the Special Masters to address issues as they arise. The Special Masters have the final say in how the Settlement is implemented, subject only to the Court's oversight.

**33.** ***Program Rules.*** There are 10 sets of Rules available on the Settlement Website (under "Governing Documents," click "Governing Rules") and on the online portals of law firms, lawyers and pro se Settlement Class Members. We have not made changes to any posted Rules since Status Report No. 22 filed in March 2024.

**34.** ***Published Decisions.*** Since Status Report No. 22, the Special Masters issued two new decisions they designated for publication. Both of these decisions relate to how we analyze claims for Monetary Awards.

### Alzheimer's Disease Diagnostic Criteria

March 15, 2024

A Retired NFL Football Player appealed the Claims Administrator's denial of his Alzheimer's Disease claim, arguing that the AAPLC and the Claims Administrator erred in concluding that the Player's MoCA scores (to detect mild cognitive impairment and dementia), depression and migraine symptoms, and biomarker testing intertwined to contraindicate Alzheimer's Disease. The Special Master denied the appeal after concluding that the non-linear trajectory of the Player's MoCA score, and the absence of biomarkers, combined to support the Claims Administrator's determination. The Special Master further concluded that use of biomarkers as probative, not dispositive, evidence in diagnosing Alzheimer's is consistent with the DSM-5 definition and thus the Settlement Agreement, and that the Claims Administrator is empowered to make sure that Diagnosing Physicians practices in using biomarkers is reasonably consistent.

### Functional Impairment and Alternative Causation

March 29, 2024

The Special Master rejected a Retired NFL Football Player's appeal of the Claims Administrator's denial of his Supplemental Level 2.0 claim. The neurologist's failure to show that the Player's CDR scores were assigned due to cognitive loss, and not other factors, led to the Supplemental Claim's denial. A diagnosing physician's articulated consideration of confounding factors is typically sufficient to establish that a Player's impairment is generally consistent with the Settlement's requirements. Here however, the neurologist never discussed the Player's depression and anxiety as possible contributors of his functional impairment, despite multiple inquiries. Both because the evidence of the Player's functional loss was partially inconsistent with the required showing under the injury definitions, and because his physician did not attempt to show that it resulted from cognitive loss, as opposed to mental health and other factors, the Special Master found that the Player did not offer clear and convincing evidence of error in the denial.

We post all such rulings to the Settlement Website (under “Governing Documents” select “Governing Decisions” and then click the Monetary Award Claims button on the Special Master tab). The Special Masters have so far issued 78 published Monetary Award appeal decisions and 12 Audit decisions (90 total such decisions).[27]

## XI. FREQUENTLY ASKED QUESTIONS

**35.** ***Frequently Asked Questions.*** We have not added any new FAQs or made substantive revisions to existing FAQs since Status Report No. 22. There now are 391 FAQs in 18 categories. These FAQs contain links to other tools and resource guides posted on the Settlement Website to help Settlement Class Members and their lawyers navigate the Program. The banner at the top of the page contains a link to a printable PDF version of the full set of FAQs. Note that when we add new FAQs, we place them within the existing set where it makes the most sense. This means that the numbering of FAQs within the set may change from time to time.

## XII. REGISTRATION

**36.** ***Registration Submissions.***

(a) Sections 1 and 2 of the Summary Report on the Settlement Website cover Registrations. Table 24 shows changes in the number of timely Registration submissions since our Status Report No. 22:

| Table 24 | TIMELY REGISTRATION SUBMISSIONS | | | |
|---|---|---|---|---|
| | TYPE OF SETTLEMENT CLASS MEMBER | AS OF 3/4/24 | AS OF 6/3/24 | CHANGE |
| 1. | Retired NFL Football Players | 15,810 | 15,799 | -11 |
| 2. | Representative Claimants | 1,435 | 1,445 | +10 |
| 3. | Derivative Claimants | 3,328 | 3,328 | 0 |

[27] On October 28, 2020, the Special Master issued contextually similar decisions on deviation from BAP Criteria for six claimants. One of the six decisions appears on the Settlement Website.

| Table 24 | TIMELY REGISTRATION SUBMISSIONS | | | |
|---|---|---|---|---|
| | TYPE OF SETTLEMENT CLASS MEMBER | AS OF 3/4/24 | AS OF 6/3/24 | CHANGE |
| 4. | Totals | 20,573 | 20,572 | -1[28] |

The number of Retired NFL Football Players (Row 1) went down by 11 from Status Report No. 22 because ten were replaced by Representative Claimants and one was removed as a duplicate after we determined the Player had already registered under a different Settlement Program ID. Of the 20,572 to whom we issued Registration notices, we were able to confirm that 19,411 of them are Settlement Class Members under the Settlement Agreement, 12,837 of whom are Retired NFL Football Players eligible to participate in the BAP. The other 1,161 persons are not Settlement Class Members under the Settlement Agreement because of one or more of these reasons: (1) they were on an Active Roster as of July 7, 2014; (2) they did not play "NFL Football" as defined in the Settlement Agreement; (3) they opted out of the Settlement Program; (4) they did not provide us with the information or support required by the Settlement Agreement to register, after several notices from us and up to 150 days to turn it in; or (5) they tried to register as a Derivative Claimant but did not have a relationship with the Retired NFL Football Player by which they had a right under applicable state law to sue independently or derivatively.

(b) We are responsible for determining whether registrations submitted after August 7, 2017, meet one of the good cause exceptions specified in Section 4.2(c)(i) of the Settlement Agreement or can otherwise be accepted under the Rules Governing Registration Determinations and Appeals. We have made determinations on 336 such Registrations and

[28] There is a net loss of one timely Registration submission because we determined that a Retired NFL Football Player previously had registered under a different Settlement Program ID and was being counted twice in the Timely Registration Submission Total.

found that 176 (52%) of them presented good reasons to be allowed to register after August 7, 2017. Table 25 shows the change in these numbers since Status Report No. 22:

| Table 25 | REGISTRATIONS SUBMITTED AFTER AUGUST 7, 2017 | | | |
|---|---|---|---|---|
| | **STATUS** | **AS OF 3/4/24** | **AS OF 6/3/24** | **CHANGE** |
| 1. | Accepted | 176 | 176 | 0 |
| 2. | Not Accepted | 159 | 160 | +1 |
| **3.** | **Totals** | **335** | **336** | **+1** |

(c) Settlement Class Members who disagree with our Registration determinations may object to them by sending us a challenge. The NFL Parties also may challenge our good cause exception decisions. We have received 384 challenges, which is two more than the number we have reported since Status Report No. 22. Table 26 explains these challenges and what happened to them:

| Table 26 | CHALLENGES OF OUR REGISTRATION DETERMINATIONS | | | | |
|---|---|---|---|---|---|
| | **ISSUE** | **HOW MANY** | **WHO CHALLENGED** | **CHALLENGE SUCCESSFUL** | **CHALLENGE NOT SUCCESSFUL** |
| 1. | Not a Retired NFL Football Player | 46 | Settlement Class Member | 23 | 23 |
| 2. | Not Eligible for the BAP | 245 | Settlement Class Member | 77 | 168 |
| 3. | Not Properly Registered | 53 | Settlement Class Member | 44 | 9 |
| 4. | Granted Good Cause Extension for Untimely Registration | 9 | NFL | 1 | 8 |
| 5. | Denied Good Cause Extension for Untimely Registration | 29 | Settlement Class Member | 5 | 24 |
| 6. | Not a Valid Derivative Claimant Relationship | 2 | Settlement Class Member | 0 | 2 |
| **7.** | **Totals** | **384** | | **150** | **234** |

Those who are not successful in challenging Registration determinations to us may appeal our decision to the Special Masters. Table 27 shows the appeals thus far and the Special Masters' rulings on them:

| Table 27 | APPEALS OF OUR DECISIONS ON REGISTRATION CHALLENGES | | | | |
|---|---|---|---|---|---|
| | **ISSUE** | **HOW MANY** | **WHO APPEALED** | **DECISION UPHELD** | **DECISION OVERTURNED** |
| 1. | Not a Retired NFL Football Player | 3 | Settlement Class Member | 3 | 0 |
| 2. | Not Eligible for the BAP | 26 | Settlement Class Member | 24 | 2 |
| 3. | Not a Valid Derivative Claimant Relationship | 1 | Settlement Class Member | 1 | 0 |
| 4. | Denied Good Cause Extension for Untimely Registration | 9 | Settlement Class Member | 8 | 1 |
| **5.** | **Totals** | **39** | | **36** | **3** |

**37.** ***Centralized Process for Appointment of Representative Claimants and Derivative Claimant Representatives.*** The Special Masters have approved 488 petitions from persons to serve as the Representative Claimant of a deceased or legally incapacitated or incompetent Retired NFL Football Player and three petitions from Derivative Claimant Representatives to act on behalf of minor Derivative Claimants. There have been 10 new Representative Claimant approvals and no new Derivative Claimant Representatives since Status Report No. 22.

## XIII. CONCLUSION

**38.** ***General Status.*** We have 301,412 document files (23,028 gigabytes, or 23 terabytes of registration and claims data), including notices we have issued, stored on Settlement Class Members, which is 21,212 more than when we filed Status Report No. 22. We have issued 57,002 notices (280 more since Status Report No. 22) to 21,043 different persons since March 23, 2017. There are 759 documents posted on the Settlement Website.

Respectfully submitted,

**CLAIMS ADMINISTRATOR**

By: /s/ Roma Petkauskas
Roma Petkauskas
Virginia State Bar No.: 71357
BrownGreer PLC
250 Rocketts Way
Richmond, Virginia 23231
Telephone: (804) 521-7218
Facsimile: (804) 521-7299
Email: rpetkauskas@browngreer.com